No. 25-1384

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

SVITLANA DOE, *et al.*,

*Plaintiffs-Appellees*,

v.

KRISTI NOEM, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-10495-IT (Hon. Indira Talwani)

———————————————

## PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO
## EMERGENCY MOTION FOR STAY PENDING APPEAL

———————————————

Justin B. Cox
LAW OFFICE OF JUSTIN B. COX
*JAC Cooperating Counsel*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

John A. Freedman
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES ....................................................... ii

INTRODUCTION .............................................................1

BACKGROUND .............................................................3

ARGUMENT ...............................................................8

I.     Defendants-Appellants cannot show they will be irreparably harmed absent a stay.................................................................9

II.    Defendants-Appellants fail to make a "strong showing" they are likely to succeed on their appeal ................................12

    A.    The Court properly exercised jurisdiction..............................12

    B.    The Court correctly held that Plaintiffs-Appellants met their burden on the merits of their claims .........................14

III.   Defendants-Appellants have failed to show that a stay would not substantially injure Plaintiffs-Appellees and class members...........................20

CONCLUSION ...............................................................21

CERTIFICATE OF COMPLIANCE...................................22

CERTIFICATE OF SERVICE ...........................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Texas*,
   597 U.S. 785 (2022)..........................................................................10, 13, 18, 19

*Bouarfa v. Mayorkas*,
   604 U.S. 6 (2024)...............................................................................12

*DHS v. Regents of the University of California*,
   591 U.S. 1 (2020)...............................................................................14

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ........................................................11

*Hassan v. Chertoff*,
   593 F.3d 785 (9th Cir. 2010) ..........................................................13

*Kucana v. Holder*,
   558 U.S. 233 (2010)..........................................................................12

*LaMarche v. Mayorkas*,
   691 F. Supp. 3d 274 (D. Mass. 2023).............................................13

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..........................................................................15

*New Jersey v. Trump*,
   131 F.4th 27 (1st Cir. 2025)......................................................8, 9, 11

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021)..........................................................................18

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................8, 9

*Roe v. Mayorkas*,
   No. 22-cv-10808-ADB, 2023 WL 3466327
   (D. Mass. May 12, 2023) .................................................................13

*Samirah v. Holder*,
    627 F.3d 652 (7th Cir. 2010) ................................................................. 13

*Samirah v. O'Connell*,
    335 F.3d 545 (7th Cir. 2003) ................................................................. 13

*Turner v. U.S. Att'y Gen.*,
    130 F.4th 1254 (11th Cir. 2025) ........................................................... 16

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................. 9

*Zheng v. Napolitano*,
    No. 09-cv-00347, 2009 WL 1258908 (D. Colo. May 4, 2009) ........................ 19

## Statutes and Regulations

8 U.S.C. § 1182(d)(5)(A) ................................................................. 2, 12

8 U.S.C. § 1225(b)(1)(iii)(II) ................................................................. 2

8 U.S.C. § 1252(a)(2)(B)(ii) ................................................................. 12

8 C.F.R. § 212(e)(2)(i) ................................................................. 15

8 C.F.R. § 212.5(e)(2)(i) ................................................................. 19

8 C.F.R. § 235.3(b)(1)(ii) ................................................................. 16

iii

## INTRODUCTION

Over the course of the two years immediately preceding President Trump's inauguration on January 20, 2025, Customs and Border Protection (CBP) officers across the country granted parole, on a case-by-case basis, to approximately 530,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela who had applied from abroad with a U.S.-based financial sponsor, passed security checks, and were given permission to fly to an interior port of entry (an airport). The parolees were generally given two-year grants of parole and, per longstanding regulations, could obtain employment authorization while also applying for other forms of immigration relief. Over the last 70 years, there have been well over a hundred similar parole processes that were used by every Administration, including the first Trump Administration, and for similar reasons. During the 2024 campaign, however, President Trump criticized the CHNV parole processes; and on January 20, he ordered that they be terminated. DHS formally did so in a Federal Register Notice (FRN) published on March 25, announcing that it would no longer accept applications, had cancelled already-approved applications, and would summarily deny the millions of pending applications. The current appeal does not concern those aspects of the FRN.

Additionally, however, the FRN also purported to cut short all existing grants of parole to CHNV nationals, affecting approximately 400,000 parolees, as of April 24, 2025 (30 days from publication), and no matter how much time remained on a

given parole period or any other individualized circumstance. DHS acknowledged the considerable reliance interests of the parolees but explained that it had decided against "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done," because doing so would mean that some CHNV parolees "may begin to accrue more than two years of continuous presence in the United States," thereby becoming statutorily ineligible for "expedited" removal—the abbreviated removal process without judicial review and other procedural protections. App-062.

But DHS got the law wrong, and in more ways than one: not only does the Immigration and Nationality Act (INA) require that parole conditions be "prescribe[d] only on a case-by-case basis," 8 U.S.C. § 1182(d)(5)(A), it also does not permit subjecting someone who has "been admitted or paroled" to expedited removal *no matter how long they have been here*, 8 U.S.C. § 1225(b)(1)(iii)(II). So Plaintiffs filed suit and, following briefing and argument, the district court granted their request for a stay under 5 U.S.C. § 705 of the FRN to the extent that it truncated all existing grants of CHNV parole.

A week after the district court's stay opinion, Defendants moved this Court for a stay pending appeal, *see* Mot., but they cannot make the showings required to justify that relief. Defendants can identify no legal error in the district court's well-reasoned opinion and do not contest its factual findings. Instead, Defendants rely on

2

mischaracterizing the FRN and the district court's order, claiming that it imposes great hardship on the government when, in fact, it has no effect on DHS's decision to end the CHNV parole processes; does not prohibit DHS from revoking anyone's parole; does not prohibit DHS from removing anyone; and does not require DHS to do anything at all *except* to respect the district court's preliminary conclusion that the FRN's attempt to truncate parole *en masse* was based on DHS's patently incorrect understanding of the law. To the extent Defendants have complaints, it is with the statutes Congress has enacted and the rule of law itself, which does not justify the requested relief, particularly given the irreparable harm that would result from hundreds of thousands of hardworking and law-abiding people across the country becoming undocumented and legally unemployable overnight.

## BACKGROUND

Since the INA was enacted in 1952, U.S. law has authorized immigration "parole, a form of temporary permission to be in the country. The statute currently reads in relevant part:

> The Secretary of Homeland Security may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the

3

United States.

App-002; *see also* App-311. Starting in 1956 with President Eisenhower's creation of a parole program for Hungarians fleeing a Soviet crackdown, every administration has used the parole authority on a "categorical" or "programmatic" basis to permit large numbers of noncitizens to come to the United States when other immigration pathways were unavailable, insufficiently expeditious, or otherwise inadequate. App-320-41. These parole processes usually provide criteria and guidance as to when parole could be appropriate—typically by reference to nationals of specified countries who present additional enumerated factors or circumstances—with applicants then assessed individually on a case-by-case basis. *See, e.g.*, App-342-427. Over the last seven decades, there have been at least 126 "categorical" or "programmatic" parole processes of this nature. App-314-19.

On October 19, 2022, DHS announced a parole process to address the increasing number of Venezuelans arriving at the southern border, "coupl[ing] a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly." App-002. Under the process, individuals who passed security checks and who had a U.S. sponsor committed to providing financial support could receive advance authorization to travel to the United States to request parole at an internal port of entry. *Id.* In early 2023, DHS expanded it and implemented similar processes

for nationals of Cuba, Haiti, and Nicaragua. App-003.

Under these programs, approximately 530,000 people were paroled into the United States on a case-by-case basis. This includes eight pseudonymous plaintiffs—Armando, Ana, Carlos, Andrea, Lucia, Miguel and Daniel Doe—each of whose families faced political persecution, threats from non-state actors, and/or economic hardship in their home countries. App-011-17. Five of them were sponsored by U.S. citizen family members who are also plaintiffs. App-230-44.

Starting on January 20, 2025, Defendants have engaged in a series of actions to terminate established parole processes and to prevent parolees from obtaining more permanent status for which Congress has made them eligible. On January 20, President Trump issued two relevant Executive Orders. The first (No. 14165) directed the DHS Secretary to "take all appropriate action … [to t]erminate all categorical parole programs." App-004. The second (No. 14159) directed the Secretary to "ensure that the parole authority … is exercised on only a case-by-case basis … [and] only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States." *Id.*

Following several other actions, App-004-06, on March 25, DHS published the FRN announcing that, effective immediately, DHS "is terminating the categorical parole programs" for nationals of Cuba, Haiti, Nicaragua, and Venezuela

5

(CHNV), and that the "parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025"— hundreds of thousands of people with varying amounts of time remaining, App-435 n.1—"will terminate on that date." App-006-07. The FRN warns that "parolees without a lawful basis to remain in the United States … must depart the United States before their parole termination date," as "DHS generally intends to remove [them] promptly." App-007. The FRN explained that DHS "considered the alternative of permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done," but rejected that alternative because it would "foreclose DHS's ability to expeditiously remove those CHNV parolees" through expedited removal—a shortcut deportation process that is statutorily unavailable when noncitizens have been continuously present for more than two years—since each of the CHNV parolee's parole period was for two years. App-061-62 ("Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal"); App-009-10.

Plaintiffs filed suit on February 28 and amended their complaint to address the FRN a month later. Following three hearings on Plaintiffs' requests for class certification and preliminary relief, on April 14 the Court granted a 5 U.S.C. § 705 stay of the FRN insofar as it truncates "previously granted parole and work

6

authorizations" to CHNV parolees. App-001-02. After rejecting the federal government's typical arguments regarding jurisdiction and reviewability, App-017-27; and certifying a class, App-027-31; the Court held that Plaintiffs had established each of the requirements for preliminary equitable relief.

On the merits, the Court held that Plaintiffs were likely to prevail for multiple reasons. First, the FRN's "sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error" that ending parole would maximize DHS's ability to subject parolees to expedited removal. App-033. As the Court noted, the parolee Plaintiffs "are not subject to expedited removal even if they have been here less than two years," because by its terms, the statute Defendants rely upon can be applied only to someone who "has *not* been admitted or paroled into the United States." App-031-32 (quoting 8 U.S.C. §§ 1225(b)(1)(A)(i) (emphasis added)); *see generally* App-031-35. Second, the Court held that Plaintiffs were likely to succeed on their claim that the FRN's categorical truncation of all existing grants of CHNV parole was "contrary to the statutory requirement that parole be exercised only on a case-by-case basis," App-036 (citation omitted), noting the mismatch between the individualized purpose of each parole grant and the Secretary's decision to change a key term of parole (its expiration date) on a blanket basis, App-037.

The Court also found that Plaintiffs had established irreparable harm, as the FRN would cause Plaintiffs' parole "to terminate in less than two weeks, at which

time they will be forced to choose between two injurious options" of leaving the country, forfeiting their claims, and returning to the dangers they left behind; or staying and risking arrest and detention and the undermining of their "chances of receiving other forms of immigration relief." App-037-38. The Court concluded that the balance of equities and public interest supported relief:

> Defendants have offered no substantial reason or public interest that justifies forcing individuals who were granted parole into the United States for a specified duration to leave (or move into undocumented status) in advance of the original date their parole was set to expire. Nor is it in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families. Instead, the early termination, without any case-by-case justification, of legal status for noncitizens who have complied with DHS programs and entered the country lawfully undermines the rule of law.

App-039.

## ARGUMENT

Defendants' motion should be denied. "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly 'is not a matter of right.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009). "[T]he party seeking a stay … bears the burden of proving the circumstances justify one." *New Jersey v. Trump*, 131 F.4th 27, 34 (1st Cir. 2025). To meet that burden, the Defendants must show that: (1) they are likely to succeed on the merits in their appeal; (2) they will be irreparably injured without a stay; (3) the stay will not substantially injure Plaintiffs

and members of the certified class; and (4) the stay would serve the public interest. *Id.* The first two factors "are the most critical." *Id.* (citation omitted). Defendants have not made any of the required showings.

## I.   Defendants-Appellants cannot show they will be irreparably harmed absent a stay

Defendants have not carried their burden to show that they will be irreparably injured absent a stay, which alone is sufficient to deny their motion. *Nken*, 556 U.S at 434-35 ("[S]imply showing some possibility of irreparable injury fails to satisfy [this] factor" (citation omitted)). Here, the "injuries" Defendants claim are abstract and illusory, and to the extent they exist at all, they are caused by provisions of the statutes Congress enacted, rather than the Court's narrow stay order that simply returns CHNV parolees to the *status quo ante* (which was itself the product of DHS decision-making). *Cf. Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (denying stay where, among other reasons, an "order merely returned the nation temporarily to the position it has occupied for many previous years").

For example, Defendants' claim that the Court placed an "unreasonable" and "extra-statutory burden on the government to justify termination of parole," Mot. at 18, suffers two independent flaws. First, it collapses entirely into Defendants' merits argument about what the statute does and does not require, and so unless Defendants are likely to prove the Court was incorrect (and they aren't), simply complying with the statute provides no basis to claim irreparable injury. Second, Defendants

overstate the effect of the order, which does not prohibit Defendants from exercising their statutory authority to terminate anyone's parole or impose any requirements on doing so; it merely stays the FRN's attempt to truncate the existing grants of parole *en masse* while this case proceeds.

Similarly, Defendants' assertion that the stay order limits their ability "to exercise [DHS's] discretionary [parole] authority," Mot. at 18, ignores the Court's conclusion that Defendants do not have as much discretion as they claim. Indeed, as the Supreme Court recently emphasized, the discretionary authority under the parole statute is not without limits: "the [parole] authority is not unbounded," and "under the APA, DHS's exercise of discretion within that statutory [parole] framework must be reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 806-07 (2022). Subjecting Defendants' actions to the rule of law is not an injury.

Defendants go even further astray when they argue that the stay order "impedes" DHS's ability to "remove aliens from the United States who lack a basis to obtain a … lawful basis to remain in the United States" and "effectively compels DHS" to use regular (rather than expedited) removal proceedings, "further straining the already over-burdened immigration system." Mot. at 20. For one, most noncitizens paroled through CHNV have pending claims for other forms of

immigration relief,[1] and so Defendants are speculating about their ability to (and justification for) removing them. For another, and as with its other arguments, Defendants' "injuries" here are caused by the statutes the Court merely interpreted. And finally, the Court's order does not "compel" Defendants to do anything at all; it just pauses Defendants' effort to make hundreds of thousands of parolees undocumented overnight.

Finally, Defendants claim that the Court's order harms the government and the public interest by "inhibit[ing] the government's pursuit of its foreign policy goals," Mot. at 19, is overbroad and nonspecific to the point of being nonsensical. Under this reasoning, any court order that impacts noncitizens would purportedly cause the government "irreparable harm" by definition, essentially reading this requirement out of the standard altogether. *See, e.g.*, *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020) ("[I]f we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so."); *accord New Jersey*, 131 F.4th at 40-41.

---

[1] Defendants have indefinitely suspended adjudicating those applications filed by CHNV parolees. App-006 n.4, App-019.

## II.    Defendants-Appellants fail to make a "strong showing" they are likely to succeed on their appeal

### A.    The Court properly exercised jurisdiction

The Court correctly rejected Defendants' argument that its jurisdiction to consider Plaintiffs' claims has been stripped by 8 U.S.C. § 1252(a)(2)(B)(ii). *See* App-020-26. Section 1252(a)(2)(B) strips jurisdiction to review a "decision or action … the authority for which is specified in this subchapter to be in the discretion of … the Secretary of Homeland Security." App-020 (quoting § 1252(a)(2)(B)(ii)). Defendants assert that "[t]he exercise of the parole authority under § 1182(d)(5)(A) … is just such a discretionary 'decision or action.'" Mot. at 11.

But here's the problem: Defendants define what the statute makes discretionary at far too high a level of generality. As the Supreme Court recently wrote (unanimously) concerning § 1252(a)(2)(B)(ii): "in the immigration realm, properly identifying the mandatory or discretionary nature of a particular agency decision can be critical, precisely because that status has implications for whether the agency's decision can be challenged in court." *Bouarfa v. Mayorkas*, 604 U.S. 6, 10-11 (2024); *accord Kucana v. Holder*, 558 U.S. 233, 252 (2010). Contrary to Defendants' argument, the parole statute makes discretionary just two decisions: the decision to parole an individual noncitizen and the determination of "when the purposes" of that individual noncitizen's parole "have been served." 8 U.S.C. § 1182(d)(5)(A); App-20. Plaintiffs do not challenge either of those decisions;

12

instead, Plaintiffs seek to enforce limits on the parole authority that are neither
discretionary nor insulated from review. App-021; *accord Biden*, 597 U.S. at 806-
07 (discussing legally enforceable limits on the parole authority).

Defendants do not and cannot cite a single case endorsing their limitless view
of what the parole statute makes discretionary; rather, their position has been
rejected by courts across the country.[2] The only cases Defendants cite, Mot. at 11,
are either inapposite or support Plaintiffs.[3]

Defendants' argument that the APA precludes judicial review of Plaintiffs'
claims as to the FRN because there is purportedly no law to apply, *see* Mot. at 11-
12, is weaker still. This exception is narrow, and its application is restricted to "those
rare circumstances where the relevant statute is drawn so that a court would have no
meaningful standard against which to judge the agency's exercise of discretion."
App-025 (citation omitted). As the Court correctly held, that "rare circumstance" is
not present here, App-026, as amply illustrated by the law the Court applied in

---

[2] *See, e.g.*, *LaMarche v. Mayorkas*, 691 F. Supp. 3d 274, 277-78 (D. Mass. 2023)
(collecting cases); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at
*8-9 (D. Mass. May 12, 2023) (same); App-022-23.

[3] Unlike here, *Samirah v. O'Connell*, 335 F.3d 545 (7th Cir. 2003), and *Hassan v.
Chertoff*, 593 F.3d 785, 790 (9th Cir. 2010) (per curiam), were challenges to
individual parole revocations. Moreover, *Hassan* applied § 1252(a)(2)(B)(ii) only
after concluding on the merits that "[t]he revocation was lawfully authorized," *id.*,
while the *Samirah* plaintiff was later allowed to enforce statutory and regulatory
limits on parole notwithstanding § 1252(a)(2)(B)(ii), *Samirah v. Holder*, 627 F.3d
652, 660-61 (7th Cir. 2010) (Posner, J.).

assessing Plaintiffs' claims: most prominently, two statutes, 8 U.S.C. §§ 1182(d)(5) and § 1225(b), that Defendants have incorrectly interpreted to justify the challenged agency action. App-031-037; *see also* Mot. at 14 (arguing that the stay order "is premised on an incorrect interpretation of the parole statute"). The Court was thus correct in holding that there are meaningful standards by which the lawfulness of Defendants' actions can be measured. *See also* App-026 (discussing the holding in *DHS v. Regents of the University of California*, 591 U.S. 1 (2020)) that the decision to end the Deferred Action for Childhood Arrivals program was not committed to agency discretion by law, even though deferred action is not statutory).

**B.     The Court correctly held that Plaintiffs-Appellants met their burden on the merits of their claims**

The Court provided independent reasons why Plaintiffs are likely to succeed in proving that Defendants' categorical, *en masse* revocation of all grants of CHNV parole was unlawful. To warrant a stay, Defendants must make a "strong showing" that there was error in *each* of the Court's reasons for granting the stay.

**1.**  The Court did not err in holding that Plaintiffs are "likely to prevail on their claim that DHS's sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error." App-033. As the Court correctly found, and as Defendants do not dispute, DHS "justified early termination of the parole periods based on the two-year period of accrual specified in [8 U.S.C. §] 1225(b)(1)(iii)(II)," which allows for expedited removal of a noncitizen who "has not been admitted or

paroled into the United States" and who cannot show more than two years of "continuous presence" here. App-032 (quoting 8 U.S.C. § 1225(b)(1)(iii)(II)). Parsing the statute, the Court correctly held that 8 U.S.C. § 1225(b)(1)(A)(iii)(II) specifically "allows for expedited removal for … a non-citizen who entered the United States without authorization"—"that is, an individual who 'has not been admitted or paroled into the United States.'" App-032. As the Court correctly reasoned, by the plain terms of the statute, parolee Plaintiffs and class members have been paroled into the United States by definition and so cannot be subjected to expedited removal "regardless of how long they have been in the United States." *See id.* Since DHS's action was premised on an incorrect understanding of the law, it cannot stand. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 391 (2024).

Defendants scarcely grapple with this holding. Their entire argument about it appears in a footnote that asserts that "[t]he statute's use of the present perfect tense … reflects a 'state that continues to the present,'" Mot. at 17 n.3 (quoting *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261-62 (11th Cir. 2025)), meaning that, in Defendants' view, they can subject any parolee who has been here less than two years to expedited removal merely by terminating their parole.[4] *Id.* As Defendants

---

[4] By regulation, serving a parolee with a document charging removability—i.e., the mere act of placing a parolee in removal proceedings—automatically terminates that individual's parole. 8 C.F.R. § 212(e)(2)(i).

conceded, App-483, they cannot cite a single case endorsing their currently proffered interpretation of the statute,[5] which is likewise contradicted by DHS's own regulations, which reflect that the "has not been admitted or paroled" language refers to whether the noncitizen was inspected at a port of entry and then admitted or paroled (regardless of the noncitizen's current status).[6] In sum, the Court correctly rejected Defendants' attempt to nullify Congress's decision not to subject individuals "admitted or paroled" into the country to expedited removal. App-032-33; *see also* App-477-480 (discussing how, under DHS's proffered interpretation, it could also subject noncitizens who have been admitted to expedited removal after revoking their basis for admission).

Reflecting the weakness of their argument, Defendants rapidly pivot to argue that their legal error was harmless, asserting that the FRN articulates other justifications for the premature truncation of individual grants of parole, Mot. at 17, and that regardless, "if the Secretary were incorrect in her premise that expedited

---

[5] The only case Defendants cite, *Turner*, concerned a different statute, and Defendants misrepresent what *Turner* said about the present perfect tense. *See* 130 F.4th at 1261 ("Accepting that the use of the present-perfect tense can, as a matter of pure semantics, refer to a time in the indefinite past *or* to a past action or state that continues into the present, the question becomes which of those meanings applies in this statutory context.") (citation omitted); *see also* App-032-33.

[6] *See, e.g.*, 8 C.F.R. § 235.3(b)(1)(ii) (stating that expedited removal can be applied to "aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry").

removal is available, that would merely have been *more* reason for the Secretary to promptly terminate parole and begin the lengthy *non-expedited* removal process," Mot. at 18 (emphases in original). These arguments fail to salvage the FRN for two independent reasons.

First, the Court correctly found that the expedited removal rationale was "DHS's sole basis for rejecting the alternative of allowing parole to expire naturally" and "was based on a legal error." App-033. Defendants do not argue that the Court erred in this finding, nor could they, given that the FRN has just two paragraphs explaining why the Secretary rejected the alternatives of a longer wind-down period. App-061-062. What is more, the FRN's "other" reasons that Defendants invoke are not discussed in conjunction with and do not have anything to do with DHS's consideration of alternatives; instead, they relate to DHS's decision to terminate the CHNV parole processes generally. And contrary to the Defendants' assertion, the Court analyzed each of them.[7]

Second, Defendants' heads-we-win-tails-you-lose contention that its legal

---

[7] *See, e.g.*, App-034-35 (holding, *inter alia*, that the FRN "gave no rationale for its conclusion that [previously articulated] humanitarian concerns no longer justified the existing parole programs," "offered no reasons for categorically revoking parole despite the humanitarian concerns previously articulated by DHS," and—despite the FRN's claim that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis"—"provides for no individual case-by-case determination as to the humanitarian concerns facing each parolee whose parole is being truncated").

error was harmless because DHS would have truncated existing parole grants anyway in order to initiate non-expedited removal proceedings against CHNV parolees is a paradigmatic example of the kind of *post-hoc* reasoning of agency counsel that simply cannot be considered. *Biden*, 597 U.S. at 812 ("[T]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). And where, as here, DHS "seeks a procedural advantage against" hundreds of thousands of people who followed the law, the least it can do is follow the law itself. *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

**2.** The Court also did not err in holding that "Plaintiffs are likely to succeed on their claim that the FRN's categorical termination of existing grants of parole was arbitrary and capricious" because the parole statute "contemplate[s] termination of parole on an individual, rather than categorical, basis." App-036-037. Although Defendants claim that the statute contains no requirement that termination of individual grants of parole must be made on a case-by-case basis, the Court correctly held that the plain text of the parole statute does not support Defendants' reading. Again, parsing the statute carefully, the Court correctly observed that the statute consistently refers to both the grant *and* termination of parole on a singular and individual basis, rather than on a plural or categorical basis—which the Court further

18

found to be consistent with the design of the CHNV parole processes, under which "grants of parole were to be made on a case-by-case basis."[8] App-036. This reading is likewise consonant with the agency's implementing regulation, which also uses singular and individual terminology to specify that only when "neither humanitarian reasons nor public benefit warrants the continued presence of *the [noncitizen]* in the United States, parole shall be terminated upon written notice to *the [noncitizen]*." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). The Court also correctly rejected Defendants' reliance on *Zheng v. Napolitano*, No. 09-cv-00347, 2009 WL 1258908, at *2 (D. Colo. May 4, 2009), noting that the case involved an "individual decision" to revoke the plaintiff's parole and therefore does nothing to support Defendants' claim that categorical and *en masse* truncation of parole is permissible under the statute. App-037.

While the Court acknowledged that "the Secretary has significant discretion to terminate a grant of parole under the statute," App-036-037, the Court also correctly held that "by the terms of the statute, such termination must attend to the reasons an individual [noncitizen] received parole." App-037. In categorically

---

[8] Defendants assert without a shred of evidence that CHNV parole was "granted on a categorical basis (which the statute forbids)" and made "without the case-by-case determinations for granting parole." Mot. at 15. The Court cannot credit such assertions when the FRN itself makes no such claim; when nothing else in the record supports them; and where all record evidence is to the contrary. *See, e.g.*, App-034 n.30; *see also Biden*, 597 U.S. at 812.

cutting short the parole of all CHNV parolees, DHS transgressed Congress's limits.

### III. Defendants-Appellants have failed to show that a stay would not substantially injure Plaintiffs-Appellees and class members

The Court did not err in finding the *en masse*, early revocation of all CHNV parole grants through the FRN will cause irreparable harm to hundreds of thousands of CHNV parolees, including Plaintiffs and class members. App-018-19, App-037. Defendants ignore these irreparable injuries entirely, which include family separation, *see* App-178-79, App-245, 247, 249; deportation to countries where parolees face serious risks of danger and persecution, *see* App-169, 172; and loss of work authorization and the ability to support themselves. *See* App-160; App-141. Defendants' cursory, one paragraph argument does nothing to challenge these findings. Mot. at 20-21.

Defendants' contention that CHNV parolees will not suffer irreparable harms because parole was always temporary and "a matter of grace," Mot. at 20, is disingenuous. There is a vast difference between one's parole naturally expiring at the end of a two-year period and the government prematurely truncating parole *en masse*, cutting short valid parole grants far in advance of their original expiration date. App-445 n.1 (noting that the FRN would cut some Plaintiffs' parole by more than 460 days). Similarly disingenuous are Defendants' suggestions that CHNV parolees are not irreparably harmed because they may have some other status or could apply for it through the removal process, Mot. at 20; as the Court discussed,

those forms of immigration relief are not available in expedited removal and, in any event, Defendants' other actions have "render[ed] Plaintiffs' chances of having any benefits adjudicated outside of removal proceedings a virtual nullity." App-019.

## CONCLUSION

For the foregoing reasons, Defendants-Appellants' request for a stay should be denied.

Dated: April 25, 2025                    Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox                            John A. Freedman
LAW OFFICE OF JUSTIN B. COX              ARNOLD & PORTER
*JAC Cooperating Counsel*                  KAYE SCHOLER LLP
PO Box 1106                              601 Massachusetts Ave., NW
Hood River, OR 97031                     Washington, DC 20001
(541) 716-1818                           (202) 942-5000
justin@jcoxconsulting.org                john.freedman@arnoldporter.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A) that the foregoing opposition contains 5,001 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: April 25, 2025                          Respectfully submitted,

                                               */s/ Justin B. Cox*
                                               Justin B. Cox

                                               *Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox

*Counsel for Plaintiffs-Appellees*