# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

Svitlana Doe, *et al.*,

*Plaintiffs-Appellees*,

v.

Kristi Noem, Secretary of Homeland Security, *et al.*,

*Defendant-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

## BRIEF OF FEDERAL DEFENDANT-APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

BRIAN C. WARD
*Acting Assistant Director*

PATRICK GLEN
*Senior Litigation Counsel*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*
First Cir. Bar No. 1216699
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878,
Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
katherine.j.shinners@usdoj.gov

ELISSA FUDIM
*Trial Attorney*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES .................................................................... ii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD........................... 1

INTRODUCTION ................................................................................. 2

STATEMENT OF THE ISSUES.............................................................. 7

STATEMENT OF THE CASE................................................................. 9

SCOPE AND STANDARD OF REVIEW .............................................. 18

SUMMARY OF THE ARGUMENT ..................................................... 19

ARGUMENT ...................................................................................... 23

    I.      Plaintiffs Are Unlikely to Succeed On Their Challenge to a
          Discretionary Parole Termination Decision. .......................................23

          A.    Parole Terminations Are Not Judicially Reviewable................25

          B.    The Parole Termination is Lawful. ...........................................32

    II.     A Balancing of the Equities Does Not Favor the Entry of Injunctive
          Relief. ..............................................................................................40

CONCLUSION .................................................................................... 46

CERTIFICATE OF COMPLIANCE....................................................... 47

CERTIFICATE OF SERVICE .............................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ........................................................................7

*Amanullah v. Nelson,*
  811 F.2d 1 (1st Cir. 1987) ...............................................................9

*American Hospital Association v. NLRB,*
  499 U.S. 606 (1991) ......................................................................35

*American National Red Cross v. S.G.,*
  505 U.S. 247 (1992) ......................................................................35

*Arizona v. United States,*
  567 U.S. 387 (2012) ......................................................................43

*Atieh v. Riordan,*
  727 F.3d 73 (1st Cir. 2013) ...........................................................39

*Atieh v. Riordan,*
  797 F.3d 135 (1st Cir. 2015) .........................................................37

*Biden v. Texas,*
  597 U.S. 785 (2022) ................................................................ 29, 33

*Block v. Community Nutrition Inst.,*
  467 U.S. 340 (1984) ......................................................................28

*Camp v. Pitts,*
  411 U.S. 138 (1973) ......................................................................39

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
  370 F.3d 151 (1st Cir. 2004) .................................................... 18, 19

*City of Taunton, Massachusetts v. United States Env't Prot. Agency,*
  895 F.3d 120 (1st Cir. 2018) .........................................................39

*Cook Cnty., Illinois v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) ...............................................24

*Cuozzo Speed Technologies, LLC v. Lee*,
    579 U.S. 261 (2016) ...........................................................29

*Department of the Navy v. Egan*,
    484 U.S. 518 (1988) ...........................................................42

*DHS v. New York*,
    140 S. Ct. 599 (2020) .........................................................34

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ...............................................................31

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ...........................................................45

*FDA v. Wages & White Lion Investments, L.L.C.*,
    145 S. Ct. 898 (2025) .........................................................39

*Federal Power Commission v. Texaco, Inc.*,
    377 U.S. 33 (1964) .............................................................35

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ..........................................25

*Fryzel v. Mortgage Elec. Registration Sys. Inc.*,
    719 F.3d 40 (1st Cir. 2013) ................................................7

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
    290 F.3d 63 (1st Cir.) ........................................................19

*Guerrero-Lasprilla v. Barr*,
    589 U.S. 221 (2020) ...........................................................28

*Haig v. Agee*,
    453 U.S. 280 (1981) ...................................................... 42, 43

*Hassan v. Chertoff*,
    593 F.3d 785 (9th Cir.), *cert. denied*, 561 U.S. 1007 (2010)................26

*Heckler v. Campbell,*
  461 U.S. 458 (1983) ........................................................................35

*Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.,*
  864 F.2d 927 (1st Cir. 1988) ...................................................... 18, 40

*INS v. Legalization Assistance Project,*
  510 U.S. 1301 (1993) ....................................................................43

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) ......................................................................41

*Kreis v. Sec'y of Air Force,*
  866 F.2d 1508 (D.C. Cir. 1989) .....................................................30

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958) ......................................................................38

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ......................................................................30

*Lopez v. Davis,*
  531 U.S. 230 (2001) ......................................................................35

*Mak v. INS,*
  435 F.2d 728 (2d Cir. 1970).........................................................36

*Marasco & Nesselbush, LLP v. Collins,*
  6 F.4th 150 (1st Cir. 2021)...........................................................36

*Maryland v. King,*
  567 U.S. 1301 (2012) ....................................................................41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................36

*Munaf v. Geren,*
  553 U.S. 674 (2008) .................................................................. 23, 25

*Myers v. United States,*
  272 U.S. 52 (1926) ........................................................................41

*Nadal-Ginard v. Holder,*
558 F.3d 61 (1st Cir. 2009) .....................................................40

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.,*
100 F.4th 1 (1st Cir. 2024) ............................................... 37, 44

*Nielsen v. Preap,*
586 U.S. 392 (2019) ..................................................................3

*Nken v. Holder,*
556 U.S. 418 (2009) .............................................. 24, 40, 42

*Noem v. Doe,*
No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025)..................... 2, 18, 40, 46

*Reno v. Flores,*
507 U.S. 292 (1993) ...............................................................36

*Rosario–Urdaz v. Rivera–Hernandez,*
350 F.3d 219 (1st Cir. 2003) ...................................................19

*Russello v. United States,*
464 U.S. 16 (1983) .................................................................33

*Ryan v. U.S. Immigr. & Customs Enf't,*
974 F.3d 9 (1st Cir. 2020) ......................................................24

*Samirah v. O'Connell,*
335 F.3d 545 (7th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004) .....................26

*Sanchez-Vasquez v. Garland,*
994 F.3d 40 (1st Cir. 2021) ....................................................40

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
699 F.3d 1 (1st Cir. 2012) ......................................................24

*State v. U.S. Env't Prot. Agency,*
989 F.3d 874 (10th Cir. 2021) ...............................................24

*Turner v. U.S. Attorney General,*
130 F.4th 1254 (11th Cir. 2025) ............................................37

*United States v. Storer Broadcasting Co.*,
351 U.S. 192 (1956) ...................................................................35

*Webster v. Doe*,
486 U.S. 592 (1988) ............................................................. 30, 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................. 23, 44

*Yang v. INS*,
79 F.3d 932, *cert. denied*, 519 U.S. 824 (1996) ...............................36

**Statutes**

1 U.S.C. § 1 ..............................................................................34

5 U.S.C. § 701(a)(1) ....................................................................29

5 U.S.C. § 701(a)(2) ...................................................... 8, 16, 18, 21

5 U.S.C. §§ 705 ...........................................................................15

6 U.S.C. § 557 ..............................................................................3

8 U.S.C. § 1182(a)(4)(A) .............................................................34

8 U.S.C. § 1182(d)(5)(A) ..................................................... passim

8 U.S.C. § 1225 ..........................................................................38

8 U.S.C. § 1225(b)(1) ..................................................................22

8 U.S.C. §§ 1225(b)(1)(A) ..............................................................2

28 U.S.C. § 1292(a)(1) ...................................................................7

Pub. L. No. 119-1 § 3(d)(1) .............................................................3

**Rules**

Fed. R. App. P. 4(a)(1)(B) ...............................................................7

**Regulations**

8 C.F.R. § 208.30(b)............................................................................ 45, 46

8 C.F.R. § 212.5 ................................................................................. 10, 36

8 C.F.R. § 212.5(e)(2)(i) .........................................................................38

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

The district court entered preliminary relief on behalf of hundreds of thousands of class members. That order materially interferes with the Executive Branch's functioning and with the President's policy priorities, and the Supreme Court has granted a stay of the district court's order. Accordingly, Defendants-Appellants respectfully request oral argument on this appeal to aid the Court in resolving the important issues presented by the appeal.

**INTRODUCTION**

In the decision below, the district court entered a preliminary, classwide order barring the government from effectuating a decision to terminate parole—the discretionary release from immigration custody of applicants for admission—for hundreds of thousands of individuals. The Supreme Court has already stayed the district court's order, in a decision with just two justices noting dissent, indicating that the district court erred in assessing both the merits and the non-merits injunction factors. *Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025). This Court should take the Supreme Court's cue and reverse.

As a general matter, an alien who arrives in the United States and cannot demonstrate his admissibility generally is either promptly removed or detained pending removal proceedings. *See* 8 U.S.C. §§ 1225(b)(1)(A), (B), and (2)(A). The Immigration and Nationality Act ("INA") provides, however, that in limited circumstances the Secretary may parole such an alien—that is, release him from detention and allow him to temporarily enter the United States. *See* 8 U.S.C. § 1182(d)(5)(A). Specifically, the INA permits the Secretary to grant parole to aliens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and it permits the Secretary to terminate that parole whenever "the purposes

of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. 1182(d)(5)(A).[1]

In 2022 and 2023, then-Secretary Mayorkas created the CHNV parole programs, under which some 532,000 aliens from Cuba, Haiti, Nicaragua, and Venezuela were granted up to two-year terms of parole. He relied on categorical migration and country rationales—for example, that encouraging aliens from those countries to use parole to enter the United States would deter surges of illegal entry at the southwest border—to determine that the parole programs were warranted. See, e.g., Appx. 141 (88 Fed. Reg. 1243, 1249 (Jan. 9, 2023) (Haiti)). But he was clear that parole could be summarily terminated, and that the continuation of the programs was entirely within the Secretary's discretion. His notices creating those programs advised: "The Secretary retains the sole discretion to terminate the process at any point," and "DHS may terminate parole in its discretion at any time."[2]

---

[1] Notwithstanding the use of "Attorney General" throughout the INA, Congress has transferred enforcement of many provisions to the Secretary of Homeland Security. *See Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019). Congress amended Section 1182(d)(5) to replace "Attorney General" with "Secretary of Homeland Security" in January 2025, *see* Laken Riley Act, Pub. L. No. 119-1 § 3(d)(1), 139 Stat. 4 (Jan. 29, 2025), but that amendment merely confirmed existing understanding, *see* 6 U.S.C. § 557.

[2] Appx. 120, 126 (88 Fed. Reg. 1266, 1268, 1272 (Jan. 9, 2023) (Cuba)); *see also* Appx. 140 (88 Fed. Reg. at 1244, 1248 (Haiti)); Appx. 150, 154 (88 Fed. Reg. 1255, 1256, 1260 (Jan. 9, 2023) (Nicaragua)); Appx. 107, 112 (87 Fed. Reg. 63,507, 63,511, 63,516 (Oct. 19, 2022) (Venezuela)).

On March 25, 2025, Secretary Noem revoked those parole programs while reserving the discretion to make case-by-case exceptions. Reviewing the results of the mass-parole programs, the new Administration concluded that they "at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status." A047 (90 Fed. Reg. 13,611, 13,613 (Mar. 25, 2025)). In addition, the CHNV parole programs had "exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large," A049 (90 Fed. Reg. at 13,615), and contravened the new Administration's foreign policy focus on "other measures to deter and prevent the entry of illegal aliens," A050 (90 Fed. Reg. at 13,616). The Secretary further cited "significant gaps in the vetting process," including reports of massive fraud that had caused the government to suspend certain portions of the CHNV programs in July 2024. *Id*. Secretary Noem thus exercised her discretion to terminate the parole programs, including by terminating the parole of aliens who had been granted parole under the CHNV programs, with the possibility for case-by-case exceptions.

The Secretary's discretionary rescission of a discretionary benefit should have been the end of the matter. Congress reserved the parole-termination decision exclusively to the opinion of the Secretary. Underscoring as much, Congress barred judicial review of discretionary decisions like the decision to end parole:

"Notwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . any other decision or action . . . the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). And the parole power is just one such discretionary authority.

Despite this, the district court certified a class of all aliens in the United States who had received parole under the CHNV parole programs, then halted the Secretary's termination of parole for CHNV parolees. The district court disregarded the INA's judicial-review bar on the theory that the Secretary exceeded her statutory authority here. See A020–A021. And even though parole was *granted* based on non-individualized reasons, the district court insisted that *terminating* those grants of parole must proceed on a case-by-case, alien-by-alien basis. Secretary Mayorkas relied on categorical reasons to determine that, generally, parole under CHNV was warranted. Yet the court faulted Secretary Noem's decision to restore the traditional case-by-case process by undoing the prior categorical determinations. A036–A037; *see also* A046 (90 Fed. Reg. at 13,612).

That decision nullified one of the Administration's most consequential immigration policy decisions, maintaining parole for over a year for hundreds of thousands of aliens whose continued presence in the United States the Secretary of Homeland Security has found to be contrary to U.S. interests. The district court's

rationale for disregarding Congress's clear jurisdictional bar—that courts can review discretionary determinations if they purportedly exceed statutory bounds—would contravene and nullify the jurisdiction-stripping statute and ignore limits on review under the Administrative Procedure Act ("APA"). And the district court's reasoning that parole *terminations* must be made on a case-by-case, alien-by-alien basis contradicts the plain text of the statute.

As for the non-merits injunction factors, in staying the district court's decision, the Supreme Court necessarily concluded that the district court erred in balancing the equitable factors. An indefinite halt on parole termination irreparably harms the government. It blocks the Executive Branch from exercising its discretionary authority over a key aspect of the Nation's immigration and foreign policy and thwarts Congress's express vesting of that decision in the Secretary, not courts. Further, the government has a strong interest in expeditiously removing aliens who lack a more durable basis to remain in the United States, but the order would stymy the efforts of the Department of Homeland Security ("DHS") by requiring individualized parole determinations for every one of the hundreds of thousands of parolees under the CHNV programs—a colossal undertaking.

Finally, delaying the terminations of CHNV parole risks "undermin[ing] the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations." A055

(90 Fed. Reg. at 13,621). On the other side of the ledger, Plaintiffs cannot claim any cognizable irreparable harm; they accepted parole with full awareness that the benefit was temporary, discretionary, and revocable at any time. The Supreme Court's decision to stay the district court's badly mistaken order dictates that this Court must reverse.

## STATEMENT OF JURISDICTION

This is an appeal from an April 18, 2025, interlocutory decision of the United States District Court for the District of Massachusetts granting preliminary relief from the federal government's termination of parole grants and certifying a class of individuals to benefit from that relief. A001–A044. Appellants filed a timely notice of appeal on April 18, 2025. Appendix ("Appx.") 37; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction to review the district court's April 14, 2025 orders because they grant preliminary injunctive relief. *See* 28 U.S.C. § 1292(a)(1); *Abbott v. Perez*, 585 U.S. 579, 594 (2018); *Fryzel v. Mortgage Elec. Registration Sys. Inc.*, 719 F.3d 40, 43 (1st Cir. 2013).

## STATEMENT OF THE ISSUES

I.  Did the district court err in concluding that the jurisdictional bar on judicial review of discretionary decisions in 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply to the Secretary's discretionary decision to terminate CHNV parole grants?

II.  Did the district court err in concluding that the Secretary's decision to terminate CHNV parole grants was not "committed to agency discretion by law" under the APA, 5 U.S.C. § 701(a)(2), where the parole statute provides that the Secretary may do so when, "in [her] opinion," the purposes of parole have been served?

III.  Even if the district court had jurisdiction to reach the merits, did the district court err in evaluating the Secretary's termination of parole grants?

IV.  Did the district court abuse its discretion in concluding that the balance of the equities favored granting a preliminary injunction, where the government and the public have a strong interest in the Executive Branch's performance of its immigration function in accordance with Presidential priorities, as compared to parole recipients' interest in an inherently temporary and discretionary benefit?

# STATEMENT OF THE CASE

## A.    Statutory Background.

Parole is, by definition, a temporary release from immigration custody into the interior of the United States. Congress in 8 U.S.C. § 1182(d)(5)(A) granted the Secretary of Homeland Security (the "Secretary") "remarkably broad" discretion with respect to grants of parole. *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987).

That statute authorizes the Secretary, "in [her] discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It further provides that parole may be terminated "when the purposes of such parole shall, *in the opinion of* the Secretary of Homeland Security, have been served." *Id.* (emphasis added). The provision states in full:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5.

**B.    Factual Background.**

In late 2022 and early 2023, DHS created special parole programs for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members. *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022) (Appx. 102, *et seq.*), as amended by 88 Fed. Reg. 1279 (Jan. 9, 2023) (Appx. 114, *et seq.*); 88 Fed. Reg. 1266 (Jan. 9, 2023) (Cuba program) (Appx. 119, *et seq.*); 88 Fed. Reg. 1243 (Jan. 9, 2023) (Haiti program) (Appx. 134, *et seq.*); 88 Fed. Reg. 1255 (Jan. 9, 2023) (Nicaragua program) (Appx. 148, *et seq.*). For each program, DHS cited categorical reasons that parole of nationals from these four countries would provide a significant public benefit and address the aliens' urgent humanitarian needs, based on general migration and country conditions. *See* 87 Fed. Reg. at 63,511–15 (Appx. 108–111); 88 Fed. Reg. at 1272–75 (Appx. 126–129); 88 Fed. Reg. at 1248–51 (Appx. 140–143); 88 Fed. Reg. at 1260–63 (Appx. 154–157). Specifically, DHS stated that each CHNV program would fulfill the same six goals: reducing "irregular migration" of nationals from those countries; enabling national-security and public-safety vetting of aliens before they arrive in the United States; reducing the strain on DHS personnel and resources from surges in southwest border and maritime encounters; minimizing the burden on border communities by routing aliens to communities in the interior; disincentivizing dangerous journeys through

criminal smuggling networks; and addressing foreign-policy goals by managing migration collaboratively in the Western Hemisphere. 88 Fed. Reg. at 1272 (Cuba) (Appx. 126); 88 Fed. Reg. at 1248 (Haiti) (Appx. 140); 88 Fed. Reg. at 1260 (Nicaragua) (Appx. 154); 87 Fed. Reg. at 63,511 (Venezuela) (Appx. 108).

Under those programs, DHS could consider granting advance authorization to qualifying individuals from the four listed countries to travel to certain U.S. ports of entry to request discretionary consideration for parole for up to a two-year term. *See* 88 Fed. Reg. at 1275–76 (Cuba) (Appx. 129–30); 88 Fed. Reg. at 1252–53 (Haiti) (Appx. 144–45); 88 Fed. Reg. at 1263–64 (Nicaragua) (Appx. 157–58); 87 Fed. Reg. at 63,508, 63,515 (Venezuela) (Appx. 104, 112). Approved individuals "could seek humanitarian relief or other [immigration] benefits and receive work authorization" during the two-year parole period, but "those 'who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.'" A003 (citing 87 Fed. Reg. at 63,508). DHS later announced "that there would be no 're-parole' beyond the initial two-year period" under the CHNV programs. A003 (citing 90 Fed. Reg. at 13,614 n. 24). Even within the two-year term, DHS expressly stated that it "may terminate parole in its discretion at any time." *E.g.*, 88 Fed. Reg. at 1272 (Appx. 126). DHS granted parole to some 532,000 aliens in the ensuing two years. A046 (90 Fed. Reg. at 13,612).

On January 20, 2025, following the presidential transition, the President issued an executive order declaring it to be "the policy of the United States to take all appropriate action to secure the borders of our Nation," including by "[t]erminat[ing] all categorical parole programs that are contrary to the policies of the United States," such as "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'" *Securing Our Borders*, Exec. Order No. 14165, §§ 2, 7(b), 90 Fed. Reg. 8467, 8467–68 (Jan. 30, 2025) (cited at A004). The President also issued an executive order directing Executive Branch officials to take "all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "ensuring that the parole authority under [Section 1182(d)(5)] is exercised on only a case-by-case basis." *Protecting the American People Against Invasion*, Exec. Order No. 14159, § 16(a), 90 Fed. Reg. 8443 (Jan. 29, 2025) (cited at A004).

That same day, the Acting Secretary of Homeland Security ordered a review of all parole policies, including the CHNV parole programs. *See* Appx. 303–05. On January 23, 2025, the Acting Director of the U.S. Citizenship and Immigration Services ("USCIS") paused the acceptance and processing of new CHNV parole requests. *See* Appx. 306–07. On February 14, the Acting Deputy Director of USCIS authorized "an immediate agency-wide administrative hold on all pending status

readjustment and benefit requests filed by individuals paroled into the United States under the CHNV programs," save for case-by-case exceptions. *See* Appx. 308–11. (The district court in this matter has since entered a "stay" of USCIS's hold on adjudications. *See* Dist. Ct. Docket No. 107 (May 28, 2025).)

On March 25, 2025, Secretary Noem published a notice in the Federal Register announcing that DHS was "terminating the CHNV parole programs as of March 25, 2025," and "[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." A045 (90 Fed. Reg. at 13,611). The Secretary explained that "DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." A052 (90 Fed. Reg. at 13,618). Further, "DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice." *Id.* She instructed that "[p]arolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States before their parole termination date." A052–A053 (90 Fed. Reg. at 13,618–19).

The Secretary explained that "the CHNV programs 'do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." A007 (quoting 90 Fed. Reg. at 13,612). The Secretary also "explained in some detail why the original grounds for the CHNV program did not warrant continuing the program." A007 at n.7 (citing 90 Fed. Reg. at 13,612–17). The Secretary added that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis." A046 (90 Fed. Reg. at 13,612). "These reasons," the Secretary concluded, "independently and cumulatively, support termination of the CHNV parole programs." *Id.* The Secretary thus exercised "her discretion" to "terminat[e] the CHNV parole programs." *Id.*

The Secretary acknowledged reliance interests of parolees, potential future program beneficiaries, and potential recipients with approved advance travel authorizations who had not yet arrived in the United States. A051–A053 (90 Fed. Reg. at 13,617–19); *see also* A008–A009. But she found that those individuals knew that parole was discretionary and that the CHNV programs could be terminated at any time, and that any costs to those individuals did not outweigh the government's "sovereign interest in determining who is paroled into the United States" and "the U.S. government's strong interest in promptly removing parolees when the basis for

14

the underlying program no longer exists." A052–A053 (90 Fed. Reg. at 13,618–19). She explained that DHS chose to terminate all parole in 30 days rather than allow parolees' two-year terms naturally to expire because the latter option would "essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States" under expedited removal procedures in accordance with 8 U.S.C. § 1225(b)(1)(A)(iii)(II). A054 (90 Fed. Reg. at 13,620); *see also* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (providing for expedited removal for certain aliens who cannot demonstrate that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility").

The Secretary also announced in the March 25, 2025 notice that individualized notice of termination would be provided to CHNV parolees through their USCIS online account, which each parolee created during the application process. A054 (90 Fed. Reg. at 13,620); *see also* Appx. 620–21 (individualized notice of termination of parole and of intent to revoke parole-based employment authorization).

### C.    Procedural History.

Plaintiffs, 23 individuals and a nonprofit organization, filed a putative class action, alleging, as relevant here, that the termination of the CHNV parole programs is contrary to law, arbitrary and capricious, and unconstitutional. *See* Appx. 531–34,

535–38, 539. Plaintiffs sought emergency relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 705, 706(2), asking the district court to enjoin implementation of the CHNV termination on behalf of a class of individuals whose parole was subject to termination under the March 25, 2025 notice. Appx. 546–49. Plaintiffs based their request on their claims under the APA that the March 25, 2025 notice was "contrary to statute" and regulation. Appx. 583–88; Appx. 532–33, 539–40.

On April 14, 2025, the district court largely granted Plaintiffs' request for relief, entering a "stay" of the March 25, 2025 notice's termination of CHNV parole as to a certified class of "[a]ll individuals who have received a grant of parole" under the CHNV programs, except those outside the United States or who opt out of the class. A001–A044.

The court acknowledged that "Section 1252(a)(2)(B)(ii) strips district courts of jurisdiction to review" the Secretary's discretionary determinations, and that parole terminations are discretionary. A020. But the court held that the jurisdictional bar was inapplicable on the theory that a "categorical termination of the period of parole . . . violates the parole statute," and the statute supposedly does not "give the Secretary the discretion to take such unlawful action." A021. The court added that the decision to terminate parole was not "committed to agency discretion by law" under the APA, 5 U.S.C. § 701(a)(2), because the requirement that the Secretary

determine that "the purposes of such parole . . . have been served" constitutes a "meaningful standard" by which to judge the exercise of discretion. A025–A026 (citations omitted; ellipsis in original).

On the merits, the district court determined that Plaintiffs were likely to succeed on their APA claims on two grounds. *First*, the court held that one of the Secretary's justifications for terminating the parole periods—namely, so DHS could better secure the ability to use expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II)—was based on a "legal error" about the applicability of that clause to those who were paroled in the past. *See* A031–A035. *Second*, the court held that, because the parole statute imposes a "case-by-case basis" requirement on grants of parole, termination of parole must also be individualized. A036.

The district court thus stayed the Secretary's March 25 notice "pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to" aliens paroled into the United States under the CHNV parole programs. A040. The court also stayed "pending further court order" the sending of "individualized notices" to CHNV parolees "notifying them that their parole is being revoked without case-by-case review pursuant to the" March 25 notice. A041.

On May 5, 2025, this Court denied Defendants' motion for a stay pending appeal. Order, Entry ID No. 6718623, at 2 (May 5, 2025). The Court noted that

"parole in the first instance is to be granted only on a case-by-case basis," but "[t]he statutory text is less clear regarding the termination of parole." *Id.* The Court said the "lack of clarity cuts against a finding that the en masse termination is immune to judicial review" yet declined to hold that the action was reviewable: "Whether this is so we need not now decide." *Id.*

On May 15, 2025, Defendants applied to the Supreme Court for a stay of the district court's order pending appeal. Appx. 738–67. On May 30, 2025, the Supreme Court granted Defendants' application, allowing the parole terminations to go into effect. *Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025). Only two Justices noted their dissent from the stay order. *See id.* Justice Jackson's dissent does not touch on the reviewability of the decision or the merits of the dispute, instead taking issue with the balancing of the equities and the harms, finding the government's "harm-related showing" to be "insufficient." *Id.* at *1.

## SCOPE AND STANDARD OF REVIEW

Courts of appeals review the grant or denial of a motion for preliminary injunctive relief for abuse of discretion. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004). "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor*

*& Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir. 1988). This Court must also review the district court's "answers to abstract questions of law de novo." *Charlesbank Equity Fund II*, 370 F.3d at 158 (citing *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 71 (1st Cir.), *cert. denied,* 537 U.S. 974 (2002)). An error of law is always an abuse of discretion. *Rosario–Urdaz v. Rivera–Hernandez,* 350 F.3d 219, 221 (1st Cir. 2003).

## SUMMARY OF THE ARGUMENT

As the Supreme Court's stay decision forecasts, the district court's order should be reversed for several reasons. At the outset, the district court erred in determining it could review and enter relief concerning the Secretary's discretionary decision to terminate CHNV parole grants. On the merits, in any event, Plaintiffs did not demonstrate a likelihood of success on their APA claims because the decision to terminate CHNV parole grants based on categorical reasons is undoubtedly within the Secretary's authority and was not arbitrary and capricious.

Even if Plaintiffs could possibly establish a likelihood of success on their claims, the Supreme Court's stay also reflects that the district court abused its discretion in balancing the remaining preliminary-injunction factors. It incorrectly discounted the government's strong interest in the enforcement of the President's immigration policy and the expeditious removal of individuals who lack a basis to obtain a more durable status in the United States, placing undue weight on parolees'

interest in an inherently discretionary and temporary benefit that they were advised was subject to termination at any time. In sum, the district court lacked jurisdiction to enter its order and lacked the authority to usurp the Executive Branch's control of foreign policy and immigration.

**I.A.** Congress forbids judicial review of decisions that are placed within the Secretary's discretion by statute. 8 U.S.C. § 1252(a)(2)(B)(ii). Parole terminations decisions are one such class of decisions: Congress gave the Secretary authority to terminate parole grants when, "in [her] opinion," the purpose of parole has been served. 8 U.S.C. § 1182(d)(5)(A). That language is plainly discretionary, and the district court thus lacked authority to enjoin the government from terminating the CHNV parole programs.

The district court nonetheless held that the review bar does not apply here because, in the court's view, the statute does not give the Secretary the discretion to categorically terminate parole; the Secretary must instead "attend, in some way, to the reasons an individual alien received parole." A021. Leaving aside that this requirement does not appear in the parole statute, the termination decision does not become reviewable simply because the court disagrees with the manner in which the Secretary exercised her discretion. Permitting what is in effect abuse-of-discretion review would eviscerate the bar on review of discretionary decisions. Nor does the

presumption of judicial review apply when Congress has explicitly foreclosed judicial review.

Even if the INA's specific bar on review of discretionary decisions did not apply, Plaintiffs still cannot succeed on the merits because the APA does not permit review of actions and decisions (like the parole termination) that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The parole statute expressly commits the decision to the "opinion" of the Secretary as to whether the purposes of parole have been served and provides no manageable standards on which a court could base its review of that opinion. The APA thus independently forecloses the judicial review of the Secretary's parole-termination decision.

**B.** Even if the Secretary's decision were reviewable, the district court erred in its evaluation of the underlying merits.

First, in assessing Plaintiffs' likelihood of success on the merits of their APA claims, the district court was wrong to conclude that the parole statute imposes a "case-by-case" requirement on parole terminations. While Section 1182(d)(5)(A) requires that *grants* of parole be made on a case-by-case basis, it contains no parallel language with respect to *terminations*. Congress's inclusion of a case-by-case requirement for grants of parole, but not terminations, is strong evidence that parole terminations need not be so individualized. This is true notwithstanding the fact that the statute uses the singular rather than the plural when referring to terminations.

Many statutes use the singular rather than the plural in circumstances where courts have found they may be broadly applied. Moreover, Congress's insertion of the "only on a case-by-case basis" language in 1996, *see* A046 n.4 (90 Fed. Reg. at 13,612 n.4) (describing the statutory history), would have been unnecessary if use of the singular already did that work for them.

The district court likewise erred in finding that the parole termination decision was likely arbitrary and capricious based on its conclusion that one of the supporting reasons for that decision was legally erroneous. One of several reasons the Secretary gave for terminating all CHNV parole in 30 days rather than allowing parolees' two-year terms to naturally expire was that under the latter course, DHS could face the prospect of forgoing expedited removal proceedings under Section 1225(b). The district court concluded that expedited removal cannot be applied to aliens who were previously paroled, and that this justification thus cannot support the Secretary's decision. That is wrong. Section 1182(d)(5)(A) provides that after parole is terminated, the alien's case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). And the expedited removal statute is applicable to certain applicants for admission who have been present in the United States for less than two years. 8 U.S.C. § 1225(b)(1). Even if the Secretary had erred in that one rationale, that error alone does not justify halting parole terminations, because the Secretary invoked

several other independently sufficient reasons, and noted that these rationales "independently and cumulatively" supported her decision. *See, e.g.*, A046, A054 (90 Fed. Reg. at 13,612, 13,620).

**II.** As for the non-merits injunction factors, the district court abused its discretion in finding that the balance of the equities favored Plaintiffs. Again, the Supreme Court's decision to grant a stay of the district court's order necessarily indicates it disagrees with the district court's balancing of the equities—as the dissent from that decision confirmed. For good reason. The district court's order stymies the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests, and thus it inhibits the government's pursuit of its foreign policy goals. On the other side of the coin, while Plaintiffs might have the desire to remain in the country, they cannot claim an interest in a privilege that was always stated to be temporary and always disclosed to be revocable.

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed On Their Challenge to a Discretionary Parole Termination Decision.

To award the "extraordinary and drastic remedy" of preliminary injunctive relief, *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008), the district court must find that the plaintiff "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008). The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These four factors likewise govern whether a court should issue an order staying agency action under section 705 of the APA, which is in substance and practical effect an injunction. *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

The district court erred and abused its discretion in granting a stay of the Secretary's decision to terminate parole, because Plaintiffs did not meet their burden on any of the required elements. Plaintiffs' request for injunctive relief does not overcome even the first hurdle of showing likelihood of success on the merits, which this Court has described as the "sine qua non" of preliminary injunctive relief. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiffs have not demonstrated a "strong likelihood that they will ultimately prevail," *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012), because the Secretary's decision terminating CHNV parole is not reviewable and, even if reviewable, was reasonable and in accordance with the law. Indeed, the Supreme Court's grant of a stay pending appeal strongly indicates that a majority of the Court disagreed with the district court on these issues. And even the two justices who noted their dissent discussed only the equitable injunction factors—not even attempting to hazard a defense of the district court's jurisdictional and merits holdings.

## A. Parole Terminations Are Not Judicially Reviewable.

### 1. The INA deprives the district court of jurisdiction.

The district court incorrectly asserted jurisdiction to review the Secretary's discretionary parole decisions. Plaintiffs cannot show a likelihood of success where the district court lacked jurisdiction over the underlying claim. *Munaf*, 553 U.S. at 690 (doubts about jurisdiction make success on the merits "more *unlikely* due to potential impediments to even reaching the merits"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."). And without jurisdiction over the underlying claim, the district court lacked authority to issue relief.

To find the Secretary's decision reviewable, the district court adopted an untenably narrow reading of the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(B)(ii). That provision states that, with exceptions not relevant here, "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security." *Id.* The exercise of parole authority under Section 1182(d)(5)(A)—which permits the Secretary to terminate parole grants "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served," 8 U.S.C.

§ 1182(d)(5)(A) (emphasis added)—is just such a discretionary "decision or action," 8 U.S.C. § 1252(a)(2)(B)(ii).

Tellingly, neither Plaintiffs nor the district court disputed that the INA reserves parole termination decisions to the Secretary's discretion. Other courts agree—and have held that such discretionary parole revocations are unreviewable. See, *e.g.*, *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (authority to "grant or revoke" parole under Section 1182(d)(5)(A) is a matter of agency discretion barred from review by Section 1252(a)(2)(B)(ii)), *cert. denied*, 541 U.S. 1085 (2004); *Hassan v. Chertoff*, 593 F.3d 785, 789 (9th Cir.) (per curiam) (similar), *cert. denied*, 561 U.S. 1007 (2010). Section 1252(a)(2)(B)(ii) thus precludes review of respondents' challenges to the Secretary's decision to terminate parole, as memorialized in the March 25, 2025, Federal Register notice.

The district court nevertheless sidestepped Section 1252(a)(2)(B)'s plain text and asserted jurisdiction based on the premise that the parole "statute cannot be read to give the Secretary the discretion" to categorically terminate the parole period for members of the class, and instead requires her to "attend, in some way, to the reasons an individual alien received parole." A021. That is doubly wrong. First, the INA does not forbid categorical parole terminations, as explained below. *See infra* § I(B). Second, even if it did, Section 1252(a)(2)(B)(ii) still precludes judicial review. Again, this provision bars judicial review when "the authority for" that action is

specified to be in the Secretary's discretion. The provision thus focuses on whether particular statutory provisions grant discretion over particular decisions—not the *manner* in which the Secretary exercises that authority to make those discretionary decisions. Section 1252(a)(2)(B)(ii) bars review of the Secretary's discretionary decisions; it does not somehow permit abuse-of-discretion review of those decisions.

Here, Section 1182(d)(5)(A) plainly grants the Secretary authority to terminate parole and specifies that her parole-termination authority may be exercised based solely on her own "opinion." 8 U.S.C. § 1182(d)(5)(A). That is about as discretionary a grant of authority as the statute books contain. Even if a particular Secretary were to exercise that discretion improperly in a particular case, Congress conclusively "specified" that the "authority" to terminate parole is within the Secretary's "discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). No more is needed to trigger Section 1252(a)(2)(B)(ii)'s jurisdictional bar.

The district court's contrary reasoning would nullify that bar. Under the district court's view, courts would always review the merits of the Secretary's exercise of discretion to determine whether the jurisdictional bar applied in the first place. And the bar would apply only where a court first determines that the Secretary exercised the discretionary authority in a manner the court deems proper, thus rendering the bar meaningless. But the jurisdictional bar is supposed to *foreclose*

review of the Secretary's discretionary actions—not induce courts to review the lawfulness of those actions just to decide whether review is foreclosed.

The district court suggested that the jurisdictional bar might not apply because respondents allegedly challenged "the legality of policies and processes governing discretionary decisions under the INA." A022 (citation omitted). But even assuming such a claim were reviewable, there is no overarching policy or process here that is separate and distinct from the parole terminations themselves. The Secretary acted to end the CHNV parole programs entirely—including by terminating existing parole grants—not to promulgate some set of policies or procedures to govern those programs going forward. And the "decision or action" that respondents have challenged, 8 U.S.C. § 1252(a)(2)(B)(ii), is the decision to terminate parole—not some *other* decision.

The district court also relied on a presumption of judicial review, A021–A023, but that presumption lacks force where there is "'clear and convincing evidence' of congressional intent to preclude judicial review," *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citation omitted), whether from "specific language" in the statute or "inferences . . . drawn from the statutory scheme as a whole," *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984). Here, Congress clearly and convincingly directed that "no court shall have jurisdiction to review" "any" decision or action that the INA specifies to be within the Secretary's discretion. 8

U.S.C. § 1252(a)(2)(B)(ii); *cf. Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 273-274 (2016). And that jurisdictional bar applies "[n]otwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(B)(ii). Where parole determinations are concerned, "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations." *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring). All the statutory evidence points the other way, against review.

### 2. The APA also forecloses review.

The district court also improperly rejected the Government's argument that the termination was separately unreviewable under the APA, which does not permit review when "agency action is committed to agency discretion by law" or when "statutes preclude judicial review." 5 U.S.C. § 701(a)(1), (2). Section 1252(a)(2)(B)(ii) is a statute that precludes judicial review, and thus the district court's error as to the applicability of that provision infected its holding on the APA review bars as well.

But even without Section 1252(a)(2)(B)(ii)'s review bar, parole decisions are unreviewable because they are committed to agency discretion by law. Section 1182(d)(5)(A) commits parole decisions to agency discretion by bestowing the

29

Secretary with the discretion to grant parole when she concludes that certain conditions are met and placing no limits on the Secretary's discretion to deny or terminate parole. Instead, the statute provides that the Secretary may end a parole grant whenever "the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

The statute provides no judicially manageable standards on which a court may base its review of that opinion. *See Lincoln v. Vigil*, 508 U.S. 182, 191–94 (1993); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (CIA director's authority to fire an employee "whenever [he] shall deem such termination necessary or advisable in the interests of the United States" was unreviewable); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (statutes that turn on "an administrator's determination of the existence of [a] condition," as opposed to the objective existence of that condition, "exude deference[]" to that determination). The Secretary made just such a determination here. *See id.* The Court lacks authority to review it.

Here again, the district court reasoned that a decision to "categorically terminate grants of parole" is not within the Secretary's discretion and thus not "committed to agency discretion by law." A026. That conclusion was wrong, as it simply repeats the mistaken view that Section 1182(d)(5)(A) requires parole terminations to be made on a case-by-case basis. *See infra* § II(B). The court added

that Section 1182(d)(5)(A) "establishes standards for the termination of parole by requiring a determination by the Secretary that 'the purposes of such parole . . . have been served." But the court's quotation omits the key language—"in the opinion of the Secretary"—that puts the determination entirely in the Secretary's purview and forecloses a "meaningful standard" to allow courts to review the exercise of discretion. *Webster*, 486 U.S. at 600 (no review when statute provided for terminations when relevant official "shall deem such termination necessary or advisable in the interests of the United States"). There are no judicially manageable standards for courts to review the Secretary's own "opinion." 8 U.S.C. § 1182(d)(5)(A).

The district court's reliance (A026–A027) on *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), likewise was misplaced. That case involved what the Supreme Court called a "program for conferring affirmative immigration relief," rather than an unreviewable "non-enforcement policy," as the government had argued. *Id.* at 18. Here, in contrast, the government did not argue that the CHNV parole programs, or their termination, are non-enforcement policies. Rather, judicial review is barred because, unlike the program in *Regents*, the INA expressly commits parole determinations to the Secretary's discretion by law. *See Webster*, 486 U.S. at 600 (no review where statute provided for terminations when relevant official "shall

deem such termination necessary or advisable in the interests of the United States")
(emphasis omitted).

## B. The Parole Termination is Lawful.

Even if the Secretary's decision were reviewable, the district court misread
the parole and expedited removal statutes in concluding that Plaintiffs are likely to
succeed on their APA claims. Plaintiffs' reasoning, which the district court adopted,
would produce a perverse result: though the previous Administration effectively
*granted* parole on a categorical basis to over half a million aliens—by using common
reasons to determine the prerequisites for parole were met—this Administration
cannot *terminate* parole absent individual determinations.

### 1. The Parole Termination Does Not Violate the INA.

To start, the district court erred in concluding that the parole statute imposes
a "case-by-case" requirement on parole terminations. A036. The INA explicitly
requires case-by-case determinations for *granting* parole, providing that the
Secretary may, with certain exceptions, "in h[er] discretion parole into the United
States temporarily under such conditions as [s]he may prescribe only on a case-by-
case basis for urgent humanitarian reasons or significant public benefit any alien
applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis
added). But Section 1182(d)(5)(A) contains no parallel language with respect to
*terminating* parole, instead providing only that "when the purposes of such parole

shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.*

Congress's inclusion of a case-by-case requirement for grants of parole, but not terminations, is strong evidence that parole terminations need not be so individualized. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets and citation omitted). For good reason: many conceivable grounds for terminating parole may apply to more than one parolee or may be common to an entire group of parolees. For instance, a change in geopolitical conditions might eliminate the "urgent humanitarian reasons" that justified parole for all nationals of certain countries, 8 U.S.C. § 1182(d)(5)(A); or the Secretary may determine that all aliens paroled solely because of a shortage of detention capacity should be re-detained once a new detention facility becomes available, *cf. Biden v. Texas*, 597 U.S. at 815-816 (Kavanaugh, J., concurring) (discussing parole in such a circumstance). Here, one independently sufficient ground for terminating the CHNV parole programs is that those programs made parole available to hundreds of thousands of aliens based on programmatic, non-individualized findings in the first place. *See* A046 (90 Fed. Reg. at 13,612).

Requiring the Secretary to make case-by-case determinations to terminate parole (which the statute does not require) that was made available on a categorical basis would further overburden the immigration system. *See* A053–A054 (90 Fed. Reg. at 13,619-13,620).

The district court reasoned that Section 1182(d)(5)(A) "refers in singular, rather than plural, to grants of parole," and "thus seems to contemplate termination of parole on an individual, rather than categorical, basis." A036 (emphasizing that in the clause authorizing termination, the statute refers to "such parole," "the alien," "he was paroled," and "his case") (citation and emphases omitted); *see also* A046.

That reasoning lacks merit. Most important, it proves too much. Countless INA provisions, not to mention statutes writ large, use the singular rather than the plural; that does not necessarily mean those provisions mandate case-by-case determinations, as the Dictionary Act's first provision instructs: "In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. For example, in the same section as the parole authority, the INA uses the singular to provide that "[a]ny alien who . . . is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). Yet DHS plainly may make categorical determinations that certain classes of aliens are likely to become public charges and are thus inadmissible. *Cf. DHS v. New York*, 140 S. Ct. 599 (2020)

(staying injunction against public-charge rule). Further, if the court's reasoning were correct, Congress's insertion of the "only on a case-by-case basis" language in 1996, *see* A046 (90 Fed. Reg. at 13,612 n.4) (describing the statutory history); Appx. 170, was entirely superfluous because the statute's use of the singular already required that result. But courts ordinarily "requir[e] a change in language to be read, if possible, to have some effect." *American National Red Cross v. S.G.*, 505 U.S. 247, 263 (1992).

Regardless, even if the INA imposed some sort of case-by-case requirement on parole terminations, that would not preclude the Secretary from establishing generally applicable criteria to guide her exercise of discretion. Even when Congress "requires individualized determinations," that requirement does not displace decisionmakers' "authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hospital Association v. NLRB*, 499 U.S. 606, 612 (1991); *see also*, *e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 467 (1983) (agency may rely on generally applicable medical-vocational guidelines even where statute requires individualized determinations of disability); *Federal Power Commission v. Texaco, Inc.*, 377 U.S. 33, 44 (1964) (similar, under Natural Gas Act); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205 (1956) (similar, under the Communications Act of 1934); *cf. Lopez v. Davis*, 531 U.S. 230, 243-244 (2001). Indeed, longstanding regulations

implementing Section 1182(d)(5)(A) take that approach. *See* 8 C.F.R. § 212.5. And the Supreme Court and other courts have repeatedly observed that generally applicable determinations are appropriate elsewhere in the immigration context. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting that the agency need not "forswear use of reasonable presumptions and generic rules" even where statute required " 'some level of individualized determination'") (citation omitted); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir.) (similar), *cert. denied*, 519 U.S. 824 (1996); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar).

Finally, the Secretary will continue to exercise her discretion to grant or deny parole to CHNV parolees on a case-by-case basis, *see* A046 (90 Fed. Reg. at 13,612), underscoring that the March 25 notice does not violate even the district court's flawed understanding of Section 1182(d)(5)(A).

## 2. The Parole Termination is Not Arbitrary or Capricious.

The district court also erred in concluding that the Secretary acted arbitrarily by relying on an allegedly "obvious legal error." A031 (citation omitted); *see* A031–A035. "The scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "highly deferential standard," *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 172 (1st Cir. 2021), the agency need only show that it has "considered the

relevant factors and articulated a rational connection between the facts found and the choice made," *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). Courts should uphold an agency determination if it is "supported by any rational view of the record." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015).

One of several reasons the Secretary gave for terminating all CHNV parole in 30 days rather than allow parolees' two-year terms to naturally expire was that the latter course "would increase the likelihood that th[ose aliens] would accrue more than two years of continuous presence in the United States" and thereby preclude the use of expedited removal under Section 1225(b)(1). A053–A054 (90 Fed. Reg. at 13,619-13,620). The court, however, concluded that CHNV parolees "are not subject to expedited removal even if they have been here less than two years." A032. The court observed (at A032) that expedited removal is available for an alien "who has not been admitted or paroled into the United States" and who cannot establish the two-year continuous-presence requirement. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). The court interpreted that language to mean that any alien who has ever been paroled, for any length of time, is categorically immune from expedited removal. That interpretation is incorrect.

The statute's use of the present perfect tense ("has not been . . . paroled") is best read to reflect a "state that continues into the present." *Turner v. U.S. Attorney*

*General*, 130 F.4th 1254, 1261 (11th Cir. 2025). Under this reading, an alien who was paroled but whose parole has terminated or expired "has not been . . . paroled" and may be processed for expedited removal under this clause. That reading tracks the statutory and historical context of parole, which temporarily allows an alien into the interior of the country while remaining constructively at the border. *See Leng May Ma v. Barber*, 357 U.S. 185, 188–190 (1958). That reading also aligns with statutory language providing that after parole is terminated, the alien's case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). To treat aliens whose parole has been terminated in the same manner as any other applicant for admission, all such aliens must be subject to expedited removal. Any "other" applicant—*i.e.*, one who was never paroled—who lacks two years of continuous presence at the time of the determination of inadmissibility would be subject to expedited removal. The district court's contrary reading would require a former parolee's case to be dealt with differently from any other applicant's by categorically taking expedited removal off the table. The court's reading also contradicts longstanding regulatory practice. Applicable regulations provide that after parole is terminated, "further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i). Section 235 of the Act is 8 U.S.C. § 1225—the expedited removal provision.

Moreover, even if the Secretary had erred in that one rationale, that error alone would not justify halting parole terminations, because the Secretary invoked several other independently sufficient reasons. *See, e.g.*, A054 (90 Fed. Reg. at 13,620) ("neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served"); A048–A050 (90 Fed. Reg. at 13,614-13,616) (expressing concern with expanded public-benefits eligibility of certain parolees); A053 (90 Fed. Reg. at 13,619) (recognizing a "strong interest in promptly returning parolees when the basis for the underlying parole no longer exists"). Indeed, the Secretary stated that her various reasons "independently and cumulatively[] support termination of the CHNV parole programs." A046 (90 Fed. Reg. at 13,612). Even the district court acknowledged that the Secretary's decision rested on many factors. A007–A008. Yet the court improperly, and summarily, dismissed these other reasons without the benefit of an administrative record.[3] A034; *cf. FDA v. Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898, 930 (2025) (remand on arbitrary-and-capricious claim is unnecessary "when an agency's

---

[3] Plaintiffs maintained their request for emergency relief could be decided without an administrative record. *See* Appx. 332. But "[t]he focal point for judicial review" of whether agency action is arbitrary and capricious is the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *City of Taunton, Massachusetts v. United States Env't Prot. Agency*, 895 F.3d 120, 127 (1st Cir. 2018); *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013).

decision is supported by a plethora of factual findings, only one of which is unsound"); *Sanchez-Vasquez v. Garland*, 994 F.3d 40, 48 (1st Cir. 2021). ("When . . . an agency premises a decision on alternate grounds, each of which is independently sufficient, we may uphold its decision if either ground is supportable."); *Nadal-Ginard v. Holder*, 558 F.3d 61, 69 n. 7 (1st Cir. 2009) ("We therefore need not reach the [agency's] other rationale for its decision [because if the other rationale constituted error] . . . there was no prejudice").

## II. A Balancing of the Equities Does Not Favor the Entry of Injunctive Relief.

In staying the district court's grant of preliminary relief, the Supreme Court "determined that the equity balance weighs in the Government's favor" at this stage. *See Noem v. Doe*, 2025 WL 1534782, at *4 (Jackson, J., dissenting). That conclusion controls here. In balancing the equities and harms, the district court made a "serious mistake" by improperly discounting the strong governmental and public interest in effectuating the Administration's immigration policies and placing undue weight on parolees' interest in an inherently discretionary benefit that they were advised was subject to termination at any time. *See Indep. Oil & Chem. Workers of Quincy, Inc.,* 864 F.2d at 929 (district court abuses discretion when it makes a "serious mistake" in weighing the relevant factors).

A stay of the parole termination on a class-wide basis imposes irreparable harm on the government and public, whose interests "merge" here, *Nken v. Holder*,

556 U.S. 418, 435 (2009). The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. The United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Those concerns escalate when, as here, the injunction would undermine the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Moreover, the Legislative Branch's prerogatives are injured as well where, as here, the injunctive relief bypasses a judicial-review bar.

The irreparable harm to the government and the public is acute. The relief the district court granted—had it not been stayed by the Supreme Court—would stymy the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests and thus inhibit the government's pursuit of its foreign policy goals. The court entirely discounted those harms on the grounds that "it [is not] in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country," and that the

government supposedly "offered no substantial reason or public interest that justifies forcing [CHNV parolees] to leave (or move into undocumented status) in advance of the original date their parole was set to expire." A039. Neither ground has merit.

As to the first, the Constitution and INA grant the Secretary and the political Branches—not the courts—the task of deciding whether it is in the public interest to allow up to 532,000 aliens who were never admitted and were paroled en masse, to remain in the country. *Cf. Nken*, 556 U.S. at 435 (government and public interests "merge" in this context).

As to the second, the Secretary explained at length her assessment that the CHNV parole programs, and the specific foreign policy approach that justified the creation of those programs, are inconsistent with the Administration's domestic and foreign policy goals. *See* A046, A049–A050 (90 Fed. Reg. at 13,612, 13,615–16); *see also Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) ("[F]oreign policy [is] the province and responsibility of the Executive."); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

The Secretary explained that any delay in terminating the CHNV parole programs "would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time sensitive negotiations following a change in Administration." A055 (90 Fed.

Reg. at 13,621). She observed that "U.S. foreign policy has changed in critical respects" since the CHNV parole programs were implemented; that the government currently "is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries," and that "[i]n the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing." *Id.* By indefinitely freezing those vestiges in place, a stay of parole terminations irreparably and unjustifiably harms the government's foreign-policy efforts.

On top of all that, staying parole terminations improperly encroaches on the core Executive function of managing the immigration system. *See Arizona v. United States*, 567 U.S. 387, 394-396 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). A stay of the parole termination contravenes the government's—and the public's—strong interest in expeditiously removing aliens who lack a lawful basis to remain in the United States. *See* A053–A054 (90 Fed. Reg. at 13,619–20). The district court's stay would effectively force DHS to delay removal proceedings for this population for a long period of time, unless it undertook the expensive and

time-consuming task of an individualized termination process for hundreds of thousands of CHNV parole recipients. This means that it would not be able to efficiently commence removal even for those CHNV parolees—like a number of the Plaintiffs in this case—who have no pending application for asylum or immigrant or nonimmigrant status. It also may compel DHS "to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system." *Id*. at 13,619.

The district court attempted to minimize those harms by observing that the order does not itself "authorize the entry" of any alien or "extend the original grants of [CHNV] parole," and instead "only require[s] the agency to give fuller consideration to the reliance interests of parolees" and "to make any decisions terminating grants of parole in an individual, case-by-case manner." A038. But the Secretary already extensively considered reliance interests, *see* A051–A052 (90 Fed. Reg. at 13,617–18), as the court elsewhere acknowledged, *see* A008–A010. And making individualized parole terminations would be enormously burdensome and entail substantial delays given the sheer number (532,000) of CHNV parolees and the two-year parole term each was granted. *See* A046 (90 Fed. Reg. at 13,612). The order is thus tantamount to permanently enjoining any termination of CHNV parole.

On the flip side, Plaintiffs did not establish that they or the class were likely to suffer irreparable injury in the absence of preliminary injunction. *See Winter*, 555

U.S. at 20, 22 ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."). Plaintiffs and class members are or should be well aware that parole is a discretionary benefit that can be terminated at any time—not least because Secretary Mayorkas repeated that admonition when establishing these very parole programs. *See*, *e.g.*, 88 Fed. Reg. at 1272 (Appx. 126) ("DHS may terminate parole in its discretion at any time."); *supra* at pg. 3 & n.2. Further, some class members may already have obtained immigrant or nonimmigrant status and would thus suffer no harm from the termination of their parole. Moreover, the termination of parole is not equivalent to a final removal order; parolees who seek asylum or other forms of humanitarian protection from removal, in particular, would have the opportunity to assert those claims if they are placed in expedited removal or removal proceedings. *See* 8 U.S.C. 1225(b)(1)(A)(ii), 1229a(c)(4); 8 C.F.R. § 208.30(b), (e)(2)-(3).

Plaintiffs may contend, as they did before the Supreme Court, that absent a preliminary injunction, many CHNV parole beneficiaries would be subject to a risk of deportation without due process. That is incorrect. As the government has explained, CHNV parolees may be placed in expedited removal proceedings, which comport with the Constitution, including the Due Process Clause. *See DHS v. Thuraissigiam*, 591 U.S. 103, 138–140 (2020). And any alien placed in expedited removal proceedings could raise asylum claims or claims for protection under the

Convention Against Torture or statutory withholding of removal. *See* 8 C.F.R. §§ 208.30(b) and (e)(2)-(3).

In sum, the district court erred in concluding that the equities favor Plaintiffs, as the Supreme Court tacitly found when granting a stay and determining that the equities instead weigh in the Government's favor. *See Noem v. Doe*, 2025 WL 1534782, at *3-4 (Jackson, J., dissenting) (criticizing the majority for "determin[ing] that the equity balance weighs in the Government's favor").

## CONCLUSION

For these reasons, this Court should reverse the district court's decision.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel

/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
First Cir. Bar No. 1216699
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 598-8259
(202) 305-7000 (facsimile)
katherine.j.shinners@usdoj.gov

ELISSA FUDIM
*Trial Attorney*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,534 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word for Microsoft 365 in proportionally spaced Times New Roman 14-point font.

*s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel

## CERTIFICATE OF SERVICE

I, Katherine J. Shinners, Senior Litigation Counsel, hereby certify that on June 11, 2025, I filed the forgoing brief and the addendum through the CM/ECF system, which will provide electronic service to the registered participants as identified on the Notice of Electronic Filing (NEF).

*s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel

# ADDENDUM

# TABLE OF CONTENTS

| Document | Page |
|---|---|
| Memorandum and Order Granting in Part Plaintiffs' Emergency Motion for a Stay (Dkt. No. 97) | A001 |
| Order Granting Class Certification (Dkt. No. 98) | A042 |
| *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13,611 (Mar. 25, 2025) | A045 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,                                    *
                                                        *
        Plaintiffs,                                     *
                                                        *
            v.                                          *
                                                        *
KRISTI NOEM, in her official capacity as                *
Secretary of Homeland Security; TODD M.                 *
LYONS, in his official capacity as the                  *
Acting Director of Immigration and                      *
Customs Enforcement; PETE R. FLORES,                    *        Civil Action No. 1:25-cv-10495-IT
in his official capacity as Acting                      *
Commissioner of U.S. Customs and Border                 *
Protection; KIKA SCOTT, in her official                 *
capacity as the Senior Official Performing             *
the Duties of the Director of U.S.                      *
Citizenship and Immigration Services; and               *
DONALD J. TRUMP, in his official                        *
capacity as President of the United States,            *
                                                        *
        Defendants.                                     *

MEMORANDUM & ORDER GRANTING IN PART PLAINTIFFS'
EMERGENCY MOTION FOR A STAY OF DHS'S *EN MASSE* TRUNCATION
OF ALL VALID GRANTS OF CHNV PAROLE

April 14, 2025

Among several motions pending before the court is Plaintiffs' Emergency Motion for

Preliminary Injunction and Stay of DHS's *En Masse* Truncation of All Valid Grants of CHNV

Parole [Doc. No. 70]. For the reasons that follow, and pending further court order, the court

grants emergency relief staying the *Termination of Parole Processes for Cubans, Haitians,*

*Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), insofar as it revokes,

without case-by-case review, the previously granted parole and work authorization issued to

noncitizens paroled into the United States pursuant to parole programs for noncitizens from

Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's

originally stated parole end date.

## I.    Background

### A.    The Statutory Parole Authority

Under the Immigration and Nationalization Act, as amended:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit <u>any alien applying for admission</u> to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (emphasis added).[1]

### B.    The CHNV Processes

On October 19, 2022, the Department of Homeland Security ("DHS") announced an

effort to address the increasing number of Venezuelan nationals arriving at the southern border

of the United States by "coupl[ing] a meaningful incentive to seek a lawful, safe and orderly

means of traveling to the United States with the imposition of consequences for those who seek

to enter irregularly." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507

(Oct. 19, 2022). Under the program, individuals who passed a national security and public safety

vetting and who had a supporter in the United States who agreed to provide housing and other

support could receive an advanced authorization to travel to the United States for the purposes of

seeking, on a case-by-case basis, a discretionary grant of parole at an internal port of entry. <u>See</u>

---

[1] An "alien" is "any person not a citizen or national of the United States." <u>Id.</u> § 1101(a)(3).

A002

id. at 63515; see also id. at 63508 ("[o]nly those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.").[2] The program specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization. See id. at 63508. The program specified further that those "who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires." Id. The process was capped at 24,000 beneficiaries. See id. Individuals who had been ordered removed from the United States in the past five years, or who crossed into the United States between ports of entry or entered Mexico or Panama without authorization after October 19, 2022, were barred from the program. Id.

In early 2023, DHS implemented similar processes for nationals of Cuba, Haiti, and Nicaragua. See Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023).

On October 4, 2024, DHS announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. See Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614 n.24 (Mar. 25, 2025).[3]

---

[2] In contrast, "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i).

[3] Plaintiffs do not dispute that re-parole is not available through the CHNV processes. See Mem. ISO Second Mot. for PI at 3 n.4 [Doc. No. 72].

A003

C. *The January 20, 2025 Executive Orders*

On January 20, 2025, President Trump signed numerous executive orders, including two that are relevant here:

The first order directed the Secretary of Homeland Security to "take all appropriate action [consistent with applicable law] to . . . [t]erminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the [CHNV program]." See Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 30, 2025).

The second order directed the Secretary to take "all appropriate action, consistent with law," to:

> ensur[e] that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole[.]

See Exec Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

D. *The Huffman Memorandum*

On January 20, 2025, Acting Secretary of Homeland Security Benjamin C. Huffman issued a memorandum stating that "[i]t is evident that many current DHS policies and practices governing parole are inconsistent with [8 U.S.C § 1182(d)(5)]." See Huffman Memorandum 2 [Doc. No. 41-1]. The memorandum stated that the language and context of 8 U.S.C. § 1182(d)(5) "make it abundantly clear that it is a limited use authority, applicable only in a very narrow set of circumstances," and that the statute "does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria." Id. at 1-2 (emphasis in original). The memorandum further stated that "it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens

4

found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims." Id. at 2.

The Huffman memorandum ordered that within 60 days, the Director of U.S. Immigration and Customs Enforcement ("ICE"), the Commissioner of U.S. Customs and Border Protection ("CBP"), and the Director of U.S. Citizenship and Immigration Services ("USCIS") were to compile and review all policies pertaining to parole to determine "which are not strictly in accord with" 8 U.S.C § 1182(d)(5), and to thereafter "[f]ormulate a plan for phasing out" any such policies. See id. It further ordered that pending such review, DHS Components would have "discretion to pause, modify, or terminate any parole program described in [the previous paragraph] to the extent" that: (1) the policy was not promulgated pursuant to the procedural requirements of the APA; (2) DHS could take such action while protecting legitimate reliance interests; and (3) taking such action was otherwise consistent with applicable statutes, regulations, and court orders. See id.

Huffman concluded his memorandum by stating that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance." Id.

E. *The Davidson Memorandum*

On February 14, 2025, Andrew Davidson, the Acting Deputy Director of USCIS, issued a memorandum authorizing an immediate agency-wide administrative hold on all pending status readjustment and benefit requests filed by individuals paroled into the United States under the CHNV programs, pending "the completion of additional vetting flags in ELIS to identity any fraud, public safety, or national security concerns." Davidson Memorandum [Doc. No. 41-3]. The memorandum stated that USCIS had suspended parts of the CHNV processes in July 2024

5

after a USCIS assessment identified potential concerns related to fraudulent sponsorship

requests. Id. at 2. Based on this assessment, the memorandum stated that "benefit requests filed

by aliens who are or were paroled under any of these categorical parole programs need further

review to determine the level of fraud and the possible involvement of beneficiaries." Id.[4]

The Davidson memorandum concluded by stating:

> Any case subject to this administrative hold with a litigation need may only be lifted
> from the hold on a case-by-case basis, in a subsequent memo to file, with approval
> by the USCIS Director or USCIS Deputy Director. This case-by-case requirement
> must be followed even when aliens are member of a class that is subject to
> injunction, settlement agreement, or other court order. Once USCIS completes a
> comprehensive review and evaluation of the in-country population of aliens who
> are or were paroled into the United States under these categorical parole programs,
> USCIS may issue a subsequent memo lifting this administrative hold.

Id. To date, the "administrative hold" has not been lifted.

*F. The March 25, 2025 Federal Register Notice*

On March 25, 2025, DHS published a Federal Register Notice ("FRN") announcing that,

effective immediately, DHS "is terminating the categorical parole programs for inadmissible

aliens from Cuba, Haiti, Nicaragua, and Venezuela." See Termination of Parole Processes for

Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).[5] The

---

[4] The Davidson Memorandum also suspended benefits requests filed by individuals paroled
under the Uniting for Ukraine and Family Reunification Parole programs. See Davidson
Memorandum 1 [Doc. No. 41-3]. The court will address Plaintiffs' challenge to the Davidson
Memorandum in a separate order.

[5] The FRN repeatedly uses the term "inadmissible aliens" in describing the individuals in the
United States pursuant to these parole programs. See e.g. id. at 13614 (referring to "inadmissible
aliens arriving in local communities"); id. at 13618 ("Between October 19, 2022, and January 22,
2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant
to the CHNV parole programs.") (emphasis added). Parole is authorized for individuals
"applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). In other words, parole
may be granted when an individual has not yet been deemed either admissible or inadmissible.
The FRN gives no reason for mislabeling individuals who received parole through CHNV (or
any other program) as "inadmissible" and, when detailing the statutory scheme, acknowledges

FRN announced further that "[t]he temporary parole period of aliens in the United States under

the CHNV parole programs and whose parole has not already expired by April 24, 2025[,] will

terminate on that date unless the Secretary makes an individual determination to the contrary."

Id. It directed further that "[p]arolees without a lawful basis to remain in the United States

following this termination of the CHNV parole programs must depart the United States before

their parole termination date." Id. The FRN detailed further that:

> DHS generally intends to remove promptly aliens who entered the United States
> under the CHNV parole programs who do not depart the United States before their
> parole termination date and do not have any lawful basis to remain in the United
> States. DHS retains its discretion to commence enforcement action against any
> alien at any time, including during the 30-day waiting period created by this notice.

Id. at 13618.[6]

The FRN stated that terminating the CHNV programs and existing grants of parole under

CHNV was consistent with the President's executive orders, including Executive Order 14165.

See id. at 13611. According to the FRN, the CHNV programs "do not serve a significant public

benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the

domestic effects of illegal immigration, are not serving their intended purposes, and are

inconsistent with the Administration's foreign policy goals." Id. at 13612.[7] The FRN further

---

that "a parolee remains an applicant for admission during the period of parole in the United
States." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans,
90 Fed. Reg. 13611, 13618 (Mar. 25, 2025).

[6] The FRN further stated that "DHS intends to prioritize for removal those who (1) have not,
prior to the publication of this notice, properly filed an immigration benefit request, with
appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the
United States (e.g., adjustment of status, asylum, Temporary Protected Status, or T or U
nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly
filed by someone else on their behalf (e.g., petition for alien relative, fiancé petition, petition for
immigrant employee), with appropriate fee (or fee waiver request, if available)." Id. at 13619.

[7] The FRN explained in some detail why the original grounds for the CHNV program did not
warrant continuing the program. See id. at 13612-13614 (explaining why, in DHS's view, the

stated that as to prior arguments or determinations "that these programs were consistent with the requirement of 'urgent humanitarian reasons' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." Id. The FRN concluded that these reasons, independently and cumulatively, support termination of the CHNV programs. Id.

After addressing DHS's rationale for terminating the CHNV programs, the FRN turned to the reliance interests of prospective supporters and parolees. Id. at 13617. The FRN asserted first that "the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted," but that it was addressing certain reliance interests "in an abundance of caution." Id.

The FRN addressed first the reliance interests of supporters and potential beneficiaries of the CHNV programs, concluding that the costs potentially incurred by these individuals were minimal and "pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States." Id. at 13617-18.

The FRN addressed next the reliance interests of potential beneficiaries with approved advanced travel authorizations ("ATA") and their supporters. The FRN stated that "[t]here are no currently approved ATAs upon which an alien may travel under the CHNV programs," and that

---

CHNV programs were unnecessary to achieve border security goals); id. at 13614-15 (explaining why, in DHS's view, the CHNV programs did not minimize "the burden on communities, state and local governments, and NGOs"); id. at 13615-16 (explaining why, in DHS's view, the CHNV programs are inconsistent with the new administration's foreign policy goals); id. at 13616-17 (explaining why, in DHS's view, other factors do not counsel in favor of maintaining the CHNV programs).

the interests of any individual whose application for an ATA has been cancelled are outweighed by the other concerns specified in the FRN. Id. at 13618.[8]

Finally, the FRN addressed the reliance interests of individuals with a current grant of parole under the CHNV programs, including that these individuals "will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside." Id. at 13619. The FRN stated that "any assessment of" these interests "must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served; and that (2) the initial term of parole would be limited to a maximum of two years." Id.

The FRN concluded that "the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." Id. DHS stated that it considered the alternative of permitting CHNV parole recipients to

---

[8] The absence of any approved ATA requests followed a directive issued on January 23, 2025, by Jennifer B. Higgins, then Acting Director of USCIS, to her colleagues to "ensure effective immediately that your staff do not make any final decisions (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request" for the CHNV, or other parole programs. See Higgins E-mail [Doc. No. 41-2]. On January 28, 2025, USCIS provided notice on its website that it was "pausing acceptance" of the Form I-134A, Online Request to be a Supporter and Declaration of Financial Support used to initiate the parole processes for the CHNV and certain other programs, "until the Agency had reviewed all categorical parole programs as instructed by Executive Order (EO) 14165." See Kika Scott Decl. ¶ 4 [Doc. No. 41-4]. The court will address Plaintiffs' challenge to the Higgins E-mail in a separate order.

remain in the country until the natural expiration of the parole, but the FRN rejected that

alternative on the grounds that it would:

> essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

Id. at 13619-20.

For the same reason, DHS rejected the alternative of more than a 30-day

termination period for existing grants of parole. See id. at 13620.

The FRN concluded by stating DHS's view that publication of the notice in the Federal

Register constitutes legally sufficient notice to all interested or affected persons. Id.

G. *Plaintiffs Who Were Paroled into the United States Under the CHNV Programs*[9]

Plaintiffs[10] who were paroled into the United States under the CHNV Programs have

supported the pending motions with declarations stating the following:

---

[9] For the purposes of this order, this court addresses only the claims of individuals who received parole through a CHNV program. The court does not address here the claims of Plaintiffs who supported individuals or are seeking to support individuals for parole through the CHNV programs. The court is also not addressing here the claims of Plaintiffs who received parole or have supported or are seeking to support individuals through any parole program other than CHNV.

[10] These Plaintiffs are proceeding here under pseudonyms pursuant to the parties' Stipulated Protective Order Concerning Confidential Doe PII [Doc. No. 57] and this court's Electronic Order [Doc. No. 69] granting Plaintiffs' Second Supplemental Motion to Proceed Under Pseudonym [Doc. No. 64]. All Plaintiffs except Miguel Doe voluntarily provided their identities to Defendants, and all Plaintiffs have provided their identities to this court for *in camera* review. See Mem. & Order [Doc. No. 79]; Sealed Notice Providing Plaintiffs' Identities [Doc. No. 81-1].

A010

1.   Armando Doe[11]

Armando Doe fled Nicaragua due to the dangers he faced stemming from his work dedicated to documenting government abuse, the arrest of his father-in-law, and the harassment and persecution of his wife's family.[12] He lawfully entered the United States pursuant to a two-year grant of parole in February 2024. He received work authorization in April 2024 and has been working at a company that makes tractor trailers. The salary he earns helps him provide for his family here as well as for his parents in Nicaragua, including to pay for their medical appointments and living expenses. If Armando Doe cannot work in the United States, he will be forced to returned to Nicaragua and face persecution by the Nicaraguan government. He is scared to return to Nicaragua and has a pending asylum application, which he submitted in January 2025. He attended his biometrics appointment for his asylum application in February 2025.

2.     Ana Doe[13]

Ana Doe, the wife of Armando Doe, is also a citizen of Nicaragua who received a two-year grant of parole in February 2024. She received work authorization in April 2024. In Nicaragua, Ana Doe completed college studies computer engineering. Here, she has been working for a company that supplies personal protective equipment. She uses her salary here to provide for her family and for her mother who lives in Nicaragua.

---

[11] See Armando Doe Decl. [Doc. No. 24-3].

[12] Armando Doe's wife is Plaintiff Ana Doe.

[13] See Ana Doe Decl. [Doc. No. 24-2].

Ana Doe has a pending asylum application that she submitted in January 2025 because she fears persecution by the current governmental regime. She states that she is not even certain she would be allowed entry into Nicaragua, which would leave her and her family stateless.

3.    Carlos Doe[14]

Carlos Doe is a citizen of Nicaragua and is the cousin of Ana and Alejandro Doe. In his hometown in Nicaragua, the government assassinated 32 people and disappeared more than 50 after protests broke out. The army identified him as being involved in the protests and in opposition to the government, and soldiers and police officers came to his home several times and made death threats against him and his family. He and his father fled their hometown and went into hiding, but later received anonymous calls and more death threats. Soldiers visited his mother's home in 2021 and told her that they would imprison Carlos Doe and his father for treason if they found them. A family member living in the U.S. sponsored him for CHNV parole, and he was approved to travel to the United States in May 2023. He arrived in the United States and received a two-year grant of parole, originally set to expire in June 2025.

Carlos Doe obtained work authorization in October 2023. He currently works at a manufacturing plant performing welding and soldering. He has also worked providing food delivery services and performing home renovations and has learned English through these jobs.

Carlos Doe has a pending application for asylum that he submitted in January 2025 and had an appointment with USCIS for his asylum application scheduled for March 4, 2025.

---

[14] See Carlos Doe Decl. [Doc. No. 24-4].

A012

4.    Andrea Doe[15]

Plaintiff Andrea Doe is a citizen of Nicaragua whose husband was sentenced to over 20 years in prison due to his opposition to the Nicaraguan government. In prison, Andrea Doe's husband suffered physical and mental torture. While her husband was incarcerated, Andrea Doe's home was surveilled, and police vehicles stationed themselves in front of her home. When Andrea Doe and her children traveled to the penitentiary to visit her husband, police agents waited at the corner until she and her children got on the bus. After her husband was in prison for four years, the Nicaraguan government agreed to release 222 political prisoners, including her husband, on the condition that the United States would take them. The political prisoners were abruptly released from prison and placed on a flight to the United States. Her husband received parole into the United States, and the Nicaraguan government stripped him and the other passengers on the flight of their Nicaraguan citizenship, making Andrea Doe's husband stateless.

Andrea Doe states that the U.S. government told her husband and other passengers on his flight to use the CHNV programs to apply for reunification with their family members who were left behind in Nicaragua. Her husband followed that instruction, and Andrea Doe and their children arrived in the United States in the summer of 2023, after being sponsored for CHNV parole by someone outside her family.

In the United States, Andrea Doe received work authorization, and she and her husband both work at a company that installs vinyl on cars for advertising. Their children attend elementary school.

---

[15] See Andrea Doe Decl. [Doc. No. 27-1].

Andrea Doe's husband included her on his asylum application, which is still pending. She fears returning to Nicaragua, where government officials saw her visiting her husband in prison and know she is his wife. She reports that when she and her children were leaving Nicaragua, they were pulled out of the line, had their passports taken, and were held up at the airport for two hours. She believes that if she was forced to return to Nicaragua, she would be detained, and the government would take away her children.

5.    Lucia Doe[16]

Plaintiff Lucia Doe is a Venezuelan national who left her home country due to her family's difficult financial circumstances. She has a bachelor's degree in Christian Education from a university in Puerto Rico, but her salary as Director of Children's Ministries at a Christian church in Venezuela was insufficient to provide for basic needs like food, rent, and clothing. Her family had to rely on financial assistance from her relatives living abroad. She received a two-year grant of parole in July 2024 and obtained a work permit in August 2024.

Lucia Doe works cleaning apartments, condominiums, houses, schools, and businesses. Her plan when seeking parole was to use her two-year grant of parole to work to support her parents and to save money for the future, as well as to pay back her sister for the money her sister spent helping Lucia Doe obtain a work permit and secure transportation to the United States. She fears returning to Venezuela, where she says it is especially difficult to find employment over the age of 40. She has been saving money in case she needs to purchase a last-minute ticket to Venezuela, as to avoid unlawful status in the United States.

---

[16] <u>See</u> Lucia Doe Decl. [Doc. No. 64-3].

Lucia Doe is concerned about returning to Venezuela with a parole stamp on her passport and states that other Venezuelans who have returned with such stamps have been forced to pay money to military officials at the border in order to be allowed to return to Venezuela, while others have had their passports confiscated, have been imprisoned, or have disappeared.

6.    Miguel Doe[17]

Plaintiff Miguel Doe is a Nicaraguan national and is the brother of Alejandro Doe. In Nicaragua, he struggled to find stable work, after being unable to complete his university studies due to interruptions from the Covid-19 pandemic, subsequent changes to the curriculum and course requirements, and the frequent cancellation of courses at his public university. He received a two-year grant of parole in July 2024 after being sponsored by his cousin. He intended to use his two-year grant of parole to provide for his family and save money. He never intended to stay in the United States indefinitely, as his mother needs help caring for herself. Miguel Doe received work authorization in September 2024 and currently works full-time producing marble panels.

Miguel Doe fears that the Nicaraguan government will assume he opposes it if he returns as a deportee and recipient of parole. He believes the risk is even greater if he applies for but does not receive asylum in the United States. However, he also fears staying in the United States without lawful status.

7.    Daniel Doe[18]

Plaintiff Daniel Doe is a Haitian national. While in Haiti, Daniel Doe worked as a court interpreter and as an interpreter for the U.S. Embassy, among other groups. On multiple

---

[17] See Miguel Doe Decl. [Doc. No. 64-4].

[18] See Daniel Doe Decl. [Doc. No. 64-5].

A015

occasions, he was followed by people on motorcycles on his way to work; Daniel Doe believes these individuals were part of a gang and were tracking his and his family's whereabouts due to his work as an interpreter and with the U.S. Embassy.

In Haiti, his neighborhood came under the control of a gang, whose members attacked and kidnapped neighborhood residents. Daniel Doe and his wife left their original neighborhood after the gang broke into their neighbor's home, physically attacked the husband of the household, and kidnapped the wife of the household. In their new neighborhood, a gang attacked the police station, and there are no longer police forces in the neighborhood.

A friend of Daniel Doe's father offered to support him for CHNV parole but could only afford to support Daniel and not his family. Daniel Doe and his wife searched for a supporter through a matching process so that they could be paroled as a family. They were matched with a sponsor, but Daniel Doe subsequently received travel authorization through his original application. He was granted a two-year period of parole in February 2024.

Daniel Doe received work authorization in March 2024. He worked as a tutor and currently works as an English as a Second Language teacher at two schools. He also obtained his license as a life insurance agent, is currently taking courses on financial investing, and is seeking to receive certification to work as an interpreter in the United States. Daniel Doe has also started a company that promotes education for Haitian immigrants who are new to the United States. He is the main financial supporter of his wife and daughter who live in Haiti. Without work authorization, Daniel Doe will not be able to provide for his family.

Daniel Doe received Temporary Protected Status in September 2024, which was originally set to expire in February 2026. The government has since modified his TPS to terminate in August 2025.

## II.    Jurisdiction and Reviewability

Defendants raise numerous challenges to this court's jurisdiction. While Defendants are correct that the Secretary's discretion in this area is broad, their conclusion that the Secretary's actions are wholly shielded from judicial review is incorrect. Accordingly, while this court recognizes that its role in reviewing agency action in this area is limited, within that limited role the court is not precluded from considering Plaintiffs' APA claims or from staying the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 5, 2025) insofar as it revokes, without case-by-case review, previously granted parole and work authorizations for individuals currently in the United States.

### A.  Standing

"If at least one plaintiff has standing, the suit may proceed." Biden v. Nebraska, 600 U.S. 477, 489 (2023). To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024). The court finds that the Plaintiffs listed above are similarly situated for purposes of this inquiry and are all likely to establish each element of standing to challenge the FRN's early termination of their parole and work authorization.

The Plaintiffs described above attest to the risks they face from the loss of lawful status and work authorization as well as from a subsequent removal from the United States. See supra Part I.G. Defendants argue that these injuries are not redressable by a stay of the FRN because even if the FRN is stayed, the Secretary still retains authority (1) to end the CHNV programs any

A017

time, without issuing guidance in the Federal Register; and (2) to make individual determinations terminating Plaintiffs' parole.

The first argument goes to the underlying merits of this dispute, namely whether the discretion to end the CHNV program moving forward allows the Secretary to ignore, on a categorical basis, the specific duration of parole accorded in the grant of parole to each individual parolee. The first argument does not go to the threshold question of standing. The second argument is beside the point, where Defendants have made no individual determinations regarding the revocation of individual grants of parole and Plaintiffs' challenge is to Defendants' categorical actions.

The court finds that Plaintiffs have standing to challenge the shortening of their grant of parole. Plaintiffs were paroled into the United States by complying with the immigration processes made available to them. As lawful parolees, they did not have to fear arrest for being in the United States, were permitted to legally work if they received work authorization, and could apply for adjustment of status or other benefits while paroled into this country. The immediate impact of the shortening of their grant of parole is to cause their lawful status in the United States to lapse early—in less than two weeks. If their parole status is allowed to lapse, Plaintiffs will be faced with two unfavorable options: continue following the law and leave the country on their own, or await removal proceedings.

If Plaintiffs leave the country on their own, they will face dangers in their native countries, as set forth in their affidavits. For some Plaintiffs, leaving will also cause family separation. Leaving may also mean Plaintiffs will have forfeited any opportunity to obtain a remedy based on their APA claims, as leaving may moot those claims.

If, in the alternative, Plaintiffs remain in the United States and await removal proceedings, they may be subject to arrest and detention, they will no longer be authorized to work legally in this country[19] and their opportunities to seek any adjustment of status will evaporate. In this litigation, Defendants have repeatedly contended that Plaintiffs will have the opportunity to renew their requests for immigration benefits if placed in removal proceedings.[20] But even if Plaintiffs can renew requests for certain benefits, some requests may very well be denied simply because Plaintiffs would no longer be in lawful status. Defendants' positions are also inconsistent. Despite claiming Plaintiffs could renew requests in removal proceedings, Defendants: (1) are defending the FRN, which states that the revoking of parole is designed to ensure expedited removal (thereby avoiding removal proceedings); and (2) insist that Plaintiffs can be subjected to expedited removal proceedings while acknowledging, at a hearing before this court, that Plaintiffs could not renew most immigration benefits requests if placed in expedited proceedings. See infra Part IV.A. Finally, Defendants neglect to mention that the Davidson Memorandum—which Defendants maintain is lawful—imposed an indefinite suspension of immigration benefits adjudications, rendering Plaintiffs' chances of having any benefits adjudicated outside of removal proceedings a virtual nullity.

In either event, Plaintiffs have standing.

---

[19] Denial of work authorization over the course of this litigation would cause harm to Plaintiffs that could not be remedied through damages. See supra Part I.G.

[20] See, e.g., Opp. to Supp. Mot. for Class Cert. 8 [Doc. No. 90] ("If Rescinded Parolee Plaintiffs are placed into removal proceedings under 8 U.S.C. § 1229a, they can renew their requests for relief—whether for asylum, withholding of removal, TPS, or adjustment of status—in those proceedings, which have multiple levels of appellate review."); Opp. to Mot. for PI 7 [Doc. No. 42] ("If a Parolee Plaintiff who asserts a fear of return to her home country or entitlement to TPS is placed in removal proceedings under § 1229a, those claims could be raised before the immigration judge.").

*B.  Section 1252(a)(2)(B)(ii)*

Defendants argue that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes this court's review of Plaintiffs' claims. See Opp. to Second Mot. for PI 7 [Doc. No. 89]. That is incorrect.

Section 1252(a)(2)(B)(ii) strips district courts of jurisdiction to review "any [] decision or action of . . . the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."[21] The decision to categorically truncate, without any individual review, grants of parole is not specified in the Subchapter to be within the Secretary's discretion.

Defendants argue that the decision whether to terminate parole is within the Secretary's discretion under 8 U.S.C. § 1182(d)(5)(A) and is therefore precluded from review by Section 1252(a)(2)(B)(ii). As to the revocation of an individual grant of parole, that statement is unremarkable: The parole statute, which is in the same subchapter, provides that an alien's parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served[.]" 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Section 1252(a)(2)(B)(ii) applies to matters where discretion is conferred by statute on the Secretary, see Kucana v. Holder, 558 U.S. 233, 251-52 (2010) (emphasis added), and under 8 U.S.C. § 1182(d)(5)(A), Congress has placed individual parole determinations, and the decision of whether to revoke such individual grants of parole, within the Secretary's discretion.

But there is a separate question as to whether Congress, by statute, also has given the Secretary the discretion, after parole has been granted and individuals have entered the country

---

[21] Section 1158(a) pertains to the granting of asylum. See 8 U.S.C. § 1158(a).

on a lawful basis for approved periods, to categorically truncate these grants of parole *en masse* and without individual review, such that review of that *en masse* revocation may be precluded here under Section 1252(a)(2)(B)(ii). The answer is no. As this court explains below, the FRN's categorical truncation of Plaintiffs' previously awarded period of parole violates Section 1182(d)(5)(A). That statute requires grants of parole to be made on a case-by-case basis. Thus, the statute requires that to determine whether the purposes of a grant of parole "have been served" such that termination is warranted, the Secretary must attend, in some way, to the reasons an individual alien received parole. See infra Part IV.A. Because the categorical termination of the period of parole previously awarded to the parolees violates the parole statute, the same statute cannot be read to give the Secretary the discretion to take such unlawful action. Therefore, Section 1252(a)(2)(B)(ii) is no bar to review.

The Supreme Court's decision in Kucana points to the same conclusion. The Kucana Court, in considering whether Section 1252(a)(2)(B)(ii) barred judicial review of an administrative determination, emphasized "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." 558 U.S. at 251. "When a statute is 'reasonably susceptible to divergent interpretation, [the Court] adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review" Id. (internal quotations omitted)." With these principles in mind, the Kucana Court concluded that Section 1252(a)(2)(B)(ii)'s limitation on judicial review applied only to Attorney General determinations made discretionary by statute, and not to determinations declared discretionary by the Attorney General. Id. at 249-52.[22]

_____

[22] It is thus of no consequence, despite Defendants' suggestion to the contrary, see Opp. to Second Mot. for PI 7 [Doc. No. 89], that the guidance instituting the CHNV programs asserted

Consistent with that distinction, "courts have declined to apply [Section 1252(a)(2)(B)(ii)] to claims challenging the legality of policies and processes governing discretionary decisions under the INA." Roe v. Mayorkas, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023) (quoting Aracely, R v. Nielsen, 319 F. Supp. 3d 110, 135 (D.D.C. 2018)); R.F.M. v. Nielsen, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019) ("The plaintiffs do not seek to litigate individual claims but rather a policy the agency uses to adjudicate those claims."); Doe 1 v. Mayorkas, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021) ("[T]he Court does not find 8 U.S.C. § 1252(a)(2)(B)(ii), which applies to decisions made to individual applications, applicable here to this challenge of immigration policy."); Doe v. Trump, 288 F. Supp. 3d 1045, 1072 (W.D. Wash. 2017) (concluding Section 1252(a)(2)(B)(ii) may bar challenge to denial of refugee admission, but not challenge to failure to act on refugee admissions).

Defendants suggest that there is no reason to distinguish the FRN's "announcement of the decision to terminate numerous CHNV parolees' existing parole terms . . . from an individual decision to terminate a particular grant of parole for purposes of § 1252(a)(2)(B)(ii)." Opp. to Second Mot. for PI 7 [Doc. No. 89]. That argument is addressed on the merits below. But as to the jurisdiction stripping statute, the distinction between an individual revocation of parole and the categorical truncation of grants of parole is warranted where the presumption of reviewability has been "consistently applied" to immigration statutes and can only be overcome by "clear and

---

that "[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point" and that the CHNV programs were "being implemented as a matter of the Secretary's discretion." 88 Fed. Reg. 1266, 1277 (Jan. 9, 2023) (alterations in original). Section 1252(a)(2)(B)(ii)'s bar on review applies only to determinations made discretionary by statute and not to determinations made by the guidance itself.

A022

convincing evidence" of congressional intent to preclude judicial review. Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (internal citations omitted).

Nor do cases relied upon by Defendants dictate otherwise, as each finds a stripping of jurisdiction under Section 1252(a)(2)(B)(ii) warranted only after examining the specific immigration statute at issue, none of which involved Section 1182(d)(5)(A). See Thigulla v. Jaddou, 94 F.4th 770, 774-76 (8th Cir. 2024) (finding that Section 1252(a)(2)(B)(ii) barred review of an adjudication hold policy promulgated under authority granted in 8 U.S.C. § 1255(a)); accord Cheejati v. Blinken, 106 F.4th 388, 394-95 (5th Cir. 2024); Geda v. Dir. United States Citizenship and Immigr. Servs., 126 F.4th 835, 843-44 (3d Cir. 2025).[23]

Defendants cite Patel v. Garland, 596 U.S. 328 (2022), for the proposition that "the statutory bar applie[s] to every decision in the chain leading to [a] particular decision, including, as relevant to the CHNV termination, the agency's guidance related to that ultimate discretionary judgment." Opp. to Second Mot. for PI 8 [Doc. No. 89]. But the Patel Court was construing Section 1252(a)(2)(B)(i), which bars review of judgments under five specific statutes providing for individual, discretionary relief.[24] 596 U.S. at 336. While the Kucana Court noted that

---

[23] In Patel v. Jaddou, defendants argued that the challenged action was an act within the Secretary's discretion conferred by Section 1255(a), precluding judicial review by the district court. 695 F. Supp. 3d 158, 166 (D. Mass. 2023). This court determined that the inquiry first required consideration of the claim on the merits, see id. at 169, and concluded, after a detailed review of Section 1255(a), that the challenged action "does not contradict § 1255" and was "an act within the Secretary's discretion[.]" Id. at 173. The First Circuit, in turn, affirmed the dismissal based on its review of Section 1255(a), without addressing defendants' continuing objection that courts are barred by Section 1252(a)(2)(B)(ii) from even considering the question. Gupta v. Jaddou, 118 F.4th 475 (1st Cir. 2024).

[24] See 8 U.S.C. § 1252(a)(2)(B)(i) (listing § 1182(h) (waiver of alien's inadmissibility based on single offense of marijuana possession), § 1182(i) (waiver of immigrant's inadmissibility for fraud or willful misrepresentation of material fact), § 1229b (cancellation of removal for certain permanent residents), § 1229c (permission for alien to voluntarily depart the United States), and § 1255 (adjustment of status of alien).

decisions shielded from review by Sections 1252(a)(2)(B)(i) and 1252(a)(2)(B)(ii) "are of a like kind," 558 U.S. at 248, Patel focused in large part on language found only in the former Section, namely that courts are without jurisdiction to review any judgment "regarding the granting of relief" under the specified statutes. Patel, 596 U.S. at 336-40. The Patel Court parsed this phrase, including the term "regarding," which it found "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject [any judgment regarding the granting of relief], but also matters relating to that subject.'" Id. at 338-39. Given this language, the Court found that Section 1252(a)(2)(B)(i) barred review of an immigration judge's underlying factual findings in a proceeding under the five statutes identified in Section 1252(a)(2)(B)(i). Id. at 339. The text of Section 1252(a)(2)(B)(ii) is distinct and, specifically, does not include the broadening word "regarding."

The Court in Patel found its reading of Section 1252(a)(2)(B)(i) reinforced by Section 1252(a)(2)(D), id., "which preserves review of constitutional claims and questions of law" by appellate courts of the judgments obtained through the individual discretionary-relief process under the enumerated statutes, 8 U.S.C. § 1252(a)(2)(D). In contrast, there is no individual discretionary-relief process before an immigration judge (with appellate review of questions of law) as to the impending termination of the grant of parole or of the revocation of parole after it has occurred.[25] Accordingly, if Section 1252(a)(2)(B)(ii) precludes a district court from

---

[25] Instead, an individual who leaves the United States voluntarily may forfeit all claims related to the original grant of parole. And while an individual who stays may be able to seek review of a removal order and seek adjustment of status, he would be treated as an applicant for admission, not a parolee, for the purposes of that petition, see 8 U.S.C. § 1182(d)(5), negating any potential legal challenge to the categorical termination of his parole.

24

A024

considering Plaintiffs' challenges to Defendants' categorical actions at issue here, review of that question of law will not be preserved by Section 1252(a)(2)(D).

As discussed further below, "[t]he APA . . . creates a 'presumption favoring judicial review of administrative action." Sackett v. E.P.A., 566 U.S. 120, 128 (2012) (quoting Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984)). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 141 (1967) (citing Rusk v. Cort, 369 U.S. 367, 379-80 (1962)). The reasoning in Patel as to Section 1252(a)(2)(B)(i) does not suggest any clear legislative intent that the categorical actions challenged here are precluded from judicial review by Section 1252(a)(2)(B)(ii).

C. *Committed to Agency Discretion by Law*

Defendants argue that Plaintiffs cannot challenge the actions at issue here because Section 1182(d)(5)(A) commits parole and other immigration benefits decisions to the "discretion" of the Secretary of Homeland Security. See Opp. to Second Mot. for PI 8-9 [Doc. No. 89]. The APA "establishes a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action[,]'" but that presumption may rebutted, including by a showing that the "agency action is committed to agency discretion by law." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16-17 (2020) (first alteration in original) (citations omitted). The Supreme Court has read this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Dep't of Com. v. New York, 588 U.S. 752, 772 (2019) (citations omitted).

A025

This is not the rare circumstance in which the agency's decision is "committed to agency discretion by law." As a preliminary matter, as stated above and discussed further below, the Secretary does not have the discretion to categorically terminate grants of parole. In any event, the parole statute establishes standards for the Secretary's exercise of discretion in granting parole—in that such grants must be made on a case-by-case basis for urgent humanitarian reasons or public benefit—and the statute also establishes standards for the termination of parole by requiring a determination by the Secretary that "the purposes of such parole . . . have been served[.]" 8 U.S.C. § 1182(d)(5)(A).

This court finds further support for the view that Plaintiffs' challenge to the FRN is reviewable in the Supreme Court's decision in Department of Homeland Security v. Regents of the University of California, 591 U.S. 1 (2020). Rejecting the government's argument that decisions related to Deferred Action for Childhood Arrivals ("DACA") were committed to agency discretion by law, the Court determined that DACA was not an unreviewable non-enforcement policy but rather was a program for conferring affirmative immigration relief, including the conferral of eligibility for work authorization and Social Security. Id. at 18-19. On that basis, the Court reasoned that "[t]he creation of that program—and its rescission—is an 'action [that] provides a focus for judicial review.'" Id. at 18 (second alteration in original) (quoting Heckler v. Chaney, 470 U.S. 821, 832 (1985)).

The CHNV programs similarly created processes for conferring affirmative immigration relief and related benefits, including lawful entry into the United States and work authorization. The categorical termination of all grants of parole made pursuant to the CHNV programs creates a focal point for judicial review. See Regents, 591 U.S. at 10 (DACA Memorandum instructed ICE to "exercise prosecutorial discretion[] on an individual basis"); see also I.N.S. v. Yueh-

26

A026

Shaio Yang, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset,

if it announces and follows—by rule or by settled course of adjudication—a general policy by

which its exercise of discretion will be governed, an irrational departure from that policy (as

opposed to an avowed alteration of it) could constitute action that must be overturned as

'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative

Procedure Act, 5 U.S.C. § 706(2)(A)."); see also Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir.

1987) ("Judicially manageable standards may be found in formal and informal policy statements

and regulations as well as in statutes[.]"). Therefore, the action challenged by Plaintiffs here is

not committed to agency discretion by law.

Accordingly, Defendants' arguments that this court lacks jurisdiction to consider

Plaintiffs' challenge to the truncation of their periods of parole and related benefits fail.

## III.    Class Treatment

Because the relief that Plaintiffs seek will have nationwide impact, the court considers

whether Plaintiffs may proceed on a class-wide basis as to this relief.[26]

"An order that certifies a class action must define the class and the class claims, issues, or

defenses[.]" Fed. R. Civ. P. 23(c)(1)(B). The order "may be altered or amended before final

judgment." Fed. R. Civ. P. 23(c)(1)(C).

Plaintiffs' Supplemental Motion for Class Certification [Doc. No. 73] proposes a subclass

consisting of "[a]ll individuals who have received parole through humanitarian parole processes,

including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject

---

[26] This court will address class certification in full, including other subclasses proposed by
Plaintiffs and Defendants' objections to such proposals, in subsequent orders.

A027

to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the 'Rescinded Parolee Class')."

Plaintiffs' proposed Rescinded Parolee Subclass is defined more broadly than necessary for the challenge to the March FRN presently before the court. First, it encompasses programs besides CHNV, which are not the subject of the present order. It also includes "subsequent similar actions by Defendants," referring to actions that have not yet occurred,[27] and does not exclude individuals who have already left the United States.[28] Accordingly, the court considers whether certification is appropriate only as to the "Early Revocation Parolee Class," which this court defines to include:

> All individuals who have received a grant of parole that is subject to the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), rescinding individual grants of parole on a categorical and *en masse* basis, except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of that Notice; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

*A. The Rule 23(a) Requirements*

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[27] If Defendants take or threaten further action affecting Plaintiffs, modification of the class definition might be warranted, but the request here is premature.

[28] Individuals who voluntarily leave the United States generally lose their parole authorization. See 8 C.F.R. § 212.5 ("Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized[.]").

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The Early Revocation Parolee Class satisfies these four requirements. First, the class is numerous because it includes several hundred thousand members.

Second, there are common issues of law and fact capable of class-wide resolution under the standard set forth in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) ("What matters to class certification . . . is not the raising of common 'questions' . . . but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.") (first alteration in original) (emphasis in original) (internal citations omitted). All members of the class challenge the FRN's categorical revocation of their existing grants of parole. That categorical revocation was made on the same terms for every class member. Answering the question of whether such termination was lawful will resolve the issue of whether, in the absence of individual determinations, all class members' parole should expire no later than the date specified in the FRN or, by contrast, on the date set forth on each class members' original grant of parole.

Third, the claims of the representative Plaintiffs are typical of the claims of the class. "The plaintiff can meet [the typicality] requirement by showing that [their] injuries arise from the same events or course of conduct as do the injuries of the class, and that [their] claims are based on the same legal theory as those of the class." In re Boston Scientific Corp. Secs. Litigation, 604 F. Supp. 2d 275, 282 (D. Mass. 2009). The claims of the representative Plaintiffs described above are typical in that all Plaintiffs advance the same arguments as to why the categorical termination of their grants of parole was unlawful.

Fourth, the representative Plaintiffs fairly and adequately protect the interests of the class. "The First Circuit requires two elements to establish adequacy under Rule 23(a)(4): (1) 'that the interests of the representative party will not conflict with the interests of any of the class members,' and (2) 'that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" Bowers v. Russell, 2025 WL 342077, at *5 (D. Mass. Jan. 30, 2025) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)). The interests of the representative Plaintiffs will not conflict with those of any class members because the FRN does not differentiate between the different CHNV programs and instead categorically revokes parole for all individuals paroled through those programs. Additionally, the FRN's rationale for why parole was no longer justified for these individuals did not depend on circumstances specific to any Plaintiff or to Plaintiffs from any of the four countries at issue. Finally, this court finds that Plaintiffs' attorneys are qualified, experienced, and able to vigorously conduct the proposed litigation.

Therefore, the Rule 23(a) requirements are satisfied as to the Early Revocation Parolee Class.

### B. The Rule 23(b)(2) Requirements

Plaintiffs argue that certification is appropriate here under Rule 23(b)(2), which applies where Defendants have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Wal-Mart, 564 U.S. at 360.

A030

Certification under Rule 23(b)(2) is appropriate here. A stay of the FRN as to the revocation of existing grants of parole would address each Plaintiffs' injuries, as described above. See supra Part II.A.

## IV. Preliminary Relief

Courts weigh four factors in determining whether a stay should issue: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 425-26 (2009).

### A. Likelihood of Success on the Merits

"An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" Id. (quoting Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).

Plaintiffs raise two arguments regarding DHS's termination of existing grants of parole made pursuant to the CHNV programs.

First, Plaintiffs argue that the FRN's explanation for why DHS rejected the alternative of allowing CHNV parole to expire naturally rather than in 30 days was based on an "obvious legal error." Mem. ISO Mot. for Second PI 10 [Doc. No. 72]. The FRN stated that DHS rejected that alternative because allowing parolees to remain in the United States for longer than 30 days

31

would "essentially foreclose" DHS's ability to deport them via expedited removal because it would increase the likelihood that they would accrue more than two years of continuous presence in the United States. See 90 Fed. Reg. at 13620 (citing 8 U.S.C. § 1232(b)(1)(iii)(II)).

Plaintiffs are likely to prevail on this argument because they are not subject to expedited removal even if they have been here less than two years. Section 1225(b)(1), entitled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," provides for screening and expedited removal for a non-citizen "arriving in the United States" or a non-citizen "who has not been admitted or paroled into the United States, and who has not affirmatively shown . . . that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(A)(iii)(II). The statute thus allows for expedited removal for a non-citizen "arriving in the United States" (i.e., arriving at the border or a port of entry) and for a non-citizen who entered the United States without authorization, except that a non-citizen who entered the United States without authorization, that is an individual who "has not been paroled or admitted into the United States," may not be subject to the expedited removal period if that individual has been present in the United States for two years. The statute does not subject persons who were authorized to enter the United States to expedited removal, regardless of how long they have been in the United States.

Citing a case from the 11th Circuit, Defendants respond that the use of the present perfect tense ("has not been . . . paroled") reflects a "state that continues into the present," meaning such an alien may be processed for expedited removal under the provision once said alien's parole has been terminated or has expired. See Opp. to Second Mot. for PI 12 [Doc. No. 89]. But that case

merely explained that "the use of the present-perfect tense can, as a matter of pure semantics, refer to a time in the indefinite past <u>or</u> to a past action or state that continues into the present." <u>Turner v. U.S. Att'y Gen.</u>, 130 F.4th 1254, 1261 (11th Cir. 2025) (emphasis in original). That the present perfect tense may sometimes denote a state continuing into the present is obvious. But the text of the provision at issue here makes clear its purpose, which is to limit the Secretary's authority to utilize expedited removal only with regard to those arriving at the border or a port of entry, or those who entered the country unlawfully and have not been present in the country long enough to warrant consideration of any interests their residence may have created.

The government further argues that, in any event, individuals whose parole has terminated "may also be processed for expedited removal as an alien 'arriving in the United States' under § 1225(b)(1)(A)(i)." That argument is contrary to the FRN's rationale. The FRN justified early termination of the parole periods based on the two-year period of accrual specified in 1225(b)(1)(iii)(II). If, as Defendants contend, removal is proper under a provision with no two-year period of accrual, early termination cannot be justified on the grounds that it would remove an obstacle to expedited removal.

Plaintiffs are thus likely to prevail on their claim that DHS's sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error. While "DHS was not required . . . to 'consider all policy alternatives in reaching [its] decision' . . . it <u>was</u> required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." <u>Regents of the Univ. of California</u>, 591 U.S. at 33 (quoting <u>State Farm</u>, 463 U.S. at 51). DHS acknowledged the reliance interests of individuals who are lawfully present in the United States based on grants of parole pursuant to

the CHNV programs, but its stated reason for terminating parole grants within 30 days lacked a rational basis.[29]

Defendants maintain that even if this justification for rejecting the alternative was in error, the decision was separately justified by DHS's conclusion that "neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served." See 90 Fed. Reg. at 13620. But the FRN did not attend to any of the humanitarian reasons underlying the creation of the CHNV programs and ignores that, under the CHNV programs, "case-by-case temporary parole" was being used to address the relevant humanitarian concerns.[30]

_____

[29] DHS's rationale regarding expedited removal may have a further problem, namely, that expedited removal proceedings "[do] not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

[30] See, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63515 (Oct. 19, 2022) ("The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro."); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1275 (Jan. 9, 2023) ("The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The [Government of Cuba] continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions. This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States."); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1251 (Jan. 9, 2023) ("The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals[.] . . . [E]scalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti."); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1263 (Jan. 9, 2023) ("The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions.").

The FRN gave no explanation or support for the conclusion that the CHNV programs were addressing relevant humanitarian concerns through something other than case-by-case determinations. The FRN also gave no rationale for its conclusion that such humanitarian concerns no longer justified the existing parole programs and offered no reasons for categorically revoking parole despite the humanitarian concerns previously articulated by DHS. Finally, despite asserting that "DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances," 90 Fed. Reg. at 13612, the FRN provides for no individual case-by-case determination as to the humanitarian concerns facing each parolee whose parole is being truncated.

Given the significant reliance interests at stake—which the FRN recognized as aliens departing their native countries, incurring expenses traveling to the United States, obtaining housing and means of transport, and building connections in their communities—DHS was required to give a justification for terminating existing grants of parole within 30 days instead of on the original termination dates. Plaintiffs are likely to prevail on their claim that DHS's justification was inadequate because it was based on a legal error and failed to explain why humanitarian concerns no longer justified the original periods of parole extended to the CHNV parolees. Therefore, Plaintiffs are likely to prevail on their claim that the early termination of parole was arbitrary and capricious.[31]

---

[31] Defendants' contention that Plaintiffs are improperly seeking to challenge the application of expedited removal, see Opp. to Second Mot. for PI at 13 [Doc. No. 89], mischaracterizes Plaintiffs' argument, which is that a desire to avoid the two-year accrual period of the expedited removal statute was not a valid reason for early termination of grants of parole.

A035

Second, Plaintiffs argue that the decision to truncate all existing grants of parole was contrary to the statutory requirement that parole be exercised "only on a case-by-case basis." 8 U.S.C § 1182(d)(5)(A). Defendants respond that while Section 1182(d)(5)(A) requires grants of parole to be made on "a case-by-case basis," it imposes no similar requirement on terminations of parole, where "[t]he sole statutory requirement to terminated parole is that, 'in the opinion of the Secretary,' the purposes of parole have been served." See Opp. to Second Mot. for PI 13 [Doc. No. 89] (quoting 8 U.S.C § 1182(d)(5)(A)). But the text of the statute supports Plaintiffs' reading. Throughout the provision, Section 1182(d)(5)(A) refers in singular, rather than plural, to grants of parole:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only <u>on a case-by-case basis</u> for urgent humanitarian reasons or significant public benefit <u>any alien</u> applying for admission to the United States, but <u>such parole of such alien</u> shall not be regarded as an admission of <u>the alien</u> and when the purposes of <u>such parole</u> shall, in the opinion of the Secretary of Homeland Security, have been served <u>the alien</u> shall forthwith return or be returned to the custody from which <u>he was paroled</u> and thereafter <u>his case</u> shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(Emphasis added). The statute thus seems to contemplate termination of parole on an individual, rather than categorical, basis. This makes sense: Even under the categorical programs, grants of parole were to be made on a case-by-case basis. While the reasons underlying grants pursuant to the CHNV programs were likely fairly consistent, an individual parolee's application was subject to case-by-case review. The grant of parole may well have been justified for reasons not applicable to others paroled through the programs, such that a categorical determination that the "purposes of such parole" have been served may not attend to the reasons for that individual's grant of parole. Certainly, the Secretary has significant discretion to terminate a grant of parole

under the statute. But by the terms of the statute, such termination must attend to the reasons an individual alien received parole.

Defendants point to <u>Zheng v. Napolitano</u>, No. 09-cv-00347, 2009 WL 1258908, at *2 (D. Colo. May 4, 2009), as "rejecting argument asserted in habeas petition that sought to 'engraft[] the requirements pertaining to initial parole decisions onto parole revocation decisions.'" <u>See</u> Opp. to Second Mot. for PI at 14 [Doc. No. 89] (alteration in original). While that court did note that it had found no case law supporting petitioner's claim that individual determinations were required, it explained that petitioner's notice that his parole had been revoked "specifically informed him that parole had been granted initially to allow him to acquire appropriate travel documents," that such documents had been obtained previously, and there was no reason to believe that travel documents would not be forthcoming. 2009 WL 1258908, at *2. In other words, an individual decision was made to revoke his parole. The absence of case law supporting Plaintiffs' position may thus reflect DHS's prior practice of making individual determinations to revoke parole and does not undermine the textual analysis.

Therefore, Plaintiffs are likely to succeed on their claim that the FRN's categorical termination of existing grants of parole was arbitrary and capricious.

### B. Irreparable Harm

Absent preliminary relief, the FRN will cause Plaintiffs' parole to terminate in less than two weeks, at which time they will be forced to choose between two injurious options: continue following the law and leave the country on their own, or await removal proceedings. The court discussed the harmful consequences of either of these two options above. <u>See</u> <u>supra</u> Part II.A. The first option will expose Plaintiffs to dangers in their native countries and will cause Plaintiffs forfeit their APA claims. The second option will put Plaintiffs at risk of arrest and detention and,

because Plaintiffs will be in the United States without legal status, undermine Plaintiffs' chances of receiving other forms of immigration relief in the future—potentially permanently. Waiting for final relief will not spare Plaintiffs from these consequences.[32]

### C. The Balance of Equities and the Public Interest

The final two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." Nken, 556 U.S. at 435. Defendants maintain that preliminary relief would "limit the Administration's ability to pursue its foreign policy goals and to exercise its discretionary powers with respect to immigration." Opp. to Second Mot. for PI 18 [Doc. No. 89]. However, the relief contemplated in this order would not authorize the entry of any individual currently outside the United States. Nor would it extend the original grants of parole awarded by DHS. It would only require the agency to give fuller consideration to the reliance interests of parolees who entered the United States lawfully and who followed instructions established by the United States government for seeking discretionary grants of parole, and to make any decisions terminating grants of parole in an individual, case-by-case manner.

Defendants contend that preliminary relief would "impede the Government's strong interest in being able to remove aliens from the United States who lack the ability to obtain more

---

[32] At an April 10, 2025 hearing before the court, Defendants emphasized the FRN's language indicating that DHS would not prioritize for removal aliens who had filed requests for benefits such as TPS or asylum prior to the issuance of the FRN. See 90 Fed. Reg. at 13619. But this statement is essentially meaningless, where Defendants gave no specificity, in the FRN or at the hearing, as to what it means in this circumstance for individuals with pending benefits requests to not be an enforcement priority. Regardless of whether particular individuals are "enforcement priorities," they would still be unlawfully present in the United States and therefore subject to the negative repercussions of that status, including an inability to legally work and the possibility of being arrested when stepping outside their door. Moreover, Defendants' Davidson Memorandum has indefinitely suspended benefits adjudications filed by CHNV parolees, further undermining Defendants' enforcement priority argument.

permanent status." Id. at 19. The suggestion that these noncitizens "lack the ability to obtain more permanent status" reflects the Defendants' choice to not make permanent status more available to them. Regardless, Defendants have offered no substantial reason or public interest that justifies forcing individuals who were granted parole into the United States for a specified duration to leave (or move into undocumented status) in advance of the original date their parole was set to expire. Nor is it in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families. Instead, the early termination, without any case-by-case justification, of legal status for noncitizens who have complied with DHS programs and entered the country lawfully undermines the rule of law.

The court finds the balance of equities and public interest weigh in favor of preliminary relief.[33]

---

[33] Defendants argue that, should preliminary relief issue, such relief should be subject to bond. See Fed. R. Civ. P. 65(c). "[T]here is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (citing Crowley v. Local No. 82, Furniture and Piano Moving, 679 F.2d 978, 999-1001 (1st Cir. 1982)). In Crowley, the court stated that in deciding whether to set a bond requirement in non-commercial cases, the court should consider "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant," and, "[s]econd, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right[.]" Crowley, 679 F.2d at 1000. Here, the court finds: (1) no showing of any monetary loss on the enjoined parties in staying the early termination of the grants of parole; (2) that requiring a bond would impose a substantial hardship on the Plaintiffs; and (3) a grave risk that imposing a bond would undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions. Accordingly, the court finds that the burden of a bond on Plaintiffs outweighs any likely loss by the government.

**V.    Request for a Stay Pending Appeal**

Defendants orally requested a stay of this decision pending appeal. As with Plaintiffs' request for a stay of the FRN, the court must weigh four factors in determining whether a stay of the court's order pending appeal should issue: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." See Nken, 556 U.S. at 425-26. Here, Defendants have not made a strong showing that they are likely to succeed on the merits or that they will be injured absent a stay, while the issuance of a stay of the court's order would allow for the truncation of parole of hundreds of thousands of parolees. And for the reasons set forth above, the public interest lies in denying Defendants' request for a stay. Accordingly, Defendants' request for a stay in DENIED.

**VI.    Conclusion**

Accordingly, the court grants emergency relief as follows:

1. The *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), is hereby STAYED pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's originally stated parole end date.

A040

2. All individualized notices[34] sent to noncitizens from Cuba, Haiti, Nicaragua, and

   Venezuela via their USCIS online account notifying them that their parole is being

   revoked without case-by-case review pursuant to the *Termination of Parole Processes*

   *for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25,

   2025) are also STAYED pending further court order.

IT IS SO ORDERED.

April 14, 2025                                        /s/ Indira Talwani
                                                     United States District Judge

---

[34] See, e.g., Termination of Parole Notice [Doc. No. 88-1] ("Effective March 25, 2025, the U.S. Department of Homeland Security (DHS) has exercised its discretion to terminate the categorical parole programs for aliens who are nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members.").

A041

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:25-cv-10495-IT |
| KRISTI NOEM, in her official capacity as | * | |
| Secretary of Homeland Security, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

ORDER GRANTING CLASS CERTIFICATION

April 14, 2025

Upon consideration of Plaintiffs' Supplemental Motion for Class Certification [Doc. No. 73], the court hereby certifies a class of:

> All individuals who have received a grant of parole that is subject to the *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025), rescinding individual grants of parole on a categorical and *en masse* basis, except: (1) those individuals who voluntarily left, and remain outside, the United States prior to the issuance of that Notice; and (2) those individuals who choose to opt out of the class in order to seek relief in separate litigation.

The court appoints Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe as Class Representatives[1] and John A. Freedman, Daniel B. Asimow, and Laura Scott Shores of Arnold & Porter Kaye Scholer LLP, Karen C. Tumlin of Justice Action Center, and Anwen Hughes of Human Rights First as class counsel.

---

[1] These Plaintiffs are proceeding here under pseudonyms pursuant to the parties' Stipulated Protective Order Concerning Confidential Doe PII [Doc. No. 57] and this court's Electronic Order [Doc. No. 69] granting Plaintiffs' Second Supplemental Motion to Proceed Under Pseudonym [Doc. No. 64]. All Plaintiffs except Miguel Doe voluntarily provided their identities to Defendants, and all Plaintiffs have provided their identities to this court for *in camera* review. See Mem. & Order [Doc. No. 79]; Sealed Notice Providing Plaintiffs' Identities [Doc. No. 81-1].

For the reasons set forth in the court's <u>Memorandum & Order Granting in Part Plaintiffs'</u> <u>Emergency Motion for a Stay of DHS's *En Masse* Truncation of All Valid Grants of CHNV</u> <u>Parole ("Order on Motion to Stay")</u> [Doc. No. 97], the court finds, as to the prerequisites set forth in Fed. R. Civ. P. 23(a), that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties[2] are typical of the claims or defenses of the class, and (4) the interests of the representative parties will not conflict with the interests of any of the class members; and as to the types of class actions permitted under Fed. R. Civ. P. 23(b), that Defendants have "acted or refused to act on grounds that apply generally to the class." <u>See</u> Fed. R. Civ. P. 23(b)(2). Finally, the court finds, based on counsels' declarations and filings,[3] that counsel chosen by Plaintiffs are "qualified, experienced and able to vigorously conduct the proposed litigation." <u>Andrews v. Bechtel Power Corp.</u>, 780 F.2d 124, 130 (1st Cir. 1985)). Accordingly, certification under Rule 23(b)(2) is appropriate.

At the time of certification, the court "must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). "Class counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). "In appointing class counsel, the court . . . must consider (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in

---

[2] <u>See</u> Order on Motion to Stay 10-16 [Doc. No. 97]; <u>see also</u> Armando Doe Decl. [Doc. No. 24-3]; Ana Doe Decl. [Doc. No. 24-2]; Carlos Doe Decl. [Doc. No. 24-4]; Andrea Doe Decl. [Doc. No. 27-1]; Lucia Doe Decl. [Doc. No. 64-3]; Miguel Doe Decl. [Doc. No. 64-4]; Daniel Doe Decl. [Doc. No. 64-5].

[3] <u>See</u> John A. Freedman Decl. [Doc. No. 46-2] (describing experience litigating class actions and immigration challenges and attesting to the work of his team in conducting this litigation); Karen C. Tumlin Decl. [Doc. No. 46-3] (similar); Anwen Hughes Decl. [Doc. No. 46-4] (similar). All counsel state that they are aware of no conflicts of interest.

A043

the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1).

Based on counsels' declarations and filings, the proposed counsel have conducted factual investigations leading to this lawsuit, have engaged in class action litigation or other complex litigation involving immigration matters, have demonstrated knowledge of the applicable immigration law, and have attested to having adequate resources to represent the class. Therefore, the Rule 23(g) requirements are satisfied by the appointment of class counsel here.

This order "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Further relief sought in Plaintiffs' <u>Motion to Certify Class</u> [Doc. No. 46] and <u>Supplemental Motion for Class Certification</u> [Doc. No. 73] remains pending.

IT IS SO ORDERED.

April 14, 2025                                    /s/ Indira Talwani
                                                  United States District Judge

A044

below in advance of the meeting. The open session will be videocast and can be accessed from the NIH Videocasting website (*http://videocast.nih.gov/*).

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Council of Councils.
*Date:* April 21, 2025.
*Open:* April 21, 2025, 10:00 a.m. to 12:15 p.m.
*Agenda:* Welcome and Opening Remarks; Announcements, and NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Closed:* April 21, 2025, 12:15 p.m. to 01:15 p.m.
*Agenda:* Review of Grant Applications.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Open:* April 21, 2025, 01:15 p.m. to 04:35 p.m.
*Agenda:* NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Contact Person:* Franziska Grieder, D.V.M., Ph.D., Executive Secretary, Council of Councils, Director, Office of Research Infrastructure Programs, Division of Program Coordination, Planning, and Strategic Initiatives, Office of the Director, NIH, 6701 Democracy Boulevard, Room 948, Bethesda, MD 20892, *GriederF@mail.nih.gov*, 301–435–0744.

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

Information is also available on the Council of Council's home page at *http://dpcpsi.nih.gov/council/* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.14, Intramural Research Training Award; 93.22, Clinical Research Loan Repayment Program for Individuals from Disadvantaged Backgrounds; 93.232, Loan Repayment Program for Research Generally; 93.39, Academic Research Enhancement Award; 93.936, NIH Acquired Immunodeficiency Syndrome Research Loan Repayment Program; 93.187, Undergraduate Scholarship Program for Individuals from Disadvantaged Backgrounds, National Institutes of Health, HHS)

Dated: March 20, 2025.

**Bruce A. George,**
*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–05010 Filed 3–24–25; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security ("DHS") is terminating the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members (hereinafter referred to as "CHNV parole programs") that DHS announced in 2022 and 2023. This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of the CHNV parole programs and related employment authorization.

**DATES:** DHS is terminating the CHNV parole programs as of March 25, 2025. The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary. Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS has implemented programs through which inadmissible aliens who are citizens or nationals of designated countries, and their immediate family members, could request authorization to travel to the United States in order to be considered for parole into the country.[1] Under these categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis, for advance authorization to travel to a U.S. port of entry ("POE") in the interior of the country to seek a discretionary grant of parole.

On January 20, 2025, President Trump issued Executive Order 14165, "Securing Our Borders."[2] Section 2 of the Order establishes a policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the Order directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the CHNV parole programs. Although DHS established the categorical programs for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the four categorical programs was very similar,[3] and the rationale for termination is largely consistent for all four parole programs. Thus, DHS is announcing the termination of all four parole programs by publishing this single notice in the **Federal Register**.

## II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary of Homeland Security ("Secretary") the narrow discretionary authority to parole inadmissible aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a

Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26337 (Apr. 28, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[2] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[3] *Compare, e.g.,* 88 FR at 1260–63, *with* 88 FR at 1248–52 (setting out the justifications for the parole programs for Nicaragua and Haiti, respectively).

humanitarian reasons or significant public benefit.'' *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien is required to depart the United States ''or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the history of the parole authority supports the contention that discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria.[4] Under the law, the determination to parole an alien into the country should only be made on a case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a POE is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis

for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the CHNV parole programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an arriving alien. *See* 8 CFR 1.2; *see also* INA 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B).

## III. Rationale for Initial Implementation

When DHS established the CHNV parole programs, DHS provided several justifications for their promulgation. *See, e.g.,* 88 FR at 1248–51 (Implementation of a Parole Process for Haitians). Overall, DHS stated that the programs would provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries.

With respect to the significant public benefit, DHS wrote that the CHNV parole programs would: (i) enhance border security by reducing illegal immigration between the POEs, (ii) minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities; (iii) improve vetting for national security and public safety; (iv) reduce the strain on DHS personnel and resources; (v) disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

For the reasons discussed below, DHS has determined that it is now appropriate and necessary to terminate the CHNV parole programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's

foreign policy goals.[5] Regarding previous arguments or determinations that these programs were consistent with the requirement of ''urgent humanitarian reasons'' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances. These reasons, independently and cumulatively, support termination of the CHNV parole programs.

Accordingly, the Secretary, in her discretion, is terminating the CHNV parole programs. Consistent with her statutory authority, the Secretary retains discretion to continue to extend parole to any alien paroled under CHNV— temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

*1. The CHNV Parole Programs Are Unnecessary To Achieve Border Security Goals*

From the announcement of the parole program for Venezuelans and their immediate family members on October 12, 2022, through the subsequent addition of the programs for Cubans, Haitians, Nicaraguans, and their immediate family members in January 2023, and until January 22, 2025, approximately 532,000 inadmissible aliens were granted advance authorization to travel to the United States and receive consideration for parole into the United States.[6]

One justification for these 532,000 discretionary paroles was to ''enhance border security'' at the southwest border of the United States.[7] DHS reasoned that by ''incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing

---

[4] Parole was codified into immigration law in the Immigration and Nationality Act of 1952. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, ''the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.'' *See Leng May Ma* v. *Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress, which in 1996 wrote, ''[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.'' *See* H.R. Rep. 104–469, pt. 1, at 140 (1996). Furthermore, the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (''IIRIRA'') struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' *See* Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under 8 U.S.C. 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[5] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''. . . when the purposes of such parole shall, in the opinion the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.'').

[6] Office of Homeland Security Statistics (''OHSS'') analysis of advanced travel authorizations data provided by CBP Passenger Systems Program Directorate and valid as of January 22, 2025. Beneficiary travel authorizations excluded expired applications. The Venezuelan program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.

[7] *See, e.g.,* 88 FR at 1255 (''The [Nicaraguan] parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs.'').

consequences to irregular migration, . . . the new parole process will mitigate anticipated future surges'' of illegal immigration. *See, e.g.,* 88 FR at 1249 (Implementation of a Parole Process for Haitians). DHS pointed to past experience with rapidly increasing ''encounters of Guatemalan and Honduran nationals from January 2021 until August 2021'' along the southwest border, explaining that the resumption of repatriation flights to Guatemala and Honduras helped reduce the amount of illegal immigration but was insufficient to address the sheer numbers.[8] Accordingly, the CHNV parole programs contemplated enhancing border security by combining ''a consequence for [nationals seeking] to enter the United States [in an unlawful manner between POEs (*i.e.,* removal or return to a third country, such as Mexico), while introducing] an incentive to use [a] lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.''[9]

Upon review, DHS concludes that this ''deterrent'' and ''incentive'' approach did not result in a sufficient and sustained improvement in border security, and has exacerbated challenges associated with interior enforcement of the immigration laws. Encounters of CHNV nationals, particularly at POEs, remained unacceptably high while the CHNV parole programs were in effect, and overall migration of CHNV nationals to the United States increased between October 12, 2022 and January 22, 2025. In addition, the CHNV parole programs have at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status.

As an initial matter, DHS acknowledges that in establishing the CHNV parole programs, and in subsequent DHS evaluations of these programs, DHS focused, in part, on a goal of reducing encounters of CHNV nationals between POEs.[10] And it is true that there was a reduction in encounters

of CHNV nationals between POEs from FY 2022 through FY 2024—from around 600,000 encounters in FY 2022 to 416,000 in FY 2023 and 183,000 in FY 2024.[11] But in implementing the CHNV parole programs, DHS also focused on the importance of reducing pressures at the southwest border generally. It was for this reason that the CHNV parole programs required, for instance, that CHNV nationals ''fly at their own expense to an interior [POE] rather than entering at a land POE''[12] and rendered ineligible those CHNV nationals who irregularly entered the United States, Mexico, or Panama after the programs' announcement.[13]

Consistent with that focus and in light of the reality that DHS's border security mission involves activities at southwest border POEs as well, DHS has concluded that the present assessment of the efficacy of the CHNV parole programs should include encounters at such land POEs. If one includes encounters of CHNV nationals at POEs, the actual reduction in southwest border encounters of CHNV nationals is much more muted: encounters of CHNV nationals at and between southwest border POEs dropped from approximately 626,000 in FY 2022 only to 584,000 in FY 2023 and 535,000 in FY 2024.[14] This is due to a significant increase in encounters of such aliens at southwest border POEs over that time period: from 26,250 in FY 2022 to 168,010 in FY 2023 and 352,790 in FY 2024.[15] The increase can be attributed to the use of the CBP One mobile application (''CBP One app'' or ''CBP One'') to schedule appointments at southwest border POEs,[16] which resulted in very high numbers of CHNV nationals placed into removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and released into

U.S. border communities,[17] exacerbating the immigration court backlog and the poor incentives that the backlog creates.[18] Finally, it is important to emphasize that in addition to these southwest border encounters, DHS must also consider the 532,000 parolees who entered the United States under the CHNV parole programs.

The decision to terminate the discretionary and temporary parole programs is further informed by the actions of the prior administration, which found the CHNV parole programs, even when paired with the Circumvention of Lawful Pathways rule, to be insufficient to address very high levels of illegal immigration.[19] For example, DHS and the Department of Justice (DOJ) promulgated the Securing the Border framework[20] as an emergency measure to address ongoing high levels of unlawful immigration between southwest border POEs.[21] The Departments explained that ''at the current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.''[22] This conclusion—that DHS's ability to swiftly impose consequences for illegal immigration ''continue[d] to be overwhelmed''[23]—followed nearly two years of the CHNV parole programs, whose chief justification had been facilitating operational control of the

---

[8] *See, e.g.,* 87 FR at 63509.

[9] *See, e.g.,* 87 FR at 63510.

[10] *See, e.g.,* 87 FR at 63507 (''The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.''); *see also* Circumvention of Lawful Pathways 88 FR 31314, 31317 (May 16, 2023) (noting that in the first weeks following implementation of the CHNV parole programs, encounters of CHNV nationals between POEs dropped significantly).

[11] OHSS analysis of January 2025 OHSS Persist Dataset.

[12] *See, e.g.,* 87 FR at 63507; *see also id.* at 63512 (explaining that by ''diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process,'' DHS could relieve pressure on border communities).

[13] *See, e.g.,* 87 FR at 63515.

[14] OHSS analysis of January 2025 OHSS Persist Dataset.

[15] OHSS analysis of January 2025 OHSS Persist Dataset.

[16] Section 7 of Executive Order 14165 also directed the Secretary to, consistent with applicable law, take all appropriate action to cease using the CBP One app, as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States. DHS has ceased the use of the CBP One app for this purpose. *See* CBP, Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), *https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app* (last updated Jan. 22, 2025).

[17] A total of 582,800 CHNV nationals with CBP One registration numbers were encountered at southwest border POEs from Jan. 1, 2023–Jan. 31, 2025, including 576,900 (99 percent) that were issued NTAs. OHSS analysis of January 2025 OHSS Persist Dataset.

[18] *See, e.g.,* Securing the Border, 89 FR 81156, 81181 (Oct. 7, 2024) (explaining that particularly in light of the immigration court backlog, ''releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal.'').

[19] 88 FR 31314 (May 16, 2023).

[20] *See* 89 FR 48710 (June 7, 2024) (interim final rule); 89 FR 81156 (Oct. 7, 2024) (final rule).

[21] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' *See* 89 FR at 48157–58.

[22] 89 FR at 48714.

[23] 89 FR at 48715.

southwest border of the United States. Promulgation of the Securing the Border interim final rule in June 2024 reflected the reality that the CHNV parole programs and Circumvention of Lawful Pathways rule did not sufficiently enhance border security.[24]

Finally, to whatever extent the CHNV parole programs could be characterized as reducing encounters of CHNV nationals at the southwest border from the very high levels that existed in late 2022, DHS does not believe that the programs are necessary to achieve such reductions at this time. In December 2022—the last full month prior to implementation of all four programs— the U.S. Border Patrol (USBP) encountered around 84,000 CHNV nationals at the southwest border.[25] That figure has been below 12,000 every month since January 2024, and below 6,000 every month since June 2024, when CHNV and DOJ issued the Securing the Border rule.[26] In January 2025, even with the CHNV parole programs paused, USBP encountered around 3,400 CHNV nationals at the southwest border.[27] Whatever the need for these programs may have been in late 2022, the situation at the southwest border now, and the set of tools implemented by DHS to deter illegal immigration, are quite different.

Moreover, with the implementation of President Trump's policies beginning on January 20, 2025, border encounters generally have continued to drop notwithstanding the ongoing pause on these programs. Southwest border encounters between POEs fell from an average of about 1,180 aliens per day in the two-week period ending on January 20, 2025, to an average of about 640 per day in the two-week period from January 21 to February 3, 2025, and fell further to an average just under 260 per day in the two-week period from February 12, 2025 to February 25, 2025.[28] Over those same three time periods, southwest border releases from USBP custody fell from an average of about 240 per day to an average of about 50 per day and then an average of fewer than 5 per day.[29]

The need to break the "vicious cycle" of unlawful immigration supports this DHS action to terminate the CHNV parole programs in favor of new presidential directives that address the demand for enhanced border security beyond the 2024 Securing the Border framework.[30] Executive Order 14165, "Securing Our Borders," [31] and Executive Order 14159, "Protecting the American People Against Invasion," [32] exemplify more reasoned and realistic initiatives to control unlawful immigration at the southwest border of the United States.

### 2. The Domestic Effects of Illegal Immigration Continued To Be Felt Throughout Implementation of the CHNV Parole Programs

Although one goal of the CHNV parole programs was to "help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB," the programs did not have this effect. As discussed in the preceding section, overall levels of CHNV migration at and between southwest border POEs did not fall dramatically year-over-year in FY 2023 and FY 2024. In addition, if one takes into account the 532,000 parolees who entered the United States at an interior POE, CHNV migration may have increased over the relevant time period. Recent policy interventions have proven more effective than the CHNV parole programs in addressing very high levels of illegal immigration.

Over the past few years, there has been extensive public discussion of the effects of high levels of illegal immigration and inadmissible aliens arriving in local communities. Although public accounts of these effects do not always distinguish between aliens strictly on the basis of how they entered the country or their status (e.g., CHNV parolees; aliens whom DHS encountered at a southwest border POE placed in section 240 removal proceedings; and aliens present without admission or parole), localities nationwide have experienced the effects of very high levels of migration.[33] CHNV parolees and other recent arrivals have competed for limited resources such as housing, food, transportation, education, legal services, and public benefits.[34] Some localities experienced surges of CHNV parolees in particular.[35]

The domestic impact of the CHNV parole program was also felt at the Federal level in at least three ways. First, the CHNV parole programs resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a "qualified alien." See 8 U.S.C. 1641(b)(4). Because DHS generally issued two-year periods of parole from the outset, CHNV parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, see, e.g., 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all CHNV parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, see

[24] DHS notes that on October 4, 2024, the prior administration announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. The decision of the prior administration to decline renewal or extension of the CHNV related parole coincided in large part with other actions of DHS to promulgate policies to reduce illegal immigration.

[25] OHSS analysis of January 2025 OHSS Persist Dataset.

[26] OHSS analysis of January 2025 OHSS Persist Dataset.

[27] OHSS analysis of January 2025 OHSS Persist Dataset.

[28] OHSS analysis of data downloaded from UIP February 25, 2025.

[29] OHSS analysis of data downloaded from UIP Feb. 25, 2025. DHS also notes that to whatever extent the incentives created by the parole programs for Cubans and Haitians deterred illegal immigration by sea—a particularly dangerous form of migration—the parole programs are not necessary for such deterrence and raise other issues, some of which are outlined in sections III.2–4 of this notice. DHS has adopted a more robust enforcement posture in general, and will monitor trends in maritime migration and respond as appropriate. Through early February 2025, DHS has yet to see a return to the very high levels of maritime migration observed in 2022.

[30] The streamlined procedures offered by the Securing the Border framework and complementary actions permitted DHS to more than triple the percentage of aliens processed for expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and decrease the number of aliens released by USBP pending immigration court proceedings by 89 percent, a number that has only improved further with the end of "catch and release." Encounters and releases based on OHSS analysis of January 2025 OHSS Persist Dataset. Processed for ER based on OHSS analysis of September 2024 OHSS enforcement Lifecycle and CBP data downloaded from UIP ER Daily Report Data Dashboard as of February 4, 2025.

[31] 90 FR 8611 (Jan. 20, 2025).

[32] 90 FR 8443 (Jan. 20, 2025).

[33] See, e.g., Adam Shaw, Fox News, Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns (Oct. 31, 2024), https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns; Muzaffar Chishti & Colleen Putzel-Kavanaugh, After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[34] See Muzaffar Chishti & Colleen Putzel-Kavanaugh, After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[35] Nick Mordowanec, Map Shows Hotspots for Migrants Flying Into U.S., Newsweek (May 1, 2024), https://www.newsweek.com/migrants-dhs-flying-border-illegal-1896239.

7 CFR 273.4(a)(6)(ii)(J), as might "a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)," *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to "lawfully residing" children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[36]

Second, the CHNV parole programs have exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large. For example, the population of aliens paroled into the United States and who have filed an application for asylum contributes to an already taxed immigration system with historically high backlogs before USCIS and the Executive Office for Immigration Review ("EOIR").[37] Many such parolees may not otherwise have come to the United States and have exacerbated such backlogs or are likely to eventually do so. U.S. Citizenship and Immigration Services ("USCIS") recently reported that as of the end of December 2024, the USCIS asylum backlog had increased to over 1.4 million cases.[38] CHNV parolees account for approximately 75,000 affirmative asylum applications.[39] In addition, when a CHNV parolee's two-year parole period ends, if the CHNV parolee has no lawful basis to remain in the United States, DHS may place the alien in section 240 removal proceedings. But, due in part to the overwhelmed expedited removal system, EOIR's immigration court backlog has already been growing rapidly, and will be further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends. The immigration court backlog increased by approximately 44 percent between the end of FY 2023 (2.5 million cases) and FY 2024 (3.6 million cases).[40]

Third, the CHNV parole programs had a disruptive impact for CBP operations at interior air POEs. A progressive increase in beneficiaries of the CHNV parole programs arriving at POEs with advance travel authorizations "(ATAs)" were ultimately not granted parole due to CBP's determination that the alien did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country. As a result, CBP processed these aliens for another appropriate disposition under Title 8, including detention or referral into expedited removal proceedings or section 240 removal proceedings, as appropriate. This caused further processing delays and coordination with air carriers for return flights when appropriate, and further contributed to the immigration court backlog.

The overwhelmed immigration systems in particular may incentivize aliens to enter the United States, without regard to the strength of any potential claims for immigration status, as aliens who are subject to expedited removal may nevertheless be placed in section 240 removal proceedings when the system is strained beyond its processing capacity. As a result, many remain in the United States until their immigration benefit requests are adjudicated or their section 240 removal proceedings conclude and any resultant removal order is executed. Any further strain to the immigration systems resulting from aliens pursuing the CHNV parole programs exacerbates these detrimental incentives.

In short, the domestic impact of the CHNV parole programs do not warrant continuing to operate these programs. Implementation of these programs coincided with an overall increase in CHNV migration, significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs.

### 3. The CHNV Parole Programs Are Inconsistent With the Administration's Foreign Policy Goals

One of the stated goals of the CHNV parole programs was to promote the foreign policy objectives of the prior administration. Indeed, DHS explained repeatedly in its notices promulgating the CHNV parole programs that their implementation would advance the foreign policy objectives of the then-current administration.[41] The foreign

policy objectives underlying the CHNV parole programs, however, are not consistent with those of the current Administration.

Executive Order 14150, "America First Policy Directive to the Secretary of State" (Jan. 20, 2025) clearly sets out the President's vision that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[42] Executive Order 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025) states that it is the policy of the United States to "faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." Further, it is the policy of the United States to achieve the "total and efficient enforcement of those laws, including through lawful incentives and detention capabilities."[43]

Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico ("GOM") making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens. Section 13 of that Executive Order 14159 specifically addresses repatriation, and directs the Secretaries of State and Homeland Security to take all appropriate action to cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), and ensure that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States. Section 13 further directs the Secretaries to eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. The Order provides that any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out section 243(d) sanctions and shall also be considered regarding the issuance of

---

[36] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[37] *See* Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog (2025); *see also* Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time* (Center for Immigration Studies) (July 26, 2024), *https://cis.org/Jacobs/Affirmative-Asylum-Backlog-Exceeds-One-Million-First-Time.*

[38] USCIS, Performance Data, Asylum Division Monthly Statistics Report (Dec. 2024), *https://www.uscis.gov/sites/default/files/document/data/asylumfiscalyear2025todatestats_241231.xlsx* (last visited Feb. 25, 2025).

[39] USCIS Office of Performance & Quality.

[40] EOIR, Executive Office for Immigration Review Adjudication Statistics (Jan. 16, 2025), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[41] *See e.g.,* 87 FR at 63516 ("the implementation of [the Venezuela process] will advance the Administration's foreign policy goals"); 88 FR at

1253 ("[the Haiti process] is fully aligned with larger and important foreign policy objectives of this Administration").

[42] See Executive Order 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

[43] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

any other sanctions that may be available to the United States.

Further, as noted above, Executive Order 14165, "Securing Our Borders" states that DHS shall "terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'" [44] In the same Order, the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending section 240 removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

The President has pursued the cooperation of foreign partners in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[45]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[46]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to "do what's right" in regard to illegal migration.[47]

• Beginning on February 1, 2025, President Trump has issued a number of tariff-related executive orders in connection with the situation at the southern border.[48]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, who will then be repatriated to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[49]

Multiple agencies of the U.S. Government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced multiple discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[50] consistent with Secretary of State Rubio's January 22, 2025 announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[51] In that announcement, the Department of State made clear that it "will no longer undertake any activities that facilitate or encourage mass migration" and that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants." [52] Additionally, pursuant to his authority under section 219 of the INA, 8 U.S.C. 1189,[53] Secretary of State

Rubio designated the Venezuelan gang, Tren de Aragua, along with other cartels and gangs, as Foreign Terrorist Organizations.[54]

In other words, in addition to directly fulfilling the President's directive to terminate the CHNV parole programs, this action complements and underscores the Administration's pivot to a foreign policy that prioritizes the United States' interests in a secure border. Regardless of whether the prior Administration saw the CHNV parole programs as a component of a regional migration management strategy, the current Administration is not pursuing that strategy. Rather, as described above, the current Administration has focused its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States and obtain complete operational control of our borders.

These measures will allow DHS to better "achieve the total and efficient enforcement" of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[55] In short, the continued implementation of the CHNV parole programs no longer accords with the President's stated priorities and foreign policy objectives.

### 4. Other Factors Do Not Counsel in Favor of Maintaining the Programs

The other factors cited by DHS in promulgating the CHNV parole programs also do not counsel in favor of maintaining the programs. For instance:

• DHS predicted that by allowing DHS to vet aliens before they travel to the United States, the programs would enhance national security as compared to high levels of illegal immigration. But as discussed above, these programs are unnecessary to counter high levels of illegal immigration. In addition, and critically, such vetting is inherently limited and, as has been reported publicly, there were significant gaps in the vetting process. In response to these problems, the CHNV parole programs were paused briefly in July 2024 to evaluate the program vulnerabilities.[56]

---

[44] See Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[45] The White House, "Readout of President Donald J. Trump's Call with President Nayib Bukele" (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/*.

[46] The White House, "Statement From the Press Secretary" (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/*.

[47] Meryl Sebastian, *Trump Says India 'Will Do What's Right' on Illegal Immigration* BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo*.

[48] See, e.g., Executive Order 14194, Imposing Duties to Address the Situation at Our Southern

Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[49] *Panama Receives First U.S. Deportation Flight Under Trump Administration*, The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration*.

[50] *See, e.g.*, U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) ("President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country."), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/*; U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) ("Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap."), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/*.

[51] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025).

[52] *Id.*

[53] See Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global

Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[54] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025).

[55] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[56] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards,* Wash. Times (Aug. 2, 2024),

• DHS also initially reasoned that the CHNV parole programs would disincentivize a dangerous journey that puts aliens' lives and safety at risk and enriches smuggling networks. As noted above, however, although these programs were accompanied by a significant decrease in CHNV encounters between southwest border POEs, they were also accompanied by a significant increase in CHNV encounters at southwest land border POEs. This indicates that CHNV nationals continued to engage in dangerous migration to the southwest border, even if the overall level of migration to the southwest border dropped somewhat and CHNV aliens did not cross between POEs with the same frequency. And, as also noted above, the U.S. Government has implemented other policies that have more effectively deterred illegal immigration.

• Another stated goal of the CHNV parole programs was to reduce the burden on DHS personnel and resources that would otherwise be required for detention, monitoring, processing, and removal. However, as noted above, significant resource burdens persisted even after the programs' implementation, including with respect to encounters at and between POEs. Program implementation itself occupied significant resources. For instance, there have been approximately 2,970,000 Forms I–134 and I–134A filed with USCIS since October 2022,[57] which includes 2,140,000 pending review, 642,410 confirmed by USCIS, and 181,820 non-confirmed by USCIS.[58] Further, DHS needed additional resources to counter the fraud, national

security concerns, and public safety concerns discussed above. In addition, due to the originating location of beneficiaries of the CHNV parole programs and available travel routes via commercial airlines, over 80 percent of the aliens who were issued an ATA under the CHNV parole programs flew to Florida POEs. The unexpected increase in approximately 25,000 inadmissible aliens per month resulted in CBP experiencing a decrease in enforcement operations and an increase in wait times, overtime expenditures, and other needs at Florida POEs. Processing an alien requesting parole under the CHNV parole programs requires secondary processing and enrollment of biometrics, resulting in a more extensive and prolonged time in CBP facilities.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the CHNV parole programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted. The notices establishing the CHNV parole programs expressly advise the public that, "[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point"[59] and that "DHS may terminate parole in its discretion at any time."[60] The CHNV parole programs were "being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal."[61]

In addition, DHS observes that on October 4, 2024, the prior administration announced that there was no re-parole process under CHNV, informing participants that, "if you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires."[62] Finally, as noted above, Executive Order 14165 directs the Secretary to terminate

the CHNV parole programs consistent with law.

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, that DHS made clear months ago that there would be no "re-parole" process under the CHNV parole programs, and the additional notice provided in Executive Order 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution.[63]

### 1. Reliance Interests of Potential Supporters and Beneficiaries

DHS first considered the potential reliance interests of those U.S.-based supporters who had intended to file or have filed a Form I–134A in support of a potential parolee. In general, the costs associated with such filings are minimal. The potential supporter may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response, and a few potential supporters who submitted Form I–134A may have submitted their biometrics (photograph and fingerprints) at a USCIS Application Support Center for biometric screening and vetting by USCIS as part of the review of their Form I–134A.[64]

At this early stage in the process, the costs incurred by a potential beneficiary are also minimal. Once a supporter is confirmed, the potential beneficiary receives instructions to create a USCIS online account, confirm their biographic information in their online account, and attest to meeting the eligibility requirements, including public health requirements, and certain vaccination requirements. It is also possible that a beneficiary who has received instructions to create an online account may have obtained vaccinations in anticipation of the required attestation. After confirming their biographic information, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. CBP One was used to collect the beneficiary's biographic information and photo and was an additional step in the process prior to the alien being authorized to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the

---

*https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.*

[57] Under the parole program for Venezuelans, a U.S.-based supporter would initiate consideration for parole under the program by filing Form I–134, *Declaration of Financial Support* (Online), along with supporting evidence. 87 FR at 63515. In January 2023, when DHS expanded the programs to cover Cubans, Haitians, and Nicaraguans and their immediate family members as well, DHS announced that it would instead begin accepting the Form I–134A *Online Request to be a Supporter and Declaration of Financial Support*, along with supporting evidence, to initiate consideration for parole under all four programs. *See, e.g.,* 88 FR at 1279. Neither form could be filed on paper and neither form required the payment of a fee.

[58] OHSS analysis of USCIS Form I–134/Form I–134A data as of January 22, 2025. The Venezuelan parole program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023. "Confirmed" in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[59] *E.g.,* 88 FR at 1268 (Cuba).

[60] *E.g.,* 88 FR at 1272 (Cuba).

[61] *E.g.,* 88 FR at 1277 (Cuba).

[62] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program,* CBS News (Oct. 4, 2024), *https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/.*

[63] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024), available at *https://web.archive.org/web/20250104043158/https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[64] Biometrics submission is estimated to require 1.17 hours per respondent. 89 FR 104557 (Dec. 23, 2024).

ATA process was 10 minutes. *See* 88 FR 62810, 62812 (Sept. 13, 2023).

In general, these costs are not significant and pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States. DHS intends to issue a notice of non-confirmation for all remaining pending Forms I–134A. DHS will also rescind the confirmation of all Form I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A.

### 2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Supporters

A beneficiary with an approved ATA may travel to the United States to seek a discretionary grant of parole. Authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel, at no cost to the U.S. government, via commercial air to the United States.[65] DHS intends to cancel all pending applications for advance authorizations to travel to the United States to seek a discretionary grant of parole under the CHNV parole programs. There are no currently approved ATAs upon which an alien may travel under the CHNV parole programs.[66]

A beneficiary whose application for an ATA is cancelled may have, for example, provided notice to their landlord, sold property, and/or resigned from employment. In addition, a confirmed Form I–134A supporter may have incurred expenses, for example, to secure living quarters or furniture for the beneficiary in anticipation of their process being completed through parole into the United States.

DHS recognizes that the potential costs incurred by supporters and potential beneficiaries at this point could be viewed as significant. Nevertheless, as explained above, supporters and potential beneficiaries were apprised that DHS could terminate the programs at any point. Moreover, the notices for each parole program made it clear that the approval of an

ATA or grant of parole at a POE was entirely discretionary. *See, e.g.,* 88 FR 1243, 1252 (noting that a potential beneficiary may be "ineligible for advance authorization to travel to the United States as well as parole under this process" for a range of reasons, including if the alien "fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion"); 88 FR at 1253 ("Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the [aliens] is a discretionary determination made by CBP at the POE at the time the [alien] arrives at the interior POE"); 88 FR at 1253 ("[Aliens] who . . . otherwise do not warrant parole pursuant to [section 212(d)(5)(A) of the INA], and as a matter of discretion upon inspection, . . . may be referred to ICE for detention."). While the termination of the CHNV parole programs as provided in this notice may result in costs incurred by both the supporter and potential beneficiary who have prepared to travel to the United States, those parties chose to incur such expenses knowing that completion of the process was never guaranteed by the terms of the program, and the termination of the programs was possible at any time. DHS has concluded that any such reliance interests are outweighed by other interests and policy concerns as explained in this notice.[67]

### V. Effect of Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests

The notices establishing the CHNV parole programs explain that parole is not an admission of the alien to the United States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for

granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the CHNV parole programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs. DHS has determined that as one aspect of the termination of the CHNV parole programs, consistent with the Secretary's statutory and regulatory authority,[68] the parole of aliens who have been paroled into the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice. Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States

---

[65] Authorization to travel does not guarantee parole. Parole of the individual is a discretionary determination made by CBP when the individual arrives at the interior POE. *See, e.g.,* 88 FR 1255, 1264 (Jan. 9, 2023).

[66] OHSS analysis of advance travel authorization data provided by CBP PSPD and valid as of February 27, 2025.

[67] DHS has considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms. Even if there were currently approved ATAs, DHS would not pursue this route, because DHS would not wish to incentivize aliens flying to the United States to seek parole under policies that DHS no longer supports or appear to encourage them to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. Such an approach would risk exacerbating the problems created by the CHNV parole programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit. If parole is not granted, the alien may be returned to their home country at U.S. Government expense or processed for another appropriate disposition under the INA.

[68] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"); 8 CFR 212.5(e)(2)(i) ("[U]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien. . . .*" (emphasis added)).

before their parole termination date. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home mobile app. Aliens should visit *https:// i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

In implementing this approach, DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (*e.g.,* adjustment of status, asylum, Temporary Protected Status, or T or U nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (*e.g.,* petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available). Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS's institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures. 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States.[69] Parolees will have departed their native country; traveled

to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

However, any assessment of the reliance interests of CHNV parolees must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served[70]; and that (2) the initial term of parole would be limited to a maximum of two years. These clear, limiting conditions of the parole programs served to attenuate any long-term expectations and interests amongst CHNV parolees. Accordingly, DHS has taken these limiting conditions, along with CHNV parolees' knowledge of them, into consideration when weighing their reliance interests.[71]

DHS has concluded that the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists. To effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate. Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination. INA 235(b)(1)(iii)(II), 8 U.S.C. 1225(b)(1)(iii)(II); 8 CFR 235.3.[72] If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system discussed in Section III.1.

To the extent that current parolees have obtained housing and employment authorization, or created new ties

within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the Univ. of Cal.*[73] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[74] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than two years, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchase of homes.[75] As the Court noted, these interests, though noteworthy, were not "necessarily dispositive," and "DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests."[76] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the CHNV parole programs are far less than the population in *Regents.* Further, as stated above, the reliance interests under the CHNV parole programs must take into account the express, discretionary terms of the parole program. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, DHS finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS has considered the alternative of permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in

---

[69] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)).

[70] As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia,* the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.

[71] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is "unjustified in light of the express limitations" in relevant immigration policy).

[72] *See* Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025).

[73] 591 U.S. 1 (2020).

[74] *Id.* at 31.

[75] *Id.*

[76] *Id.*

the past done with some parole terminations. *See, e.g.,* 82 FR 38926, 38927 (Aug. 16, 2017). However, DHS has opted to not pursue this route. As explained above, this would essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

DHS has also considered the alternative of a longer than 30-day wind-down period. After due consideration, DHS has also decided not to pursue this option. As discussed above, DHS has a strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system. Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal.[77] DHS has determined that a 30-day wind-down period provides affected parties sufficient notice while also preserving DHS's ability to enforce the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States. Accordingly, DHS is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole. *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall*

be terminated upon written notice to the alien. . . .*" (emphasis added)). For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served. This notice accordingly serves as written notice to CHNV parolees.

DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance. *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements. *See* 8 U.S.C. 1305; 8 CFR 265.1. Because all CHNV parolees should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account. *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . ."). This notice, and the individual notice through the USCIS online account, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A). *i.e.,* a "statement [ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)). By terminating the CHNV parole programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 1277—DHS is explaining how it will implement the Secretary's broad

discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA).[78]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the CHNV parole programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary of Homeland Security "in [her] discretion." The CHNV parole programs therefore were general statements of policy.

Because the CHNV parole programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice and comment rulemaking requirements. Through the termination of the CHNV parole programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[79] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation.[80]

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[81]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[82] Consistent

[77] According to OHSS analysis of data provided by USCIS, for each month from March 2025 through September 2026, there are thousands of CHNV parolees who will become ineligible for expedited removal upon the natural expiration of their two-year parole.

[78] *Cf. Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[79] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[80] *See* 5 U.S.C. 553(d)(2).

[81] *See* 5 U.S.C. 553(a)(1); 88 FR at 1277; 88 FR at 1253; 88 FR at 1264; 87 FR at 63516 (as modified by 88 FR 1279).

[82] *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir.

with the Secretary of State's February 21, 2025 determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[83]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-comment rulemaking, some courts have required such a showing,[84] and DHS can make one here. Delaying rescission of the CHNV parole programs to undertake rulemaking would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in Section III.3 of this notice, the CHNV parole programs were implemented as an integral part of negotiations with regional neighbors, including Mexico, to address unlawful migratory flows challenging immigration systems throughout the region. For instance, in announcing the Venezuela parole program, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United

States.[85] DHS cautioned that it "will not implement the new parole process without the ability to return Venezuelan nationals who enter [unlawfully] to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States [unlawfully] between POEs." DHS explained that "initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements."[86] DHS noted that the program was "not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—[but] also fully aligned with larger and important foreign policy objectives of [the prior] Administration and fits within a web of carefully negotiated actions by multiple governments."[87] When implementing the Cuba, Haiti, and Nicaragua parole programs, DHS invoked the foreign affairs exemption on similar grounds.[88]

Yet, as also discussed in Section III.3 of this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the CHNV parole programs was contingent upon the GOM making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the CHNV parole programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations

and may result in an even greater number of CHNV nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.3 of this notice, with countries to accept the removal of illegal aliens, including inadmissible CHNV nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. Any delay for such procedures would harm the U.S. Government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the CHNV parole programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border. Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.[89]

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[90] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[83] U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate the CHNV parole programs.

[84] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[85] *See* 87 FR at 63516.

[86] *Id.*

[87] *Id.*

[88] *See* 88 FR at 1277 (Cuba), 88 FR at 1253–54 (Haiti), 88 FR at 1265 (Nicaragua).

[89] *See* 5 U.S.C. 553(b)(B), 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) ('a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[90] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

For example, DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

This rule does not promulgate new or revise existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–05128 Filed 3–21–25; 4:15 pm]

**BILLING CODE 9110–9M–P**

## DEPARTMENT OF HOMELAND SECURITY

### Finding of Mass Influx of Aliens

On January 23, 2025, the Acting Secretary of Homeland Security issued a Finding of Mass Influx of Aliens. This finding went into effect immediately (on January 23, 2025) and remained in effect for 60 days (until March 23, 2025). The Acting Secretary's finding published in the **Federal Register** on January 23, 2025. *See* 90 FR 8,399. Upon review of the current situation at the border, I am extending that finding.

The Immigration and Nationality Act (INA), at 8 U.S.C. 1103(a), provides an expansive grant of authority, stating that in the event of a mass influx of aliens off the coast of the United States or a land border, the Secretary may authorize a State or local law enforcement officer, with the consent of the officer's superiors, to perform duties of immigration officers under the INA. In turn, section 65.83 of Title 28 of the Code of Federal Regulations allows the Secretary [1] to "request assistance from a

---

[1] Although the regulations reference the "Attorney General," Congress has, since the publication of these regulations, transferred the authority and responsibility for administering and enforcing the immigration laws to the Secretary of Homeland Security. See Homeland Security Act of 2002 471, 6 U.S.C. 291 (abolishing the former Immigration and Naturalization Service); id. S 441, 6 U.S.C. 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); Immigration and Nationality Act 103(a)(1), 8 U.S.C. 1103(a)(1) ("the Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens.")

State or local government in the administration of the immigration laws of the United States" under certain specified circumstances. Among those circumstances are when "[t]he [Secretary] determines that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality." 28 CFR 65.83(b).

In making such a determination, the Secretary may also determine that there is an "immigration emergency." The regulations define an immigration emergency as "an actual or imminent mass influx of aliens which either is of such magnitude or exhibits such other characteristics that effective administration of the immigration laws of the United States is beyond the existing capabilities of [the Department of Homeland Security (DHS)] in the affected area or areas." 28 CFR 65.83(d)(1) (using identical language as 8 U.S.C. 1103(a)(10)).

Such a determination is based on "the factors set forth in the definitions contained in" 28 CFR 65.81. Characteristics of an influx of aliens, other than magnitude, which may be considered in determining whether an immigration emergency exists include: the likelihood of continued growth in the magnitude of the influx; an apparent connection between the influx and increases in criminal activity; the actual or imminent imposition of unusual and overwhelming demands on law enforcement agencies; and other similar characteristics.

Upon review of the current data, I have determined that there continues to exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of all 50 States and that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring a continued federal response. I make this finding for the reasons discussed below.

First, over the last four years, our southern border has been overrun. As noted in Proclamation 10,888, *Guaranteeing the States Protection Against Invasion,* "[o]ver the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States.").

Second, as of March 12, 2025, DHS estimates that there are likely approximately 20,000 aliens across the

Southwest border waiting to illegally enter. While encounters along the southwest border declined in February 2025, historical trends over the past four years strongly indicate that without this finding, aliens are likely to resume crossing the border, and border crossing numbers are likely to rise again before DHS can gain operational control. It is precisely measures, such as this one, that have kept the numbers under control.

Third, as stated in the January 23, 2025 notice, when border crossing numbers are high, much detention capacity is required of U.S. Immigration and Customs Enforcement (ICE). Mandatory detention of aliens apprehended at the border serves important public safety and national security purposes. Aliens who have not completed this process have not been effectively vetted for criminality or national security threats. Current databases do not allow for comprehensive and rapid searching for foreign convictions or other public safety and national security risks. As a result, the fact that the numbers at the border are effectively forcing DHS to engage in catch-and-release practices is eliminating or thwarting legally mandated screenings and it is threatening public safety and national security. This does not account for so-called gotaways, of which there have been millions over the last four years, who are not screened in any manner. Without controls in place at the border to stem the influx, DHS loses its capacity to hold all aliens as required by the INA. 8 U.S.C. 1225(b). As of March 13, 2025, ICE has a detention population of 47,372, with a maximum capacity of 54,500. ICE's facilities are currently at nearly at 87% occupancy, and ICE's priority for detention space is removing aliens with criminal records, public safety risks, and national security risks. Should this finding not be extended, ICE would be hampered in this critical effort.

Fourth, an influx of aliens presents significant concerns with respect to increased criminal activity. Between FY 2017 and 2019, ICE removed 485,930 aliens with criminal convictions or pending criminal charges. However, between FY 2021 and FY 2023, ICE removed 158,931 aliens with criminal convictions or pending criminal charges. Assuming that the crime rate of foreign nationals has remained unchanged over the year, this 67% decrease (in removals) suggests that tens of thousands of criminal aliens remain in the United States. Where there is an increase in criminal aliens, there is