25-1384

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

Svitlana Doe, *et al.*,

*Plaintiffs-Appellees*,

v.

Kristi Noem, Secretary of Homeland Security, *et al.*,

*Defendant-Appellants*.

————————————

On Appeal from the United States District Court
for the District of Massachusetts

————————————

## APPENDIX

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

BRIAN C. WARD
*Acting Assistant Director*

PATRICK GLEN
*Senior Litigation Counsel*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*
First Cir. Bar No. 1216699
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878,
Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
katherine.j.shinners@usdoj.gov

ELISSA FUDIM
*Trial Attorney*

# TABLE OF CONTENTS

| Document[1] | Dist. Ct. Docket No. | Starting Page |
|---|---|---|
| Docket | N/A | 1 |
| Notice of Appeal | 100 | 37 |
| Declaration of Plaintiff Alejandro Doe | 24-1 | 40 |
| Declaration of Plaintiff Ana Doe | 24-2 | 49 |
| Declaration of Plaintiff Armando Doe | 24-3 | 59 |
| Declaration of Plaintiff Carlos Doe | 24-4 | 70 |
| Declaration of Plaintiff Sandra McAnany | 24-9 | 78 |
| Declaration of Plaintiff Kyle Varner | 24-10 | 86 |
| Declaration of Plaintiff Wilhen Pierre Victor | 24-11 | 95 |
| Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022) | 24-21 | 102 |
| Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023) | 24-22 | 114 |
| Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023) | 24-23 | 119 |
| Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023) | 24-24 | 134 |
| Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) | 24-25 | 148 |
| Declaration of Esther H. Sung, counsel for Plaintiffs | 24-36 | 161 |
| Plaintiffs' Exhibit 37, "History of INA § 212(d)(5), 8 U.S.C. § 1182(d)(5)" | 24-37 | 168 |
| Plaintiffs' Exhibit 38 | 24-38 | 171 |
| Declaration of Yael Schacher | 24-39 | 177 |
| Declaration of Eric Schwartz | 24-40 | 199 |
| Declaration of Morton H. Halperin | 24-41 | 216 |
| Declaration of Debra Rogers | 24-42 | 271 |
| Plaintiffs' Exhibit 43, Bo Cooper, INS Gen. Counsel, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | 24-43 | 285 |
| Declaration of Plaintiff Andrea Doe (amended) | 27-1 | 292 |

[1] Where the document was preceded in a docket filing by an Exhibit page or cover page, such page has been included in the document as reproduced here.

| Document[1] | Dist. Ct. Docket No. | Starting Page |
|---|---|---|
| Memorandum from Benjamine C. Huffman, Acting Secretary, Department of Homeland Security, *Exercising Appropriate Discretion Under Parole Authority* (Jan. 20, 2025) | 41-1 | 303 |
| Email from Jennifer Higgins, Securing Our Borders EO and Parole Processing (Jan. 23, 2025) | 41-2 | 306 |
| Memorandum from Andrew Davidson, Acting Deputy Director, U.S. Citizenship and Immigration Services *Administrative Hold on All USCIS Benefit Requests Filed by Parolees Under the Uniting for Ukraine (U4U) Process, Processes for Haitians, Cubans, Nicaraguans, and Venezuelans (CHNV) Process, or Family Reunification Parole (FRP) Process* | 41-3 | 308 |
| Declaration of Kika Scott | 41-4 | 312 |
| Defendants' Exhibit E, "Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year" | 41-5 | 319 |
| Joint Status Report | 55 | 329 |
| Declaration of Plaintiff Lucia Doe | 64-3 | 336 |
| Declaration of Plaintiff Miguel Doe | 64-4 | 345 |
| Declaration of Plaintiff Daniel Doe | 64-5 | 353 |
| Declaration of Plaintiff Gabriela Doe | 64-6 | 361 |
| Transcript of March 24, 2025 Hearing | 66 | 370 |
| Second Amended Complaint | 68 | 442 |
| Emergency Motion for a Preliminary Injunction and Stay | 70 | 546 |
| Declaration of Plaintiff Norma Lorena Dus | 71-2 | 550 |
| Declaration of Guerline Jozef, Co-Founder and Executive Director at Plaintiff Haitian Bridge Alliance | 71-3 | 556 |
| Plaintiffs' Memorandum of Law in Support of Emergency Motion for a Preliminary Injunction and Stay | 72 | 564 |
| Plaintiffs' Supplemental Motion for Class Certification | 73 | 590 |

| Document[1] | Dist. Ct. Docket No. | Starting Page |
|---|---|---|
| Memorandum of Law in Support of Plaintiffs' Supplemental Motion for Class Certification | 74 | 594 |
| Defendants' Exhibit A, Termination of Parole | 88-1 | 620 |
| Defendants' Memorandum in Opposition to Plaintiffs' Emergency Motion for a Preliminary Injunction | 89 | 622 |
| Defendants' Memorandum in Opposition to Plaintiffs' Supplemental Motion for Class Certification | 90 | 650 |
| Transcript April 10, 2025 Hearing | 104 | 675 |
| Application to Stay the Order Issued by the United States District Court for the District of Massachusetts, S. Ct. No. 24A1079 | N/A | 738 |
| Opposition to Application to Stay, S. Ct. No. 24A1079 | N/A | 768 |
| Reply in Support of the Application to Stay, S. Ct. No. 24A1079 | N/A | 810 |

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-10495-IT

Doe et al v. Noem et al                          Date Filed: 02/28/2025
Assigned to: Judge Indira Talwani                Jury Demand: None
Case in other court:  USCA - First Circuit, 25-01384    Nature of Suit: 899 Other Statutes:
Cause: 05:702 Administrative Procedure Act       Administrative Procedures Act/Review or
                                                 Appeal of Agency Decision
                                                 Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Svitlana Doe**                    represented by    **John A. Freedman**
                                                      Arnold & Porter Kaye Scholer LLP
                                                      601 Massachusetts Avenue, NW
                                                      Washington, DC 20001
                                                      202-942-5316
                                                      Fax: 202-942-5999
                                                      Email: John.Freedman@aporter.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Anwen Hughes**
                                                      Human Rights First
                                                      121 W. 36th St. PMB 520
                                                      New York, NY 10018
                                                      212-845-5244
                                                      Email: HughesA@humanrightsfirst.org
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Brandon Galli-Graves**
                                                      Justice Action Center
                                                      P.O. Box 27280
                                                      Los Angeles, CA 90027
                                                      435-359-6480
                                                      Email: brandon.galli-
                                                      graves@justiceactioncenter.org
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Daniel B Asimow**
                                                      Arnold & Porter Kaye Scholer LLP
                                                      Three Embarcadero Center
                                                      Ste 10th Floor
                                                      San Francisco, CA 94111
                                                      415-471-3142
                                                      Fax: 415-471-3400
                                                      Email: Daniel.Asimow@arnoldporter.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Esther Sung**

Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
713-560-7518
Email: esther.sung@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
Arnold & Porter Kaye Scholer LLP
200 Clarendon Street,
Ste FL 53
Boston, MA 02116
617-351-8050
Fax: 627-226-9199
Email: Tiffany.Jang@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Hillary Li**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-450-7262
Email: hillary.li@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**Justin Cox**
Law Office of Justin B. Cox
PO Box 1106
97031-7031
Hood River, OR 30317
541-716-1818
Email: justin@jcoxconsulting.org
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
Justice Action Center
P.O. Box 27280
90027
Los Angeles, CA 90027
323-316-0944
Email:
karen.tumlin@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-450-7267
Email: laura.flores-
perilla@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave NW
Washington, DC 20001
202-942-6855
Email: laura.shores@kayescholer.com
*(Inactive)*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maksym Doe**                    represented by   **John A. Freedman**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Anwen Hughes**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Brandon Galli-Graves**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Daniel B Asimow**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Esther Sung**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **H. Tiffany Jang**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Hillary Li**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Justin Cox**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Karen C. Tumlin**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Laura Flores-Perilla**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Laura Scott Shores**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maria Doe**
                                  represented by **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alejandro Doe**
                                  represented by **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Armando Doe**                    represented by    **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ana Doe**                    represented by   **John A. Freedman**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Anwen Hughes**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Brandon Galli-Graves**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Daniel B Asimow**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Esther Sung**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **H. Tiffany Jang**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carlos Doe**                          represented by  **John A. Freedman**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brandon Galli-Graves**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Daniel B Asimow**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Esther Sung**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **H. Tiffany Jang**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Hillary Li**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Cox**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Omar Doe**                        represented by    **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sandra McAnany**                    represented by **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle Varner**                         represented by   **John A. Freedman**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brandon Galli-Graves**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Daniel B Asimow**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Esther Sung**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **H. Tiffany Jang**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Hillary Li**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Cox**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Karen C. Tumlin**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Laura Flores-Perilla**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Laura Scott Shores**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wilhen Pierre Victor**                represented by   **John A. Freedman**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Haitian Bridge Alliance**                  represented by **John A. Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Galli-Graves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel B Asimow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Sung**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen C. Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrea Doe**                    represented by    **Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Valentin Rosales Tabares**              represented by    **Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marim Doe**                          represented by     **Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Adolfo Gonzalez, Jr.**                represented by     **Anwen Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H. Tiffany Jang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Aleksandra Doe**                    represented by    **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **H. Tiffany Jang**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **John A. Freedman**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Cox**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Laura Scott Shores**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Teresa Doe**                        represented by    **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **H. Tiffany Jang**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **John A. Freedman**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Cox**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Laura Scott Shores**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rosa Doe**                          represented by    **Anwen Hughes**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **H. Tiffany Jang**
                                                        (See above for address)

*ATTORNEY TO BE NOTICED*

**John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura Scott Shores**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Miguel Doe**                    represented by    **John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Lucia Doe**                     represented by    **John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Daniel Doe**                    represented by    **John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Gabriela Doe**                  represented by    **John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Norma Lorena Dus**              represented by    **John A. Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Kristi Noem**                   represented by    **Brian Ward**
*in her official capacity as Secretary of*          United States Department of Justice
*Homeland Security*                                 P.O. Box 868 Ben Franklin Station
Washington, DC 20044
(202) 616-9121
Email: brian.c.ward@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elissa Fudim**
DOJ-Civ

Post Office Box 868
Ben Franklin Station
Washington, DC 20044
202-451-7460
Email: elissa.p.fudim@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Joseph A. Darrow**
DOJ-USAO
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-598-7537
Email: joseph.a.darrow@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
DOJ-Civ
P.O. Box 878 Ben Franklin Station
Washington, DC 20044
202-598-8259
Fax: 202-305-7000
Email: katherine.j.shinners@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
Fax: 617-748-3971
Email: rayford.farquhar@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Caleb Vitello**
*in his official capacity as the Acting Director of Immigration and Customs Enforcement*

represented by **Brian Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elissa Fudim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph A. Darrow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pete R. Flores**                                    represented by    **Brian Ward**
*in his official capacity as Acting*                                   (See above for address)
*Commissioner of U.S. Customs and Border*                             *LEAD ATTORNEY*
*Protection*                                                          *ATTORNEY TO BE NOTICED*

                                                                      **Elissa Fudim**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Joseph A. Darrow**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Katherine J. Shinners**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Rayford A. Farquhar**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Defendant**

**Kika Scott**                                       represented by    **Brian Ward**
*in her official capacity as the Senior Official*                     (See above for address)
*Performing the Duties of the Director of*                            *LEAD ATTORNEY*
*U.S. Citizenship and Immigration Services*                           *ATTORNEY TO BE NOTICED*

                                                                      **Elissa Fudim**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Joseph A. Darrow**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Katherine J. Shinners**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Rayford A. Farquhar**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Defendant**

**Donald J. Trump**                                  represented by    **Brian Ward**
*in his official capacity as President of the*                        (See above for address)
*United States*                                                       *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Elissa Fudim**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph A. Darrow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Attorney's Office for the District of**          represented by    **Brian Ward**
**Massachusetts**                                                         (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Elissa Fudim**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Joseph A. Darrow**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Rayford A. Farquhar**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Mr. Todd Lyons**                                       represented by    **Brian Ward**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Elissa Fudim**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Joseph A. Darrow**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Katherine J. Shinners**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Rayford A. Farquhar**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Movant**

**State of New York, et al.**

represented by **Anagha Sundararajan**
New York Office of the Attorney General
28 Liberty St
New York, NY 10005
212-416-8073
Email: anagha.sundararajan@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J. Yanni**
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
212-416-6184
Email: stephen.yanni@ag.ny.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2025 | 1 | COMPLAINT *CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello Filing fee: $ 405, receipt number AMADC-10866188 (Fee Status: Filing Fee paid), filed by KYLE VARNER, WILHEN PIERRE VICTOR, Haitian Bridge Alliance, SVITLANA DOE, MAKSYM DOE, MARIA DOE, ALEJANDRO DOE, ARMANDO DOE, ANA DOE, CARLOS DOE, OMAR DOE, SANDRA MCANANY. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Freedman, John) (Entered: 02/28/2025) |
| 02/28/2025 | 2 | MOTION for Leave to Appear Pro Hac Vice for admission of Esther H. Sung, Karen C. Tumlin, Hillary Li, Laura Flores-Perilla, Brandon Galli-Graves, Daniel B. Asimow Filing fee: $ 750, receipt number AMADC-10866190 by KYLE VARNER, WILHEN PIERRE VICTOR, Haitian Bridge Alliance, SVITLANA DOE, MAKSYM DOE, MARIA DOE, ALEJANDRO DOE, ARMANDO DOE, ANA DOE, CARLOS DOE, OMAR DOE, SANDRA MCANANY. (Attachments: # 1 Exhibit CERTIFICATE OF ESTHER H. SUNG IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 2 Exhibit CERTIFICATE OF KAREN C. TUMLIN IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 3 Exhibit CERTIFICATE OF HILLARY LI IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 4 Exhibit CERTIFICATE OF LAURA FLORES-PERILLA IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 5 Exhibit CERTIFICATE OF BRANDON GALLI-GRAVES IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 6 Exhibit CERTIFICATE OF DANIEL B. ASIMOW IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE) (Freedman, John) (Entered: 02/28/2025) |
| 03/03/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Paul G. Levenson. (JAM) (Entered: 03/03/2025) |
| 03/03/2025 | 4 | Summons Issued as to Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. **Counsel receiving this notice electronically should download this summons,** |

| | | |
|---|---|---|
| | | **complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (JAM) (Entered: 03/03/2025) |
| 03/03/2025 | 7 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 2 Motion for Leave to Appear Pro Hac Vice Added Esther H. Sung, Karen C. Tumlin, Hillary Li, Laura Flores-Perilla, Brandon Galli-Graves, and Daniel B. Asimow.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 03/03/2025) |
| 03/03/2025 | 8 | Judge Indira Talwani: ORDER re 5 *Ex Parte* Motion to Proceed Under Pseudonym. See attached. (SEC) (Entered: 03/03/2025) |
| 03/10/2025 | 9 | AFFIDAVIT OF SERVICE Executed by Wilhen Pierre Victor, Carlos Doe, Maksym Doe, Svitlana Doe, Ana Doe, Maria Doe, Sandra McAnany, Haitian Bridge Alliance, Omar Doe, Alejandro Doe, Kyle Varner, Armando Doe. U.S. Attorney's Office for the District of Massachusetts served on 3/6/2025, answer due 5/5/2025. Acknowledgement filed by Wilhen Pierre Victor; Carlos Doe; Maksym Doe; Svitlana Doe; Ana Doe; Maria Doe; Sandra McAnany; Haitian Bridge Alliance; Omar Doe; Alejandro Doe; Kyle Varner; Armando Doe. (Freedman, John) Modified on 3/11/2025 to reflect correct answer due date (SEC). (Entered: 03/10/2025) |
| 03/10/2025 | 10 | NOTICE of Appearance by H. Tiffany Jang on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Jang, H.) (Entered: 03/10/2025) |
| 03/10/2025 | 11 | NOTICE of Appearance by John A. Freedman on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Freedman, John) (Entered: 03/10/2025) |
| 03/10/2025 | 12 | NOTICE of Appearance by Esther Sung on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Sung, Esther) (Entered: 03/10/2025) |
| 03/10/2025 | 13 | NOTICE of Appearance by Laura Flores-Perilla on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Flores-Perilla, Laura) (Entered: 03/10/2025) |

| 03/10/2025 | 14 | NOTICE of Appearance by Karen C. Tumlin on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Tumlin, Karen) (Entered: 03/10/2025) |
| --- | --- | --- |
| 03/10/2025 | 15 | NOTICE of Appearance by Brandon Galli-Graves on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Galli-Graves, Brandon) (Entered: 03/10/2025) |
| 03/12/2025 | 16 | NOTICE of Appearance by Daniel B Asimow on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Asimow, Daniel) (Entered: 03/12/2025) |
| 03/13/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Justin B. Cox Filing fee: $ 125, receipt number AMADC-10890788 by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Affidavit CERTIFICATE OF JUSTIN B. COX)(Freedman, John) (Entered: 03/13/2025) |
| 03/13/2025 | 18 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added Justin B. Cox. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (SEC) (Entered: 03/13/2025) |
| 03/13/2025 | 19 | MOTION for Leave to File Excess Pages *[Expedited Relief Requested]* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/13/2025) |
| 03/14/2025 | 20 | Judge Indira Talwani: ELECTRONIC ORDER allowing Plaintiffs' Motion for Leave to Exceed Page Limit 19 . Plaintiffs' memorandum shall include a table of contents and table of authorities which need not be counted toward the 30-page limit. (SEC) (Entered: 03/14/2025) |
| 03/14/2025 | 21 | NOTICE of Appearance by Hillary Li on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Li, Hillary) (Entered: 03/14/2025) |
| 03/17/2025 | 22 | AMENDED COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Todd Lyons, filed by Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, |

| | | |
|---|---|---|
| | | Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany.(Freedman, John) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | EXHIBIT re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit 1 Declaration of Alejandro Doe, # 2 Exhibit 2 Declaration of Ana Doe, # 3 Exhibit 3 Declaration of Armando Doe, # 4 Exhibit 4 Declaration of Carlos Doe, # 5 Exhibit 5 Declaration of Maksym Doe, # 6 Exhibit 6 Declaration of Maria Doe, # 7 Exhibit 7 Declaration of Omar Doe, # 8 Exhibit 8 Declaration of Svitlana Doe, # 9 Exhibit 9 Declaration of Sandra McAnany, # 10 Exhibit 10 Declaration of Kyle Varner, # 11 Exhibit 11 Declaration of Wilhen Pierre Victor, # 12 Exhibit 12 Declaration of Valentin Rosales Tabares, # 13 Exhibit 13 Declaration of Adolfo Gonzalez Jr, # 14 Exhibit 14 Declaration of Marim Doe, # 15 Exhibit 15 Declaration of Teresa Doe, # 16 Exhibit 16 Declaration of Rosa Doe, # 17 Exhibit 17 Declaration of Aleksandra Doe, # 18 Exhibit 18 Aleksandra Doe Notice of Interview Cancellation by USCIS Redacted, # 19 Exhibit 19 Declaration of Andrea Doe, # 20 Exhibit 20 Fed Reg. Notice U4U April 27, 2022 - NC, # 21 Exhibit 21 Fed. Reg. Notice Venezuelan parole process Oct. 19, 2022 - NC, # 22 Exhibit 22 Fed. Reg. Notice Updates to Venezuelan parole process Jan 9, 2023 - NC, # 23 Exhibit 23 Fed. Reg. Notice re Cuban parole process Jan 9, 2023 NC, # 24 Exhibit 24 - Fed. Reg. Notice re Haitian parole process Jan 9, 2023 NC, # 25 Exhibit 25 Fed. Reg. Notice re Nicaraguan parole process Jan 9, 2023 NC, # 26 Exhibit 26 Fed. Reg. Notice re Colombian FRP NC, # 27 Exhibit 27 Fed. Reg. Notice re Ecuadorian FRP - NC, # 28 Exhibit 28 Fed. Reg. Notice re Guatemalan FRP NC, # 29 Exhibit 29 Fed. Reg. Notice re Honduran FRP NC, # 30 Exhibit 30 - Fed. Reg. Notice re Salvadoran FRP NC, # 31 Exhibit 31 - Fed. Reg. Notice re Change to Haitian FRP NC, # 32 Exhibit 32 - Fed. Reg. Notice re Change to Cuban FRP NC, # 33 Exhibit 33 - Fed. Reg. Notice re Haitian FRP NC, # 34 Exhibit 34 - Fed. Reg. Notice re Cuban FRP NC, # 35 Exhibit 35 - Fed. Reg. Notice re CAM NC, # 36 Exhibit 36 Sung Declaration, # 37 Exhibit 37 History of Parole Statute, # 38 Exhibit 38 CATO Inst. Categories of parole of INA, # 39 Exhibit 39 Decl of Yael Schacher, # 40 Exhibit 40 Decl of Eric Schwartz, # 41 Exhibit 41 Decl of Morton Halperin, # 42 Exhibit 42 Rogers Decl, # 43 Exhibit 43 2001-06-15 Bo Cooper INS Memo on Parole, # 44 Exhibit 44 Update on Form 1-134A USCIS, # 45 Exhibit 45 CBP Carrier Liaison Program notice of 1-24-25, # 46 Exhibit 46 USCIS Message to CHNV Parolee, # 47 Exhibit 47 USCIS Message to Ukrainian Parolee re: TPS, # 48 Exhibit 48 - USCIS Message to MPIP applicant, # 49 Exhibit 49 USCIS Message to U4U Parolee, # 50 Exhibit 50 Fee Schedule G-1055 USCIC)(Freedman, John) (Entered: 03/17/2025) |
| 03/18/2025 | 25 | MEMORANDUM in Support re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/18/2025) |

| 03/18/2025 | 26 | Judge Indira Talwani: ELECTRONIC ORDER entered: Under Fed.R.Civ.P. 65(a), the court "may issue a preliminary injunction only on notice to the adverse party." Plaintiffs' Emergency Motion for Preliminary Injunction 23 includes a certificate of service certifying that "this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)." As no Defendants has entered an appearance in this action, filing through ECF is insufficient to give Defendants notice of Plaintiffs' motion. Plaintiffs shall serve their motion 23, supporting papers 24, 25, and this Order on Defendants pursuant to Fed.R.Civ.P. 5(a) and shall promptly file proof of such service with this court. Any opposition to Plaintiffs' request for emergency relief shall be filed no later than 72 hours from such service. A hearing shall be set by the clerk upon Plaintiffs' filing of proof of service. (SEC) (Entered: 03/18/2025) |
| 03/18/2025 | 27 | *NOTICE OF* Errata by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany to 24 Exhibit,,,,,,,,,,,,, *TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION.* (Attachments: # 1 Exhibit (Amended) Exhibit 19 to Plaintiffs' Motion for Preliminary Injunction) (Freedman, John) (Entered: 03/18/2025) |
| 03/18/2025 | 28 | AFFIDAVIT OF SERVICE Executed by Wilhen Pierre Victor, Marim Doe, Carlos Doe, Maksym Doe, Adolfo Gonzalez, Jr., Svitlana Doe, Ana Doe, Andrea Doe, Maria Doe, Sandra McAnany, Haitian Bridge Alliance, Omar Doe, Valentin Rosales Tabares, Alejandro Doe, Rosa Doe, Aleksandra Doe, Kyle Varner, Teresa Doe, Armando Doe. U.S. Attorney's Office for the District of Massachusetts served on 3/18/2025, answer due 4/8/2025. Acknowledgement filed by Wilhen Pierre Victor; Marim Doe; Carlos Doe; Maksym Doe; Adolfo Gonzalez, Jr.; Svitlana Doe; Ana Doe; Andrea Doe; Maria Doe; Sandra McAnany; Haitian Bridge Alliance; Omar Doe; Valentin Rosales Tabares; Alejandro Doe; Rosa Doe; Aleksandra Doe; Kyle Varner; Teresa Doe; Armando Doe. (Freedman, John) (Entered: 03/18/2025) |
| 03/19/2025 | 29 | ELECTRONIC NOTICE Setting Hearing on Motion 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* : Motion Hearing set for 3/24/2025 11:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (CAM) (Entered: 03/19/2025) |
| 03/19/2025 | 30 | NOTICE of Appearance by Joseph A. Darrow on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Darrow, Joseph) (Entered: 03/19/2025) |
| 03/19/2025 | 31 | Consent MOTION for Leave to File Excess Pages *In Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Attachments: # 1 Proposed Order)(Darrow, Joseph) (Entered: 03/19/2025) |
| 03/20/2025 | 32 | Judge Indira Talwani: ELECTRONIC ORDER allowing Defendants' Consent Motion for Leave to File Excess Pages 31 . Defendants are granted leave to file a memorandum in opposition to Plaintiffs' motion for preliminary injunction of up to 30 pages. The memorandum shall include a table of contents and table of authorities which need not be counted toward the 30-page limit. (SEC) (Entered: 03/20/2025) |
| 03/20/2025 | 33 | MOTION for Leave to Appear Pro Hac Vice for admission of Laura Shores, Anwen Hughes, Sarah Elnahal, Robert Stout Filing fee: $ 500, receipt number AMADC-10902779 by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, |

| | | |
|---|---|---|
| | | Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit A - Certificate of Laura Shores, # 2 Exhibit B - Certificate of Anwen Hughes, # 3 Exhibit C - Certificate of Sarah Elnahal, # 4 Exhibit D - Certificate of Robert Stout)(Jang, H.) (Entered: 03/20/2025) |
| 03/20/2025 | 34 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 33 Motion for Leave to Appear Pro Hac Vice Added Laura Shores, Anwen Hughes, Sarah Elnahal, and Robert Stout.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 03/20/2025) |
| 03/20/2025 | 35 | NOTICE of Appearance by Laura Scott Shores on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Shores, Laura) (Entered: 03/20/2025) |
| 03/20/2025 | 36 | NOTICE of Appearance by Elissa Fudim on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Fudim, Elissa) (Entered: 03/20/2025) |
| 03/21/2025 | 37 | Amicus Curiae APPEARANCE entered by Anagha Sundararajan on behalf of State of New York, et al.. (Sundararajan, Anagha) (Entered: 03/21/2025) |
| 03/21/2025 | 38 | Supplemental MOTION to Proceed under Pseudonym by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 39 | MEMORANDUM in Support re 38 Supplemental MOTION to Proceed under Pseudonym filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 40 | NOTICE of Appearance by Justin Cox on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Cox, Justin) (Entered: 03/21/2025) |

| 03/21/2025 | 41 | EXHIBIT re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action Index of Exhibits for Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Attachments: # 1 Exhibit Memorandum from Benjamine Huffman, # 2 Exhibit Email from Jennifer Higgins, # 3 Exhibit Memorandum from Andrew Davidson, # 4 Exhibit Declaration of Kika Scott, # 5 Exhibit USCIS Historic Processing Times)(Darrow, Joseph) (Entered: 03/21/2025) |
|---|---|---|
| 03/21/2025 | 42 | MEMORANDUM in Opposition re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Darrow, Joseph) (Entered: 03/21/2025) |
| 03/21/2025 | 43 | Judge Indira Talwani: ELECTRONIC ORDER: Upon consideration of the Plaintiffs' Supplemental Motion to Proceed Under Pseudonym 38 , pending further court order, (1) the new Doe Plaintiffs are granted leave to proceed in this matter under pseudonyms; and (2) all parties shall submit pleadings, briefing and evidence either (a) using the new Doe Plaintiffs' pseudonyms instead of their real names and other personally identifying information or (b) by redacting the new Doe Plaintiffs' names and other personally identifying information. Plaintiffs' request for a jointly-agreed upon protective order is denied without prejudice. Counsel for all parties shall comply with Local Rule 7.1(a)(2), which requires counsel to confer and attempt in good faith to resolve or narrow the issue before a motion is filed. Plaintiffs may refile their motion as: (a) a request for entry of a jointly-agreed protective order if an agreement is reached; or (b) a request for entry of Plaintiffs' proposed protective order if no agreement is reached. Either way, the motion shall include a proposed protective order. (SEC) (Entered: 03/21/2025) |
| 03/21/2025 | 44 | MOTION for Leave to File *Amicus Brief* by State of New York, et al.. (Attachments: # 1 Exhibit Proposed Memorandum of Amici States, # 2 Text of Proposed Order Proposed Order)(Sundararajan, Anagha) (Entered: 03/21/2025) |
| 03/21/2025 | 45 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *Regarding Federal Register Notice Terminating the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV)* (Attachments: # 1 Exhibit A)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 46 | MOTION to Certify Class by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit DECLARATION OF JOHN A. FREEDMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, # 3 Exhibit DECLARATION OF KAREN C. TUMLIN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, # 4 Exhibit DECLARATION OF ANWEN HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 47 | MEMORANDUM in Support re 46 MOTION to Certify Class filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/21/2025) |

| 03/21/2025 | 48 | NOTICE of Appearance by Brian Ward on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Ward, Brian) (Entered: 03/21/2025) |
| --- | --- | --- |
| 03/24/2025 | 49 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 44 MOTION for Leave to File Amicus Brief; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 03/24/2025) |
| 03/24/2025 | 50 | AMICUS BRIEF filed by State of New York, et al. *Leave to file granted on March 24, 2025.* (Sundararajan, Anagha) (Entered: 03/24/2025) |
| 03/24/2025 | 51 | Amicus Curiae APPEARANCE entered by Anagha Sundararajan on behalf of State of New York, et al.. (Sundararajan, Anagha) (Entered: 03/24/2025) |
| 03/24/2025 | 62 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Motion Hearing held on 3/24/2025 re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Teresa Doe, Maria Doe, Kyle Varner, Armando Doe, Ana Doe, Alejandro Doe, Svitlana Doe, Adolfo Gonzalez, Jr., Andrea Doe, Omar Doe, Haitian Bridge Alliance, Marim Doe, Valentin Rosales Tabares, Maksym Doe, Aleksandra Doe, Sandra McAnany, Rosa Doe, Carlos Doe, Wilhen Pierre Victor. Case called. Court heard argument from counsel. Any motion for leave to file a 2nd amended complaint due 3/28/2025. Counsel shall confer and if possible, submit an agreed-upon schedule or a status report. Motion taken under advisement. Counsel to file an agreed-upon motion for protective order. Further hearing to be set for the morning of April 7, 2025.

(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Laura Flores-Perilla, Esther Sung, Karen C. Tumlin, Justin Cox, John A. Freedman, H. Tiffany Jang, Anwen Hughes (to file appearance), Brian Ward) (GAM) (Entered: 03/27/2025) |
| 03/25/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephen J. Yanni Filing fee: $ 125, receipt number AMADC-10911426 by State of New York, et al.. (Attachments: # 1 Affidavit Affidavit of Stephen Yanni for Admission Pro Hac Vice)(Sundararajan, Anagha) (Entered: 03/25/2025) |
| 03/25/2025 | 53 | NOTICE of Appearance by Anwen Hughes on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Hughes, Anwen) (Entered: 03/25/2025) |
| 03/26/2025 | 54 | Joint MOTION for Protective Order *Concerning Doe Plaintiffs' PII* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit A)(Freedman, John) (Entered: 03/26/2025) |
| 03/26/2025 | 55 | STATUS REPORT *(JOINT)* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/26/2025) |

| 03/26/2025 | 56 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 52 Motion for Leave to Appear Pro Hac Vice Added Stephen J. Yanni.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 03/26/2025) |
| 03/26/2025 | 57 | Judge Indira Talwani: ORDER entered granting 54 Motion for Protective Order. See attached Stipulated Protective Order Concerning Confidential Doe PII (Talwani, Indira) (Entered: 03/26/2025) |
| 03/26/2025 | 58 | Judge Indira Talwani: ELECTRONIC ORDER: the court has considered the Joint Status Report 55 and sets the following briefing schedule, which takes into account this court's trial schedule:1. The court anticipates addressing the pending Motion for Preliminary Injunction and Stay of Administrative Action 23 and Motion to Certify Class 46 , as currently filed (excluding consideration of claims relating to the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV program"), individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program). Defendants shall file their opposition to the Motion to Certify Class 46 as currently filed (excluding consideration of claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program), no later than April 4, 2025. The court will hold a hearing on both motions (excluding consideration of claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program) at 10:00 a.m. on April 7, 2025. 2. Plaintiffs shall promptly file their anticipated Motion to Amend the Complaint to address the issuance of the recently published Federal Register Notice, entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611 (March 25, 2025).3. Plaintiffs shall file their anticipated Supplemental Motion for Preliminary Injunction and Stay of Administrative Action and Supplemental Motion to Certify Class as to claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program by March 27, 2025. Defendants shall file any oppositions to these supplemental motions no later than April 8, 2025. The clerk will set a hearing on these supplemental motions for April 10, 2025, at 3:00 p.m. (Talwani, Indira) (Entered: 03/26/2025) |
| 03/26/2025 | 59 | MOTION for Leave to File *Second Amended Complaint (Unopposed)* by Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit - Second Amended Complaint, # 2 Exhibit - Second Amended Complaint (Redline Copy))(Freedman, John) (Entered: 03/26/2025) |
| 03/26/2025 | 60 | MEMORANDUM in Support re 59 MOTION for Leave to File *Second Amended Complaint (Unopposed)* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., |

| | | |
|---|---|---|
| | | Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/26/2025) |
| 03/27/2025 | 61 | Judge Indira Talwani: ELECTRONIC ORDER: Good cause shown, Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint 59 is GRANTED.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 03/27/2025) |
| 03/27/2025 | 63 | ELECTRONIC NOTICE of Hearings (See Order at docket entry 58 re 55 ):<br><br>Hearing set for 4/7/2025 10:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>Hearing set for 4/10/2025 03:00 PM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>(GAM) Modified on 4/14/2025 to correct docket reference (GAM). (Entered: 03/27/2025) |
| 03/27/2025 | 64 | Supplemental MOTION *(Second Supplemental Motion to Proceed Under Pseudonym)* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Attachment A - Proposed Order, # 2 Attachment B - Federal Register Notice (90 FR 13611), # 3 Attachment C - Lucia Doe Decl., # 4 Attachment D - Miguel Doe Decl., # 5 Attachment E - Daniel Doe Decl., # 6 Attachment F - Gabriela Doe Decl.)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 65 | MEMORANDUM in Support re 64 Supplemental MOTION *(Second Supplemental Motion to Proceed Under Pseudonym)* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 66 | Transcript of Motion Hearing held on March 24, 2025, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/17/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 6/25/2025. (DRK) (Entered: 03/27/2025) |
| 03/27/2025 | 67 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/27/2025) |
| 03/27/2025 | 68 | AMENDED COMPLAINT *SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, |

| | | |
|---|---|---|
| | | Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany.(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 69 | Judge Indira Talwani: ELECTRONIC ORDER: granting Plaintiffs' Second Supplemental Motion to Proceed under Pseudonym 64 . Plaintiffs seek "a supplement to the March 3, 2025 and March 21, 2025 Orders (Doc. Nos. 8 , 43 ) permitting certain plaintiffs to proceed in this litigation using pseudonyms to protect their identities from public disclosure." Pending further court order, (1) new Plaintiffs identified as Lucia Doe, Miguel Doe, Daniel Doe, and Gabriela Doe are granted leave to proceed in this matter under pseudonyms; and (2) all parties shall submit pleadings, briefing and evidence either (a) using the new Doe Plaintiffs' pseudonyms instead of their real names and other personally identifying information or (b) by redacting the new Doe Plaintiffs' names and other personally identifying information. The court orders further that the reference to "Doe Plaintiffs" in the Stipulated Protective Order Concerning Confidential Doe PII 57 includes the new Doe Plaintiffs. (SEC) (Entered: 03/27/2025) |
| 03/27/2025 | 70 | Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 71 | EXHIBIT re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE INDEX OF EXHIBITS* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit 1: Federal Register Notice 90 FR 13611, # 2 Exhibit 2: Norma Lorena Dus Declaration, # 3 Exhibit 3: Haitian Bridge Alliance Declaration)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 72 | MEMORANDUM in Support re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 73 | Supplemental MOTION to Certify Class by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 74 | MEMORANDUM in Support re 73 Supplemental MOTION to Certify Class filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma |

| | | |
|---|---|---|
| | | Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/28/2025 | 75 | NOTICE of Appearance by Stephen J. Yanni on behalf of State of New York, et al. (Yanni, Stephen) (Entered: 03/28/2025) |
| 03/31/2025 | 76 | NOTICE of Appearance by Katherine J. Shinners on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump (Shinners, Katherine) (Entered: 03/31/2025) |
| 04/01/2025 | 77 | MOTION for Order by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts.(Ward, Brian) Modified event type on 4/1/2025 (SEC). (Entered: 04/01/2025) |
| 04/01/2025 | 78 | Opposition re 77 MOTION for Order *to Provide Identifying Information for the Individual Plaintiffs* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 04/01/2025) |
| 04/02/2025 | 79 | Judge Indira Talwani: <u>MEMORANDUM AND ORDER</u> entered.<br><br>For the foregoing reasons, Defendants' Motion for an Order to Provide Identifying Information for the Individual Plaintiffs [Doc. No. 77 ] is DENIED. No later than April 5, 2025, Plaintiffs shall disclose their identities to this court under seal to facilitate a recusal check.<br><br>**IT IS SO ORDERED.**(SEC) (Entered: 04/02/2025) |
| 04/02/2025 | 80 | MOTION FOR PUBLIC TELEPHONE ACCESS by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 04/02/2025) |
| 04/03/2025 | 81 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany re 79 Memorandum & ORDER, *Notice of True Identities of Doe Plaintiffs* (Freedman, John) (Additional attachment(s) added on 4/3/2025: # 1 *SEALED* Exhibit A) (SEC). (Entered: 04/03/2025) |
| 04/04/2025 | 82 | Judge Indira Talwani: ELECTRONIC ORDER denying Plaintiffs' Motion for Telephone Access 80 . See Local Rule 83.3. (GAM) (Entered: 04/04/2025) |
| 04/04/2025 | 83 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *of Defendants' Actions regarding U4U* (Attachments: # 1 Exhibit A)(Sung, Esther) (Entered: 04/04/2025) |
| 04/04/2025 | 84 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela |

| | | |
|---|---|---|
| | | Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *Notice of Supplemental Authority* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Sung, Esther) (Entered: 04/04/2025) |
| 04/04/2025 | 85 | MEMORANDUM in Opposition re 46 MOTION to Certify Class filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Shinners, Katherine) (Entered: 04/04/2025) |
| 04/05/2025 | 86 | Response by Kristi Noem, Caleb Vitello, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts to 83 Notice (Other), *Response to Plaintiffs' Notice Of Defendants' Actions Regarding U4U.* (Darrow, Joseph) (Entered: 04/05/2025) |
| 04/06/2025 | 87 | Response by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts to 84 Notice (Other), *Response to Plaintiffs' Notice of Supplemental Authority.* (Darrow, Joseph) (Entered: 04/06/2025) |
| 04/07/2025 | 96 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Hearing held on 4/7/2025. Case called. Court heard argument from counsel. Hearing continued to 4/10/2025 at 03:00 PM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (Attorneys present: Justin Cox, Laura Flores-Perilla, John A. Freedman, Anwen Hughes, H. Tiffany Jang, Hillary Li, Esther Sung, Karen C. Tumlin, Brian Ward) (GAM) (Entered: 04/14/2025) |
| 04/08/2025 | 88 | EXHIBIT re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Attachments: # 1 Exhibit A - USCIS Notice of Termination)(Shinners, Katherine) (Entered: 04/08/2025) |
| 04/08/2025 | 89 | MEMORANDUM in Opposition re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Darrow, Joseph) (Entered: 04/08/2025) |
| 04/08/2025 | 90 | Opposition re 73 Supplemental MOTION to Certify Class filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Shinners, Katherine) (Entered: 04/08/2025) |
| 04/09/2025 | 91 | NOTICE of Appearance by Rayford A. Farquhar on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Farquhar, Rayford) (Entered: 04/09/2025) |
| 04/10/2025 | 92 | Transcript of Hearing held on April 7, 2025, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 5/1/2025. Redacted Transcript Deadline set for 5/12/2025. Release of Transcript Restriction set for 7/9/2025. (DRK) (Entered: 04/10/2025) |
| 04/10/2025 | 93 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/10/2025) |

| 04/10/2025 | 94 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Hearing held on 4/10/2025. Court hears argument from the parties; Court takes the matter under advisement. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Freedman, Hughes, Sung, Jang, Li, Cox, Tumlin, Flores-Perilla for plaintiffs; Ward for defendants) (TRM) Modified on 4/13/2025, to correct judge's name (GAM). (Entered: 04/11/2025) |
| --- | --- | --- |
| 04/13/2025 | 95 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *of Defendants' Actions Regarding "Notice of Parole Termination" sent to Parolees & Non-Parolees* (Sung, Esther) (Entered: 04/13/2025) |
| 04/14/2025 | 97 | Judge Indira Talwani: ORDER entered granting 70 in part PLAINTIFFS' EMERGENCY MOTION FOR A STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE. The court grants emergency relief as follows: 1. The Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025), is hereby STAYED pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's originally stated parole end date. 2. All individualized notices sent to noncitizens from Cuba, Haiti, Nicaragua, and Venezuela via their USCIS online account notifying them that their parole is being revoked without case-by-case review pursuant to the Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025), are also STAYED pending further court order. See attached Memorandum and Order.(Talwani, Indira) (Entered: 04/14/2025) |
| 04/14/2025 | 98 | Judge Indira Talwani: ORDER entered granting in part 73 Motion to Certify Class. See attached Order Granting Class Certification. (Talwani, Indira) (Entered: 04/14/2025) |
| 04/17/2025 | 99 | Judge Indira Talwani: ELECTRONIC ORDER: Plaintiff has filed two notices regarding recent emails. See Notice 83 ; Notice 95 . The first notice reports that emails, dated April 3, 2025, with the subject line "Notice of Termination of Parole," were received by Plaintiff Maksym Doe and others who have been paroled into the United States pursuant to the Uniting for Ukraine ("U4U") program, directing them that their parole would terminate 7 days from the date of the notice. See [83-1]. Defendants responded that the emails referenced in that notice were sent in error and that "U4U parolees were not intended to receive this message." See Response 86 . |
| | | Plaintiffs' second notice reports that Defendants have continued sending the "Notice of Termination of Parole" email [83-1] to an unknown number of parolees, including paroles under the Operation Allies Welcome ("OAW") program. Defendants shall notify the court by 2 p.m. on April 18, 2025, whether emails entitled "Notice of Termination of Parole," have been sent en masse to parolees who entered the United States under any other programs identified in Plaintiffs' Second Amended Complaint 68 , including the OAW program, and, if so, whether those parolees also were not intended to receive this message. (SEC) (Entered: 04/17/2025) |
| 04/18/2025 | 100 | NOTICE OF APPEAL as to 97 Order on Motion for Preliminary Injunction,,,, 98 Order on Motion to Certify Class by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. Fee Status: US Government. |

| | | |
|---|---|---|
| | | NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 5/8/2025. (Shinners, Katherine) (Entered: 04/18/2025) |
| 04/18/2025 | 101 | RESPONSE TO COURT ORDER by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts re 99 Order,,,,, . (Darrow, Joseph) (Entered: 04/18/2025) |
| 04/18/2025 | 102 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 100 Notice of Appeal. (MAP) (Entered: 04/18/2025) |
| 04/18/2025 | 103 | USCA Case Number 25-1384 for 100 Notice of Appeal, filed by Caleb Vitello, Kristi Noem, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 04/18/2025) |
| 04/18/2025 | 104 | Transcript of Hearing held on April 10, 2025, before Judge Indira Talwani. COA Case No. 25-1384. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 5/9/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/17/2025. (DRK) (Entered: 04/21/2025) |
| 04/18/2025 | 105 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/21/2025) |
| 05/09/2025 | 106 | STIPULATION *regarding Production of Administrative Record and Time for Defendants to Respond to Second Amended Complaint* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 05/09/2025) |
| 05/28/2025 | 107 | Judge Indira Talwani: ORDER entered granting in part 23 PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION. The court grants emergency relief as follows: 1. The January 23, 2025 email from former Acting Director of the U.S. Citizenship and Immigration Services Jennifer B. Higgins is hereby STAYED pending further court order, insofar as it suspends adjudications of re-parole applications filed by individuals who received parole pursuant to the programs specified in that email and insofar as it suspends adjudications of applications for non-parole benefits filed by individuals who received parole pursuant to those same programs; 2. Any actions by Defendants suspending adjudications of initial parole and re-parole applications filed by individuals who are seeking or who have received parole pursuant to the Military Parole in Place (MPIP) program, as well as applications for other immigration benefits filed by individuals paroled through that program, are hereby STAYED pending further court order; 3. The February 14, 2025 memorandum by Acting Deputy Director of USCIS, Andrew Davidson, is hereby STAYED pending further court order, insofar as it suspends adjudications for immigration benefits applications filed by individuals who received parole through the Uniting for Ukraine (U4U) and Family Reunification Parole (FRP) programs, as well as through the |

| | | |
|---|---|---|
| | | parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the CHNV parole programs), and insofar as it directs agency staff that the administrative hold may only be lifted on a case-by-case basis even when aliens are members of a class that is subject to... [a] court order. See attached Memorandum and Order. (Talwani, Indira) (Entered: 05/28/2025) |
| 05/28/2025 | 108 | Judge Indira Talwani: ORDER entered granting in part 73 Motion to Certify Class. See attached Amended Order Granting Class Certification. The court's prior Order Granting Class Certification 98 is superseded by the attached Amended Order. (Talwani, Indira) (Entered: 05/28/2025) |
| 05/29/2025 | 109 | Consent MOTION for Extension of Time to June 30, 2025 to File Answer by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello.(Ward, Brian) (Entered: 05/29/2025) |
| 05/30/2025 | 110 | Judge Indira Talwani: ELECTRONIC ORDER allowing 109 Consent MOTION for Extension of Time to June 30, 2025 to File Answer. (SEC) (Entered: 05/30/2025) |
| 05/30/2025 | 111 | Judge Indira Talwani: ELECTRONIC ORDER vacating Order 110 allowing Consent Motion for Extension of Time 109 in light of the Supreme Court's grant of the application for a stay of this court's April 14, 2025 order. Defendants may refile their motion for an extension of time to file their responsive pleading after conferring with Plaintiffs' counsel. Any such motion shall include a Local Rule 7.1 certificate. (SEC) (Entered: 05/30/2025) |
| 05/30/2025 | 112 | MOTION for Leave to File Excess Pages *for Memorandum In Support of Motion to Dismiss* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/30/2025) |
| 05/30/2025 | 113 | MOTION to Dismiss for Lack of Jurisdiction , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ( Responses due by 6/13/2025) by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/30/2025) |
| 05/30/2025 | 114 | MEMORANDUM in Support re 113 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Shinners, Katherine) (Entered: 05/30/2025) |
| 06/02/2025 | 115 | Judge Indira Talwani: ELECTRONIC ORDER allowing 112 MOTION for Leave to File Excess Pages *for Memorandum In Support of Motion to Dismiss*. (SEC) (Entered: 06/02/2025) |
| 06/05/2025 | 116 | MOTION for Order to Show Cause by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 06/05/2025) |
| 06/05/2025 | 117 | EXHIBIT re 116 MOTION for Order to Show Cause *(Index of Exhibits)* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit - 1, # 2 Exhibit - 2, # 3 Exhibit - 3, # 4 Exhibit - 4, # 5 Exhibit - 5, # 6 Exhibit - 6, # 7 Exhibit - 7, # 8 Exhibit - 8, # 9 Exhibit - 9, # 10 Exhibit - 10, # 11 Exhibit - 11)(Freedman, John) (Entered: 06/05/2025) |

| 06/05/2025 | 118 | MEMORANDUM in Support re 116 MOTION for Order to Show Cause filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 06/05/2025) |
|---|---|---|
| 06/06/2025 | 119 | Judge Indira Talwani: ELECTRONIC ORDER entered: On May 28, 2025, this court entered an Order 107 staying Defendants' actions suspending adjudications of applications for non-parole immigration benefits, initial parole, and re-parole as to individuals who received parole through certain parole programs. On June 5, 2025, Plaintiffs filed a Notice and Motion for an Order to Show Cause 116 informing the court that Plaintiffs' counsel have received multiple communications from class members reporting that the USCIS website messaging system is still stating that USCIS's "has placed an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the UFU, CHNV, or FRP processes[,]" that USCIS "has placed an administrative hold" on all such requests "[d]ue to the Jan. 20, 2025 Executive Order[,]" and similar statements.

Defendants shall notify this court by 5:00 p.m. on June 9, 2025, of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as is required by this court's May 28, 2025 Order 107 . This report shall include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension or resumption of adjudications. (SEC) (Entered: 06/06/2025) |
| 06/09/2025 | 120 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 119 Order,,,,,, Set Deadlines,,,,, . (Attachments: # 1 Declaration of Kika Scott)(Shinners, Katherine) (Entered: 06/09/2025) |
| 06/10/2025 | 121 | Judge Indira Talwani: ELECTRONIC ORDER entered: On June 6, 2025, this court ordered Defendants to notify this court of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as required by this court's May 28, 2025 Order 107 . The court stated that the report must include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension or resumption of adjudications.

Defendants' Response 120 stated that, as of June 9, 2025, "USCIS has lifted any hold on or suspension of the adjudication of (1) requests for re-parole and any associated benefits that may have been paused pursuant to the January 23, 2025 email from former Acting Director of U.S. Citizenship and Immigration Services, Jennifer B. Higgins; (2) requests for other immigration benefits filed by aliens who were paroled into the United States under the FRP and U4U programs as well as the CHNV parole programs, as set forth in the February 14, 2025 memorandum by former Acting Deputy Director of USCIS, Andrew Davidson, or in the Higgins email; and (3) any requests for Military Parole in Place and associated benefits (to the extent any individual case was held or suspended)." Defendants further stated that "[o]perational guidance, technical changes to USCIS systems, website virtual agent scripts, and other form communications necessary to execute [such actions] **will be implemented**." (Emphasis added).

No later than June 13, 2025, Defendants shall confirm that updates to Defendants' guidance, systems, website virtual agent scripts, and other form communications have been implemented. (SEC) (Entered: 06/10/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/10/2025 12:39:26 | | | |
| **PACER Login:** | kshinners | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10495-IT |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | Civil Action No. 1:25-cv-10495 |
| Svitlana Doe, *et al.*, ) |  |
| ) |  |
| Plaintiffs, ) |  |
| ) |  |
| v. ) |  |
| ) |  |
| Kristi Noem, in her official capacity as ) | |
| Secretary of Homeland Security, *et al.*, ) |  |
| ) |  |
| Defendants. ) |  |
| _____ ) |  |

## NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT

Notice is hereby given that the Defendants appeal to the United States Court of Appeals for the First Circuit from the Court's order granting a stay of parole terminations (Doc. No. 97) and the accompanying class-certification order (Doc. No. 98) entered in this action on April 14, 2025.

Date: April 18, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW ENSIGN
Deputy Assistant Attorney General

BRIAN C. WARD
Acting Assistant Director

 /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

1

PATRICK GLEN
Senior Litigation Counsel

JOSEPH A. DARROW
ELISSA FUDIM
ZACHARY CARDIN
DANIEL SCHUTRUM-BROWARD
Trial Attorneys

2

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine J. Shinners, hereby certify that on April 18, 2025, I filed this document through the ECF system, through which notice will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ <i>Katherine J. Shinners</i>
Katherine J. Shinners
Senior Litigation Counsel
U.S. Department of Justice

Appx-0039

# EXHIBIT 1

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

                          Plaintiffs,


            – *versus* –                                    **Civil Action No.: 1:25-cv-10495-IT**


KRISTI NOEM, in her official capacity as Secretary
of Homeland Security, et al.,

                          Defendants.

## DECLARATION OF ALEJANDRO DOE

I, Alejandro Doe, upon my personal knowledge, hereby declare as follows:

1.     I was born in Diriamba, Nicaragua, in May 2000. I am a national of Nicaragua.

2.     I currently live in Gainesville, Georgia. I have lived in Gainesville since I entered the United States.

3.     I entered the United States under the parole process for Nicaraguans, a component of the CHNV parole processes announced on January 6, 2023. My cousin—a U.S. citizen who lives in Washington—sponsored me through the program. I received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. After spending hours at inspection at the airport, officers granted me a temporary two-year stay in the United States. I received work authorization pursuant to my parole in September 2024.

4.     I fled Nicaragua because of the physical danger my family faced and the untenable economic reality.

5.      In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega that raised income and payroll taxes while reducing pension benefits. The demonstrations—mostly involving elderly individuals, university students, religious leaders, and other activists—were immediately and heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors. Dozens of people were killed and scores injured in the initial days. After only a few months, the death toll reached upwards of three hundred. Countless others were imprisoned.

6.      Despite my fear, I attended marches with my family and friends, aware of the risks but determined to speak out for the lives lost and the injustices suffered. However, the Nicaraguan government eventually linked my family to the protests, actively persecuting my uncle and cousins. One day, government actors illegally raided my grandmother's house looking for them, but after an unsuccessful search, abducted my father from her home instead. All along the way to prison, they violently interrogated him, beating him in the ribs.

7.      Once there, prison staff continued to torture him. They would beat and psychologically abuse him, telling him that they were going to kill him and that he would never leave the prison. In the three days he spent in prison, the guards provided him food on only two occasions.

8.      When the government released my father, he was labeled an opponent of the regime, and our family decided we needed to leave the country. We felt we had no other option. When the United States announced the parole process for Nicaragua, my cousin, a U.S. citizen, submitted an application to sponsor my father. In August

2

2023, my father lawfully entered the U.S. with parole status. In 2024, my siblings and I followed him, also having been sponsored and having received parole status.

9.    In Nicaragua, the sociopolitical and economic situation makes it very difficult to earn a living wage. I held various jobs to provide for myself and my family, working as a tattoo artist and a street vendor. Together between these jobs, I averaged about $500 per month.

10.    I also studied Integral Communication Design at Universidad Politécnica de Nicaragua (Polytechnic University of Nicaragua). However, my school was one of the epicenters of the 2018 protests and subsequent governmental repression, and I was unable to return to school for some time. The government eventually seized control of my university, stripping its legal registration and renaming it to bring it under government management and control. By that point, I needed to work full-time to provide for myself and my family and I was not able to finish my studies.

11.    When I arrived in the U.S., it took some time to adapt to the many differences between Nicaragua and Georgia, including the food, climate, and the length of day. In Nicaragua, the length of day does not change much throughout the year given its proximity to the equator—the sun sets between 5:00–6:00pm. But when I arrived in Gainesville, the sun did not set until around 9:00pm. It also gets much colder in Gainesville. Nonetheless, the community in Gainesville is very welcoming and united.

12.    After I received work authorization in September 2024, I found work the following month producing marble bathroom panels. I have learned this trade since arriving in the United States.

3

13.     I first heard rumors about the termination of the CHNV parole processes toward the end of January, including that existing grants of parole could be revoked. This made me feel extremely worried about my family's safety and wellbeing. It was my goal to save as much money as possible while in the United States to have a better chance of success in Nicaragua upon our return.

14.     We are good people looking for a better future. We strive to follow the legal avenues to travel to the United States, even at great personal and financial sacrifice. My family sold many of our possessions to make the trip to the United States. But I found a sponsor for parole, I paid for my own flight, and I waited to work in the United States until I had work authorization. I pay taxes. I am self-sufficient here, and pay for everything I need, including my own rent each month.

15.     After all my family's sacrifice and efforts to follow the law, the prospect of having our parole cancelled, losing work authorization, and being subject to deportation feels like a betrayal. It would be devastating. We would lose everything we have worked so hard to achieve, and we would likely be forced to break apartment leases we have entered into, rendering us homeless. Because of this fear, my family and I have been sharing our bank account passwords with one another in case anything were to happen.

16.     I am afraid to leave my apartment. I have heard rumors and seen news of immigration officials showing up at jobsites, and while I was granted parole, I feel like I am in limbo and could be swept up in an enforcement action. Because I have to work to survive, however, I cannot afford to stay home from work. I am also

Appx-0044

Catholic, and frequently attend religious services, but I have been staying home recently due to this fear.

17. On January 21, 2025, I submitted an application for asylum (Form I-589) based on my family's political persecution to United States Citizenship and Immigration Services, and on February 7, 2025, I traveled to Atlanta, Georgia to provide biometrics. Knowing I had a chance of asylum gave me some small degree of hope in the face of a sudden parole termination.

18. That is, until I learned the Trump administration also indefinitely paused processing all immigration applications from individuals who entered the U.S. pursuant to parole. This came as a gut punch. We are overwhelmed—parole and asylum were the only avenues that could keep my family safe. If we are no longer permitted to remain in the U.S., we would have to look for alternatives to go somewhere else, because we cannot safely return to Nicaragua.

19. For years, the Nicaraguan government has kept a close eye on individuals who apply for asylum in other countries, as it views those people as political dissidents. What's more, the Parliament loyal to the Ortega-Murillo dynasty recently engaged in law reform legalizing the banishment and denial of entry or exit to people deemed to be critics of Nicaragua, including Nicaraguan citizens. It is my understanding that thousands of individuals have been already stripped of their nationality and exiled, and I am aware of various individuals granted humanitarian parole in the United States that have been denied reentry into Nicaragua in the past few weeks. I am worried about what will happen if we are deported and cannot

5

reenter Nicaragua, or what will happen to my family given my family's history of political persecution by the State.

20.    Maintaining my parole status and continuing with my asylum application is critical for me, my family, and the community we are a pad of. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

21.    I am willing to serve as a class representative on behalf of those who am similarly situated to me.

22.    I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of immigration applications benefits.

23.    For all of the above reasons, however, I fear having my real name become public in this lawsuit. I fear that if the U.S. government knows that I am participating, it will retaliate against me and my family and deport us all to Nicaragua. I fear that if we are deported, the Nicaraguan government will retaliate against us in turn as parolees, as asylum-seekers, and as a family previously designated by the government as "defectors" and "traitors." If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate. I cannot risk my safety and that of my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

6

Executed in Gainesville, Georgia on February 28, 2025.

ALEJANDRO DOE

Appx-0047

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Brandon Galli-Graves, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Alejandro Doe in Spanish and that he affirmed that it is true and correct.

Executed: 2/28/2025

Brandon Galli-Graves

# EXHIBIT 2

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

                          Plaintiffs,

          – *versus* –                                    **Civil Action No.: 1:25-cv-10495-IT**

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, et al.,

                          Defendants.

## DECLARATION OF ANA DOE

I, Ana Doe, upon my personal knowledge, hereby declare as follows:

1.      I was born in Diriamba, Nicaragua in February 1993. I am a national of Nicaragua.

2.      I currently live in Gainesville, Georgia. I have lived here for about a year, since arriving in the United States and receiving parole under parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV").

3.      I currently live with my husband, Armando Doe, in Gainesville. Armando is also a Nicaraguan national and has also received parole through the CHNV parole processes. My husband and I live in the same area as some cousins, including Carlos Doe, and my brothers, including Alejandro Doe, and my father, all of whom are Nicaraguan nationals and are here in the United States through CHNV parole. I have other family members who have CHNV parole too, like my sister, her child and husband who live in a different state.

4.      Since arriving to the United States on CHNV parole, my husband and I have been able to work and contribute to the local community. I obtained my work

authorization in April 2024. My first employer in the United States was a company that makes trailers. Currently I work for a company that supplies personal protective equipment to my former employer, where I am in charge of handling our inventory system, adding and transferring products within the system, and supporting our warehouse's needs. There was a lot to learn when I first arrived, but I've since learned a lot and I've been able to improve my English while on the job. My husband and I both work full time.

5.     Apart from work, my husband and I lead a very normal and peaceful life here. We attend a local church as often as we can. We enjoy exercising when we can and leading a healthy lifestyle. We recently purchased a car to help us navigate life and work here, and we are working to establish good credit here too. On the weekends, when we have free time, we like to enjoy ourselves, including getting together with my brothers and father to enjoy a nice meal together. There is also a large Latino community in our area that has been welcoming, and we have settled into our life here in the United States well.

6.     The life we have begun to create here in the United States looks very different compared to our lives back in Nicaragua. Everything started to deteriorate in 2018, when the social security reforms by President Ortega were announced, which would negatively impact a lot of people in the community. Looting in supermarkets became more common, which made it hard to find food. Many protests against this reform and the government began happening on a regular basis, and the police would come to these protests and take away as many protestors as possible, many times in violent ways.

2

7.      While I was in college finishing up my studies in computer engineering, in 2018, I met Armando in Nicaragua. As a student I participated with other university friends in peaceful protests that were happening at my university regarding issues with the Nicaraguan government. I remember that during my time as a student I lived near another university, and there were several protests around that university that resulted in people sustaining serious injuries at the hands of the government, and at a certain point it was no longer safe for me to remain living near the school because of the ways these demonstrations were met with violence by the police and militia. At the time, my husband was a government employee and was not allowed to participate in protests, but we supported each other as the situation in Nicaragua grew more intense. We got married in April 2023.

8.      Around July 2018, the police and pro-government militia entered the area where my family lived, as they were actively looking for my uncle. While looking for my uncle, the police raided my grandmother's house. My uncle was not there at the time, but the police arrested my father who was there and put him in jail. He spent about three to four days in jail, where they interrogated him about my uncle's whereabouts and physically beat him. All I could do was hope for his release. Eventually he was released, but our family remained people of interest in the police and government's eyes due to our last name, which is widely known by the government as being anti-government, and our family connection to our uncle and cousins.

9.      While still in Nicaragua, in 2020, Armando worked as a web designer for a digital media platform that publishes commentaries on politics and the government in

3

Nicaragua. At a certain point, the police found and took hostage some of his co-workers at the company, simply because they took some water to some women who had been protesting a hunger strike. Eventually, once they were released, they left the country for their own safety. Although Armando's role was not very high profile, he remained fearful that he could be discovered by the Nicaraguan government, since the government had already identified the organization as being against the government.

10.  The danger in Nicaragua for me and my family felt as if it was all just closing in on us, making it necessary for us to leave the country for our own safety and security. Armando and I began researching legal pathways to immigrate for our safety. That is why when the CHNV parole processes were announced and we learned about this path, it became a light of hope for me, my husband, and my family.

11.  My cousin, who is a U.S. citizen living in Washington, is my sponsor under CHNV parole. During one of her visits to Nicaragua in May 2023, while visiting her father and my uncle who at the time was sick with cancer, she told us more about the CHNV parole and agreed to support us as our sponsor. This came as such a relief for me and my family, as we were actively looking for ways to lawfully leave the country for quite some time but there were no viable options for us.

12.  We quickly moved to gather all the necessary documents and information needed for the application and process. My U.S. citizen cousin started the process and submitted the application to sponsor Armando and I in September 2023. I was approved to travel to the United States in December 2023, and I arrived in the

United States and was granted parole in February 2024. My parole expires in February 2026.

13.    I first heard the announcement about the government's termination of the CHNV parole processes from the news. This came as a shock to us, and we became concerned that the government would revoke existing grants of parole. It was very rough news for us to hear, because I, my husband, and my family members still have time remaining on our parole. We thought that because we went through this lawful process to get parole in 2023, we would be protected for the full parole period. Now, we are left with uncertainty of what is to come.

14.    My entire family is nervous about the possibility of our parole being terminated. We do not know what is going to happen. The possibility of having to return to Nicaragua is nerve-wracking, as the situation has not improved there, and my family and I remain targets there. And there is no guarantee I would even be let back into Nicaragua given the state of the country, leaving me and my family stranded and vulnerable in some other country. This possibility is devastating and leaves me with fear.

15.    My husband, brothers, father, and I have been talking about this scary possibility of having our parole revoked. We try to remain in constant communication with one another. We are also saving all the money we can through work to prepare for this and what could come — and we are even making sure we all know each other's banking information in case one of us needs to access each other's funds in case of an emergency.

Appx-0054

16.    If my parole status is revoked, I will no longer be eligible to work and provide for myself, my husband, and my family. Specifically, my mother, who still lives in Nicaragua, relies on us to send her money to support her. As one of her main supporters, if my parole was revoked and I was no longer able to work or no longer had an income, I would no longer be able to provide for my mother and support her.

17.    Maintaining my parole status is crucial for me, my husband, and my family to live a stable life free from danger, violence, and persecution, which we all face a serious risk for if we are removed and sent back to Nicaragua. And without work authorization, I will no longer be able to provide for myself, my husband, or my mother who remains in Nicaragua.

18.    Last month, in January 2025, my husband and I submitted an application for asylum (Form I-589) to the United States Citizenship and Immigration Services ("USCIS"). I am listed as a derivative under my husband's asylum application. I applied for asylum because I fear that I will be persecuted due to my and my family's well-known political beliefs against the current governmental regime. My father, uncle, and cousin, Carlos, have been persecuted in the past, and my father was imprisoned by the Nicaraguan government before. The government knows where we live in Nicaragua. I do not doubt that my family and I will face the same grave dangers we once did if we are forced to return to Nicaragua.

19.    I recently heard the news about the government's indefinite pause on processing immigration applications of people who entered the United States under CHNV parole. This includes me and my husband, who have both applied for asylum and

Appx-0055

whose applications are pending. We did not expect that this would happen at all –– we thought we did everything right in terms of coming here on parole and then submitting an asylum application in order to seek additional protection from the dangers we face in our country. It is frustrating to think that this indefinite pause on processing my asylum application could cut off our access to this protection for an indefinite period of time, including our ability to obtain work authorization through the asylum application process, allowing us to continue working in the United States after our parole expires and while we wait for a decision on our asylum applications.

20.     We have no guarantees in terms of our security in Nicaragua if we are forced to return there, while at the same time there is no guarantee we would even be let back into Nicaragua. So, without parole and the ability to continue pursuing asylum, our futures will be left up in the air, and we will be vulnerable and without security.

21.     I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

22.     I am willing to serve as a class representative on behalf of those who are similarly situated to me.

23.     I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of immigration applications benefits.

7

24.    While I believe in the importance of defending the CHNV parole processes, I am afraid of using my real name in this lawsuit. Specifically, I fear that if my real name were to be made public in this lawsuit, I could be retaliated against by the U.S. government and Nicaraguan government. I fear the possibility that if my name were public in this case and the U.S. government discovered I was going against them in this lawsuit, I could be subject to retaliation and deported, despite my pending asylum case. And if I were forced to return to Nicaragua because of the termination of my CHNV parole status, I am afraid that the Nicaraguan government could retaliate against me and my family again, and I could become a target for the Nicaraguan government due to my family's name and my connection to my uncle and cousin, whom the government was actively searching for.

25.    Also, if my name were to be public, I fear that my other family members, like my sister, her husband, and her child, could be identified and targeted too, both by those who are here in the United States and hold anti-immigrant views, and in Nicaragua if she and her family are forced to return, given our family's name and the fact that the Nicaraguan government has targeted our family before.

26.    For these reasons, I am respectfully asking the court to allow me to proceed as plaintiff in this lawsuit under a pseudonym, to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on 2/28/2025.

_____
Ana Doe

8

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret

between these languages, and that I transcribed the foregoing between English and Spanish

accurately. I further certify that I provided a translation of the foregoing to Ana Doe in Spanish

and that she affirmed that it is true and correct.


Executed: 2/28/2025                                    _____

                                                       Emily Martin

Appx-0058

# EXHIBIT 3

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>                  Plaintiffs,<br><br>       – *versus* –<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>                  Defendants. | Civil Action No.: 1:25-cv-10495-IT |

**DECLARATION OF ARMANDO DOE**

I, Armando Doe, upon my personal knowledge, hereby declare as follows:

1.      I was born in Managua, Nicaragua in May 1993. I am a national of Nicaragua.

2.      I currently live in Gainesville, Georgia. I have lived in Gainesville since I arrived in the United States one year ago through the parole processes for nationals of Cuba, Haiti, Nicaragua and Venezuela ("CHNV").

3.      I live with my wife, Ana Doe, who is from Nicaragua and also traveled to the U.S. on CHNV parole. Several other members of my wife's family live near us in Gainesville and came to the U.S. on CHNV parole.

4.      I met Ana several years ago in Managua. We eventually got married in April 2023.

5.      Prior to marrying, Ana and I had been thinking about leaving Nicaragua for a while. The sociopolitical situation in Nicaragua is not good and there are a lot of factors contributing to the insecurity there. Food is very expensive, and salaries are low, which makes it very difficult to survive. There were also many security concerns related to my work in Nicaragua.

6.      My interaction with the government began in 2014 when I started my professional internship at the Nicaraguan Institute of Territorial Studies (INETER). That same year, I was hired as part of the IT department. Initially, it seemed like a promising professional opportunity, but I soon realized the tensions that came with working for a public institution under the current authoritarian regime.

7.      From the beginning, it was clear that neutrality or disagreement with the government's stance was not tolerated. We were forced to participate in pro-government marches and events. Failing to comply with these obligations could cost you your job. Many of us feared retaliation and felt trapped in a system where we had no voice and no option to refuse.

8.      In 2018, everything changed, and the situation became unsustainable when the government ignored a fire in a crucial natural reserve and rejected international aid to control it. This, combined with the announcement of increased social security contributions, sparked widespread discontent. On April 18, a peaceful protest was initiated, marking the beginning of a brutal government crackdown.

9.      My wife, Ana, who was then a close friend, actively participated in these marches. On at least one occasion, she was in grave danger due to the violent repression by the National Police and pro-government groups. These experiences strengthened our bond, as we both shared the fear and uncertainty of living in a country where expressing an opinion contrary to the regime could cost you your life.

10.     In 2018, when the social conflict in Nicaragua reached its peak, Ana was a direct witness to the repression her family suffered at the hand of the regime. In July 2018, Ana's grandmother's house was raided by the police in search of "stolen goods,"

2

but this was only an excuse for the police to look for her uncle. Ana's uncle was not there at that moment, so the police arrested Ana's father instead. Ana's father was accused of being connected to anti-government protestors. During the time her father was imprisoned, Ana used her social media to denounce her father's disappearance, which quickly gained the support of many people who shared her message, and the denouncement went viral on Twitter.

11.     Ana's father was released a few days later, but there were many consequences of the arrest. Her father was labeled as a "defector" and "traitor" by government supporters, and his family was systematically harassed and persecuted. Many members of Ana's family were forced to leave the country. This experience left emotional scars on Ana and solidified our constant fear of living in a country where expressing an opinion can cost you your life.

12.     In 2020, I started working for a digital media company founded by friends who had actively participated in the protests. Initially, my role was to develop the website and edit articles and columns. The company's mission is to democratize information and change the culture of politics in Nicaragua and the region at large. Over time, my involvement expanded to projects with other media outlets that documented electoral irregularities and government abuses.

13.     Both media outlets frequently conduct investigations and publish reports that are critical of the Ortega government. One report publicized the number of people that did not vote in Nicaragua and, by doing so, directly challenged the accuracy of the government's report regarding the election.

3

14.     Nicaraguan government officials made frequent posts on social media accusing the digital media company for whom I worked of publishing false information. In Nicaragua, it is not uncommon for the police to look for and interrogate people who speak out against the government. In 2019, various employees of the company I worked for were imprisoned for taking water to women who were protesting by hunger strike. This is when the company was labeled as an anti-government platform. Around a month and a half later, and after considerable international pressure, the Nicaraguan government released the four individuals from jail. Due to safety concerns, all four individuals left Nicaragua and fled to other countries after this incident.

15.     Everyone who worked at our digital media company had to take precautions to ensure that their identities would not be discovered. All of the employees, except for one coworker and myself, were located outside of Nicaragua. I worked from home, used a virtual private network ("VPN"), and took security measures so that I could not be located. I could not tell anyone where I worked or whom I worked for because I feared that I would be put in jail.

16.     Ana and I started living together in 2022. Living together was a relief, but it also meant constant concern for our safety, as we still feared the government discovering my involvement in anti-government projects. In my neighborhood, most residents were staunch supporters of the ruling party, and to this day, they remain so. Living in an area surrounded by people so committed to the regime heightened our fear. We knew that if at any point they discovered my work with anti-government organizations, the consequences would be severe for me and my family.

17. I heard about the possibility to travel to the United States through the CHNV parole processes from friends and family. Many people saw it as a good option because the process of applying for a U.S. visa is very complicated and slow. I was interested in applying for parole because it was a legal way to travel to the U.S. and the process was not as time intensive as other immigration processes like applying for a U.S. visa. I knew that I would need someone to sponsor me, so I decided to speak with family members living in United States to see if they would be willing to be my sponsor.

18. Ana's cousin, a U.S. citizen, lives in Washington state. Ana's cousin was visiting family in Nicaragua in May 2023, and Ana and I decided to talk to her about sponsoring us for parole. Ana's cousin agreed to be our sponsor and submitted her application to sponsor us for CHNV parole in September 2023. Three months later, in December 2023, I was approved to travel to the United States, and in February 2024, Ana and I traveled to the United States. Upon arrival we were granted two years of parole. My parole expires in February 2026.

19. I received my work permit in April 2024 and started working at a company in Gainesville that makes tractor trailers. I work installing axles in the Post Painting Assembly (PPA) area. It is hard work, but time goes by quickly.

20. Ana and I like living in Gainesville. The people are very warm and friendly, and there are many people from Central America. It was an easy adjustment since my wife's father and other family members were already here. We had a lot of help and support, and I feel like things have fallen into place for us. We are both working,

5

and we have started our savings and have also been building our credit. We would like to buy a house in the future.

21.     We enjoy living an active lifestyle and taking care of ourselves. Life can be fast here, so we focus on our health. We like working out together, cooking healthy meals, and spending time outdoors.

22.     I first heard that CHNV parole was being terminated in late January 2025. Information spread very quickly on social media and on Nicaraguan news outlets, and I saw an article in the *New York Times* about it as well. We also started to hear reports of immigration officials being in the area and making arrests.

23.     After hearing that the CHNV parole processes were ending, I felt stressed and anxious that Ana's and my grants of parole could be revoked. It felt like we were just getting started here and now our wings were getting clipped. Ana and I made so many sacrifices to come to the United States, including leaving my parents, our home, our pets, and our jobs behind. Everything is happening very quickly. One day we were talking about buying a house, and the next day we were talking about what it would mean if we had to leave. It has been very difficult, and it seems very unfair to be told that after only one year, we can't be here anymore. We made the decision to leave Nicaragua through CHNV parole thinking that we were going to have more time.

24.     Ana and I started talking and trying to figure out what to do. We are trying to prepare ourselves psychologically for what may happen. If our parole is terminated and we are deported, it is important for us to recoup some of the financial

Appx-0065

investments that we've made, so we have discussed selling our car and our other belongings before we have to leave, if it comes to that.

25.    Maintaining my parole status is critical for me and my family. It has given me a chance to establish myself and start a new life. The salary I earn at my job allows me to help my family in Nicaragua and build my own savings. I often send money to my parents in Nicaragua to help pay for medical appointments and for living expenses, especially since they are caring for my pets. My parole status has also allowed me time to apply for asylum, which is critical for my safety.

26.    If my parole status is revoked, I will no longer be eligible to work and provide for my family. If I am unable to work here, I will be forced to return to my country where I risk facing persecution by the Nicaraguan government.

27.    In January 2025, I submitted an application for asylum to USCIS, and in February 2025, I traveled to Atlanta, Georgia to attend my biometrics appointment. I applied for asylum because I am scared to return to Nicaragua, and a grant of asylum would offer my wife and I more long-term protection since our parole will expire next year.

28.    Two weeks ago, we heard on the news that the United States government plans to indefinitely pause processing all immigration applications filed by people who came to the United States on CHNV parole. This would mean that mine and Ana's asylum applications are not going to be reviewed for this indefinite period of time. If my parole is terminated, and I am not permitted to continue with my asylum application, I will be completely without protection.

29.     I feel like this is very unfair and inhumane. I believe that Ana and I have a right to seek asylum especially since the situation in Nicaragua is dangerous for us. If I am forced to return to Nicaragua, the Nicaraguan government may become aware of my work for the digital media company that it targeted, and I would not be safe. I believe I would be interrogated and imprisoned.

30.     After hearing the news regarding the pause on processing immigration applications, I feel very uncertain about our future. It would be very risky to attempt to return to Nicaragua knowing that things have not changed there. If Ana and I were to return to Nicaragua we would be stripped of our citizenship and imprisoned. Those who remain in Nicaragua live under constant surveillance and persecution, and those who have returned have faced arbitrary detentions, torture, and threats. The people I know have not considered returning to Nicaragua out of fear of retaliation. I also believe that it is likely that we would be denied entry to the country. If I am not allowed to pursue asylum in the United States and not allowed to return to Nicaragua, I would be in complete limbo.

31.     I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

32.     I am willing to serve as a class representative on behalf of those who are similarly situated to me.

33.     I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all

harmed by the indefinite pause on the processing of immigration applications benefits.

34.    For related reasons, I am very nervous about publicly using my real name in this lawsuit. I am afraid that if the U.S. government knows that I am participating they will retaliate against me and my family and will deport us all to Nicaragua. If I were to get deported, I would no longer be able to continue with my asylum application, which is very important for my own safety. I am also concerned that the Nicaraguan government could learn about my involvement in this lawsuit and discover the story I am telling about the terrible conditions in the country and how it is unsafe for people who speak out against the government. If I end up being deported to Nicaragua, I fear that I will be targeted for retaliation by the government. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate. I can't risk my safety and that of my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on 2/27/2025.



_____
Armando Doe

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret

between these languages, and that I transcribed the foregoing between English and Spanish

accurately. I further certify that I provided a translation of the foregoing to Armando Doe in

Spanish and that he affirmed that it is true and correct.

Executed: 2/28/2025

_____

Emily Martin

Appx-0069

# EXHIBIT 4

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

Plaintiffs,

– *versus* –

**Civil Action No.: 1:25-cv-10495-IT**

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,

Defendants.

## DECLARATION OF CARLOS DOE

I, Carlos Doe, upon my personal knowledge, hereby declare as follows:

1.    I was born in Jinotepe, Nicaragua in May 2000. I am a national of Nicaragua.

2.    I currently live in Gainesville, Georgia. I have lived in Gainesville since 2023 when I arrived in the United States after receiving parole under parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"). I live with my brother and one of my cousins, who are both here in the United States with CHNV parole. My uncle and four other cousins—which include Ana, Armando (Ana's husband), Alejandro, and another cousin of mine—also reside in the United States with CHNV parole, and they all live in Gainesville, too.

3.    After obtaining my work authorization in October 2023, I began working at a company dealing in trailers, where I learned how to weld and solder. I have also worked providing food delivery services and in home renovations. I currently work for a manufacturing plant where I'm continuing my work as a welder and solderer. I have learned a lot through these jobs and have improved my English significantly.

4.      I have created a community here in Gainesville, made new friends, and created new social circles. I like to practice Jiu Jitsu and Mixed Martial Arts and have made several friends through the sport. I have also made friends through my past jobs, and I remain in contact with many of them. In the social circles that I am part of, I have met Latino, Black, and white Americans and they have all treated me with respect. Many of these people have also helped me with finding work. I have had a good experience living here in the United States, and I have found the communities here have a lot of love and respect for one another.

5.      My life in Nicaragua was very different to the life I have now in the United States. I fled Nicaragua because it became politically unstable, and the government was persecuting my family. In 2018 as a university student, I became involved in protests against the government. Other protests in my city broke out until the government came to my city and assassinated about 32 people and more than 50 people disappeared. The army, with help from some neighbors of mine, later identified me as being involved in the protests and being against the government. Soldiers and police officers then came to my house several times with death threats against me and my family. My father and I decided we had to flee our hometown and go into hiding. While in hiding we received anonymous calls and more death threats. Most recently in 2021, military soldiers visited my mother's house, where my mother and little brother currently live, and they told her that they will imprison my father and I for treason if they ever find us.

6.      When the CHNV parole processes were first announced, my father informed me about these parole processes, but I also heard about it in the news. A family member

2

of mine was able to sponsor me through CHNV parole. I was approved to travel to the United States in May 2023, and I arrived in the United States and was granted parole in June 2023. My parole expires in June 2025.

7.      I first heard the announcement about the Trump administration ending the CHNV parole processes from both the news and my U.S. citizen cousin who lives in Washington who has sponsored my four other cousins through CHNV parole. Along with the end to the processing of new applications, I heard that it was a possibility that existing grants of parole would be revoked as well.

8.      When I heard about the possibility of my parole being terminated, I became extremely worried and scared about being deported. I'm also scared to lose my work authorization in the United States if my parole is terminated. My mother and little brother living in Nicaragua depend on me financially. I also financially support my sister, who lives in Costa Rica at the moment. I'm scared to be deported and left with nothing. My family would suffer significant hardship if my parole status were revoked, not only financially but also emotionally and psychologically.

9.      Since learning about the government's termination of CHNV parole, I have been trying to prepare for the worst outcome. I have taken some cash out from my savings account in preparation. If I am deported, I hope someone can send me my savings so that I can have something. I also have copies of all my personal documents and immigration filings in case I lose access to all of these important documents.

10.     Maintaining my parole status is critical for maintaining my safety, and the safety of my family who remain in Nicaragua. I fear the Nicaraguan government is still after

Appx-0073

me and my dad and I fear for our lives if we were to return. If I return to Nicaragua, I also fear I will not be able to provide for my family who depend on me financially.

11. Last month, in January 2025, I submitted an application for asylum (Form I-589) to United States Citizenship and Immigration Services ("USCIS"). I have an appointment with USCIS on March 4, 2025. I applied for asylum because I fear that I will be persecuted by the Nicaraguan government based on my anti-governmental political beliefs and their previous attempts to persecute my father and I when we lived in Nicaragua.

12. I recently learned that the government has indefinitely paused the processing of immigration benefit applications filed by people who came to the United States with parole, like CHNV parole. This means that there is an indefinite pause in the processing of my asylum application. Seeking asylum while here in the United States under parole was the only avenue I had to secure a more secure legal status, and to obtain work authorization through my asylum application, which would allow me to continue working after my parole expires and while I wait for my asylum case to be decided.

13. Now, on top of worrying about the government's termination of CHNV parole and the potential revocation of my parole status, I am very worried and anxious about this indefinite pause on the processing of my asylum application. If I am without protection from parole and my asylum application is paused indefinitely, I feel that I am more at risk of being without a legal status, without work authorization, and of being deported back to the danger and persecution I fled from in Nicaragua in the first place.

14.     This all feels very unjust to me. My cousins and I are working hard, paying taxes, and engaging with and contributing to our local communities. My cousins and I have been doing well in the United States and to take away our parole under CHNV and indefinitely freezing our asylum applications, which was our only other option to seek legal protection here in the United States, is just not right.

15.     I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our applications for immigration benefits processed, as they should be.

16.     I am willing to serve as a class representative on behalf of those who are similarly situated to me.

17.     I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of immigration applications benefits.

18.     With all of this being said, I am afraid of using my real name in this lawsuit. Specifically, I fear that if my real name were to be made public in this lawsuit, I could be retaliated against by the Nicaraguan and U.S. government. In Nicaragua, I fear that I am still a wanted man for my anti-government political views. I fear that the Nicaraguan army will follow through with the death threats made against me and my father. The possibility of being imprisoned for treason is also still a threat. I also fear that if my name were made public in this case and the U.S.

government discovered I was going against them in this lawsuit, I could be subject to retaliation and deported, despite my pending asylum case.

19.     For these reasons, I am respectfully asking the court to allow me to proceed as plaintiff in this lawsuit under a pseudonym, to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on 2/27/2025.



Carlos Doe

6

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Elia Gil Rojas, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Carlos Doe in Spanish and that he affirmed that it is true and correct.

Executed: 2/28/2025

_Elia Gil Rojas_

Elia Gil Rojas

7

# EXHIBIT 9

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al*.,

    *Plaintiffs,*

    v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

---

### DECLARATION OF SANDRA MCANANY

I, Sandra McAnany, upon my personal knowledge, hereby declare as follows:

1. I was born in 1967 in La Crosse, Wisconsin. I am a United States citizen.

2. I currently live in La Crosse, Wisconsin. I work in procurement. I have five sons and fourteen grandchildren that range from ages one to twenty-one. My grandchildren are an important part of my life, and I spend as much time as I can with them, taking them hiking and on trips. Outside of work, I do volunteer photography for various nonprofits in the La Crosse area and for organizations abroad in Honduras, Colombia, and Burundi. While volunteering for On the Ground International in Colombia in February 2023, I saw many people leaving Venezuela and walking along the highways. This experience has stayed with me and inspired me to look for a way to support people from Venezuela in particular.

3. I am the sponsor for seventeen individuals who were approved to come to the United States and were granted parole under the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"). I also have pending applications for CHNV sponsorship for four other individuals, who are all Cuban. I learned of the CHNV parole

processes when I read an article about Kyle Varner and his sponsorship of dozens of people through CHNV. CHNV seemed like an incredible legal pathway for people to come to the United States with the support of U.S. citizens. I felt like becoming a sponsor would be a great opportunity for me to not only support and help these people and families in need, but also contribute to the United States, a country that I love. I reached out to Mr. Varner. At first, I intended to sponsor only one or two people, but as I started connecting with people and hearing their stories, I felt compelled to sponsor more. I spent a significant amount of time talking to people, getting to know them, and understanding the support they needed, in addition to the time and effort I put into completing and submitting CHNV sponsorship applications.

4.  My religious convictions and commitment to caring about others motivate me to welcome and support these immigrants in need. As a Christian, I strongly believe that we should treat others like we want to be treated, no matter the color of their skin or their nationality. I believe that if more people helped each other, the world would be a better place. When my children were younger, they had friends who were undocumented whom I came to know and relate to. We lived in Norwalk, Wisconsin for a period of time, where we saw U.S. Immigration and Customs Enforcement ("ICE") carry out an immigration raid in the community on a weekend. It was heartbreaking. As we watched out our window, ICE agents moved in and took immigrants away. During the raid, two of my children, who were seven and nine at the time, told me that they needed to go warn their friends so they could keep them safe. This is the kind of empathy with which I lead my life and which I am proud to have instilled in my children.

5. When I was considering sponsoring people through the CHNV processes, I was especially drawn to helping families reunite. For many of the beneficiaries I sponsored, I was drawn to their resilience in the face of challenges in their home country, their dedication to working hard for their families, and their commitment to giving back to their communities.

6. Fifteen of the people I sponsored are nationals of Venezuela, and two are nationals of Nicaragua. All of them arrived in the United States between September and December 2023, and all were approved for two-year parole periods. To my knowledge, most of my parole beneficiaries have pending asylum applications.

7. My beneficiaries include four mothers with young children and one father with a teen son who, only because of the CHNV parole processes, have been able to reunite with family members already in the United States, and six adults without children. They seek not only stability for their families but also safety from persecution and violence in their countries of origin. One of these parents is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela. Her grant of CHNV parole allowed her to be reunited with him in the U.S. and care for him while he went through treatment. All my beneficiaries have settled into their communities in the United States, received work authorization, and are working at least one job, if not more. I am so proud that they are all committed to supporting themselves.

8. When the people I sponsored received approval to travel to the United States and started planning for their travel, I provided advice and resources, including flight recommendations and guidance on navigating the U.S. airport system. I paid for some of them to take online English classes through Express Yourself while they were waiting for

approval. After they arrived and were granted parole in the United States, I helped many

of them get settled. Most of them already had housing lined up, but I helped make sure

that the locations were safe and stable for them. Only one family, a parent and son pair,

needed a place to stay temporarily, so they lived with me for a little over a year while the

parent got a work permit and found a job. I drove them three hours to Milwaukee to get

the work permit, which also involved paying for a hotel and food along the way. Over the

course of the year, it was beautiful to see both of them get on their feet and become

integrated into our local community. The parent now has two jobs, and they have moved

into their own place. They are able to go to church safely, which is something they

couldn't do in their home country. My grandchildren have also met them and learned the

importance of humanitarian parole through their story.

9.  I helped beneficiaries with their job searches as well, including proofreading resumes and

helping them understand employment requirements. I helped parents research local

schools for their kids and understand what they needed to do to enroll them. I assisted

them in enrolling in English classes, and I helped pay some of their initial cell phone

plans. Additionally, several of the people I have sponsored arrived in United States during

the winter, and they did not have any winter clothes. I provided several families with

winter clothing or money to buy it themselves. Finally, I provided emotional support to

many of my beneficiaries as they navigated a new country and time away from their

families in Venezuela or Nicaragua. It has been a blessing to be a part of making these

families' lives tangibly better. I am grateful that the CHNV parole processes gave me a

way to live out my religious convictions in a meaningful way.

10. On January 21, 2025, the morning after President Trump's inauguration, I first learned of President Trump's express intent to terminate the CHNV parole process when my friend sent me an article about it. Soon after, I saw news reporting that the Trump administration paused processing of new CHNV applications and could revoke existing parole applications previously granted. Immediately, I became extremely anxious and worried about the people and families I sponsored who are in the U.S., what might happen to them if the Trump administration revoked their parole applications, and the many people whose applications may now never be adjudicated. I quickly contacted my beneficiaries to make sure that they knew what happened and had the latest information on how they might be impacted. I also made sure that my beneficiaries in the U.S. knew their rights when they interact with immigration officers and reminded them to carry documentation of their parole status whenever they left home. Understandably, many of my beneficiaries have expressed fear and anxiety at the prospect of losing their parole status while their applications for other immigration protections remain pending. Some are trying to find additional jobs so that they can save more money to support their families.

11. On February 19, I saw news reporting that the Trump administration had taken further steps to harm CHNV parolees by initiating a pause on processing requests for immigration benefits submitted by CHNV parolees. This horrified me and the people I sponsored who have applied for protections in the U.S., including asylum and Temporary Protected Status, because of the dangers they would face upon returning to their countries of origin.

12. Since January 21, I have had trouble sleeping through the night because I worry about my beneficiaries, especially the children who will be impacted by the termination of the

5

CHNV parole process. As a sponsor, I have heard their stories about the difficult and dangerous life in their countries of origin, the risks taken to enroll in the CHNV parole program and legally enter the United States, the efforts to make a new life in the United States, and the chilling prospect of having to return to their countries of origin. A few of my beneficiaries have become like family to me. We talk frequently, and we have built a support network with other CHNV sponsors and beneficiaries. If they lose their parole status and become subject to deportation, I may never see them again, and the possibilities of the harm they would suffer would haunt me.

13. I am also concerned about the four Cuban people for whom my applications remain pending but may now never be adjudicated. It is frustrating to have put time and effort into their applications for the CHNV parole process only for a new administration to pause their applications indefinitely. The effect of the administration's pause, however, is more concerning as it means that these individuals will now continue to face the challenges of living in Cuba. I understand that daily life in Cuba is extremely difficult under the Communist government. For example, my beneficiaries often struggle to make enough money to pay for food for themselves and their families. Also, food shortages due to government failures are a common experience in Cuba. Making matters worse, frequent power outages make it difficult to keep the food they do have fresh. I applied for them to come to the United States through CHNV parole to reunite them with family already here or to earn money to support their families in Cuba. One of the beneficiaries that I applied for needs to work to help her parent pay for critical cancer treatment. Another is the parent of two young children and struggles to access medical care for their family in Cuba. This beneficiary has lost jobs in Cuba in the past for speaking out against

6

the government and fears being arrested if he continues to speak out. These people that I have sponsored admire the democracy of the United States and want to experience the freedoms that are supposed to come with it.

14. To me, the loss of CHNV parole is not only the loss of these relationships with amazing people and families that I have met and spent time and resources supporting, but it is a loss of the American dream. The CHNV parole process was a safe, legal pathway through which U.S. citizens could welcome immigrants into their communities. The beneficiaries complied with the rules for the CHNV parole process set forth by the U.S. government, including a rigorous application and vetting process. Now, the Trump administration is turning its back on them and seeks to terminate the legal process by which these individuals have entered the United States, deprive them of immigration benefits, and ultimately, deport them to their countries of origin. After investing significant time and effort to sponsor these amazing, resilient people and to help them become thriving, contributing members of their communities, the idea that all of that could be taken away from us is heartbreaking. That is not the American dream that so many of us have worked so hard for, and it contradicts the very reason why I was so eager to become a sponsor in the CHNV parole process.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in La Crosse, Wisconsin on March 13, 2025.

_Sandra McAnany_

Sandra McAnany

7

# EXHIBIT 10

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al*.,

    *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants*.

Case No.: 1:25-cv-10495-IT

### DECLARATION OF KYLE VARNER

I, Kyle Varner, upon my personal knowledge, hereby declare as follows:

1. I was born in 1984 in Glendora, California. I am a United States citizen.

2. I currently live in Spokane, Washington. I am a physician at Providence Holy Family
   Hospital in Spokane. In my personal capacity, I have been involved in supporting liberal
   and libertarian movements in Venezuela, including Vente Venezuela and Movimiento
   Libertario de Venezuela, for many years. I have also traveled to various countries in Latin
   America, including doing global health work at the Venezuelan border. I have seen first-
   hand the challenges faced by people in poverty in Venezuela. When I learned about the
   parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"), I knew
   I needed to get involved with that as well. It seemed too good to be true, a pathway
   through which U.S.-based sponsors could support people to come to the United States
   and help them start a new chapter of their lives here.

3. Between October 2022 and June 2023, I submitted applications to sponsor 79 individuals
   under the CHNV parole processes. Forty-eight of the applications were approved, and
   forty-three of those individuals are still in the United States now. Currently, two of them

have active parole status in the United States. The rest have applications for other kinds of immigration relief that have either been approved or are still pending. At least 31 have pending applications for asylum, TPS, or other immigration relief. I also have 32 other pending applications for CHNV sponsorship. All the people I have sponsored are Venezuelan, except for two – one Cuban individual and one Nicaraguan individual – whose applications are still pending. The first beneficiaries to arrive in the United States arrived in November 2022.

4.  The people I have sponsored are individuals I already knew through my activism with the Venezuelan political movements, family members of individuals I already knew, or individuals who reached out to me on Facebook. As the CHNV process was rolling out, I posted on Facebook that I would be open to sponsoring people, and I received such an overwhelming response that I had to take the post down. Of the people who reached out to me on Facebook, I was drawn to the stories of people who were either stuck in Mexico or Central America with nowhere to go, or who described compelling asylum cases.

5.  My beneficiaries include a son who was only able to pay for his mother's life-saving cancer treatment because he came to the United States and got a job here; a daughter who has been supporting her father and grandmother through her job here; and a mother and her young son who stayed with my parents for about eight months when they first arrived. My parents see the boy as their own grandchild now, and he calls them his grandparents. They still enjoy spending time together, including going fishing.

6.  I identify as a Libertarian, and I strongly believe that immigration is the most important civil rights issue of our time. I feel that there is something fundamentally and morally wrong with treating people differently and giving them fewer rights simply because they

2

were not born in this country. At the core of this is a belief that people should have the ability to move freely and build their lives without restriction. My commitment to immigration advocacy and supporting immigrants in multiple capacities are an expression of my political beliefs, which are rooted in these fierce moral convictions.

7. Therefore, I am deeply committed to this parole process, and I have put countless hours of my time and untold resources into supporting the people I sponsored. I did the financial calculations immediately to determine how many people I could sponsor given my financial situation, and then I set about sponsoring as many as possible. First, it took me many hours to fill out all the applications. I would work during the day, then stay up late at night doing applications. One night, I even stayed up the entire night completing sponsorship forms. The first four applications that I submitted were approved very quickly. After that, we were waiting for a while on the others, so I contacted my Congressional representative's office multiple times to ask for their assistance in expediting the applications.

8. When the people I sponsored received approval to travel to the United States, I bought plane tickets for most of them. For some, I bought plane tickets twice because, when Texas and other states filed suit to terminate the CHNV parole processes, I contacted all my beneficiaries who had been granted parole and asked them if we could move up their travel date. I wanted to ensure they traveled before the court did anything to affect the process. That required buying a new plane ticket for a lot of people. Fortunately, they were all able to arrive safely in the United States.

9. After my beneficiaries arrived in the United States, I continued to provide support and provided significant amounts of resources to them to help them get settled quickly and

3

securely. Many of the people I sponsored lived with me for some period of time at first. I had twenty-five people in my house at one point. But I helped them find other safe housing, including co-signing some leases. I also rented properties I own to many of them, charging them reduced rates, helping pay for utilities, and providing favorable terms like no security deposit and month-to-month tenancy, which allowed them to be free of a fixed-term contract. At some points when I was waiting for sponsorship applications to be granted, I kept properties that I own vacant so that beneficiaries could live there when they were approved for parole. Often times this meant I missed out on renting it to other renters.

10. I also paid for most of my beneficiaries' work permit applications, which cost $410 each, and, after they got their work permit, I helped them with job applications. I bought SIM cards for their phones and helped many of them enroll in community college ESL (English as a Second Language) courses. For those who did not know how to drive, I taught a few to drive and found volunteers to help others learn. Finally, as a physician, I was able to help provide free medical care for minor health conditions, so they wouldn't have to go to the hospital. I helped translate and summarize Spanish-language medical records from Venezuela as well, so they could maintain continuity of care in the United States when they found providers. I essentially put my life on hold for about two years to provide for and support the people I sponsored through the CHNV parole processes. I wanted to make sure they were on solid footing as soon as possible, which would serve as a launching pad for their lives here and allow them to support their families and other loved ones.

11. I first got confirmation that the Trump administration was going to terminate the CHNV parole processes when my beneficiaries started messaging me, asking me what they should do and telling me how scared they were. I then read news reporting that processing of new CHNV applications had been terminated, and that existing grants of parole could be revoked. It was heartbreaking. Over the last few years, both my parents and I have gotten to know my beneficiaries well. I have connected with all of them and supported them as they navigated settling in a new country and the difficulties that come with that. If they become deportable, I may never see them again, and it is scary to think about what challenges and danger lie back in Venezuela if they were forced to go back.

12. Additionally, I am concerned about the individuals I have sponsored whose applications are now pending indefinitely. I put a lot of time and effort into understanding their stories and submitting their applications, and it is truly unfair that they are being deprived of a safe, legal pathway to the United States. Daily life in Venezuela, Nicaragua, and Cuba is not only challenging, but dangerous. I am very familiar with conditions in Venezuela in particular, and I know that my beneficiaries whose applications are now paused will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are not able to support the people that rely on them.

13. On February 19, I read news reporting that the administration was pausing processing of immigration benefits requests submitted by people who had come to the United States through the CHNV parole processes. Many of my beneficiaries who are in the United States have pending applications for asylum, TPS, or other immigration relief because it is unsafe for them to return to their countries of origin. If those applications are not adjudicated, they will be gravely harmed, not only because they will be deprived of the

right to access the U.S. immigration system in a fair and just way, but also because they could be forced to return to countries where it is dangerous and unsustainable for them.

14. I also put my own time and money into helping my beneficiaries apply for their affirmative immigration protections. I made sure that everyone knew that applying for asylum was an option and that they needed to do it within a year of arrival. In some cases, I lent money to help pay for lawyer fees. I helped many of them compile documents, recommended certified translator services, allowed them to use my printer and scanner, and connected and recommended them to attorneys. This time and money that I have put in will be lost if my beneficiaries' applications are not adjudicated.

15. To help the people I have sponsored who are in the U.S. prepare for the possibility that their parole could be revoked, I held meetings to teach people about their rights. I told my beneficiaries to memorize my phone number in case they are detained, and to give me any contact information I may need for their families or other loved ones. I told them to make plans for their kids in the event that they are detained. I have spent a lot of time educating my in Spokane beneficiaries and others in the immigrant community that it is not safe to travel to the adjoining state of Idaho, and that they should generally avoid rural areas because of anti-immigrant sentiment. It has been difficult explaining the concerns of anti-immigrant violence to people who came to the USA believing that this would be a place where they would be safe.

16. I have spent a lot of time researching alternative options for where people can go, and I'm trying to put some money away to be able to hire lawyers for people. I have also spent a lot of time just talking to my beneficiaries as they process this tremendous betrayal and

have to re-plan their lives and think through the huge implications this has for them. I have been trying to be as supportive as I can be.

17. Serving as a CHNV parole sponsor is by far the most important thing I have done in my life. I put so much time, money, and heart into supporting the people I have sponsored, including those whose applications are still pending, because I wanted to see them build a life here, be successful, and then be able to pay it forward and help their families and other people in their communities. It is very frustrating to have put a lot of time and money and effort into a process that the government is now reversing course on. My beneficiaries and I followed all the rules laid out by the government, and I worked hard to make sure that the people I sponsored had a strong start in a new country. It is difficult to see all that effort go to waste if the government goes back on its word and starts trying to deport them.

18. If the beneficiaries who are here lose their status and their work authorization, they will not be able to support themselves or their families, and they won't realize their full potential. I will definitely need to put more time and resources into making sure they have a place to live, including waiving rent for those who are renting properties of mine, and that they don't go hungry. I would never tell someone that I helped bring to the United States, "sorry, at this point, you're on your own." I would do everything I can to continue supporting them.

19. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our sponsorship applications for CHNV parole processed, as they should be.

20. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

21. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of sponsorship applications for CHNV parole.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Spokane, Washington on March 13, 2025.

_____

Kyle Varner

8

# EXHIBIT 11

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al.*,

    *Plaintiffs,*

    v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

## DECLARATION OF WILHEN PIERRE VICTOR

I, Wilhen Pierre Victor, upon my personal knowledge, hereby declare as follows:

1. I was born in Haiti in 1967. I arrived in the United States in August 1996 and became a U.S. citizen on October 10, 2002.

2. I currently live in Woburn, Massachusetts. I have lived in Woburn since 2013. I have three siblings who live in Massachusetts as well. I am employed as a Licensed Practical Nurse ("LPN") in a local nursing home.

3. Along with my two children (a 28-year-old daughter and a 17-year-old son), I live with my brother, his wife, and her three children (ages 7, 13, and 16), all of whom are from Haiti and came to the United States under the Cuba, Haiti, Nicaragua, Venezuela ("CHNV") humanitarian parole processes.

4. My brother and his family were approved to travel to the United States under CHNV parole in May 2024. His wife and her children arrived in the United States in June 2024, and my brother arrived shortly after in July 2024.  All were granted two years of parole upon entry to the United States.

Appx-0096

5. In addition, I have applied to sponsor my niece (age 13), who is the daughter of my brother currently in the United States, as well as my cousin (age 50), for CHNV parole. Both are currently in Haiti, and their parole applications remain pending.

6. I applied for a green card for my brother in 2007, and it remains pending. We are still waiting for U.S. Citizenship and Immigration Services ("USCIS") to schedule an interview for him. As my brother's green card application remained pending when the CHNV parole processes began, I decided to apply for CHNV parole for him and his family

7. My brother is ineligible to apply for Temporary Protected Status ("TPS"), having arrived in the United States after the cutoff date. He does plan to apply for asylum.

8. I first learned about the CHNV parole processes from news reports that described how people were applying to bring their family members experiencing dangerous conditions to the United States. My family and I were so excited to hear about it. Finally, there was a safe, legal pathway for my family members in Haiti to come to the U.S.

9. I spent significant time and effort into gathering documentation for, filling out, and submitting the applications for my family members, and after my brother and his family received approval to travel to the U.S., I pooled money with other family members   to pay for their airfare from Haiti.  I also prepared my home to accommodate five additional people to live with me and my two children.

10. It was extremely urgent for my brother, his wife, and their children to leave Haiti given the political and socioeconomic conditions there. In my family's experience, Haiti does not currently have any meaningful law enforcement or government oversight, meaning people in Haiti live in a mostly lawless state, in constant danger of falling victim to

Appx-0097

violent crimes such as murders and kidnappings.  Kidnapping for ransom also frequently occurs in Haiti.

11. Additionally, my brother had searched for a job in Haiti for over thirteen years, but he was unsuccessful.  His wife also did not have good employment prospects while in Haiti. While there, she sold things for a small business, but she did not make enough money to feed or care for their family. She and my brother relied on money from other family members to get by.

12. If forced to return to Haiti, my brother's wife's children would also not be able to receive a proper education, as they would not be able to attend school consistently there. When they were back in Haiti, there was often gang violence, including gunfire, in the streets of where they lived, which prevented them from going outside at all. My brother's wife's children often could not go outside to attend school for up to a week due to the violence.

13. The conditions in Haiti that led to my brother and his family's departure for the United States have persisted for a long time and were the reason I submitted a green card application on his behalf in 2007—nearly twenty years ago. The situation in Haiti has only worsened since then.

14. Because of the conditions in Haiti, my brother is very concerned and anxious about the possibility of having to return there because the region he previously lived in is now even more dangerous than before, having been evacuated by residents and replaced with gangs.  He cannot imagine what life there would be like if he, his wife, and her three young children were forced to return. I was so relieved that my brother and his family were able to come to the U.S. through CHNV parole and be safe here, especially because of their young children. When my sister and I met them at the airport, we felt so much

3

happiness, relief, and joy. The last time I saw my brother in person was in 2001 when I

returned to Haiti after our mother passed away, so we were finally reunited after more

than 20 years. My brother had been waiting for so long to come to the United States, and

I feel blessed to be able to provide for them here and be a good sister to my brother and

aunt to his children.

15. My brother and his family have adjusted well to life in the United States, and they are

actively engaged in their local community.  My brother quickly got a job working in the

kitchen of a nursing home, and his wife has been actively searching for a job.  They both

attend English classes and go to church regularly, and their children are attending school.

In his free time, my brother helps me around the house, including with yardwork and

clearing snow. It has been wonderful to have him around, not only because he helps out

and supports me, but because we are finally reunited as a family after so long.

16. When I heard that the CHNV process was going to be terminated and that my brother and

his family's parole status could be terminated early, I was shocked. If their parole were

terminated before their expected expiration date in 2026, my brother and his family

would be forced to return to unpredictable, dangerous, possibly life-threatening,

conditions in Haiti. They would also lose the ability to apply for asylum in the United

States. We do not know how to even start making plans for this possibility, because it is

simply impossible to plan for life in Haiti given the unstable political and socioeconomic

conditions there, but we do know that it would be devastating. We followed all the rules

that the government laid out for us to bring our families to safety here, and it feels like a

major betrayal if the Trump administration ends their parole early and then tries to deport

them.

4

17. Additionally, I heard that the administration is pausing processing of immigration relief requests for people who have come to the United States under CHNV parole, which could include my brother. This means my brother could be forced to forfeit his pending green card application **over seventeen years** after I filed the application on his behalf.  This would be deeply unjust given how long we have been waiting on his application.

18. I am also very concerned about how the end to the CHNV parole process is affecting my niece and cousin, whose applications are now on pause indefinitely. My niece, who is my brother's child and only 13 years old, is left in Haiti without either of her parents. After my brother left for the United States, her mother also came to the United States without her, leaving her in the care of her aunt. She is so young, and in Haiti she cannot go to school reliably because of the gang violence shutting down the streets. She fears leaving her house because of the violence that is rampant. She needs to be reunited in a safe place with her father, who is worried about her and talks with her as often as possible. Although I have been sending money back to Haiti to support her, and talked to her on the phone, I have not had the chance to meet my niece in person. If she came to the United States, I would look forward to the opportunity to meet her and be an even better aunt to her.

19. My cousin also lives under fear of violence in Haiti. She has heard that people who have family members in the United States are targeted by the gangs for ransom, and that the gangs will kidnap people and threaten to kill them if they are not given large sums of money – it can be anywhere from $200,000 to $300,000. If the person cannot produce the money, the gangs will kill them. My cousin lives in an area with significant gang violence that makes it hard to go outside even to run errands for daily needs. It is unsafe for her to continue to stay there.

20. If my niece and cousin are not able to come to the United States through CHNV parole, the time and energy I put into their applications will be lost, but even more importantly, we will not be able to all reunite as a family and they will continue to live with the terrors of the ongoing violence in Haiti. It has been wonderful having my brother and his family here with me and my children, but without my niece and cousin, our family is incomplete. To me, it feels like the U.S. government provided a route to safety in the U.S. so that families like ours can be together, and now it is taking it away without any regard for just how dangerous and uncertain it is in Haiti.

21. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our sponsorship applications for CHNV parole processed, as they should be.

22. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

23. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the indefinite pause on the processing of sponsorship applications for CHNV parole.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Woburn, Massachusetts on March 15, 2025.

_____

Wilhen Pierre Victor

6

# EXHIBIT 21

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register**.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**

*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*

[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria

and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.*

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

**63508**    **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on

a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important

foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America[5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

## 2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

### a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that ''[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity.'' [12] Amnesty International further reported that ''trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents'' of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its

territory from Colombia via the Darién jungle each day.

### b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

### c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC*,—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



NOTE: Figure depicts 30-day average of daily encounters.

Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17]

Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.

This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

Appx-0106

Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices  **63511**

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit."[23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

#### 1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

#### 2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

---

[21] Data from SBCC, as of September 29, 2022.

[22] Data from SBCC, as of September 29, 2022.

[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).

[27] *See* 8 CFR 212.5(e).

[28] *See* 8 CFR 274a.12(c)(11).

**63512** **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

### 3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

### 4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on

communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office (last visited Sept. 29, 2022).

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sep. 14, 2022, available at: https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/ (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/ (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

---

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticas*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X* (last visited Oct. 2, 2022).

[43] L.A. Declaration.

[44] The Department of State Cable, 22 Panama 624.



**Note:** September figure is a preliminary estimate.

Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

---

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-*

*stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Venezuela or be a non-Venezuelan immediate family member [49] of and traveling with a Venezuelan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;

• possess a passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order; [51]

• has crossed irregularly into the United States, between the POEs, after October 19, 2022;

• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

### C. Processing Steps

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan beneficiary.

[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

**63516**   **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to

apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will

not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–9M–P**

---

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7050–N–52]**

## 30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 18, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@omb.eop.gov* or *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:**
Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

## A. Overview of Information Collection

*Title of Information Collection:* Debt Resolution Program.

*OMB Approval Number:* 2502–0483.

*OMB Expiration Date:* November 30, 2022.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–56141, HUD–56142, HUD–56146.

*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).

*Respondents:* Individuals or Households, Business or other For-Profit.

*Estimated Number of Respondents:* 648.

*Estimated Number of Responses:* 2,159.

*Frequency of Response:* 1.

*Average Hours per Response:* 1.

*Total Estimated Burden:* 590 hours.

---

[58] See 82 FR 4902 (Jan. 17, 2017).
[59] 5 U.S.C. 553(b)(B).

# EXHIBIT 22

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

Case: 25-1384    Document: 00118298863    Page: 119    Date Filed: 06/11/2025    Entry ID: 6728192
Case 1:25-cv-10495-IT    Document 24-22    Filed 03/17/25    Page 2 of 5

*Federal Register* / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    **1279**

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary has also updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

## III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

*A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes*

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

### B. Updated Eligibility Criteria

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds foreign status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

### C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

### IV. Regulatory Requirements

#### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] i.e., a ''statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security ''in his discretion.''

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM would no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

#### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'* https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/, Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]

**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4678– DR; Docket ID FEMA–2022–0001]

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**

*Administrator, Federal Emergency Management Agency.*

[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]

**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4677– DR; Docket ID FEMA–2022–0001]

### South Carolina; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:

# EXHIBIT 23

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Cubans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices     **1267**

of our Southwest Border (SWB) by reducing the number of encounters of Cuban nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Cubans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Cuban nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Cuban Parole Process

This notice describes the implementation of a new parole process for certain Cuban nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Cuban nationals

entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

Building on the success of the Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Cuban nationals at the SWB and at sea, which have reached record levels over the past six months. Similar to Venezuela, Cuba has restricted DHS's ability to remove

individuals to Cuba, which has constrained the Department's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Cubans will reduce the number of Cubans seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Cubans is

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Cuban Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

contingent on the GOM accepting the return, departure, or removal to Mexico of Cuban nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Cuban national (and certain non-Cuban nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Cuban nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Cubans from the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits, including adjustment of status pursuant to the Cuban Adjustment Act, Public Law 89–732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note), for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Cuban nationals pursuant to this process will provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Cubans to flee their home country, to include crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's (GOC) violent repression of dissent.[6] Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

### B. Conditions at the Border

#### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500. Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society. Other migrants who were about to enter the Darién Gap have turned around and headed back south. Still others who were intending to migrate north are staying where they are to apply for this parole process. Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

#### 2. Trends and Flows: Increase of Cuban Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[9] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[10] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[11]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and

---

[6] Washington Office on Latin America, *U.S.–Cuba Relations: The Old, the New and What Should Come Next*, Dec. 16, 2022, *https://www.wola.org/analysis/us-cuba-relations-old-new-should-come-next/* (last visited Dec. 17, 2022).

[7] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[9] OIS analysis of historic CBP data.

[10] *Id.*

[11] *Id.*

Appx-0122

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices **1269**

1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[12] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[13] (NCA) and, since the late 2010s, from countries throughout the Americas.[14] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[15]

Cubans are fleeing the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980.[16] In FY 2022, DHS encountered about 213,709 unique Cuban nationals at the SWB, a seven-fold increase over FY 2021 rates, and a marked 29-fold increase over FY 2020.[17] FY 2022 average monthly unique encounters of Cuban nationals at the land border totaled 17,809, a stark increase over the average monthly rate of 589 unique encounters in FYs 2014–

2019.[18] These trends are only accelerating in FY 2023. In October and November 2022, DHS encountered 62,788 unique Cuban nationals at the border—almost one third FY 2022's record total.[19] The monthly average of 31,394 unique Cuban nationals is a 76 percent increase over the FY 2022 monthly average.[20] The first 10 days of December 2022 saw 15,657 encounters of Cubans at the SWB.[21] In FY 2023, Cuban nationals have represented 16.5 percent of all unique encounters at the SWB, the second largest origin group.[22]

Maritime migration from Cuba also increased sharply in FY 2022 compared to FY 2021. According to DHS data, in FY 2022, a total of 5,740 Cuban nationals were interdicted at sea, the top nationality, compared to 827 in FY 2021, an almost 600 percent increase in a single fiscal year.[23]

In addition to the increase of Cuban nationals in U.S. Coast Guard (USCG) interdictions at sea and U.S. Customs and Border Protection (CBP) encounters at the SWB, USBP encounters of Cubans in southeast coastal sectors are also on the rise.[24] In FY 2022, DHS encountered 2,657 unique Cuban nationals (46 percent of total unique encounters), an increase of 1,040 percent compared to FY 2021.[25] This trend also has accelerated sharply in FY 2023, as CBP has made 1,917 unique encounters of Cuban nationals in the first two months of the FY—almost three-quarters of FY 2022's total.[26] Cuban nationals are 72 percent of all unique encounters in these sectors in October and November.[27]

**3. Push and Pull Factors**

DHS assesses that the high—and rising—number of Cuban nationals encountered at the SWB and interdicted at sea is driven by three key factors: First, Cuba is facing its worst economic crisis in decades due to the lingering impacts of the COVID–19 pandemic, high food prices, and economic sanctions.[28] Second, the government's

response has been marked by further political repression, including widespread arrests and arbitrary detentions in response to protests.[29] Third, the United States faces significant limits on the ability to return Cuban nationals who do not establish a legal basis to remain in the United States to Cuba or elsewhere; absent the ability to return Cubans who do not have a lawful basis to stay in the United States, more individuals are willing to take a chance that they can come—and stay.

Further, in November 2021, the Government of Nicaragua announced visa-free travel for Cubans.[30] This policy provided Cubans a more convenient and accessible path into the continent, facilitating their ability to begin an irregular migration journey to the SWB via land routes.[31] Many such Cuban migrants fall victim to human smugglers and traffickers, who look to exploit the most vulnerable individuals for profit with utter disregard for their safety and wellbeing, as they attempt the dangerous journey northward through Central America and Mexico.[32]

**i. Factors Pushing Migration From Cuba**

There are a number of economic and other factors that are driving migration of Cuban nationals. Cuba is undergoing its worst economic crisis since the 1990s[33] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[34] In July 2022, the

---

[12] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' *The Journal of American History* Vol. 86, No. 2, 518–536 (Sept. 1999).

[13] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[14] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[15] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[16] El País, *The Cuban Migration Crisis, Biggest Exodus in History Holds Key to Havana-Washington Relations*, Dec. 15, 2022, https://english.elpais.com/international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html (last visited Dec. 17, 2022).

[17] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled on December 12, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[24] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[25] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[26] *Id.*

[27] *Id.*

[28] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s*, July 1, 2021, https://

www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s (last visited Dec. 17, 2022).

[29] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests*, October 2, 2022, https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html (last visited Dec. 17, 2022).

[30] Reuters, Nicaragua Eliminates Visa Requirement for Cubans, November 23, 2021, https://www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/ (last visited Dec. 17, 2022).

[31] The New York Times, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*, May 4, 2022, https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html (last visited Dec. 17, 2022).

[32] CNN, *Cubans are Arriving to the U.S. in Record Numbers. Smugglers are Profiting from Their Exodus*, https://www.cnn.com/2022/05/12/americas/cuba-mass-migration-intl-latam/index.html, May 12, 2022 (last visited Dec. 17, 2022).

[33] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s*, July 1, 2021, https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s (last visited Dec. 17, 2022).

[34] Congressional Research Service, *Cuba: U.S. Policy in the 117th Congress*, Sept. 22, 2022, https://
Continued

Appx-0123

**1270**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

Government of Cuba (GOC) reported the economy contracted by 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[35] However, this projected expansion is unlikely to respond to the needs of the Cuban people. Mass shortages of dairy and other basic goods continue to persist, and Cubans wait in lines for hours to receive subsidized cooking oil or other basic goods.[36] Deepening poverty, exacerbated by the COVID–19 pandemic, has led to food shortages and rolling blackouts, and continues to batter the economy.[37] This combination of factors has created untenable economic conditions on the island that are likely to continue to drive Cubans to travel irregularly to the United States in the immediate future.[38]

The GOC has not been able to effectively address these issues to date, and has instead taken to repressive tactics to manage public discontent. Cuba remains a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which continues to restrict freedoms of expression, association, peaceful assembly, and other human rights.[39] The GOC employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.[40] While the Cuban constitution grants limited freedoms of peaceful assembly and association, the GOC restricts these freedoms in practice.[41] The government routinely blocks any attempts to peacefully assemble that might result in opposition to, or criticism of, the government.[42] This was evident when the human rights situation in Cuba began to decline significantly in 2020.[43]

In November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression.[44] This crackdown, coupled with deteriorating economic conditions (food and medicine shortages and blackouts), led to demonstrations in Havana and throughout the country.[45]

According to a Human Rights Watch report, the GOC also committed extensive human rights violations in response to massive anti-government protests in July 2021 with the apparent goal of punishing protesters and deterring future demonstrations.[46] The report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including, arbitrary detention, prosecutions without fair trial guarantees, and cases of physical ill treatment, including beatings that in some cases constitute torture.[47] Several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.[48]

Protests over the challenges of obtaining basic necessities have continued as have heavy-handed government responses. In September 2022, a prolonged blackout caused by Hurricane Ian led to protests in Havana and other cities.[49] Cuban President Miguel Díaz-Canel denounced the peaceful gatherings as "counterrevolutionary" and "indecent," remarking that "[d]emonstrations of this type have no legitimacy."[50] Amnesty International received reports of the GOC deploying the military and police to repress these protests as well as reports of arbitrary detention.[51]

The government's repression and inability to address the underlying shortages that inspired those lawful demonstrations have generated a human rights and humanitarian crisis that is driving Cubans from the country. On June 2, 2022, the Inter-American Commission on Human Rights (IACHR) in its 2021 Annual Report stated that no guarantees currently exist for exercising freedom of expression in Cuba.[52] Although the forms of harassment of independent journalists, artists, activists, and any who question government officials are not new, the 2021 Annual Report notes that they are worsening quickly.[53] The government controls formal media and closely monitors and targets perceived dissidents within the artistic community, mainstream artists, and media figures who express independent or critical views.[54] GOC frequently blocks access to many news websites and blogs and has repeatedly imposed targeted restrictions on critics' access to cellphone data.[55]

Cuba's deteriorating economic conditions and political repression continue to increasingly drive Cubans out of their country. As a result, many have taken dangerous journeys, including through maritime means, often costing their lives at sea and on land while trying to reach the United States.

ii. Return Limitations

Due to the global COVID–19 pandemic, the GOC stopped accepting regular returns of their nationals via U.S. Immigration and Customs Enforcement (ICE) aircraft after February 28, 2020. The U.S. Government has been engaged in discussions with the GOC to reactivate the Migration Accords, which specify that the United States will process 20,000 Cuban nationals—not including immediate relatives of U.S. citizens—to come to the United States through immigrant visas and other lawful pathways, such as the Cuban Family Reunification Parole (CFRP) program, and that the Cuban government will accept the repatriation of its nationals who are encountered entering the United States without authorization. A limited number of removal flights will not, absent other efforts, impose a deterrent to Cuban nationals seeking to cross, unauthorized, into the United States.

crsreports.congress.gov/product/pdf/R/R47246 (last visited Dec. 17, 2022).

[35] Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed,* Cuba Briefing, July 25, 2022, *https://www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/* (last visited Sept. 25, 2022).

[36] Washington Post, *In Cuba, a Frantic Search for Milk,* May 21, 2022, *https://www.washingtonpost.com/world/interactive/2022/cuba-economy-milk-shortage/* (last visited Sept. 25, 2022).

[37] New York Times, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future,* Dec. 10, 2022. *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html* (last visited Dec. 16, 2022).

[38] *Id.*

[39] U.S. Department of State, *2021 Country Reports on Human Rights Practices: Cuba, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/* (last visited Dec. 17, 2022).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Congressional Research Service, Cuba: U.S. Policy Overview, Aug. 5, 2022, *https://*

crsreports.congress.gov/product/pdf/IF/IF10045 (last visited Dec. 17, 2022).

[44] *Id.*

[45] *Id.*

[46] Human Rights Watch, Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators, July 11, 2022. *https://www.hrw.org/report/2022/07/11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators.*

[47] *Id.*

[48] Human Rights Watch, World Report 2022—Cuba. See *https://www.hrw.org/world-report/2022/country-chapters/cuba.*

[49] Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts, *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/.*

[50] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests,* October 2, 2022, *https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html* (last visited Dec. 17, 2022).

[51] Amnesty International, *Cuba: Tactics of Repression Must Not be Repeated,* Oct. 5, 2022, *https://www.amnesty.org/en/latest/news/2022/10/cuba-repression-must-not-be-repeated/* (last viewed Dec. 19, 2022).

[52] IACHR, Annual Report 2021—Chapter IV.B—Cuba, p.678, June 2, 2022, *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021* (last visited Dec. 19, 2022).

[53] *Id.*

[54] *Id.*

[55] *Id.*

As a result, the U.S. did not return any Cuban nationals directly to Cuba in FY 2022. In addition, other countries, including Mexico, have generally refused to accept the returns of Cuban nationals, with limited exceptions including Cubans who have immediate family members who are Mexican citizens or who otherwise have legal status in Mexico. In FY 2022, DHS expelled 4,710 Cuban nationals to Mexico, equivalent to 2 percent of Cuban encounters for the year.[56]

Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the GOM's acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between POEs.

Returns alone, however, are not sufficient to reduce and divert the flows of Cubans. The United States will combine a consequence for Cuban nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air, and seek parole to enter, the United States, without making the dangerous journey to the border.

### 4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Cuban nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations

that were designated for SWB enforcement and processing capacities.[57]

The impact has been particularly acute in certain border sectors. The increased flows of Cuban nationals are disproportionately occurring within the remote Del Rio and Yuma sectors, both of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 73 percent of unique encounters of Cuban nationals occurred in these two sectors.[58] Thus far in FY 2023, Del Rio and Yuma sectors have accounted for 72 percent of unique encounters of Cuban nationals.[59] In FY 2022, Del Rio and Yuma sectors encountered over double (137 percent increase) the number of migrants as compared to FY 2021, a fifteen-fold increase over the average for FY 2014–FY 2019, in part as a result of the sharp increase in Cuban nationals being encountered there.[60]

The focused increase in encounters within those two sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, it has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[61]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove noncitizens in its custody by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force–Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[62] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States. USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[63] Moreover, USCG had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly

---

[56] OIS analysis of OIS Persist Dataset and CBP subject-level data through November 30, 2022.

[57] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[58] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[59] *Id.*

[60] *Id.*

[61] Data from SBCC, as of December 11, 2022.

[62] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[63] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [64] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[65] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[66] DHS may terminate parole in its discretion at any time.[67] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[68]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Cuban nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [69]

### A. Significant Public Benefit

The parole of Cuban nationals and their immediate family members under

this process—which imposes new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhance Border Security by Reducing Irregular Migration of Cuban Nationals

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be removed to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate that the process could relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a

---

[64] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[65] INA sec. 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[66] *See* 8 CFR 212.5(c).

[67] *See* 8 CFR 212.5(e).

[68] *See* 8 CFR 274a.12(c)(11).

[69] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Cubans who seek to enter the United States by sea, and will allow USCG to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Cuban nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Cuban nationals in substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the border in November 2022.[70] The increased volume of provisional releases of Cuban nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Cuban nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[71] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[72] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[73] Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Cuban nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a

key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[74]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[75] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[76] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[77] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[78] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[79] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[80] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[81] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area,

---

[70] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[71] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[72] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[73] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

[74] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.*

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.*

[80] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[81] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[82]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.[83]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.[84] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[85]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human-smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human-smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[86]

### 6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[87] the Collaborative Migration Management Strategy (CMMS);[88] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[89] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[90] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [91]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[92] These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017—which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available. Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[93] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available. Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[94]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced

---

[82] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R*; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[83] Email from U.S. Coast Guard to DHS Policy, Re: heads up on assistance needed, Dec. 13, 2022.

[84] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[85] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[86] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42* (last visited Dec. 18, 2022).

[87] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[88] National Security Council, *Collaborative Migration Management Strategy,* July 2021, *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[89] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration), June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[90] *Id.*

[91] *Id.*

[92] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; *https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.*

[93] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations, https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations,* Sept. 9, 2022 (last visited Dec. 10, 2022).

[94] Public Law 89–732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, *https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf* (last viewed Dec. 16, 2022).

Case: 25-1384    Document: 00118298863    Page: 133    Date Filed: 06/11/2025    Entry ID: 6728192
Case 1:25-cv-10495-IT    Document 24-23    Filed 03/17/25    Page 11 of 15

Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    1275

operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process helps achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Cuba will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Cuban nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United

States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to U.S. actions in this regard, and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions.[95] This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

### IV. Eligibility To Participate in the Process and Processing Steps

#### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Cuban national and, if applicable, the national's immediate

family members.[96] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

- be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

#### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

- be outside the United States;
- be a national of Cuba or be a non-Cuban immediate family member[97] and traveling with a Cuban principal beneficiary;
- have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- possess an unexpired passport valid for international travel;
- provide for their own commercial travel to an air POE and final U.S. destination;
- undergo and pass required national security and public safety vetting;
- comply with all additional requirements, including vaccination requirements and other public health guidelines; and

---

[95] Id.; Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, https://crsreports.congress.gov/product/pdf/R/R47246.

[96] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[97] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Cuban national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Cuba, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[98]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[99]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023, except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[100]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements

for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV*.

*C. Processing Steps*

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Cubans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United

States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to an interior POE of the United States.[101] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request employment authorization from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

---

[98] This limitation does not apply to immediate family members traveling with a Cuban national.

[99] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[100] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

[101] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices　1277

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Cubans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Nicaraguans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[102] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[104] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [105] In addition, although the text of the Administrative Procedure Act

does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[106] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Cuban nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Cuban nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Cuban nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Cuba to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the

implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[107] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[108]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[109] The numbers of Cubans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge, and would miss a critical opportunity to reduce and divert the flow of irregular migration.[110]

Undertaking notice-and-comment rulemaking procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[111] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment

---

[102] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] 5 U.S.C. 553(a)(1).

[105] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[106] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[107] *See* 82 FR 4902 (Jan. 17, 2017).

[108] *See* 87 FR 63507 (Oct. 19, 2022).

[109] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[110] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[111] *See* 5 U.S.C. 553(b)(B).

**1278**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

process.[112] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[113] A number of cases follow this logic in the context of economic regulation.[114]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy [115] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it

likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Cuban nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [116] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." [117] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable

Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." [118] DHS concluded that "a surge could result in significant loss of human life." [119]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Cuban parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Cuban nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP

---

[112] See, e.g., *Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

[113] See, e.g., *Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[114] See, e.g., *Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[115] See Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[116] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[117] *Id.*

[118] *Id.*

[119] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary has also updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

## II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

---

[1] 87 FR 63507 (Oct. 19, 2022).

# EXHIBIT 24

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    **1243**

include: (1) remarks from the administration and CISA leadership on salient NS/EP and cybersecurity efforts; (2) a status update on the NSTAC Addressing the Misuse of Domestic Infrastructure by Foreign Malicious Actors Subcommittee; and (3) a deliberation and vote on the *NSTAC Report to the President on a Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem.*

Dated: January 3, 2023.

**Christina Berger,**

*Designated Federal Officer, NSTAC, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–00181 Filed 1–6–23; 8:45 am]

**BILLING CODE 9110–9P–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Haitians

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Haitian nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for

admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Haitian Parole Process

This notice describes the implementation of a new parole process for certain Haitian nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for

migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day, and as of the week ending December 4, to an average of 86 a day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Haitian Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/ img2022/PDF/IRREGULARES_%20POR_*

Continued

DHS anticipates that implementing a similar process for Haitians will reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all-of-government response. In FY 2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[6] In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago. Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[7]

Haitian migrants are also increasingly taking to the sea in makeshift boats. Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[8] While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti will reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea. This will be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States with the imposition of consequences for those who seek to enter without authorization between POEs along the SWB. Individuals can access this lawful process from safe locations in Haiti or in third countries. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Haitian national (and certain non-Haitian nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

### B. Conditions at the Border

**1. Impact of Venezuela Process**

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the

---

[6] %20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[7] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf,* (last viewed Dec. 11, 2022).

[8] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[9] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[10]

Panama's daily encounters of Venezuelans also declined significantly, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[11]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[12] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[13] Still others who were intending to migrate north are staying where they are to apply for this parole process.[14] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

### 2. Trends and Flows: Increase of Haitian Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[15] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[16] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[17]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[18] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [19] (NCA) and, since the late 2010s, from countries throughout the Americas.[20] Migrant

populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[21]

### C. Trends in Haitian Migration

#### 1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[22] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[23]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas, within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[24] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May 2022.[25] While encounters of Haitian migrants at our border have declined since June 2022, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in

[9] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[10] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[11] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[12] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[13] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[14] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://*

*www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[15] OIS analysis of historic CBP data.

[16] *Id.*

[17] *Id.*

[18] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[19] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[20] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an

average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[21] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] *Id.*

[24] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio,* Oct. 7, 2021, *https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/.*

[25] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters,* (last visited, Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July 2022, to 2,170 in September, to 4,607 in November.[26]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there were 62,680 Haitians in Mexico in 2022 and projects that this population will grow to 104,541 in 2023.[27] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of any nationality and almost twice as many as the second-highest nationality.[28] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[29] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the Centers for Disease Control and Prevention (CDC) Title 42 Order is lifted.

2. Migration by Sea

Increasing numbers of Haitian migrants also continue to attempt migration to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[30]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived in the United States by sea.[31] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[32]

In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—composing 31 percent of total unique encounters by USBP in the southeast coastal sectors.[33]

3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion of gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation in Haiti is having an impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States; absent such an ability, more individuals may be willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Haiti

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[34]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[35] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[36] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[37] The World Bank estimates

that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[38]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[39] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[40] The situation has deteriorated to such a point that the Haitian Government itself, on October 7, 2022, asked for international military assistance to help address the converging crises.[41]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[42] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.[43] This recent surge in gang

[26] Servicio Nacional de Migración de Panamá, Irregulares Por Darien, November 2022.

[27] UNHCR Global Focus, Mexico, See countries of origin data for 2022 and 2023, https://reporting.unhcr.org/mexico?year=2022.

[28] OIS analysis of Instituto Nacional de Migracion data.

[29] Estadísticas Comisión Mexicana de Ayuda a Refugiados, Mexican Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November), https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic._.pdf, (last viewed Dec. 17, 2022].

[30] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[31] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[32] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[33] Id.

[34] Diana Roy, Council on Foreign Relations, Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022 (Dec. 1, 2022), https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022.

[35] UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families, https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti (last viewed Dec. 12, 2022].

[36] The Washington Post, Tropical Depression Grace Drenching Haiti Days After Major Earthquake, Aug. 16, 2021, https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/, (last viewed Dec. 19, 2022].

[37] UNICEF, One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance, Sept. 15, 20221, https://www.unicef.org.uk/press-releases/one-month-after-

haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef/, (last visited Dec. 19, 2022].

[38] The World Bank, Haiti Overview, Updated Nov. 8, 2022, https://www.worldbank.org/en/country/haiti/overview#~:text=The%20results%20of%20the%20assessment%20of%20the%20effects,in%20damage%20and%20losses%2C%20or%2011%25%20of%20GDP, (last visited Dec. 19, 2022].

[39] Id.

[40] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.

[41] CNN, Haiti government asks for international military assistance, Oct. 7, 2022, https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html (last viewed Dec. 17, 2022].

[42] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation (July 7, 2021). https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.

[43] See International Crisis Group, New Gang Battle Lines Scar Haiti as Political Deadlock Persists (July 27, 2022), https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists; Office of the High Commissioner for Human Rights, Sexual violence in Port-au-Prince: A weapon used by gangs to instill

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices **1247**

violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[44] Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.[45]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[46]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[47] This Haitian diaspora in South America developed after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people. Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[48] Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free. As of 2020, there were an estimated 143,000 Haitians living in Brazil and 180,000 in Chile.[49] However, over the

past two years, declining economic conditions in Chile and Brazil, which were exacerbated by the COVID–19 pandemic, have led many Haitian migrants to leave those countries to head north.[50]

As noted above, UNHCR estimates 62,680 Haitians were in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[51] Many thousands more are between Mexico and South America.

### ii. Return Limitations

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by air or maritime repatriations by sea. For example, in early September 2022, destabilizing events, including gangs seizing control of a key fuel terminal, led to a pause in repatriation flights. The ability of our on-the-ground partners to help receive migrants that provide services for individuals returned to Haiti is evaluated on a day-to-day basis.[52] The ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly affected by the limitation on returns. Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources. U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.

### 4. Impact on DHS Resources and Operations

#### i. Impact on DHS Resources

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a

combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[53]

#### ii. Impact on Border Operations

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[54] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[55] All three sectors remain at risk of operating, or are currently operating, over capacity.[56] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014–FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[57]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such

---

*fear* (Oct. 14, 2022), *https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear.* Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[44] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[45] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6* (Nov. 17, 2022), *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[46] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html,* (last viewed Dec. 17, 2022).

[47] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas;* Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[48] *Id.*

[49] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* (May 2021), *https://www.migrationpolicy.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/,* (last visited Dec. 19, 2022).

[50] *Id.* Migration Policy Institute.

[51] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[52] International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). *https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.*

[53] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[54] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[55] *Id.*

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] *Id.*

**1248**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[58]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

### iii. Impact on Maritime Operations

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[59] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[60] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast Guard deployed three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[61] USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[62] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

### II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [63] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[64] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[65] DHS may terminate parole in its discretion at any time.[66] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[67]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Haitian nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [68]

#### A. Significant Public Benefit

The parole of Haitian nationals and their immediate family members under this process—which imposes new consequences for Haitians who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

#### 1. Enhance Border Security by Reducing Irregular Migration of Haitian Nationals

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have

---

[58] Data from SBCC, as of December 11, 2022.

[59] OIS analysis of USCG data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[60] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[61] *Id.*

[62] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

[63] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[64] INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[65] *See* 8 CFR 212.5(c).

[66] *See* 8 CFR 212.5(e).

[67] *See* 8 CFR 274a.12(c)(11).

[68] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-

travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs, we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Haitian nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly

directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have provided services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[69] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[70] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[71] As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Haitian nationals into an orderly and lawful process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide

---

[69] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.*

[70] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.*

[71] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.*

basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[72]

In FY 2022, more than 750 migrants died attempting to enter the United States,[73] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[74] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[75] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[76] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[77] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[78] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of

death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[79] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[80]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of

the capsized vessel and survivor.[81] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[82] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off of the Florida Keys.[83] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[84]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[85] the Collaborative Migration Management Strategy (CMMS);[86] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[87] The

---

[72] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[73] CNN, First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[74] DHS, CBP, Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.

[75] CNN, First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[76] DHS, CBP, Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.

[77] The Guardian, Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream' (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[78] DHS, CBP, Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.

[79] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, DHS Plan for Southwest Border Security and Preparedness (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[80] Reuters, Migrant Truck Crashes in Mexico Killing 54 (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[81] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.

[82] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.

[83] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys, Nov. 22, 2022, https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.

[84] Id.

[85] National Security Council, Root Causes of Migration in Central America (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[86] National Security Council, Collaborative Migration Management Strategy (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.

[87] Id.; The White House, Los Angeles Declaration on Migration and Protection (LA Declaration) (June 10, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    **1251**

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[88] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [89]

In June 2022, the U.S. Government announced the planned resumption of operations under the Haitian Family Reunification Parole (HFRP) program.[90] Approved HFRP beneficiaries enter the United States as parolees but are eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State temporarily reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility criteria, coupled with the operational challenges posed by the security situation in Haiti and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process will help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while

we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries.

The process also will respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID–19 pandemic.[91] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[92]

Along with the Venezuelan process, this new process will add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Haiti will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to return or remove to

Mexico Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermath of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[93] This process provides a safe mechanism for Haitian nationals who

---

[88] Id.

[89] Id.

[90] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (June 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

[91] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border, (last visited Dec. 19, 2022).

[92] Reuters, *Thousands of mostly Haitian Migrants Traverse Panama on Way to United States*, Sept. 26, 2021, https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/, (last viewed Dec. 19, 2021).

[93] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12182.

seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea.

## IV. Eligibility

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Haitian national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Haiti or be a non-Haitian immediate family member [81] and traveling with a Haitian principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public

benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Haitian national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Haiti, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[94]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order; [83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

#### Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Haitians' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

#### Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

#### Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

#### Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel

---

[94] This limitation does not apply to immediate family members traveling with a Haitian national.

via commercial air to an interior POE of the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

D. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Haitians at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the

Federal Register) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

V. Regulatory Requirements

A. Administrative Procedure Act

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

First, the Department is merely adopting a general statement of policy,[95] i.e., a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [96] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[97] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [98] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[99] This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Haitian nationals to enter the United States. The United States will only implement the

new parole process while able to return or remove Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Haitian nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Haiti to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs

---

[85] See Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979)).

[95] 5 U.S.C. 553(b)(A); id. 553(d)(2).

[96] See Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979)).

[97] 5 U.S.C. 553(a)(1).

[98] Mast Indus. v. Regan, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[99] See, e.g., Rajah v. Mukasey, 544 F.3d 427, 437 (2d Cir. 2008).

**1254**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market

dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in

response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[109] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[110] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[111] DHS concluded that "a surge could result in significant loss of human life."[112]

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

# EXHIBIT 25

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

Case: 25-1384    Document: 00118298863    Page: 153    Date Filed: 06/11/2025    Entry ID: 6728192
Case 1:25-cv-10495-IT    Document 24-25    Filed 03/17/25    Page 2 of 13

Federal Register / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices    1255

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

**1256**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek

a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole

period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

### B. Conditions at the Border

#### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices        **1257**

200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1990s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and— following a steep drop in the first months of the COVID–19 pandemic— continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for non-economic reasons.[18]

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system, and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

---

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf*, (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7, 2022 (last viewed Dec. 8, 2022).

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), *https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5*.

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, *https://news.un.org/en/story/2022/03/1114792*, Mar. 25, 2022 (last viewed Dec. 9, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, *https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/*, Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, *https://www.unhcr.org/en/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html*, Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

**1258**    **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime

and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that ''[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary.''[31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive ''has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . supported by the other branches of government.''[32] The IACHR reported in June 2022 that ''the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua,''[33] and as of late September, ''more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled'' since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua ''is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation,

intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists.''[35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern ''about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country.''[37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop ''persisted in destabilizing and provocative activities.''[38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, ''over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily,'' and ''17 percent of children aged under five suffer from chronic malnutrition.''[41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] Id.

[26] Id.

[27] Id.; OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, With Turmoil at Home, More Nicaraguans Flee to the U.S. (July 29, 2021), https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.

[29] Los Angeles Times, Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections (Nov. 8, 2022), https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.

[30] Reuters, Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President (Nov. 3, 2021), https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), Human Rights Situation in Nicaragua 2 (Sept. 2, 2022), https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.

[32] Inter-American Commission On Human Rights, Nicaragua: Concentration of Power and the Undermining of the Rule of Law, OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.

[33] Inter-American Commission On Human Rights, Annual Report 2021, Chapter IV.B—Nicaragua, 775, (June 2, 2022), https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257.

[35] Nicaragua Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.

[36] IACHR, Annual Report 2021, Chapter IV.B—Nicaragua, 775 (June 2, 2022), https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

[37] Inter-American Commission On Human Rights, IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua (Dec. 20, 2021), http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.

[38] The Washington Post, Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent (Aug. 19, 2022), https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.

[39] Politico, Sandinistas Complete Their Political Domination of Nicaragua (Nov. 8, 2022), https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.

[40] The World Bank, GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false (last visited Dec. 6, 2022).

[41] World Food Programme, Nicaragua, https://www.wfp.org/countries/nicaragua (last visited: Sept. 26, 2022).

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices     **1259**

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021,

DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is

geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central De Nicaragua, Remesas Por País de Origen, *https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm* (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, *https://www.unhcr.org/en-us/displacement-in-central-america.html*.

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, *https://www.unhcr.org/62a9d1494/global-trends-report-2021.*

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] *Id.*, and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

Appx-0153

significant public benefit." [52] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States. [53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. [54] Individuals may be granted advance authorization to travel to the United States to seek parole. [55] DHS may terminate parole in its discretion at any time. [56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization. [57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [58]

#### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated

reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures,

withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[54] *Id.*

[55] *See* 8 CFR 212.5(f).

[56] *See* 8 CFR 212.5(e).

[57] *See* 8 CFR 274a.12(c)(11).

[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

Appx-0154

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will

eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants

rescued by CBP in FY 2022 (almost 19,000 rescues)[66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[74] the Collaborative Migration Management Strategy (CMMS);[75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in

Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R*; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X*.

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42*.

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery*.

[76] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[77] *Id.*
[78] *Id.*

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Nicaragua or be a non-Nicaraguan immediate family member[81] and traveling with a Nicaraguan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

#### Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

#### Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

#### Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.*

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

**1264**   **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to

applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the process at any point. The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

Appx-0158

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United

States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as

detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on

Social Media, *https:// www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:**
Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Cubans**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*
[102] *Id.*
[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

# EXHIBIT 36

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

*Plaintiffs*,

– *versus* –

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

*Defendants.*

No: 1:25-cv-10495-IT

**DECLARATION OF ESTHER H. SUNG IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION AND STAY**

    1.    My name is Esther H. Sung, I am over the age of 18, and my business address is P.O. Box 27280, Los Angeles, CA 90027.

    2.    I am the legal director of Justice Action Center, counsel of record for the Plaintiffs in the above-captioned action. I am a member in good standing of the State Bar of California and I have been admitted *pro hac vice* in this action.

    3.    I respectfully submit this declaration in connection with Plaintiffs' Motion for Preliminary Injunction and Stay ("Motion.").

    4.    Attached as **Exhibit 37** to the Index of Exhibits is a compilation of true and correct copies of the legislative amendments, in chronological order as enacted, to the parole authority codified at 8 U.S.C. §1182(d)(5).

    5.    Attached as **Exhibit 38** is a true and correct copy of a page from the CATO Institute's website, dated July 27, 2023, titled "126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders." The document is available at

https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders.

6.      Attached as **Exhibit 39** is a true and correct copy of the **Declaration of Yael Schacher**, dated June 19, 2023. Ms. Schacher is a historian who focuses "on the relationship between foreign policy and migration policy, particularly as it relates to humanitarian protection," and she has "conducted extensive archival research on the Executive branch's use of the statutory parole authority." Schacher Decl. ¶ 3. Ms. Schacher's expert report—which "explain[s] and summarize[s] the legislative and administrative history of parole programs under 8 U.S.C. § 1182(d)(5), with particular focus on the programmatic use of parole, including after the statute was revised in 1980 and 1996, and how the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole processes compare to past parole programs," *id.* ¶ 5—was submitted by Intervenor Defendants as part of the trial record in Texas's lawsuit challenging as unlawful the CHNV parole processes, *Texas v. DHS*, No. 6:23cv7 (S.D. Tex. filed Jan. 23, 2023). I and other attorneys at Justice Action Center represent the Intervenor Defendants in that case.

7.      Attached as **Exhibit 40** is a true and correct copy of the fact **Declaration of Eric Schwartz**, dated June 19, 2023, which was also submitted by Intervenor Defendants in the *Texas* case. From 1993 to 2001, Mr. Schwartz served in the White House on the National Security Council, and then from 2009 to 2011 as the Assistant Secretary of State for the Bureau of Population, Refugees, and Migration. His declaration discusses, on the basis of his own personal knowledge, how the parole authority was used by the Executive to address specific foreign policy, migration, and humanitarian issues challenges.

8.      Attached as **Exhibit 41** is a true and correct copy of the fact **Declaration of Morton H. Halperin**, dated June 16, 2023, which was also submitted by Intervenor Defendants in the *Texas*

Appx-0163

case. Mr. Halperin was a national security advisor in the Johnson, Nixon, and Clinton Administrations, and his declaration—which is supported by primary source documents attached to it—discusses how he saw the Executive use the parole authority to address the Cuban migration crisis of the 1990s.

9.    Attached as **Exhibit 42** is a true and correct copy of the fact **Declaration of Debra Rogers**, dated October 19, 2024. Ms. Rogers had a 38-year career in public service that started with the Immigration and Naturalization Service (INS) and continued with DHS upon its creation in 2003 through 2023. Ms. Rogers' declaration discusses her intimate involvement in the development of the Military Parole-In-Place process and the various reasons why DHS issued the guidance creating it. Ms. Rogers' declaration was submitted with an amicus brief by individuals who were denied intervention in a different Texas's lawsuit, this one challenging as unlawful the Keeping Families Together parole processes. *Texas v. DHS*, No. 6:24cv306 (E.D. Tex. filed August 23, 2024). I and other attorneys at Justice Action Center represented the individuals who filed the amicus brief with Ms. Rogers' declaration after unsuccessfully seeking intervention as defendants.

10.    Attached as **Exhibit 43** is a true and correct copy of a June 15, 2001 memorandum from Bo Cooper, General Counsel of the U.S. Immigration and Naturalization Service, addressed to Jeffrey L. Weiss, the Director of the Office for International Affairs, providing a "Legal Opinion" on the "Parole of Individuals From the Former Soviet Union Who are Denied Refugee Status." The memorandum, which was issued shortly after the enactment of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104, 208 Division C., § 602(a), 110 Stat. 3009-546, 3009-689 (1996), examined whether "the Attorney General may continue to parole individuals into the United States from the Former Soviet Union after they are denied refugee status." Acknowledging that through IIRIRA, Congress specified that parole should be granted

"only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," the memorandum concluded that "[d]esignating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case."

11.    Attached as **Exhibit 44** is a true and correct copy of a USCIS webpage providing an "Update on Form I-134A," stating that because of the January 20, 2025 "Securing Our Borders" Executive Order, USCIS "is pausing acceptance of Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, until we review all categorical parole processes as required by that order." Until the release of the "Update on Form I-134A" on January 28, 2025, Form I-13A had been the online application form filed by individuals who wished to sponsor a foreign national for admission to the United States through the U4U and CHNV parole processes.

12.    Attached as **Exhibit 45** is a true and correct copy of  "Updated Guidance," issued by U.S. Customs and Border Protection, providing guidance to airline carriers and advising that "[c]arriers that transport [individuals] subject to the Presidential Executive Order ["Securing Our Borders"] may be subject to a carrier fine for each [individual] brought to the United States." The Guidance further advised that "impacted programs" subject to the "Securing Our Borders" Executive Order include Uniting for Ukraine; Operation Allies Welcome; Family Reunification Parole; parole for Cubans, Haitians, Nicaraguans, and Venezuelans; and 'Central American Minor [CAM]'." The "Updated Guidance" was first published on X.com by Kathleen Bush-Joseph (@KathleenBus hJo2), *available at* x.com/KathleenBushJo2/status/1887111257725038888.

Appx-0165

13.     Attached as **Exhibit 46** is a true and correct copy of a communication sent by USCIS to a CHNV parole beneficiary, advising CHNV parole beneficiaries that "USCIS has placed an administrative hold on all benefit requests filed by [individuals] who are or were paroled into the United States under the U4U, CHNV, or FRP processes, pending the completion of the required screening and vetting to identify any fraud, public safety, or national security concerns." We received a copy of this USCIS communication from the parole beneficiary's attorney.

14.     Attached as **Exhibit 47** is a true and correct copy of a communication sent by USCIS to a U4U parole beneficiary who has applied for TPS, stating that "UCSIS is pausing the processing of any immigration benefit requests filed by or on behalf of [individuals] who were paroled under the U4U, CHNV, or FRP processes . . ." We received a copy of this USCIS communication from the parole beneficiary's attorney.

15.     Attached as **Exhibit 48** is a true and correct copy of a communication, sent on February 28, 2025, from USCIS to a Military Parole in Place sponsor , indicating that "due to the current administration," the MPIP sponsor's application "is now on hold until further notice." We received a copy of this USCIS communication from the sponsor's attorney.

16.     Attached as **Exhibit 49** is a true and correct copy of a communication, dated March 5, 2025, from a USCIS Immigration Services Officer to a U4U parole beneficiary, stating that due to the January 20, 2025 Executive Order entitled "Security Our Borders," USCIS "has placed an administrative hold on all benefit requests filed by [individuals] who are or were paroled into the United States under the U4U, CHNV, or FRP processes . . ." We received a copy of this USCIS communication from the parole beneficiary's attorney.

17.     Attached as **Exhibit 50** is a true and correct copy of USCIS's webpage regarding the G-1055, its fee schedule, available at https://www.uscis.gov/g-1055.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on this 17th day of March, 2025.

/s/ Esther H. Sung
Esther H. Sung
California Bar No. 255962*
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276
esther.sung@justiceactioncenter.org

* admitted *pro hac vice*

6

# EXHIBIT 37

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

### History of INA § 212(d)(5), 8 U.S.C. § 1182(d)(5)

**As enacted in 1952:**

*The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*

**As amended in 1980 (additions in blue):**

(A)  *The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*

(B)  *The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207 [of the INA, 8 U.S.C. § 1357].*

**As amended in 1990 (addition in blue):**

(A)  *The Attorney General may, except as provided in subparagraph (B) or in section 214(f) [of the INA, 8 U.S.C. § 1184(f)], in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*

(B)  *The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.*

**As amended in 1996 (deletion in ~~red~~, addition in blue):**

(A)  *The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe ~~for emergent reasons or for reasons deemed strictly in the public interest~~ only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*

(B)  *The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.*

# EXHIBIT 38

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

Case 1:25-cv-10495 Document 21 Filed 03/14/25 Page 2 of 2

Table 1 Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act - Infogram

Table 1

## Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act

| Number | Date | Order | Adjustment of Status | Other Act* |
|---|---|---|---|---|
| 1 | 11/12/54 | Parole from detention | | |
| 2 | 11/13/56 | Setting a limit of 5,000 parolees from Hungary | P.L. 85-559 | |
| 3 | 12/1/56 | Setting a limit of 15,000 parolees from Hungary | P.L. 85-559 | |
| 4 | 1/2/57 | Removing the limit on parolees from Hungary | P.L. 85-559 | |
| 5 | 12/6/57 | Pre-examination parole | | |
| 6 | 12/6/57 | Parole of crewmembers | | P.L. 104-208 |
| 7 | 1/8/58 | Parole at ports | | |
| 8 | 1/1/59 | Paroling small numbers of Cubans | P.L. 89-732 | |
| 9 | 1/1/62 | Paroling Cubans, not referring to hearings | P.L. 89-732 | |
| 10 | 1/27/60 | Guam Parolee Defense program | | |
| 11 | 7/14/60 | Fair Share Act parole | P.L. 86-648 | |
| 12 | 12/8/61 | Parole of crewmembers expanded | | P.L. 104-208 |
| 13 | 5/23/62 | Hong Kong Chinese parole | P.L. 95-412 | |
| 14 | 11/15/62 | Guam Reconstruction and Rehabilitation Parole Program | | |
| 15 | 3/15/63 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 16 | 5/10/63 | Russian Orthodox Old Believer parole | P.L. 95-412 | |
| 17 | 11/15/63 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 18 | 3/15/64 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 19 | 11/15/64 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 20 | 3/15/65 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 21 | 11/6/65 | Cuba Airlift Parole | P.L. 89-732 | |
| 22 | 11/15/65 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 23 | 3/15/66 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 24 | 11/15/66 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 25 | 3/22/67 | Parole of crewmembers expanded | | P.L. 104-208 |
| 26 | 5/15/67 | Guam Reconstruction and Rehabilitation Parole Program extension | | |

Sources: See links and text above

*Note: Other acts refer to congressional references to the use of parole, extension of benefits to parolees, extensions of deadlines to apply for adjustment of status, etc.

Table 1

## Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act

| Number | Date | Order | Adjustment of Status | Other Act* |
|--------|------|-------|---------------------|-----------|
| 27 | 11/15/67 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 28 | 3/15/68 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 29 | 11/15/68 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 30 | 3/15/69 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 31 | 11/15/69 | Guam Reconstruction and Rehabilitation Parole Program extension | | |
| 32 | 1/2/70 | Czechoslovak parole | P.L. 95-412 | |
| 33 | 10/1/71 | Soviet Union minority religious groups | P.L. 95-412 | |
| 34 | 12/11/71 | Advance parole | | P.L. 96-422 |
| 35 | 9/30/72 | Ugandan Asians | P.L. 95-412 | |
| 36 | 10/26/73 | Cuban third country parole | P.L. 89-732 | |
| 37 | 3/25/75 | Vietnamese orphans | P.L. 95–145 | |
| 38 | 4/18/75 | Vietnamese refugees | P.L. 95–145 | |
| 39 | 6/12/75 | Detained Chilean dissidents | P.L. 95-412 | |
| 40 | 8/1/75 | Vietnamese and Cambodian refugees | P.L. 95–145 | |
| 41 | 5/6/76 | 11,000 refugees from Vietnam, Cambodia, or Laos | P.L. 95–145 | |
| 42 | 10/27/76 | South Americans | P.L. 95-412 | |
| 43 | 8/11/77 | 15,000 refugees from Vietnam, Cambodia, or Laos | P.L. 95–145 | |
| 44 | 1/25/78 | 7,000 "boat cases" from Vietnam | P.L. 95–145 | |
| 45 | 6/14/78 | South Americans | P.L. 95-412 | |
| 46 | 6/14/78 | Long Range Parole program for 25,000 from Vietnam, Cambodia, or Laos | P.L. 95–145 | |
| 47 | 12/1/78 | Soviet Jews and Romanians | P.L. 95-412 | |
| 48 | 12/5/78 | Long Range Parole program increased to 46,875 | P.L. 95–145 | |
| 49 | 12/6/78 | 1,000 Lebanonese refugees | P.L. 95-412 | |
| 50 | 12/6/78 | 3,500 Cuban political prisoners and family | P.L. 95-412 | |
| 51 | 4/10/79 | Asylum Parole Regulation | P.L. 96-212 | |
| 52 | 4/16/79 | Iranian parole | P.L. 95-412 | |
| 53 | 4/13/79 | 40,000 refugees from Vietnam, Cambodia, or Laos | P.L. 95–145 | |
| 54 | 10/16/79 | 3,000 refugees from Eastern Europe | P.L. 95-412 | |
| 55 | 10/16/79 | 14,000 refugees from Vietnam, Cambodia, or Laos per month | P.L. 95-412 | |

Sources: See links and text above

*Note: Other acts refer to congressional references to the use of parole, extension of benefits to parolees, extensions of deadlines to apply for adjustment of status, etc.

Table 1

## Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act

| Number | Date | Order | Adjustment of Status | Other Act* |
|--------|------|-------|----------------------|------------|
| 56 | 12/15/79 | 3,000 refugees from Eastern Europe | P.L. 95-412 | |
| 57 | 12/15/79 | 14,000 refugees from Vietnam, Cambodia, or Laos per month | P.L. 95-412 | |
| 58 | 6/20/80 | Cuban/Haitian entrant parole | P.L. 99-603 | P.L. 96-422 |
| 59 | 10/21/80 | Cuban/Haitian entrant parole extended | P.L. 99-603 | P.L. 96-422 |
| 60 | 12/14/84 | Cuban political prisoner parole | P.L. 89-732 | |
| 61 | 5/1/86 | Border Khmer parole | P.L. 101-167 | |
| 62 | 12/28/87 | Parole of Mariel boatlift Cubans detained since the boatlift ended | P.L. 89-732 | |
| 63 | 12/8/88 | 2,000 Soviets per month who were denied refugee status | P.L. 101-167 | P.L. 102-391 |
| 64 | 2/1/89 | Orderly Departure Vietnam parole | P.L. 101-167 | P.L. 106–429 |
| 65 | 11/21/89 | Hungarian and Polish parole | P.L. 104–208 | |
| 66 | 6/12/05 | Undated 1990s parole processes | | |
| 67 | 4/11/90 | Chinese parole from detention | P.L. 102-404 | |
| 68 | 7/27/90 | Parole of crewmembers expanded | | P.L. 104-208 |
| 69 | 5/1/90 | Pilot parole program from detention for asylum seekers | | |
| 70 | 1/31/91 | Salvadorans and Guatemalans, ABC settlement asylum parole | P.L. 105-100 | |
| 71 | 9/30/91 | Haitian Parole | P.L. 105-277 | |
| 72 | 4/20/92 | Parole program from detention for asylum seekers | | |
| 73 | 9/9/94 | Cuban migration accord first lottery | P.L. 89-732 | |
| 74 | 10/14/94 | Cuban Guantanamo parole of certain children and elderly | P.L. 89-732 | |
| 75 | 11/25/94 | Adoptee parole | P.L. 104-51 | |
| 76 | 12/2/94 | Cuban Guantanamo parole of all children | P.L. 89-732 | |
| 77 | 5/2/95 | Cuban Guantanamo parole of everyone else | P.L. 89-732 | |
| 78 | 5/2/95 | Wet Foot, Dry Foot Cuban parole | | |
| 79 | 3/15/96 | Cuban migration accord second lottery | P.L. 89-732 | |
| 80 | 9/17/96 | Iraqi parole | P.L. 105–277 | |
| 81 | 3/6/97 | Re-establishing parole categories under new parole statute | | |
| 82 | 3/6/97 | Clarifying and extending parole for crew members | | |
| 83 | 6/15/98 | Cuban migration accord third lottery | P.L. 89-732 | |
| 84 | 10/7/98 | Presumption in favor of paroling asylum seekers | | |

Sources: See links and text above

*Note: Other acts refer to congressional references to the use of parole, extension of benefits to parolees, extensions of deadlines to apply for adjustment of status, etc.

Table 1

## Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act

| Number | Date | Order | Adjustment of Status | Other Act* |
|--------|------|-------|---------------------|-----------|
| 85 | 12/21/00 | Parole of people ordered removed who could not be removed | | |
| 86 | 4/6/04 | Crew lightering parole | | P.L. 104-208 |
| 87 | 8/11/06 | Cuban Medical Professional Parole program | P.L. 89-732 | |
| 88 | 6/21/07 | Parole in Place for family of U.S. veterans | | P.L. 116–92 |
| 89 | 8/6/07 | Transferring responsibility for 2 parole programs to USCIS | | |
| 90 | 11/21/07 | Cuban Family Reunification Parole program | P.L. 89-732 | |
| 91 | 9/1/08 | Re-establishing various parole categories and agency responsibility | | |
| 92 | 12/8/09 | Reinstating the presumption in favor of asylum parole | | |
| 93 | 1/13/10 | Haitian parole | | |
| 94 | 1/18/10 | Haitian orphan parole | P.L. 111-293 | |
| 95 | 1/25/10 | Haitian advance parole extension | | |
| 96 | 11/15/13 | Parole in Place for family of U.S. veterans formalized and expanded | | P.L. 116–92 |
| 97 | 11/14/14 | Central American Minors program | | |
| 98 | 12/18/14 | Haitian Family Reunification Parole | | |
| 99 | 5/9/16 | Filipino World War II Veterans Parole | | |
| 100 | 6/26/16 | Central American Minors program expansion | | |
| 101 | 11/23/16 | Parole in Place for family of U.S. veterans expanded again | | P.L. 116–92 |
| 102 | 1/17/17 | International Entrepreneur Rule | | |
| 103 | 3/10/21 | Partial reopening of the Central American Minors program | | |
| 104 | 6/15/21 | Expansion of the Central American Minors program | | |
| 105 | 7/31/21 | Parole from Border Patrol detention | | |
| 106 | 8/23/21 | Afghan evacuation parole | | P.L. 117–43 |
| 107 | 10/12/21 | Haitian Family Reunification Parole restart | | |
| 108 | 10/12/21 | Filipino World War II Veterans Parole restart | | |
| 109 | 11/2/21 | Parole + Alternatives to Detention from Border Patrol for families | | |
| 110 | 3/11/22 | Ukrainian port of entry parole | | P.L. 117–128 |
| 111 | 3/29/22 | Asylum Parole Rule | | |
| 112 | 4/27/22 | Haitian family reunion parole | | P.L. 117– |

Sources: See links and text above
*Note: Other acts refer to congressional references to the use of parole, extension of benefits to parolees, extensions of deadlines to apply for adjustment of status, etc.

Table 1

## Programmatic or categorical parole orders under section 212(d)(5) of the Immigration and Nationality Act

| Number | Date | Order | Adjustment of Status | Other Act* |
|--------|------|-------|---------------------|------------|
| 99 | 5/9/16 | Filipino World War II Veterans Parole | | |
| 100 | 6/26/16 | Central American Minors program expansion | | |
| 101 | 11/23/16 | Parole in Place for family of U.S. veterans expanded again | | P.L. 116–92 |
| 102 | 1/17/17 | International Entrepreneur Rule | | |
| 103 | 3/10/21 | Partial reopening of the Central American Minors program | | |
| 104 | 6/15/21 | Expansion of the Central American Minors program | | |
| 105 | 7/31/21 | Parole from Border Patrol detention | | |
| 106 | 8/23/21 | Afghan evacuation parole | | P.L. 117–43 |
| 107 | 10/12/21 | Haitian Family Reunification Parole restart | | |
| 108 | 10/12/21 | Filipino World War II Veterans Parole restart | | |
| 109 | 11/2/21 | Parole + Alternatives to Detention from Border Patrol for families | | |
| 110 | 3/11/22 | Ukrainian port of entry parole | | P.L. 117–128 |
| 111 | 3/29/22 | Asylum Parole Rule | | |
| 112 | 4/27/22 | Uniting for Ukraine parole | | P.L. 117–128 |
| 113 | 5/16/22 | Cuban Family Reunification Parole program restart | P.L. 89-732 | |
| 114 | 7/18/22 | Parole + Alternatives to Detention from Border Patrol for all | | |
| 115 | 10/19/22 | Venezuelan parole process | | |
| 116 | 1/9/23 | Venezuelan parole process cap increased | | |
| 117 | 1/9/23 | Haitian parole process | | |
| 118 | 1/9/23 | Nicaraguan parole process | | |
| 119 | 1/9/23 | Cuban parole process | P.L. 89-732 | |
| 120 | 3/13/23 | Ukrainian port of entry parole re-parole extension | | P.L. 117–128 |
| 121 | 4/11/23 | Further expansion of the Central American Minors program | | |
| 122 | 6/8/23 | Afghan parole extension | | P.L. 117–43 |
| 123 | 7/10/23 | Colombian family reunification parole process | | |
| 124 | 7/10/23 | Salvadoran family reunification parole process | | |
| 125 | 7/10/23 | Guatemalan family reunification parole process | | |
| 126 | 7/10/23 | Honduran family reunification parole process | | |

Sources: See links and text above

*Note: Other acts refer to congressional references to the use of parole, extension of benefits to parolees, extensions of deadlines to apply for adjustment of status, etc.

# EXHIBIT 39

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton |
| *Plaintiffs*, | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § § § § § § § § § § § § § § § | **EXPERT DECLARATION OF YAEL SCHACHER** |
| *Defendants*, and | § § § | |
| VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; and GERMAN CADENAS, | § § § | |
| *Intervenors*. | § § § | |

## EXPERT DECLARATION OF YAEL SCHACHER

I, YAEL SCHACHER, hereby declare pursuant to 28 U.S.C. § 1746:

### BACKGROUND

1.      I am an historian of immigration to the United States and I currently serve as the Director for the Americas and Europe at Refugees International, a non-partisan, non-profit organization founded in 1979.

2.      I have published peer reviewed academic articles on immigration law and policy in, for example, the *Journal of American History* and *Whose America?: U.S. Immigration Policy Since 1980* (University of Illinois Press). A list of all publications I have authored in the past ten years is attached to this declaration. I have also taught courses on United States immigration history at the University of Connecticut and at Georgetown University. I have not testified as an expert witness in the last four years.

3.      My academic focus is on the relationship between foreign policy and migration policy, particularly as it relates to humanitarian protection. As part of my doctoral (Harvard University Ph.D., 2016) and postdoctoral (University of Texas at Austin, 2017-2018) work, I have conducted extensive archival research on the Executive branch's use of the statutory parole authority.

4.      My archival research has focused particularly on parole programs whereby the Executive defines a group (typically by nationality plus additional factors) whose entry on parole may be justified by humanitarian and/or public benefit reasons, with applications of individuals therein considered on a case-by-case basis. I refer to this below as "programmatic" uses of parole.

5.      I have been retained by counsel for the Intervenor Defendants to explain and summarize the legislative and administrative history of parole programs under 8 U.S.C. § 1182(d)(5), with particular focus on the programmatic use of parole, including after the statute was revised in 1980 and 1996, and how the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole processes compare to past parole programs.

6.      In preparing this declaration I reviewed the following documents:

a.  Plaintiffs' complaint

b.  Federal Register Notices for the CHNV, U4U, and other past parole programs

c.  DHS policy documents about parole programs

d.  Congressional hearings and reports relating to parole

e.  Documents compiled in *Foreign Relations of the United States*

f.  State and Justice Department (including Immigration and Naturalization Service) records at the National Archives relating to parole

g.  Documents from the USCIS Historical Library relating to parole

h.  Documents from papers of members of Congress and Presidential libraries

i.  Articles and books about U.S. parole and refugee programs

### SUMMARY OF OPINIONS

7.      Overall, my research shows that parole has for many decades been an important, flexible, and frequently used tool of successive administrations of both political parties to facilitate entry into the United States of large groups of non-citizens.

8.      Congress has frequently responded to parole programs by seeming to approve of the Executive's programmatic use of parole by, for example, extending immigration and other benefits to individuals who were or will be paroled through a program; and by declining

to amend the parole provision to limit the use of parole to narrow, highly prescriptive circumstances that likely would significantly constrain its programmatic use.

9.      Most recently, Congress amended the parole statute in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 to state that parole may be granted "only on a case-by-case basis." Long before 1996, however, the Executive made case by case determinations for parole even in the context of parole programs. The executive specified classes of people to apply for parole and then assessed each applicant individually. The addition of the "case-by-case" language thus did not materially change the way Executives have used parole programmatically. Since 1996, just as before, Congress has several times extended benefits to large numbers of parolees who have (or will) come to the United States through parole programs.

10.      Although the specific humanitarian and/or public benefit justification has varied, programmatic uses of parole have frequently been heavily influenced by U.S. foreign policy and humanitarian objectives. Especially since 1980, these have prominently included (though have not been limited to) deterring dangerous irregular migration, promoting the reception and protection of migrants by other countries, and family unification.

11.      The Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) Parole Processes—as well as the ongoing Uniting for Ukraine Parole Process, on which they were modelled, and through which the Biden Administration has paroled more than 120,000 Ukrainians—are well within this historical tradition of the programmatic use of parole.

**Congress and the Executive on Parole**

12.      Section 212(d)(5) of the 1952 Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1182(d)(5), established that "the Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent

reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Congress did not define the terms "emergent" or "public interest" reasons and did not modify the wording of the parole provision for 28 years. Congress did, however, extend benefits to noncitizens who came in through multiple different parole programs, such as the ability to become lawful permanent residents (e.g., "green card" holders) who would eventually be eligible to naturalize.

13.     For example, in late 1956 and early 1957, President Dwight D. Eisenhower directed his Attorney General to parole about 32,000 Hungarian nationals who had fled Soviet repression of the Hungarian Revolution. Each parolee was personally screened before entry to the United States. In 1958, Congress enacted legislation (Public Law 85-559) enabling Hungarian parolees to become lawful permanent residents.

14.     Parole of Cubans into the United States began in 1961, with almost 100,000 Cubans paroled into the United States in just a three-year period, from 1961 to 1963.

15.     In 1965, members of Congress expressed awareness of (and some concern about) large parole programs, but in amending the INA that year, Congress made no changes to the parole statute. Overall, between 1965 and 1975, about 310,000 Cubans—coming directly from Cuba or from third countries—were paroled into the United States after individual screening.

16.     In 1966, Congress enacted the Cuban Adjustment Act (CAA), which granted past and future Cuban parolees the ability to adjust status to lawful permanent residence.

17.     In the midst of a complicated Vietnamese displacement crisis further discussed below, Congress added a restriction to the parole authority in the Refugee Act of 1980 (Public Law § 203(f)): "The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest

with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

18.    Beginning in 1988, the Attorney General authorized the parole of people from Vietnam, Laos or Cambodia and the Soviet Union who had been *denied* refugee status. Congress, in 1989, passed a law (Public Law 101-167 § 599E) providing that such parolees could adjust their status to lawful permanent resident after one year. The same law specified that certain categories of people from the Soviet Union, Vietnam, Laos and Cambodia could be granted refugee status on a lower evidentiary burden. The latter is referred to as the "Lautenberg amendment."

19.    Some in Congress became concerned that parole was being used to allow large groups of noncitizens who may not have had a path to permanent legal status to remain in the United States for long periods. Congress addressed this concern in IIRIRA in a provision that limits immigration because of the presence of long-term parolees. Section 603 of the IIRIRA requires that nearly all long-term parolees who have yet to become legal permanent residents be counted against annual numerical caps on family-sponsored immigration, thereby diminishing the available number of family-based visas from a particular country by the same number of its nationals who are long-term parolees in the United States.

20.    IIRIRA also mandated annual reporting to Congress on the Executive's use of parole and replaced the "emergent reasons or for reasons deemed strictly in the public interest" language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." As before, Congress left those terms undefined and therefore up to interpretation by the executive.

21.    In contrast, an alternative proposal that the House Judiciary Committee considered would have defined those terms with great particularity. *See* H. Rep. 104-469 (1996) at

77-78. That proposal defined the "urgent humanitarian reasons" basis for parole to refer only to certain medical emergencies (i.e., the parolee donating an organ or visiting a dying relative) and defined the "strictly in the public interest" basis as applying only where the parolee assisted the U.S. Government in a law enforcement activity or was to be criminally prosecuted. It also would have explicitly prohibited using parole for noncitizens "who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply." To explain the proposed extensive amendments to the parole statute, the report criticized the programmatic use of parole, including the Clinton Administration's September 1994 migration agreement with Cuba discussed more below. This House Judiciary Committee report's parole amendment proposal *did not become law*; the provisions defining and restricting when parole could be used were removed from the legislation even before the bill was considered by the full House.

22.     IIRIRA also amended the parole statute to specify that parole must be granted "only on a case-by-case basis." As described above, it had long been understood by the Executive that, even when used programmatically, the statutory parole authority required assessing individual applicants for parole.

23.     There were times before the passage of IIRIRA when this individualized assessment was explicitly referred to as "case by case." For example, a September 30, 1994, INS Focus pamphlet from the Office of the Commissioner of the Immigration and Naturalization Service (INS) explained that "the INS authorizes parole, under delegated authority from the Attorney General, on a case-by-case basis." A September 1995 GAO report on the parole of Cubans in 1994 (available at www.gao.gov/assets/nsiad-95-211.pdf) likewise referred to it as a "case-by-case" process.

24.     In the nearly 30 years since the parole authority was amended to include the "case-by-case" language, the Executive and Congress have continued to indicate that the statute permits programmatic uses of the parole.

25.     In June 2001, for example, INS General Counsel Bo Cooper issued a legal opinion on the continued INS authority to parole individuals from the former Soviet Union who are denied refugee status (I understand that this opinion is in the administrative records for the CHNV litigation). Cooper concluded:

> "Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with the 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case. . . . So long as individual consideration is given to parole decisions, the Service's determination—that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg amendment-—does not violate the case-by-case requirement."

26.     After the passage of IIRIRA, the Executive has continued to use parole programmatically, where individual members of a group or class defined by agency policy to be considered on a case-by-case basis. Such programs include, for example, the Central American Minors Program whereby at-risk children from El Salvador, Honduras, and Guatemala are individually considered for parole if denied refugee status.

27.     Also since the passage of IIRIRA, Congress has taken a number of legislative actions that seem to endorse the programmatic use of parole by the Executive.

28.     For example, in section 1758 of the 2020 National Defense Authorization Act (Public Law 116-92), Congress essentially mandated as a legislative matter a parole program that had been created years earlier by the Executive. Like the Executive-created program, the legislation defined a class (certain family members of those in the military) and then ordered case-by-case consideration of requests for parole of individual members of that class.

29.     In 2021 (Public Law 117-43) and 2022 (Public Law 117-128), Congress extended benefits to Afghans and Ukrainians, respectively, who had already been paroled in through one of the programs created by the Biden Administration, and to certain Afghans and Ukrainians who might be paroled into the United States sometime in the future.

### The Use of Parole as a Tool of Foreign Policy

30.     Regardless of the particular statutory language, administrations have been heavily influenced by matters of foreign policy and diplomatic relations when deciding whether and how to use parole on a programmatic basis.

31.     The Eisenhower administration used parole for tens of thousands of Hungarians, for example, in order to support opponents of communism non-militarily, shore up Cold War alliances (especially with Austria and Yugoslavia, where most Hungarians initially fled), and reassert America's moral leadership by promoting solutions to refugee and migration crises.

32.     In the wake of the passage of the Refugee Act of 1980 and IIRIRA in 1996, parole programs for Vietnamese and Cubans helped achieve important foreign policy objectives, as discussed below. Most prominent among them were promoting orderly (and safe) migration and encouraging other countries to receive migrants as well.

### The Use of Parole from Vietnam

33.     In the wake of the war in Vietnam, the United States made extensive use of its parole authority for twenty five years. Parole was used to effectively control and collaboratively manage irregular migration, to ensure countries of first asylum in Southeast Asia (not signatories to the UN Refugee Convention and Protocol) would shelter refugees, and to ensure Vietnamese of concern to the United States (including Amerasian children and those released from re-education camps) could enter the United States with their relatives.

34.     Congress was well informed of the extensive use of parole authority to achieve these goals and, not only in 1989 (as mentioned above) but several additional times, including in the Indochinese Parole Adjustment Act of 2000, provided for the adjustment to permanent status of Vietnamese paroled into the United States through the late 1990s. As discussed below, the Executive's programmatic use of parole was crucial to achieving long-term foreign policy objectives.

35.     As Congress in 1979 debated the legislation that ultimately became the Refugee Act of 1980, the number of people leaving Vietnam to seek refuge in other countries in the region (i.e., overland to Thailand, by boat to Malaysia) increased dramatically. The Office of the United Nations High Commissioner for Refugees (UNHCR) and Vietnamese officials signed a memorandum of understanding to try to better control migration called the Orderly Departure Program (ODP). At a conference in Geneva in the summer of 1979, the Vietnamese government agreed to stop boats from embarking while the United States (and other nations such as Canada, France, and Australia) agreed to receive individuals directly from Vietnam through ODP. By 1985, more Vietnamese were leaving via the ODP process than were arriving by boat in countries of first asylum in the region thus indicating that the program was successfully working to bring order to Vietnamese migration.

36.     But, in 1986, the Vietnamese government suspended the ODP program, accusing the United States of not following through on its responsibility to process applicants, stating an applicant backlog had developed of thousands of people wishing to unite with family in the United States.

37.     At this time, the United States—to fulfill a law passed by Congress— wanted to process Amerasians in Vietnam for resettlement in the United States. The Vietnamese

government insisted that Amerasians were not refugees but American children, yet most Amerasians in Vietnam were not claimed by American fathers and also had mothers and siblings in Vietnam who needed to be processed with them lest families be separated.

38.    To ensure the continuing cooperation of the Vietnamese government with the ODP (and especially the issuing of exit permits) and release and emigration to the United States of those imprisoned in reeducation camps as a result of their close association with the United States (a population of unanimous concern to the Senate as indicated in Resolution 205 of May 1, 1987) it was crucial to use the parole authority.

39.    Between 1990 and 1995, over 45,000 Vietnamese—mostly family members of Vietnamese ineligible for immigrant visas, former United States government employees and former reeducation prisoners denied refugee status, and accompanying relatives of Amerasians and former prisoners—were paroled into the United States as part of the Orderly Departure Program. In the decade and a half after the passage of the 1980 Refugee Act, the continued use of parole *alongside* refugee resettlement to unite Vietnamese families and allow for the migration of Amerasians and prisoners with their relatives was crucial to the normalization of U.S.-Vietnam relations, especially the United States' decisions to permit international financial institutions to lend to Vietnam in July 1993, lift the embargo in February 1994, and establish formal diplomatic relations in July 1995.

40.    In 1995, first countries of asylum insisted on closing camps of screened-out refugees (i.e., individuals who had been determined *not* to meet the refugee definition) and on pushing back all future Vietnamese boat arrivals. In response, the United States and Vietnam negotiated an agreement called Resettlement Opportunity for Vietnamese Returnees (ROVR). The

program accepted the requirement that all screened-out migrants return to Vietnam but offered returnees one more chance to apply for resettlement to the United States from Vietnam.

41.    The use of parole continued alongside resettlement in the ROVR program; over an eight-month period ending in April 1998, nearly 20 percent of the Vietnamese who came to the United States through ROVR were paroled. The existence of the program prevented forced repatriation in the region and upheld a commitment to resettle families together. Ending the program at the end of the millennium honorably brought to a close a 20-year U.S. engagement on the Vietnamese refugee crisis and paved the way to the U.S. awarding Vietnam most favored nation status in late 2021.

**Parole Programs for Cuban Nationals**

42.    The use of parole to advance important U.S. foreign policy interests, both before and after the 1996 changes to the parole authority, can also be seen in the longstanding and robust use of parole for certain Cuban nationals.

43.    Parole programs for Cubans put in place during the Clinton and George W. Bush administrations were designed to regularize migration, promote family unification, and put pressure on Cuba to promote political and economic reform and transition to democracy.

44.    In late 1984, the United States and Cuba negotiated an agreement whereby Cuba would accept the return of a certain number of Cubans excluded from the United States and would allow for the emigration of 3,000 political prisoners and their families, while the United States would issue 20,000 visas for Cubans to immigrate to the United States annually.

45.    In 1985, after the United States launched Radio Marti, a U.S. sponsored broadcaster that transmits to Cuba, Castro suspended implementation of the agreement. Though the agreement was restarted in 1987, the United States interests section in Havana issued only

11,222 visas between 1988 and 1994. In 1993 and 1994, when the United States issued fewer than 1,000 visas annually, the number of Cubans arriving in the United States by raft more than doubled (to over 4000 annually from less than 2000 in 1991, during the first half of which Representative Lawrence J. Smith said Florida found approximately 860 corpses along its coasts).

46.      In the spring and summer of 1994 there was a huge uptick in irregular sea migration from Cuba; there were more than 3,000 Cubans interdicted by the Coast Guard on some days in August. The Clinton administration was determined not to allow a repeat of the Mariel boatlift of 1980, when more than 125,000 Cubans traveled by sea to the United States over a period of months, so it adopted a policy of interdicting Cubans heading to Miami and bringing them to the U.S. Naval Base in Guantanamo Bay. Although the U.S. Government wanted to return many of these individuals to Cuba in order to deter irregular journeys by sea, it also was concerned about the safety of such people upon being returned.

47.      In September 1994, the United States and Cuba came to an agreement. The Cuban government agreed to take steps to discourage Cuban nationals from departing by boat in exchange for the Clinton administration allowing 20,000 Cubans to enter the United States annually, not counting the immediate relatives of U.S. citizens.

48.      To get to the annual 20,000 migrants and to include among them people likely to migrate irregularly via rafts, the Attorney General created several programmatic parole programs for Cuban nationals in Cuba, most notably the Special Cuban Migration Program through which those between the ages of 18 and 55 who met specified criteria could register for a parole lottery. Those selected in the lottery were then interviewed about their qualifications and to ensure they met medical, criminal and public charge requirements. This was done in the public

interest of stemming irregular migration and promoting "safe, legal, and orderly" migration from Cuba.

49.     In early 1995, the two countries reached another agreement, memorialized in a joint statement, that specifically addressed how Cubans paroled from Guantanamo would be counted toward the 20,000 figure. As the United States decided to no longer transport interdicted Cuban migrants to Guantanamo but to instead generally repatriate them to Cuba, the agreement also included certain assurances that no actions would be taken against repatriated individuals. Between May 1995 and the end of June 1997, the U.S. Coast Guard interdicted only 771 Cuban migrants attempting to migrate to the United States, the lowest Cuban interdiction rates since the late 1980s.

50.     Due to the success of the programmatic parole programs from Cuba, Castro was unable to use the threat of irregular migration to push for change in other U.S. policies towards Cuba, such as the embargo.

51.     Congress seems to have appreciated this approach of using parole to advance foreign policy: in section 606 of IIRIRA, Congress reaffirmed (rather than repealed, as was considered and rejected by Congress) the Cuban Adjustment Act of 1966, mandating that it stay in place until the President determines that a democratically elected government in Cuba is in power. As mentioned above, the Cuban Adjustment Act permits Cubans paroled into the United States the ability to become lawful permanent residents after one year.

52.     Between January 2004 and June 2009, the Department of State cancelled talks with Cuba because it was not abiding by the agreements by refusing to discuss the issuance of exit permits, to allow registration for the Special Cuban Migration Program, to permit U.S.

diplomats to travel to monitor returned migrants, and to accept the return of Cuban nationals the United States wished to deport.

53.    It was in this context that the United States once more turned to the statutory parole authority to advance a significant public benefit in the eyes of the Executive and to support U.S. foreign policy objectives with respect to Cuba.

54.    The George W. Bush administration created two parole programs for Cubans. The Cuban Family Reunification Parole Program (CFRP) was designed to "expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." The program allowed Cuban nationals in Cuba who were the beneficiaries of approved relative visa petitions for which visas were not yet available to be considered for parole on a case-by-case basis.

55.    The Bush administration also created the Cuban Medical Professionals Parole (CMPP) Program, which allowed Cuban doctors and other medical professionals working in third countries such as Venezuela or Namibia to request that they and their dependents be paroled into the United States. The Cuban Medical Professionals Parole Program served U.S. foreign policy interests by undermining Cuba's efforts to cultivate foreign influence through its medical aid program. More than 9,000 Cuban medical professionals and their family members were paroled into the United States under the program before its termination in 2017.

56.    The Obama's administration's decision to terminate that parole program in early 2017 illustrates how the changing landscape on foreign policy shifted the U.S. government's analysis of whether the parole of Cuban medical professionals advanced a significant public benefit to the United States. By that point, the United States had worked with Cuban doctors to

respond to humanitarian needs in Haiti in the wake of that country's 2010 earthquake and as part of other public health efforts.

57.     The U.S. Government was also rethinking its policy toward Cubans who traveled by land to the U.S.-Mexico border (under the so-called "wet foot/dry foot" policy, whereby Cubans caught attempting to enter the United States by sea would be returned to Cuba or to a third country, but if apprehended on land would get a chance to remain in the United States). This was partially in response to complaints by several countries in South and Central America through which Cubans traveled to the border that the policy encouraged irregular and unsafe migration, increased smuggling and trafficking among Cubans en route, as well as insecurity and humanitarian needs among those stranded in transit.

58.     As a step toward normalizing relations with Cuba and toward a more regional and multilateral approach to managing migration and forced displacement, the Obama Administration decided in January 2017 to terminate both the Cuban Medical Professionals Parole Program and its longstanding wet foot/dry foot policy.

59.     Parole programs established by the Obama administration in 2014—the Central American Minors (CAM) Program and the Haitian Family Reunification Parole Program (HFRP)—were designed to unite families and address humanitarian and protection needs in origin countries while stopping dangerous migration in the hands of smugglers by land (through several transit countries) and sea. In response to a rise in child arrivals at the U.S. border and as part of a multifaceted effort to stop children from taking "irregular" and "dangerous" journeys through Mexico, the Obama administration announced the creation of the Central American Minors program in its late 2014 Report to Congress on 2015 refugee admissions.

60.     The CAM Program continues today; it allows certain parents and legal guardians with authorized presence in the United States to request that their unmarried children in El Salvador, Guatemala, and Honduras under the age of 21, as well as some of the child's relatives, receive a refugee resettlement interview. When those interviewed are not deemed to be a refugee but nonetheless determined to be at risk of harm in their country, USCIS decides whether each person merits a grant of parole. As with the parole of Vietnamese nationals through the Orderly Departure Program, commitments of support from a U.S.-based supporter are required to be considered for parole through CAM.

61.     The Haitian Family Reunification Parole (HFRP) Program, like its Cuban predecessor, is for certain beneficiaries of approved family-based immigrant visa petitions. The Federal Register Notice on the program explains that "[b]y expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States." The Notice additionally recognized that using parole for HFRP Program beneficiaries would facilitate the ability of beneficiaries to more quickly work lawfully in the United States and earn money that could be sent back to Haiti in the form of remittances to help fund the "rebuilding and development of a safe and economically strong Haiti," a multi-year project and "a priority for the United States." Approximately 8,300 applications for parole have been approved through the HFRP program.

**CHNV Processes Resemble Previous Uses of Parole**

62.     In the wake of Russia's invasion of Ukraine, over twenty thousand Ukrainians traveled to Mexico in order to come to the United States via the land border. The Biden administration started the Uniting for Ukraine parole program to provide an alternative, more orderly pathway for displaced Ukrainians to come to the United States directly through airports.

Just as with Hungarians and Vietnamese, parole is being used for Ukrainians alongside refugee resettlement and to complement the reception of displaced people in other countries. Similar to several other parole programs discussed above—most notably the Orderly Departure Program and the CAM Parole Program—Ukrainian nationals seeking parole through the program must be supported by one or more individuals or entities in the United States who have demonstrated to USCIS that they have sufficient income or immediate access to sufficient financial resources to support the parole beneficiaries for the duration of the parole (typically two years). Unlike the CHNV parole programs, the Ukrainian parole program does not have any monthly numerical caps.

63.    The justifications provided in the Federal Register Notices for the CHNV Parole Processes are similar in many respects to the humanitarian, foreign policy, and migration control goals of past parole programs.

64.    The CHNV processes are designed to provide a safe pathway for migrants from four countries experiencing humanitarian and human rights crises—and from which in-country consular processing, and to which removals, are a challenge, if not impossible—to enter the United States through an airport, as an alternative to them coming to the U.S.-Mexico border. Just like the parole programs for Vietnamese and Cubans discussed above, the CHNV programs are designed to deter dangerous irregular migration frequently facilitated by smugglers. Each potential parolee is assessed on a case-by-case basis, as the Executive has long understood the parole statute to require, as discussed above. Each must have a financial supporter in the United States, as was the case with the Orderly Departure Program and the Uniting for Ukraine, and each must pass background checks, as was the case with individuals paroled through all the past programs discussed in this declaration.

65.     Consistent with the historical use of the parole statute discussed above, CHNV is also part of a broader foreign policy strategy—articulated at the 2022 Summit of the Americas and through collaborative engagement on the L.A. Declaration on Migration and Protection—to address the unprecedented challenge of displacement in the Western Hemisphere. Like the handling of Vietnamese discussed above, this effort involves the United States taking the lead in working with key allied countries and international organizations towards resolution of a regional displacement crisis. Just as with the Uniting for Ukraine program, the Biden administration is planning also to resettle Cubans, Haitians, Nicaraguans and Venezuelans as refugees and the CHNV processes complement the reception of, for example, Nicaraguans in Costa Rica and Venezuelans in Colombia.  Since the start of the CHNV processes, the United States has continued to work with Colombia and Costa Rica to curb irregular migration of CHNV nationals.

66.     Like in several prominent past parole programs, such as those related to parolees from Vietnam and Cuba discussed above, the number of people considered for parole is linked to relations and negotiations with foreign governments, including origin and transit or regional countries. Regarding the current program, the number of people from Cuba, Haiti, Nicaragua, and Venezuela that may be paroled into the United States (30,000 per month) is tied directly to the number of people of the same four nationalities that Mexico has agreed to accept for removal.

67.     Through the parole of Cubans in the CHNV program, the United States is also reviving migration talks with Cuba to accept return of its nationals—in April of this year, deportations to Cuba were restarted for the first time in two years—similar to how parole programs have been used by past administrations as a tool to achieve foreign policy objectives in a bilateral context.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Yael Schacher

Executed on June 19, 2023 in Washington, D.C.

## Appendix – Publications of Yael Schacher

A list of Yael Schacher's publications for Refugees International can be found here: https://refugeesintpro.wpengine.com/authors/yael-schacher/

"Misreading History: The United States Supreme Court and the Thwarting of the U.S. Asylum System since the 1980s," *Whose America?: U.S. Immigration Policy since 1980*, ed. Maddalena Marinari and Maria Cristina Garcia, Univ. of Illinois Press, 2023, 209-236.

Review of *The Deportation Machine* by Adam Goodman, *Federal History,* Issue 15 (2023), 132-135, https://shfg.wildapricot.org/page-18388

"The Wedge of the Refugee As Worker: Litigation over Asylum Seeker Work Authorization in the United States, 1974-2021," *Global Labor Migration: New Directions,* ed. Julie Greene, Eileen Boris, Heidi Gottfried, and Joo-Cheong Tham, Univ. of Illinois Press, 2022, 171-189.

"Return of the Repressed," *Journal of American History*, Vol. 109, Issue 2, Sept. 2022, 375–387.

"Exclusions and Exceptions: The History of Asylum in the United States," *The State of Human Rights: Historical Genealogies, Political Controversies, and Cultural Imaginaries,* ed. Kerstin Schmidt, Universitatsverlag Winter, 2020, 71-84.

"Family Separation and Lives in Limbo," *Annals of the American Academy of Political and Social Science*, Vol. 690, July 2020, 192-199.

"'I Hate to See Human Beings Kicked Around by Fate & by Law:' Edith Lowenstein's Asylum Advocacy in the 1950s and 1960s," *Journal of American Ethnic History*, Vol. 30, No. 3, Spring 2020, 49-74.

"Diversity in American Letters," *American Literature in Transition: The 1930s,* ed. Ichiro Takayoshi (Cambridge UP, 2018), 177-197.

Review of *Making Refuge: Somali Bantu Refugees and Lewiston, Maine* by Catherine Besteman, *Border Criminologies*, July 13, 2018, https://www.law.ox.ac.uk/research-subject-groups/centre-criminology/centreborder-criminologies/blog/2018/07/book-review

Review of "A View from the Bridge," Nov. 20, 2017, *Not Even Past* (UT Austin), https://notevenpast.org/a-view-from-the-bridge-directed-by-sidney-lumet-1962.

Review of *Captivity Beyond Prisons: Criminalization Experiences of Latina (Im)migrants*, by Martha D. Escobar, *Journal of American Ethnic History,* Vol. 37, No.1, Fall 2017, 92-95.

"Refugees and Restrictionism: Armenian Women Immigrants to the United States in the Post WWI Era" in *Gender, Migration, and Categorisation,* eds. Marlou Schrover and Deirdre Maloney, Amsterdam Univ. Press, 2013, 55-74.

# EXHIBIT 40

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton<br><br><br>**DECLARATION OF ERIC SCHWARTZ** |
| *Plaintiffs*, | | |
| v. | | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in | | |

his official capacity,                    §
                                          §
        *Defendants*, and                 §
                                          §
VALERIE LAVEUS; FRANCIS ARAUZ;            §
PAUL ZITO; ERIC SYPE; KATE                §
SUGARMAN; NAN LANGOWITZ; and              §
GERMAN CADENAS,                           §
                                          §
        *Intervenors*.                    §
                                          §

## DECLARATION OF ERIC P. SCHWARTZ

ERIC P. SCHWARTZ declares pursuant to 28 U.S.C. § 1746:

**Background**

      1.      I am currently a Professor of Public Affairs at the Hubert H. Humphrey School of Public Affairs at the University of Minnesota. From 2011 to 2017, I was both a professor and the dean of the Humphrey School.

      2.      Between 2017 and 2022, I served as the President of Refugees International, an independent nonprofit organization that advocates for assistance and protection for forcibly displaced persons, while on leave from the Humphrey School and the University of Minnesota.

      3.      Prior to academia, much of my career was spent working for the federal government, principally in the executive branch, although my career in government began as a Congressional Subcommittee staff member. Throughout my time in government, I focused on matters of migration and humanitarian protection, particularly as it intersects with foreign policy.

2

4.      From July 2009 to October 2011, I served as Assistant Secretary of State for the Bureau of Population, Refugees, and Migration ("PRM").  Before that, from 1993 to 2001, I served as the principal human rights and humanitarian official on the National Security Council ("NSC") staff, ultimately in the role of Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.  Prior to that I served from 1989 to 1993 as staff consultant to the U.S. House of Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs.

5.      The Assistant Secretary of State for PRM is the senior-most State Department official devoted primarily to migration, refugee, and humanitarian issues.  The Assistant Secretary is also the senior-most State Department official for whom a principal focus, day-in and day-out, is diplomacy on U.S. foreign policy issues involving international migration and humanitarian objectives.  In that role, I regularly interacted with the heads of offices and agencies such as the International Committee of the Red Cross, the UN High Commissioner for Refugees, the UN Office for the Coordination of Humanitarian Affairs, and the UN Relief and Works Agency for Palestine Refugees in the Near East, among others.  I pursued U.S. foreign and international humanitarian objectives not only with leaders of these international organizations, but also with heads of state and other senior officials in countries dealing with issues of forcible displacement.  During my tenure as Assistant Secretary, the Bureau I led had an annual budget of about $1.85 billion.

6.      During the eight years that I served in the White House, I was the principal official on the NSC staff overseeing refugee- and international migration-related issues. In that role I was involved in a broad array of issues that impacted U.S. national security interests and were of deep concern to the NSC, such as forced migration from Haiti connected to political

3

violence in that country, U.S. refuge and/or resettlement of Kosovars in the context of the Serbian government attack on that population, and emigration of asylum-seekers from Vietnam, among many other issues.

7.    During the more than three years I served on the staff of the House of Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs, I advised Members of Congress, including the subcommittee's chairman, Representative Stephen J. Solarz, on a range of migration-related issues.  This included working on legislative proposals to expand access to refugee resettlement to certain nationals from the former Soviet Union to also include nationals from Vietnam, Cambodia, and Laos.

8.    Based on my experience as Assistant Secretary of State for PRM, my years on the NSC and with the House Foreign Affairs Subcommittee, and my career focused on humanitarian and migration issues, I understand that foreign relations matters are frequently complex, delicate, and of great importance to the national interest.  This is particularly true when such matters involve sensitive, fragile, and often tense bilateral or multilateral negotiations with foreign governments in which all parties are working to secure an agreement that advances their own foreign policy priorities.

9.    As I have seen, when engaging in negotiations with a foreign government(s), it is critical for the Executive to have as many legislative and administrative tools at its disposal as possible.  This is especially the case in the humanitarian context, when flexibility in particular can be critical to ensuring life-saving and life-sustaining action that furthers human rights objectives long-articulated by executive and legislative branches.

10. The development and implementation of migration policy frequently has significant impacts beyond the borders of the United States and, as a result, on U.S. objectives around the world.

11. Based on my professional experience, the ability to make commitments regarding migration policy that are within the purview of the Executive can be a powerful foreign policy tool to promote the interests of the United States, through advancing negotiating objectives with foreign governments, and through achieving humanitarian, human rights, anti-trafficking, and regional security goals, among others. I am aware of the periodic use of the statutory parole authority by past administrations to advance this nation's foreign policy interests, and I have had personal experience with several of those instances. I believe that in each of these instances, parole was the only reasonable approach to serve urgent humanitarian needs or to otherwise advance the national interest. Other options were, as a practicable matter, unavailable due, for example, to constraints related to access to affected populations and the need to move quickly to secure foreign policy and national security objectives.

**The Cuban Migration Accords and Parole**

12. During my tenure on the NSC, I was involved in White House and agency deliberations around Cuban migration, including migration accords between the United States and Cuba.

13. Early during the administration in 1994, we began to see a significant increase in the departure of boats from Cuba filled with would-be migrants headed to the United States. Cuba was experiencing economic and political turmoil, due in large part to the end of financial support that the country had been receiving from the Soviet Union prior to its collapse. As conditions in the country worsened, Cuban president Fidel Castro criticized what he claimed

Appx-0204

were inadequate U.S. efforts to stem hijacking and loosened restrictions on people seeking to leave, which resulted in tens of thousands of Cubans taking to the seas en route to the United States.

14. This migration was irregular and disorderly, and it not only posed a significant risk to the lives of these migrants but also consumed Coast Guard resources due to interdiction and rescue efforts.

15. As Castro had decades earlier deployed a similar tactic that spurred a tremendous out-migration from Cuba culminating in the 1980 Mariel boatlift, this renewed wave of Cuban nationals taking to the sea created significant tensions between the United States and Cuba.

16. This was a topic of great public concern in the United States that represented a major humanitarian and border management challenge. It was of great importance to the administration and to the country that the Clinton Administration find some way of directing Cuban migration into safe, legal, and orderly channels.

17. After months of negotiations, in September 1994 the United States agreed to provide a minimum of 20,000 travel documents each year to Cuban nationals interested in immigrating to the United States, not including the immediate relatives of U.S. citizens, in exchange for the Cuban government's commitment to discourage irregular and unsafe departures by sea. Both countries also agreed to continue to discuss Cuba's willingness to accept the return of Cuban nationals excludable from the United States. Communique Between the United States of America and Cuba, 94-909, signed at New York Sept. 9, 1994, entered into force Sept. 9, 1994.

18. The United States understood at the time that some share of the 20,000 figure would come through immigrant visa programs and an in-country refugee program operated out of the U.S. Interests Section in Havana, Cuba. The United States also understood that we

Appx-0205

would have to rely heavily on the ability of the Attorney General to use the statutory authority to parole a significant number of Cuban nationals into the country in order to meet the U.S. government's commitment.

19.    Shortly after this agreement was reached, the Immigration and Naturalization Service ("INS"), in partnership with the Department of State, created the Special Cuban Migration Program ("SCMP") to select applicants who met certain, preset requirements for parole in an effort to meet the 20,000 figure to which we had committed.

20.    Individuals interested in participating in the SCMP would register and be selected randomly to receive individualized consideration of their application.  Potential parolees had to meet certain criteria established by the Executive, and several were based on education, work experience, and/or U.S. family ties. Of course, the program was open only to Cuban nationals. Registration periods for the program took place in fiscal years 1994, 1996, and 1998, and enough individuals registered during those periods that individuals could continue to be selected, interviewed, and paroled for many years after that.

21.    If the U.S. Government had not been able to rely upon the statutory parole authority when it negotiated the 20,000 figure with the Government of Cuba, it is not clear that the agreement could have been reached and it is not clear that Fidel Castro would have taken steps to discourage continued largescale irregular migration to the United States by boat.

22.    Similarly, if the U.S. Government had not been able to utilize parole effectively in the years following the agreement it is all but certain that the U.S. Government would have failed to uphold its commitment and diplomatic relations between the countries would have been diminished.  That would have caused significant harm to U.S. foreign policy interests,

including by potentially triggering an increase once more in largescale Cuban migration to the United States by sea.

23.     Had the executive's ability to use its statutory parole authority been unduly constrained, it also would have likely interfered with the U.S. government's ability to reach a second migration-related agreement with Cuba in May 1995 in which the United States began returning to Cuba certain Cuban nationals interdicted at sea or apprehended entering the U.S. Naval Base at Guantanamo Bay and Cuba agreed not to take any punitive actions against such people. In that agreement, the United States and Cuba also reached an understanding about how the United States would proceed with the approximately 20,000 Cuban nationals who had been interdicted at sea beginning in August 1994 and taken to a safe haven at the U.S. Naval Base at Guantanamo Bay. Although a small number who met certain specified criteria were already being paroled into the United States on a case-by-case basis and a small number had agreed to voluntarily return to Cuba, the large majority remained at Guantanamo and the situation required resolution.

24.     In the May 1995 Joint Statement on Migration, both countries agreed that the limited criteria for Cuban nationals remaining at Guantanamo to be considered for parole would need to be expanded and that up to 5,000 paroles could be counted each year toward the 20,000 annual figure provided in the September 1994 agreement. The United States anticipated that the large majority of Cubans at Guantanamo—about 15,000 people—would be paroled into the United States, also on a case-by-case basis, and the remainder would be returned to Cuba with negotiated assurances that such individuals would face no reprisals for their decision to leave Cuba. The same assurances would apply to Cuban nationals interdicted at sea en route to the United

Appx-0207

States who similarly would be returned to Cuba after first being screened for refugee status. Office of Public Affairs, U.S.-Cuba Joint Statement on Migration, White House, May 2, 1995.[1]

25.     As the then-NSC director for human rights, refugees, and migration, in the NSC Office of Global Affairs and Multilateral program, I worked closely with the NSC Office of Democracy, led by my colleague Morton Halperin, in the evolution of the overall approaches on Cuban migration.

**The Rescue and Resettlement of Kurds in Northern Iraq Using Parole**

26.     A dramatic and compelling example of the critical importance of the parole authority involved the 1996 rescue and resettlement of Kurds affiliated with U.S. non-governmental organizations who fled northern Iraq. These individuals were at risk of persecution and/or death at the hands of Saddam Hussein, and the administration initiated a large-scale evacuation following Cabinet-level deliberations in which I was directly involved. Ultimately, some five thousand or more individuals were assisted by U.S. agencies and paroled into the United States.

27.     Having this quick and flexible authority was absolutely critical to the administration's capacity to achieve critical foreign policy objectives—including the avoidance of atrocities against individuals who had been affiliated with U.S. agencies. Needless to say, the United States not only had a moral interest in achieving this objective, but also an interest related to communicating to others that the United States will stand by—and not abandon—those who seek to promote humanitarian and human rights objectives.

_____

[1] *Available at* https://www.american.edu/centers/latin-american-latino-studies/upload/1995-migration-agreement.pdf.

Appx-0208

**The Resettlement Opportunity for Vietnamese Returnees Initiative and Parole**

28.     Also during my tenure on the NSC and beginning in around 1996, I led a U.S. government effort to establish the Resettlement Opportunity for Vietnamese Returnees ("ROVR") initiative.  Along with State Department officials, I was also involved in negotiations with the Government of Vietnam on this initiative.  And I advised the U.S. National Security Advisor, Anthony Lake, who was also involved in efforts to secure the program.

29.     For many years preceding the establishment of ROVR, the United States had used a variety of migration pathways—including both refugee admissions and parole—to bring large numbers of Vietnamese nationals and their family members to the United States. There were critically important foreign policy objectives that were served through these efforts: international humanitarian goals that are critical components of U.S. foreign policy as well as communicating to others around the world that the United States government will not walk away from those who have in been associated with the U.S. government or U.S. government agencies. And in fact, the effective execution of such programs also helped to lay the groundwork for normalization of relations with Vietnam, and to support countries in the region that were hosting large numbers of Vietnamese nationals for long periods of time.

30.     As countries in southeast Asia that had long hosted Vietnamese refugees worked to close their camps and repatriate Vietnamese nationals back to their home country—most of whom at this point had already been screened by the United Nations High Commissioner for Human Rights and others and determined not to be refugees—the United States wanted to provide one final opportunity to consider these individuals for resettlement in the United States.

31.     During our efforts to establish ROVR, it became clear that U.S. processing directly from host countries would not be possible, in large measure because governments of these

10

countries would have been concerned that it could draw additional refugees into the camps from other areas or countries. That would run counter to their efforts to close the camps. As a result, we worked with the Government of Vietnam to facilitate prompt interviews for U.S. resettlement for these individuals upon their return to Vietnam.

32.    The United States would submit lists of names to the Government of Vietnam in order for them to be cleared for interviews by U.S. personnel. Due to various cumbersome requirements initially imposed by the Government of Vietnam, things got off to a slow start, but we negotiated efficiencies and the program improved.

33.    Although ROVR was primarily a refugee admissions program, as with other parole programs, individuals who were determined not to be refugees were considered for parole and many ultimately were paroled into the United States in furtherance of the United States's important foreign policy objectives.

34.    More broadly, through the pre-existing Orderly Departure Program for resettlement of Vietnamese that was established in 1979, many thousands of people who were denied refugee status in the United States were favorably considered for parole and allowed to travel to the United States if they paid for their own travel and had affidavits of support from relatives or organizations in the United States.

35.    For all programs of resettlement from Vietnam after the conflict had ended, parole was an important tool—and its absence would have created significant foreign policy challenges. In particular, it would have undermined the United States' ability to meet our humanitarian objectives and risked causing additional and unnecessary friction with the Government of Vietnam as we sought to move our bilateral relationship in a new direction.

Appx-0210

**The Lautenberg Refugee Program and Parole**

36.    As staff consultant to the House Foreign Affairs Subcommittee on Asian and Pacific Affairs, I was involved in the evolution of legislation that was enacted in 1989 that both (a) relied upon the continued and expanded use of parole for certain populations that were of particular interest to U.S. foreign policy; and (b) extended to these individuals the ability to adjust their status in the United States to that of a lawful permanent resident (i.e., a "green card" holder).

37.    Specifically, in 1988, then-Attorney General Edwin Meese wrote in a letter to the White House that he had determined that Soviet refugee applicants were being processed at the U.S. Embassy in Moscow in a manner inconsistent with the Refugee Act of 1980 and that he was sending INS personnel to the Embassy to address the issue.  *See* Letter from Edwin Meese III, Attorney General, to Lt. Gen. Colin Powell, Assistant to the President for National Security Affairs, Aug. 4, 1988.[2]  Although his particular concern was left unstated in the letter, I recall that he believed refugee status determinations—in which refugee officers determine whether or not an individual meets the legal definition of a "refugee," which is the same one that is used in the asylum context—needed to be made on more of a case-by-case basis rather than with a presumption of refugee status based on proof that an individual is a member of a persecuted group.  Attorney General Meese was clear that the changes he would be implementing likely would decrease the refugee grant rate, but he committed to using his parole authority to allow potentially a "significant number of emigrants" determined not to be refugees to nevertheless enter the United States.

38.    The refugee grant rate did, in fact, drop significantly for these Soviet refugee applicants, and many who were denied were Jews, Evangelical Christians, and others and who nonetheless risked discrimination in the Soviet Union.  This was of great concern to many

---

[2] *Available at* https://archive.org/details/sovietrefugeeshe00unit/page/128/mode/2up.

Appx-0211

humanitarians and humanitarian organizations, as well as to Members of Congress. As a result, Members began work on legislation to provide for more favorable treatment for these individuals in the refugee status determination process. In particular, the legislation effectively created presumptions of refugee status for members of historically persecuted groups mentioned in the legislation. The chair of the House Foreign Affairs Subcommittee for which I worked supported similarly heightened humanitarian protection for other populations of particular concern to U.S. foreign policy interests—Vietnamese, Cambodians, and Laotians.

39.    In 1989, Congress enacted legislation commonly referred to as the Lautenberg Amendment that modified the refugee status determination process for certain nationals of the Soviet Union, Vietnam, Cambodia, and Laos. Moreover, the legislation authorized individuals from these countries denied refugee status who had been paroled into the country—and those who still would be paroled into the country in the remainder of the fiscal year—to adjust their status to that of a lawful permanent resident.

40.    Congress has repeatedly reauthorized and extended that legislation, demonstrating congressional approval not only of the modified refugee status determination process for these individuals, but also for the continued use of parole for individuals determined not to meet the legal definition of a "refugee" and for the continued ability of those parolees to become lawful permanent residents (and ultimately, the opportunity to apply for U.S. citizenship).

41.    The flexibility provided by Congress to the executive in deciding when, whether, and how to use the parole authority—within certain specified constraints—has been of great value to the advancement of U.S. foreign policy interests. In particular, after winning often hard-fought concessions from foreign governments to permit the emigration of their nationals, parole has enabled the United States to meet its undertakings to those governments about our

Appx-0212

willingness accept individuals who have been forced to flee but who might not have met all the requirements for refugee status.   In addition, it has demonstrated that the United States will not break faith with those who have been subject to discrimination and abuse, communicating U.S. global credibility as a proponent of human rights and humanitarian values.

**The Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes**

42.    I am very familiar with the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes that the Department of Homeland Security recently began to implement as part of a broader suite of migration management policies.   I understand that these processes were adopted—and are continuing to be implemented—in furtherance of extensive bilateral negotiations with the Government of Mexico regarding the management of migration at the U.S.-Mexico border and throughout South and Central America, and that the United States Government has specifically secured a commitment from the Government of Mexico that while the former will parole up to 30,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela each month, the latter will accept the removal or return of up to 30,000 nationals from these countries each month.   I further understand that these processes were adopted to advance commitments made by the U.S. Government as part of the Los Angeles Declaration on Migration and Protection and that other countries that are signatories to that Declaration have similarly enacted laws and adopted policies in furtherance of their commitments.

43.    The stated goal of the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes—to facilitate safe, legal, and orderly migration and discourage dangerous irregular migration, in partnership with foreign governments in the region—is essentially the same goal that the United States pursued nearly 30 years ago when it agreed to use the statutory parole authority as part of the 1994 and 1995 agreements with Cuba.  *See* Joint Communiqué on Migration, U.S.-

14

Cuba (Sept. 9, 1994) ("Representatives of the United States of American and the Republic of Cuba today concluded talks concerning their mutual interest in normalizing migration procedures and agreed to take measures to ensure that migration between the two countries is safe, legal, and orderly."); Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) ("The United States of America and the Republic of Cuba have reached agreement on steps to normalize further their migration relationship. These steps build upon the September 9, 1994 agreement and seek to address safety and humanitarian concerns and to ensure that migration between the countries is safe, legal, and orderly.").

44.      It is also the very same goal reflected in the George W. Bush administration's decision in 2007 to create the Cuban Family Reunification Parole Program that remains in place today. *See* Department of Homeland Security, Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) ("The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.").

45.      And just as decreasing dangerous arrivals by boat was a priority of the U.S. Government in negotiating agreements with Cuba in the mid-1990s and in adopting the Cuban Family Reunification Parole Program, the recent modifications to the Cuban and Haitian Parole Processes that disqualify people for parole consideration if they are interdicted at sea subsequent to the modifications demonstrate how important this priority remains to the Government of the United States. *See, e.g.*, Department of Homeland Security, Implementation of a Change to the Parole Process for Cubans, 88 FR 26329, 26331 (Apr. 28, 2023) ("In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been

15

interdicted at sea after April 27, 2023 ineligible for the parole process for Cubans. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.").

46.    I further understand that the new Cuban Parole Process was created in part to support United States Government negotiations with the Government of Cuba to "reactivate the Migration Accords." Department of Homeland Security, Implementation of a Parole Process for Cubans, 88 FR 1266, 1270 (Jan. 9, 2023). The U.S. Government's stated reason for seeking to reactivate the Migration Accords is that it could help the United States secure the cooperation of the Cuban government in accepting the repatriation of many more of its nationals who are ordered removed from the United States after attempting entry without authorization, which, in turn, is expected to decrease further irregular migration and instead channel people through various safe, legal, and orderly pathways. *Id.* at 1270-71. The Cuban Parole Process in particular, therefore, is very clearly grounded in a complex and shifting diplomatic relationship with the Government of Cuba that has been ongoing for nearly 30 years—and certainly longer.

I declare under the penalty of perjury that the foregoing is true and correct.

Eric P. Schwartz

Executed in _Silver Spring, Maryland_, on June 1_7_, 2023.

Appx-0215

# EXHIBIT 41

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton<br><br><br>**DECLARATION OF MORTON H. HALPERIN** |
| *Plaintiffs,* | § § § § | |
| v. | § § § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in | § § § § § § § § § § § § | |

|                                                                                      |     |
|--------------------------------------------------------------------------------------|-----|
| his official capacity,                                                               | §   |
|                                                                                      | §   |
| *Defendants*, and                                                                    | §   |
|                                                                                      | §   |
| VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; and GERMAN CADENAS, | §   |
|                                                                                      | §   |
|                                                                                      | §   |
|                                                                                      | §   |
| *Intervenors.*                                                                       | §   |

## DECLARATION OF MORTON H. HALPERIN

MORTON H. HALPERN declares pursuant to 28 U.S.C. § 1746:

      1.      After a six-decade career in national security, foreign policy, and democracy work, I recently retired and am continuing to support the causes in which I believe through such roles as Chair of the Executive Board of the Center for Ethics and the Rule of Law at the University of Pennsylvania, member of the Board of Directors of The ONE Campaign and ONE Action, and member of the Board of J Street.

      2.      During my career in public service, I worked as a national security advisor in the Johnson, Nixon, and Clinton administrations. During the period of time most relevant to this declaration, from 1994 to 1996, I served as a Special Assistant to President Clinton and Senior Director for Democracy at the National Security Council ("NSC").

Appx-0218

3.      In that capacity, I had the opportunity to see how the statutory parole authority provided the executive with a critically needed tool to advance the public interest by furthering foreign policy objectives of great importance to the president and the nation.

4.      At the NSC during the Clinton administration, from August 1994 until May 1995 I was the lead official in the White House working day-to-day on all issues related to Cuba, including guiding U.S. policy and diplomacy to respond to a dramatic spike in Cuban migrants taking to the sea in hopes of reaching the United States.  In the period following the Mariel boatlift, when more than 125,000 Cubans left the island with the encouragement of Fidel Castro and arrived in the United States between April and October 1980, relatively few Cubans attempted to make this journey by sea.  In 1989 and 1990 that figure began to rise, reaching several thousand people annually in 1992 and 1993 before jumping to more than 37,000 in 1994.

5.      The large majority of this increase took place beginning in August 1994. As civil unrest began to grow in Cuba, Castro blamed the United States government for his difficulties and threatened to once again remove his restrictions on Cubans leaving the country so that many Cubans could depart for the United States by boat.   Eventually that was precisely what he did. Within the administration, this was viewed as a tactic by Castro to attempt to gain leverage over United States foreign policy and to essentially dictate our immigration policy as well. It was also viewed as a way for him to distract from the poor social and economic

3

conditions in Cuba, as well as to encourage dissidents and others who exacerbated his political challenges to leave, allowing him to better consolidate power. Finally, it was incredibly cruel to the migrants themselves, who placed their lives in jeopardy every time they left on unsafe vessels; U.S. Coast Guard personnel began to encounter boats with Cuban migrants who had lost their lives as well as empty boats, suggesting that some migrants drowned, and their bodies could not be recovered.

6.      The Clinton administration focused significant attention on how to address this situation, recognizing that U.S.-Cuba relations were complicated and delicate. President Clinton was committed to the policy contained in the Cuban Democracy Act, legislation that was signed by President George H.W. Bush in October 1992. The legislation sought to capitalize on the fall of the Soviet Union, which removed a powerful supporter of the Castro government, and it promoted a two-track approach—on the one hand strengthening the diplomatic, political, and economic isolation of the Cuban government, particularly through the economic embargo, and on the other opening the possibility for humanitarian assistance and increased information-flow to the people of Cuba to promote the transition to democracy.

7.      By the middle of August 1994, hundreds of Cuban migrants were being interdicted at sea by the Coast Guard each day and the number kept growing.

8.      Senior officials in the administration from various government agencies and within the White House proposed options for addressing the rising crisis. **Exhibit A** is an example of one kind of "options" paper that would have been

4

circulated within the administration; it is a true and correct copy of a memorandum that I obtained via a records request to the William J. Clinton Presidential Library, which is administered by the National Archives and Records Administration (NARA), except that phone and fax numbers on the first page have been redacted.

9.      On August 18, 1994, I convened a meeting at the White House of senior officials from the relevant agencies, including the Department of State, the Department of Defense, and the Department of Justice, to discuss options to stop the flow of Cuban traveling by sea.  There was agreement at the meeting that dramatic action was needed, and consensus was reached on recommending to the President that the Coast Guard begin taking Cubans picked up in international waters to the U.S Naval Base at Guantanamo Bay, Cuba.  The Defense Department agreed to accept them.

10.     Immediately after the meeting I drafted a short memo to the President reporting this consensus and recommending that he approve the recommendation.  The Deputy National Security Advisor and the National Security Advisor approved the memo and it was immediately sent to the President.  Early in the evening I was informed by the Staff Secretary that the President had approved the recommendation.  I immediately informed the relevant Cabinet Offices. The Attorney General came to the White House and held a late-night press conference announcing the new policy which took effect immediately.

11.     The following day, on August 19, 1994, President Clinton gave a press conference announcing the significant change in the U.S. Government's

approach to Cubans interdicted at sea. Up until that time—and for three decades—Cuban nationals who were interdicted at sea, frequently on makeshift boats that were unseaworthy, were brought to the United States and paroled into the country using the Attorney General's statutory parole authority. Those who reached the United States on their own and set foot on dry land were similarly paroled into the country. Because of the Cuban Adjustment Act, legislation enacted in 1966, such individuals typically would be able to apply for lawful permanent resident status one year later.

12. President Clinton announced that effective immediately, Cubans interdicted at sea would instead be taken to a safe haven at Guantanamo where they would be free to voluntarily return to Cuba proper but would also be free to remain on the U.S. base and receive basic subsistence from the Department of Defense. The Cubans brought to the U.S. base would not be allowed entry into the United States. The message we were sending to Cubans was clear: do not attempt to come to the United States by boat.

13. In the days following the August 19 policy change, interdictions of Cubans at sea continued to rise dramatically—more than 1,000 on August 20 and 21 and more than 2,500 and 3,000 on August 22 and 23, respectively.

14. President Clinton understood that given Castro's active encouragement of these migration flows, there were limits to what we could achieve unilaterally to prevent a repeat of the Mariel boatlift. As a result, it would be necessary to engage in diplomatic talks with Cuba. But because public outreach to Cuba would be seen by many as legitimizing Castro's government and a premature

6

turn toward normalization of diplomatic relations with the country without securing critical democracy and human rights reforms, including the release of political prisoners, outreach had to be done carefully.

15.     President Clinton made quiet contact with Castro through President Salinas of Mexico, sending the message that he would be willing to negotiate changes in the embargo that was putting so much pressure on the Castro Government's hold on the country but not until the countries worked together to fix the migration situation. Moreover, negotiations over the embargo could not be tied to negotiations over migration, which we made explicit in public comments. **Exhibit B**, for example—which is true and correct copy of a document I obtained via a records request to the William J. Clinton Presidential Library—shows edits that I made to draft talking points to ensure that they were consistent with administration policy toward Cuba. The edits emphasize how central resolving the issue of migration was to U.S. foreign policy toward Cuba during this time period.

16.     The Cuban Government accepted the proposal to engage in talks focused exclusively on migration and the American government explained to the public that such talks were a continuation of migration negotiations that began during the Reagan Administration in 1984. At that earlier time, the United States committed to issuing up to 20,000 preference-based immigrant visas each year to Cuban nationals in Cuba, not counting immigrant visas for Cuban parents, spouses, and children under the age of 21 of United States citizens and Cuba agreed to accept

7

the return of 2,746 Cuban nationals who arrived during the Mariel boatlift and who had been deemed ineligible to enter the United States.

17.     The 1984 agreement was suspended by Cuba shortly after it was reached and although it was restarted several years later, the United States never came close to issuing 20,000 preference-based immigrant visas each year.

18.     In advance of the 1994 negotiations with Cuba, I convened an interagency meeting and proposed that we agree to allow a certain number of Cubans to come to the United States legally each year.  Someone in the meeting said that we should not put such a number on the table in negotiations because we had never met the commitment we made in 1984.  I responded that the difference between now and then was that this time we would actually do it.  The decision to provide entry to up to 20,000 Cuban nationals that was ultimately included in the 1994 agreement was therefore not only motivated by the need to deal with the immediate flow of people migrating via makeshift rafts from the island, but also as a way of getting the Cuban government to see that we intended to live up to our agreement.  That was an important step in advancing the United States' foreign policy interests.

19.     The negotiations were conducted between the Cuban delegation to the United Nations and an inter-agency U.S. Government team.  The fact of the negotiations was public.  The talks were held in secret.  I took no part in these negotiations.

20.     On September 9, 1994, the United States and Cuba issued a joint communique announcing the completion of talks regarding our countries' "mutual

8

interest in normalizing migration procedures" and agreement "to take measures to ensure that migration between the two countries is safe, legal, and orderly."  Among other things, the United States committed to using provisions of United States law to ensure that a minimum of 20,000 Cubans could migrate legally to the United States each year, not counting the immediate relatives of United States citizens. Cuba agreed to "take effective measures in every way it possibly can to prevent unsafe departures using mainly persuasive measures."  Both parties agreed to continue facilitating the voluntary return to Cuba of individuals who arrived in the United States or at safe havens outside the United States following the August 19, 1994, policy change announced by the Clinton administration, and to continue discussing the non-voluntary return of Cuban nationals who were ordered excluded from the United States.

21.     To reach the 20,000 figure, the U.S. increased visa processing out of the Special Interests Section in Havana.  We also expanded our in-country refugee process out of the Special Interests Section.  As individuals in Cuba were issued family-based immigrant visas and were identified as refugees for admission to the United States, the United States decided to parole family members of these individuals—unmarried sons and daughters and extended family members in the same household and economic unit—who would not have counted as derivatives on their applications into the United States.  Parole also would be used to allow into the United States certain Cuban nationals waiting for immigrant visas to become available.  But still more was needed.

9

22.     During the negotiations that took place at the U.N. in New York, Cuban officials focused not only on making sure the United States would meet the 20,000 figure that we had proposed, but also that some of these slots would be available to those who fit the "rafter" profile (i.e., people who may not have had family members in the United States who could sponsor them and who may not have had refugee claims, and who might risk trying to come to the United States on an unsafe boat or raft). We provided assurances that some such people would be included within the 20,000 figure. The Special Cuban Migration Program that we created to allow an estimated 5,000 Cuban nationals to enter the United States each year through parole was therefore critical to reaching the agreement with Cuba through which we successfully abated the unsafe and disorderly flow of Cuban migrants.

23.     As explained in materials prepared following the agreement, the use of parole in the Special Cuban Migration Program and for family members of immigrants and refugees beyond spouses and minor children who would ordinarily be allowed to travel together as a family advanced the public interest by helping to normalize the immigration flow from Cuba to the United States as part of a broader effort to "redirect the abnormal flow into a legal one." **Exhibit C** is an example of these materials; it is undated but I believe it is from October 1994. It is a true and correct copy of a document that I obtained via a records request to the William J. Clinton Presidential Library.

24.     In the months that followed, irregular migration dropped precipitously as Cubans understood both that they would be taken to Guantanamo

Appx-0226

and not the United States if they were interdicted at sea and that there were other options available to them. However, there were around 20,000 Cubans at the Guantanamo Bay safe haven and thousands more at a safe haven that we had negotiated with the government of Panama to establish there who did not want to return to Cuba.

25.     Some proposed allowing all of them to come to the United States, but we expected that that would undo the progress we had made in dramatically reducing the number of boats leaving Cuba since August and September.

26.     Another option would have been to try to return them all to Cuba, but that would have required securing Cuba's agreement to take them as well as significant assurances that they would be kept safe upon their return.

27.     The U.S. Government explored opportunities to resettle these Cuban nationals in third countries. By April 1995, more than 4,000 Cubans at Guantanamo had expressed interest in being resettled in 75 different countries around the world, but efforts to secure agreements from such third countries were hitting significant setbacks.

28.     To address a portion of the Cubans held at the safe havens, in late 1994, we established criteria to allow certain people to be considered for parole into the United States. This included individuals with certain medical needs and elderly people over the age of 70, together with their family members, and unaccompanied children. State Department officials at Guantanamo reported that Cubans at the safe haven were optimistic about these parole processes and were hopeful that a

Appx-0227

broader parole process would be announced for mothers and children. The State Department officials cautioned that if no such process was created, people could become despairful. Over time, thousands of Cubans were paroled from the safe havens into the United States under these policies, but the vast majority remained.

29.      But by April 1995, the situation at Guantanamo had become unsustainable. Not only was the U.S. Government paying approximately $1 million each day to maintain the facility for its residents, but the Acting Chairman of the Joint Chiefs of Staff warned the White House that once the particularly vulnerable people were paroled into the United States from Guantanamo Bay, the remaining 14,500 Cubans could become despairful and that could lead to anger and violence as well as self-mutilations and suicides. Riots at the Panama safe haven in late 1994—which were prompted by concerns that the targeted parole processes were changing and becoming less effective—resulted in injuries to 300 U.S. personnel and the deaths of two Cuban nationals. This situation posed a growing risk to the safety of the residents at Guantanamo and U.S. military personnel, and could have led to concerns about mistreatment of the Cubans at Guantanamo, which would have jeopardized the interests of the country and undermined our ongoing efforts to reengage with the Cuban government. There were also reports that Castro might again encourage unsafe and uncontrolled migration from Cuba. **Exhibit D** is a true and correct copy of an unedited transcript of an April 12, 1995, Department of State press briefing that I obtained via a records request to the William J. Clinton Presidential Library.

12

30.    To find a path forward, the United States once more entered into negotiations with Cuban officials.  As with the negotiations that resulted in the September 1994 agreement, the United States made clear in public statements that talks would be focused on normalizing migration.  But consistent with the two-track approach to Cuban relations contained in the Cuban Democracy Act, we entered the April negotiations with the longer-term goal of advancing Track II measures once the migration agreement was reached and encouraging the Cuban government to take steps toward democracy, including by freeing political dissidents.

31.    I conducted some of the negotiations myself, meeting informally with senior Cuban officials who were in the United States.  The key negotiating session between a senior State Department official and a senior official of the Cuban government was held in Canada in great secrecy over a weekend.  It resulted in agreement on a joint statement to be issued by the two governments once approved by the two leaders—Castro and Clinton.  I drafted the instructions for our negotiator.  When he returned with an agreed text, I sent it to the President with a recommendation that he approve.  Once again the memo came out of the Oval Office quickly with the "approved" box checked.

32.    The agreed joint statement was released on May 2, 1995, reaffirming the 1994 agreement and modifying it in certain respects.  To deal with the Cubans at Guantanamo, the United States agreed to use its parole authority to allow approximately 15,000 individuals to enter the United States.  We secured the agreement of Cuba that no more than 5,000 of these parolees each year would count

13

against the 20,000 figure to which we had committed in September 1994. Cuba agreed to accept the return of those individuals at Guantanamo deemed ineligible for parole for certain reasons. **Exhibit E** is a true and correct copy of talking points and anticipated questions and answers prepared in advance of the May 2, 1995, announcement that I obtained via a records request to the William J. Clinton Presidential Library.

33.    With respect to the use of parole in the agreement, Attorney General Reno explained that such decisions would continue to be made on a case-by-case basis, and sponsorship and resettlement assistance would be secured prior to entry. **Exhibit F** is a true and correct copy of the transcript of the May 2, 1995, White House press briefing that I obtained via a records request to the William J. Clinton Presidential Library.

34.    A key agreement between the two countries was that Cubans interdicted at sea would no longer be transferred to Guantanamo but would instead be returned directly by the Coast Guard to Cuba after receiving a shipboard fear screening. The Cuban government agreed to specific procedures to ensure the safety of such returnees, including that such returnees would land on Cuban beaches in U.S. Coast Guard ships and first be met at the Cuban port by U.S. officials who could apprise them of their ability to go to the Special Interests Section to pursue a refugee determination or to register for some other legal pathway to the United States.

35.    Once more, the ability to use the statutory parole authority to advance the public interest—as determined by the executive—was critical to securing

Appx-0230

an agreement that furthered foreign relations priorities of great importance to the president and the country.

I declare under the penalty of perjury that the foregoing is true and correct.

Morton H. Halperin

Executed in Washington, DC, on June 16, 2023.

Appx-0231

AUG 18 '94 09:42 PII10 T1                                                    P.1



**U.S. Department of Justice**

Immigration and Naturalization Service

---

*425 Eye Street N.W.*          AUG 1 8 1994
*Washington, D.C. 20536*

URGENT.......URGENT.......URGENT.......URGENT.....URGENT......

TO:     Capt. James Carmichael
        Office of the Coast Guard

        SECURE FAX: ▓▓▓▓▓▓

        John Goetchius
        Joint Chiefs of Staff
        ▓▓▓▓▓▓▓▓

        SECURE FAX: ▓▓▓▓▓▓                    *Tim Atkin NSC*

        Dennis Hays
        Mark Susser
        Department of State                   ▓▓▓▓▓▓▓▓

        SECURE FAX: ▓▓▓▓▓▓

        Ray Ruga
        Department of Defense

        SECURE FAX: ▓▓▓▓▓▓

FROM:   T. Alexander Aleinikoff
        General Counsel
        Immigration & Naturalization Service

Subject: Options Paper on Cuba

        Attached is a very rough draft of an options paper.  Please
        take an immediate look and fax comments by 11:00 a.m.

        OFFICE PHONE: ▓▓▓▓▓
        Office fax number: ▓▓▓▓▓▓▓
        Secure fax number is: ▓▓▓▓▓▓

┌─────────────┐
│  **EXHIBIT** │
│             │
│     **A**    │
└─────────────┘

CLINTON LIBRARY PHOTOCOPY

AUG 18 '94 09:43 P2110 T1                                                    P.1

## Options on the Cuban Flow

We are currently witnessing a flow of more than 300 Cuban
migrants a day.  The usual procedure is for the Coast Guard to
pick up the migrants on the high seas and transport them to Key
West for INS processing.  This memo explores options for reducing
the Cuban flow.

### 1. Negotiate with Castro to prevent outflows

It is apparent that the increased flow of rafters is
attributable in large part to Castro's instructions to the Cuban
Coast Guard that it tolerate departures.  The surest way to abate
the flow would be a decision by Castro that it should end.
Accordingly, the US could attempt to induce Castro to stop the
flow, either by entering into some form of negotiations or by
unilaterally adopting policies that meet his goals.

Leaving aside the obvious issue of whether the USG wants to
be in a negotiation, it is the State Department's view that there
is little that we would be willing to offer at this point that
would produce a fruitful negotiation.  On the immigration front,
Castro is likely to seek return of migrants who have hijacked
vessels or committed acts of violence and repeal of policies
permitting Cubans entry and granting lawful residence.  State
further believes that Castro's goals go far beyond immigration
issues; what he seeks is what he has sought for years: an end to
the embargo and to "hostile" broadcasts from the US.  If these
are in fact Castro's terms, then there appears to be no point to
seeking any sort of negotiation.  [It should be added that State
believes that it still may be worthwhile to have private contact
with Castro to allow him to vent frustration in a non-public
forum.]

### 2. Direct return of migrants to Cuba

Coast Guard advises that this option can not be effected
with the consent of the Cuban government.  Cutters can not turn
around rafts or escort them back to Cuban territorial waters
without serious risk to the lives of the rafters.  Safe return
can only be accomplished if cutters are permitted to dock in
Cuban ports--an option clearly within the control of Castro.

### 3. Long-term Detention of Cubans in the US

Currently Cuban migrants know that if they are picked up at
sea they will be brought to the US and quickly released.
Institution of a policy of detention (as is used for Chinese
involved in smuggling operations) is likely to have a significant
impact on decisions to leave Cuba.  If an emergency is declared
and Operation Distant Shore is invoked, then long-term detention

CLINTON LIBRARY PHOTOCOPY

AUG 15 '94 09:45 P2110 T1                                                      P.3

could occur in DOD facilities.  Such a policy would be costly and
would no doubt bring demands for release of Cubans with close
family members in the US.  It would also be subject to the
criticism that it is unreasonable to detain aliens whom we have
no prospect of returning to their country of origin; we currently
continue to detain Mariel Cubans--some for years--who have
committed crimes in the US but whom Castro will not accept back.

[Although attention has been focussed on the Cuban Adjustment
Act, it is not obvious that repeal of the Act (or a decision by
the Attorney General not to exercise her authority under the Act
to adjust paroled Cubans) would materially affect the flow of
rafters.  Because of the inability of the USG to return Cubans
without Castro's consent, any Cuban who gets to the US may
anticipate an indefinite stay.  Moreover, any Cuban present in
the US may file for political asylum and remain here while that
claim is being adjudicated.]

### 4.  Safe Haven in a Third Country

   Cubans intercepted at sea could be taken to safe havens in
third countries.  As we have witnessed with the Haitian flow,
denying migrants a chance to come to the US provides a major
disincentive to take to boats.  Safe haven offers protection and
non-return and requires no negotiation with Castro.  The
difficulty with this option is the identification of third
countries willing to take Cubans.  It may also impose significant
costs if camps are to be constructed (although it is possible
that countries in the region would accept Cubans without
requiring they be detained).

### 5.  Safe Haven at GTMO

   We currently have capacity for 23,000 migrants at GTMO.  The
Haitian population is now below 15,000, leaving some 8000 spaces
for Cubans.  Use of GTMO would likely be viewed as provocative by
Castro, who could simply remove the Cuban guards outside GTMO and
permit tens of thousands of Cubans to enter in a short period of
time.

CLINTON LIBRARY PHOTOCOPY

Appx-0234

*It would not possible to consider talking about*

TALKING POINTS

-- This is a critical moment in relations between our countries. The migration crisis has produced a situation which must be resolved quickly because, if it is not, pressures on both governments will increase. If, on the other had, a mutually satisfactory result is achieved on migration issues, it might be possible for the United States and Cuba to talk about other issues that been discussed between us in the past. For example, your representative at the December 1993 migration talks suggested that we discuss narcotics issues. Telecommunications is another such subject. That would be a good idea.

-- However, this will not be possible unless the migration issue is resolved.

-- I would also like to mention Guantanamo, a subject which Ambassador Skol told me you and he agreed was an important one for both Cuba and the United States. Neither of us want to have a large number of Cubans held indefinitely in Guantanamo and we are ready to begin moving Cubans out of Guantanamo to other safe havens in the region. However, unless this matter is resolved quickly and the flow cutoff, we may have no choice but to provide haven for large numbers of Cubans in Guantahamo and to begin making improvements in the facilities for Cubans there. *little*

-- I understand that you are working on your version of a proposed joint communiqué. As long as it is confined to migration issues, Mike is ready to work with you constructively and we hope that agreement can be reached quickly.

*It would not be possible to consider talking about other issues we have discussed in the past unless the migration issue is resolved.*

EXHIBIT
B

CLINTON LIBRARY PHOTOCOPY

Appx-0235

TALKING POINTS

-- This is a critical moment in relations between our countries.
The migration crisis has produced a situation which must be
resolved quickly because, if it is not, pressures on both
governments will increase.  It would not be possible to consider
talking about other issues we have discussed in the past, such as
narcotics and telecommunications, unless the migration issue is
resolved.

-- I would also like to mention Guantanamo, a subject which
Ambassador Skol told me you and he agreed was an important one
for both Cuba and the United States.  Neither of us want to have
a large number of Cubans held indefinitely in Guantanamo and we
are ready to begin moving Cubans out of Guantanamo to other safe
havens in the region.  However, unless this matter is resolved
quickly and the flow cutoff, we may have little choice but to
provide haven for large numbers of Cubans in Guantanamo and to
begin making improvements in the facilities for Cubans there.

-- I understand that you are working on your version of a
proposed joint communiqué.  As long as it is confined to
migration issues, Mike is ready to work with you constructively
and we hope that agreement can be reached quickly.

CLINTON LIBRARY PHOTOCOPY
Appx-0236

## Cuba Legal Migration Program
### Qs and A's

### I.   LOTTERY

Q.:  How does one apply for the lottery?

A.:  All details of the lottery - how to apply, when to apply,
etc. - will be well advertised in the US, Cuba proper, and the
safehavens by November 1st.  The lottery is designed to offer
Cubans who might not qualify under previously existing programs
an opportunity to come to the US.  We will be looking for people
who can be self-sufficient and have manifested an interest in
coming to the US.

Q.: Will having family ties be a requirement for selection in the
lottery?

No.  Legal migration will be available to people with no direct
family ties in the United States.

Q.: Will Cubans in safehavens be able to participate in the
lottery?

Yes.  Cubans in safehavens will have to return home to
participate in the lottery, but we will make sure that they do
not suffer any disadvantage if they cannot return in a timely
fashion. We anticipate that many Cubans in safehavens will meet
some of the criteria we are looking for.

### II.  Refugee Processing

Q.:  Who is eligible to qualify for refugee status?

A.:  Refugee status in the US may be granted to persons who have
a well-founded fear of persecution on account of race, religion,
nationality, membership in a particular social group, or
political opinion.

Q.:  In what way have the interview criteria been expanded?

A.:  Eligibility for the in-country program in Havana originally
was limited to former political prisoners.  The program now gives
priority to Cubans who are (1) former political prisoners; (2)
members of persecuted religious minorities; (3) human rights
activists; (4) forced labor conscripts during the period 1965-
1968; (5) persons deprived of their professional credentials or
subjected to other disproportionately harsh or discriminatory

EXHIBIT
C

CLINTON LIBRARY PHOTOCOPY

treatment resulting from their perceived or actual political or religious beliefs; and (6)others who appear to have a credible claim that they will face persecution as defined in the United Nations Refugee Convention.

Q.:  If a Cuban already has applied for refugee status and did not qualify, can (s)he apply again?

A.:  Any person denied refugee status can ask to have his or her case reconsidered on the basis of new information.  A Cuban who was denied a refugee interview under the old criteria might be eligible under the new criteria.  The USG will review pending and previously denied refugee cases to identify those qualifying under the expanded criteria.

Q.:  What about Cubans in safehavens?

A.:  If a Cuban chooses to return home and believes that (s)he qualifies for the refugee program, (s)he should contact USINT in Havana for a determination of eligibility.  US government representatives in the safehavens will provide general information on the program.

Q.:  What about Cubans in safehavens who fear persecution in Cuba if they return?

A.:  Our policy is clear: Nobody will be forced or encouraged to return.  Persons who fear persecution, like all other Cubans in safehavens, can remain in a safehaven if they so choose.  Efforts are continuing to be made to improve quality of life in Guantanamo and Panama.  We share the desire to find durable solutions for bona fide refugees in safehavens who fear returning home.  For this reason, we also will be exploring with UNHCR alternatives for such people as the situation develops, including voluntary resettlement in third countries.

## III. Parole of Additional Family of Refugees and Visa Beneficiaries.

Q.:  What is new about the additional family parole?

Typically, immigrants are only allowed to bring in their spouse and minor unmarried children.  Under this new program, we are extending the group of family members who can accompany a Cuban issued an immigrant visa or granted refugee status to include: (1) family members who reside in the same household and are part of the same economic unit as the immigrant or refugee; (2) unmarried sons and daughters of the immigrant or refugee regardless of age or place of residence.

CLINTON LIBRARY PHOTOCOPY

3

Q.: How will this program work?

Cubans to whom it is possible to issue immigrant visas in fiscal
year 1995 are being informed by USINT of their new opportunity to
bring additional family members with them. The USG will make
other efforts to identify and contact possible beneficiaries of
this program.

Q.: Can Cubans in safehavens benefit from this program?

Yes, if they choose to return home. Cubans in Guantanamo and
Panama will be provided information about this program by US
representatives. The USG will try to assist Cubans in safehavens
with this program. If a Cuban in a safehaven believes he or she
might be eligible under this program, (s)he should contact a USG
representative.

IV. Immigrant Visas and Visa Waiting List

Q.: How does one get an immigrant visa?

A.: The U.S. is continuing to issue immigrant visas to qualified
Cubans, and relatives in the US are encouraged to file visa
petitions on behalf of their family members in Cuba. Visa
petition forms (I-130's) are available by calling the INS toll-
free number, 1-800-755-0777. They also can be picked up in the
US Federal Building in Miami, located at 51 SW 1st Avenue, Room
630, or at any INS office in the United States.

Q.: What is being done with the backlog?

A.: USINT has received names and addresses of all those on the
immigrant visa waiting list. Efforts have begun to notify Cubans
who are eligible.

Q.: Can Cubans in safehavens benefit from this program?

Yes, if they choose to return home. Cubans in Guantanamo and
Panama will be provided information about this program by US
representatives. If a Cuban in a safehaven believes that a
relative has filed a petition for him or her, and that (s)he
might be on the waiting list, (s)he should contact a USG
representative.

V. Voluntary Return

Q.: How many Cubans who requested to return have been able to do
so?

CLINTON LIBRARY PHOTOCOPY

Appx-0239

ase: 25-1384 Document: 00118298863 Page: 244 Date Filed: 06/11/2025 Entry ID: 6728195
Case 1:25-cv-10495-IT Document 24-41 Filed 03/17/25 Page 25 of 55

4

A.: An initial group of 17 Cubans who chose to go home were returned on October 7. They were flown from Guantanamo to Havana. We are anticipating the return of Cubans who have made the request to proceed on a regular basis.

Q.: How many Cubans have requested to return?

A.: Several hundred

Q.: Will Cubans in safehavens be forced to return?

A.: No. They can remain in the safehavens indefinitely.

Q.: Is the US government encouraging Cubans to return?

A.: No. We have provided Cubans in safehavens full information about their options, including the possibility of going back home or of remaining in the safehavens.

Q.: How can we be sure that Cubans who choose to return will not be persecuted when they do?

A.: As part of the Cuba/US talks, we made clear that people who wish to return should not be subject to negative treatment. These migration talks will be ongoing, and will next be resumed at the end of the month. This is a subject that can and will be monitored.

Q.: If individuals are not cleared for return by the Cuban authorities, what will be their eligibility for migration to the US?

A.: We will do our very best to ensure that individuals who wish to return are able to go home. We also will ensure that all individuals who are eligible to migrate legally to the US will have an opportunity to do so.


VI. Parole (in general)

Q.: Will any conditions be placed on paroled Cubans? Will there be any time limit?

A.: No. They will be paroled into the US for a two-year period. After one year, they will be eligible to apply for permanent residence.

Q.: How many Cubans do you anticipate will be receiving parole?

CLINTON LIBRARY PHOTOCOPY

Appx-0240

We will be using a combination of our programs to reach the 20,000 figure in the agreement.

VII. Legal Authority

Q.:  What legal authority does the Attorney General have to exercise her parole authority in this way?

A.:  Under section 212(d) (5) of the Immigration and Nationality Act, the Attorney General is given the authority, at her discretion, to parole aliens into the US "for reasons deemed strictly in the public interest."  Normalizing the immigration flow between Cuba and the US is "strictly in the public interest."  The parole program is part of an overall effort to redirect an abnormal flow into a legal one.

Q.:  Doesn't such a parole program intrude upon Congress' law-making authority?

A.:  No.  The purpose of the program is to facilitate a normalization of migration between the two countries.  It is perfectly consistent with overall congressional goals to stem irregular migration and promote legal migration.

Q.:  Isn't the parole program inconsistent with the 1980 Refugee Act which provides that the AG "may not parole into the US an alien who is a refugee . . . except in compelling, individual circumstances"?

A.:  No.  People admitted as refugees will not be paroled.  The US has operated for a number of years - and will continue to operate - an in-country refugee program in Havana under which several thousand Cubans are admitted into the US each year.

Q.:  Why isn't a similar program being established for Haitians?

Historically we have had a special migration relationship with Cuba.  We did not regularly parole in and legalize virtually every Haitian who reached our shores.  The Cuban Adjustement Act is unique to Cubans.  Moreover, we expect conditions that have produced large irregular migration from Haiti to change with the restoration of democratic government.

VIII.  Cubans at Krome and Port Isabel

Q.:  What are the plans for Cubans in Florida and Texas?

CLINTON LIBRARY PHOTOCOPY

Appx-0241

ase: 25-1384   Document: 00118298863   Page: 246   Date Filed: 06/11/2025   Entry ID: 672819
Case 1:25-cv-10495-IT   Document 24-41   Filed 03/17/25   Page 27 of 55

6

A.: Cubans at Krome and Port Isabel have been placed in normal immigration proceedings.

Q. How many Cubans have been paroled in from Krome and Port Isabelle?

A.: Children and their caregivers have been paroled in.

CLINTON LIBRARY PHOTOCOPY

UNEDITED

U.S. DEPARTMENT OF STATE
DAILY PRESS BRIEFING

**EXHIBIT D**

DPC #50

WEDNESDAY, APRIL 12, 1995, 1:28 P. M.
(ON THE RECORD UNLESS OTHERWISE NOTED)

MR. BURNS: Good afternoon, ladies and gentlemen. Welcome to the State Department briefing. I apologize for being late. We'll try not to make a habit of that. I don't have any prepared statements for you, so I'm glad to go directly to your questions.

Q    Do you have any reaction -- today is the parliament-in-exile they're establishing in The Netherlands.

MR. BURNS: Excuse me, I didn't hear the last part of your question.

Q    The Kurdish parliament-in-exile -- do you have any reaction. They established today.

MR. BURNS: We have seen the reports that the PKK Parliament-in-exile will be meeting in The Netherlands. We've expressed our views both to the Government of Turkey and to the Government of The Netherlands that we think that the PKK is a brutal terrorist organization, and we obviously don't support the creation of any kind of parliament-in-exile that is associated with the PKK.

We've made those views known to both governments in the last 24 hours.

Q    Are you expected to ask The Netherlands to somehow make it impossible for this parliament to have its meeting there? I mean, did you make any representations to that effect?

MR. BURNS: I don't have details on our conversations with the Dutch Government, and I leave it to them to characterize their views on this. But I believe that the organization -- the people who will be meeting have not violated -- at least we understand they have not violated Dutch law, and therefore there wasn't any grounds to deny them the right to meet.

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL**    # of pages ▶ 3

To                    From

Dept./Agency          Phone #

Fax #                 Fax #

NSN 7540-01-317-7368    5099-101    GENERAL SERVICES ADMINISTRATION

Cuba portion begins page 2

CLINTON LIBRARY PHOTOCOPY

Appx-0243

-2-                          Wednesday, 4/12/95

     But I do want to reaffirm that it's our position that
this is a brutal terrorist organization, and we obviously
don't support the convening of a parliament of this nature
in any way.



     Q      There's a story in the Post today that suggests
that the Cubans are upset about the Helms' proposal and that
a new exodus of migrants could be unleashed if it's
approved.  Do you have any comment?  And I should mention
that this is what the Cubans have informed the State
Department.

     MR. BURNS:  I do have a comment.  I have a general
comment about our policy towards -- on the migration talks
that I think might help with this question, George.

     I'll just take you back to last September and remind
you that the measures announced by President Clinton last
September provide for a safe and orderly flow of migrants
from Cuba to the United States.

     We have an agreement with Cuba that is being
implemented by the United States and by Cuba.  We are on
track to meet our commitments under this September 9
migration agreement, and we certainly expect the Cuban
Government to meet its own obligations, and we believe it is
meeting its obligations.

     Remember that we pledged to issue 20,000 travel
documents.  I believe it's 16,000 people -- Cubans have been
approved for migration, 11,000 of whom fall under this
category to receive benefits under the 20,000 number.

     It remains our policy that Cubans intercepted
attempting unauthorized migration will not be taken into the
United States but will be offered safehaven at Guantanamo.
This policy has discouraged over many months, and we believe
that it will continue to discourage unsafe voyages.

     The Cuban Government has not communicated to us any
message about a looming large-scale migrant problem.  If you
have any specific questions on the numbers of people at
Guantanamo or who has been paroled and who hasn't, I've got
some figures for you.  But let me take the next question,
George, if you have one.

     Q     In effect, then you seem to be denying a point
in this Post story which was that the Cubans informed the
United States or warned the United States that if the Helms'
legislation were to go through, that would result in a
large-scale exodus, uncontrollable exodus.  Are you saying
that they didn't say that?

CLINTON LIBRARY PHOTOCOPY
Appx-0244

-3-                          Wednesday, 4/12/95

MR. BURNS:  I checked with our experts this morning, the people who deal with the Cubans every day, and I understand that we have not received any such kind of a dire warning from the Cuban Government on this issue.

Q     Is this something short of a dire warning, Nick?

MR. BURNS:  No --

Q     Has there been any concern -- I mean, use any word you want, but has there been any sort of communication that might indicate they would do that?

MR. BURNS:  Our general view is that this agreement is in force; that both sides are meeting it; that the refugees -- excuse me -- the migrants are being handled in a constructive and orderly way, and that there isn't a large-scale problem here, and we have not heard anything of the kind from the Cuban Government in our private discussions with them.

Q     Can I just try that another way.  Have they told you that a refugee outflow would be "difficult to control" if the Helms' measure was passed?

MR. BURNS:  I have not been in discussions with the Cuban Government on this issue, so I can't speak to everything that has been said.  But after seeing the piece this morning, we certainly looked into this and discussed it with a lot of people, including those people who are responsible for Cuban affairs, and I'm giving you in essence this morning a quite categorical response to the story.

Q     Are there any major issues concerning this September 9th agreement still pending that the United States expects to raise when the migration talks resume next week?

MR. BURNS:  The migration talks will resume -- will take place next week in New York.  I think we announced that last week.  This provides an opportunity for the United State and Cuba to review -- and we've done this a couple of times since this September 9th agreement -- review the major issues surrounding the migrant program, to review the status of the individuals who are still at Guantanamo -- and I think there are a little over 22,000 Cuban migrants who are still in Guantanamo -- and we look forward to the review.

Q     Nick, can I try again from another angle, as Carol said.  Regardless of what the Cubans may or may not have told you, it's not brain surgery to know that they don't like the Helms' amendment, and the threat of migration is their only trump card in this sort of thing.

CLINTON LIBRARY PHOTOCOPY
Appx-0245

-4-                    Wednesday, 4/12/95

Are you folks worried about the Helms' amendment passing and what that might mean for possibly a migration?

MR. BURNS:  I can't speak to the Cuban view of the Helms-Burton legislation, but I can speak to an American Government view.  As you know, we have been discussing this legislation for some time with interested members of Congress.  Our policy towards Cuba is based on the Cuban Democracy Act of 1992.  We believe that is a very good foundation for our policy.

Some aspects of the Helms-Burton legislation support the Cuban Democracy Act, are beneficial, and we could support some aspects.  There are other aspects that are troubling to us, and we have made our views known to the interested members of Congress.

Q    (Inaudible)

MR. BURNS:  I don't think it's wise for me to go into our discussions with the members of Congress on the bill in detail.  I think a general response really suffices for the moment.

Q    And it's fair to say also you have gotten a number of letters and complaints from allied governments on this, have you not?

MR. BURNS:  I think certainly some allied governments have spoken publicly about potential problems that they see in this legislation.  Some of those problems are problems that we have identified, and we've made our views known directly to the interested members of Congress.

Q    I'd like to switch subjects if there are no other questions on that.

Q    Wait.  I have one more question.

MR. BURNS:  Betsy.

Q    Has there been any planning or thinking in this building about what to do to Guantanamo?  I mean, are you just going to leave twenty-some thousand people there or less?  I mean, has there been any kind of long-range planning at all as to what to do with that facility?  If you keep taking Cubans there, there must be some kind of permanent housing or something.

MR. BURNS:  It's obviously a very difficult situation, and the status of the people at Guantanamo is of great concern to us.  We have made one clear decision, and

CLINTON LIBRARY PHOTOCOPY

Appx-0246

-5-                        Wednesday, 4/12/95

that is we are not going to compel anyone to leave Guantanamo.  No one will be required by force to leave.

I can give you some background on the status of the people there.  I believe that nearly 9,000 Cuban migrants have been paroled into the United States on humanitarian grounds or have been medically evacuated to the United States since this agreement came into effect in early September.

Roughly 7700 of those people are from Guantanamo and roughly 1200 from Panama.  There are no longer any Cuban migrants in Panama.

We are operating under the provisions of humanitarian parole.  Humanitarian parole is granted by the Attorney General on a case-by-case basis, so I'm unable really to tell you how many more Cubans at Guantanamo will be paroled into the United States.  Because it's done on a case-by-case basis.  We don't have set numbers and set targets, but they will be eligible for humanitarian parole in accordance with criteria that the President set down many months ago, and I can get into that if you'd like.

Q      I asked at the beginning of the week. Christine said it was being investigated.  An article in The New York Times on Saturday said that Iran had shipped two oil rigs enroute to Serbia in violation of U.N. sanctions. Have you got anything on that?

MR. BURNS:  We're interested in that question.  We are looking into it, and we don't have anything for you on it.  But on the question of sanctions in general, obviously we're still committed to the sanctions against Serbia.  That question has sparked our interest, and I hope to get something for you, but I don't have anything for you today.

Q      Since we're on the subject of Serbia, the Contact Group meeting in -- Mr. Milosevic, has he accepted the deal now, so on and so forth?

MR. BURNS:  I have something, yes.  The Contact Group representatives met in Belgrade yesterday, as you know, with the Serbian President.  That meeting gave no cause for optimism regarding early movement towards the mutual recognition among the former Yugoslav republics or really any optimism about a Bosnian cease-fire.

As you know, the group had to cancel its planned travel to Bosnia today, April 12, because the Serbs in the region would not guarantee the security of the Contact Group's plane to land at Sarajevo airport.

CLINTON LIBRARY PHOTOCOPY

Appx-0247

> **EXHIBIT**
>
> **E**

## TALKING POINTS

--    At 12:00 noon, the United States and Cuba will be announcing that they have agreed to modifications of the September 9, 1994 migration agreement.

--    The statement will present the broad outlines of the new agreement soon to be finalized.

--    The new agreement represents an important step towards regularizing migration procedures with Cuba, finding a humanitarian solution to the situation at Guantanamo, and preventing another uncontrolled and dangerous outflow from Cuba.

--    Our general policy toward Cuba remains committed to the Cuban Democracy Act and to its central goal - promoting a peaceful transition to democracy in Cuba. We will continue to enfoce the economic embargo to pressure the Cuban regime to reform. We will continue to reach out to the Cuban people through private humanitarian assistance and through the free flow of ideas and information to strengthen Cuba's fledgling civil society as presented under Track II of the Cuban Democracy Act. And we remain ready to respond in carefully calibrated ways to meaningful steps toward political and economic reform in Cuba.

### PAROLE FROM GUANTANAMO

--    The new agreement will provide for the continued humanitarian parole of migrants currently at Guantanamo after the current program has been completed. There will be about 15,000 Cuban migrants remaining at Guantanamo this summer, once we complete the parole process on the basis of existing criteria. Many of them were caught in the midst of a changing migration policy, have been living in difficult conditions, at a cost to the U.S. of $1 million per day, and with security risks for U.S. personnel.

--    The Joint Staff has expressed its concern at the continued presence of thousands of Cuban migrants at Guantanamo.

--    As in the case of prior parole programs for children, the elderly, and medical hardship cases, we will proceed carefully, on a case by case basis. We will seek adequate sponsorship guarantees for the parolees and verify their criminal and medical backgrounds. Every effort will be made to minimize the impact of the parole program on state and local economies.

--    Beginning in September 1995 and over the following three years, Cubans paroled from Guantanamo under this agreement will count toward meeting the minimum of 20,000 Cubans which we agreed

CLINTON LIBRARY PHOTOCOPY
Appx-0248

2

to admit every year from Cuba under the September 9, 1994
agreement.  To be concrete: We will parole into the U.S. Cubans
currently at Guantanamo who do not meet existing parole criteria.
In order to lessen the burden on state and local economies, we
will reduce the number of Cubans allowed to migrate legally from
Cuba to the U.S. over the next three years to reflect this added
influx from Guantanamo.  As agreed with the Cuban government, we
will be able to offset up to 5,000 Cubans paroled into the U.S.
under this agreement (regardless of when they are paroled)
against the 20,000 we had agreed to admit legally from Cuba.

--   Cuba has agreed to take back those Cubans who would be
ineligible for admission into the United States, based either on
their criminal record, their medical condition, or the commission
of acts of violence while at Guantanamo.


UNSAFE, IRREGULAR DEPARTURES FROM CUBA

--   At the same time, in order to ensure against a resumption of
dangerous, irregular migration from Cuba to the U.S., the two
countries have agreed that, effective immediately, migrants
intercepted at sea by the United States and who are attempting to
enter the U.S. as well as Cubans who enter Guantanamo illegally,
would be taken back to Cuba.  The Cuban government will continue
to take appropriate steps to prevent irregular departures from
Cuba, in accordance with the September 9 agreement.

--   Of course, the United States will continue to abide by its
international responsibilities with regard to *bona fide* refugees,
and we will take appropriate steps to ensure their protection.
U.S. policy in this regard will conform as much as possible to
our practices towards migrants from other countries.

--   Cuban migrants who make it to the United States will be
placed in deportation proceedings, consistent with U.S. policy
towards other illegal migrants.

--   We have a commitment from the Cuban government that no
migrant taken back to Cuba will suffer reprisals, be prosecuted,
lose any type of benefit, or be prejudiced in any manner, as a
result either of an attempted irregular departure or of applying
for refugee status at the U.S. Interests Section.  US officials
in Cuba will monitor this situation carefully.

--   U.S. officials will be at the dock upon the return of Cuban
migrants to provide assistance for asylum applicants.  Cuba has
agreed to this procedure as well as to U.S. monitoring of the
treatment of Cuban nationals who are taken back to Cuba.

CLINTON LIBRARY PHOTOCOPY
Appx-0249

3

--    Cubans must know that nobody leaving Cuba irregularly by
boat will be resettled in the United States.  The only way to
come to the U.S. is through the migration process in Cuba which
includes in-country refugee processing, our new lottery program,
and expanded opportunities for family members of immigrant visa
beneficiaries.  That process is now well underway.

--    In particular, Cubans who believe they have a valid asylum
claim should apply at the U.S. Interests Section.  Cuba is one of
only three countries in which the U.S. offers in-country
processing for asylum claimants, and we are making great efforts
to meet the needs of Cubans who fear persecution.  The
Administration has vastly increased the number of Cubans who can
be admitted to the U.S. as refugees each year.  It is now
approximately 7,000.

CLINTON LIBRARY PHOTOCOPY

<u>Q's and A's</u>

Q1.  Are there any secret, side agreements with Cuba?

A.   No.

Q2.  Were any other topics discussed?

A.   In the course of our conversations with the Cuban representatives, we have made clear our intention to continue with Track II efforts to increase contacts between our two people.  We also explained the Administration's position on the Helms/Burton bill, which we had previously communicated to the Congress.  Finally, we reiterated our willingness to respond to meaningful steps towards economic and political reform in a carefully calibrated manner.  In that context, we indicated that we were following the state of the recently allowed farmers markets.  If progress were to continue, we would consider appropriate steps, consistent with the Cuban Democracy Act.  We made clear that any additional steps would have to await changes more significant than we have seen to date.

Q3.  How were these discussions conducted?

A.   Through diplomatic channels.

Q4.  Doesn't this represent a total reversal of policy?

A.   Our goal was and remains the establishment of safe, legal, and orderly migration.  The Guantanamo safehaven was one element toward that goal.  But, as we know, it raised significant problems -- in humanitarian terms, in financial terms, and in safety terms.  This new approach permits us to find a humanitarian solution to the situation at Guantanamo without encouraging a new unsafe and uncontrolled migration, and preserving the broad legal migration program for Cubans in Cuba. The approach furthers our goal and U.S. national interests.

Q5.  How will you ensure the protection of migrants who claim refugee status?

A.   Any Cuban with a legitimate political asylum claim should go to the U.S. Interests Section in Havana where such claim will be processed.  As for Cubans intercepted at sea, as I have said, we will take adequate measures to ensure that cases of those with a genuine need for protection will be examined before return.

I also want to emphasize that Cuba is one of the very few countries in the world in which we maintain an in-country processing center.  The Cuban government has given us assurances

CLINTON LIBRARY PHOTOCOPY

that returnees will not suffer reprisals (including persecution, withholding of benefit or other detrimental action) for applying for refugee status. The situation of refugee applicants will be followed by U.S. officials to ensure that the Cuban government lives up to its commitment.

Q6. What form of screening will take place on the Coast Guard cutters?

A. As we have said, we will ensure that the rights of individuals to claim refugee status is fully protected and we will deal with each situation as it arises. We will develop whatever procedures are appropriate given our experience under this new program. Our firm intention is to provide each migrant who so desires an opportunity to make an asylum claim in a setting free of coercion. Beyond that, I see no purpose in getting into the details of the procedures we will be applying to ensure such protection.

Q7. Will all Cubans at Guantanamo be paroled into the U.S.?

A. The Cuban government has agreed that we could parole as many Cubans currently at Guantanamo as we deem necessary on humanitarian grounds. Cuba also has agreed to the return of migrants who would be ineligible for admission into the U.S. This would include Cubans previously deported from the U.S., Cubans with a criminal record, or Cubans responsible for acts of violence at Guantanamo.

As we have done in the case of children, the elderly and medical hardship cases, we will assess the situation of Cuban migrants on a case-by-case basis, bearing in mind the impact of paroles on state and local economies and the need for adequate sponsorship. In particular, no migrants will be brought from Guantanamo until sponsorship and resettlement assistance has been obtained through the Justice Department's Community Relations Service and the national voluntary agencies with which CRS works. That is why we have given ourselves up to a year to complete this process.

Q8: I don't really understand what you are saying about the Guantanamo population. Will people in the safe haven be returned to Cuba against their will?

A: Cubans in the safe haven who are ineligible for entry into the United States -- such as those who have serious criminal histories, who were previously removed from the United States for committing crimes, or who committed violent acts in Guantanamo -- may be returned to Cuba.

CLINTON LIBRARY PHOTOCOPY

Appx-0252

3

**Q9:** Isn't this going to pose a great burden on the State of Florida?

**A:** We think precisely to the contrary. By reducing further the risk of uncontrolled migration, this program further minimizes the greatest burden on the state and its subdivisions. Moreover, migrants are brought in from Guantanamo in a manner that is quite deliberately designed to minimize the impact on Florida. No one is brought in without sponsorship arranged in advance, and migrants without direct family links in Florida are resettled elsewhere in the United States.

Of course, we are sympathetic to the burden that the State of Florida is carrying with regard to migration from Cuba, and we will be considering steps we can take to come to Florida's assistance.

**Q10.** Are you prepared to use force in case Cubans intercepted at sea refuse to return to Cuba?

**A.** The Coast Guard will apply its regular guidelines regarding the return of migrants rescued at sea. We expect that, given expanded possibilities for legal migration from Cuba and our commitment to facilitate the processing of refugee claims in Havana, Cuban migrants rescued at sea will cooperate with U.S. Coast Guard.

**Q11.** If Cuba is the repressive, outlaw regime our government says it is, how can you justify returning people who are fleeing for their lives?

**A:** This program is in no way an endorsement of the Castro regime. The United States has an obligation both to protect itself against uncontrolled and illegal immigration and to protect the rights of refugees in accordance with international law. We believe the program we are implementing today represents a significant step in furtherance of both goals.

**Q12:** You have said that Cubans who reach the United States illegally will be placed in exclusion proceedings, detained, and treated like illegal migrants from other countries. Does this mean you are going to go after Cubans who previously arrived illegally?

**A:** The vast majority of Cubans now in this country are here legally. We will treat those who are already here and have violated the terms of their admissions consistent with the policy that has been in effect until this day.

**Q13:** The Cuban government has long expressed interest in the return to Cuba of certain people now living in the United States who

CLINTON LIBRARY PHOTOCOPY

4

are accused of crimes in Cuba.  Will you now return those people against their will?

A:   Cubans who are legally in this country and who have not violated the terms of their admission will not be returned.  [We have no extradition treaty with Cuba.]

Q14: Does this mean you now favor repeal of the Cuban Adjustment Act?

A:   No.

CLINTON LIBRARY PHOTOCOPY

Appx-0254

Cuba Call List

## NSC

SANDY BERGER
CALLS:

To be made at 8:30
in order to
precede calls made
by Sen. Graham:

Mack
Torricelli

Other calls to be
made by Sandy:

Rangel
Mfume

Other NSC calls:

Dole
Daschle
Specter
Kerrey
Gingrich
Gephardt
Armey
Bonior
DeLay
Combest
Dicks
Meek
Young
Gibbons
Canady
Miller
Dave Weldon
Mark Foley
Meek
Shaw

## STATE

Calls to be made
by Tarnoff or
Watson at 8:30 to

precede Graham
calls:

Menedez
Ros-Lehtinen
Diaz-Balart
Goss

Other State calls:

Helms-P
Pell
Coverdell-P
Dodd-P
Leahy
McConnell
Gilman
Hamilton
Burton-P
Obey
Livingston
Hastings
Deutsch-P
Johnston-P
Payne-P

## DOD

Thurmond
Nunn
Stevens
Inouye
Spence
Dellums
Young-P
Murtha
McDade

## DoJ

Hatch-P
Biden-P
Simpson-P
Kennedy-P
Hyde-P
Conyers-P
Lamar Smith-P
Bryant-P
McCollum-P
Schumer-P

P-- Principal
call, other calls
staff or principal

Briefings should
be offered to
SFRC, HIRC,
Judiciary
Committees and
Fla. delegation.

Calls that we will
ask Sen. Graham to
make beginning at
9 am:

Mack
Torricelli
Menedez
Diaz-Balart
Goss

CLINTON LIBRARY PHOTOCOPY
Appx-0255

EXHIBIT

F

THE WHITE HOUSE

Office of the Press Secretary

_____

For Immediate Release　　　　　　　　　　　　　　May 2, 1995

PRESS BRIEFING
BY ATTORNEY GENERAL JANET RENO,
GENERAL JOHN SHEEHAN, COMMANDER IN CHIEF OF
THE U.S. ATLANTIC COMMAND,
AND UNDER SECRETARY OF STATE
FOR POLITICAL AFFAIRS PETER TARNOFF

12:15 P.M. EDT

　　　　MR. MCCURRY:  Good afternoon, everybody.  As you know,
we're here to discuss some matters related to Cuban migration
policy.  But I know a lot of you have got interest in the
Oklahoma City investigation.  For that reason, I've asked the
Attorney General to start with just a very brief statement on
that subject.  She's not in a position to take many questions.
We will then move on to the Cuban migration discussion.

　　　　Attorney General.

　　　　ATTORNEY GENERAL RENO:  At approximately 6:45 a.m. this
morning, the FBI arrested Robert Jacks and Gary Land in Carthage,
Missouri based on material witness warrants issued by a
magistrate judge in Oklahoma, based on probable cause to believe
that they possessed information concerning the April 19, 1995
bombing in Oklahoma City.  The arrest occurred without incident.
Jacks and Land are cooperating with the FBI in the
investigation, and have agreed to be interviewed and provided
consent to search their property.  The investigation is
continuing.

　　　　Also today, at the request of Director Freeh, I have
approved his appointment, Larry Potts as the Director of the FBI.
Director Freeh's recommendation was based on Mr. Potts's long
and distinguished career in law enforcement and the confidence
the Director has in him.

　　　　Director Freeh has described Mr. Potts as the very best
the FBI has.  Mr. Potts has been directing the investigation of
the Oklahoma City bombing, and the results to date are a tribute
to his ability to coordinate a complex, nationwide, multi-agency
investigation.

　　　　Q　　　How did you find those guys?

CLINTON LIBRARY PHOTOCOPY
Appx-0256

2

Q        Madam Attorney General, are these two considered suspects in the bombing?

ATTORNEY GENERAL RENO:  I would not comment and I would ask everyone to let the investigation proceed and not jump to conclusions.

Q        Well, is either believed to be John Doe II?

ATTORNEY GENERAL RENO:  Again, I would not comment and would reiterate my concern.

Q        General Reno, is the search --

Q        Can you tell us how they were discovered, how you found them?  Could you tell us how you found them?  Did they give themselves up, or did you get an informant tip, or how were they discovered?

ATTORNEY GENERAL RENO:  Again, as I have told you all, it's just not right for me to comment on how the investigation is conducted, what leads us to a certain point, because that can only lead to an interruption of the investigation, and I know we want to have it proceed as --

Q        In other words, you're not going to say anything? (Laughter.)

ATTORNEY GENERAL RENO:  I have told you again and again that I don't comment on pending investigations, because I think --

Q        Ma'am can you tell us please why Potts was named and what's the reason -- and the head of -- the Assistant Director of FBI --

Q        Could you tell us how the search for John Doe II is proceeding?

ATTORNEY GENERAL RENO:  Again, as I have said before, we are following every lead, and there are many.  The people of this country are cooperating in an extraordinary fashion, and the investigation is proceeding.

Q        And you're looking for others, are you?

Q        Are there other suspects that you are still looking for at this point?

ATTORNEY GENERAL RENO:  I think it's fair to say that we're following every lead with respect to any information that would lead us to anybody responsible for this bombing.

CLINTON LIBRARY PHOTOCOPY

3

Q       Ms. Reno, could you talk about the death threats you've been getting?

MR. MCCURRY:  I think that's about all.  We want to move on.

Q       Well, I think she might answer my question, which was fully on the floor.  I want to know why Mr. Potts's named and have we had a man like this designated in the FBI before and what's the reason for this?

ATTORNEY GENERAL:  As Director Freeh has said, he appointed Mr. Potts as the Deputy Director of the FBI based on his very distinguished career in law enforcement.  Larry Potts is an extraordinary agent, a dedicated law enforcement official.  He has been the person responsible in this instance for the day-to-day operation of the Oklahoma City investigation, and I think it has been a landmark for law enforcement efforts.

Q       Ms. Reno, can you talk about the death threats?

MR. MCCURRY: Okay, we're going to move on now to the subject of Cuba. At this hour, the United States and the Republic of Cuba are releasing a joint statement on agreements that they have reached to regularize further their migration relationship.  That's what our cast here is to talk about.  I'm going to ask Attorney General Reno to open with a statement on that.  We will have a copy of the joint statement that we are issuing along with the Republic of Cuba.  That will be available to you at the conclusion of the briefing.

Attorney General Reno will speak and then I've also asked General John Sheehan, who is the Commander In Chief of the U.S. Atlantic Command, to talk a little bit about Guantanamo Bay and some aspects of the migration agreement. We also have Doris Meissner, the Commissioner of the Immigration and Naturalization Service, Admiral Kramek, who is the Commandant of the Coast Guard, and Under Secretary of State for Political Affairs, Peter Tarnoff, who is here as well. And they're available as you might have any questions related to the agreement that we discussed today.  So I'll start again with Attorney General Reno.

ATTORNEY GENERAL RENO:  It has long been the policy of the United States that Cubans who wish to migrate to the United States should do so by legal means.  The U.S. interest section in Havana accepts and processes requests for visas, and it also operates an in-country program for those Cubans who seek refugee status for entry into the United States.

Pursuant to this policy, last August I announced that Cubans attempting a regular means of migration to the United

CLINTON LIBRARY PHOTOCOPY

4

States on boats and rafts would not be allowed to enter this country, but, rather, would be brought to the United States Naval Base at Guantanamo Bay where they would be offered safe haven.

Last September, following negotiations with representatives of the Cuban government, the United States announced that it would increase Cuban migration to the United States to permit 20,000 legal entrants per year. This program, which includes immigrant visas, refugee applications and a special Cuban migration program designed to broaden the pool of potential entrants, is on target, and we expect to continue Cuban legal migration at this level in the years to come. This year alone, we expect to bring 7,000 Cuban refugees to the United States through our in-country program in Havana.

The United States is now prepared to make another important step towards regularizing Cuban migration between Cuba and the United States. First, with respect to Guantanamo, we will continue to bring to the United States those persons who are eligible for special humanitarian parole under the guidelines announced by the President last October and December.

The government of Cuba has agreed to accept all Cuban nationals in Guantanamo who wish to return home, as well as persons who have previously been deported from the United States and persons who would be ineligible for admission to the United States because of criminal record, medical, physical or mental condition, or commission of acts of violence while at Guantanamo.

All other Cubans in the safe haven will be admitted into the United States on a case-by-case basis as special Guantanamo entrants, bearing in mind the impact of paroles on state and local economies and the need for adequate sponsorships. As has been true for all Cubans and Haitians previously paroled into the United States from Guantanamo, sponsorship and resettlement assistance will be obtained prior to entry. The number of these special Guantanamo entrants admitted to the United States will be credited against the 20,000 annual Cuban migration figure. Thus, there will be no net increase in Cuban migration.

Effective immediately, Cuban migrants intercepted at sea, attempting to enter the United States or who enter Guantanamo illegally will be taken to Cuba where U.S. consular officers will assist those who wish to apply to come to the United States through already-established mechanisms. Cubans must know that the only way to come to the United States is by applying in Cuba.

All returnees will be permitted to apply for refugee status at the U.S. interest section in Havana. Cuba is one of only three countries in the world in which the United States conducts in-country processing for refugees. The government of Cuba has committed to the government of the United States that no

CLINTON LIBRARY PHOTOCOPY

5

one will suffer reprisals, lose benefits or be prejudiced in any manner, either because he or she sought to depart irregularly, or because he or she has applied for refugee status at the United States interest section.

The Cuban government made a similar commitment in the context of the September, 1994 agreement and we are satisfied that it has been honored. Moreover, the government of Cuba will permit monitoring by U.S. consular officers of the treatment of all returnees.

Migrants intercepted at sea or in Guantanamo will be advised that they will be taken back to Cuba where U.S. consular officials will meet them at the dock and assist those who wish to apply for refugee admission to the United States at the interest section in Havana. They will be told that the government of Cuba has provided a commitment to the United States government that they will suffer no adverse consequences or reprisals of any sort, and that U.S. consular officers will monitor their treatment. they will also be told that those persons who seek resettlement in the United States as refugees must use the in-country refugee program.

Measures will be taken to ensure that persons who claim a genuine need for protection which they believe cannot be satisfied by applying at the U.S. interest section will be examined before return. Cubans who reach the United States through irregular means will be placed in exclusion proceedings and treated as are all illegal migrants from other countries, including giving them the opportunity to apply for asylum.

The United States government reiterates its opposition to the use of violence in connection with departure from Cuba and its determination to prosecute cases of hijacking and alien smuggling.

These new procedures represent another step towards regularizing migration procedures with Cuba, finding a humanitarian solution to the situation at Guantanamo and preventing another uncontrolled and dangerous outflow from Cuba.

I want to make clear that the United States policy towards Cuba remains the same. We remain committed to the Cuban Democracy Act and its central goal -- promoting a peaceful transition to democracy in Cuba. We will continue to enforce the economic embargo to pressure the Cuban regime to reform.

We will continue to reach out to the Cuban people through private humanitarian assistance and through the free flow of ideas and information to strengthen Cuba's fledgling civil society. And we remain ready to respond in carefully calibrated

CLINTON LIBRARY PHOTOCOPY

6

ways to meaningful steps towards political and economic reform in Cuba.

UNDER SECRETARY TARNOFF: Thank you very much. I would like to applaud the effort on the part of the Attorney General to regularize this process for three very simple reasons -- first, the safety of the 6,000 American servicemen that are serving in Guantanamo Bay, Cuba. As you know, we were moving down a trail where there was distinct possibility of some of those servicemen and some of those Cubans being hurt.

Second, from a military perspective, it's costing us $1 million a day to run the camps at Guantanamo Bay, Cuba. That money now can be turned -- and once we return these servicemen back to the parent units, back into the readiness accounts and we can start plussing up the readiness capability to military forces. In addition to that, we're about ready to spend $100 million to make the camps more permanent, and so all of these collective things, I think, go, and I would like to truly applaud the efforts on the part of the Attorney General to regularize this process.

MR. MCCURRY: Let me just add one closing comment before we go to questions. In developing the approach that the administration has outlined today, we have consulted very closely with both Governor Chiles and with Senator Graham. And I must say that the President is grateful for the fact that they have both authorized the White House to indicate that they are fully supportive of the policy that we are reviewing today with you.

With that, let's go to questions and you can direct them anywhere.

Q      How about Senator Mack?

MR. MCCURRY: Well, we will continue consultations. There have been consultations ongoing this morning with other members as well.

Q      Was this policy forced because it was about to blow up on Guantanamo?

ATTORNEY GENERAL RENO: What we have tried to do from the beginning is regularize migration from Cuba so that anybody who came to this country came legally and safely. It was clear as we put the process into effect that it was beginning to work. We now have a track record since September of legal migration procedures working so that people can apply safely for refugee status. Over 6,000 have been determined to be refugees; 800 have all ready been brought to this country; and I think people can understand that legal migration does work.

CLINTON LIBRARY PHOTOCOPY
Appx-0261

7

At the same --

Q       That's not an answer to my question.  The General indicated safety --

ATTORNEY GENERAL RENO:  You asked what prompted this, and I'm --

Q       No, I didn't ask what prompted it.  He indicated there was a safety problem.

ATTORNEY GENERAL RENO:  Well, I'm telling you what prompted the particular change.  Seeing that worked, seeing however, that the migrants at Guantanamo had been dislocated, had lost their jobs, had not been able to watch firsthand how it was working, I think that this represents a humanitarian way to address the issue while putting everybody on notice that legal migration processes are working and that they will be utilized.

Q       Well, General, you said that any Cubans who tried to leave Cuba now must do so through the Cuban interest section, will be intercepted at sea and brought back to Cuba.  But you were equally as firm last summer, as was the President, in saying that this is not the way to get to the United States and that those who were in Guantanamo would never be admitted to the United States.  Why should anybody in Cuba believe the new policy when the old policy was reversed?

ATTORNEY GENERAL RENO:  One of the things that we have tried to do in this whole process is avert a mass migration to this country and to avoid a tremendous outflow of illegal immigrants.  What we did then was to put into place a system that we knew worked.  Obviously, it was not that convincing to those at Guantanamo, but it has been convincing to people in Havana, in Cuba who can see that it's worked and who are utilizing those processes now.  We think that this is the best way to move forward to further regularize migration from Cuba.

Q       General, how long would you anticipate this will take?  You said all of those there now would be eligible, but you said on a case-by-case basis.  Which is it?

ATTORNEY GENERAL RENO:  Not all.  Those with --

Q       I understand.  All who qualify, but -- but basically, you've got a large number of people --

ATTORNEY GENERAL RENO:  What we want to do is to admit those that are not excludable that don't have criminal histories.  We want to admit them in an orderly way based on appropriate sponsorships, based on concern for the community that they're going to.  What we have been doing to date is paroling in on a

CLINTON LIBRARY PHOTOCOPY
Appx-0262

8

humanitarian basis the children and their families at roughly 500 a week, and I would expect that rate would continue.

Q       That it would continue to be 500 a week until you've emptied the compound there at Guantanamo?  Is that the --

ATTORNEY GENERAL RENO:  Again, what we want to do -- it may be that, or it may be as we formulate it and see just what's involved, that we can speed it up, but we want to make sure that it's done in an orderly way.

Q       Can the General tell us a question, please?  You said, sir, I believe I understood you to say that you were going to spend $100 million making permanent the camps down there?

GENERAL SHEEHAN:  That's correct.

Q       Well, if you're taking these people away from there and back to Cuba, why do you need to spend $100 million on camps if it was already perfect there?

GENERAL SHEEHAN:  What I said was that this act, on the part of regularizing the process has averted that $100 million that we can use now to put back into the readiness O & M accounts so the readiness of the forces will not suffer as a result of this housing migrants.

Q       Yes, but you said you were going to spend $100 million on making permanent the camps.

Q       No, no, no.

GENERAL SHEEHAN:  No.  What I said was, it averts that $100 million cost.

Q       General, how explosive was the situation in the camps there?  You alluded to that at --

GENERAL SHEEHAN:  I think the Attorney General has a right.  This is a process of a lot of dynamics.  There are 6,000 people in the camps right now who are in the process of coming into the United States at a rate that the Attorney General has spoken about.  As we saw this summer going down and the protocols ran out, where there was no exit strategy for the camps; then clearly, the frustration level on the camps was going to be very high.  These were essentially young males, 15 to 32 years old, very, very talented people.

I think that you need to understand that better than 50 percent of these kids are high school graduates, but nine percent of college degrees and two percent have graduate degrees.  There

CLINTON LIBRARY PHOTOCOPY
Appx-0263

9

are 127 doctors in the camps; but, yet, if there's no exit strategy for them, they're frustrated.

Q    But how did you see that frustration become manifested?

GENERAL SHEEHAN:  It's manifested itself twice in Guantanamo previously and once in Panama when the Cubans who were there thought they were going to be -- end up in a permanent internment process.

Q    So there is a threat of violence.  Is that what you're saying?

GENERAL SHEEHAN:  There is always a threat of violence in that type of situation.  I would call it civil disturbance as opposed to violence, but there is some violence probability, yes.

Q    Can you tell us a little bit about how this was negotiated, who did the negotiating for the U.S. and who did the negotiation for the Cubans?

UNDER SECRETARY TARNOFF:  I think all I'd like to say is that this was negotiated through normal diplomatic channels and not go into the details of how the conversation was --

Q    Well, we don't really have such normal diplomatic relations with the Cubans.

UNDER SECRETARY TARNOFF:  Yes, we do.  We have a U.S. interest section in Havana, there is a Cuban interest section here, and we have regular migration talks, the last of which occurred, I think, a couple of weeks ago in New York.

Q    Was this, Mr. Tarnoff, negotiated in the context of those migration talks, or was this a separate, secret negotiation?

UNDER SECRETARY TARNOFF:  I'd rather not go into the details of how this was actually conducted, because this was, again, done in diplomatic channels, but it certainly was consistent with the administration's policy decided last summer to be in touch with the Cubans on migration matters.

Q    Did anyone from the U.S. have a direct discussion with Fidel Castro?

UNDER SECRETARY TARNOFF:  I'm not going to talk about the specifics of what the exchanges were, but I can say that what happened was fully consistent with and in the context of the migration talks that we've been having with the Cubans over the last nine years.

CLINTON LIBRARY PHOTOCOPY

Appx-0264

10

Q        Has Cuba been provided with any assurances that any of the sanctions added last August would be rolled back?

UNDER SECRETARY TARNOFF:   None whatsoever.

Q        -- or, these sanctions would be eased in any way?

UNDER SECRETARY TARNOFF:   None whatsoever.

Q        How about that the administration will oppose the Helms bill?

UNDER SECRETARY TARNOFF:   The administration stated its position on the Helms-Burton legislation.  At the end of last week, the State Department informed Chairman Gilman of the House International Relations Committee that, while we supported many of the objectives of the Helms-Burton draft legislation as we see it, namely the promotion of an acceleration of democracy in Cuba, the endorsement of the continued vigilance and reinforcement of the embargo, the other provisions of the Cuban Democracy Act, and also features of that bill which allow the United States to begin assistance to a transition government in Cuba, all of those we regard as quite positive.  There are, nonetheless, certain other aspects of the bill, the extraterritoriality of it and other things which do causes problems, but we are available to have discussions with sponsors of the bill on the legislation.

Q        Mr. Secretary, does this agreement between the United States and Cuba improve the relationship between the two countries?

UNDER SECRETARY TARNOFF:  I don't believe the overall relationship is affected.  This is a narrow agreement on migration matters that is a direct result of the September 9, 1994 accord between us, and it's a natural extension from that, and limited to migration matters.

Q        To follow up, has there ever been a case where the United States has forcibly returned refugees to a communist country?

UNDER SECRETARY TARNOFF:  Well, let me talk to the Attorney General or the -- but we do have policies in other countries with respect to returning nationals to those countries.

Q        Has the U.S. ever returned forcibly any refugee to a communist country?

ATTORNEY GENERAL RENO:  We are trying to make sure that our policy with respect to returns are consistent.  As you have seen, there have been situations with respect to Chinese boats

CLINTON LIBRARY PHOTOCOPY

Appx-0265

that have come within or near our shores, and we're trying to make sure that everybody understands that we need to address the problem through legal migration standards.

Q        Was there any agreement on the part of the Cubans to crack down on boat people?

ATTORNEY GENERAL RENO:  There was no agreement, other than the September agreement.

Q        A question for General Reno.  How long have the Guantanamo Bay Cubans -- how long has the process of admitting them been going on?  Do I understand that 500 a week --

ATTORNEY GENERAL RENO:  As you will recall, the President, early on in October, noted that there were humanitarian cases of the elderly, of people who were ill, and we started addressing those acute humanitarian concerns.  We all were concerned with the status of the children at Guantanamo, and in December the President made clear that we were going to try to review each case and bring in the children and their immediate families.

Q        But have you gone past those humanitarian concerns already?

ATTORNEY GENERAL RENO:  No.  We are still bringing the children out in an orderly way, trying to do it -- and as a person reaches 70 or as a medical problem develops, we've tried to address those humanitarian concerns and will continue to do so.  But when we reach the end of that group, then we will admit all others who are not excludable because of criminal records or other factors and bring them in, again in an orderly way, on a case-by-case basis.

Q        And how many would you think that will be?

ATTORNEY GENERAL RENO:  We're going to start reviewing the whole process and be geared up to do it in as orderly a way as possible.

Q        How many Haitians are still in Guantanamo?

Q        How many will be coming into the U.S.?  How many will go back to Cuba?  Do you have any figures?

ATTORNEY GENERAL RENO:  I wouldn't speculate on that. We'll just see as the process works out.  But again, I would stress that it is not an increase that will not produce a net increase in legal migration from Cuba.

CLINTON LIBRARY PHOTOCOPY
Appx-0266

12

Q       Will Cuba continue to curb the exodus of migrants as they promised last September, or is that null and void now?

ATTORNEY GENERAL RENO:  Cuba made that commitment last September, has honored that commitment, and every indication is that it will continue to honor that commitment.

Q       What do you mean --

Q       Does that mean that you will slow the influx of Cubans from Cuba, the legal migration to reward these people who fled their country and were taken to Guantanamo?

ATTORNEY GENERAL RENO:  What we've tried to do is address the issue of those who seek immigrant visas, those who have applied for refugee status, and even then, through the legal migration process there are others.  We have then developed the special program for Cuba that establishes the lottery, and these would be part of the lottery, in effect.

Q       General Reno, where are these people going to end up, and who is going to pay for their relocation and for the rest of -- until they get settled?

ATTORNEY GENERAL RENO:  We have worked with people in the community to develop sponsorships.  The community relations service works with various groups to ensure proper sponsorship, works with families, and where they end up will depend on where families are located across this country.

Q       Do you expect them mostly, however, in Florida -- Miami area?

ATTORNEY GENERAL RENO:  I think Florida will certainly be a place that many of them seek to reside, and the community has pulled together in an extraordinary way in trying to develop sponsorships.  They have worked closely with the community relations service in arranging for sponsorships for those people that are currently being brought in for humanitarian concerns.

Q       Will any federal resettlement funds be made available for these people?

ATTORNEY GENERAL RENO:  There are provisions now for Cuban Haitian resettlement, and we will work with the states as we try to work with all states to address the issue.

Q       Could you talk for a second?  We understand you're under increased death threats -- numerous ones.  Are you doing anything about it?  Is it true?  Can you talk at all about them?

CLINTON LIBRARY PHOTOCOPY
Appx-0267

13

ATTORNEY GENERAL RENO:  I don't know.  I'll let you talk to the FBI.  I don't pay any attention to it.

Q        Secretary Tarnoff, if Cuba is a safe and democratic enough place to forcibly repatriate --

Q        General, what have you done to bring Governor Chiles and Senator Graham on board?  They're obviously concerned about the effect on Florida of this influx.  What steps have you taken to appease them?

ATTORNEY GENERAL RENO:  We have worked with everybody concerned by our efforts beginning last summer to regularize migration from Cuba.  What we have tried to avoid is a massive flow into South Florida in ways that could adversely affect the community, just in terms of a vast number of people coming in, in a short period of time.  We have worked with the Governor, with the Senator in trying to address these problems and trying to make sure that what we do regularizes migration so that people can understand where they stand, that we do so in accordance with humanitarian interests and that we maintain an adherence to international migration policy, and I think we've been able to do it, and I appreciate both the Governor's and the Senator's great assistance in this effort.

Q        General Reno, what happened with the Haitians that are in Guantanamo now?  Do you foresee any similar policy in the future for them?

ATTORNEY GENERAL RENO:  What we're doing right now with respect to the unaccompanied minors in Haiti, we worked with United States -- United Nations High Commission for Refugees.  We asked them to become involved so that we could relocate the children based on what was in the best interest of the child.  We are attempting to place them with their families in Haiti.  Where families are not located, we're trying to see what is in the best interest.  And so that we made sure we did everything consistent with international migration policy, we have been working with the U.N. High Commission on Refugee Status.

Q        How many Haitians are there in --

ATTORNEY GENERAL RENO:  I don't know the last number.  A little over 400 the General tells me.

Q        General, Representative Tauzin from Louisiana says he has -- he thinks he has voluntary with the fertilizer industries to neutralize their product so it can't be used to make bombs.  Does that sound like a good idea to you, or do you think we still may need the legislation, perhaps like Europe, so fertilizer cannot be used for bomb-making?

CLINTON LIBRARY PHOTOCOPY
Appx-0268

14

ATTORNEY GENERAL RENO:  I think what we need to do is what we have all ready initiated -- a thoughtful, good, bipartisan discussion on what needs to be done.  The ATF will look at the situation -- I certainly think they would consider such legislation -- see what can be done to minimize the use of these otherwise legal products in terms of bomb manufacture.

Q       Attorney General Reno, you're talking about regularizing migration, why not regularize something else?

Q       What happened to your recommendation on easing -- lifting the -- sanctions, for instance?

UNDER SECRETARY TARNOFF:  Well, our policy has been consistent in support of the Cuban Democracy Act which involves strict monitoring of the embargo and pursuit of what is called Track 2, and that is programs of direct benefit to the Cuban people.  And we are continually seeking to implement that, to find new ways to strengthen both parts of that.

But this migration agreement has nothing to do with that. It's a separate -- and I might add that the reason we have to conclude these migration agreements with Cuba is because Cuba is not a free society, it's not a democratic society, it has not offered hope to its people, and only when Cuba is well on the road to democracy could our relationship improve significantly and will this migration problem disappear.

Q       There's an older law which is to grant Cubans asylum.  So that is essentially being superseded by what the Attorney General did, by intercepting them and forcibly repatriating them.

ATTORNEY GENERAL RENO:  We will continue, and I have stressed in my remarks, that we will continue to provide the opportunity for refugee status which is asylum in-country, and for those who think that there are extreme circumstances that warrant asylum processing or refugee processing otherwise, we are going to continue to adhere to international migration policy with respect to refugees and asylum.

Q       Secretary Tarnoff, this shows, obviously, that you can cut a worthwhile deal with Castro.  Why not use this as a basis for broader negotiations on appropriation of property, the embargo and the transition to democracy?

UNDER SECRETARY TARNOFF:  Again, let me go back to my statement and to say that this agreement builds on what we concluded with the Cubans last summer.  It was in the interest of the United States to regularize migration in Cuba, from Cuba, and this is a further step which goes in that direction.

CLINTON LIBRARY PHOTOCOPY

Appx-0269

15

Our policy mark with respect to all other aspects of Cuban policy and U.S. attitudes toward Cuba remains the same. And there is nothing in this agreement which affects in any way, shape or form our overall approach to Cuba, which is the one I described beforehand.

Q        Secretary Tarnoff, you just said that Cuba is not a democratic society.  What guarantees have you received from that government that U.S. officers there, consular officers there will be able to monitor the Cubans that are repatriated or caught at sea and repatriated to their country?

UNDER SECRETARY TARNOFF:  We had understandings last summer in connection with the September 9th agreement that Cuba would do nothing to impede the attempts by Cuban nationals to go to the interest section and to apply for admission to the United States.  There have also bee 1,600 Cubans who have returned from Guantanamo voluntarily, over 200 of whom have also applied for regular admission status at the interest section.  So it was based on our experience with the Cubans, our ability to have people on the ground, more people, if necessary, to monitor the situation that the Attorney General concluded that it was possible for us to have this kind of an agreement with a high degree of assurance that the Cubans would continue to honor it.

Q        Mr. Tarnoff, how can you justify in moral terms the repatriation, the forced repatriation of people to a society that by the administration's own reckoning does not value basic human rights.

UNDER SECRETARY TARNOFF:  The rationale that we are using is for the purposes of legal migration to the United States.  We believe we have not only a commitment by the government of Cuba, but experience with that government over the last nine months that they will not interfere with the ability of these people to either return to their homes, resume their lives, or come to the interest section and begin the process of legal migration to the United States.  This has nothing to do with the broader reaches of Cuban society where the attitudes of the United States is well-known.

MR. MCCURRY:  Thank you.  I want to thank everyone for the briefing.  I've got copies here of the joint statement that has been simultaneously issued in Havana and will be issued here.

THE PRESS:  Thank you.

END

12:48 P.M. EDT

CLINTON LIBRARY PHOTOCOPY
Appx-0270

# EXHIBIT 42

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

STATE OF TEXAS, *et al.*,                    §
                                              §
                                              §
*Plaintiffs*,                                 §
                                              §
                                              §    Civil Action No. 6:24-CV-00306
v.                                            §
                                              §    Judge J. Campbell Barker
UNITED STATES DEPARTMENT OF                   §
HOMELAND SECURITY, *et al.*,                  §
                                              §
                                              §
*Defendants*                                  §

## DECLARATION OF DEBRA ROGERS

I, DEBRA ROGERS, hereby declare pursuant to 28 U.S.C. § 1746:

1. My name is Debra Rogers and I am currently a leadership coach drawing upon experiences gained during my 38-year career in public service.

2. I began my service with the Immigration and Naturalization Service (INS) in 1986 and remained with the agency through the creation of the Department of Homeland Security (DHS) in 2002. From 2008 to 2023, I was a Senior Executive at DHS, primarily with the U.S. Citizenship and Immigration Services (USCIS). During that time, I served in many different capacities, including as Deputy Associate Director for Domestic Operations, Associate Director for Field Operations, Deputy Citizenship and Immigration Services (CIS) Ombudsman, Deputy Associate Director for Customer Service and Public Engagement, and for the last two years of my government service, I served as a Senior Counselor to the USCIS Director and was detailed to the DHS Office of the Secretary as the Director of the Immigrant Military Members and Veterans Initiative (IMMVI).

Appx-0272

3.  I first became aware of hardships experienced by military service members married to noncitizens without lawful immigration status in the early 2000s, when I was serving as an INS manager and later as the USCIS District Director in San Diego, California. At the time, U.S. service members—of which there are many in the San Diego region— occasionally came into our office expressing concerns about the possibility that their undocumented family members would be subjected to immigration enforcement, particularly while the service members were away on periods of deployment. In some cases, their family members were eligible to become lawful permanent residents (green card holders) by adjusting their status from within the United States, but in other cases family members were unable to adjust status because they had not been inspected and admitted or paroled, as required by immigration law. For some but not all of these individuals, leaving the country to consular process—often while seeking an inadmissibility waiver abroad—was an option, but it came with uncertainties and the risk of potentially lengthy delays. I know from my own casework that such families often expressed great concern to me about the prospect of being separated for an unknown length of time, but they also worried about the prospect of remaining in the country, subject to the possibility of immigration enforcement. These concerns about the welfare of their family impacted the U.S. service member's military readiness.

4.  At the time, USCIS had approximately 26 district offices and 84 field offices. As I knew from my own observations, beginning in 2006 when I held supervisory roles at USCIS Headquarters overseeing national operations, the absence of a policy on the matter resulted in different offices handling these cases differently. Some offices assisted by expediting advance parole requests and coordinating with the State Department, while other offices

granted parole in place to family members of military personnel. For instance, I recall that the San Antonio Field Office, which covered a geographic area containing several military bases that were home to these families, granted parole in place in some circumstances. Other offices did not know or understand that parole in place was an option. Our office in San Diego consulted with our local counsel to identify possible options that included coordinating closely with our State Department counterparts, typically in Mexico, to expedite visa processing outside the United States and re-entry at the U.S. Port of Entry. This ad hoc, office-by-office approach to the issue continued for a number of years, with different offices around the country handling seemingly like cases in materially different ways.

5. During that period, thousands of adjudicators nationwide had general guidance and training regarding how to consider requests for humanitarian or significant public benefit parole under the statute, 8 U.S.C. 1182(d)(5)(A), but lacked specific guidance regarding whether or how they could exercise the statutory parole authority to help military personnel or their family members avoid periods of family separation, including where that could promote military readiness.

6. The lack of specific guidance or a formal policy about these cases resulted in inconsistent adjudications across the agency, which was challenging from a management perspective and meant that military service members and their families requesting assistance from the agency could not reasonably predict how a request for parole would be handled or understand where and how to make such a request.

7. The lack of such guidance or policy also meant that most of these cases were raised by attorneys with particular expertise in handling immigration matters pertaining to military

personnel and their family members. The broader public, including military personnel and their family members who lacked counsel, were less likely to request discretionary relief such as parole in place.

8.   In 2009, when I was serving as the Associate Director for Field Operations, I began working with others on a DHS/USCIS policy recommendation designed to improve USCIS' use of its discretionary authorities to help military service members and their close family members who lacked lawful immigration status.

9.   In 2010, Secretary of Homeland Security Janet Napolitano confirmed in a letter to Members of Congress that DHS was utilizing parole, on a case-by-case basis, to assist military personnel and their family members, including to shorten periods of family separation and to facilitate adjustment to lawful permanent residence from within the United States, where possible and appropriate. Letter from Janet Napolitano, Secretary, DHS, to Hon. Zoe Lofgren, August 30, 2010, attached as **Exhibit A**.

10.   Also in 2010, and as part of the agency's regular communications with its workforce, information was conveyed through USCIS leadership channels to officers in the field to remind them about the availability of parole in place as a potential option for noncitizen family members of U.S. military service members.

11.   In October 2010, I left USCIS to take the position of Deputy CIS Ombudsman and served for a period of time in 2012 as Acting CIS Ombudsman. By statute, the role of the CIS Ombudsman is to assist stakeholders in resolving problems with USCIS, identify areas in which stakeholders have such problems, and, to the extent possible, propose changes in the administrative practices of USCIS to mitigate those problem areas. *See* 6 U.S.C. § 272(b). Among other things, the statute also requires the CIS Ombudsman to regularly report to

Congress the Ombudsman's findings, recommendations, and the actions taken (and not taken) regarding recommendations and identified problems. *Ibid.* § 272(c).

12. In my roles in the Office of the CIS Ombudsman, I continued to receive concerns from both within USCIS and from outside stakeholders about the lack of clear and consistent guidance provided to USCIS field offices on how to exercise their discretionary authorities, including parole in place, with respect to family members of U.S. service members, as well as similar concerns about the lack of guidance for the public about how to make such requests.

13. The Office of the CIS Ombudsman raised those concerns repeatedly within the Department to USCIS and in several reports to Congress. *See, e.g.*, Citizenship and Immigration Services Ombudsman, Annual Report 2011, June 29, 2011 ("2011 CIS Ombudsman Report to Congress"), available at https://www.dhs.gov/sites/default/files/publications/cisomb-annual-report-2011.pdf; Citizenship and Immigration Services Ombudsman, Annual Report 2012, June 25, 2012 ("2012 CIS Ombudsman Report to Congress"), *available at* https://www.dhs.gov/sites/default/files/publications/cisomb-2012-annualreport.pdf.

14. In the 2011 Annual Report to Congress, the CIS Ombudsman wrote with respect to "Discretionary Relief for Military Families," that "Members of Congress and U.S. military leaders have consistently emphasized to the Department of Homeland Security that military immigration issues (e.g. military naturalization; regularization of military dependent immigration status; preserving military family unity) are aspects of military readiness that USCIS must address." 2011 CIS Ombudsman Report to Congress, 20. The report further noted that although USCIS had "committed to issuing policies on the use of discretionary relief for military family members," it had "not indicated when it will publish these

policies." *Ibid*. The report continued, "Stakeholders report a great deal of confusion regarding the exact nature of the relief available to military family members and how to request it. Meanwhile, overseas deployments of military members continue, as do their concerns regarding the immigration status of dependent spouses, children, and parents who remain in the United States during such deployments." *Ibid*.

15. On May 22, 2012, I authored a letter on the topic as Acting CIS Ombudsman to then-USCIS Director, Alejandro Mayorkas. In that letter, I explained that despite the assurances provided by Secretary Napolitano to Congress in August 2010 regarding the consideration of available discretionary options for family members of service members, "[t]he lack of guidance has led to troubling inconsistency across the country." Letter from Debra Rogers, Acting CIS Ombudsman, to Alejandro Mayorkas, Director, USCIS, May 22, 2012, attached as **Exhibit B**. I provided the following examples:

   a. "Some USCIS field offices consider parole requests on a case-by-case basis for any immediate family member of a U.S. Serviceman or woman; others consider requests from spouses only; and the remainder does not consider requests at all.

   b. "Some USCIS field offices will consider parole requests for immediate family members of U.S. Servicemen or women and also accept and adjudicate related adjustment of status applications; and other offices will only consider parole requests, but will not accept or consider adjustment of status applications, claiming they lack guidance from USCIS Headquarters to proceed.

   c. "Some USCIS field offices require an I-131 application with fee before they will consider a parole request; and other offices require only a letter from the family requesting parole.

d.  "In addition, there is no instruction to the public or those who assist military families on how to request a review of their circumstances to determine which discretionary benefits are available to them."

16. I explained in that letter that "[p]ermitting widespread inconsistency across USCIS field offices is untenable," and relayed the experience of the spouse of a deployed U.S. Serviceman who recently had spent two nights in U.S. Immigration and Customs Enforcement custody after having been arrested by local police on a minor traffic violation while driving to buy candles for the couple's young daughter's birthday party. In that case, a request for parole had been filed and left pending with a local USCIS office for months.

17. In the 2012 Annual Report to Congress, when I was still serving as Acting CIS Ombudsman, I reiterated the Office of CIS Ombudsman's ongoing concern with the lack of guidance provided by USCIS to its field offices on how to administer discretionary relief, including parole in place, for family members of U.S. service members. 2012 CIS Ombudsman Report to Congress, 23.

18. On November 15, 2013, the Office of the Director issued USCIS Policy Memorandum PM-602-0091, addressing the use of parole for certain family members of active-duty members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and former members of the U.S. Armed Forces and Selected Reserve. The Policy Memorandum amended relevant portions of the Adjudicator's Field Manual. *See* USCIS Policy Memorandum PM-602-0091, Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i) (Nov. 15, 2013).

19. The policy acknowledged that both current and former service members "face stress and anxiety because of the immigration status of their family members in the United States." To address these and other concerns, a new section was added to the Adjudicator's Field Manual, which is relied upon by line and supervisory adjudicators in individual cases, stating that "[t]he fact that the individual is a spouse, child or parent" of a current or former service member "ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual."

20. During my career I acted in various capacities as a supervisory adjudications officer. That was the case when I was the District Director in San Diego and before that when I served as a Supervisory Immigration Officer. In those roles, I understood how adjudicators routinely applied broad policy guidance to the specific facts presented in individual adjudications to make case-by-case determinations. That was no different with parole in place adjudications under the 2013 military families parole policy or under the version of that policy that superseded the original in 2016. Adjudicators would continue to look at each case individually, weighing the positive factors identified generally by the policy with any negative factors that could weigh against a grant.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Ashburn, VA on October 19, 2024

_____
Debra Rogers

# **EXHIBIT A**

*Secretary*

U.S. Department of Homeland Security
Washington, DC 20528



Homeland
Security

August 30, 2010

The Honorable Zoe Lofgren
U.S. House of Representatives
Washington, DC 20515

Dear Representative Lofgren:

Thank you for your July 9, 2010 letter regarding the immigration needs of soldiers and their families. The Department of Homeland Security (DHS), including U.S. Citizenship and Immigration Services (USCIS), is committed to assisting military families. In partnership with the Department of Defense, USCIS launched the Naturalization at Basic Training Initiative in August 2009, a program that gives non-citizen enlistees an opportunity to naturalize immediately before graduation from basic training. Since January 2009, USCIS has naturalized over 500 military personnel through this initiative.

In addition, a new DHS policy under this Administration promotes the use of several discretionary authorities to help military dependents secure permanent immigration status in the United States as soon as possible. On a case-by-case basis, DHS utilizes parole and deferred action to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members. Where military dependents have already departed the United States to seek an immigrant visa through consulate processing, DHS in collaboration with the Department of State, is expediting the adjudication of all necessary waivers, including the Form I-601, Waiver of Inadmissibility.

Finally, DHS as a matter of policy does not initiate removal proceedings involving military dependents absent the existence of serious, negative factors indicating that the individuals pose a threat to public safety or national security. On a case by case basis, we also consider requests for joint motions to reopen past proceedings where relief for a military dependent appears to be available.

Thank you for your concern. I hope to continue to foster a close working relationship with you on this and other important issues. An identical letter will be sent to the representatives who co-signed your letter. If you need additional assistance, please do not hesitate to contact me at (202) 282-8203.

Yours very truly,

Janet Napolitano

**www.dhs.gov**

Copyright © 2015 American Immigration Lawyers Association

# <u>EXHIBIT B</u>

**Appendix 4: Acting Ombudsman Letter to USCIS on Military Immigration Issues**

U.S. Department of Homeland Security
Washington, DC 20528-1225

**Homeland
Security**

May 22, 2012

Alejandro Mayorkas, Director
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Dear Director Mayorkas:

I would like to bring to your attention issues that are adversely affecting U.S. Servicemen and women and their families, and urge you to provide USCIS field directors with guidance on how to effectively implement programs to support the U.S. Military.

As you know, on July 9, 2010 eighteen Members of Congress sent a letter to DHS Secretary Napolitano urging her to address, within her authority, the immigration needs of U.S. Servicemen and women.[1] The letter stressed that keeping families together is a military readiness issue, quoting Retired Lieutenant General Ricardo Sanchez, former commander of ground forces in Iraq: "We should not continue to allow our citizenship and immigration bureaucracy to put our war-fighting readiness at risk."[2] In addition, the letter encouraged DHS to join in motions to reopen where legal relief may be available, consider deferred action where no permanent relief is available but strong equities exist, and consider favorably exercising parole authority for close family members that entered without inspection.

In response to this letter, Secretary Napolitano outlined a number of options available to members of the military and their families, including the Naturalization at Basic Training Program and the use of discretionary authorities to help military dependents secure permanent immigration status.[3] The letter states that, on a case-by-case basis, DHS will consider parole and deferred action to minimize periods of family separation and to facilitate adjustment of status for spouses, parents and children of military members. Most of the options outlined in Secretary Napolitano's letter are within the purview of USCIS.

Your agency is commended for fully implementing the Naturalization at Basic Training initiative in partnership with the Department of Defense (DOD). The four largest branches of the U.S. Military now provide U.S. Servicemen and women the opportunity to apply for naturalization and, if found eligible by USCIS, become citizens upon graduation from basic training. This initiative required a great deal of coordination with the DOD and an abiding commitment from USCIS Headquarters and Field leadership; it offers a lasting benefit to all who participate.

---

[1] Letter from Congress of the United States House of Representatives, July 9, 2010.
[2] *Id.*
[3] Letter from Secretary Janet Napolitano, U.S. Department of Homeland Security, August 30, 2010.

www.dhs.gov/cisombudsman

*Citizenship and Immigration Services Ombudsman*

Unfortunately, USCIS has not provided its field offices with consistent guidance on how to administer available discretionary options for family members of U.S. Servicemen and women. The lack of guidance has led to troubling inconsistency across the country. For example:

- Some USCIS field offices consider parole requests on a case-by-case basis for any immediate family member of a U.S. Serviceman or woman; others consider requests from spouses only; and the remainder does not consider requests at all.

- Some USCIS field offices will consider parole requests for immediate family members of U.S. Servicemen or women and also accept and adjudicate related adjustment of status applications; and other offices will only consider parole requests, but will not accept or consider adjustment of status applications, claiming they lack guidance from USCIS Headquarters to proceed.

- Some USCIS field offices require an I-131 application with fee before they will consider a parole request; and other offices require only a letter from the family requesting parole.

In addition, there is no instruction to the public or those who assist military families on how to request a review of their circumstances to determine which discretionary benefits are available to them.

Our office has expressed concern about these issues for over a year, emphasizing the customer impact and the need for resolution. Permitting widespread inconsistency across USCIS field offices is untenable. Just recently, the spouse of a deployed U.S. Serviceman was apprehended by local police for a minor traffic violation on her way to pick up candles for their young daughter's birthday party. She was turned over to Immigration and Customs Enforcement and spent two nights at an immigration detention center before being released. Meanwhile, her request for parole had been pending for months at a local USCIS office. Imagine the impact on their child.

Our office is asking you to empower your field directors to fully and fairly exercise the authority entrusted to them, and to work in collaboration with the DOD to address the urgent needs of U.S. Servicemen and women. Our troops need to know that their government, specifically USCIS, will do everything in its power to care for their families while they are protecting our country and when they return home. USCIS has the honor of demonstrating a true commitment to our Servicemen and women and we urge you to do so.

Sincerely,

*Debra Rogers*

Debra Rogers
Acting CIS Ombudsman

# EXHIBIT 43

to Plaintiffs' Motion for a Preliminary Injunction

and a Stay Under 5 U.S.C. § 705



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 90/15-P; HQCOU 120/17-P

Office of the General Counsel

*425 I Street NW*
*Washington, DC 20536*

JUN 1 5 2001

MEMORANDUM FOR JEFFREY L. WEISS, DIRECTOR
OFFICE OF INTERNATIONAL AFFAIRS

FROM:     Bo Cooper
          General Counsel

SUBJECT:  <u>Legal Opinion: Parole of Individuals From the Former Soviet Union Who Are
          Denied Refugee Status</u>

**I. Question Presented:**

1. May the Attorney General continue to parole individuals into the United States from the
Former Soviet Union after they are denied refugee status?

**II. Summary Conclusion:**

1. Yes. Section 212(d)(5)(A) of the Immigration and Nationality Act, as amended, authorizes
the Attorney General to parole individuals into the United States from the Former Soviet Union
after they are denied refugee status.

**III. Analysis:**

    **A. Introduction**

        This memorandum explores the legal basis upon which, and the extent to which, the
Immigration and Naturalization Service (INS) may continue to parole into the United States
individuals who are denied refugee status after applying through the in-country refugee program
in Moscow. Since 1988, the INS has exercised its discretionary authority to parole into the
United States aliens from the Former Soviet Union who were denied refugee status. In 1996, the
104th Congress amended the standards which guide the Attorney General's exercise of the parole
power. As amended in 1996, section 212(d)(5)(A) of the Immigration and Nationality Act (INA,
or the Act) does not curtail the Attorney General's legal authority to parole into the United States
individuals from the Former Soviet Union who are denied refugee status.

Case: 25-1384    Document: 00118298863    Page: 291    Date Filed: 06/11/2025    Entry ID: 6728192
Case 2:25-cv-00049 Document confidential on 03/24/23 in TXSD Page 1 of 45

### B. Refugee Processing and Parole in the Context of the Former Soviet Union

Before 1988, Soviet refugee applicants were processed in Rome.  The shift to in-country processing in Moscow began in August 1988 with approximately 2000 Armenians who were divested of their Soviet citizenship, but unable to leave the Soviet Union for lack of State Department funding for their transportation and temporary support in Rome.  At the inception of in-country refugee processing in Moscow, INS adjudicators apparently construed refugee eligibility more broadly than permitted by the statute and, as a result, approval rates were high.  Attorney General Edwin Meese instructed INS to bring the Moscow program "into sync" with existing statutes and INS procedures, but nonetheless offered to parole into the United States those individuals who did not qualify as refugees.[1]

*The Lautenberg Amendment (1990)*:  When INS aligned its overseas refugee processing with the standards set out in the Act, refugee approval rates in the Moscow program declined appreciably.  Congress responded by adopting a provision, commonly known as the Lautenberg Amendment, designed to restore the traditionally high approval rates for certain categories of refugee applicants by reducing the evidentiary burden for establishing eligibility for refugee status.[2]  While not expressly endorsing parole of those denied refugee status, section 599E of the Lautenberg Amendment does permit nationals of the Soviet Union, Vietnam, Laos, or Cambodia to adjust their status if they had been paroled into the United States after being denied refugee status.

To date, INS in Moscow continues both to process qualified refugee applicants under the reduced evidentiary standards set out in the Lautenberg Amendment and also to parole into the United States a high percentage of Lautenberg category members who are denied refugee status.

---

[1]  Letter from Edwin Meese, Attorney General, to then Lt. General Colin Powell, Assistant to the President for National Security Affairs (Aug. 4, 1988) (on file with the INS, Office of the General Counsel).

[2]  Sections 599D and E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Pub. L. No. 101-167, 103 Stat. 1195 (1989).  An introductory note to the July 13, 1989, Senate Voting Record on the Lautenberg Amendment explains:

> Proponents stated that this amendment is necessary to correct the actions of Attorney General Meese, who, in 1988, changed the criteria under which Soviet Jews and Vietnamese . . . could qualify as refugees.  In the past, these two groups of people have been assumed to have a well-founded fear of persecution and, therefore, have automatically qualified as refugees.  As a result of the Attorney General's actions in March 1988, the denial rate for Soviet Jews rose from seven percent to a high of 38 percent. . . .  Many of the refugees from the Soviet Union and Vietnam, who have been turned down, are displaced and uprooted.  They have given up their country, homes, and families because they thought they could rely on the U.S. government's long-standing promise of resettlement.

Senate Voting Record No. 134, Bill No. S.1160 (H.R. 1487), Amendment No. 367.  Temp. Cong. Rec. S-8394 (July 20, 1989).

Cuba AR_000093
Appx-0287

Memorandum for Jeffrey L. Weiss                                                 Page 3
Subject:  Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

Parole decisions are made on a case-by-case basis in accordance with section 212(d)(5)(A) of the Act.

### C. Evolution of INA Section 212(d)(5)

The Attorney General's parole authority has changed little since 1952, when it was codified into section 212(d)(5) of the INA.  Though subsequent Congresses often debated the proper scope of the Attorney General's parole power,[3] section 212(d)(5) has been amended only three times in the past fifty years.  As originally enacted, section 212(d)(5) of the Act provided:

> (5)  The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (1952); Act of June 27, 1952, 66 Stat. 163.

*The Refugee Act of 1980*:  As part of the comprehensive restructuring of refugee admission procedures achieved in the Refugee Act of 1980,[4] the 96th Congress split section 212(d)(5) into subparagraphs (A) and (B), adding the underlined text as follows:

> (A)  The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States. . . .

> (B)  The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.

1980 Refugee Act § 202(f).  This language was designed to funnel all refugee admissions under the numerical cap to be established annually by the President after consultations with Congress,

---

[3]  See, e.g., Arthur Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71 INTERPRETER RELEASES 1637 (Dec. 12, 1994); Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis:  A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. REV. 9 (1981); Elizabeth J. Harper, IMMIGRATION LAWS OF THE UNITED STATES 503-14 (3d ed. 1975).

[4]  Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 108, *codified as* 8 U.S.C. §§ 1157-1159 (1980) (hereinafter 1980 Refugee Act).

Case: 25-1384    Document: 00118298863    Page: 293    Date Filed: 06/11/2025    Entry ID: 6728192
Case 2:25-cv-00409 Document 12 Filed on 03/24/25 in TXSD Page 3 of 45

and thus to discourage the admission of additional refugees under the Attorney General's parole power.[5]

*The Immigration Act of 1990*:  In 1990, the 101st Congress added a minor limitation to section 212(d)(5)(A):  "The [AG] may, except as provided in subparagraph (B) <u>or in section 214(f)</u>, in his discretion parole. . ." (emphasis added).[6]  This amendment curtails the Attorney General's power to parole an alien crewmember who is present in the United States during a labor dispute that leads to a strike or lockout.  <u>See also</u> INA § 214(f)(2)(A).  Until this point, no Congress had modified the substantive criteria that guide the Attorney General's exercise of the parole authority.

*The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)*:  In 1996, as part of its overhaul of the INA, the 104th Congress narrowed the Attorney General's parole authority by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  IIRIRA § 602(a).[7]

## D.  Construing INA Section 212(d)(5)(A), as Amended by IIRIRA Section 602

The question presented is whether, under the amended statutory criteria, INS may continue to parole into the United States persons denied refugee status.

*Plain Meaning*:  The preferred method of statutory construction is to carry out the plain meaning of the text of a statute.  <u>Perry v. Commerce Loan Co.</u>, 383 U.S. 392, 400, <u>reh'g denied</u>, 384 U.S. 934 (1966), *cited in* <u>Matter of H-N-</u>, Int. Dec. 3414 (BIA 1999).  The 104th Congress replaced "emergent" reasons with "urgent humanitarian" reasons, and "strictly in the public interest" with "significant public benefit."  IIRIRA § 602(a).  The differences between these phrases are perceptible, but the text alone is insufficient to determine whether Congress intended, by this amendment, to end the practice of paroling those denied refugee status from the Former Soviet Union.

---

[5]  For analysis of this amendment to section 212(d)(5) of the Act and of the 1980 Refugee Act in general, see Anker & Posner, *supra* note 3.

[6]  Reference to section 214(f) added by section 202(b) of the Immigration Act of 1990, Act of Nov. 29, 1990, Pub. L. 101-649, 104 Stat. 4978.

[7]  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996).  At the same time, Congress also inserted a provision requiring the Attorney General to submit an annual report describing the number and category of aliens paroled into the United States, including information such as the country of origin, duration of parole, current status of such parolees.  IIRIRA § 602(b).

Memorandum for Jeffrey L. Weiss                                                    Page 5
Subject:  Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

    Section 602 of IIRIRA, which amends INA section 212(d)(5), is entitled "Limitation on Use of Parole."[8]  Titles have a communicative function.  They may be considered to clarify uncertainty in the text but cannot limit the text's plain meaning.  2A Sutherland, *Statutes and Statutory Construction* (6th ed., Norman Singer ed.) § 47.03.  The title "Limitation on Use of Parole" confirms what the text suggests, but does not resolve by *how much* Congress intended to curtail the Attorney General's parole authority.

    *Legislative History*:  The legislative history of IIRIRA section 602 is similarly vague.  Describing the import of proposed language that would ultimately be adopted in the final version of IIRIRA section 602, a Senate Report states only that the amendment "[t]ightens The [sic] Attorney General's parole authority. . . ."  S. Rep. No. 249, 104th Cong., 2d Sess. 21 (1996).  Nor does the final Conference Report for IIRIRA explain to what extent parole should be "tightened."  H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

    While the legislative history does not clarify to what extent Congress sought to limit the parole authority, it does indicate that the 104th Congress rejected language that would have circumscribed the Attorney General's authority to parole individuals who were denied refugee status.  The adopted Senate language replaced an earlier House proposal, section 524 of H.R. 2202, that enumerated four exclusive reasons for which the Attorney General could parole an individual into the United States:  medical emergency; organ donation; to visit a dying relative; and to assist U.S. law enforcement efforts (or to protect an individual who so assisted).  In addition, section 524 provided:

        (D) LIMITATION ON THE USE OF PAROLE AUTHORITY- The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.

The 104th Congress specifically considered, but rejected, the House's proposal to limit the practice of paroling into the United States those denied refugee status.  "[W]here the language under question was rejected by the legislature and thus not contained in the statute it provides an indication that the legislature did not want the issue considered."  2A Sutherland, *supra*, § 48.04.

    *Re-Authorization of the Lautenberg Amendment*:  Within the Omnibus Consolidated Appropriations Act of 1997, Congress both amended the Attorney General's parole authority (Division C) and re-authorized the Lautenberg Amendment for an additional year (Division A).  *Compare* Pub. L. 104-208, Div. C, Title VI § 602(a), 110 Stat. 3009-689 (Sept. 30, 1996), *with* Pub. L. 104-208, Div. A, Title I § 101(c) [Title V, § 575(2)], 110 Stat. 3009-168 (Sept. 30, 1996).  As discussed above, the Lautenberg Amendment affords adjustment of status to those who are paroled into the United States after being denied refugee status.  Not only did the 104th Congress specifically reject proposed limits to the Attorney General's authority to parole denied

---

[8] This title is not codified into the INA.

Case: 25-1384     Document: 00118298863     Page: 295     Date Filed: 06/11/2025     Entry ID: 6728192
Case 2:25-cv-00409 Document 2-12 Filed on 03/24/17 in TXSD Page 5 of 45

refugee applicants, it tacitly approved of the practice by renewing an existing provision that permitted these parolees to adjust their status to that of lawful permanent residents.  Subsequent Congresses have re-authorized the Lautenberg Amendment four (4) times since IIRIRA.[9]

  *Case-by-case basis of parole decisions*:  For indivi... s found to be ineligible to be classified as a refugees, parole decisions must comply with i  case-by-case requirement of amended section 212(d)(5)(A) of the Act and may not be made on a "blanket" basis.  Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a "case-by-case" decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case.

  Under current practice, every refugee applicant is interviewed by an immigration officer for possible classification as a refugee.  If the applicant is found not to be eligible for refugee status, the officer considers the merits of the case for an offer of parole.  So long as individual consideration is given to parole decisions, the Service's determination - that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg Amendment - does not violate the case-by-case requirement.

## IV.  Conclusion:

  While section 602 of IIRIRA generally tightens the criteria by which parole decisions are made, it is the opinion of the General Counsel that section 212(d)(5)(A), as amended, does not curtail the Attorney General's legal authority to parole into the United State individuals from the Former Soviet Union who are denied refugee status.

---

[9] Pub. L. 105-118, Title V, § 574(2), Nov. 26, 1997, 111 Stat. 2432; Pub. L. 105-277, Div. A, § 101(f) [Title VII, § 705(2)], Oct. 21, 1998, Γ12 Stat. 2681-389; Pub. L. 106-113, Div. B, § 1000(a)(4) [Title II, § 214(2)], Nov. 29, 1999, 113 Stat. 1535, 1501A-240; Pub. L. 106-554, enacting by reference Title II, § 212(2) of H.R. 5656, Dec. 21, 2000, 14 Stat. 2763A-25.

# EXHIBIT 19
# (Amended)

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

*Plaintiffs*,

v.

Kristi Noem, et al.,

*Defendants*.

C.A. No: 1:25-cv-10495-IT

## DECLARATION OF ANDREA DOE

I, Andrea Doe, upon my personal knowledge, hereby declare as follows:

1. I am a citizen of Nicaragua.  I was born in the Department of Carazo in Nicaragua in 1991.

2. I currently live in Mount Airy, Maryland, with my husband, Rafael Doe, and our two young children, Isaias and Francisco Doe.

3. My husband Rafael was a political prisoner in Nicaragua before the United States government flew him to this country on February 9, 2023.  He was jailed for his opposition to the regime of Daniel Ortega and sentenced to over 20 years in prison.  The Nicaraguan government held him under terrible conditions and he suffered physical and mental torture.

4.  Our separation was terribly hard on our children and me.  It wasn't just that I missed my husband terribly and that the children missed their father—the Nicaraguan police were also surveilling our house and harassing me.  Police vehicles would station themselves in front of our house, and when we visited my husband at the penitentiary where he was being held, police agents would be waiting for us at the corner until we got on the bus.  It was terrifying for the children.

5.  After four long years of this, the Nicaraguan government abruptly released 222 political prisoners, among them Rafael.  The Ortega regime agreed to release them on the condition that the United States take them.  Before any of us knew what was happening, Rafael and 221 of our imprisoned compatriots had been pulled out of prison and were on a flight to the United States.

6.  He and the others in the same situation were brought into the United States through parole.

7.  I was so relieved that Rafael was out of prison and safe in the United States, but his departure left me and our children in a very unsafe situation in Nicaragua.

8.  A kind American whom Rafael had gotten to know through another passenger on the flight out of Nicaragua sponsored me and the children to be reunited with him here in Maryland.  He sponsored us through the program the United States government had set up for Cubans, Haitians, Nicaraguans, and Venezuelans to apply for humanitarian parole to the United States.

9.  We were all reunited in Maryland in the summer of 2023.  Rafael found volunteer lawyers to represent him in applying for asylum, and he included the children and me in his application.

10. Rafael found a job with a company that installs vinyl on vehicles for use as publicity, and the same company then hired me as well after I received my work permit. We have rented an apartment. Our children have settled in; they are both attending elementary school and have made friends. We felt happy and well-integrated into our new community.

11. The news that the U.S. government was canceling the Nicaraguan parole program and suspending processing of any immigration applications the children and I have filed or may file in the future, has come as a great shock. The children and I are included in Rafael's application for asylum, which is pending. Our safety and our future depend on the protection asylum would give us.

12. If the children and I could not get our asylum application adjudicated and were deprived of that path to safety in the United States, it would be a disaster for us, individually and as a family. The Nicaraguan government saw me visiting Rafael in prison. They were watching our house. They know that I am his wife. If I were forced to go back to Nicaragua now I would be detained and the government would take my children away. When I was trying to leave in 2023, I was held up for two hours at the airport in Managua, they took my passport and those of the children and pulled me out of line. They finally let us go, but it was frightening.

13. Rafael would not want us to face such danger on our own, but if he went back to Nicaragua he would be detained immediately. And he could not return to Nicaragua even if he wanted to: when it expelled him and the other passengers on the February 9 flight to the United States, the regime of Daniel Ortega also stripped them of their Nicaraguan

citizenship.  As a result, Rafael is now stateless, and until his application for asylum is

approved, he has no access to documentation that would allow him to travel anywhere.

14. We were welcomed here in Maryland and we have felt happy here.  We have been

working very hard to build a future for our family.  These recent decisions by the U.S.

immigration authorities are causing us great anxiety.  Rafael came to this country under

circumstances over which he had no control at all, because the Nicaraguan government

decided to expel him and the United States government flew him and the others here to

keep them safe.  The U.S. government told the passengers on this flight to use this

Nicaraguan parole program to apply for reunification with their family members who

were left behind in Nicaragua, and that is what Rafael did, with help from the community

here.

15. I am participating in this lawsuit so that I and my children and others who are in the same

position can have our applications for immigration benefits processed in a normal way.

16. I am asking that my husband and children and I allow us to appear under pseudonyms in

the court filings.  We have a pending asylum application, and we have security concerns

with respect to the Nicaraguan government, but I am also worried now about the

consequences for our lives here in the United States if we are known to be plaintiffs in

this lawsuit.  There has been a lot of ugly talk about immigrants recently, and I do not

want my family to be targeted for abuse that we really have done nothing to deserve.  My

family and I are very grateful for U.S. government's help in getting Rafael released from

his unjust sentence in Nicaragua, for bringing him here, and for helping us reunite after

our long separation.  We just want to make sure we can continue living and working here

in safety and that our application for asylum is processed normally.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Signed at Mount Airy, Maryland,
on March 16, 2025.

_____

Andrea Doe

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

*Plaintiffs*,

v.

Kristi Noem, et al.,

*Defendants*.

C.A. No: 1:25-cv-10495-IT

## DECLARATION OF ANDREA DOE

Yo, Andrea Doe, según mi conocimiento personal, declaro lo siguiente:

1. Soy ciudadana de Nicaragua. Nací en el departamento de Carazo, Nicaragua, en 1991.

2. Actualmente vivo en Mount Airy, Maryland, con mi esposo, Rafael Doe, y nuestros dos hijos pequeños, Isaías y Francisco Doe.

3. Mi esposo, Rafael, fue preso político en Nicaragua antes de que el gobierno de Estados Unidos lo trasladara a este país el 9 de febrero de 2023. Fue encarcelado por su oposición al régimen de Daniel Ortega y condenado a más de 20 años de prisión. El gobierno nicaragüense lo mantuvo en condiciones terribles y sufrió tortura física y mental.

4. Nuestra separación fue terriblemente dura para nuestros hijos y para mí. No solo extrañaba muchísimo a mi esposo, y a mis hijos a su padre, sino que la policía nicaragüense también vigilaba nuestra casa y me daba asedio.  Vehículos policiales se estacionaban frente a nuestra

casa, y cuando visitábamos a mi esposo en la penitenciaría donde estaba detenido, los agentes nos esperaban en la esquina hasta que subíamos al autobús. Fue aterrador para los niños.

5. Después de cuatro largos años de esto, el gobierno nicaragüense liberó abruptamente a 222 presos políticos, entre ellos Rafael. El régimen de Ortega accedió a liberarlos con la condición de que el gobierno de los Estados Unidos los aceptara. Antes de que ninguno de nosotros supiera lo que estaba sucediendo, Rafael y 221 de nuestros compatriotas encarcelados habían sido sacados de la cárcel y estaban en un vuelo a Estados Unidos.

6. A él y a los demás en la misma situación los dejaron entrar a Estados Unidos con "parole."

7. Sentí un gran alivio de que Rafael estuviera fuera de la cárcel y a salvo en Estados Unidos, pero su partida nos dejó a mí y a nuestros hijos en una situación muy insegura en Nicaragua.

8. Un amable estadounidense a quien Rafael había conocido a través de otro pasajero en el vuelo de salida de Nicaragua nos patrocinó a mí y a los niños para que nos reuniéramos con él aquí en Maryland. Nos patrocinó a través del programa que el gobierno de Estados Unidos había establecido para que cubanos, haitianos, nicaragüenses y venezolanos solicitaran permiso humanitario para entrar en Estados Unidos.

9. Nos reunimos en Maryland en el verano de 2023. Rafael encontró abogados voluntarios que lo representaran en la solicitud de asilo y nos incluyó a los niños y a mí en su solicitud.

10. Rafael encontró trabajo en una empresa que instala vinilos publicitarios en vehículos, y la misma empresa me contrató también después de recibir mi permiso de trabajo. Hemos alquilado un apartamento. Nuestros hijos se han adaptado; ambos asisten a la escuela primaria y tienen amigos. Nos sentimos felices y bien integrados en nuestra nueva comunidad.

11. La noticia de que el gobierno de Estados Unidos cancelaría el programa de "parole" humanitario nicaragüense y suspendería el procesamiento de cualquier solicitud de inmigración

que los niños y yo hayamos presentado o podamos presentar en el futuro ha sido una gran sorpresa. Los niños y yo estamos incluidos en la solicitud de asilo de Rafael, que está pendiente. Nuestra seguridad y nuestro futuro dependen de la protección que nos brindaría el asilo.

12. Si mis hijos y yo no lográramos que se aprobara nuestra solicitud de asilo y nos privaran de esa vía hacia la seguridad en Estados Unidos, sería un desastre para nosotros, individualmente y como familia. El gobierno nicaragüense me vio visitando a Rafael en prisión. Vigilaban nuestra casa. Saben que soy su esposa. Si me obligaran a regresar a Nicaragua ahora, me detendrían y el gobierno me quitaría a mis hijos. Cuando intentaba irme en 2023, me retuvieron dos horas en el aeropuerto de Managua; me quitaron el pasaporte y el de los niños, y me sacaron de la fila. Finalmente nos dejaron ir, pero fue aterrador.

13. Rafael no querría que corriéramos ese peligro solos, pero si regresara a Nicaragua, sería detenido de inmediato. Y no podría él regresar a Nicaragua aunque quisiera: cuando lo expulsaron a él y a los demás pasajeros del vuelo del 9 de febrero a Estados Unidos, el régimen de Daniel Ortega también les quitó la ciudadanía nicaragüense. Como resultado, Rafael ahora es apátrida y, hasta que se apruebe su solicitud de asilo, no tiene acceso a la documentación que le permita viajar a ningún lugar.

14. Nos recibieron bien aquí en Maryland y nos sentimos felices. Trabajamos duro para construir un futuro para nuestra familia. Estas recientes decisiones de las autoridades migratorias estadounidenses nos causan gran ansiedad. Rafael llegó a este país en circunstancias que escapaban a su control, porque el gobierno nicaragüense decidió expulsarlo y el gobierno de Estados Unidos los trajo aquí en avión, junto con los demás, para mantenerlos a salvo. El gobierno estadounidense les indicó a los pasajeros de este vuelo que usaran este programa de

"parole" para los nicaragüenses para solicitar la reunificación con sus familiares que se quedaron en Nicaragua, y eso fue lo que hizo Rafael, con la ayuda de la comunidad de aquí.

15. Participo en esta demanda para que yo mis hijos y otras personas en la misma situación podamos tramitar nuestras solicitudes de beneficios migratorios de forma normal.

16. Solicito que mi esposo, mis hijos y yo nos permitan aparecer bajo seudónimos en los documentos judiciales. Tenemos una solicitud de asilo pendiente y tenemos preocupaciones de seguridad con respeto al gobierno nicaragüense, pero también me preocupan las consecuencias para nuestras vidas aquí en Estados Unidos si se nos descubre como demandantes en esta demanda. Últimamente se ha hablado mucho de los inmigrantes de forma bien fea, y no quiero que mi familia sea víctima de abusos que realmente no hemos hecho nada para merecer. Mi familia y yo estamos muy agradecidos por la ayuda del gobierno estadounidense para liberar a Rafael de su injusta condena en Nicaragua, por traerlo aquí y por ayudarnos a reunirnos después de nuestra larga separación. Solo queremos asegurarnos de que podamos seguir viviendo y trabajando aquí con seguridad y de que nuestra solicitud de asilo se tramite normalmente.

Declaro bajo pena de perjurio que las declaraciones anteriores son verdaderas y correctas según mi leal saber y entender.


Firmado en Mount Airy, Maryland, el 16 de marzo de 2025.

_____

Andrea Doe

## <u>CERTIFICATE OF TRANSLATION</u>

I, Shala Gafary, am competent to translate from Spanish to English, and certify that the translation of **Declaration of Andrea Doe** is true and accurate to the best of my abilities.


Date: 3/17/2025


Shala Gafary
Human Rights First
121 West 36th Street
PMB 520
New York, NY 10018
212-845-5247
gafarys@humanrightsfirst.org

# EXHIBIT A



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:    Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Jennifer B. Higgins
Acting Director
U.S. Citizenship and Immigration Services

FROM:    Benjamine C. Huffman
Acting Secretary

SUBJECT:    Exercising Appropriate Discretion Under Parole Authority

---

Congress granted to the U.S. Department of Homeland Security (DHS) authority to parole certain otherwise inadmissible aliens into the United States when, in the discretion of the Secretary of DHS, doing so either provides a significant public benefit to the American public or permits the United States to respond to an urgent humanitarian need.

Authority to grant parole is discretionary and may be exercised only on a case-by-case basis by immigration officers in the employ of DHS. When in the opinion of the Secretary of DHS the purposes of an alien's parole have been served, the alien must be returned to the custody of DHS and the alien's case must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible.

The Secretary of DHS's parole authority is set forth in 8 U.S.C. § 1182(d)(5). The statutory language and context make it abundantly clear that it is a *limited use* authority, applicable only in a very narrow set of circumstances. Congress retained its authority to legislatively determine which categories of aliens are admissible or inadmissible to the United States, while simultaneously providing DHS with the operational flexibility to deal with extraordinary situations including, but not limited to: inadmissible aliens with emergency medical conditions and the temporary entry of otherwise inadmissible aliens coming to the United States whose presence is required in legal proceedings as a defendant or witness.

Although parole is a discretionary authority to be exercised in narrow circumstances and only on a case-by-case basis, it has been repeatedly abused by the Executive Branch over the past several

1

decades in ways that are blatantly inconsistent with the statute. Most important, the parole statute does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria.

Furthermore, 8 U.S.C. § 1182(d)(5)(B) limits the circumstances under which an alien who is a refugee as defined in 8 U.S.C. § 1101(a)(42) may be paroled into the United States. This means it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims. The sole exception to this bar is when the Secretary of DHS determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than admitted as a refugee.

It is evident that many current DHS policies and practices governing parole are inconsistent with the statute.

Therefore, I order the following:
   (1) Within sixty (60) days of the date of this order, the Director of U.S. Immigration and Customs Enforcement; the Commissioner of U.S. Customs and Border Protection; and the Director of U.S. Citizenship and Immigration Services are directed to:
       a. Compile a list of all instructions, policies, procedures, rules, and regulations pertaining to parole;
       b. Review all such instructions, policies, procedures, rules, and regulations and determine, in consultation with the DHS General Counsel, which are not strictly in accord with the text and structure of 8 U.S.C. § 1182(d)(5);
       c. Formulate a plan for phasing out any such instructions, policies, procedures, rules, and regulations, accompanied by a proposal and timeline for any necessary public notices to be published pursuant to the terms of the Administrative Procedure Act or any other applicable law;
       d. Provide the Secretary of DHS with a report summarizing the results of the following reviews and inquiries.

   (2) Pending the review contemplated by paragraph (1), DHS Components have discretion to pause, modify, or terminate any parole program described in paragraph (1) to the extent:
       a. The policy was not promulgated pursuant to the procedural requirements of the Administrative Procedure Act or any comparable scheme;
       b. The DHS Component can do so in a manner that protects any legitimate reliance interests; and
       c. Doing so is otherwise consistent with applicable statutes, regulations, and court orders.

The purpose of this memorandum is to ensure that all future actions taken by DHS with regard to the exercise of the parole authority are consistent with law and within the scope of DHS's authority. Having said that, should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance.

# EXHIBIT B

| From: | Higgins, Jennifer B |
|---|---|
| To: | Meckley, Tammy M; DeNayer, Larry C; Nolan, Connie L; Valverde, Michael; Lotspeich, Katherine J; Kim, Ted H; Maxwell, Rebecca M (Becca); Knafla, Susan J |
| Cc: | Scott, Kika M; Calkins, Aaron L; Deshommes, Samantha L; johndmilesuscisdh (Vendor); Selby, Cara M; Lotspeich, Katherine J; Puchek, Elizabeth A (Beth) |
| Subject: | Securing Our Borders EO and Parole Processing |
| Date: | Thursday, January 23, 2025 4:54:41 PM |

Colleagues,

Pursuant to the Executive Order issued Jan. 20. 2025 titled *Securing Our Borders*, and in accordance with Acting Secretary Huffman's memorandum dated Jan. 20, 2025, which directs ICE, CBP, and USCIS to conduct a review of DHS policies and practices governing parole, **please ensure effective immediately that your staff do not make any final decisions** (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request, for the following parole programs, processes, or types:

- Uniting for Ukraine (U4U),
- Re-parole of Afghan nationals paroled under Operations Allies Welcome (OAW),
- Family Reunification Parole (FRP) Processes, including legacy Cuban Family Reunification Parole Program (CFRP) cases,
- Central American Minors (CAM),
- Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV),
- International Entrepreneur Parole,
- Parole of Western Hemisphere nationals interviewed for refugee status in Safe Mobility Offices (WHP), and
- Certain former members of the Mojahedin-e-Khalq (MeK) reparole,

This instruction does not include requests for advance parole, non-categorical Form I-131 Humanitarian Parole requests, or government referrals for parole filed and adjudicated on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

We will provide additional information when available.

Thank you,

Jennifer

EXHIBIT C

FOR OFFICIAL USE ONLY

**U.S. Department of Homeland Security**

U.S. Citizenship and Immigration
Services
*Office of the Director*
Camp Springs, MD 20588-0009



U.S. Citizenship
and Immigration
Services

February 14, 2025

# Memorandum

FROM:       Andrew Davidson,  <small>ANDREW J DAVIDSON Digitally signed by ANDREW J DAVIDSON Date: 2025.02.14 12:00:38 -05'00'</small>
            Acting Deputy Director, U.S. Citizenship and Immigration Services

TO:         Connie Nolan, Associate Director, Service Center Operations
            Michael Valverde, Associate Director, Field Operations
            Ted Kim, Associate Director, Refugee, Asylum and International Operations
            Tammy Meckley, Associate Director, Immigration Records and Identity Services
            Rebecca Maxwell, Chief (A) Administrative Appeals Office

SUBJECT:    **Administrative Hold on All USCIS Benefit Requests filed by Parolees Under the
            Uniting for Ukraine (U4U) Process, Processes for Haitians, Cubans,
            Nicaraguans, and Venezuelans (CHNV) Process, or Family Reunification Parole
            (FRP) Process**

**Purpose:** This memorandum authorizes an immediate USCIS-wide administrative hold on all
pending benefit requests filed by aliens who are or were paroled into the United States under the
U4U, CHNV, or FRP processes pending the completion of additional vetting flags in ELIS to
identity any fraud, public safety, or national security concerns.

**Background:** USCIS' authority to exercise the parole power stems from the Immigration and
Nationality Act (INA) section 212(d)(5)(A), which states that parole is available "only on a case-
by-case basis for urgent humanitarian reasons or significant public benefit."

Over the previous two years, the U.S. Department of Homeland Security (DHS) has implemented
processes through which Ukrainians, Cubans, Haitians, Nicaraguans, Venezuelans, and nationals of
other countries, and their immediate family members, could request to travel to the United States to
seek parole.[1] Under the U4U, CHNV, and FRP processes, potential beneficiaries with a confirmed

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Change to the Parole
Process for Cubans, 88 FR 26329 (Apr. 28, 2023). Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9,

FOR OFFICIAL USE ONLY

U.S.-based supporter may be considered, on a case-by-case basis, for advanced authorization to travel to an interior U.S. port of entry to seek a discretionary grant of parole for urgent humanitarian reasons or significant public benefit. The processes are initiated when a U.S.-based potential supporter files a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through myUSCIS for each beneficiary they seek to support. The potential supporter is vetted by USCIS and if the potential supporter passed vetting checks and is determined by USCIS as able to financially support the beneficiary, USCIS confirms the Form I-134A.

In July 2024, USCIS suspended parts of the CHNV processes after a USCIS Fraud Detection and National Security (FDNS) Directorate preliminary assessment identified potential concerns related to fraudulent supporter requests, during an internal review of the U4U and CHNV processes (or, as the report stated, the "UCHNV" process). An Interim Staff Report of the Committee on the Judiciary and Subcommittee on Immigration Integrity, Security, and Enforcement, titled "The Biden-Harris Administration's CHNV Parole Program Two Years Later: A Fraud-Ridden, Unmitigated Disaster," indicates, in part, that Forms I-134A filed by potential supporters under the CHNV processes included social security numbers, addresses, and phone numbers that had been used hundreds of times and, in some cases, were filed used biographical information for individuals who are deceased. Roughly 100,948 Forms I-134A were filed by 3,200 "serial" supporters, defined as a supporter whose biographical data appeared on 20 or more Forms I-134A. The report also found that nearly 1,000 Form I-134A applications provided Social Security numbers of confirmed dead people. Meanwhile, 100 physical addresses for potential supporters were used at least 124 times on over 19,000 Forms I-134A. Upon further investigation, fraud was confirmed in some of these cases, while it was not in others.[2] Further, the identified potential concerns related to fraudulent supporter requests exposed serious vulnerabilities in USCIS' vetting process not only for potential supporters but also for potential beneficiaries. There were instances identified where certain beneficiaries were not fully vetted by CBP and were the subject of national security or public safety information that was not properly assessed prior to parole by CBP. Therefore, benefit requests filed by aliens who are or were paroled under any of these categorical parole programs need further review to determine the level of fraud and the possible involvement of beneficiaries.

On January 20, 2025, the President issued Executive Order (EO) 14165, Securing our Borders, requiring DHS to terminate all categorical parole programs that are contrary to law or policy, including the parole program known as CHNV.[3] The President also issued EO 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats,

---

2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023). Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023). Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023)). Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023); Implementation of the Uniting for Ukraine Parole Process (Apr. 27, 2022).

[2] For additional details on the fraud found in the CHNV parole process, see Interim Staff Report of the Committee on the Judiciary and Subcommittee on Immigration Integrity, Security, and Enforcement (November 20, 2024).

[3] See, Securing Our Borders, Executive Order 14165, 90 FR 8467, 8468 (Jan. 20, 2025) available at (last viewed Jan. 28, 2025).

FOR OFFICIAL USE ONLY

requiring DHS to identify all resources that may be used to ensure that all aliens seeking admission to the U.S., or who are already in the U.S., are screened and vetted to the maximum degree possible and re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind.[4]

Currently, fraud information and public safety or national security concerns are not being properly flagged in USCIS' adjudicative systems. The procedures that the parolees under these categorical parole programs underwent may not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161.

Due to the potential fraud trends already identified for supporter fraud by FDNS in their initial review of the U4U and CHNV processes, the implication of beneficiary participation in the supporter fraud, and the explicit instruction to DHS to screen and vet aliens seeking immigration benefits to the maximum degree possible, USCIS is pausing the adjudication of benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes to ensure that these benefit requests are being reviewed with the appropriate screening and vetting standards and procedures as set out in EO 14161.

**Recommendation/Decision:**  Accordingly, USCIS will immediately place an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes, pending the completion of the required screening and vetting in ELIS to identify any fraud, public safety, or national security concerns.

Any case subject to this administrative hold with a litigation need may only be lifted from the hold on a case-by-case basis, in a subsequent memo to file, with approval by the USCIS Director or USCIS Deputy Director. This case-by-case requirement must be followed even when aliens are member of a class that is subject to injunction, settlement agreement, or other court order. Once USCIS completes a comprehensive review and evaluation of the in-country population of aliens who are or were paroled into the United States under these categorical parole programs, USCIS may issue a subsequent memo lifting this administrative hold.

C.C. John Miles, Chief Counsel (A)
       Susan Knafla, Associate Director (A), Fraud Detection and National Security

---

[4] *See*, Protecting the United States from Foreign Terrorists and Other National Security and Public Safey Threats, 90 FR 8451 (Jan. 29, 2025) (last viewed Feb. 4, 2025).

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SVITLANA DOE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:25-cv-10495-IT |
| | ) | |
| KRISTI NOEM, in her official capacity as | ) | |
| Secretary of Homeland Security, et al.; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF KIKA SCOTT</u>

I, Kika Scott, make the following declaration, as permitted by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Massachusetts. I hereby certify:

1. I am the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency within the United States Department of Homeland Security ("DHS"). I have held this position since February 9, 2025. Previously, I was the Chief Financial Officer, USCIS, DHS, since May 27, 2019.

2. The statements contained in this declaration are based upon my personal knowledge, and upon information provided to me in my official capacity.

3. President Trump signed Executive Order 14165 on January 20, 2025.[1] Pursuant to that Executive Order, on January 23, 2025, Acting Director Jennifer Higgins directed that USCIS adjudicators should not make any final decisions (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request, filed under Uniting for Ukraine (U4U), the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV), Operation Allies Welcome

---

[1] Executive Order 14165, Securing Our Borders, 90 Fed. Reg. R 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

Appx-0313

(OAW) re-parole, Family Reunification Parole (FRP) programs, and the Central
American Minors (CAM) parole program. She further instructed that the pause did not
apply to requests for advance parole, non-categorical Form I-131 Humanitarian Parole, or
government referrals for parole filed and adjudicated on a case-by-case basis for urgent
humanitarian reasons or significant public benefit.

4. On January 28, 2025, USCIS provided notice on its website (*see, e.g.,* www.uscis.gov/i-
134A) that it was pausing acceptance of the Form I-134A, Online Request to be a
Supporter and Declaration of Financial Support, until the Agency had reviewed all
categorial parole programs as instructed by Executive Order (EO) 14165. The Form I-
134A is used to initiate the parole processes for the U4U, CHNV, and FRP programs.

5. The CHNV parole programs were also previously briefly paused in July 2024 to evaluate
program vulnerabilities, as has been publicly reported.[2] The then-Secretary of Homeland
Security instructed USCIS and U.S. Customs and Border Protection (CBP) to pause the
CHNV parole programs due to concerns that fraud, public safety, and national security
were insufficiently addressed and that U.S.-based supporters were not sufficiently
screened and vetted.

6. On February 14, 2025, Acting Deputy Director Andrew Davidson issued a USCIS-wide
administrative hold on all pending benefit requests filed by aliens who are or were
paroled into the United States pursuant to INA § 212(d)(5)(A) under the U4U, CHNV,
and FRP programs pending the completion of additional vetting to identify any fraud,
public safety, or national security concerns. The hold was issued pursuant to EO 14165.

7. As of the date of this declaration, the programs have not been terminated. Benefit
requests submitted by U4U, CHNV, and FRP parolees remain pending and on hold until
USCIS completes its review of the programs and the screening and vetting that these
parolees and their supporters received to ensure that it comported with the uniform

---

[2] *See, e.g.,* Staff of H. Comm. on the Judiciary, 119th Cong., The Biden-Harris Administration's CHNV Parole
Program Two Years Later: A Fraud-Ridden, Unmitigated Disaster (2024), https://judiciary.house.gov/sites/evo-
subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-11-
20%20The%20Biden%20Harris%20Administration%27s%20CHNV%20Parole%20Program%20Two%20Years%2
0Later%20-%20A%20Fraud-Ridden%2C%20Unmitigated%20Disaster.pdf.

Appx-0314

baseline that existed on January 19, 2021. USCIS has issued a temporary pause to review vetting procedures to ensure that only individuals who are eligible for immigration benefits receive them.

8. Although certain categorical parole programs have been paused pending further review, DHS and USCIS continue to accept and process certain individual parole requests filed on Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, on a case-by-cases basis, for urgent humanitarian reasons or significant public benefit, including requests based on military parole in place (MIL PIP), Immigrant Military Members and Veterans Initiative (IMMVI), U.S. Government referrals for parole, as well as individual parole requests not under a particular program or process.[3] Additionally, in some instances where an alien needs to remain in the United States after their period of parole terminates, the alien may request a new period of parole, also known as re-parole, by filing Form I-131 with USCIS from within the United States. Such requests are also adjudicated on a case-by-case basis for urgent humanitarian reasons or significant public benefit which warrants the new period of parole.

9. The Immigration and Nationality Act ("INA") confers upon the Secretary of Homeland Security ("Secretary") the narrow discretionary authority to parole aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit . . . but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled...." ." *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Pursuant to EO 14165, the Secretary is evaluating categorical parole programs to determine whether to exercise her discretion in this way, evaluating whether

---

[3] *See, e.g.*, Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States https://www.uscis.gov/humanitarian/humanitarian_parole

the programs still serve their intended purposes and are consistent with the goals of the current Administration.

9.  In this case, DHS, including USCIS, would be harmed if a preliminary injunction were granted to require DHS to resume review of requests filed under certain parole programs before the Secretary of DHS has completed her review. Requiring USCIS to review requests related to parole under the paused parole programs while the Secretary's review is taking place would require USCIS to allocate resources away from other Administration priorities, even though the Secretary may decide not to exercise her discretion to continue these categorical parole programs. Further, to the extent that fraud, public safety, and national security concerns exist among individuals seeking to support a potential beneficiary and among potential beneficiaries under the paused programs, requiring DHS to continue screening, vetting, and reviewing individuals' requests to be a supporter or applications for parole or re-parole would harm the agency's ability to fulfill its mission for the reasons explained below.

10. From their inception, DHS has expressly advised the public that the parole programs are discretionary. In establishing the CHNV parole programs, DHS stated that "[t]he Secretary retains the sole discretion to terminate the [Parole Program] … at any point"[4] and that "DHS may terminate parole in its discretion at any time."[5] The CHNV parole programs were "being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." DHS made similar statements regarding FRP, including explaining, "The Secretary retains the sole discretion to terminate this FRP process at any point."[6] In establishing the CAM program, DHS explained, "DHS may terminate parole in its discretion at any time."[7]

---

[4] *E.g.*, 88 FR at 1268 (Cuba).

[5] *E.g.*, 88 FR at 1272 (Cuba).

[6] 88 FR 43611 at 43619 (FRP for Salvadorans).

[7] 88 FR at 21698 (CAM).

Appx-0316

11. In most instances, potential beneficiaries of these parole programs are currently outside of the United States. If individuals are engaged in fraud, or wish to cause harm to the United States, requiring DHS to resume these programs would facilitate the arrival of aliens who may be bad actors onto U.S. soil. Further, once paroled into the United States, DHS would need to expend additional resources to terminate parole and remove the alien, as appropriate.

13. Permitting aliens to travel to the United States, if they are engaged in fraud, also undermines the integrity of the immigration system. If the American public believes that DHS does not have thorough vetting and that aliens who do not warrant a favorable exercise of discretion are paroled into the United States, then there is less trust in the immigration system. Further, perception that DHS is not combatting fraud is likely to encourage more fraudulent applications, petitions, and requests. In this instance, there is reason to believe that there is fraud occurring in these parole programs, based on USCIS' findings in its prior review of the CHNV programs.

14. USCIS would also be harmed if the February 14, 2025 Davidson Memo to pause adjudication of immigration benefits filed by aliens who were paroled into the United States under these programs were enjoined. A temporary hold on processing of immigration benefit requests filed by aliens paroled into the United States under the U4U, CHNV, and FRP programs allows USCIS, in coordination with other partners in DHS, to determine the scope of any further fraud, and implement measures to prevent those individuals from obtaining further immigration benefits in the United States.

15. USCIS may, in its discretion, issue temporary holds on adjudication of certain benefits to conduct investigations and vetting to determine that an individual is eligible for the benefit sought. USCIS has an obligation to only grant immigration benefits to individuals who are eligible for them, and to investigate the individual's background to ensure eligibility. In this instance, as articulated in the February 14, 2025 Davidson Memo, USCIS determined that parolees whose immigration benefits are subject to the hold may not have received screening and vetting to the maximum degree possible or that comports

with the uniform baseline that existed on January 19, 2021, as required per EO 14161, prior to being granted parole. Without this hold, and taking the time to flag cases where the parolee (and/or their supporter) may have committed fraud or pose a national security or public safety concern for additional review, USCIS may inadvertently grant immigration benefits to aliens who are either ineligible for the benefit sought as a matter of law or where the benefit is discretionary, does not warrant a favorable exercise of discretion. Further, while parole is not a permanent benefit, many aliens who were paroled into the United States under these programs now have applications pending that would provide them permanent status in the United States. If USCIS later determines that these benefits were improperly granted, it may be difficult and time-consuming to rescind or terminate.

16. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.  Executed this 20th day of March, 2025, in Camp Springs, Maryland.

KIKA M SCOTT

Digitally signed by KIKA M
SCOTT
Date: 2025.03.20 23:01:49
-04'00'

Kika Scott
Senior Official Performing the Duties of the Director
U.S. Citizenship and Immigration Services
Department of Homeland Security

# EXHIBIT E

Para tener acceso a este sitio en Español, presione aquí (./historic-pt-es)

# Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year

## Fiscal Year 2020 to 2025 (up to January 31, 2025)

Next Page (./historic-pt-2)

## Median Processing Times (in Months)

The number of months shown is the median. It represents the time it took to complete half of the cases in a given time period.

| Form | Form Description | Classification or Basis for Filing | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025[7] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|-----------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance, replacement or renewal | 8.3 | 5.2 | 1.2 | 9.1 | 1.1 | 0.7 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3.9 | 4.0 | 7.8 | 5.2 | 3.6 | 2.2 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (Premium filed) | 0.4 | 0.3 | 0.3 | 0.2 | 0.3 | 0.4 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (non Premium filed) | 2.3 | 1.8 | 2.3 | 2.5 | 2.2 | 3.5 |
| I-129F | Petition for Alien Fiancé(e) | All Classifications | 4.6 | 8.0 | 12.1 | 13.9 | 8.5 | 6.0 |
| I-130 | Petition for Alien Relative | Adoptions | 22.3 | 27.7 | 35.4 | 49.2 | 37.3 | 45.1 |
| I-130 | Petition for Alien Relative | Immediate Relative | 8.3 | 10.2 | 10.3 | 11.8 | 11.7 | 14.4 |
| I-131 | Application for Travel Document | Advance Parole Document | 4.6 | 7.7 | 7.3 | 5.8 | 5.9 | 6.7 |
| I-131 | Application for Travel Document | Parole in Place | 4.8 | 4.9 | 4.7 | 5.4 | 4.1 | 4.1 |
| I-131[1] | Application for Travel Document | Travel Document | 4.0 | 7.2 | 10.6 | 15.9 | 14.3 | 13.7 |

| Form | Form Description | Classification or Basis for Filing | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025[7] |
|---|---|---|---|---|---|---|---|---|
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (Premium filed) | 0.3 | 0.4 | 0.3 | 0.3 | 0.3 | 0.7 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (non Premium filed) | 4.9 | 8.2 | 9.3 | 4.3 | 7.1 | 7.6 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Immigrant Petition (All Classifications) | 11.4 | 5.5 | 8.4 | 6.8 | 3.1 | 3.5 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | 6.9 | 12.9 | 22.6 | 22.9 | 13.4 | 10.2 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on refugee admission more than 1 year ago | 9.3 | 7.1 | 14.1 | 21.6 | 13.2 | 7.9 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 8.8 | 9.9 | 11.0 | 8.6 | 6.6 | 6.9 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Family-based adjustment applications | 9.3 | 12.9 | 10.6 | 11.4 | 8.9 | 9.3 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on Cuban Adjustment Act of 1966 (CAA) | 7.1 | 8.5 | 5.5 | 3.3 | 4.6 | 7.3 |
| I-485[2] | Application to Register Permanent Residence or to Adjust Status | All Other Adjustment of Status | 32.7 | 8.7 | 5.4 | 7.0 | 9.7 | 11.0 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an investor who wishes to immigrate to the United States | 31.1 | 32.5 | 44.2 | 50.0 | 53.8 | 70.9 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All Extend/Change Applications | 4.8 | 9.6 | 6.8 | 5.8 | 2.7 | 2.5 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | U.S. citizen filing to adopt an orphan | 3.2 | 5.3 | 6.3 | 5.8 | 7.4 | 10.6 |
| I-600A | Application for Advance Processing of Orphan Petition | U.S. citizen who plans to adopt a foreign-born child | 2.8 | 3.5 | 3.0 | 3.0 | 3.2 | 3.2 |

3/19/25, 10:45 PM    Historic Processing Times

| Form | Form Description | Classification or Basis for Filing | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025[7] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|--------|
| I-601A | Application for Provisional Unlawful Presence Waiver | Provisional Waiver of INA 212(a)(9)(B) | 11.2 | 17.1 | 31.7 | 43.0 | 41.2 | 32.1 |
| I-730[3] | Asylee Relative Petition | Petition for accompanying family members of an asylee | 15.3 | 18.9 | 27.3 | 8.9 | 7.3 | 9.9 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of conditions on lawful permanent resident status (spouses and children of U.S. citizens and lawful permanent residents) | 13.8 | 13.6 | 18.2 | 20.8 | 23.5 | 21.8 |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 2.4 | 3.0 | 4.7 | 3.2 | 3.1 | 1.9 |
| I-765 | Application for Employment Authorization | Based on an approved, concurrently filed, I-821D, Consideration of Deferred Action for Childhood Arrivals (c)(33). | 1.1 | 1.9 | 0.5 | 1.0 | 1.8 | 0.4 |
| I-765 | Application for Employment Authorization | Based on a pending asylum application | 2.5 | 3.2 | 9.2 | 1.6 | 0.5 | 0.5 |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application | 4.8 | 7.1 | 6.7 | 5.5 | 3.7 | 2.1 |
| I-765 | Application for Employment Authorization | Based on parole | 4.7 | 0.6 | 1.1 | 1.3 | 0.8 | 0.8 |
| I-800 | Petition to Classify Convention Adoptee as an Immediate Relative | Petition to classify Convention Adoptee as an Immediate Relative | 0.7 | 0.9 | 0.9 | 1.0 | 1.2 | 1.2 |

| Form | Form Description | Classification or Basis for Filing | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025[7] |
|---|---|---|---|---|---|---|---|---|
| I-800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | Application for Determination of Suitability to Adopt a Child from a Convention Country | 1.9 | 2.5 | 2.3 | 2.1 | 2.8 | 2.8 |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program and LIFE Act family unity | 5.3 | 5.9 | 7.1 | 8.5 | 6.9 | 3.9 |
| I-821 | Application for Temporary Protected Status | To request or reregister for TPS | 2.2 | 4.1 | 10.2 | 11.8 | 5.9 | 5.5 |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Initial Deferred Action | 5.5 | 5.9 | N/A | N/A | N/A | N/A |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Renewal of Deferred Action | 1.1 | 1.8 | 0.5 | 1.0 | 1.8 | 0.4 |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 6.0 | 4.4 | 6.0 | 3.6 | 7.9 | 6.0 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Removal of conditions on lawful permanent resident status (immigrant investors) | 24.8 | 34.5 | 45.5 | 49.4 | 41.0 | 17.1 |
| I-914[4] | Application for T Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of trafficking in persons, and immediate family | 18.6 | 18.0 | 12.9 | 12.3 | 14.9 | 17.5 |
| I-918[5] | Petition for U Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of qualifying criminal activity, and their qualifying family | 54.3 | 53.6 | 59.0 | 57.5 | 46.1 | 32.1 |

| Form | Form Description | Classification or Basis for Filing | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025[7] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|------------|
| I-924 | Application For Regional Center Designation Under the Immigrant Investor Program | I-924 - Application For Regional Center Designation Under the Immigrant Investor Program | 19.1 | 22.1 | N/A | N/A | N/A | N/A |
| I956 | Application for Regional Center Designation | I-956 - Application for Regional Center Designation | N/A | N/A | N/A | 9.4 | 10.4 | 8.8 |
| I956F | Application for Approval of an Investment in a Commercial Enterprise | I-956F - Application for Approval of an Investment in a Commercial Enterprise | N/A | N/A | N/A | 11.7 | 10.2 | 8.5 |
| N-400 | Application for Naturalization | All Other Application for Naturalization | 8.9 | 11.5 | 10.5 | 6.0 | 5.0 | 5.5 |
| N-400 | Application for Naturalization | Military Application for Naturalization | 7.1 | 7.0 | 5.6 | 4.9 | 3.0 | 2.2 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | U.S. citizen applying for a replacement of naturalization or citizenship certificate | 3.6 | 6.7 | 10.8 | 8.1 | 5.6 | 5.4 |
| N-600 | Application for Certificate of Citizenship | Application for recognition of U.S. citizenship | 5.1 | 5.8 | 6.3 | 6.9 | 4.3 | 3.7 |
| N-600K | Application for Certificate of Citizenship and Issuance of Certificate Under Section 322 | Application for Citizenship and Issuance of Certificate | 5.7 | 9.6 | 6.1 | 7.0 | 6.2 | 6.3 |
| Waivers[6] | Waivers | Excluding I-601A | 7.3 | 7.6 | 8.0 | 11.6 | 16.0 | 16.9 |

Next Page (./historic-pt-2)

Table Key:

N/A Not available.

References:

[1] The processing time listed for form I-131, Application for Travel Document, reflects travel document requests associated with most form types across agency components; however, it does not reflect

the processing time for specific types of travel document requests such as humanitarian parole.

[2] Excludes EOIR Adjustment applications.

[3] Excludes petitions for accompanying family members of a refugee.

[4] Includes I-914A, Application for Family Member of T-1 Recipient.

[5] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient.

[6] Includes the following applications filed to waive exclusionary grounds: Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[7] FY2025 uses data from October 1, 2024 to January 31, 2025.

<u>Note(s):</u>

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Processing times may differ from previously published reports due to system updates and post-adjudicative outcomes.

3) Discrepancies from past historical processing time reports may exist due to differences in reporting procedures.

4) Some of the forms have been aggregated.

5) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. Visa regressed I-485s and revoked petitions or applications are excluded. Additional information on visa retrogression can be found on our website (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).

6) Historical processing times are not comparable to the processing times posted on the USCIS processing times webpage (https://egov.uscis.gov/processing-times/) for certain form types due to different methodologies (for example, cycle time methodology versus processing time methodology). For more information, visit the Case Processing Times webpage (https://egov.uscis.gov/processing-times/more-info).

7) From FY2017 through FY2021, the processing time for the I-918/I-918A is calculated using the receipt date to waitlist determination date. Beginning in FY 2022, the processing time is calculated using the receipt date to Bona Fide Determination (BFD) review.

8) Consistent with the July 16, 2021 order (https://www.uscis.gov/DACADecisionStateofTexas) from the Southern District of Texas that prohibits DHS from granting initial DACA requests, USCIS has suspended calculations of processing times for initial DACA requests. The 5.9 months historical processing time listed for initial DACA requests was current as of June 30, 2021.

9) Statutory authorization related to the EB-5 Immigrant Investor Regional Center Program expired at midnight on June 30, 2021. For information regarding Form I-526 petition processing, and the impact of the lapse in statutory authorization related to the EB-5 Immigrant Investor Regional Center Program, please see: https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program).

10) The federal fiscal year is from October 1st through September 30th.

11) Beginning in FY2024 the following I-765 classifications: based on a pending I-485 adjustment application, based on parole, and based on asylum applications were retroactively added for FY 2013 through FY 2023.

12) Beginning in FY2025 the following N-400 classifications: military application for naturalization and all other application for naturalization were retroactively added for FY 2014 through FY 2025.

13) Beginning in FY2025 I-956 and I-956F processing times were retroactively added for FY 2020 through FY 2025.

**Source(s):**

1) Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Electronic Immigration System (ELIS), C3 Consolidated, C4 Consolidated, INFACT, queried February 2025.

# ↗ Other case processing times resources

Reducing Processing Backlogs(./reducing-processing-backlogs)

Frequently Asked Questions About Processing Times(./processing-times-faqs)

When to expect to receive your Green Card(./expect-green-card)

Check current processing times(./home)

Processing information for the I-765(./i765)

Affirmative Asylum Interview Scheduling (http://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-scheduling-bulletin)

Administrative Appeals Office(https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/aao-processing-times)

Parole Processing(https://www.uscis.gov/humanitarian/humanitarian-parole/parole-processing)

# ? Case management tools

Inquire about a case outside normal processing time (https://egov.uscis.gov/e-request/onp)

Check your case status(https://egov.uscis.gov/casestatus/landing.do)

Update your mailing address(https://egov.uscis.gov/coa/)

Ask about missing mail(https://egov.uscis.gov/e-request/)

Correct a typographical error(https://egov.uscis.gov/e-request/typo)

Request appointment accommodations(https://egov.uscis.gov/e-request/accom)

Feedback

Let us know what you think about our redesigned Processing Times webpage at ProcessingTimesFeedback@uscis.dhs.gov (mailto:ProcessingTimesFeedback@uscis.dhs.gov) **(Please do not submit case-specific inquiries).**

Return to top

**Topics (https://www.uscis.gov/topics)**

**Forms (https://www.uscis.gov/forms)**

**Newsroom (https://www.uscis.gov/newsr**

**Citizenship (https://www.uscis.gov/citizenship)**

**Green Card (https://www.uscis.gov/green-card)**

**Laws (https://www.uscis.gov/laws-and-policy)**

**Tools (https://www.uscis.gov/tools)**

(https://www.facebook.com/uscis) (https://twitter.com/uscis) (https://www.youtube.com/uscis) (https://www.instagram.com/uscis)

## Contact USCIS (https://www.uscis.gov/about-us/contact-us)

(https://www.dhs.gov)

USCIS.gov
**An official website of the U.S. Department of Homeland Security (https://www.dhs.gov)**

## National Terrorism Advisory System

About USCIS (https://www.uscis.gov/about-us)

Accessibility (https://www.uscis.gov/website-policies/accessibility)

Budget and Performance (https://www.uscis.gov/about-us/budget-planning-and-performance)

DHS Components (https://www.uscis.gov/website-policies/dhs-component-websites)

Freedom of Information Act (https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act)

No FEAR Act Data
(https://www.uscis.gov/about-us/equal-
employment-opportunity/equal-
employment-opportunity-data-posted-
pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers
(https://www.uscis.gov/website-
policies/privacy-and-legal-disclaimers)

Site Map
(https://www.uscis.gov/sitemap)

Office of
(https://w

The Whit
(https://w

USA.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SVITLANA DOE, et al.,<br><br>        Plaintiffs,<br><br>     *v.*<br><br>KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security, et al.,<br><br>       Defendants. | Civil Action No.: 1:25-cv-10495-IT |

## JOINT STATUS REPORT

Pursuant to this Court's directive on March 24, 2025 at the hearing on Plaintiffs'[1] Emergency Motion for Preliminary Injunction, Plaintiffs and Defendants[2] (collectively, the Parties) have conferred on: (i) Plaintiffs' filing of a Second Amended Complaint; (ii) a briefing and hearing schedule for Plaintiffs' motions to certify a class (Doc. No. 46 and forthcoming Supplemental Motion to Certify Class); and (iii) Plaintiffs' forthcoming Motion for Temporary Restraining Order / Preliminary Injunction, but were unable to come to an agreement on all matters. The Parties, by and through their representative counsel of record, jointly submit the status report below and are willing to abide by the schedule ordered by the Court.

---

[1] Plaintiffs include Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Andrea Doe, Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, and Haitian Bridge Alliance.

[2] Defendants include Kristi Noem, in her official capacity as Secretary of Homeland Security; Todd M. Lyons, in his official capacity as the Acting Director of Immigration and Customs Enforcement; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; Kika Scott, in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and Donald J. Trump, in his official capacity as President of the United States.

**Plaintiffs' Second Amended Complaint**

*Plaintiffs' Position*

  Plaintiffs' and Defendants' counsel have conferred, and Defendants' counsel consent to

Plaintiffs' filing of a second amended complaint to address the issuance of the recently published

Federal Register Notice, entitled "Termination of Parole Processes for Cubans, Haitians,

Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611 (March 25, 2025). Plaintiffs therefore

intend to file a Motion for Leave to File an Amended Complaint and a Second Amended

Complaint on March 26, 2025.

*Defendants' Position*

  Defendants do not oppose Plaintiffs' motion for leave to file a second amended

complaint. However, as set forth below, Defendants believe it is in the interests of judicial

economy and fairness to bifurcate consideration of any new requests for relief relating to added

claims addressing the recently published Federal Register Notice (FRN), entitled "Termination of

Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611

(March 25, 2025), from the already-pending requests for relief related to the prior agency

guidance. Defendants thus set forth a schedule below that will allow the Court to address those

pending requests for relief at the April 7, 2025, hearing, while also providing both the parties and

the Court with additional time to separately address any new requests for relief related to the

FRN in advance of April 24, 2025.

**Plaintiffs' Motions to Certify Class**

*Plaintiffs' Position*

  Plaintiffs respectfully request that the Court establish the following schedule for briefing

and a hearing on Plaintiffs' Motion to Certify Class, Doc. No. 46:

Appx-0330

- Plaintiffs shall file a Supplemental Motion to Certify Class by March 27, 2025;

- Defendants shall file their Opposition to Plaintiffs' Supplemental Motion to Certify Class by April 4, 2025; and

- Hearing on Plaintiffs' Supplemental Motion to Certify Class on April 7, 2025.

***Defendants' Position***

Defendants propose the following schedule, which bifurcates requests for class certification pertaining to the already-pending claims and requests for relief from new requests for relief pertaining to the FRN:

<u>Pending Motion for Class Certification</u>

- Defendants shall file their Opposition to Plaintiffs' Motion to Certify Class (Doc. No. 46) by April 4, 2025[3];

- Hearing on Plaintiffs' Motion to Certify Class (Doc. No. 46) on April 7, 2025;

<u>Supplemental Motion for Class Certification</u>

- Plaintiffs shall file a Supplemental Motion to Certify Class relating to the FRN by March 27, 2025;

- Defendants shall file their Opposition to Plaintiffs' Supplemental Motion to Certify Class on April 10, 2025; and

- Hearing on Plaintiffs' Supplemental Motion to Certify Class to be set by the Court.

---

[3] Defendants do not yet know the identities of Plaintiffs and will need time to gather information on those Plaintiffs once their identities are known. Per the Court's suggestion at the March 24 hearing, if Defendants are unable to gather all the necessary information by the time of the April 4 filing, Defendants will note the need to bifurcate and supplement their response in that filing.

Appx-0331

### Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction

***Plaintiffs' Position***

- Plaintiffs shall file a Motion for Temporary Restraining Order / Preliminary Injunction by March 28, 2025;

- Defendants shall file their Opposition to Plaintiffs' Motion for Temporary Restraining Order / Preliminary Injunction by April 4, 2025; and

- Hearing on Plaintiffs' Motion for Temporary Restraining Order / Preliminary Injunction on April 7, 2025.

***Defendants' Position***

Plaintiffs have represented that their new request for preliminary-injunctive relief concerning the FRN will depend on purely legal arguments that do not require review of the Certified Administrative Record. Based on that representation, Defendants propose the following schedule, which bifurcates requests for relief pertaining to the already-pending claims from new requests for relief pertaining to the FRN[4]:

- Plaintiffs shall file a Motion for Temporary Restraining Order / Preliminary Injunction addressing any new requests for relief relating to the FRN by March 28, 2025;

- Defendants shall file their Opposition to Plaintiffs' Motion for Temporary Restraining Order / Preliminary Injunction by April 11, 2025; and

---

[4] If Plaintiffs advance claims that require record review, Defendants reserve the right to seek an amended schedule that provides Defendants with reasonable time to produce a Certified Administrative Record. The Defendant agencies will need time to collect, review, and certify an administrative record, and will not be able to complete that process on the schedule proposed here. *See, e.g.*, *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582-83 (D.C. Cir. 2001) (noting that courts must give agencies time to provide an administrative record before determining probability of success on the merits of a claim requiring record review when ruling on a motion for preliminary injunction).

4

- Hearing on Plaintiffs' Motion for Temporary Restraining Order / Preliminary Injunction to be set by the Court.

In conferring on this schedule, Plaintiffs represented that they were concerned about completing briefing on this motion before the April 24, 2025 termination of temporary parole periods for existing CHNV parole grants. *See* 90 Fed. Reg. at 13,611. Defendants' proposed schedule accomplishes this goal by setting a date for Defendants' response nearly two weeks in advance of April 24, 2025. Under this schedule the Court could set a hearing sometime between April 11 and April 24, 2025, to resolve this issue before that latter date. Defendants' proposal would also allow Defendants the time to respond to Plaintiffs' motion contemplated by the local rules, and would allow the Court more time to review the Parties' briefing before any hearing.

Appx-0333

Dated March 26, 2025

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Acting Director*

EREZ REUVENI
*Acting Deputy Director*

PATRICK GLEN
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

/s/ Brian C. Ward
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

ELISSA FUDIM
ZACHARY CARDIN
DANIEL SCHUTRUM-BOWARD
*Trial Attorneys*

*Counsel for Defendants*

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Appx-0334

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF).

Dated: March 26, 2025

/s/ John A. Freedman
John A. Freedman

7

# ATTACHMENT C

to Plaintiffs' Second Supplemental Motion to

Proceed Under Pseudonym

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.

           Plaintiffs,

    – *v.* –

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, et al.

         Defendants.

Civil Action No.: 1:25-cv-10495-IT

## DECLARATION OF LUCIA DOE

I, Lucia Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Caracas, Venezuela in 1980. I am a national of Venezuela.

2. I currently live in St. Augustine, Florida. I have lived in St. Augustine since I came to the United States through the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV") eight months ago in July 2024.

3. Before coming to St. Augustine, I lived with my mom in Merida, Venezuela. When the parole process for Venezuelans was announced in 2022, I heard about it on the news and later spoke to my sister, Plaintiff Norma Lorena Dus ("Lorena"), about the process. Lorena is a U.S. citizen and lives in West Stockbridge, Massachusetts and she is my sponsor for CHNV parole.

4. I decided to leave Venezuela due to the difficulty my family was having financially. I never wanted to leave Venezuela and live abroad, but unfortunately the situation in Venezuela is unsustainable. In Venezuela, I lived with my mom in Merida. I helped provide for them financially, but the salary I earned working was never sufficient to provide for even basic needs like food, rent, and clothing.

5. In Venezuela, I was employed as the Director of Children's Ministries at a local Christian church in Merida. I have a bachelor's degree in Christian Education from the Universidad Teologica del Caribe (Theological University of the Caribbean) in Saint Just, Puerto Rico. I worked for 12 years at the church and loved my job. However, my salary at the church was around $60 per month, which was not nearly enough to cover our most basic expenses, which were around $500 per month. This was a very typical monthly salary in Merida where I lived. Since no one can live on a salary this low, most people were always looking for side jobs and new income streams. My mom and I were not able to survive on the money I made working at the church, so we had to rely on financial assistance from my siblings living abroad. Thanks to my siblings, we were able to survive and have enough money for food and rent.

6. When I learned about the opportunity for CHNV parole, I talked with Lorena about the possibility of her sponsoring me so that I could go to the U.S. to work and help our family. I felt like there was more to life than the way I was living in Venezuela, and that I shouldn't have to work that hard to just survive.

7. Lorena submitted an application to sponsor me for CHNV parole in December 2022. I was excited when I was approved to travel to the United States in May 2024, and I traveled from Venezuela to Colombia, and then from Colombia to St. Augustine, Florida in July 2024.

8. When I arrived in Florida, U.S. immigration officials reviewed my documents and granted me parole until July 2026. I quickly applied for a social security number and a work permit, and my documents arrived in August 2024.

Appx-0338

9.  I decided to live in St. Augustine rather than near my sister in Massachusetts because, from a previous trip I made to Florida when I was studying in Puerto Rico, I already had several friends living and working in St. Augustine. I thought it would be easier to find work there and I also needed access to public transportation since I do not have a car. My sister lives in a rural part of Massachusetts and I knew if I lived there, it would be much harder to find a job and get transportation to and from work.

10. I have adapted easily to living in St. Augustine. I am renting a room from a friend and after receiving my work permit, I was hired by a cleaning company. I work cleaning apartments, condominiums, houses, schools, and businesses and I can either ride my bike or take the bus to work. I like to ride my bike around town, and I also enjoy going to the beach. I regularly attend a local Christian evangelical church and hope to get more involved in their ministries.

11. Around the beginning of February, I heard about the possibility of my parole being terminated from the news and social media. I was immediately alarmed and started feeling like I was in a moment of crisis.

12. On March 21, 2025 I heard that the CHNV parole process had been terminated and that the remaining time I had on my parole is being revoked. I am very worried that I will now be here in the U.S. without papers, as that was never part of my plan. I do not want to be in the U.S. without a legal status. I am worried about being deported back to Venezuela and tarnishing my immigration record in a way that does not allow me to come back in the future.

13. From the initial outset of applying for parole my plan has always been to use my full two years of parole to work, financially support my parents, and save money for my future. I

also want to pay my sister back for the money she has spent covering my expenses related to my parole, including my work permit and transportation to the United States. I want to stay here for the remainder of time I have left on my parole. It seems very unfair to be in limbo and at risk of being deported when I made many sacrifices to come here legally.

14. If I were to have to return to Venezuela now, there would be many economic implications. I would not have sufficient money to pay back the money I owe to my sister. I would also be returning to Venezuela with very little savings, which would make my future there very uncertain. It would also mean less help for my family and a greater financial burden on my brothers and sisters. If I do have to return, I will need to find a job and it is very difficult to find work in Venezuela if you are older than 40 years old, as people assume that you will not be as productive. Thinking about having to return right away gives me anxiety.

15. Since learning of the possible termination of my parole I have been saving money in case I need to purchase a last-minute plane ticket to return to Venezuela. This is my priority right now and I am trying not to spend money on anything extra.

16. I am participating in this lawsuit so that I, along with other individuals who are in the same position, are allowed to stay in the United States for the remainder of the time that we have left on our parole.

17. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

18. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class

representative means. I want to help everyone in my situation because we are all harmed by the revocation of parole.

19. I am scared to go back to Venezuela and fearful of what the Venezuelan government will do if they see the parole stamp on my passport when I re-enter the country. I have heard many stories of the government interrogating Venezuelans who have returned home after seeking parole or asylum in other countries. Many Venezuelan citizens who have returned have been forced to pay money to military officials at the border in order to be allowed to return to Venezuela, and others have had their passports confiscated or have ended up imprisoned. I have also heard of people disappearing after they have been arrested. I am afraid of the Venezuelan government retaliating against me in this way.

20. I want to use a pseudonym in this litigation because I am afraid of retaliation by the Venezuelan government. The government closely monitors social media and news reports. I have seen reports that government officials interrogate and imprison anyone who speaks out against the government or discusses the difficulties of living in Venezuela. I am afraid of them knowing that I left Venezuela to come to the U.S. on parole and that I am participating in this lawsuit. I try very hard not to talk about politics publicly, but I am implicated by truthfully stating what is going on in Venezuela and saying that I don't feel safe there. I believe that if I use my real name, the government will target me. If I am not able to participate in this litigation using a pseudonym, I may consider not participating at all.

21. While I don't want to be in the United States without legal status and jeopardize my ability to come back legally in the future, I also don't want to be retaliated against and

5

singled out for removal. I am fearful that if I use my real name I may be targeted and

deported.

22. Maintaining my parole status is critical for me and my family. It is the only opportunity I

have to better my life.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

6

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in St. Augustine, Florida on March 25, 2025

Lucia Doe

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Lucia Doe in Spanish and that she affirmed that it is true and correct.

Executed: 3/25/2025                    _____

                                       Emily Martin

# ATTACHMENT

to Plaintiffs' Second Supplemental Motion to

Proceed Under Pseudonym

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al.*,

    *Plaintiffs,*

    *v.*

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

## DECLARATION OF MIGUEL DOE

I, Miguel Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Diriamba, Nicaragua, on November 7, 2002. I am a national of Nicaragua.

2. I currently live in Gainesville, Georgia. I have lived in Gainesville since I entered the United States.

3. I entered the United States with my brother, Alejandro Doe, under the parole process for Nicaraguans, a component of the CHNV parole processes announced on January 6, 2023. My cousin, a U.S. citizen who lives in Washington, sponsored me through the program. I received travel authorization in May 2024, and arrived in the United States on July 29, 2024. After spending time at inspections at the airport, officers granted me a temporary two-year stay in the United States. I received work authorization pursuant to my parole in September 2024.

4. My U.S. citizen cousin was the first in our family to learn about the CHNV parole processes. She informed my father, and I became aware of them around July or August of 2023, when my father explained the process to me and that he would be traveling to the

United States through the parole process for Nicaraguans. Eventually, my siblings and I followed him. I traveled with my brother, Alejandro Doe.

5. I decided to come to the United States because it seemed like an incredible opportunity. In Nicaragua, I began university studies in 2020, studying nutrition at UNAN-Managua (National Autonomous University of Nicaragua). I studied off-and-on throughout the next three years, but due to COVID- and program-related impediments, I was unable to complete my studies. When COVID spread through Nicaragua, my school closed for some time. When classes resumed, however, the University had made changes to the curriculum and course requirements, and many of the classes I had taken had changed names. In my transcript, it showed I had not taken the courses, and I was forced to retake them. Shortly after, the University told me I could not continue in my second year of study because many of the classes I needed overlapped with the times of other courses I needed. I felt the University could have accommodated me. Instead, they returned me to my first year of study and reclassified me accordingly.

6. Because I was not progressing, I decided to pause my university studies and work for a time. A year later, I returned to school. I did not have the resources to attend a private university, so I returned to UNAN-Managua, but unfortunately, things had not improved there. Classes were always getting cancelled; one month, I only had five classes. I decided I could better spend my time working.

7. I worked for a time in a fast-food restaurant, but the restaurant closed, leaving me without a job. Around December 2023, I became an electrician's assistant, but there were problems with the business. They did not pay us, and the project did not continue. In 2024, I found a job working in construction, which I enjoyed, but it was only temporary.

8. When the opportunity for parole came along, I spent a long time considering it, especially given that I would be leaving not only my friends and community I grew up in, but also my mother with whom I lived and whom I helped take care of. Ultimately, I decided I could best help my family and my own future by coming to the U.S. I was excited to work hard in the United States for two years, save up and invest money, and improve my future as well as my family's.

9. My experience in the U.S. has been better than I hoped. After receiving my work authorization, I found a good job quickly. In Nicaragua, it is very hard to find work, let alone work that pays decent wages. I currently work full-time producing marble panels. Outside of work, I enjoy spending time with my family.

10. I first started to hear rumors of a potential end to the CHNV parole processes on social media. Around this same time, I began seeing videos on the news and social media about immigration raids and deportations. It was hard to distinguish the extent of what was happening amid so much chaos, so I tried not to get too worried about it all. But around the beginning of February, my U.S. citizen aunt confirmed to me and my family that the Trump administration would be ending CHNV parole.

11. Since then, everything has felt uncertain. I've heard about raids and deportations happening in my own town, Gainesville, which has hit the community hard. On March 21, I learned about the publication of the Federal Register notice that will officially terminate the CHNV parole process and revoke my parole. This news makes me fearful for my safety. Neither I nor my family has done anything wrong, but we have felt forced to keep a low profile, avoiding going out whenever possible. I also follow networks that

post about where people have seen ICE, and I try my best to avoid those locations. Living

this way has impacted my daily life and makes me worry about the future.

12. I came to this country with the idea that the United States is the land of opportunity—a

place where one could get ahead. I came through a legal process. I have done everything

the U.S. government has asked, caused no trouble, and I have contributed to the United

States. So I could not believe when I learned that the Trump administration is not only

cancelling the parole processes, but revoking people's parole as well, leaving us without

legal status and work authorization. I never expected this could happen.

13. I never planned on staying in the U.S. indefinitely. My mother remained in Nicaragua

alone when I left, and I need to help take care of her. My family has limited resources in

Nicaragua. But I have only been in the U.S. for a matter of months, far less than the time

the U.S. government initially approved me for parole. I came to this country to work and

to be a contributing member of society. I was granted legal permission to be here, but

from one day to the next the government has changed its mind, stating that I am now here

illegally. This is unjust and unfair.

14. I wish the administration would think through what their actions will do to people. Parole

benefits not only parolees, but the United States. We are not bad people, and we are not

looking for trouble. We are just here to work and help our families. Families suffer when

they're deported.

15. I am worried about what will happen to my own family if we are deported to Nicaragua.

Since the 2018 protests in Nicaragua, there is no freedom of expression. Even displaying

a Nicaraguan flag can get you imprisoned. If you enter the country as a deportee, you are

looked down on by the public loyal to the ruling regime, and you must go through a long,

involved interview process with government officials—the government assumes you are against it.

16. I am heavily weighing my options. I have not accomplished what I hoped to in the U.S. in my short time here, but if I stay in the country undocumented, I could have bigger problems to deal with. I was previously considering filing for asylum given my family's history of political persecution, even though it would make me a bigger target for my own government if I were to be deported. But now even that option has been taken away from me. It feels like an untenable situation, and one that could have been avoided if the U.S. government had kept its word.

17. Defending CHNV parole from termination, maintaining my status and work authorization, and having the opportunity to file for other immigration relief I am eligible for are vital for me. I am participating in this lawsuit so that I, along with other individuals who are in the same position, may be protected from the Trump administration's actions.

18. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

19. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the cancellation of our parole status and work authorization, and the indefinite pause on the processing of immigration applications benefits.

20. For all of the above reasons, however, I fear having my real name become public in this lawsuit. I fear that if the U.S. government knows that I am participating, it will retaliate

against me and my family and deport us all to Nicaragua. I fear that if we are deported,

the Nicaraguan government will retaliate against us in turn as parolees, as asylum-

seekers, and as a family with a history of State political persecution. If I am not permitted

to use a pseudonym in this lawsuit, I will likely decide not to participate. I cannot risk my

safety and that of my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is

true and correct to the best of my knowledge.

Executed in Gainesville, Georgia on March 24, 2025.



Miguel Doe

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Elia Gil Rojas, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Miguel Doe in Spanish and that he affirmed that it is true and correct.


Executed: 3/24/2025                              _____

                                                Elia Gil Rojas

# ATTACHMENT E

to Plaintiffs' Second Supplemental Motion to

Proceed Under Pseudonym

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al.*,

    *Plaintiffs,*

      *v.*

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

## DECLARATION OF DANIEL DOE

I, Daniel Doe, upon my personal knowledge, hereby declare as follows:

1.  I was born in Delmas, Haiti in October 1992. I am a national of Haiti.

2.  I currently live in Orlando, Florida. I have lived here since I first arrived in the United States and received parole under the parole processes established for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV") in 2024.

3.  I have many family members who have had sponsors apply for them through CHNV parole and have pending sponsorship applications, like my wife and three-year old daughter, who are still in Haiti. I also have a brother, an uncle, and a few cousins who are also in Haiti with pending sponsorship CHNV applications.

4.  I married my wife in August 2019, and our daughter was born three years later in 2022.

5.  Life in Haiti was becoming increasingly worse for me and my family starting around 2022. In 2022, our neighborhood—which was originally a nice and peaceful place to live—came under the control of a gang, and there were multiple incidents where the gang controlling this neighborhood would attack and kidnap people living in the neighborhood.

One time, while my wife was pregnant with our daughter, the gang broke into our

neighbor's house, where they physically attacked the husband of the household and

kidnapped his wife. This incident caused my wife great stress and triggered us to flee that

neighborhood for our own safety. So, we moved into a new neighborhood within the

same city, about 10 miles away from our old neighborhood.

6.  Our new neighborhood was also controlled by a gang, but they were not known for

attacking innocent civilians, so we weren't as concerned about our safety. However, this

all changed when another gang attacked the police station near this new neighborhood,

killing some police officers there and destroying the police station. Now, there are no

police forces in this neighborhood, making it much more dangerous and civilians more

vulnerable to attacks by gangs. My wife and daughter currently still live in this area.

7.  While in Haiti, I worked as a court interpreter for foreigners, and sometimes I worked as

an interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief

Services. At least twice, in 2023 and early 2024, while going to work, I was followed by

people on motorcycles. As a result, I had to go to work in different cars and change the

way I moved around the city. These people on motorcycles even drove by our house one

time. I believe these people were part of a gang tracking my whereabouts and my family.

Another time, in 2023, some people we do not know told my wife to "be careful." My

wife and I considered this as a warning that people, likely gangs, were watching us and

tracking our whereabouts to target us and possibly kidnap us, likely because of my work

as a court interpreter and work with the U.S. Embassy.

8.  All of these incidents made it clear for my wife and I that we needed to seek safety

outside of Haiti, for ourselves and our young daughter. I first heard about the CHNV

parole processes when they were announced in early 2023, as it was all over the news and many people were talking about when it first came out.

9. In early 2023, a friend of my father's offered to sponsor me through CHNV parole. Unfortunately, because this friend had already sponsored several of their family members under CHNV, they could only afford to sponsor one more person. My father's friend submitted the sponsorship application for me in April 2023. In late 2023, my wife and I learned about Welcome.US, and we decided to search for a sponsor through a matching process hosted by Welcome.US because my other application was taking a while and we preferred to be sponsored together as a family so we could get parole as a family. We were matched with a sponsor through Welcome.US, and subsequently our Welcome.US sponsor submitted a sponsorship application for me, my wife, and our daughter in early January 2024. About a week later, in mid-January 2024, I received travel authorization to come to the United States through my father's friend's sponsorship application of me. While it was an extremely difficult decision to make, my wife and I decided that I should proceed with coming to the United States on parole. I arrived in the United States and was subsequently granted parole in February 2024. My parole expires in February 2026.

10. When I first came to the United States on CHNV parole, it required some adjustments to the new culture and way of life here, but I have been able to adapt and become part of a community here. I joined a local Haitian church in my area, and I try and surround myself with family that I have here in the Orlando. Although I remain in contact with my wife and daughter every day, it is very hard to be apart from them for so long, so having family and a community here helps.

Appx-0356

11. Once I obtained work authorization in March 2024, I found work to support myself while also supporting my wife and daughter back in Haiti. I first found a job as a tutor in reading and math for children. Currently, I work as an English as a Secondary Language ("ESL") teacher at two different schools in the area with adult students who are immigrants or are here in the United States on a student visa. Beyond my work, I have many goals for myself to expand my skills here in the United States. In October 2024, I obtained my license as a life insurance agent in the state of Florida. I am also interested in financial investments, so I am currently taking classes to learn more about this area and hopefully obtain a license in this area too. I am also looking for ways I can certify myself as an interpreter here in Florida, so I can continue my interpretation work here in the United States.

12. I have also partnered with a friend of mine here in the United States to start a company where we promote education for Haitian immigrants who have recently arrived in the United States. We host free online classes, three times a week, for these individuals, where we educate Haitian immigrants on U.S. culture, teach English, and provide updates on the latest immigration policies affecting the Haitian immigrant community. I personally know about the struggles involved when navigating the language barrier in a new country, so using my experiences and skills to provide this support for other Haitian immigrants in my community is important to me.

13. On Friday, March 21 I learned about the publication of the Federal Register notice that will terminate the CHNV parole processes. At first, when reading about these plans, I was shocked. Now I have no idea what I can do about this now that this has become a reality. My wife and daughter are still in Haiti, and the most important thing for me is to get them

here with me in the United States, in a safe place. But now with CHNV being terminated

and the government refusing to review any pending CHNV applications, this seems

impossible.

14. My wife currently isn't working in Haiti and is taking care of and raising our daughter, so

I am my family's main financial support, and they rely on me. With my parole and work

authorization terminated, I won't be able to provide for my wife and daughter in Haiti. If

I am without parole, I am also afraid of being sent back to Haiti because the conditions in

Haiti have not improved, and if I returned, I would be a target given our past experiences

in Haiti and the fact that I would be returning to Haiti after having been in the United

States on parole.

15. My wife and I have been discussing and trying to prepare for the end of the CHNV parole

process. She is very concerned about what is going on here in the United States.  We have

discussed the possibility of moving to Canada, where I have family. But we are unsure of

a way to do this, and moving there would require me to start from zero all over again.

16. I have had to do a lot through the CHNV parole process, and I have followed all the steps

and procedures to obtain parole. With the situation my family and I faced in Haiti, things

felt hopeless, but when I was granted parole, I suddenly had hope that there will be better

days ahead for me and my family. But now things just feel hopeless again. All of this

causes me a lot of stress, and I can't sleep well at night knowing that my situation here is

unstable, and my family continue to remain in bad conditions in Haiti with no hope of

being able to come here with parole. It has been a hard situation for me to handle.

17. I received Temporary Protected Status ("TPS") in September 2024. It was originally valid

until February 2026, but I recently learned that the government has ended TPS early,

making my TPS valid until August 2025 instead. I also have not applied for asylum yet, but I was planning to at some point while here on parole. I have not done so yet because I was waiting for my wife and daughter come to the United States through CHNV parole before I applied. But now with the processing of immigration applications like asylum applications filed by parolees like me indefinitely paused, this does not seem like a viable option for me anymore.

18. With my TPS status in flux, maintaining my parole status is important for me and my family's future to live in a safe place where we can be together as a family and where my wife and I can raise our daughter. Without CHNV parole, my wife and daughter will remain vulnerable in Haiti where the situation has not improved for them. And with my parole revoked, I fear that I will be removed back to Haiti where I would face the same dangers as I did before and be unable to financially support my wife and daughter and build a better future for us.

19. I am participating in this lawsuit so that I, along with other individuals who are in the same position, are allowed to stay in the United States for the remainder of the time that we have left on our parole.

20. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

21. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the revocation of parole.

Appx-0359

22. I believe participating in this lawsuit is an important way I can help my Haitian

community, but I still have fears of using my real name in this lawsuit. I fear that if my

name and identity is known, I could be threatened or targeted by individuals here in the

United States who are anti-immigrant and/or side politically with the Trump

administration. I also fear that I could be retaliated against by the U.S. government

through deportation if the U.S. government knows I am going against them in this

lawsuit, especially because of my status. Lastly, I fear that if my name is used in this

lawsuit, this could cause harm to me in Haiti, if I am deported back to Haiti, and my

family who remain in Haiti. Specifically, we could be targeted by gangs if they learn

about my participation in this lawsuit and about the fact that I have been in the United

States for over a year on parole. But this fear is even more real for my wife and daughter,

who remain in Haiti and could be easily targeted by gangs now and in the immediate

future if my name is disclosed in this case and gangs are able to connect me by name to

my wife and daughter.

23. For these reasons, I am respectfully asking the court to allow me to proceed as plaintiff in

this lawsuit under a pseudonym, to protect myself and my family in Haiti.


I declare under penalty of perjury and under the laws of the United States that the foregoing is
true and correct to the best of my knowledge.


Executed in Orlando, Florida on 3/25/2025.



Daniel Doe

7

# ATTACHMENT

to Plaintiffs' Second Supplemental Motion to

Proceed Under Pseudonym

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al.*,

    *Plaintiffs,*

     *v.*

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

## DECLARATION OF GABRIELA DOE

I, Gabriela Doe, upon my personal knowledge, hereby declare as follows:

1.  I was born in Managua, Nicaragua in March 1983. I came to the United States in 1992, and in 2011 I became a U.S. citizen. I have been living in the United States for the last 33 years.

2.  I currently live in Tacoma, Washington, with my husband and two kids, who are twelve and seventeen years old, respectively. I have lived here in Tacoma for the last 17 years. I work as an accredited representative at a non-profit that provides direct legal services and educational resources to immigrants in the state.

3.  I have sponsored seven people through the parole process for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"). I first learned about CHNV parole processes in 2023, when my uncle asked me if I could sponsor his girlfriend. She was the first person I sponsored under CHNV.

4.  Specifically, besides my uncle's girlfriend whom I sponsored in 2023 and whose two-year parole period has since ended, I have sponsored four of my cousins, Ana Doe, her

husband Armando Doe, and her two brothers, Miguel and Alejandro Doe; a family friend whose parole has since ended, and the seventeen-year-old son of another family friend. I also have another cousin, Carlos Doe, who is here in the United States with CHNV parole, but he is sponsored by someone else in the family.

5. Everyone I have sponsored are nationals of Nicaragua. The cousins I am sponsoring were approved for two-year parole periods in 2024 and are currently living in Georgia. The seventeen-year-old boy I sponsored entered the United States and was approved for two years of parole in August 2024, but he has since returned to Nicaragua.

6. For my cousins, four of whom I am sponsoring, life in Nicaragua was becoming more and more dangerous for them. Our family has a history of being on the side of the socialist party in Nicaragua, and I have many family members who are now living in exile outside of Nicaragua because of this. For my family who remained in Nicaragua, many have been targeted by the government and the police for their political beliefs or even because of their relation to our family. My uncle—Ana, Alejandro, and Miguel's father—was even arrested and detained for three to four days because of this, and my aunt, their mother, keeps a low profile in Nicaragua given her name and relation to our family. Because our family name is prominently known by the Nicaraguan police and government as being against the government, continuing to live in Nicaragua was just no longer a safe option for my cousins.

7. I offered to sponsor my cousins through CHNV in 2023. Being able to sponsor them was not only vital for their well-being and safety, but it was also important for me, as someone who believes in the importance of family. I have a special relationship with my cousins, as they supported me greatly when my father became sick with cancer and

Appx-0363

eventually passed away in June 2023, which was an extremely difficult time for me. My father was the eldest of his nine siblings, and he was known for always taking care of and supporting his family however he could. As it happens, I am the eldest cousin of 27 cousins in our family, so supporting my family and cousins by sponsoring them under the CHNV parole processes not only reflects an important personal value of mine but is also a way for me to continue my father's legacy of supporting the family whatever means necessary.

8. In order to sponsor all of my beneficiaries, I had to provide extensive proof and documents to demonstrate I was able to support all of my beneficiaries, including bank account statements and other financial-related documents. It was a time-consuming process. During the process, I made sure all of my beneficiaries had a checklist of all of the important documents they needed for every step, while helping them through the process to the best of my ability.

9. When the cousins I sponsored arrived in the United States and were granted parole in 2024, they moved to Georgia to be near their father, who has been a great help to them in settling in. After they obtained work authorization and were able to secure employment, they have been very self-sufficient in providing for themselves financially. I continue to support them by helping them navigate the U.S. immigration system, informing them about new changes or policies, and supporting them in exploring other options they have for immigration relief. Since they've been living in the United States, my family and I have visited them in Georgia twice. It was great to be reunited with them here in the United States and see how well they have all been doing. They've all gotten jobs and have established lives for themselves here. My cousins are a very close-knit group, and I

3

am amazed and proud of how well they've worked together to support one another as

they've settled into new lives here in the United States.

10. I first heard about the government's intention in terminating the CHNV parole processes

through my work in immigration. Naturally, my family—including those with parole—

started to grow more nervous as news about President Trump's plans to terminate the

CHNV parole processes began to spread. On Friday, March 21, I learned about the

publication of the Federal Register notice that will officially terminate the CHNV parole

process. The termination of the CHNV parole process and the revocation of my cousins'

parole leaves me feeling scared and worried. I'm worried for my cousins and the prospect

of them having to go back to Nicaragua, given how the government and police have

persecuted them and my family before. In Nicaragua, once someone leaves the country, it

is common for these people to be considered "traitors" of the country; if you try to return,

there is no guarantee that the government will allow you to re-enter, basically leaving you

stateless. All of these possible outcomes for my cousins if their parole is revoked and they

are deported are terrifying to me.

11. As a person who must manage clinical depression and anxiety, the loss of CHNV parole

and the impact this would have on my cousins would have a terrible impact on my mental

health. All I can do is stay up to date on the news and latest developments of the plans

regarding the termination of CHNV, and make sure they understand possible scenarios

and other relevant Know Your Rights information. But apart from that, I feel powerless in

being able to prevent how this termination will be implemented, and the harm they would

suffer as a result. My cousins are rightfully very concerned and worried about what this

termination of CHNV could mean for them, and I try to support and comfort them the best I can, but it is hard to do so when I do not know what lies ahead.

12.  CHNV parole has opened doors to new opportunities for all immigrant parolees. As is the case with my cousins, immigrants who have been paroled through this process have shown that how much they bring to the table by helping each other and their communities and hitting the ground running by building productive lives for themselves and their families. The loss of CHNV would mean closing the doors on all of these opportunities and benefits that have been made possible because of this parole process.

13. The loss of CHNV would also mean the loss of having my family here in the United States. It would mean the loss in choices my cousins would have in establishing a full life for themselves, one where they are working hard and contributing to the community, and one that is on their own terms and free of the fear of persecution and instability. My cousins all abided by the process set forth by the U.S. government when creating CHNV, including rigorous vetting and screening at multiple points. I have invested time, effort, and resources into the sponsorship process for all of my cousins and continue to make sure they are all taken care of—continuing my father's legacy in always taking care of your community and loved ones. Now, the U.S. government wants to upend the entire process by terminating CHNV, leaving my cousins vulnerable to deportation and removal and stripping them of the lives they have begun to cultivate here. This is not only cruel but goes against all the reasons that drove me to help my family as a sponsor.

14. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our beneficiaries take full advantage of their CHNV parole period, as they should be allowed to do.

5

15. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

16. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the termination of the CHNV parole program and the revocation of parole.

17. Defending CHNV parole from termination is very important to me and is the reason why I am joining this lawsuit as a plaintiff. However, at the same time, I am fearful that if my real name was disclosed, this would inflict harm onto my family.

18. First, my cousins—Ana, Armando, Alejandro, Carlos, and Miguel Doe—are CHNV parolees and plaintiffs in this lawsuit. As a result, I fear that if I use my real name in this lawsuit, the fact that I have sponsored four of my cousins could lead to them all being identified by either the U.S. government or Nicaraguan government, and thus make them vulnerable to retaliation both in the United States through deportation, for example, or in Nicaragua through continued targeted attacks and persecution.

19. Second, I have several family members here and abroad who could be vulnerable if my real name is used in this lawsuit. I have family members here in the United States who have CHNV parole and are not participating in this lawsuit. If I use my real name in this lawsuit, they could be identified by either the U.S. government or Nicaraguan government, which would make them vulnerable to retaliation in the United States, and if deported, in Nicaragua too.

20. I also have family members in Nicaragua who have no connection to this lawsuit, so I fear that if my real name is disclosed and the Nicaraguan government discovers that I am

related to them due to our shared last name, they will face heightened risks of retaliation by the Nicaraguan government who has persecuted our family in the past. For example, after a U.S. based uncle of mine posted anti-Nicaraguan government content on his social media and subsequently received direct threats from pro-government individuals about this post—where they threatened that they would hurt him through his family who was still in Nicaragua—shortly afterwards an uncle of mine in Nicaragua was a victim to an attempted poisoning. Moreover, both my maternal and paternal families were part of the revolution in the 1980s and have declined invitations to join the controlling regime in Nicaragua. As a result, the Nicaraguan government has watched our family closely and has shown—through their actions—that we are a family of interest because of our political past and present. Because of this, I fear that if my real name is used in this lawsuit, this information will get back to Nicaragua and it will only add fuel to the threats and actions the government has taken against my family.

21. Lastly, I have family members here in the United States with varying statuses and I fear that if my real name were used publicly in this lawsuit they could potentially be targeted and retaliated against by the U.S. government, whose plans to deport as many undocumented immigrants as possible are evident.

22. If I were not able to proceed pseudonymously in this lawsuit, I would not proceed any further in this litigation as a plaintiff, out of an abundance of caution for the safety and well-being of my cousins and family here in the United States and in Nicaragua.

23. For these reasons, I am respectfully asking the court to allow me to proceed as plaintiff in this lawsuit under a pseudonym so I can protect my family.

Appx-0368

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Tacoma, Washington on 3/24/2025

Gabriela Doe

1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3    _____

4    SVITLANA DOE, et al.,                 )
                                           )
5          Plaintiffs,                     )
                                           )
6        v.                                )
                                           )  Civil Action No.
7    KRISTI NOEM, in her official capacity )  1:25-cv-10495-IT
     as Secretary of Homeland Security,    )
8    et al.,                               )
                                           )
9          Defendants.                     )
                                           )
10   _____

11

12        BEFORE THE HONORABLE INDIRA TALWANI DISTRICT JUDGE

13

14                        MOTION HEARING

15

                       Monday, March 24, 2025
16                          11:04 a.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 9
     One Courthouse Way
22   Boston, Massachusetts

23

     Robert W. Paschal, RMR, CRR
24   Official Court Reporter
     rwp.reporter@gmail.com

25

1                      **A P P E A R A N C E S**

2

   On behalf of the Plaintiffs:

3

4        LAW OFFICE OF JUSTIN B. COX
         BY:  JUSTIN B. COX
         PO Box 1106
5        Hood River, OR  97031
         (541) 716-1818
6        justin@jcoxconsulting.org

7

8        ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  H. TIFFANY JANG
         200 Clarendon Street
9        53rd Floor
         Boston, MA  02116
10       (617) 351-8050
         tiffany.jang@arnoldporter.com

11

12       ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  JOHN A. FREEDMAN
13       601 Massachusetts Avenue NW
         Washington, DC  20001
14       (202) 942-5000
         john.freedman@arnoldporter.com

15

16       JUSTICE ACTION CENTER
         BY:  ESTHER SUNG
17          LAURA FLORES-PERILLA
            KAREN C. TUMLIN
18       PO Box 27280
         Los Angeles, CA  90027
19       (323) 450-7272
         esther.sung@justiceactioncenter.org
20       laura.flores-perilla@justiceactioncenter.org
         karen.tumlin@justiceactioncenter.org

21

22       HUMAN RIGHTS FIRST
         BY:  ANWEN HUGHES
23       75 Broad Street
         31st Floor
24       New York, NY  10004
         (212) 845-5200
25       hughesa@humanrightsfirst.org

1

2    On behalf of the Defendants:

3        UNITED STATES DEPARTMENT OF JUSTICE
         BY:  BRIAN C. WARD
4        PO Box 868
         Washington, DC  20044
5        (202) 616-9121
         brian.c.ward@usdoj.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              (In open court at 11:04 a.m.)
 3              THE DEPUTY CLERK:  United States District Court is
 4     now in session, the Honorable Judge Indira Talwani presiding.
 5                 This is Case Number 25-cv-10495, Doe, et al. v.
 6     Noem, et al.  Will counsel please identify themselves for the
 7     record.
 8              MR. COX:  Good morning, Your Honor.  Justin Cox for
 9     plaintiffs.
10              THE COURT:  Good morning.
11              MS. JANG:  Good morning, Your Honor.  My name is
12     Tiffany Jang, and I'm here for the plaintiffs.
13              THE COURT:  Good morning.
14              MR. FREEDMAN:  Good morning, Your Honor.  John
15     Freedman for the plaintiffs.
16              THE COURT:  Good morning.
17              MS. SUNG:  Good morning, Your Honor.  Esther Sung
18     for the plaintiffs.
19              THE COURT:  Good morning.
20              MS. FLORES-PERILLA:  Good morning, Your Honor.
21     Laura Flores-Perilla for plaintiffs.
22              THE COURT:  Good morning.
23              MS. TUMLIN:  Good morning, Your Honor.  Karen
24     Tumlin for the plaintiffs.
25              THE COURT:  Good morning.
```

 1          MS. HUGHES:  Good morning, Your Honor.  Anwen
 2   Hughes, also for plaintiffs.
 3          THE COURT:  Good morning.
 4          MR. WARD:  Good morning, Your Honor.  Brian Ward
 5   for the government defendants.
 6          THE COURT:  Good morning.
 7          So we are here on plaintiffs' motion, emergency
 8   motion for a preliminary injunction.  I'm going to start with
 9   a little housekeeping and a few questions that I have just at
10   the beginning, and then I will let the moving parties start.
11   I tend to go back and forth in arguments as I try to figure
12   things out.
13          So, housekeeping, there's a recently filed motion
14   for class certification.  That's not on the table for today.
15   There's a notice you filed on Friday that said you would be
16   asking for a briefing schedule regarding amending the
17   pleadings, et cetera.  Is that something you wanted to
18   discuss here; and if so, did you want to start with it or end
19   with it?
20          MR. COX:  Thank you, Your Honor.
21          We're happy to discuss that now.  It was on our
22   list as well to take care of.  And, yes, so on Friday, a
23   federal register notice was issued by defendants.
24          THE COURT:  I read what you put.
25          MR. COX:  Great.

1          THE COURT:  So what's your proposal?

2          MR. COX:  Proposal, Your Honor, is to file our

3     supplemental complaint by a week from today, and then our

4     proposal would be to file our motion for a preliminary

5     injunction by Friday of next week.

6          And then we would propose that defendants'

7     opposition be due a week from that, on Monday, April 11th.

8     And as Your Honor is surely aware, the effective date of the

9     federal register notice, or rather when the terminations are

10    effective, is April 24th.  So we would hope to get a decision

11    before that, if possible.

12         THE COURT:  Have you discussed your proposed

13    schedule with defendants' counsel?

14         MR. COX:  My understanding from defense counsel is

15    that they will be opposing the -- supplementing the

16    complaint.

17         THE COURT:  Okay.  So let's start with that.  You

18    want to -- I'm not sure the difference between amending and

19    supplementing your complaint.  I would think you may be

20    tacking additional material on, but it would then be a second

21    amended complaint.  I can't have two different documents --

22         MR. COX:  Of course.

23         THE COURT:  -- being a complaint.

24         So when are you prepared to file a motion for leave

25    to amend the complaint?

1          MR. COX:  We could -- we could file that either in

2     advance of the -- of the amended complaint.  We could do that

3     by the end of this week, certainly.  But if Your Honor would

4     prefer them at the same time, we could do that as -- as well.

5          THE COURT:  If you're asking me to do things

6     expeditiously, you need to tell me what's the earliest you

7     can get things.

8          MR. COX:  Fair enough, Your Honor.

9          THE COURT:  I don't -- I understand what you want

10     to be adding allegations relating to this.  I'm not sure why

11     you wouldn't either propose we're going to file things by the

12     end of the day, telling you that's what we want to do, or

13     we're going to propose -- file things slightly later with an

14     attached proposed complaint, one of those two.  But I don't

15     know that you would need a week to give me the first if

16     that's what you wanted to do.

17          MR. COX:  Sure.  We are happy to file our motion

18     for leave to file the second amended complaint as well as the

19     second amended complaint by the end of this week, certainly.

20          THE COURT:  Okay.  And so that's the 28th.  And are

21     you anticipating you would then file your motion for a

22     preliminary injunction at the same time?

23          MR. COX:  We would request a few days extra.  We're

24     filing two other lawsuits this week.  And so -- but we can

25     certainly -- I think, originally, we had proposed April -- we

1    were thinking April 4th, but we can move it up more if the

2    Court would need more time.  We can meet whatever deadline.

3          THE COURT:  Well, you're asking me to deal with

4    something that is going to be done by -- that the drop-dead

5    date is --

6          MR. COX:  April 24th.

7          THE COURT:  Okay.  Let me ask defendants this

8    question.

9          Obviously, you're -- have disagreements with many

10    things that are happening with this case.  But just as a

11    procedural matter and saving everybody's time, I don't even

12    know what the difference was between the initial complaint

13    and the first amended.  If they hadn't done those little

14    things, they could simply file a second amended complaint.

15          And I assume your opposition is not that they're

16    delayed or taken on -- it's going to be a substantive

17    opposition, no different than you would file on a motion to

18    dismiss, presumably.

19          MR. WARD:  Yes, Your Honor.  Our objection is more

20    efficiency, is that what they're challenging -- my

21    understanding -- I don't know what the claims are going to be

22    in this second amended complaint, but what they're

23    challenging is a new federal register notice that I believe

24    is going to be published tomorrow.  And I think that federal

25    register notice and what's going on with those claims is

1    somewhat different than all the rest of the claims they bring

2    in this case.

3            And so I think what we would, essentially, have is

4    two separate cases going on at once with different claims and

5    certainly different records, because I believe --

6            THE COURT:  Well, let me ask you this question.

7            MR. WARD:  Yes.

8            THE COURT:  Do you think that it's related to these

9    issues, if not the same as the ones in this case?

10           MR. WARD:  Well, I think the issues in the initial

11   complaint are overbroad to begin with because plaintiffs

12   challenge what are, essentially, a large number of different

13   parole programs or processes.  So it is related to the parole

14   processes they raise.  We don't dispute that.

15           But I think it's -- we would be dealing with,

16   essentially, separate claims, claims dealt in a different way

17   and claims dealt on what the government would have to put

18   together a record for the federal register notice if they're

19   challenging that on APA grounds, and that would be a separate

20   record that wouldn't apply to any of the other claims in this

21   case.

22           THE COURT:  So --

23           MR. WARD:  So they're broadly related, but I

24   don't --

25           THE COURT:  So under our local rules, if they're

1   related, it may be that the simplest way to proceed here is

2   that this case proceeds as is.  Plaintiffs file a complaint

3   as a related matter that's a separate complaint.  It would be

4   assigned to me if it's a related matter, so we would still be

5   proceeding with some common knowledge, but we would have two

6   separate cases.

7          Is there any reason not to proceed that way?

8          MR. WARD:  Not that I can think of at the moment,

9   Your Honor, but I'd want to confer with my clients to see if

10  we had any objection to filing it as a related case.

11         THE COURT:  Okay.  So let's do it this way:  You --

12  I think if you're asking for action on a case that has fairly

13  significant issues that is going to come up with -- and

14  you're asking everyone to address things for within less than

15  a month, you need to act expeditiously.

16         I would suggest that it seems to me the filing as a

17  related case addresses both sides' interests here.  One,

18  you're getting to continue with a judge who is working on

19  some of the similar issues.  They get to have it as a

20  discrete case -- a case with a discrete record, and that

21  seems a clean way to do it.

22         But they certainly have a right to fight it being

23  related.  And the question wouldn't be, do they not like me?

24  The question would be, do they think, under the local rule,

25  it is or isn't related?  And I haven't examined the local

1    rule in making this suggestion.  I just think it seems like a

2    clean way.

3          I would say this to the defendants, which is that

4    my inclination would be these issues are very interrelated,

5    even if they have somewhat different administrative records

6    and even if they have different postures and even if they can

7    challenge some and not others, et cetera.

8          So I am, without having read their motion, it seems

9    to me -- or your opposition -- it seems to me likely that

10   this could be amended; and, therefore, it seems to me cleaner

11   to file it as a related case and just keep two separate

12   records, but keep it here.  So that would be my suggestion.

13         You can -- I strongly -- in this session, I really

14   try to not have everyone waste each other's time without

15   talking -- where they can talk to each other first.  So I

16   would suggest, when you leave here today, that you talk to

17   each other about either proceeding on plan one or plan two.

18   Obviously, counsel needs to go back and check with his folks,

19   but have a plan of action, whichever way you're going to go.

20         And if you submit an agreed-upon time schedule, I

21   am likely to sign off on it.  If you don't submit an

22   agreed-upon, I will do the best I can in trying to balance

23   everybody's interest.

24         MR. COX:  Thank you, Your Honor.

25         Can I add one small issue?

1          THE COURT:  Sure.

2          MR. COX:  Several of our clients, several of the

3     plaintiffs in the existing case, have -- will have claims

4     regarding the federal register notice.  The parties will

5     overlap.  And so in terms of splitting into separate cases, I

6     think -- for that reason, I think we would be inclined to

7     amend.

8          THE COURT:  Well, if your clients have additional

9     claims, then it's probably hard to have an argument for why

10     those wouldn't be amended into here because the plaintiff can

11     bring all of their claims here in one place.

12          So, again, I would -- I would really suggest that

13     everybody -- I think both sides have a lot on their plate,

14     and nobody wants to be taking time on things that are -- you

15     know, yes, it's one more procedural bump or, yes, it's one

16     more disagreement; but I would suggest that the simplest

17     thing here may be an agreement to allow the amended

18     complaint, obviously, with no restrictions on your ability to

19     challenge it on a motion to dismiss.

20          And then you get that pleading filed as soon as

21     possible, and then we get the issue teed up.  That would be

22     my recommendation.

23          MR. WARD:  Yes, Your Honor.  I'd just say that this

24     is just an issue that came up on Friday night, and so I just

25     haven't had time to confer with my clients.  But I'm happy to

1    do so as soon as I get back to the office and then confer

2    further with the plaintiffs and either submit some joint

3    proposal to the Court or, if we can't agree, maybe submit

4    what we can agree on and areas of disagreement for the Court

5    to resolve.

6              THE COURT:  Great.  Okay.

7              At any rate, that -- what happened on Friday night

8    is not in front of me.  We're dealing with your challenge to

9    the January 20th Acting Director Huffman memo, the

10   February 14th Deputy Director Davidson memo, and the email

11   directive from January 20th by Acting USCIS Director Jennifer

12   Higgins, correct?

13             MR. COX:  Yes, Your Honor.

14             THE COURT:  And then I think the last thing I

15   wanted to do, which is a little bit more substantive, is just

16   making sure I'm understanding the framework here and that

17   we're all using similar vocabulary and what we are -- when

18   we're talking about what's -- what's happening.

19             The first, just in terms of words and our choice of

20   words here, the statutory term is "alien."  The statutory --

21   the statute includes the term "alien," which, obviously, is

22   both a term of art and a term with connotations.  I just want

23   to be clear, my understanding of the term "alien" when we use

24   it is that it is a person not a citizen or national of the

25   United States, and that's all that is connoted by that.

1              Any disagreement with that?

2              MR. COX:  No, Your Honor.

3              MR. WARD:  No, Your Honor.

4              THE COURT:  What about the term "illegal alien"?

5    Are we talking about illegal aliens here?

6              MR. WARD:  I'm not sure how to answer that,

7    Your Honor.  I don't believe -- is that a term that was used

8    in any of the briefing in this case?  I don't believe that it

9    necessarily has been.

10             THE COURT:  No, but it's a term that the press will

11   use and everybody else will use, so I'm just wondering

12   whether we're using the terms "illegal alien."  I think not.

13             MR. WARD:  I don't believe so, Your Honor.

14             THE COURT:  I think we're talking about aliens

15   here; that is, noncitizens, people who are not nationals of

16   the United States.  Are they here illegally, the people who

17   we are talking about right now?

18             MR. WARD:  Again, it depends on which particular

19   people we're talking about.  If there are individuals that

20   have been paroled into the United States, then no.

21             THE COURT:  Okay.  I think that's what we're

22   talking about.  We're talking about a parole program.  And

23   the parole program, as I understand it, is a program where

24   people who have not yet been admitted to the United States,

25   maybe they're inadmissible, maybe they haven't been

1    determined as to whether they're admissible or inadmissible,

2    but in any event, they're not admitted to the United States,

3    are nonetheless allowed into the United States under the

4    parole program.

5            Same language, everybody?  Okay.

6            And the programs that are at issue here, there are

7    a lot of them, I think, as defense counsel has noted.  I

8    believe the ones that are listed in the complaint are the

9    processes for Haitians, Cubans, Nicaraguans, and Venezuelans

10    (CHNV); the Uniting for Ukraine (U4U) process; the Family

11    Reunification Parole (FRP) process, the Operation Allies

12    Welcome parole (OAW) process; the military parole-in-place

13    process; and the Central American Minors parole process.

14            Is that a fair statement of your complaint?

15            MR. COX:  Yes, Your Honor.

16            THE COURT:  Okay.  And do I understand correctly

17    that for most of these processes, an individual is outside

18    the United States, applies through this process, and then is

19    inspected at a port of entry, perhaps an internal port of

20    entry rather than the border, and then paroled into the

21    United States?

22            MR. COX:  That's generally correct, Your Honor.

23    The military parole-in-place program, of course, is -- just

24    involves folks who are already here.  And, you know, I could

25    get into more details about the vetting that occurs overseas,

 1    but that's generally correct.

 2            THE COURT:  Okay.  So other than -- I didn't know

 3    about the Central American Minors, but let's start with --

 4    the military parole-in-place program is an exception to that

 5    rule that I just said.  And for the military parole-in-place

 6    process, the parole -- the parolee, the person who is paroled

 7    here, may have received that status after already being here

 8    in the United States?

 9            MR. COX:  Yes, Your Honor.  By definition, they

10    would have entered without inspection.  They would not -- if

11    they had come on a visa, they would not be eligible for

12    military parole-in-place.  But they would have come here, and

13    they would -- the beneficiary would be here, yes.

14            THE COURT:  Okay.  And so -- and how about the

15    Central American Minors?  Is that -- are they outside the

16    United States when they apply or inside?

17            MR. COX:  Technically, the parent applies.  They go

18    to a resettlement agency and file an affidavit of

19    relationship and --

20            THE COURT:  The parent applies here in the

21    United States?

22            MR. COX:  Yes, Your Honor.  The parent has to be

23    lawfully present in the United States, and they apply here

24    for -- for their children and caregivers who are -- who are

25    still abroad.

1          THE COURT:  Okay.  And then the -- for the military

2     parole-in-place process, in order for someone to receive

3     parole under that program, they would then be inspect- --

4     they're here unlawfully initially, but they're inspected and

5     then paroled in, paroled -- given parole status?

6          MR. COX:  Yes, Your Honor, which then enables them

7     to adjust status.

8          THE COURT:  Okay.  I'm not getting yet to what

9     happens next.  I'm trying to figure out the -- and it's tied

10    to my question about illegal aliens.  I'm trying to figure

11    out whether the people who have been accorded parole status

12    are people who, at this moment, legally here or illegally

13    here.  And as long as they're in parole status, as I

14    understand it, they're legal.

15         MR. WARD:  Yes.  So that -- so the military

16    parole-in-place might be an exception to what I said earlier.

17    That might deal with individuals who are in the United States

18    without any status until they are given military

19    parole-in-place.

20         THE COURT:  And then they're inspected and given

21    parole?

22         MR. WARD:  They're given parole, yes.

23         THE COURT:  And the Central American Minors parole,

24    the parent applies from here.  If an application is granted,

25    the child comes to a port of entry, perhaps internal port of

1   entry rather than on the border, and is inspected and paroled

2   into the United States?

3           MR. COX:  Yes, Your Honor.

4           THE COURT:  Okay.  With regard to the challenge

5   that you are trying to make here, I feel like there's -- in

6   the course of the process, there are a number of different

7   steps.  And I think you're trying to challenge different

8   parts of the steps, but I'm not positive.

9           You're definitely trying to challenge the people

10  who are here who have parole, what happens to them while

11  they're here, whether they can extend the parole or

12  participate in certain programs, correct?

13          MR. COX:  Yes, Your Honor.

14          THE COURT:  Okay.  Are you also trying to challenge

15  people who are in limbo, they've applied for parole but

16  haven't heard yet?

17          MR. COX:  The -- I think -- our challenge does

18  encompass that group of people.  We're, of course, most

19  concerned about those who are here and those like our client

20  Teresa Doe, who is -- she's a CAM parent.  Her daughter has

21  been conditionally -- I believe it's Teresa -- has been

22  conditionally approved, so already told, you know, "You've

23  been approved," and just had some last sort of administrative

24  steps to take, and then had the travel canceled.

25          This is very similar to, eight years ago, a similar

1    thing happened with those -- that group of people.

2         THE COURT:  Okay.  So let me just -- again, I'm

3    just trying to make sure I'm in the right place, and then

4    we're going to figure out what all your arguments are on

5    this.  I just want to be distinct here.

6         MR. COX:  Yes, Your Honor.

7         THE COURT:  There's a group of people who are here

8    who are paroled into the United States, and they have claims

9    that you are addressing here?

10        MR. COX:  Yes, Your Honor.

11        THE COURT:  There are a group of people who have

12   received parole approval or their parent received approval,

13   but they would be in, and they're in the process somewhere.

14   That approval was stopped.

15        MR. COX:  Yes, Your Honor.

16        THE COURT:  There are people who have applied --

17        MR. COX:  Yes, Your Honor.

18        THE COURT:  -- for parole, but that's not any of

19   the plaintiffs here.

20        MR. COX:  That's correct, Your Honor.  We do --

21   some of our sponsors do have -- have sponsored additional

22   individuals who have yet to have their parole applications

23   chosen in the lottery.  But that plaintiffs -- we don't have

24   any individual plaintiffs who are abroad who have applied.

25        THE COURT:  Okay.  And then you have people who

1    might want to apply at some point, but don't even have their

2    names in the hopper yet.  And, again, that would be maybe

3    your sponsors, but nothing else, correct?

4            MR. COX:  Yes, Your Honor.

5            THE COURT:  Okay.  So any disagreement that, in

6    terms of the emergency request you're making right now, the

7    people who are -- haven't ever applied or have applied but

8    haven't heard back are not the subject of today's hearing?

9            MR. COX:  We would agree with that, Your Honor.

10           THE COURT:  Okay.  With that, I will let you start.

11           MR. COX:  Okay.  Thank you, Your Honor.

12           So plaintiffs are here today to challenge the

13   agency actions that Your Honor referenced earlier, which

14   collectively, essentially, manufacture removability of the --

15   the removability of the plaintiffs and hundreds of thousands

16   of other people who are similarly situated.

17           Under the Huffman memo and the Higgins directive

18   and the Davidson memo, individuals who were paroled in

19   through one of these processes are currently -- their

20   applications for re-parole, for TPS, for asylum, for any

21   other kind of immigration benefit are suspended indefinitely.

22           I know that there's -- there are some -- there's

23   some ambiguity around the edges; but in the main, that is, I

24   believe, uncontested.  And the reason that -- that we're

25   challenging it is because folks like -- like our plaintiffs

1    are already falling out of status.

2         They had parole for a particular period of time.

3    They did as the USCIS instructed them, and they applied for

4    other forms of relief to which they are eligible, to which

5    Congress has made them eligible.  They applied for re-parole,

6    and the defendants are simply not adjudicating their

7    requests.

8         And they have -- and so folks are falling out of

9    status.  They're using employment authorization, losing the

10   ability to support their families.  And so that's why we

11   are -- we're here seeking emergency relief.

12        One of our plaintiffs has -- has already fallen out

13   of status.  So she's now removable, notwithstanding her own

14   best efforts.  We have another plaintiff, Aleksandra Doe, who

15   will fall out of status this weekend.  And this is

16   notwithstanding having won the diversity lottery.

17        She's Ukrainian.  She won the lottery.  It's

18   astronomically high -- or astronomically low odds of winning.

19   She won.  She had an interview all scheduled in February, and

20   this would allow her to become a green card holder.  Her

21   interview was canceled because of the agency actions here.

22   And if she doesn't have that, her green card in hand by the

23   end of the fiscal year, then she's -- it doesn't matter that

24   she won the lottery.  Her chance is gone.  And --

25        THE COURT:  Why -- why the end of the fiscal year?

1          MR. COX:  That's the statutory scheme.  The

2    diversity lottery requires winners to go through the last

3    steps of processing and have the visa in hand by the end of

4    the year or else they lose their chance.  And the DC Circuit

5    has discussed this in the *Gomez* decision, if you would like

6    more details on it, but that's just the way it works.

7          And as we set out in our papers, plaintiffs are --

8    we're likely to succeed on at least two claims:  one, that

9    the suspensions are contrary to law; and, second, that

10   they're arbitrary and capricious.

11         Now, the Huffman memo is, we believe, the clearest

12   and the easiest legal claim here because it sets out in no

13   uncertain terms an interpretation of the parole statute that

14   is simply wrong.  And the APA is here for precisely this kind

15   of situation where an agency takes an action -- and the

16   Higgins directive says explicitly that it is based on the

17   Huffman memorandum -- they take an action that hurts people,

18   but it's based on an erroneous interpretation of the law.

19         And so we think that's -- that's clearly contrary

20   to law.  We've set out, you know -- in our briefs, our

21   arguments, we have declarations.  We had the privilege of

22   litigating this issue in Texas -- actually, on the same side

23   of the "v." that time, with the Department of Justice.  And

24   so we think it's simply wrong and that the Huffman memo and

25   the Higgins directive should be enjoined on that basis.

1    The Davidson memorandum, which states that its

2    suspension of processing of immigration benefits, I think,

3    other than parole is sort of -- seems to be what defendants

4    are saying, that processing is -- the only statute that is

5    cited in the memo is, again, the parole statute.

6    And the Huffman memo, it stated explicitly at the

7    very end that all further exercises of the parole authority

8    shall be consistent with the erroneous interpretation in that

9    memorandum.  And so that could also be enjoined on the basis

10   of the contrary to law claim.

11   It's also plainly arbitrary and capricious.  The

12   agency seemed to give little to no consideration of the

13   numerous factors that should go into that hefty of a

14   decision, like, for example, the human impact on the people

15   whose -- whose benefits applications are no longer getting

16   processed.

17   The Davidson memo, to the extent that it has a

18   rationale, seems to point to findings of seven or eight

19   months ago, last July, where a preliminary report found

20   potential fraud in the CHNV program.  It was subsequently --

21   the program was actually paused at that time and then

22   subsequently restarted after USCIS did an investigation.

23   The Davidson memo does not cite any -- any new

24   facts, no new evidence.  It simply points to something that

25   happened in the past that the agency had already addressed

1    and decided to restart the program and says, you know, for

2    that reason, we need to stop processing immigration benefits

3    for not just CHNV parolees, but also for U4U, the Uniting for

4    Ukraine parolees, and the family reunification parolees,

5    which doesn't make any sense.

6            THE COURT:  Well, so what's your answer to the

7    government's response that all of these programs are

8    discretionary, so why -- how can you complain as that

9    discretion is being exercised to not make these available?

10   There's no guarantee to anyone that they're getting any of

11   these benefits?

12           MR. COX:  Your Honor, we don't dispute that, in the

13   appropriate circumstances, the agency could, for example,

14   decide that they don't want to proceed with these programs,

15   with the parole processes.  But there's -- but the APA --

16           THE COURT:  Okay.  So let me just stop you right

17   there.

18           MR. COX:  Yes, Your Honor.

19           THE COURT:  Do we -- is it fair to say that there's

20   two different legal questions, enormous number of legal

21   questions, but two different legal questions between stopping

22   the programs altogether versus the other opportunities for

23   other adjustment of status and things like that your clients

24   are seeking to be able to utilize?

25           MR. COX:  They do appear to be distinct agency

1    actions, yes, Your Honor.

2              THE COURT:  But also distinct legal questions?

3              MR. COX:  Potentially distinct legal questions.

4    Yes, Your Honor.  But I would submit that, because this is a

5    procedural rights case, our plaintiffs are not required to

6    show that they are entitled to parole or even that they would

7    receive parole if -- if their applications were actually

8    adjudicated pursuant to the procedures that are in place.

9              THE COURT:  Are they entitled to the various -- the

10   opportunity to apply for the various benefits that you are

11   concerned about?

12             MR. COX:  They are entitled to apply for them,

13   certainly.

14             THE COURT:  Okay.  And what's the basis that they

15   are entitled to apply for them?

16             MR. COX:  The statutory -- the statutory provisions

17   governing them, so 8 USC 1158(a), says that any alien who is

18   in the United States, regardless of status or how they came

19   to the United States, is entitled to apply for asylum.

20   Asylum is still a discretionary benefit, as defendants point

21   out.  But there's nonetheless a right to apply for it and to

22   be considered under lawful standards.

23             THE COURT:  And are the applications not being

24   accepted now, or they're not being processed?

25             MR. COX:  They're not being adjudicated currently,

1    the nonparole applications that you're referencing.  The

2    application -- the form to apply for re-parole for several of

3    the programs has been removed from the USCIS website, and

4    they're no longer accepting that.

5         THE COURT:  Again, there's sort of two separate

6    things, but on that one, I understand that, for every one of

7    these other programs, I might need to look at what the

8    statutory basis is for who's allowed to apply and so forth.

9    And I hear what you're saying, that every -- that a person

10   can apply for asylum regardless of whether they're in this

11   status or that status.  They might be able to apply for

12   certain benefits depending on those questions.

13        But with regard to re-parole, what's the authority

14   for being allowed to apply for re-parole?

15        MR. COX:  Well, the parole statute gives them the

16   ability to request parole.  And the APA gives them the

17   ability to come to court when an agency action has -- has

18   injured them, has aggrieved them.

19        And the agency's decision to stop adjudicating, it

20   comes down to final agency action, I suppose, Your Honor.

21   The agency's decision to stop adjudicating the requests for

22   re-parole is final agency action because it's -- because it's

23   a consummation of the agency's decision-making, and plainly

24   legal consequences are flowing.

25        People are falling out of status.  They're losing

1    the ability to work.  They're becoming removable, et cetera.

2    And so it's -- so that's why they're allowed to come in here.

3    It being a procedural rights case, they're allowed to come

4    and say that the agency's actions are unlawful.  They're

5    based on an unlawful interpretation of the statute.

6              And even if the agency can do something as a matter

7    of discretion, they can't do it based on something that's

8    unlawful or an unlawful interpretation of the statute.

9              THE COURT:  With regard to the parole that each of

10    your clients received, does the -- whatever the letter, the

11    action granting that parole, does it specify a term for the

12    parole?

13              MR. COX:  Yes, Your Honor.

14              THE COURT:  Does it specify anything about

15    reapplication or anything?

16              MR. COX:  The individual grant of parole?

17              THE COURT:  Yeah.

18              MR. COX:  So that's given by CBP.  I don't -- I

19    don't know, to be honest, Your Honor.  There are -- the

20    agency has made public the procedures and the policies

21    regarding re-parole.

22              THE COURT:  Okay.  But it seems to me that parole

23    is granted in different ways and, obviously, for different

24    purposes.

25              So, for example, you have a person who's been

1    convicted of many crimes in another country, and we need them

2    here for a -- as a witness in a prosecution.  That person can

3    be paroled into the United States, and when they're done

4    testifying, that purpose is done, and they would then be

5    removed -- different than what we're dealing with here, but

6    that's one way -- that same statute is used, correct?

7            MR. COX:  Yes.  The regulations also set out the

8    conditions under which it's terminated.

9            THE COURT:  Okay.  And so for that type of

10    circumstance, the duration of the parole is directly tied to

11    that --

12            MR. COX:  Purpose.

13            THE COURT:  -- purpose when they came in.

14            What -- what is said -- I don't think I have it in

15    front of me, it may be in the regs, but what is said here for

16    your clients when they receive parole as to sort of

17    duration/purpose?

18            MR. COX:  Well, the duration was typically two

19    years or thereabouts.  CBP officers would, on a case-by-case

20    basis, would grant the parole and set the particular period

21    of parole, but it tended to be about two years.

22            THE COURT:  But individually set?

23            MR. COX:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. COX:  And then the -- the federal register

1    notices set out the purposes of the parole with the

2    significant public benefits and/or the urgent humanitarian

3    reason that parole is being granted.

4            THE COURT:  Okay.

5            MR. COX:  And the other thing I wanted to mention,

6    too, Your Honor, about parole, understand that it's -- it is,

7    of course, a discretionary benefit; but the Supreme Court,

8    just two -- well, three years ago in *Biden v. Texas*,

9    emphasized that parole has to be -- excuse me -- the exercise

10   of parole has to be reasonable and reasonably explained.

11   That was Chief Justice Roberts' opinion for the majority in

12   that case.  It's the migration protection protocols case.

13   Justice Kavanaugh made the same point in concurrence.

14           And so we don't think that it's -- we're breaking

15   any new ground here when we say that the agency's exercise of

16   its parole authority, notwithstanding its discretionary

17   nature, is nonetheless subject to APA review, including

18   arbitrary and capricious review, as Chief Justice Roberts

19   said.

20           THE COURT:  Okay.

21           MR. COX:  I think the -- yes.  And in addition --

22   oh, I'm sorry, Your Honor.

23           THE COURT:  No.  Go ahead.

24           MR. COX:  The other thing, too, that I just don't

25   want to get lost here is the work authorization that comes

1    along with it, with parole.  Individuals, after they get

2    parole, pursuant to long-standing regulations of the agency,

3    they can seek an employment authorization document and work,

4    which also has a number of different benefits.  And they,

5    obviously, have interests in maintaining their ability to

6    work pursuant to their employment authorization documents.

7         So it's -- that is also a discretionary benefit,

8    but it's also something that means quite a lot to people.

9    And, you know, the agency can't simply pull the rug out from

10   under folks without considering the impacts of doing so.

11        I think --

12        THE COURT:  Okay.  The -- and what -- what is the

13   remedy here that you're -- the emergency remedy you're

14   seeking?

15        MR. COX:  We seek an injunction of the agency's

16   halt to processing of the immigration benefit applications of

17   parolees and at least the request for re-parole and so that

18   we can -- they would at least be -- have some measure of

19   protection until -- while the case proceeds to final

20   judgment.

21        Essentially, we would -- we want a return to the

22   status quo ante under which their applications are processed

23   under -- under the policies that the agency had in place at

24   the time.  Now, the agency can, of course, change its

25   policies.  It can do that so long as it does it in an

1   appropriate way.

2           THE COURT:  So would it be fair to say you're --

3   the part that you're saying is illegal in the -- or an

4   incorrect construction of the statute in the first instance

5   is the administration's position that these programmatic

6   methods of parole are unlawful; and, therefore, nothing will

7   be processed if someone came in via that programmatic avenue?

8   Is that -- is that sort of what it is you're saying is

9   unlawful there?

10          Because if they simply say, look, we -- you know,

11  it looks like conditions are much improved in some country,

12  that might change for -- for sort of a reason on the ground.

13          But I think your criticism here is that they -- the

14  administration criticized the use of these programmatic

15  avenues of parole and have stopped the applications for other

16  benefits and re-parole for people who came in via those

17  programs.

18          MR. COX:  Based on their legal conclusion that the

19  programs were unlawful.  And that's --

20          THE COURT:  And if --

21          MR. COX:  Yes.

22          THE COURT:  -- I were then to understand your

23  request for a preliminary injunction to be slightly more

24  limited than you've said, but to say that they're precluded

25  from ceasing these programs on the grounds that there was an

1    improper categorical parole program, is that -- I mean, as

2    opposed to you have to do things on a certain speed or you

3    have to get going?  It's that particular nub that you're

4    objecting to; is that accurate?

5        MR. COX:  That's all we can -- so under the *Chenery*

6    doctrine, we can only attack the grounds on which the agency

7    itself has explained its decision.  And, certainly, the

8    Huffman and Higgins directive are absolutely clear that they

9    are -- everything in there is about the legal conclusion

10   concerning the scope of the parole statute.  There's no other

11   reason given.

12       The Davidson memo gives some additional -- arguably

13   it gives some additional reasons.  It also carries forward

14   the unlawful interpretation of the parole statute.  But even

15   if it's right on the law or even if it was a completely

16   discretionary decision, it was arbitrary and capricious

17   because they simply didn't take into account what they needed

18   to.

19       THE COURT:  Okay.  That's the -- your second -- I

20   see your arguments as being, first, the rejection of the

21   existing programs are a problem as inconsistent with the

22   statute; and, secondly, that they didn't do it the right way.

23   So this is in your second bucket?

24       MR. COX:  Yes, Your Honor.  And I just wanted to

25   clarify that the "they didn't do it in the right way" is -- I

1    think it's principally -- there doesn't seem to be any

2    discretion in the first bucket.  They didn't express any

3    discretion anyway.  But, yes, Your Honor.  That's,

4    essentially -- that's, essentially, right.

5              THE COURT:  Okay.  Let me hear from the government.

6              MR. WARD:  Yes, Your Honor.

7              So a couple things about the guidance.  First of

8    all, what this guidance generally does, it's a temporary

9    pause for the new administration to evaluate whether agency

10   guidance implementing the executive broad discretion under

11   the parole statute under the prior administration, whether

12   they want to continue to use that guidance or implement that

13   guidance in the same way; and, also, in the context of

14   certain programs, wanting to do additional vetting,

15   determining whether additional vetting is necessary under

16   these programs if they go forward, based on demonstrated

17   incidents of fraud under some of these programs that were

18   identified under the last administration.

19             The last administration similarly paused some of

20   these programs while looking into whether they needed to

21   change the processing or change the vetting before moving

22   forward.

23             THE COURT:  Do we have, though, sort of two

24   different buckets here?  One is this question of should this

25   program be made available going forward to new people coming

1    to this country or even to people who want to continue,

2    extend their parole status?  One bucket.

3         The other bucket is what about the people who have

4    been -- who followed the rules and came in here per the rules

5    and are still within lawful status that they were granted

6    when they came here?

7         And as to that, how does the guidance, what you

8    just said about the -- trying to see whether you need to

9    change the vetting, et cetera, of people coming in, how does

10   that intersect with the question of whether the people who

11   came in under this program, followed the rules coming in

12   under this program, can now work or apply for adjustment of

13   status, et cetera?

14        MR. WARD:  Yes, so the guidance extends to pausing

15   adjudication of other benefits for certain of these programs.

16   So this is the Davidson memo.  And we've attached this to our

17   briefs so we can see what it actually says.  That memo does

18   not apply to all the parole programs they challenge in this

19   case.  There --

20        THE COURT:  Can I just pause you for one minute?

21        MR. WARD:  Yes.

22        THE COURT:  Counsel, that was an omission that I

23   did not understand, how you can ask for an injunction to

24   enjoin a document, and that one, you didn't give me.  You

25   gave me all the others, but not that one.  If you're doing

1    this going forward and you have other things, if there's

2    something you're challenging, you need to put that in front

3    of the judge.  That doesn't make sense to not have it.

4            MR. COX:  Understood, Your Honor.  We didn't have a

5    full copy of it.  It was never made public.  This is the

6    first time that it's ever been made public.

7            THE COURT:  The Huffman memo?

8            MR. COX:  Yes, Your Honor.  It's been reported, but

9    it had never been made public.

10           THE COURT:  Okay.  Thank you.

11           I'll let you -- I'll let you continue there.

12   Sorry.

13           MR. WARD:  So there's --

14           THE COURT:  You're saying -- you're saying it only

15   applies -- that one only applies to the CHNV one and not the

16   others?

17           MR. WARD:  No, it applies to some of the others,

18   but not all of them.  It exempts the Afghan program, the

19   Central American Minors parole program, the military

20   parole-in-place program.

21           It does apply to the CHNV process, but as

22   plaintiffs have noted in their filing on Friday, there's a

23   separate federal register notice which is going to be

24   announced tomorrow, which will address the CHNV parole

25   process.

1          And I think that's -- that's an issue with the
2     emergency relief they seek generally here, is that the
3     Huffman memo says explicitly that it's a 60-day pause for the
4     agency to evaluate both whether they need to address fraud
5     or -- and whether they want to continue to exercise
6     discretion in this way.
7          It was issued on January 20th, so that pause has
8     already gone for 60 days.  It's unclear whether that pause
9     and guidance is even still in effect.
10         THE COURT:  Well, you're the one who would know.
11    It's unclear if it's still -- is in effect or not in effect?
12         MR. WARD:  The 60 days have run.  I've asked my
13    clients to confirm what the status of it is, and I don't have
14    an answer from them on that.  But, again, these are all, by
15    their terms, guidance documents that are intended to be
16    temporary to allow --
17         THE COURT:  But this is an important thing.  If
18    you're saying to me the guidance is done, then you're saying
19    it's not there, it's not happening, we're not -- we're not
20    under it anymore.  That's a pretty big difference of how I'm
21    proceeding here.  And, certainly, you wouldn't object to my
22    enjoining it if it's not in place.
23         MR. WARD:  Well, Your Honor, I think the problem
24    with that is that it is a general redressability problem with
25    plaintiffs' claims, is what does it do to enjoin it if it's

1    not doing anything?  And, again, whether it's in place or

2    not, these were all intended to be temporary pause for the

3    agency to address how to go forward.

4              THE COURT:  But what do you do -- so I'm -- I don't

5    think you're really helping me with my bucket distinction.

6              MR. WARD:  Yes.

7              THE COURT:  And I need to think about it this way.

8    The one is the question of what happens with the program for

9    somebody who isn't already here?

10             Putting that aside for today, my question is what

11   about the person who is here?  And what is it that you're

12   saying about how people are admitted through the program that

13   has to do with -- or maybe what is -- what programs are

14   available to people to -- to seek access to?

15             That's sort of one set of things, versus we have

16   people here who have lawfully followed the rules.  What about

17   this guidance is, at that, other than, essentially, putting

18   them in a situation where -- I think the plaintiffs' charge

19   was that you were manufacturing removability, which seems a

20   bit of a strong charge.

21             But if you're, essentially, saying, you know, they

22   have a certain very limited period of time to get their

23   processes moving, and you're, for no reason at all, just sort

24   of saying for 60 days we're not going to do anything, why

25   aren't they right that that's kind of a problem?

1          MR. WARD:  Yes, Your Honor.  So I think there --

2     for those category of people who came here under these

3     programs, there's sort of -- it seems within that bucket

4     there are two buckets:  those seeking parole and those

5     seeking some other benefit.

6          For those seeking parole, the agency's been clear

7     that they're not going to -- while this pause is in place, is

8     not going to grant another term of parole for individuals.

9     Say if someone wanted to enter through the Central American

10    Minors process, they're not going to be able to do that

11    during the pause, but that's not their plaintiffs.  They

12    won't apply to someone that's already in the United States.

13         What the guidance exempts is if someone has some

14    case-by-case basis under the statute to seek parole in their

15    individual case, those things are not paused.  So --

16         THE COURT:  What does that mean as a practical

17    matter?

18         MR. WARD:  That means that if an individual has

19    some basis to seek an additional term of parole, they can

20    file what's called an I-131 application for parole.

21         THE COURT:  But doesn't everybody -- isn't

22    everybody right now -- maybe I'm misunderstanding how this

23    works, but -- and help me out here.  We have a process of

24    screening.  We're letting some people use the process of

25    screening that gets you here, right?  We're saying to most

1    people stay outside our borders, our southern or northern

2    borders.

3              And then we're saying here, for some of you, we'll

4    let you fly into an internal port of entry; and at that

5    point, we're going to let you be paroled into the country on

6    an individual basis, evaluating you individually at that

7    point.

8              And we have a program that sort of says, okay, the

9    people we're going to evaluate individually are from these

10   various things that we're -- places we're concerned about.

11   But then they're evaluated individually, correct?

12             MR. WARD:  Yes.

13             THE COURT:  And then when their year is up, they're

14   saying, "Okay.  I want to extend that," and they're again

15   being evaluated individually, right?

16             MR. WARD:  Yes, I believe so.

17             THE COURT:  And so you're saying they still have

18   the opportunity to apply individually.  I'm lost.

19             MR. WARD:  Yes, Your Honor.  So to answer an

20   earlier question, I believe -- and, again, we don't actually

21   know the identities of the plaintiffs in this case.  The

22   parties are working on a protective order where we could

23   hopefully get those identities and we could look into their

24   individual circumstances.

25             But my understanding is that, generally, every

1    grant, individual grant of parole, has a particular term and

2    an end date and also notes that it can, in the agency's

3    discretion, be terminated at any time if that parole is no

4    longer serving its purpose.

5              There is --

6              THE COURT:  Does it -- does it say that?  Because I

7    think that's an important thing for me to know if it says

8    that.

9              MR. WARD:  Again, I don't know what the documents

10   said in these particular cases.  I know that in a lot of

11   cases, it says that expressly, that parole can be terminated

12   if it's no longer serving -- serving its purpose.  So -- but,

13   again, I don't know what the particular documents said in

14   this case.

15             But individuals can always be granted parole or

16   seek parole under the statute itself.  So these guidance

17   documents and these processes, these don't need to exist at

18   all.  Nothing in the statute says that the agency has to

19   create some sort of process or program for individuals to be

20   able to apply for parole.

21             They can always request an individual grant of

22   parole.  And, in fact, some people, many people have done

23   that just by showing up at a port of entry, and they end up

24   being paroled into the United States.  They have no guarantee

25   that will happen when they show up in the United States, but

1   the agency has that authority.  And the agency has accepted

2   that authority for an individual grant under the statute from

3   this guidance.

4          So the Higgins memo says that expressly at the

5   bottom.  It says this instruction does not include requests

6   for advanced parole, noncategorical forum I-131 humanitarian

7   parole requests, or government referrals for parole filed and

8   adjudicated on a case-by-case basis for urgent humanitarian

9   reasons or significant public benefit.

10         And the same thing is in the declaration we've

11  attached from the agency to our papers at paragraph 8.  It

12  says that if these individuals have a basis for -- where they

13  believe they can satisfy the statute, they can seek an -- an

14  individual consideration for another term of parole in the

15  United States.

16         Now, aside from parole, these individuals have also

17  raised the pause on adjudicating other benefits, but I don't

18  believe that any of the plaintiffs in this case can show that

19  that's had any effect on their applications.  So what --

20         THE COURT:  But regardless of whether it has

21  effects on their application, it has effects on their lives.

22  I mean, it's pretty hard to pay your rent if you don't have

23  work authorization.

24         MR. WARD:  With respect to parole, Your Honor.

25  But, again, they can apply for an additional term of parole

```
 1    if they have some basis for it.

 2            THE COURT:  No, but they're here.

 3            MR. WARD:  And there's no --

 4            THE COURT:  Let's say I have someone who arrived on

 5    December 15th, and they were told they could be here for the

 6    next year.  Rent's due on April 1st, but they can't work now

 7    because the employment authorization isn't being processed.

 8            MR. WARD:  Well, again, I don't believe that that

 9    has happened with any of the individuals in this case.  I

10    don't believe there's anyone that has parole and received

11    work authorization that's -- no longer has it.

12            THE COURT:  Well --

13            MR. WARD:  Again, we haven't been able to look at

14    the factors of the individual plaintiffs.

15            THE COURT:  But --

16            MR. WARD:  If someone's --

17            THE COURT:  -- it is -- it is what these memos are

18    saying, that anybody who is here on parole doesn't get to

19    have their applications for various things like work

20    authorizations processed.

21            MR. WARD:  Well, again, parole is for a set term

22    and has a set end date.

23            THE COURT:  But --

24            MR. WARD:  And if these individuals sought --

25            THE COURT:  But they're here.  They're here.  They
```

1    get paroled here.  They're here.  And while they're here --

2    you know --

3         MR. WARD:  I don't believe that there are new --

4    and plaintiffs can correct me if I'm wrong, but I don't

5    believe that there are new -- for their individual plaintiffs

6    pending work authorization requests.  My understanding is

7    that if they came here on parole, they had the ability to

8    apply for work authorization.

9         THE COURT:  But --

10        MR. WARD:  And if that was granted, it's still in

11   place.

12        THE COURT:  And if that is in process, it's on hold

13   now.  That's what the memo says.  Or if it was a grant for

14   90 days, but they're here for two years, they can't get -- I

15   mean, basically, what the memo says is whatever -- whatever

16   things you are applying for --

17        I -- the reason this is a particular concern when I

18   think about what I see happening here, is I see people in

19   this country who have lawful status of some sort or other and

20   people who have no lawful status.

21        And the reason I see the people who have no

22   lawful -- this is not an immigration court.  The reason I see

23   the people who have no lawful status is because, at some

24   point, people with no lawful status are supporting themselves

25   through illegal activity because that's what you do when you

1    want to eat but you can't work, is what happens.

2         And so it seems to me, if we have people here with

3    lawful status, it's an important question of whether they can

4    keep paying their rent.  And so my -- I guess my question

5    is -- I hear you're sort of -- we want to be able to put our

6    policies going forward for parole or so forth.  I hear that

7    argument.  I don't know whether it's done correctly or not.

8    We haven't gotten to any of that.  But I hear that.

9         What I don't hear is the people -- what I don't

10   understand is the people who are here who are trying to

11   access benefits that would otherwise be available are now

12   being told because we're reconsidering the whole parole

13   program; therefore, you're going to not be able to support

14   yourself here.  And I don't understand that.

15            MR. WARD:  Well, again, I don't know that they have

16   anyone in that factual scenario.

17            THE COURT:  Okay.

18            MR. WARD:  I know that they've alleged that.  And I

19   think this gets back to sort of a fundamental problem with

20   their claim with respect to applications other than parole,

21   is that what we have here is, essentially, a group of

22   plaintiffs that are joined together, a number of mandamus

23   cases.

24         And if the Court was to consider an individual

25   mandamus case challenging an application for parole or

1    challenging an application for work authorization, there's a

2    number of very particular individual factors that the Court

3    would have to consider, including the agency's normal backlog

4    in adjudicating that application, the --

5              THE COURT:  But -- completely correct, but you've

6    put in front of us a guidance memo which simply says we're

7    not going to do any of those programs.

8              MR. WARD:  But I don't -- but it doesn't -- but,

9    again, that's limited guidance.  It doesn't mean that the

10   agency is not adjudicating any work authorization requests or

11   work authorization requests --

12             THE COURT:  Well, it's telling -- you're right.

13   There might be some disobedient officer who's going ahead and

14   doing it, but you're telling them not to.

15             MR. WARD:  No, Your Honor.  No, Your Honor, because

16   these guidance documents only cover individuals that came in

17   under a limited set of parole processes --

18             THE COURT:  Right.

19             MR. WARD:  -- not all of them.

20             THE COURT:  But as to those people, which I thought

21   the numbers are 500,000 -- am I wrong?

22             MR. WARD:  It depends on the process, Your Honor.

23   But, again, here all the Court has before it are the

24   individual plaintiffs in this case.

25             THE COURT:  I understand that, but I have a

1    guidance memo -- this is the part that I don't understand,

2    and I don't understand your argument on it.

3         You have a guidance memo that says none of those

4    people who came under these processes can apply for -- can

5    have their applications for other things under the

6    immigration laws adjudicated, whether it's adjustment of

7    status, whether it's employment authorization, TSP, all

8    these -- all these -- TPS -- all of these different things

9    they can't do right now.

10        And your reasoning for it, I think, is one of two

11   things.  One is part, "We want, looking forward, to put our

12   own policies in place here."  The other is, "We think those

13   people are here illegally because we don't like the policy

14   that allowed them in."

15        And for that one, you have to say that they've --

16   it seems to me that they've done something wrong here and

17   that this categorical approach that was used was not just a

18   choice to use it or this programmatic choice was not just a

19   choice to use it, but was somehow unlawful or so forth.

20        I don't think you're saying that.  I don't think

21   you can go that far.  But if the people here are here

22   legally, even if some months from now they may not be able to

23   continue here, even if they're here legally, what's the basis

24   for stopping them from applying for these various different

25   programs?

1      MR. WARD:  The guidance doesn't stop them from

2  applying for it.

3      THE COURT:  What's the --

4      MR. WARD:  The guidance pauses --

5      THE COURT:  What's the reason for ordering your

6  staff, your employees, to not process their things, other

7  than sort of, essentially, saying, "We've marked them as

8  illegal," even when they're not illegal?

9      MR. WARD:  No, Your Honor.  I think one of the

10  aspects of the pause is to investigate whether there was

11  fraud in these processes.  And the agency wants to evaluate

12  whether some of these processes were implemented or granted

13  in ways that weren't lawful before proceeding with other

14  benefits.

15      THE COURT:  When you --

16      MR. WARD:  My point --

17      THE COURT:  -- say whether the processes were

18  illegal, are you saying whether a particular person lied in

19  their application, or are you saying the prior administration

20  made assumptions they shouldn't have made?

21      MR. WARD:  More the former, Your Honor.  And I

22  think this is set out somewhat in the -- in the Davidson

23  memo, where it sets out ways in which, under some of these

24  processes, the agency has identified ways in which some of

25  the sponsors that sponsored individuals to come in through

1　this process were not real sponsors or were serial sponsors

2　or were using -- using fake or fraudulent information to come

3　into the United States.

4　　　　So for those processes, the agency wants to

5　evaluate whether individuals were granted parole based on an

6　application that wasn't based on true information before

7　proceeding forward.

8　　　　But my point on the adjudicating other applications

9　is that it's before the basis for what the agency ultimately

10　does with these processes, which in most cases, we don't know

11　yet and would have to be evaluated by the record the agency

12　puts together and their explanation for any change they made.

13　　　　But my point is a more fundamental one, which is

14　that I don't believe that any of these individuals can show

15　standing or irreparable harm from this agency guidance

16　because I don't believe that any of them can show some

17　benefit that would be adjudicated during the term of this

18　pause even without the guidance or that would be affected by

19　the guidance.

20　　　　THE COURT:  Well --

21　　　　MR. WARD:  So, for example, with asylum

22　applications, there's decisions within this district noting

23　that there's nearly a million backlog of cases of asylum

24　applications and regularly finding it's not unreasonable for

25　an asylum application to be pending for two or three or even

1    longer years before it's adjudicated, given the backlog of

2    cases.

3            The asylum applications at issue in this case were,

4    according to plaintiffs' allegations, are asylum applications

5    that were filed in December or January or February of this

6    year.  And so even if there was no guidance in effect

7    whatsoever or if the Court enjoined the guidance, it's not

8    clear that the agency, that it would have any effect

9    whatsoever on their applications.

10           Again, the agency hasn't stopped adjudicating all

11   asylum applications.  They've paused certain ones where the

12   individual came in under particular processes.  But

13   plaintiffs can't show that that affected their applications

14   at all.

15           THE COURT:  Well, but if it's -- so you're saying

16   the person's asylum applications would never get adjudicated

17   within the parole time in any event, so it doesn't matter if

18   it's one or two months later?  Is that --

19           MR. WARD:  Yes, Your Honor.  And there's no

20   guarantee in a grant of parole that it will be extended or it

21   will be -- last during a long enough period for their

22   application to be adjudicated.  There was never, as far as I

23   understand, any promise to these individuals that they would

24   be able to extend their parole in order to -- for the years

25   it might take for that application to be adjudicated.

1    There's no bar to them applying for it and having

2    it adjudicated, but there's also no guarantee whatsoever in

3    the statute or any of these parole processes that are

4    challenged that the individual would get some sort of

5    expedited consideration of that process or, again, the

6    mandamus context, there would be any basis for them to jump

7    in front of the line of the hundreds of thousands of

8    individuals who have filed asylum applications or TPS

9    applications earlier.

10    The same is true with the other applications

11    they've talked about, and we've -- the last attachment to our

12    response to their brief is some public information about

13    standing processing times for applications, shows that for

14    TPS applications, in many cases, it can take six months to a

15    year for those to be adjudicated.

16    So, again, from what we know from the allegations

17    of plaintiffs in this case, they can't show that a 60-day

18    pause on adjudication of those applications affected any of

19    the individual cases here.

20    THE COURT:  You keep saying 60-day pause, and I'm

21    sitting here not knowing what to do with it, because you've

22    just told me a 60-day pause, so it's over; or maybe it's not

23    over, in which case maybe it's a pause without it being

24    60 days.  I don't know which way -- I don't know what you

25    mean by it, and I don't know what -- what the guidance means

1    by it.

2            But if it's --

3            MR. WARD:  I --

4            THE COURT:  -- just 60 days, then it's gone.  We

5    can say there's no harm.  It's not happening.  But if it's

6    still in effect, which I think it is, otherwise you would say

7    this -- there's really no big problem here -- if it's still

8    in effect, then how can I say it's limited to 60 days?  It

9    seems that it's in effect.

10            MR. WARD:  Well, I think, again, and I've asked my

11    client to confirm the status of each of those guidance

12    documents; and one of them was issued, I believe, on

13    February 14th, so 60 days hasn't necessarily past yet.

14            But I think if you look closely at the guidance

15    documents themselves, they're all described in terms of a

16    temporary reevaluation period for the agency to reevaluate,

17    and this isn't unusual.  This happened in the last

18    administration when many immigration processes were paused

19    for a temporary period while the new administration evaluates

20    how best to exercise the discretionary authority, evaluating

21    the efforts of the past administration.

22            Some of these processes involved considerations of

23    foreign affairs in cooperation with foreign governments and

24    priorities for certain populations for paroling them into the

25    United States or using certain -- certain processes.

1          The executive orders cited in the briefing indicate

2     that the current administration may have different views on

3     foreign policy and cooperation with other countries it would

4     implicate or play into their decision about whether to target

5     certain populations or certain countries for parole guidance.

6          THE COURT:  Well, so let me -- let me sort of stop

7     you there, because I -- it does seem a little bit that the

8     arguments are -- are not meeting each other directly here

9     about this category question.  And I want to make sure I

10    understand what we're doing here.

11         The parole statute says there needs to be a

12    case-by-case evaluation.  The various different programs that

13    have come out over the years have set forth a process where

14    there is a certain issue:  military participants, children,

15    certain -- Ukraine -- the invasion of Ukraine, the Afghan

16    issues.

17         So there are these particular issues, and so the

18    administration has said, on a programmatic level, we're going

19    to allow applications to come in for these particular things.

20    And then, case by case, people are being evaluated.

21         I think what you're saying is, "We have a different

22    programmatic vision, and we're going to put our own programs

23    into place."  But doesn't -- but you're then not -- then

24    saying -- you're not saying we're going to continue to

25    evaluate people case by case; you're saying, no, we can

1    categorically remove those protections and status and change

2    things on a categorical basis rather than on an individual

3    basis.

4            But you're the one who's been arguing that there

5    should be more case by case, not less than case by case.  But

6    I think you're saying, no, it's a foreign policy, so forth,

7    and the President can do things categorically,

8    programmatically.  I'm not sure what the right word is to use

9    here.  Which is it?

10           I mean, these people were all -- you may disagree

11   with the program that they came in.  But these people were

12   each individually vetted coming in.  And now you're saying

13   we're categorically not going to allow them to process

14   things.

15           Am I --

16           MR. WARD:  So -- so, again, I think what the agency

17   thinks about how to exercise the parole authority going

18   forward will depend on if they modify or change these

19   processes, which with the exception of the CHNV processes,

20   they haven't even yet done.  And even there, that hasn't

21   taken effect yet.

22           But I think if there's a modification and the

23   agency's views on whether -- how that past program satisfied

24   the individual determination requirements -- or it may be

25   something other than that.  What other reasons the agency

1    might have, foreign policy or otherwise, for not setting up a

2    particular process for individuals coming in under those

3    prior programs and processes will depend on whatever

4    explanation the agency provides in that modification.

5         For most of these processes, we don't have that

6    yet, so I don't want to get out in front of my clients.  I

7    believe what plaintiffs want to amend to challenge in this

8    case in terms of the CHNV process will be a challenge to the

9    agency's determination to end those processes, and that will

10   need again to be judged based on the explanation the agency

11   gives in that -- in that determination and federal register

12   notice and whatever record the agency is able to put together

13   in support of that.

14        THE COURT:  Okay.  But, again, not focusing on

15   that, because that's tomorrow's argument, not today, but

16   focusing on the categorical restriction on processing

17   applications for immigration benefits, readjustment, any of

18   those things that is now in place for 60 days or some

19   other -- I'm correct that that's been done categorically,

20   correct?

21        MR. WARD:  Oh, for the processing of -- the people

22   here on parole, the processing of other benefits?

23        THE COURT:  Yeah.

24        MR. WARD:  Well, again, the determination and

25   timeline about when those benefits are processed, that's not

1      something that's governed by the parole statute.

2              THE COURT:  I understand that.

3              MR. WARD:  So there's nothing in 1182(d)(5)(A) that

4      says you need to make a case-by-case determination about the

5      timeline for someone separate, asylum or TPS application.

6              THE COURT:  No, but what you're doing is you're

7      saying is, "I don't like the processes in the parole

8      programs.  I don't like the particular parole programs that

9      were adopted; therefore, everyone who came in under these

10     parole programs as a group is excluded from what they would

11     otherwise, under the statute, be allowed -- statutes -- be

12     allowed to do."

13             MR. WARD:  Again, Your Honor, I don't think -- I

14     don't think it does that, because it doesn't say that these

15     benefits will never be adjudicated.  It doesn't say

16     individuals can't apply for them.  It puts a temporary pause

17     on applications that are ripe for decision for individuals in

18     those categories.

19             I'm not sure who those individuals are or if

20     there's a large number of them even.  Again, people that came

21     in for parole -- on parole in the last year, if there's a

22     backlog of almost a million affirmative asylum cases, it's

23     not clear that anyone who has applied for asylum in the last

24     year on that term would be up at the top of the list anyway.

25             THE COURT:  Asylum is a tough one.  But

1    readjustment of status, employment benefits, I mean, there

2    are a number of other things.  All of that is paused,

3    correct?

4            MR. WARD:  I'm not entirely sure.  I don't want to

5    overspeak.  I know that -- I'd have to look at the guidance

6    again on work authorization to see if that would be

7    implicated as well.

8            But, again, individuals can still apply for an

9    individual request for parole outside of these particular

10   processes.

11           THE COURT:  But we're not now talking about the

12   parole.  We're talking about their status right now to

13   participate in these other things.  And they can't do those

14   individually.  They are barred from those because they are

15   paroled here as opposed to admitted here or --

16           MR. WARD:  Yes.  And, again, on that I would say

17   they haven't shown that there's anyone who's actually been --

18   whose applications for asylum or TPS adjustment have been

19   affected by this pause or it will be affected on the timeline

20   that justifies emergency relief.

21           Again, earlier we were talking about an individual

22   seeking adjustment that they want to have adjudicated by

23   September.  It's not a basis for seeking a TRO or emergency

24   relief, particularly with respect to something that's in

25   flux, that the agency says is a temporary pause to evaluate

1    instances of fraud, but also the agency's view on how to

2    exercise its discretion.

3         It's not intended to go forever.  There's no

4    indication that it'll go until September or that, in the

5    alternative, that temporary injunctive relief is necessary

6    that the Court can reach the merits and this can be resolved

7    on full briefing in a normal schedule, after we know the

8    identity of the individual plaintiffs and can identify -- or

9    can brief more fully the issues in this case.  There's no

10   basis for seeking -- or irreparable harm in the absence of

11   some sort of TRO or preliminary injunction in this case.

12        THE COURT:  Okay.  I'm going to let the plaintiffs

13   respond to that.

14        MR. COX:  Thank you, Your Honor.

15        A couple things:  First, just to correct,

16   factually, the pause -- the two different pauses we're

17   talking about here, they're indefinite.  They don't have a

18   time frame.  The Huffman memo, the January 20th memo, says

19   that a study will take place for 60 days.

20        But the Huffman memo by itself did not -- did not

21   end the -- did not pause anything.  It was it plus the

22   Higgins directive, and the Higgins directive is indefinite.

23   And so the suggestion that the pause is only 60 days is -- is

24   not at all supported by the record, and the record is

25   entirely to the contrary.

1          Second, I understand the -- given its argument

2     about the, you know, the likelihood of applications being

3     adjudicated within a particular time frame, but that's

4     irrelevant for standing purposes.  As this Court held in --

5          THE COURT:  No, but it is relevant for harm,

6     irreparable harm.

7          MR. COX:  It is relevant to irreparable harm, but

8     we have clients right now who -- we have one client who is

9     already out of status.  We have another who loses parole and

10    work authorization on Saturday.

11         And as your court has held, they -- even if -- if

12    there's a small chance of something really bad happening,

13    that justifies --

14         THE COURT:  Yeah, but I can't order a work

15    authorization.  You would --

16         MR. COX:  That's true.  But you can -- you can make

17    the agency return to processing in the ordinary course, which

18    certainly takes her chances of getting any EAD and -- or

19    parole application adjudicated in a particular time frame, it

20    goes from zero to not zero.  And that's meaningful.

21         And particularly, Your Honor, you know, we have a

22    motion for class cert pending.  And we -- you know, we'll be

23    finishing up briefing on that.  But we are talking today

24    about our individual plaintiffs.

25         But we seek to -- to represent a class of -- I

1    don't know -- 700,000 people or thereabouts.  More than

2    500,000 came in through CHNV.  Approximately 240- or 50,000

3    came in through U4U.  So that's -- we're talking a whole lot

4    of people.

5            And so when you look at it in that frame, it's

6    inevitable that members of the class are going to be made

7    much better.  They'll be much better off.

8            THE COURT:  But I can't -- I appreciate that.  But

9    I can't be looking -- in trying to decide, determine whether

10   an emergency order needs to come out today, I can't be

11   saying, well, let me decide it on the 700,000 that you think

12   I might be able to include, can I?

13           MR. COX:  I -- I think you can take it into account

14   with regards to the next procedural steps that Your Honor

15   takes.  So, for example, Your Honor could issue a 14-day

16   temporary restraining order.  We could finish briefing on the

17   motion for class certification and have a class provisionally

18   certified with a preliminary injunction that runs through the

19   class.

20           Your Honor has ample discretion to manage your

21   docket as you wish, and that would certainly be one way that

22   this could be handled to ensure that -- that people aren't

23   unnecessarily harmed by what to date has been largely secret

24   actions by the defendants.

25           I mean, folks have had -- they didn't know why

1    their applications are just sitting there.  Defendants never

2    told them.  And even if they could have found counsel to

3    bring -- to bring litigation, I mean, that's very difficult.

4    This is a situation where class certification would be quite

5    appropriate.

6          A couple of other things I wanted to address,

7    the -- the suggestion that the pause is not final agency

8    action, I'm sure Your Honor is aware of this, but this --

9    this has been a frequently litigated issue just in the last

10   month or two where the new administration has paused or

11   suspended various things for finite or indefinite periods of

12   time, and the courts have had no trouble saying that those

13   are final agency action.

14         For example, there's a -- there was a 90-day

15   suspension of the refugee admissions program.  It's now

16   enjoined by the Western District of Washington.  And they

17   said, "Look, it's -- it has legal consequences.  Like, you

18   decided to do this.  There's nothing tentative about it.  Of

19   course, you can change your mind, but that's true of

20   literally every agency action."

21         And so -- and the presumption of reviewability

22   under the APA really mandates that when legal consequences

23   are flowing, the agencies need to be held to account to make

24   sure that they're considering what -- how their actions are

25   impacting real people.

1           The -- Your Honor's point about the categorical

2     treatment is absolutely right.  The statute, the parole

3     statute, says that conditions of parole may only be

4     prescribed on a case-by-case basis.  And the agency here,

5     defendants here, have, essentially, imposed an additional

6     condition of parole for these individuals who were affected,

7     which is, "Oh, we're not going to consider reapplications for

8     a while."

9           And that's particularly inappropriate given that

10    for -- for these processes, the federal register notices

11    explain that one of the purposes is to let folks come in,

12    apply for benefits that -- to which Congress has made them

13    eligible in an orderly fashion rather than forcing them to go

14    to the border.  And so this was a purpose of them coming in,

15    and yet now, they're imposing this new condition.

16          The --

17          THE COURT:  Well, the -- if -- I mean, if you were

18    in a circumstance -- somebody is here.  They're here for two

19    years.  During those two years, they put their application

20    in, and it's not adjudicated in time.  They don't have a

21    right to keep their parole extended simply because they

22    originally came here.

23          MR. COX:  That's fair enough, Your Honor.  And --

24    but that's, you know, why we're leaning on the APA when we're

25    talking about why these suspensions are unlawful.  We're not

1    saying they're entitled to it because of the particulars, but

2    we're saying this is a relevant factor that the agency needs

3    to take into account before taking such a consequential

4    action.

5        And I wanted to correct one thing I said earlier

6    about our plaintiffs and whether the beneficiaries were here

7    or abroad.  We do have one additional plaintiff for the

8    Family Reunification Parole program.  This gentleman, his

9    daughter is -- is waiting to come in.  She's the beneficiary.

10   She's still in Cuba.  And this is the -- under the -- the

11   family reunification program.

12       And one thing that is -- is different about this

13   program is that you're not allowed to apply until you're

14   invited to do so by the Department of State.  So what they do

15   is there are people who have filed I-130 applications for

16   visas for their relatives.  The visas aren't available yet

17   because there's such a backlog.

18       And so the decision is, rather than make that

19   family member wait outside the country, they can come in on

20   parole, wait here.  Family reunification is served in this --

21   which is one of the purposes of the INA, is family

22   reunification.

23       And so this gentleman applied for his daughter, and

24   now his -- his application is -- is no longer being

25   considered.  It's not being adjudicated.  And those -- those

 1    who have come in through this process, their subsequent

 2    benefits too, their adjustment of status, for example, is

 3    currently suspended.

 4            And the Davidson memo suspends it and says that

 5    maybe the sponsors were, you know, not real sponsors.  I

 6    mean, that's -- it just doesn't match.  The explanation

 7    doesn't match at all because the family reunification program

 8    just worked fundamentally different, but they don't -- they

 9    didn't seem to take that into account.

10            THE COURT:  That's a current plaintiff, or you're

11    intending to --

12            MR. COX:  Current plaintiff, Your Honor.  This

13    is -- this is Valentin Rosales Tabares.  His declaration is

14    Document Number 24-12.

15            THE COURT:  Okay.

16            MR. COX:  A couple of other --

17            THE COURT:  Sure.

18            MR. COX:  The other pause cases, in case it's

19    helpful, the Chief Judge of the District of Rhode Island,

20    Chief Judge McConnell, Jr., in *New York v. Trump*, on

21    March 6th, he said this pause of funding related to executive

22    orders relating to immigration and DEA, gender-affirming

23    care, foreign aid, he said that pause in funding is final

24    agency action, notwithstanding the arguments on the other

25    side.

1          The refugee case I referenced earlier is *Pacito v.*
2    *Trump*.  And then the District of DC, in *National Council of*
3    *Nonprofits v. OMB*, similarly said, you know, these pauses,
4    which seem to be -- seem to be intended to evade review, at
5    least to a certain extent, seems to be a benefit that they're
6    at least leaning into, that they're nonetheless final agency
7    action because of the legal obligations actions that flow.
8    And --
9          THE COURT:  Yeah, I don't think I'm worried so much
10   about the question of final agency action.  I think I'm
11   worried about the question that if counsel is correct and
12   everything is moving smoothly now or may be moving
13   smoothly -- he doesn't know -- then what would that mean?
14   But I think that will -- in the absence of your filing
15   something saying those memos are no longer in -- in place and
16   have been rescinded, I will assume that they are still in
17   place.
18          Go on.
19          MR. COX:  The last point I wanted to make,
20   Your Honor, is that the study, even if the study is over, I
21   mean, what that means is that there are draft federal
22   register notices ending all these other programs.
23          I mean, that's -- in fact, I'd bet my bottom dollar
24   that's the case.  Counsel could perhaps confirm that, but
25   that's what's coming.  But the APA doesn't let you shoot

1    first and justify later and just call it a pause, because

2    that hurts people.  And that's why we're here, and why we're

3    seeking emergency relief.

4            THE COURT:  Okay.  I will --

5            MR. WARD:  Your Honor, can I just respond to a few

6    things there?

7            THE COURT:  Sure.

8            MR. WARD:  I just note that, in this case, I think

9    one of the problems is that there are additional clearer

10   discretionary bars to APA review in this case than in any of

11   the other cases that me mentioned.  So statutes that say an

12   agency has to do a particular thing or a spending clause

13   litigation, I think that's a little bit different than what

14   they have in this case.

15           There are clear bars in the APA to review of

16   discretionary action either where it's made -- the statutory

17   authority is itself discretionary or where other statutes

18   preclude review.  We have both here.

19           1252(a)(2)(B)(ii) applies here and bars review of

20   agency discretionary actions.  And the parole authority is

21   plainly discretionary.  1182(d)(5)(A) says that the secretary

22   of Homeland Security may parole individuals into the

23   United States in his discretion temporarily under such

24   conditions as he may prescribe.

25           So I think we have clear --

1            THE COURT:  But we're not talking about individual

2    parole decisions.  What we're talking about is the

3    administration's position that the parole programs were

4    unlawful or improper; and, therefore, here's the

5    consequences, A, B, and C.  And whether that is accurate and

6    whether that can be challenged under the APA I have to figure

7    out.

8            But we're not talking about individual parole

9    decisions.  That's the whole problem here, is that this is an

10   all-of-a-sudden policy that says this is what we're doing

11   across the board.

12           MR. WARD:  I don't believe so, Your Honor.  I push

13   back on that.  To the extent they're challenging future

14   requests for parole, the statute places those individual

15   determinations plainly in --

16           THE COURT:  I understand -- I understand that

17   argument.  You've got stronger arguments than that one.  That

18   one, I just -- I don't think that you can go and say we can

19   do an across-the-board policy and courts aren't allowed to

20   look at it.  I don't -- I just don't see that's the way our

21   system works.

22           I think you have discretion on each one of these

23   individual case-by-case people to make decisions.

24   Absolutely.  But the question that you're doing here, which

25   is can you categorically say everybody who came in under

1    these programs is now going to be treated in this particular

2    way, you may be able to do it.  You may not be able to do it.

3    But that's a question a court needs to consider.

4            MR. WARD:  Well, again, with respect to parole, the

5    parole statute doesn't guarantee parole to anyone at all.

6    And so whether -- whether the agency determines to grant

7    parole to any category of individual or not -- and, again, as

8    I noted at the outset, individual requests for parole are

9    still available to anyone who wants to submit them.

10            I just want to make one other point on class

11    certification, and I encourage the Court to look at

12    Judge Mastroianni's recent decision in *LaMarche v. Mayorkas*.

13    That's at 2024 Westlaw 2502929, where he rejected an attempt

14    to certify a class of Afghans seeking parole and cited --

15    it's got a nice discussion of the case law explaining why

16    class certification when you're seeking parole or to

17    challenge a delay in parole applications or adjudication is

18    inappropriate.

19            Under *Wal-Mart*, these determinations depend on a

20    range of individual factors that are not appropriate for

21    class certification because you have to determine how long

22    ago did this person apply, what's the backlog in that

23    individual category, how long have they been waiting, how

24    long will they wait?  And that simply forecloses the type of

25    typicality and commonality you need under Rule 23 and

1    *Wal—Mart.*

2            THE COURT:  Okay.  Here's where we are.  I'm going

3    to go back and work my way through this.  I will either be

4    granting or denying emergency relief.  I still have a lot of

5    questions I need to figure out here.

6            If I am granting relief, it will be in the form of

7    a TRO, not a preliminary injunction.  And if I'm not granting

8    relief, I still think the preliminary injunction issues are

9    on the table.  So I would like to set a date for a

10   preliminary injunction hearing one way or another.  And that

11   needs to be within 14 days.

12           Ms. Marchione, it's --

13           THE DEPUTY CLERK:  Yes, Your Honor.  We have a

14   tight schedule, Your Honor.

15           THE COURT:  I know.

16           (The Court and deputy clerk discuss off record.)

17           THE COURT:  April 7th, is that two weeks from

18   today?  That's -- okay.  April 7th.

19           THE DEPUTY CLERK:  Eleven o'clock?

20           THE COURT:  Eleven o'clock?

21           MR. WARD:  Could I make one last point, Your Honor?

22           THE COURT:  Certainly.

23           MR. WARD:  If the Court is considering issuing a

24   TRO, we would ask the Court to temporarily stay that decision

25   to allow the solicitor general to determine whether he wants

1    to seek emergency relief on appeal of that decision.

2             THE COURT:  I hear your request.  I will -- I will

3    consider it.  I do think that the -- in the event that I find

4    a temporary restraining order appropriate, the recourse is to

5    deal with things through the litigation of a preliminary

6    injunction rather than an appeal of a TRO.  But I will -- I

7    will certainly give it thought.  And I'm not certain I'm

8    there.  So we'll go from there.

9             MR. WARD:  Thank you, Your Honor.

10            THE COURT:  And I -- there just -- I know there are

11   a number of things.  I know you are all very, very busy.  But

12   the questions of a protective order so that we can get

13   plaintiffs' names dealt with needs to be addressed if we can.

14   And if you can reach an agreement, great.  If you can't reach

15   an agreement --

16            MR. COX:  I believe we have, Your Honor.

17            MR. WARD:  I believe we're close.

18            THE COURT:  Okay.  So get that to me as soon as

19   possible.  If you can figure out what you're doing about an

20   amended complaint versus a separate action or a motion for

21   amended complaint, et cetera, the sooner you can do any of

22   that.

23            And if you're looking for me to be considering the

24   class certification issues by the preliminary injunction

25   hearing, I guess that is on the normal briefing schedule.  So

70

1    that -- because that was filed --

2            MR. COX:  Yes, Your Honor.  I believe the

3    opposition is due in a week or so, and so it'll be ready.

4            THE COURT:  Okay.

5            MR. WARD:  The -- I believe, isn't it, 14 days,

6    Your Honor?

7            THE COURT:  Yeah.

8            MR. WARD:  What I would say is we -- we would just

9    like to have the identities of the individual plaintiffs in

10   order to be able to respond to that.  So if that ends up

11   taking some time, we might need additional time to respond to

12   the class certification motion.

13           THE COURT:  And I would say this, which is that in

14   that event, I can see bifurcating your response where you can

15   make a response that is generally applicable and reserving

16   your right to make specific arguments that particular people

17   aren't appropriate class representatives or further arguments

18   once you have that information.

19           But I'm just -- if your motion for class cert was

20   filed fairly recently --

21           MR. COX:  I believe that the opposition is due on

22   April 4th in the ordinary course.  That's --

23           THE COURT:  Okay.  So that already is getting it to

24   me right before a weekend to have considered it before the

25   hearing on the 7th.  So I would like at least part of your

1    opposition to be in by then.

2              MR. WARD:  Okay.  Thank you, Your Honor.

3              MR. COX:  And, Your Honor, would Your Honor like

4    any other supplemental briefing in advance of that hearing?

5              THE COURT:  I think I'm pretty solid, and I think

6    your plates are pretty full.  So I think I'm okay.

7              MR. COX:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              THE DEPUTY CLERK:  We are in recess.

10             (Court in recess at 12:37 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of March, 2025.

/s/ Robert W. Paschal
_____
ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE; MAKSYM DOE; MARIA
DOE; ALEJANDRO DOE; ARMANDO DOE;
ANA DOE; CARLOS DOE; MIGUEL DOE;
ANDREA DOE; LUCIA DOE, DANIEL DOE;
OMAR DOE; SANDRA MCANANY; KYLE
VARNER; WILHEN PIERRE VICTOR;
GABRIELA DOE; NORMA LORENA DUS;
VALENTIN ROSALES TABARES; MARIM
DOE; ADOLFO GONZALEZ, JR.;
ALEKSANDRA DOE; TERESA DOE; ROSA
DOE; and HAITIAN BRIDGE ALLIANCE,

                Plaintiffs,

      – *versus* –

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; TODD M.
LYONS, in his official capacity as the Acting
Director of Immigration and Customs Enforcement;
PETE R. FLORES, in his official capacity as
Acting Commissioner of U.S. Customs and Border
Protection; KIKA SCOTT, in her official capacity
as the Senior Official Performing the Duties of the
Director of U.S. Citizenship and Immigration
Services; and DONALD J. TRUMP, in his official
capacity as President of the United States,

                Defendants.

**Civil Action No: 1:25-cv-10495-IT**

**Leave to File Granted – March 27, 2025**

## SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Ukrainians seeking safety from the Russian invasion of their country; Cubans,

Haitians, Nicaraguans, and Venezuelans fleeing political instability, persecution, and

environmental disasters; Afghans who assisted the United States government during its war in

1

Afghanistan; the family members of certain U.S. citizens and residents who have been deemed eligible for a visa but are simply waiting in their home countries, often for years, for one to become available for them; the undocumented family members of active and retired U.S. military servicemembers; and parents seeking to reunify with children from certain Central American countries after years of family separation are just a few of the populations that the United States has sought to aid in recent years by granting eligible individuals parole, on a case-by-case basis, so that they may enter or remain in the country for a temporary period of time and find safety and stability here.

2.    The Trump administration, however, has sought not only to terminate those legal humanitarian pathways to the United States, but to block access to any other longer-term, more stable legal status for individuals granted humanitarian parole, so that these people have no options to remain here in safety, to continue contributing to their communities, and to remain with family members here in the United States.

3.    This lawsuit challenges the steps the Trump administration has taken to radically limit what had up to this point been a broad power granted by Congress to allow the executive to respond to migration challenges, address global humanitarian crises, and further important foreign policy objectives in a flexible and adaptive way. It also challenges the Trump administration's dismantling of legally established and congressionally authorized pathways to the United States, including:

- Uniting for Ukraine ("U4U"), for Ukrainians displaced by the war with Russia;

- the processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), countries that have been ravaged by natural disasters and/or political strife;

- Operation Allies Welcome ("OAW"), for Afghans fleeing the newly resurgent Taliban;

Appx-0443

- Family Reunification Parole ("FRP"), for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras with approved family-based immigrant visa petitions;

- Military Parole in Place ("Military PIP"), so that U.S. military servicemembers may seek parole for their parents, children, and spouses, and need not worry about the immigration status of these close family members while serving their country; and

- The Central American Minors ("CAM") parole process, which reunites parents who are already in the United States with their children who remain behind.

4.     In addition, this lawsuit challenges the Trump administration's attempts to block individuals paroled through these and other processes from seeking alternate legal statuses created and authorized by Congress.

5.     On January 20, 2025—Inauguration Day—President Trump issued Executive Order 14165, entitled "Securing Our Borders," which directed the Secretary of Homeland Security to terminate all "categorical parole programs," explicitly referencing the CHNV parole processes.

6.     Also on that day, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), in which he authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute." Acting Secretary Huffman directed all DHS staff to implement the new agency policy under which this historically common use of the parole authority is unlawful.

7.     On the basis of Acting Secretary Huffman's conclusion that parole programs are unlawful, DHS has stopped considering parole applications through these processes, as well as requests on behalf of people already here for re-parole or for parole-in-place through the Military Parole-in-Place process. In addition, on March 21, 2025, DHS made public a Federal Register

3

Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," which was eventually published in the Federal Register on March 25, 2025 (the "March 25 FRN"), and "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." The March 25 FRN further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary."

8.    Also based on Acting Secretary Huffman's erroneous legal conclusion, USCIS has also unlawfully suspended the adjudication of all requests for immigration benefits (including applications for work authorization as well as asylum, Temporary Protected Status ("TPS"), or other status adjustments) for individuals paroled through "categorical" humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

9.    Weeks after this unlawful suspension was imposed, Acting Deputy Director of USCIS Andrew Davidson sought to justify it in a post-hoc February 14, 2025 memorandum (the "February 14 Davidson memorandum"),  That memorandum justified the suspension as to the U4U, CHNV, and FRP processes based solely on the "potential" that the "vetting" that the beneficiaries of these parole processes underwent in connection with their parole applications was not identical to what was in effect on January 19, 2021—the last day of President Trump's first term. This so-called administrative pause may also apply, at a minimum, to the OAW and MPIP processes. There is no authority for this suspension, and it is contrary to the laws Congress enacted governing those immigration benefit applications, in addition to being arbitrary and capricious.

10.    At the same time that it has terminated these humanitarian parole processes for their alleged illegality and suspended the ability of parolees to obtain forms of immigration relief to

4

which Congress has made them entitled, DHS has also taken aggressive action—challenged separately—to make it easier to deport individuals paroled through these processes as quickly as possible.

11.    Such actions are not only illegal, but shockingly callous. Plaintiff Svitlana Doe[1] fled Ukraine following the Russian invasion and bombing of her town. Her son still requires speech therapy to overcome the horrors of war her family witnessed. Plaintiffs Maksym and Maria Doe likewise fled Ukraine, where Maksym heroically helped to rescue over 22,000 Ukrainians and provided humanitarian assistance to over half a million more. Plaintiffs Alejandro, Armando, Ana, and Carlos fled Nicaragua following the torture of a family member at the hands of the state and subsequent political persecution. Plaintiff Andrea Doe's husband, a political prisoner in Nicaragua, was brought to the United States *by* the United States government, which then asked him and others similarly situated to use the CHNV parole program to achieve reunification with the family members they had been forced to leave behind.  Plaintiff Omar Doe—at great risk to himself and to his family—faithfully served alongside the U.S. military in Afghanistan for over eighteen years before being evacuated by the military following the country's fall to the Taliban. Plaintiff Valentin Rosales Tabares was on the cusp of reuniting with his daughter and granddaughter, who were approved for Cuban Family Reunification Parole but had not yet been given a travel date, when the Trump administration terminated the FRP process. Plaintiff Adolfo Gonzalez, Jr. has served this country honorably as a First Sergeant in the Army, and Marim Doe continues to serve his country in the Navy, but their MPIP applications for their loved ones are now indefinitely

---

[1] The Court has granted leave for Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Andrea Doe, Marim Doe, Aleksandra Doe, Teresa Doe, and Rosa Doe to proceed pseudonymously, and a motion for four other individual plaintiffs to similarly proceed will be filed imminently.

suspended. Plaintiff Teresa Doe's CAM parole has expired and she is now subject to removal because her application for re-parole is indefinitely suspended, and she fears being deported and removed from all her family. And Plaintiff Rosa Doe was about to reunite with her fourteen-year-old daughter and her father through the CAM parole process, but now does not know when she will see them again.

12.     The individuals able to obtain parole through U4U, CHNV, OAW, FRP, and CAM trusted that the U.S. government would help protect them from harm. They waited—even amid active war and persecution—to enter the United States until they had a legal avenue to enter the country. And now CHNV parole beneficiaries have had their grants of parole and work authorization prematurely cut short. All humanitarian parole beneficiaries have been cut off from the immigration relief Congress made available to them. Defendants are treating similarly our Afghan allies who arrived through OAW and individuals closely related to members of our Armed Forces.

13.     Individual Plaintiffs, including Putative Class Representatives on behalf of themselves and similarly situated persons, and Organizational Plaintiff Haitian Bridge Alliance ("HBA"), seek a declaration that humanitarian parole processes like U4U, CHNV, OAW, FRP, MPIP, and CAM are lawful; a preliminary and permanent injunction prohibiting DHS from continuing to apply its unlawful construction of the parole statute; a preliminary and permanent injunction prohibiting DHS from unlawfully and categorically revoking or otherwise placing conditions on grants of parole and work authorization to parole beneficiaries; and vacatur of agency actions taken pursuant to the agency's erroneous understanding of the law.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

Appx-0447

15.     Venue is proper in this District because Plaintiffs Svitlana Doe and Wilhen Pierre Victor reside in this District.  *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

16.     Plaintiff **Svitlana Doe** is a citizen of Ukraine. Svitlana fled Ukraine in November 2024 following Russia's unprovoked and unjustified invasion into the country. Svitlana is the mother to a young boy with celiac disease, for whom care was difficult in Ukraine even before the war, and close to impossible during wartime. Svitlana, her husband, and her young son narrowly escaped Ukraine in November 2024, and traveled to the United States pursuant to the U4U parole process. Svitlana currently lives in Dover, Massachusetts. She has a pending application for TPS filed in February 2025, which has been indefinitely stalled due to the administration's pause on processing immigration benefits applications for U4U parolees.

17.     Plaintiff **Maksym Doe** is a Ukrainian national living in Brooklyn, New York, with his wife, Maria Doe. After fleeing Kharkiv on the day Russia invaded Ukraine, he and several partners founded a nonprofit organization in Ukraine that began coordinating volunteer efforts to evacuate people from the war-stricken eastern part of the country. They rescued over 22,000 people within the first six months of the war and since then have provided humanitarian assistance to over a half million Ukrainians. Maksym came to the United States through the U4U parole process in April 2023. He and his wife have applied for Temporary Protected Status ("TPS"), and he has also applied for re-parole in September 2024 because his current grant of U4U parole expires in April 2025. Processing these applications has been paused indefinitely due to the February 14 Davidson memo. If that pause remains in effect, Maksym's parole will expire, he will lose his work authorization and his ability to continue his humanitarian work for Ukrainians, and he will be displaced once again.

Appx-0448

18.     Plaintiff **Maria Doe** is a Ukrainian national who currently lives with her husband Maksym in Brooklyn, New York. She and Maksym Doe came to the United States through the U4U parole process with all their possessions packed into two suitcases. Maria was able to apply for U4U re-parole and was granted another two years of parole in January 2025, but she has also applied for Temporary Protected Status and is working with her employer to file an H-1B employment-based visa application soon. Not only will these applications not be processed due to the administration's indefinite hold on processing applications for immigration benefits for parole beneficiaries, but if her parole expires or the administration prematurely terminates it, she will once again be displaced.

19.     Plaintiff **Alejandro Doe** is a citizen of Nicaragua. Alejandro is the brother of Ana Doe and Miguel Doe and currently lives in Gainesville, Georgia. Alejandro fled Nicaragua following the abduction and torture of his father by the Nicaraguan state. In July 2024, Alejandro entered the United States through the parole process for Nicaraguans, a component of the CHNV parole processes. He was sponsored by his cousin, Gabriela Doe. Due to the March 25 FRN, Alejandro's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely stalled due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

20.     Plaintiff **Armando Doe** is a citizen of Nicaragua. Armando is married to Ana Doe and currently lives in Gainesville, Georgia. Armando fled Nicaragua due to increasing political repression and danger stemming from the disappearance of Ana's father by the Nicaraguan government and Armando's work at a digital media company dedicated to democratizing information and documenting government abuses. Armando entered the United States in February

2024, through the CHNV parole process for Nicaraguans. He was sponsored by his wife's cousin, Gabriela Doe. Due to the March 25 FRN, Armando's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

21.     Plaintiff **Ana Doe** is a citizen of Nicaragua. Ana is married to Armando Doe and currently lives in Gainesville, Georgia. She is the sister of Alejandro Doe and Miguel Doe and cousin of Carlos Doe. Ana fled Nicaragua due to the increasing instability, political repression, and danger culminating in her father's capture and torture by the Nicaraguan government, as well as the danger her husband Armando faced working for a digital media company targeted by the Nicaraguan government for the information it published. Ana entered the United States and was granted parole through the CHNV parole process for Nicaraguans in February 2024. She was sponsored by her U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Ana's period of parole, and the associated work authorization, have been prematurely terminated. She also has a pending asylum application, as a derivative under her husband's pending asylum application, which is indefinitely on hold due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

22.     Plaintiff **Carlos Doe** is a citizen of Nicaragua. He is the cousin of Ana Doe and Alejandro Doe, and he currently lives in Gainesville, Georgia. Carlos fled Nicaragua because of the political instability and the fact that the Nicaraguan government was actively persecuting him due to his involvement in protests against the government and was issuing death threats against him and his family. As a result, Carlos went into hiding, where he received more death threats, rendering it unsafe for him to remain in Nicaragua. Carlos entered the United States and was

Appx-0450

granted parole through the CHNV parole process for Nicaraguans in May 2023. He was sponsored by a U.S. citizen family member. Due to the March 25 FRN, Carlos's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

23.     Plaintiff **Miguel Doe** is a citizen of Nicaragua. He is the younger brother of Alejandro Doe and Ana Doe, and he currently lives in Gainesville, Georgia.  Miguel came to the United States to find work so that he could better support himself and his family, including his mother, who he lived with and helped take care of back in Nicaragua. In his home country, it was difficult for Miguel to find stable work that paid decent wages. Miguel entered the United States and was granted parole through the CHNV parole process for Nicaraguans in July 2024. He was sponsored by his U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Miguel's period of parole, and the associated work authorization, have been prematurely terminated, and he will be vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

24.     Plaintiff **Andrea Doe** is a citizen of Nicaragua.  She arrived in the United States in the summer of 2023 with her two young sons to reunite with her husband, Rafael Doe, a former political prisoner from Nicaragua who had been evacuated to the United States by the U.S. government in February of that year.  Andrea Doe and the couple's two young sons joined Rafael in the United States through CHNV parole because the U.S. State Department was asking the evacuated Nicaraguans to use the CHNV parole program to seek reunification with the family members they had been forced to leave behind in Nicaragua.  The whole family then applied for

asylum together. Their application for asylum has been pending with the Asylum Office since December 2023. If that application is not processed, Andrea Doe and the children will be left without protection against removal to Nicaragua. Andrea would be at risk of detention and of losing her children, and the family would face permanent separation, because the Nicaraguan government, upon expelling Rafael and the other passengers on the evacuation flight, stripped them of their Nicaraguan citizenship. Additionally, due to the March 25 FRN, Andrea's period of parole, and the associated work authorization, have been prematurely ended, putting her in an even more vulnerable position.

25.    Plaintiff **Lucia Doe** is a citizen of Venezuela. She lives in St. Augustine, Florida, and she is the sister of Plaintiff Norma Lorena Dus ("Lorena"), who sponsored her to come to the United States on CHNV parole. Lucia left Venezuela because she and her family were experiencing extreme financial hardship there. Lucia's salary in Venezuela was not sufficient to provide for even basic needs like food, rent, and clothing. She entered the United States and was granted parole through the CHNV parole process for Venezuelans in July 2024. Due to the March 25 FRN, Lucia's period of parole, and the associated work authorization, have been prematurely terminated, and she will be vulnerable to imminent deportation in less than a month.

26.    Plaintiff **Daniel Doe** is a citizen from Haiti currently living in Orlando, Florida. Daniel left Haiti because of the continuing danger and gang-led violence in Haiti, particularly in the neighborhoods where he lived. His wife and three-year-old daughter remain in Haiti, with pending CHNV sponsorship applications that will now never be processed. He entered the United States in February 2024 through the CHNV parole process for Haitians. Due to the March 25 FRN, Daniel's period of parole and work authorization have been prematurely terminated, and he will be at risk of being vulnerable to imminent deportation in less than a month. The February 14

Appx-0452

Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

27. Plaintiff **Omar Doe** is an Afghan national living in Omaha, Nebraska. He worked for over eighteen years in different capacities with the U.S. military in Afghanistan, including as an interpreter. He and his wife and five children were evacuated to the United States as part of the U.S. military's withdrawal from Afghanistan in 2021. His application for a Special Immigrant Visa has been pending for almost three and a half years. Because his parole and his work authorization will expire in September 2025, he is also working on filing an asylum application with assistance from a nonprofit. But none of these applications will be adjudicated if the Trump administration's pause on the processing of immigration benefits continues, and Omar fears that he will lose his legal status and be vulnerable to deportation.

28. Plaintiff **Sandra McAnany** is a U.S. citizen who lives in La Crosse, Wisconsin. She is driven by her strong Christian faith to serve as the U.S.-based sponsor for seventeen individuals with active parole status through CHNV—fifteen from Venezuela and two from Nicaragua. They were all approved for two-year periods of parole, and most have applied for asylum based on the fears they have of returning to their countries of origin. Sandra has given much of her time, effort, and money over the last few years supporting her CHNV beneficiaries to safely travel to the United States, reunite with family members already in the country, and find work and settle into their communities. Sandra has four pending CHNV applications as well, for nationals from Cuba, that will now never be processed due to the administration's end to CHNV.

29. Plaintiff **Kyle Varner** is a U.S. citizen and physician who lives in Spokane, Washington. As a long-committed political activist deeply involved in liberal and libertarian movements in Venezuela, he is motivated by his strong moral and political convictions to sponsor

seventy-nine individuals through the CHNV parole processes, most of whom are nationals of Venezuela. Forty-three of his beneficiaries are currently in the United States, and at least twenty-nine have pending applications for asylum, TPS, or other immigration relief that are on pause due to the administration's policies. Over the last few years, Kyle has put immense amounts of time, energy, and money into ensuring that his beneficiaries have what they need, both to travel to the United States and to have a strong footing once they arrived. Kyle also has thirty-two pending CHNV sponsorship applications, including for a Cuban individual and a Nicaraguan individual, that will now never be processed due to the administration's end to CHNV.

30.    Plaintiff **Wilhen Pierre Victor** is a U.S. citizen and healthcare worker who lives in Woburn, Massachusetts. She is the CHNV sponsor for her brother, his wife, and their three children, who are seven, thirteen, and sixteen years old. They arrived in the United States from Haiti in the summer of 2024 and were granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn. Wilhen's application to sponsor her brother for a green card has been pending since 2007, and he has been waiting since then to have another legal pathway to come to the United States. CHNV parole has allowed Wilhen to reunite with her brother for the first time in more than twenty years, and it has allowed Wilhen's brother to find a job for the first time in thirteen years. Wilhen also has two pending applications for CHNV sponsorship of her thirteen-year-old niece (her brother's child) and her fifty-year-old cousin, who experience ongoing threats of extreme violence in Haiti, that will now never be processed due to the administration's end to CHNV.

31.    Plaintiff **Gabriela Doe** is a U.S. citizen and immigrant justice advocate who lives in Tacoma, Washington. She is cousin to Ana Doe, Armando Doe, Alejandro Doe, Carlos Doe, and Miguel Doe, and is the CHNV sponsor to all her cousins except Carlos Doe, who is sponsored

by another family member. The cousins Gabriela sponsored arrived in 2024 and were granted two-year periods of parole. Through the CHNV parole process, Gabriela was able to reunite with her five cousins, whose family faced political repression, danger, and persecution in Nicaragua. Because of the CHNV parole process for Nicaraguans, her cousins have been able to work and support themselves here in the United States and lead more stable, peaceful lives. Through the March 25 FRN, Gabriela's cousins' CHNV parole periods, and associated work authorizations, will prematurely end, subjecting their family to the possibility of separation again and causing Gabriela severe psychological distress knowing her cousins will be at risk of being vulnerable to imminent deportation in less than a month.

32.     Plaintiff **Norma Lorena Dus ("Lorena")** is a U.S. citizen and immigrant justice advocate who lives in West Stockbridge, Massachusetts. She is the CHNV sponsor for her sister, Lucia Doe, who arrived in the United States from Venezuela in July 2024 and was granted a two-year period of parole. The CHNV parole process allowed Lorena and Lucia to reunite with all of their siblings for the first time in six years, and it has allowed Lucia, whose job back in Venezuela did not pay enough for her to cover even her basic needs, let alone the needs of their mother, to become self-sufficient and send money back to their parents as well. This has relieved the financial strain on Lorena and their other siblings, all of whom regularly send money back to their parents to help them survive in Venezuela. The administration's termination of CHNV parole and premature termination of Lucia's two-year grant of parole and associated work authorization will cause severe, unexpected financial burden for Lorena, as well as psychological distress due to her sister becoming vulnerable to imminent deportation.

33.     Plaintiff **Valentin Rosales Tabares** is a U.S. legal permanent resident living in Portland, Oregon. In 2018, he submitted family-based immigrant visa petitions for his wife, son,

and daughter that were quickly approved. His wife and son were issued immigrant visas in 2022 and came to the United States that year to be reunited with him. However, his daughter and her daughter, Valentin's granddaughter, continued to await their immigrant visas in Cuba, where life was extremely difficult. When Valentin was invited by the Department of State to request Cuban Family Reunification Parole for his daughter in November 2024, he immediately submitted a request on her behalf. She was approved in December 2024, but she was not given a travel date before the Trump administration terminated the parole process. Valentin's application for his daughter is now indefinitely on pause. Valentin also applied to sponsor his son's wife and child through the CHNV parole process. Those applications remain pending indefinitely as well.

34.    Plaintiff **Marim Doe** is a U.S. citizen and active-duty member of the U.S. Navy stationed at the U.S. military base in Goose Creek, South Carolina. Marim's father does not have legal status in the U.S., and one of the main reasons Marim joined the military was to help his father obtain legal status through the military parole-in-place process. He wants to provide his father with more job stability and retirement support as he gets older, as well as protection against immigration enforcement, the fear of which has plagued their family. In May 2024, Marim submitted a military parole-in-place application for his father. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

35.    Plaintiff **Adolfo Gonzalez, Jr.** is a U.S. citizen and retired U.S. Army service member who served in the Army for over thirty years. He lives in Zapata, Texas with his wife and sixteen-year-old daughter. Adolfo's wife is a national of Mexico and does not have legal status in the United States, a fact that caused him constant anxiety and fear when he was in active duty and had to be away from home and apart from her and his daughter. In March 2024, Adolfo submitted an application for military parole-in-place for his wife so that she could have a path to permanent

Appx-0456

residency and citizenship in the United States. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

36.    Plaintiff **Aleksandra Doe** is a national of Ukraine living in San Jose, California with her husband and five-year-old son. They were granted parole through the Uniting for Ukraine parole process around April 2023. Her and her family's current authorized period of parole and associated employment authorization expires on March 29, 2025. She and her son have pending TPS applications, which she filed in December 2024. She and her family also have pending adjustment of status applications, which they were able to submit because they applied for the diversity visa lottery in October 2023 and were selected in May 2024 to move forward in the process for the Fiscal Year 2025 lottery. Aleksandra had an interview scheduled for her adjustment of status application in February 2025, but a few days before her appointment, she received a notice from USCIS notifying her that her interview had been cancelled. Because of the administration's suspension of adjudication of all immigration benefit applications for people like Aleksandra and her family, who came to the United States through U4U, Aleksandra's applications for TPS and adjustment of status are now indefinitely on hold.

37.    Plaintiff **Teresa Doe** is a national of El Salvador who has lived in Las Vegas for the last eight years with her husband and four children, one of whom is a U.S. citizen and two who are lawful permanent residents. After many years of separation from her husband and three of her children, Teresa was finally able to travel to the United States and be reunited with them when her son was approved for the CAM parole process. The two of them came to the United States in 2017 and were granted parole for an initial period of two years. After that, Teresa has consistently applied for and received CAM re-parole, which has allowed her husband to work and support their family while she takes care of their children and grandchildren. Her current period of parole

Appx-0457

expired on March 13, 2025, and her application for re-parole remains pending. Because of the administration's termination of CAM, this application is indefinitely on hold, and Teresa faces the possibility of being torn away from her family again.

38.     Plaintiff **Rosa Doe** is a national of Honduras living in Austin, Texas with her four U.S. citizen daughters. Rosa has one other daughter who is fourteen years old living in Honduras, along with Rosa's father. Rosa came to the United States in 2013. She was trafficked into the United States and is the survivor of rape and other violence in Honduras. Rosa is a U-visa applicant with deferred status while her U-visa application remains pending. In June 2023, she filed an Affidavit of Relationship through the CAM parole process to reunite with her fourteen-year-old daughter and elderly parents. Sadly, Rosa's mother died in October 2024 before Rosa was able to see her again. Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. In November 2024, they both received conditional approval letters for their parole applications. Rosa was planning to purchase their flights to come to the United States in January 2025, but at this point Rosa was no longer able to get updates on their case to facilitate purchasing the tickets for her daughter and father. In early March 2025, Rosa was able to get in contact with the International Organization for Migration and was told that it would take more time for her daughter and father to be able to travel. However, because of the administration's termination of the CAM parole process, Rosa's daughter and father will not be able to travel to the United States, which would ensure Rosa's daughter's safety from the danger she faces in Honduras.

39.     Plaintiff **Haitian Bridge Alliance ("HBA")** is a Haitian-led, Haitian Creole-speaking grassroots and community-based nonprofit organization incorporated in California. HBA was formed in early 2016 to meet the needs of an influx of Haitian and other Black migrants that came to the U.S.-Mexico border seeking humanitarian protection as conditions in their home

Appx-0458

countries deteriorated. HBA's core organizational activities have included, since the inception of

the CHNV parole process for Haiti, providing direct services and support to thousands of CHNV

sponsors and parolees from Haiti. These services include legal consultations for CHNV parolees,

assistance completing CHNV sponsorship applications, humanitarian and integration support, and

other aid. Defendants' termination of the CHNV parole processes, premature termination of grants

of CHNV parole, and suspension of processing immigration benefit applications filed by CHNV

parolees have directly interfered with these core activities.

40.     Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S.

Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate

on January 25, 2025. Until she was confirmed, Benjamine C. Huffman served as the Acting

Secretary of Homeland Security from the time when President Trump appointed him to that

position on January 20, 2025.

41.     Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of

Immigration and Customs Enforcement ("ICE"), a component agency of DHS. Prior to Mr. Lyons,

Caleb Vitello was the Acting Secretary; he was appointed to that position by President Trump on

January 20, 2025. Mr. Vitello was reportedly "reassigned" to a different role on or about February

21, 2025, due to President Trump's frustration that ICE had not arrested more immigrants in the

first few weeks of his second term, but he apparently stayed in that role until Secretary Noem

announced Mr. Lyons as the next Acting Director on March 9 .

42.     Defendant Pete R. Flores is sued in his official capacity as the Acting

Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS. Mr.

Flores has been the Acting Commissioner of CBP since January 20, 2025, when he was appointed

to that position by President Trump.

18

43.     Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS. According to USCIS's website, Ms. Scott has been in this position since February 9, even though it was previously and widely reported that Andrew Davidson, the Acting Deputy Director of USCIS, would become the Acting Director of USCIS on that same date via appointment by President Trump.

44.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

45.     Parole is a temporary form of permission for a noncitizen to be in the United States. Parole does not itself lead to any other form of immigration status, although while here on parole, nothing prevents parolees from applying for any other immigration status for which they are eligible. Many parole recipients have applied for asylum pursuant to 8 U.S.C. § 1158, temporary protected status pursuant to 8 U.S.C. § 1254a, or other forms of status adjustments. Under longstanding regulations, many parolees can apply for employment authorization.

46.     Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

47.     Congress has never defined "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or delineated with further specificity the circumstances under which

19

the Executive may grant parole, apart from what is encompassed by the clause, "except as provided in subparagraph (B) or in section 1184(f) of this title," discussed more below.

48.    The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "[t]he Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

49.    Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision until 1980.

50.    Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—i.e., by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons – with applications of individuals therein considered on a case-by-case basis.

51.    The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution.

52.    There is no comprehensive accounting of "programmatic" or "categorical" uses of parole, but in the approximately seventy years since this original such use by the Eisenhower Administration, there have been at *least* another 125 categorical parole programs, usually with multiple parole programs operating at the same time throughout that period, and during every single Administration, including the first Trump Administration.

Appx-0461

53.    In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees.

54.    In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified in subparagraph (B), 8 U.S.C. § 1182(d)(5)(B), prohibiting the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

55.    The conference report adopted by both chambers accompanying the final legislation explained that § 1182(d)(5)(B) "does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."

56.    Similarly, since it was enacted, the federal officials exercising the parole authority have consistently interpreted § 1182(d)(5)(B)'s restriction as applying only to noncitizens who have already been determined by the U.S. government to be refugees.

57.    Congress next amended the parole statute in 1990 to prohibit granting parole to noncitizens to perform certain work aboard a vessel or aircraft on an air carrier during a labor dispute where there is a strike or lockout unless the parole "is necessary to protect the national security of the United States." Pub. L. No. 101-649, § 202, 104 Stat. 4978, 5014 (1990) (codified at 8 U.S.C. § 1184(f)); *see also* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided . . . in section 1184(f) of this title.").

58.    Congress last amended the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

Appx-0462

59.     IIRIRA made just one textual change to the parole statute, striking from § 1182(d)(5)(A) the language allowing the Attorney General to grant parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with language allowing the Attorney General to grant parole "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

60.     In addition to that textual change to the parole statute, IIRIRA contained three other provisions related to exercises of the parole authority. In one, Congress required that the Attorney General annually report to the Judiciary Committee of each chamber the "number and categories of [noncitizens] paroled into the United States."

61.     In another section of IIRIRA, Congress directed that parolees who had been in the United States at least a year and had not become lawful permanent residents must be counted against per-country numerical caps on family-sponsored immigration.

62.     Finally, IIRIRA also directed the Attorney General to give green cards to Polish and Hungarian noncitizens who had been paroled into the United States through a categorical parole program that operated over a roughly two-year period ending at the end of 1991.

63.     As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee criticized the "categorical" use of parole and asserted that such use of the parole authority was *ultra vires*. It therefore proposed to narrow the substantive grounds on which parole could be granted to specify that the only "humanitarian reason" that parole could be granted involved medical emergencies, and the only "public benefit" that would warrant parole involved assisting U.S. law enforcement.

22

64.     Before the bill was brought to the House floor, however, the Judiciary Committee's language restricting parole was removed, and the legislation that ultimately was signed into law as IIRIRA left undefined the substantive criteria on which parole could be granted.

65.     Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created and administered parole programs to allow the parole of individuals within broadly defined classes, for example:

- Cuban and Haitian beneficiaries of approved family-based immigration petitions awaiting visas (2007-17; 2021-present);

- Haitian children orphaned by the 2010 earthquake in that country (2010);

- Cuban medical professionals in third countries conscripted by the Cuban government (2006-2017);

- Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam for business or pleasure (2009-19);

- family members of U.S. military service members (2013-present);

- minor children from El Salvador, Guatemala, and Honduras with family in the United States (2014-17; 2021-present); and

- family members of Filipino World War II veterans (2016-present).

66.     Consistent with ratifying the view that categorical parole was authorized, both before and after the passage of IIRIRA—and in addition to in IIRIRA itself, as discussed above regarding Polish and Hungarian parolees—Congress has repeatedly passed legislation extending various benefits and services to individuals who obtained parole via a "categorical" parole process, in some cases making benefits available prospectively to individuals who would in the future be paroled pursuant to such processes. For instance, most recently, Congress enacted legislation extending resettlement support services (normally provided only to refugees) to Ukrainians paroled under U4U and Afghans paroled under OAW, for the duration of their period of parole and any re-parole.

23

67.    The parole authority has enabled administrations to serve urgent humanitarian needs and advance the significant public benefit of promoting the national interest through achieving humanitarian, human rights, anti-trafficking, foreign policy, and regional security goals, among others.

### Uniting for Ukraine ("U4U")

68.    On February 24, 2022, Russia invaded Ukraine, beginning a war that continues to this day.

69.    In the weeks following Russia's invasion, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum . . . .").

70.    At its peak, CBP encountered up to 1,300 Ukrainians per day along the southern border; that surge strained its operations and required diverting personnel to increase processing capacity.

71.    Most Ukrainians who arrived at the southern border during this period—some 20,000 people—were paroled into the country, due at least in part to a lack of detention space. Most received an initial grant of one year of parole.

72.    Every Administration, including the first Trump Administration, has used parole in this way to process applicants for admission, particularly when there is a lack of detention space.

73.    In response to this surge of Ukrainians at the border and the accompanying strain on CBP, President Biden announced in March and April 2022 a variety of humanitarian commitments to the Ukrainian people, including establishing the Uniting for Ukraine parole

24

process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022). The Federal Register Notice for the U4U parole process cites destruction to civilian infrastructure, ongoing concerns about food security, a lack of medicine and health supplies, rampant sexual exploitation and abuse, continuing violence, and large-scale displacements of Ukrainians as reasons for the establishment of the parole process.

74.     Uniting for Ukraine is a process by which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered, on a case-by-case basis, for a grant of parole, typically for two years.

75.     U4U was created so that eligible Ukrainians could request consideration for parole without having to travel to Mexico and present at the southern border, which can be dangerous for the individuals and further strains CBP resources.

76.     Permitting Ukrainians to apply in advance also benefitted the U.S. government by making it possible to conduct security checks on the individuals before they travel.

77.     Uniting for Ukraine applicants who meet the eligibility requirements, pass security checks, and warrant a favorable exercise of discretion are granted authorization to travel directly (via flight) to the United States, where they are inspected and undergo further security checks before CBP makes the final determination of whether to grant parole.

78.     There is no fee associated with initial applications for parole under Uniting for Ukraine, but applicants must comply with all pre-travel requirements—including public health requirements—at no cost to the United States and likewise must pay for and arrange their own travel.

79.     Once approved to travel to the United States, prospective U4U parolees fly directly to an airport in the interior of the United States, which avoids the disorderly process at the border—

25

and concomitant impact on border communities and states—that was otherwise occurring because of Russia's invasion of Ukraine.

80.     Like the U4U parolees, potential U4U sponsors undergo security checks; they also must prove their own lawful status and that they have sufficient financial resources to receive, maintain, and support the intended beneficiaries for the duration of their parole period.

81.     In February 2024, USCIS announced the process by which U4U parolees could apply for re-parole, once they had less than six months left on their initial grant of parole. In addition to meeting other eligibility requirements, applicants for re-parole under U4U had to pay a fee or obtain a waiver of fees.

82.     Per legislation enacted by Congress in May 2022 and April 2024, Ukrainians paroled into the United States between February 24, 2022, and September 30, 2024, are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program—the same services to which OAW parolees are entitled, as discussed below—for the duration of their period of parole and any re-parole.

83.     From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by CBP at the southern border dropped *by more than ninety-nine percent*. There were even fewer encounters in fiscal year 2024 than in fiscal year 2023.

84.     Most U4U parolees have claims to other forms of immigration relief that would permit them to stay in the United States permanently, including family-based immigration visas and TPS.

85.     These paths to permanent immigration status for U4U parolees, however, generally take years to navigate due to how long it takes the Defendant agencies to process the immigration benefit applications.

86.     Currently, Ukrainians who have continuously resided in the United States since August 16, 2023 (which would include some U4U parolees) are eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. TPS for Ukrainians is currently set to expire (if not extended) on October 20, 2026.

87.     As of the third anniversary of Russia's invasion of Ukraine, approximately 7 million Ukrainians remain externally displaced. Approximately 200,000 of them are in United States by way of parole. Most Ukrainians here on parole had some preexisting tie to the United States (such as family), which is why they came here for refuge when they fled their home country.

**Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV")**

88.     Over the last several years, a significant number of Cubans, Haitians, Nicaraguans, and Venezuelans have been displaced due to natural disasters, economic hardship, and political strife.

89.     Today, there are approximately eleven million displaced nationals of those four countries, most of them Venezuelan; twenty percent of Venezuela's population is displaced.

90.     Due to events internal to each country, emigration from these four countries accelerated remarkably from 2020 to 2022.

91.     Per its data, CBP encountered at the southern border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2020.

92.     Per its data, CBP encountered at the southern border more than 181,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2021.

93.     Per its data, CBP encountered at the southern border more than 600,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2022—comprising more than forty percent of all migrants CBP encountered at the border that year.

Appx-0468

94.     The marked increase in the number of nationals of these four countries arriving at the southern border put considerable strain on CBP operations, causing it to divert resources and to provide sub-standard care to those migrants.

95.     As with the Ukrainians coming to the southern border discussed above, many (if not most) of the Cubans, Haitians, Nicaraguans, and Venezuelans who came to the border during this period were paroled into the United States.

96.     In October 2022, the Biden Administration created a parole process for Venezuelans. DHS, *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the success of the Venezuelan parole process, the Biden Administration expanded the parole process for Venezuelans, DHS, *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1279 (Jan. 9, 2023); and created similar parole processes for nationals of Cuba, Haiti, and Nicaragua, DHS, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023).

97.     These Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes were explicitly modeled on the Uniting for Ukraine parole process; like U4U, the rigorous application processes for CHNV parole required passing security checks, having a U.S.-based financial supporter with lawful status who has proven their ability to remain committed to providing for the parolee for the duration of their two-year period of parole, and meeting all pre-travel requirements. The travel itself must be at no cost to the United States.

98.     DHS explained in creating the CHNV parole processes that the processes provide significant public benefits by improving vetting for national security and public safety, reducing

28

the strain on CBP resources and personnel, and minimizing the impact on the United States of irregular migration from these countries.

99.     DHS also explained that the parole processes address urgent humanitarian concerns by offering a safe and legal pathway out of dangerous conditions in these four countries as an alternative to the perilous overland journey to the U.S. border.

100.     The United States-Mexico border is the world's deadliest land migration route. According to the International Organization for Migration, more than 800 people died attempting to cross the U.S.-Mexico border in 2021; more than 750 in 2022; more than 730 in 2021; but fewer than 500 in 2024.

101.     DHS also explained in creating the CHNV parole processes that they further important foreign policy objectives, including the collaborative management of migration in the hemisphere.

102.     An important aspect of the CHNV parole processes is that Mexico agreed—for the first time ever—to accept the removal of Cubans, Haitians, Nicaraguans, and Venezuelans who do not follow the CHNV parole processes, which thereby makes them presumptively ineligible for asylum in the United States.

103.     For years, the United States has had difficulty removing nationals of those four countries because of their home countries' refusals to accept the deportees.

104.     As part of CHNV, Mexico agreed to accept up to 30,000 (combined) deported nationals of these countries each month.

105.     The CHNV processes allowed up to 30,000 parolees from the four countries combined to come to the United States each month.

106.    The demand for CHNV parole was extraordinary; USCIS received more than 1.5 million applications from potential sponsors in just the first three or four months that the processes were available.

107.    Per legislation enacted by Congress, Cubans and Haitians paroled into the United States are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program.

108.    Per the Cuban Adjustment Act, as amended, Cubans paroled into the United States can become lawful permanent residents after being in the country for a year.

109.    Per a CBP statement on January 14, 2025, CBP encounters of CHNV nationals attempting to cross the southern border unlawfully were down ninety-one percent since the CHNV processes were created.

110.    Similarly, following a bench trial, Judge Tipton of the Southern District of Texas held that the State of Texas did not have standing to challenge the CHNV processes because these processes led to a decrease in Texas's claimed injuries by reducing the overall number of migrants from these countries coming to Texas, which was the source of Texas's claimed injuries.

111.    Most CHNV parolees have claims to immigration relief that would permit them to stay in the United States, including family-based immigration visas and asylum.

112.    These paths to permanent immigration status for CHNV parolees, however, generally take years to navigate recently due to how long it takes the defendant agencies to process the immigration benefit applications.

113.    For example, although Congress has directed DHS to issue final decisions on asylum claims within 180 days of receiving each application absent "exceptional circumstances,"

8 U.S.C. § 1158(d)(5)(iii), most asylum applicants are currently waiting years to get an initial decision.

114.    Currently, Venezuelans who have continuously resided in the United States since July 31, 2024 (including some Venezuelans who received parole through CHNV) are eligible for TPS; approximately 33,600 CHNV parolees from Venezuela have been granted TPS.

115.    On January 10, 2025, Secretary of Homeland Security Ali Mayorkas extended TPS for Venezuelans until October 2026, but on January 28, 2025, Secretary Noem purported to vacate that extension and then, on February 1, 2025, Secretary Noem decided to terminate one of the two TPS designations for Venezuelans. Secretary Noem's February 1 decision was based on her conclusion that the continued presence of the approximately 350,000 Venezuelans with TPS under that designation is contrary to the national interest of the United States. DHS, *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025). Secretary Noem's unprecedented vacatur of the TPS extension for Venezuelans is being separately litigated in multiple cases on the ground (among others) that the TPS statute does not authorize such actions.

116.    Currently, Haitians who have continuously resided in the United States since June 3, 2024 (including some Haitians who received parole through CHNV) are eligible for TPS. In June 2024, Secretary Mayorkas extended TPS for Haitians until February 3, 2026, but on February 20, 2025, Secretary Noem again acted in an unprecedented fashion by purporting to reduce the time remaining for Haitian TPS by six months, such that it now expires on August 3, 2025. DHS, *Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 Fed. Reg. 10511 (Feb. 24, 2025).

Appx-0472

117. Approximately 600,000 Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

### Operation Allies Welcome ("OAW")

118. Operation Allies Welcome grew out of the U.S. military's chaotic 2021 withdrawal from Afghanistan.

119. As Afghanistan's military and government quickly fell to the Taliban when the U.S. military withdrew, the U.S. government hastily evacuated approximately 124,000 people from Afghanistan, mostly on military cargo jets. Evacuees included U.S. citizens and lawful permanent residents, nationals of allied countries, and Afghans whose lives were at risk due to their service to the United States (such as interpreters).

120. After medical, security, and other screenings in third countries, approximately 75,000 Afghans were eventually brought to the United States on parole through OAW.

121. Most OAW parolees were (and remain) eligible for a congressionally-created Special Immigrant Visa ("SIV") based on having provided "faithful and valuable service" employed by or on behalf of the U.S. Government or the International Security Assistance Force or a successor mission in certain capacities in Afghanistan.

122. Many other OAW parolees are eligible for other forms of immigration relief—like family-based immigrant visas and asylum—that would likewise give them permanent lawful status in the United States.

123. These paths to permanent immigration status for OAW parolees, however, generally take years to navigate, due mostly to how long it takes the defendant agencies to process the immigration benefit applications. The federal government has been subject to a class-wide injunction against unreasonable delays in adjudicating Afghan SIV applications since early 2020

Appx-0473

and a similar class-wide settlement agreement addressing the unreasonable delays in adjudicating asylum applications of Afghan OAW parolees since September 2023.

124.    In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, Public Law 117-43. Among other things, it instructed DHS to adjudicate asylum applications filed by OAW parolees expeditiously, and to issue final decisions within 150 days of receiving each application, absent "exceptional circumstances."

125.    That Act also made OAW parolees—including those who had yet to be paroled— eligible for resettlement support services typically provided to refugees resettled in the United States through the U.S. Refugee Admissions Program until the later of March 31, 2023, and the end of their parole term. Those services include cash and medical assistance, employment preparation, job placement, and English language training. That Act also appropriated supplemental funds for USCIS and Health and Human Services to carry out these directives.

126.    To date, approximately 20,000 OAW parolees have been granted asylum; fewer than 100 parolees' asylum applications have been denied.

127.    Currently there are approximately 1,300 OAW parolees with pending asylum applications; on average, those applications have been pending for more than 600 days.

128.    Afghans who have continuously resided in the United States since September 20, 2023 (including Afghans brought here through Operation Allies Welcome) are currently eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. Unless extended by the Secretary of Homeland Security, however, TPS for Afghans will expire on May 21, 2025.

129.    In 2023, the federal government determined that "Afghans paroled under Operation Allies Welcome ("OAW"), or those paroled then subsequently granted Temporary Protected

33

Status ("TPS"), could request U.S. Government-supported family reunification support for their spouses and unmarried children under 21 years of age" who remain physically present in Afghanistan.

130.    Afghans paroled through OAW were initially given two-year grants of parole. There was no formal application process for initial grants of parole through OAW, but in June of 2023, DHS announced a re-parole process for OAW parolees, under which they may apply for an extension of up to two years.

131.    Globally, approximately 11 million Afghans are currently displaced due to the conditions in their home country, most of them in Iran (4.5 million) and Pakistan (3.1 million). Fewer than 50,000 Afghans are in the United States on current grants of parole by virtue of OAW.

### Family Reunification Parole ("FRP")

132.    Ever since the George W. Bush administration established a Cuban Family Reunification parole process in 2007, the United States has had country-specific family reunification parole processes that allow the beneficiaries of approved I-130 petitions for family-based immigrant visas to be paroled into the United States. The grant of parole allows these beneficiaries to reunite with their sponsoring family member in the United States while they wait for their immigrant visa to become available.

133.    Under the family-based immigrant visa system that Congress has devised, a U.S. citizen or lawful permanent resident must first file a petition (Form I-130, "Petition for Alien Relative") to establish that they have a family relationship with a relative abroad that makes the relative eligible for a family-based immigrant visa. Once that petition is approved, the relative abroad must then apply for an immigrant visa—but because family-based visas are distributed to eligible applicants through a complex system of queues and country-specific caps, an intending

immigrant must wait in line—often for years, or even decades—before he or she may apply to receive it. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).

134.    The family reunification parole processes allow a U.S. citizen or lawful permanent resident with an approved I-130 petition to sponsor their family member abroad for parole into the United States. Instead of having to wait abroad, often in precarious situations, for an immigrant visa to become available, a noncitizen family member who receives parole may reunite and be together with their sponsor in the safety of the United States while waiting for their immigrant visa to issue.

135.    The Federal Register Notice for the original Cuban Family Reunification parole process explained that the process "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States."

136.    Since the creation of the Cuban Family Reunification parole process in 2007, the United States has subsequently adopted similar processes for nationals of Haiti (in 2014) and Colombia, El Salvador, Guatemala, Honduras, and Ecuador (in 2023). The processes for Cuba and Haiti were also modernized in 2023.

137.    The Federal Register Notices for these more recently established family reunification parole processes each explain that these processes provide significant public benefits by promoting family reunification, a central purpose of the INA, and by deterring irregular migration, reducing strain on DHS resources at the border, addressing root causes of migration

Appx-0476

through remittances sent by parolees and furthering important foreign policy goals in regional migration management.

138.    For each of the Family Reunification parole processes, qualifying sponsors must first receive an invitation from the Department of State or USCIS before they can apply to sponsor their family member abroad. The sponsorship application requires U.S.-based sponsors to show that they can financially support their parole beneficiaries during their parole period.

139.    If the sponsorship application is approved, the beneficiary will receive advance authorization to travel to the United States. The beneficiary must travel to the United States by commercial airline within 90 days of receiving their travel authorization. At the Port of Entry, CBP screens the beneficiary, including administering an additional fingerprint biometric vetting, and grants parole, if warranted, on a case-by-case basis.

140.    Family Reunification Parole beneficiaries generally receive a three-year grant of parole and can request employment authorization while they wait for their immigrant visa to become available. When a visa does become available, they can file for adjustment of status to lawful permanent residence, although they must be independently eligible for adjustment of status; the grant of parole does not automatically qualify or otherwise indicate qualification for adjustment of status.

141.    Reliable statistics regarding the number of individuals paroled through the Family Reunification Parole processes are not publicly available.

### Military Parole-in-Place ("MPIP")

142.    The Obama administration established a Military "Parole in Place" ("Military PIP") process through a USCIS Policy Memorandum that it adopted in late 2013 (the "2013 Memorandum") to formalize a practice initiated in 2007. Under the Military PIP process, active-duty military personnel, selected reserve members, and veterans can apply to sponsor for parole

36

their spouses, children, and parents who are already physically present in the United States without inspection or admission. The grant of "parole in place"—so named because the sponsored family members are already in the country—enables the immediate family members of U.S. military personnel to become eligible to adjust status in the United States and thus to become lawful U.S. permanent residents.

143.    The first instance of granting military parole in place occurred in 2007, when after significant media coverage and public pressure, DHS Secretary Michael Chertoff ordered the parole in place of a military spouse who was facing deportation while her U.S. military husband was missing in action in Iraq.

144.    Military families subsequently began to seek humanitarian parole under the INA's parole provision, but doing so was an *ad hoc* process, with no clear guidance from the military or from USCIS about how to apply, and adjudications were inconsistent. Parole was granted on a discretionary basis to military family members, but only in about one in every three cases. In a 2010 letter to DHS Secretary Janet Napolitano, a coalition of 18 Republican and Democratic Members of Congress urged the Secretary to "use all the power at your disposal" to "address the immigration needs of our soldiers," citing the example of a U.S. army lieutenant who refrained from volunteering for combat deployment for fear of losing his wife to deportation.

145.    In establishing the Military Parole in Place process, the 2013 Memorandum's stated purpose was to "ensure consistent adjudication of parole requests" made by U.S. military service members.

146.    The Memorandum noted that "[m]ilitary preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected

37

Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents, and children."

147.    The Memorandum similarly noted that "our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them."

148.    Noting that parole is one of the "discretionary tools" available to "minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents, and children of military members," the Memorandum amended the USCIS Adjudicator's Field Manual to advise that "parole in place would generally be an appropriate exercise of discretion" for the spouse, child, or parent of a U.S. military servicemember, because the fact that the intended parole beneficiary is an immediate family member of a servicemember "ordinarily weighs heavily in favor of parole in place."

149.    Amid public reports in 2019 that the first Trump administration was considering eliminating the Military Parole in Place process, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."

150.    Reliable statistics regarding the number of individuals who receive Military Parole in Place are not publicly available.

Appx-0479

### Central American Minors ("CAM")

151.    CAM was created in 2014 to permit certain nationals of the Northern Triangle countries of El Salvador, Guatemala, and Honduras who are lawfully present in the United States to request that their children still in their home countries be considered for refugee status and humanitarian parole so that the families could be reunited.

152.    CAM's creation was prompted by a surge in unaccompanied children from the Northern Triangle countries coming to the U.S.-Mexico border.

153.    In addition to family reunification, the CAM program was intended to create a safe and lawful pathway toward family reunification to disincentive children making the overland journey to the southern border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS.

154.    In 2017-18, DHS under the first Trump Administration sought to terminate the parole portion of CAM based on its discretion. In a subsequent lawsuit, the district court held that DHS acted arbitrarily and capriciously in terminating CAM and mass rescinding 2,714 conditional grants of parole to individuals still in their home countries without considering their reliance interests.

155.    In 2018, DHS ultimately agreed to finish processing those individuals' parole applications, which it has not yet completed.

156.    DHS under President Biden restarted CAM in March 2021 and then expanded the eligibility criteria in June of that year, which were again adjusted in 2023.

157.    CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

**Summary Termination of Humanitarian Parole Processes**

158.    During the 2024 presidential campaign, Donald Trump frequently criticized the aforementioned parole processes, promising as early as November 2023 that he would end them on "day one" of his second term as President.

159.    As a candidate and as the current President, Donald Trump has denigrated the CHNV parolees as "illegal," notwithstanding their lawful grants of parole.

160.    On the day he was inaugurated—January 20, 2025—President Trump issued Executive Order 14165, entitled "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security to terminate all so-called "categorical parole programs," specifically naming "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans'" as one the Secretary must terminate.

161.    In another executive order signed that day—Executive Order 14159, entitled "Protecting the American People Against Invasion"—President Trump directed the Secretary of Homeland Security (among others) to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole."

162.    And in yet another order signed that day—Executive Order 14161, entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats"—President Trump ordered the Secretary of Homeland Security "to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible," which should be "consistent" with the "vetting

40

and screening standards" that were in effect on January 19, 2021—the last full day of President Trump's first term in office.

163.    Also on January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" to the heads of ICE, CBP, and USCIS. Upon information and belief, this memorandum has not yet been made public.

164.    In the January 20 Huffman memorandum, the acting secretary authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute."

165.    Although fewer than 800 words, the January 20 Huffman memorandum contains multiple errors of law beyond its conclusion that "categorical parole programs" like U4U, CHNV, OAW, FRP, MPIP, and CAM are unlawful.

166.    For example, in an attempt to equate lawfully present parolees with "illegal aliens," the memorandum claims that noncitizens who are paroled into the United States are "inadmissible aliens," have been "found inadmissible," and, after their parole has been terminated, "must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible."

167.    But that contention—that parolees are necessarily inadmissible—is wrong. The parole statute allows inadmissible noncitizens to come to the United States, but a grant of parole does not require or necessarily involve a finding of inadmissibility.

168.    The January 20 Huffman memorandum also erroneously describes the limitation on parole enacted as part of the Refugee Act, discussed *supra*, that is codified at 8 U.S.C. § 1182(d)(5)(B). The memorandum claims that the limitation in § 1182(d)(5)(B) means that "it is

Appx-0482

generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad" as well as "aliens found to have prima facie asylum claims who are being allowed into the United States to await adjudication of those claims."

169.    This interpretation departs from every prior Administration's understanding of § 1182(d)(5)(B), which is that it applies to noncitizens who already have been determined to be refugees pursuant to the procedures created by the Refugee Act—and *not* to those who merely have or could have claims to humanitarian relief.

170.    This interpretation also departs from past practice. Prior to being paroled into the country, for example, a significant number of Afghan OAW parolees had pending applications for refugee status filed abroad. Parole was used because those applications would have taken years to be adjudicated.

171.    Even more starkly, every Administration since at least the 1990s, including the first Trump Administration, has paroled noncitizens found to have prima facie asylum claims into the United States to await adjudication of those claims. The Supreme Court held that this is a permissible use of the parole statute in *Biden v. Texas*, 597 U.S. 785 (2022).

172.    Acting Secretary Huffman's memorandum also misrepresents the statutory parole criteria by adding words that appear nowhere in the statute. Per the statute, parole can be granted "for urgent humanitarian reasons or significant public benefit," but the memorandum claims instead that parole must "either provide[] a significant public benefit to the American public or permit[] the United States to respond to an urgent humanitarian need."

173.    The January 20 Huffman memorandum directed that "all future actions taken by DHS with regard to the exercise of the parole authority [be] consistent" with the interpretation of the statute laid out in his memorandum.

Appx-0483

174.    Acting Secretary Huffman ended his memorandum with a hedge, claiming that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

175.    In asserting that he was "also implementing this policy as a matter of my discretion to deny parole in any circumstance," Acting Secretary Huffman's memorandum did not specify anything that he considered in arriving at the allegedly discretionary decision to impose the parole policy reflected in his memorandum.

176.    The January 20 Huffman memorandum relied on an erroneous understanding of the parole statute regarding both what the statute authorizes and the nature of the Secretary of Homeland Security's discretionary authority thereunder.

177.    Also on January 20, 2025, Acting Commissioner of CBP Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. The January 20 Flores memorandum expressly supersedes any prior conflicting guidance.

178.    Later that same week, then-Acting Director of USCIS Jennifer Higgins issued a directive (the "January Higgins directive") prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the U4U, CHNV, OAW, or other named parole processes.

179.    On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, OAW, FRP, and CAM,

43

among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

180.    These actions taken by Defendants have, at a minimum, effectively terminated all humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM. Defendants base their actions to terminate these and other humanitarian parole processes, including by refusing to adjudicate pending applications for parole or re-parole through these processes, on their erroneous position that such humanitarian parole processes were and are unlawful.

181.    On March 21, 2025, DHS subsequently made public a Federal Register Notice entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which was officially published on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025). Like the January 20 Huffman Memo, the March 25 FRN asserts that "discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria." 90 Fed. Reg. at 13612. As of its date of publication on March 25, 2025, the March 25 FRN "terminat[es] the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." Id. at 13611.

182.    The March 25 FRN also rescinds all grants of CHNV parole, stating that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." *Id*.

183.    The March 25 FRN asserts that the Notice serves as "Constructive Notice" of the termination of the CHNV parole processes; "is legally sufficient notice to all interested or affected

persons regardless of actual knowledge or hardship resulting from ignorance;" and "satisfies the requirement that DHS provide written notice upon the termination of parole." Id. at 13620.

184.    Like the January 20 Huffman Memo, the March 25 FRN contends that the CHNV parole processes allow "inadmissible" noncitizens into the United States, and that all individuals paroled into the United States under the CHNV parole processes are "inadmissible." 90 Fed. Reg. at 13611, 13612. But a grant of parole does not require or necessarily involve a finding of inadmissibility.

185.    The March 25 FRN offers three main reasons justifying its termination of the CHNV parole processes and its termination of individual grants of parole: that the CHNV parole processes are unnecessary to achieve the current administration's border security goals, 90 Fed. Reg. at 13612; that the "domestic impact of the CHNV parole programs"—namely, "significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs"— "do not warrant continuing to operate these programs," id. at 13614-13615; and that the CHNV parole processes do not advance the current administration's foreign policy goals, *id*. at 13615.

186.    The March 25 FRN further notes that "[e]xpedited removal is available only when an [individual] has not been continuously present in the United States" for at least two years. *Id*. at 13619. As a result, the March 25 FRN justifies the premature termination of individual grants of CHNV parole on the grounds that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal" instead of placing them in expedited removal proceedings.

187.    The expedited removal statute, however, can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal, regardless of how long they have been in the United States. *Id.*

188.    The March 25 FRN confirms Defendants' intent to terminate humanitarian parole processes for their alleged illegality and make it easier to deport individuals paroled through these processes as quickly as possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly [individuals] who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id.* at 13618. The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate." *Id.* at 13619.

**Summary Suspension of Adjudicating Parolees' Immigration Benefits Requests**

189.    During the week of January 20, 2025, then-Acting Director of USCIS Jennifer Higgins prohibited USCIS staff from making any decisions on any request for any immigration benefit—e.g., for asylum, TPS, adjustment of status, a visa, work authorization, etc.—that would benefit individuals who received parole through any humanitarian parole process, such as U4U, CHNV, OAW, FRP, MPIP, CAM, or other named parole processes.

190.    On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum to various USCIS directorates and program offices directing them not to adjudicate immigration benefit requests filed by noncitizens who are or were paroled into the United States under U4U, CHNV, and FRP.

46

191.    The Davidson memorandum was a post-hoc attempt to justify the suspension of benefits adjudication that had started weeks earlier.

192.    Upon information and belief, the February 14 Davidson memorandum has not yet been made public. Media reporting on the memorandum explained that because paroled individuals are only given work authorization and deportation protections that typically last for two years, many such individuals apply for other immigration benefits, including TPS, asylum, and green cards—but under the February 14 Davidson memorandum, officials will no longer be able to process any applications for such programs or any other benefit, if such requests are filed by migrants who arrived in the United States under the parole processes at issue.

193.    The February 14 Davidson memorandum asserted that the suspension of these individuals' benefits requests was based on Executive Order 14161 (discussed above) and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible or consistent with the vetting "baseline" in effect on the last full day of President Trump's first term, stating: "The procedures that the parolees under these categorical parole programs underwent *may* not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161" (emphasis added).

194.    The February 14 Davidson memorandum does not cite any statutory or regulatory authority for suspending adjudication of benefits applications, including benefits for which there is statutory authorization, including asylum (under 8 U.S.C. § 1158), TPS (under 8 U.S.C. § 1254a), other requests to adjust status (such as visas under 8 U.S.C. § 1201), or work authorization (such as under 8 C.F.R. § 274a.12).

195.    The February 14 Davidson memorandum refers to alleged fraud in the CHNV parole processes that DHS detected, investigated, and, where problems were identified, corrected in the summer of 2024. Some of this claimed "fraud" was based solely on the fact that some sponsors, like Plaintiff Kyle Varner, felt compelled and were financially able to sponsor more than twenty beneficiaries—often based on the sponsors' sincerely held religious beliefs—which was entirely permissible under the rules of the process. What is more, this alleged "fraud" concerned solely the CHNV processes, yet the Davidson memo's suspension of benefits adjudications—like the January Higgins directive—was far broader than the CHNV processes, affecting other parole processes like U4U. Finally, and regardless, the Davidson memorandum's suspension of benefits adjudications was based only on Executive Order 14161 and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible.

196.    As noted above, most individuals paroled into the United States via the U4U, CHNV, and OAW processes are eligible under statutory provisions enacted by Congress for other forms of immigration relief, including but not limited to TPS, asylum, and/or visas based on familial relationships. The INA, for example, makes clear that "*[a]ny* [individual] who is physically present in the United States . . . *irrespective of such [individual's] status*, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Individuals paroled in through the family reunification processes are *all* eligible for family-based visas, because that was a requirement to apply for parole through those processes.

197.    Yet, per the January Higgins directive and the February 14 Davidson memorandum, the parolees' applications for any of these benefits—all of which would preclude their removal—are now suspended, as are any of their applications for re-parole, employment authorization, and adjustment of status.

Appx-0489

198.    Meanwhile, at the same time that the Trump Administration has suspended the ability of these parolees to seek relief from deportation by affirmatively applying for benefits, it has aggressively (and unlawfully) expanded the ability of immigration officials to remove individuals paroled into the country through expedited removal—a shortcut deportation process with few procedural protections and even less judicial review. Those actions are challenged elsewhere but comprise part of the injury and irreparable harm threatening Plaintiffs and others similarly situated.

199.    The February 14 Davidson memorandum states that if there is a "litigation need" to lift a suspension of benefits adjudication for individuals paroled through these processes, the suspension can only be lifted on a case-by-case basis with approval of the USCIS Director or Deputy Director, with a memo memorializing the lifting of the suspension as to that individual.

200.    Remarkably, the February 14 Davidson memorandum states that these requirements for lifting the suspension apply even when a court issues an injunction or other order directing the lifting of the suspension on a class-wide basis.

### Defendants' Actions Cause Harm to Plaintiffs

201.    Defendants' termination of humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM, and Defendants' related suspension of processing of immigration benefit requests, have caused Plaintiffs substantial, concrete, particularized, and irreparable injury.

202.    Plaintiff **Svitlana Doe** fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. When war struck in 2022, Svitlana and her family lived in a city immediately outside of Kyiv, the capital of Ukraine, one of Russia's initial focal points for occupation. Bombs rained down and fighting broke out regularly in the streets directly outside her apartment. It was terrifying and unpredictable. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled. Svitlana and her family

eventually fled the capital for another district further away from ground zero, where they remained for about a month and a half before returning to the capital.

203.    Svitlana is the mother to a young son with celiac disease. After her son was born and began eating solid food, he became extremely sick with an undiagnosed condition. Even at one of the best hospitals in Ukraine, it took a long time to correctly diagnose her son's condition as celiac disease. It was extremely hard to provide for her son in Ukraine, even before the war. Her son was extremely sensitive—even minimal cross-contamination using the same utensil would make him dangerously ill. Svitlana had to shop around at tens of different grocery stores to find gluten-free products for her son, and when she could find them, they cost twice as much as glutenous products. People would often criticize Svitlana at grocery stores for not buying her son "normal" food. When the war began, it became even more difficult to take care of her son. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after the onset of the war, her son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

204.    Before the war began, Svitlana never considered leaving Ukraine. She was satisfied with her life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. But amid her son's failing health and the regular shriek of air raid sirens which forced Svitlana and her family into the earthen basement of their son's school to take shelter from missile attacks, they decided they needed to flee the country. Svitlana began searching for help on the internet and social media. Eventually, she was put in touch with the executive director of a celiac disease research center in the United States. Doctors at the center began exploring Svitlana's son's condition and treating him from afar, and the executive director eventually volunteered to

assist Svitlana and her family through the Uniting for Ukraine parole process. Svitlana and her

family received travel authorization in November 2022.

205.    After the war began, men were generally not permitted to leave Ukraine due to the

draft. However, officers often made exceptions for fathers seeking treatment for their disabled

children, so Svitlana scrambled to assemble a comprehensive collection of her son's medical

documentation, who had been officially diagnosed as having a temporary disability. The U.S.

doctor working with Svitlana's son even wrote a letter documenting the medical need for treatment

outside Ukraine. This was an extremely stressful time, since border officials maintained individual

discretion and the family could not guarantee Svitlana's husband would be allowed to leave the

country. Svitlana's husband and son left first to maximize the odds of remaining together, arriving

in Poland in mid-November 2022. Svitlana followed the next day, and met her family in the capital

of Poland, Warsaw. From there Svitlana and her family traveled to the United States, arriving on

November 20, 2022, and living since their arrival in Dover, Massachusetts.

206.    Since arriving, Svitlana's son has continued to receive treatment at the medical

center specializing in celiac research. After about a year, his health began to improve dramatically,

and he is now a healthy young boy, although he will require a strict diet and comprehensive annual

checkups for the rest of his life. Svitlana has worked since receiving her work authorization around

April 2022, and she enrolled as a student in community college studying child development. In

2024, Svitlana and her family were re-paroled under U4U, and her current parole status and work

authorization is valid until November 18, 2026. Around the beginning of February 2025, Svitlana

applied for Temporary Protected Status ("TPS").

207.    If her TPS application is not adjudicated or even paused for too long, Svitlana will

lose her only chance of being able to remain in safety in the U.S., especially if her parole is revoked

as the Trump administration has threatened. If either becomes unavailable to her, she will lose her work authorization, and therefore, her ability to provide for her family. She will not be able to pay her rent (around $2200 per month), purchase groceries (around $800 per month), or pay her family's bills, and her son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy and stability. Her family would be forced to leave the U.S., but there is nowhere else for her family to go—they cannot return to Ukraine in the middle of a continuing war, where Svitlana's husband would be forcefully recruited into the army upon return. Even if negotiations won out, there is no promise peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous. U4U and the availability of TPS have been lifelines for Svitlana and her family, and losing them would cost more than they can bear.

208. Plaintiffs **Maksym and Maria Doe** are a married couple and nationals of Ukraine. They were forced to flee their home in Kharkiv on the day that Russia invaded Ukraine and began bombing the city. Once they found safety, Maksym began looking for a way to do something for his fellow Ukrainians. He and several friends started by coordinating volunteer efforts to evacuate others from cities and towns on the front lines of the war; within six months, they had saved over 22,000 people from eastern Ukraine, solely through the efforts of approximately 200 unpaid volunteers. Eventually, Maksym and his partners formed a nonprofit organization and began raising funds, managing logistics, hiring professionals and converting volunteers into paid employees, and expanding their humanitarian aid operations. In the three years since Russia invaded Ukraine, the nonprofit has grown to a staff of over 100 employees and has assisted over a half million Ukrainians displaced and affected by the war.

209. Since the invasion, Maksym's work with his nonprofit has been his singular focus. Toward the end of 2022, he and Maria, as well as his partners in the nonprofit, discussed the possibility of Maksym and Maria moving to the United States to expand the nonprofit's work with other humanitarian aid organizations, to raise more funds, and to amplify their ability to provide aid to Ukrainians harmed by the war. Maksym came to the United States first in December 2022 on a visitor visa to research registering a nonprofit in the United States and to explore how to fundraise and collaborate with other humanitarian aid organizations. A generous family friend who has known Maksym and his sister since high school subsequently agreed to be their sponsor to apply for U4U parole. Maria joined Maksym in February 2023 through U4U parole; Maksym then left the United States for Mexico, where he also went through the U4U application process with the sponsorship of his family friend, and was able to return to the United States on U4U parole in April 2023. They received their employment authorization when they entered the United States on U4U parole.

210. After arriving in the United States with only two suitcases and Maria taking all the jobs she could find to earn money, including dog walking, Maria has since found a job as a quality assurance engineer with a tech start-up and recently got a promotion to a Project Management position. Maksym has continued his work with his nonprofit, and after two years of struggle and hard work in the United States, the couple started to feel like they could finally plan for their future. They applied for U4U re-parole and TPS; while Maria's re-parole application was granted in January 2025, Maksym's re-parole application remains pending, as well as both of their TPS applications.

211. As a result, it has been devastating for the couple to learn that that President Trump has terminated U4U and paused the processing of all immigration benefits applications of U4U

parolees. Maksym's U4U parole expires in April 2025; if his re-parole application or TPS application is not processed and granted by that time, he will lose his legal status and his work authorization. Maria plans on filing an application for an H-1B work visa with her employer soon, because an H-1B visa will help provide the couple with a more stable and predictable legal status, but it is unclear if that application will ever get processed. After working so hard to come to the United States legally, and after doing all they could to maintain their status to remain here legally so that they can continue working and supporting Maksym's humanitarian efforts in Ukraine, it feels like all the doors are being slammed in their faces. Maksym and Maria never thought that they would have to face the prospect of being displaced, yet again, from a democratic country like the United States.

212.   Plaintiff **Alejandro Doe** fled Nicaragua because of increasing physical danger to his family and untenable economic conditions. In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega. The demonstrations were heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors resulting in hundreds of civilian deaths. Countless others were imprisoned.

213.   Alejandro's father was among those imprisoned. While searching for his uncle, government actors abducted Alejandro's father from his grandmother's house where he lived, beating and violently interrogating him on the way to prison. Once there, guards physically and psychologically tortured him for three days, telling him that they would kill him and that he would never leave the prison. He was withheld food for most of the duration of his three-day imprisonment.

214.    Although Alejandro's father was released, he was labeled an opponent of the regime, and Alejandro felt they had no choice but to leave the country for their safety. Alejandro's cousin, a U.S. citizen who lives in Washington, sponsored him and various other members of his family through the parole process for Nicaraguans. Alejandro received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. Since arriving in the United States, Alejandro has lived in Gainesville, Georgia, and since receiving work authorization has worked producing marble bathroom panels. To ensure he would not lose his newfound safety, Alejandro filed an application for asylum (Form I-589) on January 21, 2025.

215.    When Alejandro learned of the Trump administration's indefinite pause on processing applications for immigration relief filed by individuals who came to the U.S. through CHNV parole, it came as a gut punch, especially considering the U.S. government's recently announced plans to terminate CHNV parole. For years, the Nicaraguan government has considered individuals who apply for asylum in other countries to be political dissidents. What's more, the Parliament loyal to President Ortega recently legalized the banishment and denial of entry or exit to people deemed to be critics of Nicaragua, including Nicaraguan citizens. Alejandro is distraught about what will happen if he is deported and cannot reenter Nicaragua, or if the Nicaraguan government arrests, interrogates, or tortures him or his family upon return given his family's history of political persecution by the State. Asylum and parole were the only avenues that could keep Alejandro and his family safe. If he is no longer permitted to remain the U.S., he would be forced to look for alternative places to flee, because he cannot safely return to Nicaragua.

216.    For Plaintiffs **Ana Doe** and **Armando Doe**, fleeing Nicaragua and obtaining parole through the CHNV parole processes was a matter of seeking stability and safety from the ongoing persecution and violence they faced in Nicaragua. Similar to Alejandro Doe's account, due to the

increasing political repression and systemic violence under the Ortega regime, Ana's family has been persecuted for their political ideologies and involvement in anti-government protests. In 2018, while the police were actively looking for Ana's uncle, they found and detained her father instead. Ana's father spent days in prison where he was interrogated and tortured. Although he was eventually released, Ana's entire family had become people of interest in the eyes of the government, and they remained vulnerable to future persecution and violence. In 2020, Armando worked at a digital media company that published information regarding the political situation in Nicaragua and government abuses in the country. Before his arrival at the company, the government found and detained some employees of the company because they were discovered to be assisting some people who had been protesting during a hunger strike. While these individuals were eventually released and fled the country for their safety, it was evident that the government was keeping a close eye on Armando's employer—labeling his employer as anti-government—and Armando's safety grew ever more precarious, despite the precautions he took.

217.    The CHNV parole processes have provided Ana and Armando a safe pathway to escape the danger they faced in Nicaragua. Ana and Armando were sponsored by Ana's cousin, a U.S. citizen who lives in Washington state, and Ana and Armando subsequently received authorization to travel to the United States through the CHNV parole processes in December 2023. They both arrived in the United States and were granted two-year periods of parole in February 2024. Since then, Ana and Armando have created a home and community in Gainesville, Georgia, where they reside along with Alejandro Doe, Carlos Doe, and other members of their family. They have been welcomed by the local community in the Gainesville area. Since Ana and Armando received work authorization under CHNV parole, they have both been working full time. Ana works at a company that provides personal protective equipment, where she is responsible for

overseeing the company's inventory and supporting the company's warehouse. Armando works for a company installing machinery on trailers. Ana and Armando have been saving up money for their own futures while also supporting their family and loved ones who remain in Nicaragua. In January 2025, knowing that they needed to seek additional legal protection from the dangers and risks of persecution they face in Nicaragua, Ana and Armando applied for asylum.

218.    The news about the Trump administration's halt on processing applications for immigration relief filed by individuals who came to the United States through the CHNV parole processes came as a shock to Ana and Armando. This pause means that their asylum applications could be delayed indefinitely or not adjudicated at all in their remaining authorized time in the United States. Since their parole was only for a two-year period, Ana's and Armando's ability to seek asylum was their only avenue to ensure they can continue living a life free from the fear of persecution and danger they face in Nicaragua because of their political and ideological beliefs. If their applications remain on hold and they are subsequently removed, both Ana and Armando face the risk of being returned to the very danger and instability they fled in Nicaragua. Alternatively— if they are removed from the United States and the Nicaraguan government does not allow them to re-enter the country—Ana and Armando would be rendered stateless. Their ability to obtain work authorization through the asylum application process is likewise vital for them to be able to continue working and providing for themselves and their families after their parole expires and while they await the adjudication of their asylum applications. Given these risks, this indefinite pause on processing these applications for immigration relief and the impending termination of the CHNV parole processes irreparably harms Ana and Armando and their family.

219.    Plaintiff **Carlos Doe** also fled Nicaragua due to the political instability and direct persecution he and his family faced by the Nicaraguan government. In 2018, while he was a

university student, he became involved in protests against the government. Eventually, more protests broke out in his city, resulting in numerous assassinations and disappearances. Based on his involvement in these anti-government protests, the Nicaraguan government identified Carlos as a dissident and actively persecuted him and his father. Soldiers and police officers came to his family's home multiple times in search of Carlos and his father, making death threats against Carlos and his family. Given the danger and active persecution against Carlos and his father, they both decided to go into hiding. However, while in hiding, Carlos and his father continued to receive death threats, and at one point military soldiers came to Carlos's mother's house and told her they would imprison him and his father if they ever found them.

220.    Once Carlos learned about the CHNV parole processes, this path became a way for him to safely flee the danger and persecution he faced in Nicaragua. Carlos was sponsored by a U.S. citizen family member, and in May 2023, he received travel authorization to come to the United States under the CHNV parole processes. Carlos arrived in the United States and was granted a two-year period of parole in June 2023. Since his arrival, Carlos has created a community for himself, comprised of friends and family (including Ana, Armando, and Alejandro). He has also made many connections and friendships through his work experiences. Currently, Carlos works as a welder and solderer at a manufacturing plant. His ability to work in the United States with authorization has enabled him to provide for himself, his mother and younger brother who remain in Nicaragua, and his sister who currently lives in Costa Rica. Due to the risks of persecution and danger he faces in Nicaragua, Carlos applied for asylum in January 2025.

221.    After learning about the Trump administration's indefinite suspension of processing applications for immigration relief for individuals who entered the United States with CHNV parole, Carlos became very worried about how this pause will affect his ability to seek

asylum. Because his asylum application could be delayed indefinitely or not adjudicated at all, Carlos's only prospect of safety here in the United States beyond the end of his parole period has been stripped away from him, leaving him at risk of losing legal status or deportation back to Nicaragua where the government knows where he lives and has actively persecuted him. Moreover, obtaining work authorization through his asylum application is imperative for him to be able to support himself and his family in Nicaragua and Costa Rica, and this indefinite pause on the processing of his asylum application could render him without the ability to work, including once his parole expires or is terminated, which would harm both him and his family who rely on him.

222.    Plaintiff **Miguel Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Miguel learned of the CHNV parole processes for Nicaraguans about a year before he arrived. He spent a while deciding whether he wanted to leave his home, including his mother, with whom he lived and whom he helped take care of. In Nicaragua, COVID-related challenges and changes to his university's programs and requirements made it difficult for Miguel to receive consistent university education and progress toward a degree. It was also challenging to find a stable job that would allow him to make enough money to support himself and help his mother. Miguel decided to leave his friends, family, and community in Nicaragua for the United States because he knew it was the best way to help his family and his own future. He saw the United States as a land of opportunity and the CHNV parole processes as a safe, legal pathway there. He was excited to work hard for two years, save up money, and improve his and his family's future.

223.    In the United States, Miguel received work authorization in September 2024 and was able to quickly find work full-time producing marble panels. He has enjoyed his experience

in the United States thus far, working hard and spending time with family outside of his job. However, when he heard about the Trump administration's end to CHNV parole and the revocation of parole and work authorization for people like him, he felt scared and betrayed, and he became fearful of going outside in public given raids and deportations happening in his own town of Gainesville. Miguel has been in the United States for less than a year, and he was granted two years of parole when he entered. The inability to continue to work here for the remaining part of his parole period means that he will not be able to support himself or his mother as well, given his family's limited resources in Nicaragua. In less than a month, Miguel will be subject to imminent deportation, so he is forced to make decisions that will affect his and his family's lives and livelihoods on an extremely expedited timeline.

224.    Additionally, Miguel is worried about what will happen to him and his family if he is deported or otherwise forced to return, given his family's history of political persecution there. When Miguel was a teenager, his family experienced persecution that forced them to flee Nicaragua. He is also aware that the Nicaraguan government treats parolees and people being sent back from the United States with increased scrutiny, and that his family could be subject to harm if they returned. The early termination of Miguel's parole, combined with the administration's suspension of processing immigration benefits for parolees, deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. His legal status, work authorization, and options for protections have been erased all at once.

225.    Plaintiff **Andrea Doe** arrived in the United States in June 2023 with her two young children, Isaias and Francisco Doe, to reunite with her husband, Rafael Doe, a former political prisoner in Nicaragua. The family lives in Mount Airy, Maryland. Rafael Doe was part of a group of 222 Nicaraguan political prisoners and prisoners of conscience whom the government of Daniel

Ortega had abruptly released from prison on the condition that the United States government accept them. As many of these prisoners—Rafael Doe included—had been arbitrarily detained for very long periods, all had been exposed to harm amounting to torture, and many had pressing medical needs, the U.S. State Department agreed to evacuate them. The Nicaraguan government proceeded to strip the 222 passengers on this February 9, 2023 flight to the United States of their Nicaraguan citizenship, rendering most of them stateless.

226.    Due to the extraordinary circumstances of their departure from Nicaragua, none of the 222 were able to leave Nicaragua with their family members unless they too had been imprisoned as part of this group. After paroling the passengers on the February 9 flight into the United States, the State Department asked those needing to reunite with their family members to use the CHNV parole process to bring them here. *See* U.S. Dep't of State, 222 Nicaraguan Political Prisoners Released, Enter U.S.—Frequently Asked Questions and Resources (https://www.state.gov/222-nicaraguan-political-prisoners-released-enter-u-s-frequently-asked-questions-and-resources/).

227.    Reuniting his family was an urgent priority for Rafael Doe. He had been a political prisoner for over four years before being expelled from his own country. Not only was the continuing separation from his wife and two very young children humanly difficult for all of them, but the Nicaraguan government had been monitoring and harassing his wife, and Andrea Doe was afraid for her own safety and that of their children.

228.    Since being reunited in the United States, the family has been doing well. The couple are working for the same company that had first hired Rafael, they have rented their own apartment, and their children have settled into their new school and made friends. The family has applied for asylum, with Rafael as the principal applicant, including Andrea and their sons Isaias

and Francisco in his application.  The suspension of processing of that application prevents the whole family from achieving permanent safety in this country, and they have no other: stripped of his Nicaraguan citizenship, Rafael could not return to Nicaragua even if it were safe for him, which it is not.  If Andrea and the children's parole were terminated and they could not get their asylum application processed, Andrea fears she would be detained in Nicaragua and that her children would be taken away from her.

229.    Plaintiff **Lucia Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Back in Venezuela, Lucia lived with her mother and helped provide for her. Lucia holds a bachelor's degree in Christian Education from the Theological University of the Caribbean in Puerto Rico, and she worked at the Director of Children's Ministries at a local Christian church in Venezuela, but her salary was only around $60 a month, a very typical monthly salary where she lived. This was not nearly enough to cover her and her mom's most basic needs, including food, rent, and clothing, let alone the expensive medical care that her mom requires. Their basic expenses alone were around $500 a month. They were not able to survive on Lucia's income, so, like many other people who lived around them, they had to rely on financial support from family members living abroad. Lucia's siblings, including Plaintiff (and Lucia's CHNV sponsor) Lorena, sent money back to Venezuela regularly to help them get by.

230.    When Lucia heard about the opportunity to come to the United States on CHNV parole, she knew she wanted to pursue the pathway so she could work and help their family in a more robust way. She came to St. Augustine, Florida, because, from a previous trip she made to Florida when she was studying in Puerto Rico, she had several friends living and working there. She knew it would be easier to find work and use public transportation there, as opposed to in rural

Appx-0503

Massachusetts, where Lorena lives. Lucia received her work permit in August 2024, started

working at a cleaning company, and has settled into the community in St. Augustine. She attends

a local Christian evangelical church and hopes to get involved in their ministries.

231.    The Trump administration's end to CHNV parole and the premature revocation of

Lucia's parole and work authorization will force Lucia to, in a very short time, make many crucial

decisions that will impact her own livelihood and that of her family members. If she is not able to

stay in the United States for the two years that she was granted parole, she would be returning to

Venezuela with very little savings, which would make her future here uncertain and create more

of a financial burden for her siblings. She would not be able to provide the financial support that

she planned for her mother, and she would face challenges finding a job in Venezuela, where is it

very difficult to secure employment as someone older than 40 years old. Having to make these

decisions rapidly or risk the threat of accruing unlawful presence that could prevent her from

returning to the United States or deportation back to Venezuela, is causing Lucia a lot of anxiety.

232.    The conditions in Venezuela also threaten Lucia's safety and stability. Without a

job for potentially a lengthy period of time, and given inflation that has made necessities

unaffordable for the majority of the population, Lucia would struggle even more than before to

pay for her basic daily needs, let alone those of her parents. There are also frequent, mass internet

and power blackouts, and basic services like water, gas to cook, and transportation are often

unavailable for days. She will need to deal too with the constant concern of crime and violence.

Lucia is especially scared of what could happen to her if she is forced to return to Venezuela,

because she has heard that the Venezuelan government interrogates people who have sought parole

in other countries, and military officials have forced people to pay money at the border to be

allowed in. She has heard of Venezuelan citizens having their passports confiscated, being imprisoned, and even being disappeared.

233.    Plaintiff **Daniel Doe** is a Haitian national who was granted parole for two years through the CHNV Haitian parole process in February 2024. Daniel, his wife, and their three-year-old daughter faced imminent danger and risk of kidnapping from gangs in Haiti, in both neighborhoods where they lived. Daniel also worked as a court interpreter for foreigners, and occasionally as a general interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief Services. Daniel has been specifically targeted by the gangs, including being followed by gang members on motorcycles who have also ridden by his house. As a result, Daniel had to change the cars he drove to work, and the routes he took. Daniel's wife also received a warning that she and Daniel should "be careful," which they took as a warning that gangs were watching their movements, and that Daniel was a potential kidnapping target due to his work in Haiti.

234.    These incidents drove Daniel and his wife to the decision to seek safety outside of Haiti. In early 2023, Daniel's father's friend offered to sponsor Daniel through the CHNV parole process for Haitians. Because his father's friend had already agreed to sponsor several other of his own family members, he could only financially afford to sponsor just one more person. He submitted his sponsorship application for Daniel in April 2023. Later that same year, because Daniel's other application was taking a long time to process, Daniel and his wife learned about Welcome.US and their matching process where they would match prospective CHNV beneficiaries with individuals who could serve as sponsors. Daniel and his family were matched with a sponsor through Welcome.US, who submitted their sponsorship application for Daniel, his wife, and their daughter in early January 2024. About a week after this application was submitted,

Appx-0505

Daniel received travel authorization to come to the United States through his father's friend's sponsorship application. Although it was extremely difficult, Daniel and his wife decided that Daniel should use this travel authorization to come to the United States on CHNV parole alone. Daniel's parole expires in February 2026, and his wife and daughter remain in Haiti with their pending application through the Welcome.US sponsor. In September 2024, Daniel was also granted TPS until February 2026, but due to the administration's recent termination of Haitian TPS, that status is also now only valid until August 2025.

235.    Daniel received his work permit in March 2024. Although it required some adjusting to life in the United States, Daniel has been able to adapt and become part of the community in Orlando. He has joined a local Haitian church and is currently working as an English as a Secondary Language ("ESL") teacher at two different schools serving adult students who are immigrants or in the United States on a student visa. Daniel also supports the Haitian community by providing free online classes to Haitian immigrants who have recently arrived to the United States, teaching them about U.S. culture, teaching them English, and providing general updates on immigration policies affecting the Haitian immigrant population.

236.    The Trump administration's end to CHNV parole and the premature revocation of Daniel's parole and work authorization will prevent him from being able to continue working, which is essential not only for him to support himself but also for him to be able to support his wife and daughter who remain in Haiti, as he is the main financial supporter for them. Daniel will also be at risk of imminent deportation back to a country where he faces increased risk of targeting by gangs, and the administration's suspension of processing immigration benefits for parolees deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. Moreover, with the CHNV parole processes terminated, the chance for

him to be reunited with his wife and daughter here in the United States through CHNV parole is lost.

237.    Plaintiff **Omar Doe** is an Afghan national who faithfully and loyally served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members, that forced him to relocate his wife and children from his home province. He built up good relationships with the soldiers he worked with, so when the U.S. military withdrew from Afghanistan in 2021, they brought Omar and his family with them. His departure from Afghanistan was chaotic—up until just two or three days before the collapse of the Afghan government, he was stationed with U.S. troops in Kandahar Province. They were relocated to the Kabul airport, and then suddenly, at 3 am in the morning, he was told that if he wanted to bring his family with him to the United States, they would need to come to the airport immediately. Omar called his father, who was able to bring his family to the airport at 6 am, but congestion and crowding at the airport was so dense that Omar's family was only able to reach him at 10 am. That brief interaction, when Omar received his family at the airport, was the last time Omar saw his father. He never got to say goodbye to his mother.

238.    Upon arriving in the United States, Omar was registered by the troops he had worked with and given a work permit. He was told that he would receive a passport and a green card, and he was told not to worry about anything. Three and a half years later, however, he has yet to receive permanent legal status in the United States, which has been extremely traumatic and stressful for him and his wife. Although he is grateful that his family is safe here and that his children are in school, the lack of legal documentation has caused so much stress that he has lost all his hair, and he and his wife have both lost teeth. After so many years of service to the U.S. military, it is very frustrating to Omar that he still lacks permanent legal status.

Appx-0507

239. Shortly after arriving in the United States, Omar applied for a Special Immigrant Visa ("SIV"), which are issued to, among others, Afghan nationals who provided faithful and valuable service to the U.S. government, and who endure serious threats because of that service. In addition, because his parole and work authorization will expire in September 2025, he is working with a nonprofit to file an asylum application, which will enable him to maintain his work authorization so that he can keep working to support his family until his SIV is granted. But the Trump administration's pause on the processing of immigration benefits means that these applications will not be adjudicated. This is especially hard for Omar to stomach, given all that he has done and sacrificed for the U.S. military over the course of most of his adult life. Going back to Afghanistan is not an option for him and his family after his service to the U.S. military, and he does not know what will happen to them if they are deported there. Omar had expected dignity from the government that he had served and that brought him to this country, but that has not happened for him.

240. Plaintiff **Sandra McAnany** is a U.S. citizen and sponsor for seventeen individuals who were approved to come to the United States and granted parole through CHNV. Fifteen of these beneficiaries who are currently in the United States are nationals of Venezuela, and two are nationals of Nicaragua. They all arrived in the United States between September and December 2023 and were approved for two-year parole periods and work authorization. To Sandra's knowledge, most have pending asylum applications that are now on hold due to the administration's suspension of processing immigration benefits requests for CHNV parolees. Sandra's beneficiaries include five sets of parents with young children, who were only able to reunite with family members in the United States because of the CHNV parole process, and six adults without children. They seek both stability with their families and safety from persecution

67

and violence in their countries of origin. One beneficiary is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela, and her grant of CHNV parole allowed her to care for him while he went through treatment.

241.    Sandra also has four CHNV applications, for nationals of Cuba, that remain pending. Due to the administration's termination of the CHNV parole process and end to processing new CHNV parole applications, these applications will now never be processed. Daily life in Cuba is extremely difficult for these beneficiaries, as they struggle under the government system there to make enough money to pay for food for themselves and their families. They sought to come to the United States through CHNV parole either to reunite with family or to earn money to support their families in Cuba, including for critical medical treatment. One of these Cuban beneficiaries has also lost jobs in Cuba for speaking out against the government and fears being arrested if he continues to speak out. He and other beneficiaries hope to experience the democracy and freedoms of the United States.

242.    Sandra was driven to serve as a CHNV parole sponsor by her religious convictions, her experiences volunteering abroad in Central and South America, and her close connections with immigrant neighbors and friends in Wisconsin. As a Christian, she believes strongly in caring for others and supporting those in need, so sponsoring immigrants through CHNV parole allows her to live out her religious convictions in a meaningful way. In addition to putting considerable time and effort into completing the applications for her beneficiaries, Sandra has provided constant support, advice, and resources to them as they traveled to the United States and integrated into their communities. She provided travel guidance and support on job searches and enrollment in English classes, and one family lived with her in her home for over a year while the parent got a work permit and found a job. She helped pay for some of her beneficiaries' initial cell phone plans,

and she provided winter clothing or money to buy it for several families weathering a harsh winter for the first time.

243.   Over the last couple years, Sandra has allocated large amounts of time, effort, and money into helping the people she sponsors establish safe and stable lives in the United States, and in growing those relationships, she has come to see many of them like family. The administration's premature termination of grants of CHNV parole and pause on processing her beneficiaries' asylum applications means that all the time and money she has invested could be lost. If her beneficiaries become vulnerable to deportation, Sandra fears the harm that will come to them if they are forced to return to their countries of origin, and she will lose relationships that are valuable to her as a meaningful way to live out her faith. She worries that she may never be able to see them again.

244.   Plaintiff **Kyle Varner** has long been involved in supporting liberal and libertarian political movements in Venezuela, and he has done global health work at the Venezuelan border. Through his experiences, he has seen the challenges faced by people in poverty in the country. His personal and political convictions have led Kyle to serve as the U.S.-based sponsor for seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Of the forty-three of those individuals who are currently in the United States, at least thirty-one have pending applications for asylum, TPS, or other forms of immigration relief. The first of Kyle's beneficiaries arrived in the United States in November 2022. The people he has sponsored include a son who could only pay for his mother's life-saving cancer treatment because he got a job in the United States, and a mother and her young son who lived with Kyle's parents for eight months when they first arrived.

Appx-0510

245.    Kyle also has thirty-two other pending applications for CHNV sponsorship, including for one Cuban individual and one Nicaraguan individual. Due to the administration's termination of the CHNV parole processes and end to processing of new CHNV parole applications, these applications will now never be processed, and the beneficiaries are deprived of a legal pathway to the United States. In Venezuela, these beneficiaries will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are unable to support the country's residents.

246.    Kyle has dedicated immense time, effort, and money into supporting the people he has sponsored. He spent hours submitting applications, and after people received approval to travel to the United States, he purchased plane tickets for most of them. After they arrived, he helped them find safe housing, including allowing many of them to live with him temporarily at first. He also co-signed leases and rented properties that he owns to many beneficiaries for reduced rates and under favorable terms. He purposefully kept some of his properties vacant when he was waiting for his CHNV sponsorship applications to be granted, which meant he missed out on leasing them to other renters. Kyle paid for most of his beneficiaries' work permit applications, helped them with job applications and enrollment in English classes, paid for cell phone SIM cards, and even taught a few how to drive. As a physician, he provided free medical care for minor health conditions and helped translate Spanish-language medical records from Venezuela.

247.    When his beneficiaries were applying for asylum, TPS, and other forms of immigration relief, Kyle lent money to some to help pay for attorney fees, helped them compile documents, and otherwise provided resources that they needed to complete their applications. Kyle has invested significantly in all of his beneficiaries to assist them in settling into their communities in the United States so they can in turn support their families and other loved ones. The time and

70

money he has invested could be lost if his beneficiaries' applications for relief are not adjudicated. Additionally, if his beneficiaries lose their work authorization because of a change in their status, Kyle would need to put more time and resources into making sure they have everything they need to survive.

248.    Plaintiff **Wilhen Pierre Victor** is the U.S.-based CHNV parole sponsor for seven of her family members from Haiti. Five of them—her brother, his wife, and their three children—were approved to travel to the United States in May 2024, and arrived between June and July 2024. They were all granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn, Massachusetts. Wilhen also has two pending CHNV sponsorship applications for her niece and cousin, both of whom are still in Haiti living under unstable political conditions and subject to the daily threat of violence. Wilhen's niece is thirteen years old and in Haiti without either of her parents. She is unable to attend school consistently because there is often gang violence, including gunfire, in the streets where she lives, which prevents her from going outside at all. Sometimes, she is unable to leave to go to school for up to a week. Wilhen's cousin, who is fifty years old, lives with the constant fear of kidnapping for ransom, especially if the gangs find out she has family in the United States. She has heard of people being kidnapped and murdered when they cannot produce large sums of money. There are often days when she cannot go outside even to run minor errands because of the fear of gang violence. Given the administration's end to processing new CHNV parole applications, Wilhen's applications to bring her niece and cousin to the United States will now never be processed. Because of this, Wilhen's niece and cousin continue to live in terror of the ongoing violence in Haiti, and they are unable to reunite with their family members in the United States.

71

249.     Wilhen applied for a green card for her brother back in 2007, and they were still waiting for an interview with USCIS when the parole process for Haitians was announced in 2023. Wilhen sponsored him to come through CHNV parole because it provided a legal way for them to reunite in the United States and to bring Wilhen's family to a safer, more stable place while they continued to await adjudication of the green card application, which remains pending.

250.     Back in Haiti, Wilhen's brother had been unable to find a job for thirteen years due to the lack of economic opportunities. His wife worked as a salesperson for a small business, but they relied on support from Wilhen and other family members to survive. Their children were not able to attend school consistently, and their family dealt with frequent reports of kidnappings, murders, and other violence. In the United States, Wilhen's brother has obtained work authorization and is working at a local nursing home. His kids are enrolled in school as well, and he and his wife are both taking English classes and attending their local church.

251.     Being together as a family has been beneficial for Wilhen, her brother, and his entire family, and Wilhen has invested her time and energy into ensuring that they arrived safely and have had the resources to settle into their lives in the United States. When her brother and his family were approved to travel to the United States through the CHNV parole processes, Wilhen pooled money with other family members to pay for their plane tickets. She prepared her home for all five of them to stay with her. Once they arrived, she picked them up at the airport, where they were overjoyed to be reunited for the first time in more than twenty years. Wilhen then supported them all while her brother received his work permit and looked for work, and she helped him find his current job.

252.     The administration's premature termination of grants of CHNV parole and pause on processing applications for immigration relief for individuals who came to the United States

72

under CHNV parole means that her brother's longstanding green card application could be delayed even further or not adjudicated at all, and that he could become vulnerable to deportation and lose out on the chance to apply for asylum as well. The years that Wilhen and her brother have spent waiting for it to be processed will be lost, and her brother and his family could be forced to return to a life in Haiti rife with instability and violence. Given the difficulty of finding a job in Haiti and the frequent violence Wilhen's family experienced there, the end to the CHNV parole processes and suspension of adjudication of immigration benefits causes direct harm to Wilhen and her loved ones.

253.    Plaintiff **Gabriela Doe** is the U.S.-citizen CHNV parole sponsor to her cousins, who are Nicaraguan nationals—Ana Doe, Armando Doe (Ana's husband), Alejandro Doe, and Miguel Doe. Carlos Doe is also her cousin, but he was sponsored through CHNV by another family member. After her father passed away in June 2023 from cancer, her cousins were a great support for her during a difficult time. Thus, Gabriela wanted to help her cousins in any way she could and carry on the legacy of her father who was known for always taking care of his family. Knowing her cousins faced dangerous living conditions, violence, and persecution in Nicaragua, Gabriela offered to support her cousins through CHNV sponsorship. Gabriela submitted her sponsorship applications for her four cousins in 2023. All the cousins she sponsored arrived in the United States and were granted parole under CHNV at different points throughout 2024.

254.    Since arriving to the United States, Gabriela's cousins have acclimated to life here in the United States and have become self-sufficient in supporting themselves since they secured work authorization. Gabriela has been able to reunite with them in Gainesville, Georgia where they currently live, and she feels proud of how well they are doing here in the United States and how well they have supported one another.

255.     The Trump administration's termination of CHNV parole and the premature termination of all five of her cousins' grants of parole has left Gabriela feeling very scared and worried for her cousins. If their parole prematurely ends and they are left without status, they will be at risk of being removed back to Nicaragua, a country where they—and their entire family—face grave risks of danger and persecution by the Nicaraguan police and government because of their political ideologies. Her cousins will also be left without work authorization and the ability to support themselves and their other family members. Given that Gabriela has clinical depression and anxiety, the termination of her cousins' parole status and the impending effects that could have on them and their well-being would cause Gabriela severe psychological distress.

256.     Plaintiff **Norma Lorena Dus ("Lorena")** is the U.S.-based CHNV parole sponsor for her sister, Plaintiff Lucia Doe. Lorena submitted the CHNV sponsorship application for Lucia in December 2022, and Lucia was approved to travel to the United States in May 2024. Lucia arrived in July 2024 and was granted a two-year period of parole, and she received her work permit a month or so later. Lorena paid for Lucia's plane ticket and her work application fee, and she sent money to help support her while she was waiting for her work authorization.

257.     Once Lucia started working and was able to, she began sending money back to their parents in Venezuela, something Lorena and their other siblings who live abroad do consistently. Lucia came to the United States precisely because she sought the opportunity to work and earn wages that would allow her to support herself, help alleviate the financial burden on her siblings, and provide for their parents, including their mother, who has health conditions that require expensive doctor's visits, exams and labs, and medication. Their mother has to pay for her medical care out of pocket, but she receives a pension that is not even enough for a dozen eggs. Lorena and Lucia saw the CHNV parole process as a blessing for their entire family.

258. In addition to the economic opportunity, Lucia being in the United States has made it easier for their family to reunite. Last October, Lucia traveled to Massachusetts, and their mother and other siblings traveled in as well. For the first time in six years, all the siblings were together for a joyful reunion. As a U.S. citizen, it is difficult for Lorena to travel in and out of Venezuela, so having Lucia closer has allowed them to see each other more and strengthen their relationship.

259. The administration's termination of CHNV parole and the premature termination of Lucia's parole was devastating for both Lorena and Lucia. Lorena feels disappointed and hurt that the government would punish people like Lucia who applied from abroad, are supported by a sponsor, came through a legal pathway, and are working to support themselves and contribute to the economy. If Lucia is forced to return to Venezuela, Lorena will need to send more money back to her parents to help make up the difference, which will cause financial strain on her and require her to stretch financially and make more sacrifices to help them. Lorena is also already experiencing the emotional and psychological toll of her sister facing the possibility of imminent, sudden deportation, after having come to the United States with the permission of the government, and the decisions they have to make together as a family to try and keep her safe.

260. Plaintiff **Valentin Rosales Tabares** fled his birth country of Cuba for the United States in 2016 and received his green card in 2017. That same year, he was able to submit a family-based immigrant visa petition for his wife and son, who was less than 18 years old at the time, and another petition for his daughter. Both of these petitions were approved in May 2018. In 2022, Valentin was overjoyed that his wife and son received immigrant visas and were able to reunite with him in Portland, but his family remained separated: his daughter and her young daughter, Valentin's granddaughter, continue to this day to wait for their immigrant visas in Cuba. Valentin's son also had to leave his wife and young son behind in Cuba.

Appx-0516

261.    Valentin fears for the safety and stability of his family members still in Cuba every day. The living conditions in Cuba have been incredibly difficult for many years, and they continue to deteriorate. In Valentin's family's experience, there are often food, gas, and electricity shortages, including long periods of time where there is no electricity at all. There is very limited public transportation, so travel is nearly impossible. Cuba has also seen an increase in violence and crime, as well as retaliation from the government for speaking out. Valentin's daughter and granddaughter are afraid to leave their home even to get groceries, and other family members have suffered from incidents of theft that are on the rise.

262.    When Valentin learned about the CHNV parole processes in February 2023, he applied to sponsor his son's wife and child for humanitarian parole. Those applications were never adjudicated and, due to the administration's termination of the CHNV parole processes, now never will be.

263.    In November 2024, Valentin also learned that he had been invited by the Department of State to request Cuban Family Reunification Parole for his daughter, which would allow his daughter to come to the United States while she waited for her family-based immigrant visa to become available. Valentin quickly submitted the request for Family Reunification Parole in December 2024, and only a few days later, it was approved. He and his wife were excited that they would finally be reunited with their daughter and granddaughter after so many years, and they set about preparing for her travel. They paid for the medical exam that his daughter was required to do for the parole process, prepared a room in their home for their arrival, and purchased winter clothes and other items for them to feel welcome. However, as they waited eagerly for the issuance of a travel date for their daughter, it never came. In January 2025, Valentin received the news that the Family Reunification Parole process had been terminated. Now, he and his wife live in

uncertainty and fear about whether their daughter will be allowed to come to the United States at all through this parole process. All of the resources they put into planning for her arrival will be lost, and, far more devastatingly, their family will continue to be separated.

264.    Plaintiff **Marim Doe** joined the Navy in January 2024. He is a student in the nuclear training program, through which he is learning to operate nuclear reactors on naval carriers and submarines. Before joining the Navy, Marim lived with his family in Texas. He has a close relationship with his family, including with his father, who does not have legal status in the United States. Marim has seen his father work hard to provide for their family his entire life, enduring much hardship and making many sacrifices so that his family can thrive. When Marim heard about the military parole-in-place process in high school, he decided to join the Navy after graduation so that he could continue his education, but also help his father obtain legal status.

265.    Marim's application for military parole-in-place for his father has been pending since May 2024. A grant of parole would provide his father with more stability, particularly as he ages, both in terms of staying in the United States safely with his family and in terms of financial well-being. With parole, Marim's father would no longer fear being let go from his job if they found out he was undocumented, or being detained and subject to deportation by ICE.

266.    The news that military parole-in-place was going to be paused was heartbreaking for Marim, his father, and their entire family. At a time when Marim should be focusing on the U.S. Navy's rigorous training program, Marim is distracted and worrying about the safety and wellbeing of his family. Marim is suffering extreme emotional distress from the possibility that his father could be deported, and that such an important benefit provided to servicemembers dedicating themselves to the U.S. military is being eliminated.

267.    Plaintiff **Adolfo Gonzalez, Jr.** served in the U.S. Army as a First Sergeant for more than 30 years. In February 2025, he retired from active service and was honorably discharged. Adolfo and his wife have been together since 2017, and they have a sixteen-year-old daughter, who is Adolfo's wife's biological daughter but whom Adolfo recently legally adopted.

268.    Adolfo's wife is undocumented, which has meant that their family has lived for many years with the fear that she could be detained or deported. When Adolfo had to be away from home with the Army, he was always anxious that something would happen to her. They learned of military parole-in-place through meeting with an immigration attorney, and it felt like a beacon of hope for them. They felt it was an incredible benefit for people who served the United States military. The application that Adolfo submitted for his wife has been pending since around March 2024.

269.    In March 2025, Adolfo and his wife found out that military parole-in-place applications were no longer being processed by the U.S. government. The fact that their application has been paused indefinitely has caused him and their family immense anxiety and sadness. They worry constantly about their family being separated and their daughter losing her mother. Adolfo also feels let down by the government after serving the military honorably for more than three decades. Without military parole in place, Adolfo, along with his wife and daughter, will continue to suffer emotional distress from the prospect of their family being separated through detention or deportation.

270.    Plaintiff **Aleksandra Doe**, along with her husband and five-year-old son, fled Ukraine through the U4U parole process to seek stability and safety following the Russian invasion of Ukraine in 2022. Life in Ukraine was extremely difficult for her and her family due to the war. Aleksandra would hear missiles flying over them every day. For days on end, Aleksandra and her

family would go without electricity in their home, which would lead to her son getting sick from the cold temperatures. The U4U parole process offered Aleksandra and her family an opportunity to escape the danger and instability they faced in Ukraine. In April 2023, Aleksandra and her family were granted parole under the U4U parole process. Aleksandra and her family eventually settled in San Jose, California, where her sister (who is also in the United States with U4U parole) lives.

271.    Aleksandra and her family have settled into new lives here in the United States. Her husband works in construction, and her son is attending a transitional kindergarten school, where he is enjoying learning English and socializing with other children. Aleksandra and her family also greatly enjoy the area they live in and the local community.

272.    In October 2023, Aleksandra and her family applied for the diversity visa lottery, and in May 2024, Aleksandra was notified that their applications were selected for further processing in the diversity visa program for Fiscal Year 2025. This was life-changing news for Aleksandra and her family, because if they were able to successfully move through the process and obtain green cards, they would be able to continue living in the United States, where they have established a stable life for themselves and their son, while also being able to visit their elderly and ailing relatives in Ukraine when necessary. Aleksandra and her family followed all of the required steps in the diversity visa process and spent upwards of $6,000 on all of the application fees and other expenses associated with the process, including the required medical examinations for each of them. They submitted their I-485 applications for adjustment of status in December 2024.

273.    Aleksandra and her son also applied for TPS in December 2024 given the ongoing conflict and conditions that persist in their home country.

274.    In January 2025, USCIS scheduled an interview for Aleksandra and her family on February 27, 2025, regarding their adjustment of status applications. However, a few days before the interview, on February 19, USCIS sent a notice to Aleksandra informing her that the interview had been cancelled, without any explanation as to why.

275.    Now, Aleksandra and her family's parole will expire in less than two weeks, on March 29, 2025. If Aleksandra's TPS and adjustment of status applications are not adjudicated or are kept on hold for too much longer, she and her husband will lose their work authorization and ability to support themselves and their young son, and their entire family will lose the ability to remain safely in the United States. Without work authorization, her husband will likely lose his job at his construction company, leaving them without the ability to support themselves and pay for their basic living expenses. And if their adjustment interview and applications are indefinitely suspended, by September 2025, Aleksandra and her family will lose their once-in-a-lifetime opportunity to obtain a visa through the diversity visa lottery system and will have wasted the thousands of dollars they have invested in this process. Consequently, Aleksandra remains extremely afraid and anxious for herself, her husband, and her young son. The indefinite suspension of processing immigration benefit applications for U4U parolees is causing Aleksandra and her family tremendous emotional strain and distress.

276.    Plaintiff **Teresa Doe** and her son reunited with her husband and three other children in the United States in 2017 through the CAM parole process. They had lived apart for many years until Teresa's husband was able to petition for their son to receive parole through CAM. When his petition was approved, Teresa was able to accompany him to the United States as an eligible family member.

Appx-0521

277. Since they arrived in 2017, Teresa and her son were granted CAM re-parole for more than eight years, allowing them to settle into their community in Nevada and allowing Teresa to consistently care for her family. Teresa's husband works and provides the income for their family, while Teresa stays home and takes care of their children and house. She takes her youngest son, who is a U.S. citizen, to high school every day. During the week, she is also the caretaker for her two U.S. citizen granddaughters, who are 2.5 years old and 6 months old, while their parents work full-time. Being together again after so many years of separation has been beneficial for their family.

278. Teresa's most recent grant of CAM parole expired on March 13, 2025. She has a pending application for re-parole that has not yet been adjudicated, and she fears that due to the administration's termination of CAM and other parole processes, it never will be. The possibility of losing parole and being separated from her family again is devastating for Teresa. Her youngest son and grandchildren would have no one to take care of them, and Teresa would miss out on watching them grow up. She is also afraid of returning to El Salvador, given safety concerns and the political climate there. The termination of CAM is causing Teresa and her family more emotional distress with every passing day.

279. Plaintiff **Rosa Doe** escaped Honduras in 2013 after surviving rape and other violence. She was trafficked upon entering the United States. Rosa now lives in Austin, Texas with her four U.S. citizen daughters. She also has one fourteen-year-old daughter living in Honduras with Rosa's elderly father. Rosa applied for her daughter and mother through the CAM parole process in June 2023 in order to reunite with them after over a decade of being apart, and also for Rosa's daughter's safety. After Rosa's mother died in October 2024, Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. Rosa's daughter and father then

moved through the screening and multi-step process and were conditionally approved for CAM parole in November 2024. Rosa did not have enough money to pay for their travel in December 2024 due to having spent all her savings on her mother's medical care and funeral expenses. Rosa began planning for their arrival in late January of 2025. After January 20, 2025, Rosa was unable to reach the organization handling their applications, the International Organization for Migration, for an update on their case. Rosa went without answers regarding her daughter and father's CAM applications until early March 2025. At that time, she was informed that it would take additional time for her daughter and father to travel to the United States on parole.  Around the same time, Rosa was informed about the government's plans to terminate the CAM parole process.

280.    If the CAM parole process is terminated, Rosa fears her daughter and father will not be able to travel to the United States at all. With each day that passes without parole, Rosa's fourteen-year-old daughter remains in active danger from the same perpetrator who inflicted sexual violence and harm onto Rosa when she was fourteen years old. The termination of the CAM parole process is causing Rosa and her family serious anxiety and distress everyday Rosa's daughter remains in Honduras.

281.    Plaintiff **Haitian Bridge Alliance ("HBA")** was founded for the purpose of assisting Haitian and other Black immigrants to acclimate to the United States and to promote their ability to navigate their new lives in the United States. HBA's core organizational activities have been to educate Black migrants about legal pathways and humanitarian protections and to provide them with legal services to access them. HBA has provided direct services to over 1,000 CHNV sponsors and parolees from Haiti.

282.    Since January 2023, HBA has received over 3,000 urgent requests from potential Haitian parolee clients seeking sponsors to apply for the Haitian parole process and has conducted hundreds of consultations with Haitians wanting to apply for parole.

283.    HBA has provided aid to individuals looking to sponsor Haitian migrants through the Haitian parole process by assisting these sponsors with the completion of their sponsorship applications (the Form I-134A) and ensuring they understand each aspect of the application. Between June 2023 and January 2024 alone, HBA staff spent over 500 hours on this work.

284.    HBA has also partnered with Welcome.US—a national initiative that mobilizes and empowers Americans from across the country to welcome and support those seeking refuge here in the United States—to mobilize individuals eager to sponsor and help Haitians fleeing danger and seeking refuge in the United States through the Haitian parole process. Through HBA's partnership with Welcome.US, HBA registered over 140 Haitian parolee clients to help them get connected with potential sponsors and successfully matched 20 Haitian parolee clients with sponsors.

285.    HBA has also provided integration services to Haitian parolees once they arrive, including with regards to housing and other basic needs, transportation, and education.

286.    As a result of the overwhelming demand for assistance with the CHNV parole processes, HBA expanded their team in 2023 by hiring additional staff members to continue supporting this work for CHNV sponsors and parolees in connection to HBA's overall mission and services.

287.    The Trump administration's termination of the CHNV parole processes, including stopping the processing of CHNV parole applications, and the administration's suspension of

processing immigration benefit applications filed by CHNV parolees directly and concretely impair HBA's core activities, and in multiple ways.

288.    For one, the termination and suspensions waste the resources that HBA has already expended in helping potential sponsors and beneficiaries prepare and file applications for parole and, with regards to those who are already here, other immigration benefits.

289.    In addition, the termination of parole for those Haitian parolees already here—which will also terminate their employment authorization—will require HBA to modify its approach to its core activities to meet the needs of those parolees, including their basic economic needs and their heightened legal needs.

290.    The administration has terminated a legal pathway that is relied upon by many of HBA's clients and community members, and its actions directly interfere with HBA's humanitarian and legal support services being provided to CHNV sponsors and Haitian parolees. These needs have already increased, as the reporting of CHNV's termination by the Trump Administration has led to a rapid increase in the number of Haitians and others seeking assistance from HBA, be it legal and otherwise.

291.    The termination and suspension and the new needs it has created has forced HBA to suspend indefinitely its plans to expand the affirmative legal services it could offer its clients, and it will require HBA to respond to any deportation defense needs of CHNV parolees if they lose their status, which would be work that is outside the normal realm of services it offers CHNV parolees. Rather than move forward with their previous plans, HBA now must change course to meet the more immediate humanitarian and legal needs of the community it serves.

292.    Since the release of the March 25 FRN, HBA has been receiving increasing numbers of calls to their hotline from individuals with CHNV parole panicking about how the

March 25 FRN will affect them, including whether their parole has been or will be terminated, what will happen to their work authorization, and whether they could be targeted for expedited removal. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

293.    HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to an upcoming know-your-rights training, which will make it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

## CLASS ALLEGATIONS

294.    Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Lucia Doe, Daniel Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, Valentin Rosales Tabaras, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, and Rosa Doe (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all similarly situated persons for whom the January 20 Huffman

memorandum, the February 14 Davidson memorandum, the March 25 FRN, and subsequent similar actions have halted the processing of their applications to sponsor parole beneficiaries and to seek additional immigration benefits and rescinded existing grants of parole. The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of:

295.    All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to CHNV, U4U, OAW, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

296.    All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

297.    All individuals who have received humanitarian parole through the already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

298.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

299.    The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The demand for to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been high; USCIS received over 120,000 sponsorship applications for U4U,

and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available. Although U4U has no monthly cap on the number of applications that can be granted, only a maximum of 30,000 CHNV applications can be granted each month, which is why USCIS eventually adopted a lottery system to process some CHNV applications, rather than processing them all on a first-come-first-served basis. Similarly, by the time the first Trump administration attempted to take steps to terminate the CAM process, over 12,000 people had applied for the program. And while reliable statistics regarding the number of applications for FRP and MPIP are not publicly available, the FRP process for Haiti alone issued over 12,000 invitations to eligible sponsors within two years, and it appears that USCIS had approved close to 4,000 MPIP applications within two years in the late 2000s. The number of beneficiaries of humanitarian parole processes is also high: Approximately 200,000 Ukrainians have entered the United States through the U4U parole process; approximately 600,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela have entered the United States through the CHNV parole processes; and approximately 75,000 Afghans were brought to the United States through Operation Allies Welcome. The numbers of beneficiaries of FRP, MPIP, and CAM together also number in the many thousands. Although not all of these individuals are eligible for or have applied for additional immigration benefits, many thousands of them have already applied for asylum, TPS, and other status adjustments.

300.    The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' interpretation of the INA's parole provision is lawful and supported by the text of the statute; whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, and other similar agency actions are not in accordance with law and/or with the agencies' own regulations; and whether the January 20 Huffman memorandum,

Appx-0528

the February 14 memorandum, the March 25 FRN, and other similar agency actions violate Plaintiff Class members' rights under the APA.

301. The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the January 20 Huffman memo, the February 14 Davidson memorandum, and the March 25 FRN, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them; whether Defendants quantified or considered harms that result from the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, and their implementation; and whether class members have suffered harm as a result of the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, and Defendants' actions taken to implement these memoranda.

302. Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

303. The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the INA's parole provision, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing. They have further been harmed by Defendants' failure adequately to explain their decision to issue the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, as well as Defendants' premising these

Appx-0529

memoranda and their implementation on an erroneous interpretation of the INA's parole provision. Each of these actions, independently and collectively, have caused harm to the Putative Class Representatives and the Plaintiff Class members.

304.    The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

305.    The members of the proposed class are readily ascertainable through Defendants' records.

306.    Through implementation and enforcement of the memoranda at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

307.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

Appx-0530

## FIRST CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act (APA) – Contrary to Law
### (Termination of parole processes)
### (Against Defendants Noem, Lyons, Flores, and Davidson)

308.    All foregoing allegations are repeated and realleged as though fully set forth herein.

309.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

310.    As explained above, within days of President Trump taking office again, DHS stopped adjudicating any pending requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and stopped accepting new requests for parole or re-parole through them.

311.    Plaintiffs refer to the actions in the preceding paragraph as "terminating" those processes, but that characterization is immaterial to the legal infirmities of the actions.

312.    DHS has not informed the public that it has stopped adjudicating requests for parole and re-parole made through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM. USCIS did put on its website on January 28, 2025 that it has "paused" accepting new applications for parole through U4U, CHNV, and FRP "until we review all categorical parole processes as required by" the "Securing Our Borders" executive order.

313.    DHS subsequently published a Federal Register Notice on March 21, 2025, which expressly "terminat[es]" the CHNV parole processes and states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date." 90 Fed. Reg. 13611.

Appx-0531

314.    DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes and to stop adjudicating any pending such requests constitutes final agency action, as do the discrete actions the agency Defendants took to implement this decision, including but not limited to the January Higgins directive and the March 25 FRN.

315.    DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM; to stop adjudicating any pending such requests; and to "terminat[e]" the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, 90 Fed. Reg. 13611, was based in substantial part on an erroneous interpretation of the parole statute, 8 U.S.C. § 1182(d)(5), contained in the January 20, 2025, memorandum of the then-Acting Secretary Huffman.

316.    DHS's early termination of all existing grants of parole was also based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b). The March 25 FRN states that *the* reason DHS decided not to let CHNV parolees keep what is left on their existing two-year grants of parole is that once they are here for more than two years, they would be ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). 90 Fed. Reg. at 13620. But CHNV parolees cannot be put in expedited removal under § 1225(b)(1)(A)(iii) regardless of how long they have been here, because the statute can only be applied to a noncitizen "who has not been admitted or paroled into the United States."  8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal under § 1225(b)(1)(A)(iii)(II).

317.    Because of DHS's actions, parole and re-parole applications that have been filed are now pending indefinitely, which eliminates the right for beneficiaries to obtain parole and

holds legal consequences both for the applicants and their sponsors. For example, Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, and Valentin Rosales Tabares all have pending applications for individuals for whom CHNV parole is the only legal pathway available for them to seek safety and stability in the United States. For Wilhen, those individuals are family members of hers who deal with routine violence in Haiti; for Valentin, CHNV parole has enabled him to sponsor his daughter-in-law and granddaughter, so that they may reunite with his son and be together as a family again. The termination of the CHNV parole processes means that the beneficiaries of Plaintiffs McAnany, Varner, Victor, and Tabares have lost their opportunity to come to the United States and potentially seek further protection here. The termination of the FRP processes similarly and further harms Valentin Rosales Tabares, whose daughter and granddaughter have approved family-based immigrant visa petitions, but who have been waiting for years in Cuba for their visas to become available.

318.    Humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and remain authorized by the statutory parole authority, codified at 8 U.S.C. § 1182(d)(5).

319.    Defendants' legal conclusion regarding the scope of the parole authority and the legality of these specific parole processes is contrary to law.

320.    Even Defendants' allegedly discretionary decisions are based on an erroneous understanding of their discretionary legal authority. For example, the January 20 Huffman memorandum's assertion that the Secretary of Homeland Security has absolute discretion to deny parole for any reason and in any circumstance is wrong; not only is the Secretary's exercise of that discretion subject to constitutional constraints and self-imposed regulatory constraints, it is also currently restricted by numerous injunctions and other court orders.

321.    Defendants' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

### SECOND CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act – Contrary to Law & *Ultra Vires***
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

322.    All foregoing allegations are repeated and realleged as though fully set forth herein.

323.    As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM.

324.    USCIS did not seek to justify the suspension of the adjudication of benefits for individuals into the United States through one of these humanitarian parole processes until February 14, 2025, in the Davidson memorandum, which addressed only U4U, CHNV, and FRP.

325.    DHS has not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

326.    Defendants' suspension of benefits adjudication for parolees constituted final agency action, as did the discrete actions taken to implement it and on what it is based, including but not limited to the January 20 Huffman memorandum, the January Higgins directive, and the February 14 Davidson memorandum.

327.    Defendants' suspension of the processing of immigration benefits for those paroled through an already established humanitarian parole process has clear legal consequences for many applicants, including because a suspension of an application for relief could leave an applicant

Appx-0534

stranded without status in the United States. For example, Plaintiff Teresa Doe's parole and work authorization expired on March 13, 2025; Plaintiff Aleksandra Doe's parole and work authorization will expire imminently on March 29, 2025; Plaintiff Maksym Doe's U4U parole and work authorization will expire in April 2025. If Aleksandra Doe cannot move forward in the FY2025 Diversity Visa process or have her TPS application processed, and if Maksym Doe's pending applications for re-parole or TPS remain suspended and are not processed and granted soon, they will lose their legal status and his work authorization and become subject to deportation, just as Teresa Doe already has. Other Plaintiffs are similarly at risk of losing their status if this suspension continues.

328.    Defendants' suspension of adjudicating applications that would benefit these parolees is in excess of their statutory authority and contrary to the statutory regime Congress created that give applicants the right to apply for immigration benefits to be adjudicated under the legal standards and through the process that Congress created. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1254a (TPS).

329.    Defendants' blanket suspension of adjudicating applications that would benefit these parolees is also contrary to the parole statute, which requires that conditions for parole be "prescribe[d] only on a case by case basis." 8 U.S.C. § 1182(d)(5).

330.    Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

### THIRD CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Termination of parole processes)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

331.    All foregoing allegations are repeated and realleged as though fully set forth herein.

Appx-0535

332.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

333.    As detailed above, DHS has stopped adjudicating any pending requests for parole or re-parole through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; stopped accepting new requests for parole or re-parole through them; and issued the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations and doing so constitutes final agency action as also discussed above.

334.    Defendants' decision to stop adjudicating pending requests for parole or re-parole through already established humanitarian parole processes, to stop accepting new requests for parole or re-parole through those processes, and to expressly terminate the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, was arbitrary and capricious, for failure to consider and reasonably explain its consideration of the many factors relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the parole statute makes relevant. In so doing, DHS failed to consider important aspects of the problem and also failed to meet the APA's requirement to reasonably explain important decisions like this one.

335.    To the extent Defendants do offer some justifications for their actions, such as in the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, those justifications

were not offered contemporaneously with the termination itself and reveal a disconnect between the decision made and the rationale provided, and therefore do not provide a satisfactory explanation for Defendants' actions.

336.    Even had the explanations in the Mar. 25 FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the Mar. 25 FRN failed to consider the purposes of the parole statute and the INA more generally; the current conditions in Cuba, Haiti, Nicaragua, and Venezuela; the combined effects on CHNV parolees, their families, and their communities of the various other actions Defendants have taken, including the other agency actions challenged here; the correct interpretation of the parole statute and the expedited removal statute, 8 U.S.C. § 1225(b); and available alternatives.

337.    In imposing an erroneously narrow interpretation of the parole statute on agency personnel while also authorizing and directing them to terminate all previously established humanitarian parole processes, Acting Secretary Huffman claimed that, even if a court disagrees with his legal conclusion, "I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

338.    Acting Secretary Huffman's claim that he would impose the same policy as a discretionary matter was a pretextual and/or contrived attempt to insulate his unlawful actions from judicial review.

339.    In allegedly deciding to adopt the same policy as a matter of discretion, Acting Secretary Huffman failed to consider any factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and

potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the statute makes relevant. In so doing, he failed to consider important aspects of the problem.

340.   DHS thus acted arbitrarily and capriciously in allegedly adopting, as a matter of discretion, its parole policy, and in taking all the aforementioned actions regarding specific parole processes and the individuals who have been paroled through them.

341.   DHS' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

342.   All foregoing allegations are repeated and realleged as though fully set forth herein.

343.   A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

344.   As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, and doing so constitutes final agency action as also discussed above.

345.   DHS's decision to suspend adjudication of these requests for benefits was arbitrary and capricious due to Defendants' failure to consider seemingly every factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on those directly affected and on their family members and communities; the impact of it on the United States'

97

foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or the criteria made relevant by the statutes governing the applications. In so doing, Defendants failed to consider important aspects of the problem.

346.    In addition, DHS ignored and otherwise violated the APA reasonable explanation requirement.

347.    DHS thus acted arbitrarily and capriciously in suspending the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

348.    Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – *Accardi* Doctrine**
**(Failure to follow agency procedures)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

349.    All foregoing allegations are repeated and incorporated as though fully set forth herein.

350.    Plaintiffs are entitled to written notice that their parole is being terminated before expiry of the authorized duration pursuant to 8 CFR § 212.5(e)(2)(i), which states that "parole shall be terminated upon written notice to the alien . . . " Plaintiffs are also entitled to written notice that their employment authorization is being terminated before the expiry of the authorized duration pursuant to 8 C.F.R. § 274a.14(b), which states that a "written notice of intent to revoke the employment authorization" must be served, and that the individual "will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence."

Appx-0539

351.    Defendants' actions will result in Plaintiffs being deprived of the written notice of termination they are entitled to because the March 25 FRN terminating parole processes for CHNV nationals, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (Mar. 25, 2025), fails to provide written notice or set forth any procedure by which Defendants are provided with written notice of the premature termination of their parole. The March 25 FRN states that parolees under the CHNV parole processes will be notified that their parole is being terminated on April 24, 2025 through the March 25 FRN itself and notifications sent to the parolees' online USCIS accounts.

352.    Publication of a FRN and/or electronic notification to online USCIS accounts do not qualify as "written notice" of termination.

353.    Defendants' actions, as set forth above, violate agency procedures, including those found at 8 CFR § 212.5(e)(2)(i), which state that parolees are entitled to "written notice" of termination when parole is terminated before expiry of the authorized duration.

354.    Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

355.    Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
**Non-Statutory Claim to Enjoin Unlawful Executive Action**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

356.    All foregoing allegations are repeated and realleged as though fully set forth herein.

357.    As discussed above, Defendants' decisions terminating humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and suspending benefits

Appx-0540

adjudications for individuals paroled through those processes, are contrary to the INA and in excess of the legal authority granted Defendants.

358.    Defendants' actions should therefore be declared unlawful and enjoined pursuant to this Court's inherent equitable authority.

**SEVENTH CLAIM FOR RELIEF**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

359.    All foregoing allegations are repeated and realleged as though fully set forth herein.

360.    Plaintiffs have a protected interest in applying for parole, re-parole, and other immigration benefits; and in any grant of parole, re-parole, and other immigration benefits.

361.    Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to notice, an opportunity to be heard, and to have their claims adjudicated pursuant to the laws enacted by Congress.

362.    Defendants' actions terminating the parole processes and suspending benefits adjudication violate Plaintiffs' right to due process in numerous ways by depriving them of a meaningful opportunity to establish—under lawful standards—their eligibility for parole, re-parole, other immigration benefits, and to the remainder of any grant of parole they have already received.

363.    Defendants' termination of these parole processes and suspension of benefits adjudication must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

100

1.      Issue a preliminary injunction and/or a stay under 5 U.S.C. § 705 in order to restore the *status quo ante*, under which CHNV parole beneficiaries are entitled to enjoy the full duration of their already-issued grants of parole, and under which adjudications for requests for parole and/or re-parole under already established humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM, as well as other requests for immigration benefits for individuals paroled through such processes, all resume and continue in the ordinary course pursuant to the policies in effect prior to the January 20 Huffman memorandum.

2.      Declare that humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and are in accordance with the statutory parole authority, 8 U.S.C. § 1182(d)(5);

3.      Declare that Defendants' termination of already existing humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, arbitrary and capricious, and violated the constitutional guarantee of due process;

4.      Declare that the March 25 FRN terminating parole and work authorization granted under the CHNV parole processes was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

5.      Declare that Defendants' suspension of the adjudication of benefits applications for individuals paroled through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

6.      Hold unlawful, set aside, and/or otherwise vacate Defendants' suspension of the adjudication of requests for parole and re-parole through established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; Defendants' suspension of the adjudication

Appx-0542

of requests for immigration benefits for individuals paroled through such humanitarian parole processes; the January 20, 2025 Huffman memorandum; the January Higgins directive; the February 14, 2025 Davidson memorandum; and all DHS actions based thereon or implementing one thereof;

7.      Enjoin Defendants from applying their erroneous interpretation of the parole statute to individuals paroled into the United States through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; and from suspending the adjudication of immigration benefits of individuals paroled through such processes;

8.      Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

9.      Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

10.      Award such other and further relief that the Court may deem just, equitable, and proper.

Appx-0543

Dated: March 27, 2025

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org


Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org


Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com


H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com


Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com


Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com


*Attorneys for Plaintiffs*

Appx-0544

**CERTIFICATE OF SERVICE**

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| SVITLANA DOE, et al. |
| |
| Plaintiffs, |
| |
| – v. – |
| |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al. |
| |
| Defendants. |

Civil Action No.: 1:25-cv-10495-IT

## EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF DHS'S *EN MASSE* TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE

Plaintiffs[1] respectfully move for a supplemental preliminary injunction and a stay under Fed. R. Civ. P. 65(a) and 5 U.S.C. § 705 of Defendants'[2] unlawful termination of humanitarian parole processes for foreign nationals to gain entry to the United States under 8 U.S.C. § 1182(d)(5)(A), most recently through the publication of the Federal Register Notice terminating the parole processes for Cuba, Haiti, Nicaragua, and Venezuela. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).

Defendants' actions are unprecedented, will result in hundreds of thousands of individuals losing lawful status and work authorization on April 24, 2025, and for the purposes of this motion, are contrary to law within the meaning of the Administrative Procedure Act. Defendants' actions

---

[1] Plaintiffs are 23 individuals and a nonprofit organization (Haitian Bridge Alliance) injured by the challenged agency actions. *See* Second Am. Compl., Doc No. 68.

[2] The Defendants are Kristi Noem, in her official capacity as Secretary of Homeland Security; Todd M. Lyons, in his official capacity as the Acting Director of Immigration and Customs Enforcement; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; Kika Scott, in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and Donald J. Trump, in his official capacity as President of the United States.

will cause imminent irreparable harm to Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe; beneficiaries sponsored by Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, and Norma Lorena Dus; hundreds of thousands of similarly situated CHNV parole beneficiaries here in the United States, as well as their U.S.-based sponsors; and Haitian Bridge Alliance, which has provided legal and humanitarian services for thousands of CHNV parole beneficiaries.

For the reasons set forth above and in the accompanying exhibits and memorandum of law filed herewith, Plaintiffs respectfully request that the Court enter an order:

1. Enjoining and restraining the Defendants and their officers, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them under Rule 65 and 5 U.S.C. § 705 from the date of the Court's order, from taking any action to implement or enforce Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025); and

2. Requiring Defendants, within three days of the issuance of the Court's order and then weekly thereafter, file a status report with the Court describing in detail all steps taken to ensure agency staff are aware of and are in compliance with the Court's order, along with copies of all issued guidance and directives related to the Court's order.

A proposed order is attached hereto.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Plaintiffs respectfully request an oral argument Pursuant to Local Rule 7.1(d). The Court has scheduled oral argument on this Motion on April 10. Doc No. 63.

Appx-0547

Dated: March 27, 2025

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Respectfully submitted,

*/s/ John A. Freedman*
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

*Attorneys for Plaintiffs*

3

## CERTIFICATE UNDER LOCAL RULE 7.1(a)(2)

The plaintiffs, through their counsel, have conferred with the defendants' counsel pursuant to Local Rule 7.1(a)(2) regarding the subject matter of the instant motion, and the parties have not come to a resolution.

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

Appx-0549

# EXHIBIT 2

to Plaintiffs' Emergency Motion for a Preliminary Injunction and Stay of DHS's *En Masse* Truncation of all Valid Grants of CHNV Parole

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et al.*,

    *Plaintiffs,*

      *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-10495-IT

## DECLARATION OF NORMA LORENA DUS

I, Norma Lorena Dus, upon my personal knowledge, hereby declare as follows:

1. I was born in Caracas, Venezuela in 1988. I completed my college degree in Ireland and then moved to the United States in 2016. I became a U.S. citizen in 2020.

2. I currently live in West Stockbridge, Massachusetts with my husband and stepchildren. I have lived here since 2016. I work for a nonprofit doing immigration advocacy and providing direct legal services.

3. I am the sponsor for my sister, Lucia Doe, who is a national of Venezuela, under the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"). When I learned of the CHNV parole processes through my job, I immediately thought of Lucia, who was living in Venezuela with our mother at the time, and how it would be a beneficial, legal way for her to come to the United States.

4. Back in Venezuela, even though she was working full-time, Lucia didn't make enough money to pay for food, rent, and other necessities for herself and our parents. Daily life was very difficult for them, especially because our mother has health conditions that

require expensive doctor's visits, exams and labs, and medication. The public hospital system in Venezuela is a heartbreaking state, with many hospitals lacking even consistent electricity and running water, as well as basic medical supplies and medications. This means that the only real option for our mother is private health insurance, which is extremely expensive because there are no health insurance options. She has to pay for all her care out of pocket, but she only receives a pension that is not even enough to buy a dozen eggs. I, along with our two other siblings who have moved outside of Venezuela, regularly send money back to Venezuela to help support our parents given the low wages and severe economic challenges there. When we heard about the CHNV processes, we saw it as an opportunity for my sister to both find a way to better provide for herself and to help support the family from abroad. It was also an opportunity for her to spend time outside of Venezuela.

5. I submitted the CHNV sponsorship application for Lucia in December 2022, and she was granted authorization to travel in May 2024. I paid for her plane ticket and her work permit application fee, and Lucia arrived in the United States in July 2024. She was granted parole through July 2026. She traveled to Florida, where she has lived since then. From previous times visiting Florida when she was attending university in Puerto Rico, she has friends and some connections there. That made it easier for her to find housing with a friend and get a job right away, instead of coming to live with me in a remote part of Massachusetts.

6. After Lucia arrived in the United States, she had to wait a month or so for her work permit, so to help support her during that time, I sent money to the friend that she is living with. As soon as Lucia got her work permit, she started working at her friend's

Appx-0552

cleaning business and paying for her own expenses, including the rent for staying at her friend's apartment. She is completely self-sufficient now, and she sends money back to our parents as well, which helps them cover rent, food, and medical care. Even though I didn't ask her to, she is also paying me back for the costs I covered for her.

7. The CHNV parole process has been a blessing for our family in more ways than one. Not only is Lucia able to support herself more easily, send money back to our parents, and relieve some of the financial strain on me and our other siblings, but having her in the United States also means that we are more easily able to see each other in person. Last October, Lucia came to Massachusetts, and for the first time in six years, all the siblings were together. Our mother and our other siblings also traveled in, and we all spent time together. It was incredible to be reunited. It was a joyful reunion for everyone. As a U.S. citizen, it is very difficult for me to travel in and out of Venezuela, so having my sister physically closer allows us to connect and strengthen our relationship.

8. I first heard that CHNV parole was getting terminated, and that current parole grants like Lucia's would be revoked, through my job and by reading the news. It was devastating to hear because I know both through my own experience and my work with clients that this process has been lifechanging for so many individuals and families. It is appalling that the government would punish people like Lucia who applied from abroad to come to the United States, are supported by a sponsor, came through a legal pathway, and are working to support themselves and bolster the U.S. economy. I feel disappointed and hurt by how deeply unfair it is.

9. In preparation for Lucia's parole status being revoked, we have been discussing what options she has that will allow her to return to the United States in the future through

Appx-0553

other legal pathways, including tourist visas. I spoke with an immigration attorney at the organization that I work at to understand those options. We have also been preparing for the possibility that Lucia will need to leave at a moment's notice, which is difficult logistically given the dearth of flights to Venezuela and the fact that Lucia has settled into her community in Florida over the last eight months.

10. On March 21, 2025 I learned that the CHNV parole was officially terminated and that any time remaining on existing parole statuses would be revoked.

11. Lucia's parole being revoked will harm me and our family in several ways. First, I am concerned about Lucia's safety and stability if she has to return to Venezuela. She quit her job there when she was granted CHNV parole, so she would need to find a new job that she enjoys and that will sustain her and our parents, which is difficult to do. It will be challenging for her to get food, clothing, and other items that she needs to survive. Life in Venezuela is incredibly difficult in general, including because the healthcare system is in crisis; there are frequently mass internet and power blackouts; inflation makes daily necessities unaffordable for the majority of the population; and basic services like water, gas to cook, and transportation are unreliable or sometimes unavailable for days. On top of that, crime is a constant concern, and daily life comes with a level of uncertainty about safety that is emotionally and physically draining.

12. Second, the revocation will have a severe financial impact on me and our family. Lucia will no longer have extra income to provide for our parents, which means that our other siblings and I will need to send more money back to help them cover rent, food, transportation, clothes, and medical care. Providing money to our parents is a responsibility that we take on because we love them and because it is vital for their

4

survival in Venezuela, but it is also a sacrifice financially. Revoking Lucia's parole inevitably means that I will need to stretch even further financially to make sure my parents have what they need. Our entire family would suffer significant hardship as a result of Lucia's parole status being revoked.

13. Finally, it will be psychologically difficult. I am already beginning to experience the mental toll of how unfair the revocation is and the emotional hardship of my sister having to leave again, after coming to the United States on permission from the government. It feels like, after we followed all the rules, that we have been betrayed.

14. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our beneficiaries take full advantage of their CHNV parole period, as they should be allowed to do.

15. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

16. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the termination of the CHNV parole program and the revocation of parole.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in West Stockbridge, Massachusetts on March 24, 2025.

_____

Norma Lorena Dus

5

# EXHIBIT 3

to Plaintiffs' Emergency Motion for a Preliminary Injunction and Stay of DHS' *En Masse* Truncation of all Valid Grants of CHNV Parole

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al., | |
| Plaintiffs, | |
| *v.* | Civil Action No.: 1:25-cv-10495-IT |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., | |
| Defendants. | |

**DECLARATION OF GUERLINE JOZEF, CO-FOUNDER AND EXECUTIVE DIRECTOR AT HAITIAN BRIDGE ALLIANCE ("HBA")**

I, Guerline Jozef, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18. I make this declaration based on my own personal knowledge and, if called to testify, could and would testify as stated herein.

2. I am the Co-Founder and Executive Director of the Haitian Bridge Alliance (HBA), a grassroots and community-based nonprofit organization that advocates for fair and humane immigration policies and provides immigrants with humanitarian, legal, and social services, with a particular focus on Black immigrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA was incorporated in California in early 2016 to address the needs of an influx of Haitian and other Black immigrants in the U.S and seeking humanitarian protections as conditions in their countries deteriorated. HBA seeks to elevate the issues unique to Black immigrants and builds solidarity and collective movement toward policy change. HBA is headquartered in San Diego, California.

3.  As the Co-Founder and Executive Director, I am responsible for the comprehensive oversight of the entire organization. I am the direct liaison to the Board of Directors, and I directly supervise the management team, including the Managing Attorney and Humanitarian Director. I am engaged in both the programmatic and administrative functions of HBA. Furthermore, I play a critical role in amplifying the work of HBA and advocating for the needs of the Black immigrant communities on national and international platforms through frequent speaking engagements, panel discussions, and collaborations with media outlets and relationship building with partners.

4.  Informed by our mission, HBA was founded for the purpose of assisting recently arrived Haitian and other Black immigrants in acclimating to the United States and to ensure their success in navigating their new lives in the United States, which includes helping these immigrants access more secure immigration status here in the United States. Since 2016, this founding principle has informed how HBA has developed our core organizational work streams, which are to: advocate for and facilitate access to expanded legal pathways and humanitarian protections for all immigrants with a focus on Haitian and other Black immigrants, and especially recent arrivals; provide holistic humanitarian support to immigrants; and provide legal support to immigrants in the United States. Starting in 2020, HBA has operated a legal department with a small staff of attorneys who provide direct representation to Haitian and other Black people in U.S. immigration matters, including people in ICE detention, those in removal proceedings before the Executive Office for Immigration Review (EOIR), and those filing applications for immigration benefits with USCIS. HBA prioritizes detention cases for people in California, but it also provides limited pro bono representation before EOIR for people in jurisdictions other than

Appx-0558

California. HBA's work also focuses on local, state, national, and international advocacy for fair and humane immigration policies and pathways.

5. Since the inception of the CHNV parole processes, HBA has extended its core organizational activities to serve Haitian CHNV parolees and their sponsors as consistent with its mission to provide support to recent Haitian arrivals. These include: (1) legal consultations for Haitian parolees; (2) facilitating access to the expanded legal pathway established by CHNV parole by partnering with Welcome.US in assisting U.S.-based sponsors and their beneficiaries; and (3) humanitarian and integration support services for Haitian nationals lawfully paroled into the United States.

6. After the CHNV parole processes were established, HBA received and continues to receive numerous requests for information on CHNV parole from community members. To help respond to these requests in an effective and impactful way, HBA formed a partnership with Welcome.US, a national initiative that mobilizes and empowers Americans all over the country to welcome and support those seeking refuge in the United States. This partnership focused on mobilizing people eager to sponsor for the parole process Haitians who were fleeing danger and instability in Haiti. As a result, HBA staff along with Welcome.US has provided support to hundreds of people seeking to access the CHNV parole processes.

7. Due to the immense demand for assistance from both prospective and current Haitian CHNV parolees and sponsors, in 2023 we hired a full-time staff member to work directly with Welcome.US. Before we were able to do this, other staff members on our team had to divert some of their efforts and energies to this work.

8. Once Haitian CHNV parolees have arrived in the United States and receive parole, HBA provides humanitarian and legal services to encompass their varying needs. This has been a natural extension of the work HBA's team has always done; our humanitarian services team provides direct humanitarian and social support to recent Haitian arrivals by helping them find and secure temporary housing and other basic living necessities, and we also provide integration education about the United States. HBA's legal services department also provides direct legal assistance to recent Haitian arrivals, in the form of legal consultations and community outreach and education so people better understand what immigration pathways are available to them, such as asylum and Temporary Protected Status ("TPS"). Since the creation of CHNV, HBA has provided these same services to Haitian CHNV parolees.

9. I understand that the Trump administration has terminated the CHNV parole processes, is no longer processing CHNV sponsorship applications, and is prematurely revoking CHNV parolees' grants of parole and work authorization, stripping beneficiaries of their lawful status and ability to work in the United States. I am also aware that USCIS has indefinitely suspended the adjudication of immigration relief applications filed by CHNV and other parolees. These actions directly interfere with and affect HBA's core activities of serving recent Haitian arrivals to enable their success in navigating their new lives in the United States and help them access more secure immigration status here.

10. The administration's actions have concretely and perceptibly impaired both the legal and humanitarian services that HBA provides to recent Haitian arrivals, given the panic that has spread through our community.

4

11. Since the release of the March 25 FRN, HBA has been receiving increasing numbers of requests for support from individuals with CHNV parole panicking about how the March 25 FRN will affect them. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

12. Additionally, with the termination of CHNV parole comes the termination of work authorization, which throws recently arrived immigrants into immediate crisis. HBA has had to provide emergency humanitarian and legal assistance to individuals seeking help instead of focusing on supporting recent arrivals as they settle into the United States, pay their taxes, gain lawful employment, contribute to their adoptive communities, support themselves and their families, and pursue alternate pathways to longer-term lawful status in the United States. The abrupt rescission of validly issued parole grants and work authorizations for Haitians under the CHNV parole processes on April 24, 2025 has prompted a crisis-based rapid response from HBA's staff that prevents them from focusing on HBA's core activities intended to meet the basic economic and living needs of recent Haitian immigrants to the United States, such as fostering outreach and education, employment readiness, self-reliance, and acclimation within their adopted communities, and providing other direct services.

13. Lastly, the suspension of adjudicating immigration relief applications filed by Haitian CHNV parolees directly interferes with HBA's legal services to recently arrived Haitian migrants. Typically, HBA's outreach and education programs consist of educating Haitian

Appx-0561

parolees on other legal relief available to them, now mainly in the form of TPS and asylum, followed by tailored legal consultations to discuss each parolees' individual case and whether they may qualify for other reliefs such as family reunification, for TPS and/or asylum. If CHNV holders are now at risk for detention and deportation, HBA will be required to modify this approach, shifting course away from providing our typical affirmative legal support to Haitian parolees to respond to any new deportation defense needs that they have once they lose their status, which is work that is outside of HBA's normal core legal services for CHNV Haitian parolees.

14. Additionally, the government's actions have created confusion and uncertainty as to what options exist for CHNV parolees and what applications, if any, are being processed. Due to this opacity, HBA has had to learn through trial and error how best to invest its limited resources in providing this kind of assistance, and how to adjust the advice it provides to parolees. For example, following the suspension of adjudication of immigration benefit requests, HBA was not immediately sure whether asylum applications submitted by CHNV parolees would even receive a receipt notice and whether that would provide any greater protection against removal. This affected whether HBA should advise parolees to apply for asylum. Under the new FRN, moreover, HBA now understands that applications for work authorization will not be processed. HBA is currently in the process of helping a CHNV parolee with a pending asylum claim apply for work authorization based on their status as an asylum applicant. Due to the FRN and other directives, we do not know how to help this person. With no adjudication of asylum applications, even if they have an asylum application receipt that may protect them from deportation, they won't be able to get work authorization or protection from detention. HBA knows that these new policies will create

more demand for detention/removal defense services and also for humanitarian support, due to the lack of ability to work.

15. HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to its educational materials and will continue to need to do so to the extent there are policy changes that affect CHNV parolees. This makes it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted for trainings. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

16. HBA is deeply committed to supporting our Haitian community and other immigrant communities and fostering a smoother, more informed path to legal entry and resettlement for Haitian parolees. The CHNV parole processes have been a lifeline for Haitians seeking stability and safety here in the United States and terminating these processes and Haitian parolees' ability to access additional immigration relief while here in the United States would be taking away this lifeline for them.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Aliso Viejo, California on March 27, 2025.

_____

Guerline Jozef

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>                  Plaintiffs,<br><br>      *v.*<br><br>KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security, et al.,<br><br>                  Defendants. | Civil Action No.: 1:25-cv-10495-IT |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF DHS'S *EN MASSE* TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 7

    I.     PLAINTIFFS HAVE STANDING, THEIR CLAIMS ARE JUSTICIABLE, AND
         DEFENDANTS' ACTION IS REVIEWABLE ........................................................ 7

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT THE MARCH 25
         FRN'S *EN MASSE* TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE
         WAS UNLAWFUL ................................................................................................ 10

    III.   PRELIMINARY RELIEF IS NECESSARY TO STOP IMPENDING
         IRREPARABLE INJURY THAT IS CERTAIN TO OCCUR ................................... 15

    IV.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH
         HEAVILY IN FAVOR OF PRELIMINARY EQUITABLE RELIEF ........................ 18

CONCLUSION .................................................................................................................. 19

Appx-0565

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

<u>**Cases**</u>

*Arevalo v. Ashcroft*,
    344 F.3d 1 (1st Cir. 2003) ................................................................................15

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..........................................................................................9

*Biden v. Texas*,
    597 U.S. 785 (2022) ...................................................................................10, 11

*Bollat Vasquez v. Mayorkas*,
    520 F. Supp. 3d 94 (D. Mass. 2021) ...............................................................11

*Bollat Vasquez v. Wolf*,
    460 F. Supp. 3d 99 (D. Mass. 2020) ...............................................................11

*Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers,*
    *Helpers, Warehousemen & Packers*,
    679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) .........................19

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..............................................................................................9

*Fed. Crop Ins. Corp. v. Merrill*,
    332 U.S. 380 (1947) ........................................................................................14

*Friends of Sierra R.R., Inc. v. I.C.C.*,
    881 F.2d 663 (9th Cir. 1989) ..........................................................................14

*LaMarche v. Mayorkas*,
    691 F. Supp. 3d 274 (D. Mass. 2023) .........................................................9, 10

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) (per curiam) ....................................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................8

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
    496 F. Supp. 3d 600 (D. Mass. 2020) ..............................................................7

*Match-E-Be-Nash-She-Wish and of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................................................................8, 9

*Nken v. Holder*,
　556 U.S. 418 (2009) ........................................................................................18

*Pacito v. Trump*,
　__ F. Supp. 3d. __, 2025 WL 655076 (W.D. Wash. Feb. 28, 2025) ...................18

*Patel v. Garland*,
　596 U.S. 328 (2022) ..........................................................................................9

*Roe v. Mayorkas*,
　No. 2-cv-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ...............9, 10

*Ross-Simons of Warwick. Inc. v. Baccarat, Inc.*,
　217 F.3d 8 (1st Cir. 2000) ...............................................................................18

*United States ex rel. Accardi v. Shaughnessy*,
　347 U.S. 260 (1954) ....................................................................................14, 15

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
　645 F.3d 26 (1st Cir. 2011) ...............................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ........................................................................................7, 18

**<u>Statutes</u>**

5 U.S.C.
　§ 704 ..................................................................................................................9
　§ 705 ...............................................................................................................1, 7

8 U.S.C.
　§ 1225(b)(1)(i) ..................................................................................................11
　§ 1182(a)(9)(B) .................................................................................................16
　§ 1182(d)(5)(A) ......................................................................................... *passim*
　§ 1225 ................................................................................................................7
　§ 1225(a)(1) ......................................................................................................11
　§ 1225(b) ............................................................................................................1
　§ 1225(b)(1)(iii)(II) ...................................................................................7, 10, 11
　§ 1252(a)(2)(B)(ii) ...........................................................................................8, 9

44 U.S.C.
　§ 1505 ..............................................................................................................13
　§ 1507 ........................................................................................................13, 14

INA
　§ 225 .................................................................................................................7
　§ 235 .................................................................................................................7

Appx-0567

8 U.S.C. § 1235 ..................................................................................................................7

49 Stat. 502 ....................................................................................................................14

**Other Authorities**

8 C.F.R.
    § 212.5(e) ..............................................................................................................1
    § 212.5(e)(2)(i) ...........................................................................................6, 13, 14
    § 274a.14(b) ...................................................................................................6, 14
    § 274a.14(b)(2) ...............................................................................................6, 15

Fed. R. Civ. P
    65 .........................................................................................................................1
    65(c) ...................................................................................................................19

90 Fed. Reg
    8443, 8444 (Jan. 29, 2025) .................................................................................16
    13611 .............................................................................................................1, 15
    13611-12 Background section .............................................................................11
    13612 .......................................................................................................3, 12, 13
    13614 n.24 ...........................................................................................................3
    13617 ..................................................................................................................4
    13617 n.57 ...........................................................................................................4
    13618 ............................................................................................................4, 16
    13618 n.68 .........................................................................................................13
    13619 ......................................................................................................14, 15, 16
    3619 n.70 ...........................................................................................................11
    13619-20 ...................................................................................................... *passim*
    13620 ................................................................................................................14

iv

## INTRODUCTION

Plaintiffs respectfully move for a preliminary injunction under Rule 65 and a stay under 5 U.S.C. § 705 of the Secretary of Homeland Security's attempt to cut short via Federal Register Notice every valid period of parole granted through the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole processes—a blanket exercise of the parole authority directly affecting hundreds of thousands of people *en masse*, including eight individual Plaintiffs[1]—as of April 24, 2025. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025) (Ex. 51), Doc. No. 71-1.[2] As explained below, the Secretary's action is unprecedented, inhumane, and unlawful for multiple independent reasons, including because it: violates the statute's case-by-case requirement, 8 U.S.C. § 1182(d)(5)(A), and the regulatory (and constitutional) requirement of written notice in these circumstances, 8 C.F.R. § 212.5(e); and is premised on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b), which does not permit subjecting CHNV parolees to expedited removal even if they have been here less than two years, negating the Secretary's sole excuse for not "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done," 90 Fed. Reg. at 13619-20 ("Any lengthening of the wind-down period will increase

---

[1] *See* Alejandro Doe Decl., Doc. No. 24-1 (Plaintiff whose parole period will be cut short by approximately 461 days); Carlos Doe. Decl., Doc. No. 24-4 (same); Miguel Doe Decl., Doc. No. 64-4 (same); Lucia Doe Decl., Doc. No. 64-3 (442 days); Ana Doe Decl., Doc. No. 24-2 (305 days); Armando Doe. Decl., Doc. No. 24-3 (same); Daniel Doe Decl., Doc. No. 64-5 (283 days); Andrea Doe Decl., Doc. No. 27-1 (39 days); *see also* Gabriela Doe Decl., Doc. No. 64-6 (U.S. citizen cousin and sponsor of four of the individual Plaintiffs whose parole has been cut short); Norma Lorena Dus Decl., Doc. No. 71-2 (sponsor and sister of Plaintiff Lucia Doe); Haitian Bridge Alliance ("HBA") Decl., Doc. No. 71-3 (describing the effects of the mass termination of CHNV parole on Plaintiff Haitian Bridge Alliance).

[2] Plaintiffs challenge the Federal Register Notice as a whole, *see* Second Am. Compl., Doc. No. 68 ¶¶ 308-21, 331-41, 349-63, but only seek preliminary relief of its attempt to terminate prematurely the existing grants of parole.

1

the likelihood that additional CHNV parolees are no longer subject to expedited removal."). If the Secretary's action is allowed to take effect, hundreds of thousands of law-abiding and hardworking noncitizens across the country will be rendered removable and legally unemployable, and all on the same day in late April, inflicting irreparable injury on a breathtaking scale.

## BACKGROUND

Plaintiffs assume the Court's familiarity with the proceedings to date and will endeavor not to repeat their prior brief and exhibits related thereto, which are incorporated by reference.[3] Suffice it to say for present purposes that, without any public announcement or acknowledgement, DHS has: (1) indefinitely suspended the CHNV parole processes (among others) no later than January 23, 2025, based solely on the Secretary's erroneous legal conclusion that they were unlawful, *see* Higgins email dated Jan. 23, 2025, Doc. No. 41-2; Huffman Mem. dated Jan. 20, 2025, Doc. No. 41-1; and (2) indefinitely suspended adjudicating CHNV (and other) parolees' requests for other immigration benefits, including those authorizing employment and/or additional periods of lawful presence, on an unknown date but sometime before trying to justify that action in mid-February, *see* Davidson Mem. dated Feb. 14, 2025, Doc. No. 41-3. On March 24, the Court heard argument on Plaintiffs' request for an emergency preliminary injunction and stay of the two indefinite suspensions to at least require DHS to restart processing of parole applications already conditionally approved and of other pending immigration benefit requests (including for re-parole) of parolees already in the United States. A further hearing on that motion is scheduled for April 7, 2025. Doc. No. 58.

_____

[3] *See* Pls.' Mem. in Supp. of Emerg. Mot. for Prelim. Inj. & Stay, Doc. No. 25; Exhibits 1-50, Doc. Nos. 24-1 through 24-50.

Appx-0570

DHS's formal notification that the Secretary had decided to end the CHNV parole processes and prematurely terminate all validly issued grants of parole and related employment authorization related employment authorization was officially published last week. Doc. No. 71-1 (hereinafter, "March 25 FRN" or the "Notice"); *see also* Pls.' Notice dated Mar. 21, 2025, Doc. No. 45 (submitting pre-publication version). The Notice acknowledges that DHS created the CHNV programs based on the prior Secretary's judgment that they would both "provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries," 90 Fed. Reg. at 13612; and that President Trump had specifically ordered they nonetheless be terminated, *id.* at 13611; but elsewhere says that the Secretary "is terminating the CHNV parole programs" "in her discretion," *id.* at 13612. The March 25 FRN does not acknowledge that DHS had already indefinitely suspended the CHNV processes and the adjudication of immigration benefits for CHNV parolees.[4]

As to DHS's prior conclusion that the CHNV processes had provided a "significant public benefit," the March 25 FRN acknowledged some (but not all) of DHS's prior reasoning, stating that it now believes that they "are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with th[is] Administration's foreign policy goals." 90 Fed. Reg. at 13612. In contrast, the March 25 FRN says DHS now disagrees about its prior conclusion that the CHNV processes were independently justified by the "urgent humanitarian reasons" prong of 8 U.S.C. § 1182(d)(5)(A), based on its current interpretation of the parole statute. *See* 90 Fed. Reg. at 13612 ("Regarding previous arguments or determinations that these programs were consistent

---

[4] Unlike the other parole processes at issue in this case (but not this motion), re-parole was not available through the CHNV processes. *See* 90 Fed. Reg. at 13614 n.24.

with the requirement of 'urgent humanitarian reasons' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed *on a case-by-case basis consistent with the statute*, and taking into consideration each alien's specific circumstances." (emphasis added)); *see also* Doc. No. 41-1 (setting out that interpretation).

Beyond prospectively terminating the CHNV processes, the March 25 FRN described how DHS would handle several issues as to particular populations of applicants and recipients inherently impacted by the Secretary's termination decision. The Notice states that "there have been approximately 2,970,000 Forms I-134 and I-134A filed with USCIS since October, 2022."[5] 90 Fed. Reg. at 13617 (footnote omitted); *id.* n.58. Of those, USCIS has "confirmed" eligibility in approximately 22 percent of the applications (642,410) and has determined that another 6 percent (181,820) failed to demonstrate eligibility (which the FRN calls "non-confirmed"), with the remaining 2.14 million (some 72 percent) still pending review. *Id.* at 13617 n.58 & accompanying text. The March 25 FRN states that applications pending review will be "issue[d] a notice of non-confirmation." *Id.* at 13618. For applications "confirmed," but where the beneficiary has not yet traveled to the United States, DHS will "rescind the confirmation" and "issue updated notices of non-confirmation." *Id.* at 13618.

---

[5] As the Notice explains, USCIS used Form I-134 for applications to the Venezuela-only CHNV precursor (sometimes referred to as "P4V") announced in October 2022 but switched to using Form I-134A when the CHNV processes were established in January 2023. 90 Fed. Reg. at 13617 n.57; *see also* Sec. Am. Compl. ¶ 96. The March 2025 FRN fails to mention that Form I-134A was *also* used for Family Reunification Parole (FRP) processes established after CHNV or that both forms were also used for the Uniting for Ukraine (U4U) parole process established before CHNV, in April 2022; those omissions make DHS's proffered statistics regarding the CHNV processes less reliable but its intentions regarding U4U and FRP—already singled out in the February 14 Davidson memorandum—even clearer. *See* 90 Fed. Reg. at 13618 ("DHS intends to issue a notice of non-confirmation for *all* remaining pending Forms I–134A. DHS will also rescind the confirmation of *all* Form I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a [port of entry] POE to seek parole." (emphases added)).

The March 25 FRN addresses three further distinct groups. First, for the undisclosed number of "confirmed" applications where the beneficiary has taken the additional step of applying for "advance travel authorization" (ATA)—the rough parole equivalent of a visa authorizing a noncitizen to come to a U.S. port of entry to seek admission, except parole does not count as an admission—the Notice states "DHS intends to cancel all pending applications for [ATA]." *Id.* at 13618.

Second, the March 25 FRN strongly suggests that, for an unknown number of "confirmed" applications in which the beneficiary had received an approved ATA (which are valid for 90 days), DHS cancelled those ATAs some weeks ago. *See id.* at 13618 (asserting that there "are no currently approved ATAs" for CHNV parolees); *id* at 13618 n.67 & accompanying text (notwithstanding that prior assertion, stating that DHS "considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms," but "would not pursue this route" "[e]ven if there were currently approved ATAs"); *id.* at 13618 n.66 (noting that the assertion of "no currently approved ATAs" was based on Office of Homeland Security Statistics ("OHSS") "analysis of advance travel authorization data . . . valid as of February 27, 2025," but without explaining why DHS chose that date).[6]

Third, the March 25 FRN states that "as one aspect of the termination of the CHNV parole programs," any grants of parole to the "approximately 532,000 inadmissible" [sic] CHNV parolees that "ha[ve] not already expired on April 24, 2025 will terminate on that date." *Id.* at 13618. The Notice states that "the Secretary has determined that the purposes" of those grants of parole "have

---

[6] *Compare with* 90 Fed. Reg. at 13612 n.6 (providing data from OHSS analysis of the identical source for a different purpose, but using that data "valid as of January 22, 2025"); *and id.* at 13617 n.58 (noting that statistics regarding the numbers of Forms I-134/I-134A filed, confirmed, non-confirmed, and pending review are based on "OHSS analysis of . . . data as of January 22, 2025").

Appx-0573

been served because" the CHNV programs are unnecessary for border security, have had too much of a "domestic impact," and are "inconsistent with this Administration's foreign policy goals." *Id.* at 13619 n.70.

DHS acknowledged in the March 25 FRN that, to terminate an individual's parole on the Notice's stated basis, its regulations require "written notice to the [parolee]," *id.* at 13620 (quoting 8 C.F.R. § 212.5(e)(2)(i) (emphasis omitted)), but the Notice claims DHS "has determined that publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Id.* ("Federal Register Notice as Constructive Notice"). The Notice also states that "after termination of the parole," any associated employment authorization will be "revoke[d]" pursuant to regulation, *id.* at 13619 (citing 8 C.F.R. § 274a.14(b)), but relies on the same constructive notice to satisfy the DHS regulatory requirement to provide "written notice of intent to revoke the employment authorization" while ignoring that DHS regulations afford an individual "a period of fifteen days from the date of service of the notice within which to submit countervailing evidence." 8 C.F.R. § 274a.14(b)(2).

DHS said it considered two alternatives to cutting short the period of parole and employment authorization of CHNV parolees: "a longer than 30-day wind-down period" and simply "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done with some parole terminations." 90 Fed. Reg. at 13619-20 (citation omitted). DHS explained that it rejected both alternatives for the same reason: its "strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible." *Id.* at 13620. According to the March 25 FRN, DHS concluded that it must truncate parole because "[e]xpedited removal is available only when an alien has not been continuously

present in the United States for at least . . . two years," *id.* at 13619 (citing 8 U.S.C. § 1225(b)(1)(iii)(II)), "[a]ny lengthening of the wind-down period will increase the likelihood" that CHNV parolees will "accrue more than two years of continuous presence in the United States," which "would essentially foreclose DHS's ability" to remove them via expedited removal, *id.* at 13620 (citing the same expedited removal provision).[7]

Finally, the March 25 FRN confirms that DHS intends to "remove promptly" CHNV parolees lacking authorization to remain in the United States, *id.* at 13618, advising those soon to be in that situation that they "must depart the United States before their parole termination date." *Id.* at 13618-19; *id.* at 13611 (same). As noted above, the Notice cuts short valid grants of parole of eight Plaintiffs, five of whom were sponsored by two other Plaintiffs, *see supra* n.1, and more than five hundred thousand other people who are similarly situated.

## LEGAL STANDARD

Plaintiffs' request for a preliminary injunction and their request for a stay under 5 U.S.C. § 705 are both governed by the familiar four-factor *Winter* test. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

## ARGUMENT

I.  **PLAINTIFFS HAVE STANDING, THEIR CLAIMS ARE JUSTICIABLE, AND DEFENDANTS' ACTION IS REVIEWABLE**

This Court has jurisdiction to consider Plaintiffs' claims because Plaintiffs have standing and fall within the zone of interests of the INA; the Plaintiffs challenge final agency action that is

---

[7] In places, the March 25 FRN erroneously cites to INA section 235 and section 1235 of Title 8 of the U.S. Code, rather than INA § 225 and 8 U.S.C. § 1225. *See* 90 Fed. Reg. at 13619-20.

not committed to agency discretion; and 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude judicial review of Plaintiffs' claims.

*Jurisdictional standing*. It is beyond dispute that the March 25 FRN inflicts harm on Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe; as well as the beneficiaries sponsored by Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, and Norma Lorena Dus; and HBA, which has provided legal and humanitarian services for thousands of CHNV parole beneficiaries. The March 25 FRN terminates the CHNV parole processes and prematurely cuts short the grants of parole and work authorization of hundreds of thousands of CHNV parole beneficiaries. These harms, which are concrete, imminent, and directly traceable to the March 25 FRN more than adequately establish Plaintiffs' standing to challenge the FRN. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

*Prudential standing*. It is likewise beyond serious dispute that the CHNV sponsor Plaintiffs (Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, and Norma Lorena Dus), as well as organizational plaintiff HBA, assert interests that fall within the zone of interests protected by the INA. The zone of interests prudential analysis only forecloses a lawsuit "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal punctuation and citation omitted). The interests of sponsor Plaintiffs and HBA in welcoming and supporting parole beneficiaries to this country are core to the operation of the CHNV parole processes and easily

meet this test, which is "not meant to be especially demanding" in light of "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.*[8]

*Statutory jurisdiction*. Contrary to Defendants' earlier suggestion, Doc. No. 42 at 10, the jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(B)(ii) has no application in this case, because Plaintiffs are challenging overarching policy, not individual decisions. *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *8-9 (D. Mass. May 12, 2023) (collecting cases holding that claims "challenging changes in policy"—including policies concerning the discretionary grant of parole—are "reviewable under the APA."); *see also LaMarche v. Mayorkas*, 691 F. Supp. 3d 274, 277-78 (D. Mass. 2023); *cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17-19 (2020) (holding that the Secretary's decision to end DACA was reviewable under the APA, even though deferred action is discretionary). For the same reason, Defendants' previous reliance on *Patel v. Garland*, 596 U.S. 328, 338 (2022), Doc. No. 42 at 10, is misplaced, as it concerned review of a particular discretionary decision.

*Final agency action not committed to agency discretion*. The March 25 FRN is subject to judicial review under the APA. As its plain language states, the March 25 FRN terminates all individual grants of CHNV parole and work authorization as of April 24, 2025. These actions plainly reflect the consummation of agency decision-making and have immediate and concrete legal consequences for Plaintiffs, making them reviewable. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And while individual parole decisions are discretionary, the Supreme Court has explicitly said that DHS's parole policies are subject to APA review. *Biden v. Texas*, 597

---

[8] Defendants claim that the sponsor Plaintiffs and HBA are "not the object of a challenged regulatory action" or the parole statute, Doc. No. 42 at 19, but courts "do not require any indication of congressional purpose to benefit the would-be-plaintiffs." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (internal quotation marks omitted).

U.S. 785, 806-07 (2022) (citing 8 U.S.C. § 1182(d)(5)(A)); *accord LaMarche v. Mayorkas*, 691 F.

Supp. 3d at 277-78; *Roe*, 2023 WL 3466327, at *8-9.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT THE MARCH 25 FRN'S *EN MASSE* TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE WAS UNLAWFUL

Plaintiffs are likely to succeed on several claims as to the March 25 FRN, all of them

apparent on the face of the Notice and each of them independently justifying class-wide

preliminary relief as to the Notice's treatment of remaining valid grants of CHNV parole.

Specifically, the March 25 FRN is contrary to statute in three distinct ways and contrary to DHS's

separate regulations regarding the termination of parole and of employment authorization, both of

which require individualized "written notice" to the parolee.

To be clear: Plaintiffs' priority is obtaining class-wide relief as expeditiously as possible,

and to grant that relief, the Court need only decide that Plaintiffs are likely to succeed on any one

of the following bases and need not decide the others.

**1.** First, the March 25 FRN's explanation that DHS decided against "permitting CHNV

participants' parole to remain in effect until the natural expiration of the parole" or a longer wind-

down period—because doing so would "essentially foreclose" DHS's ability to deport them via

expedited removal by facilitating their continued presence in the United States beyond the two-

year limit for those shortcut procedures, *see* 90 Fed. Reg. at 13619-20 (discussing 8 U.S.C. §

1225(b)(1)(iii)(II))—is based on an obvious legal error. Contrary to the Notice's representations,

8 U.S.C. § 1225(b)(1)(iii)(II) does not permit subjecting the CHNV parolees to expedited removal

*no matter how long they have been in the United States.* By its own terms, that provision only

authorizes using expedited removal as to a noncitizen "who has not been admitted *or paroled* into

the United States." 8 U.S.C. § 1225(b)(1)(iii)(II) (emphasis added). By definition, the CHNV parolees "ha[ve] been . . . paroled into the United States."[9] *Id.*

"It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Bollat Vasquez v. Mayorkas*, 520 F. Supp. 3d 94, 108 (D. Mass. 2021) (citation omitted). Given that the Secretary's decision to cut short all existing grants of parole via the CHNV processes was based on an erroneous understanding of the expedited removal statute—and nothing else, 90 Fed. Reg. at 13619-20 —Plaintiffs are likely to succeed in proving that decision unlawful.

**2.**    The Secretary's decision to truncate all existing grants of CHNV parole as of April 24 was also contrary to the statutory requirement that the parole authority be exercised "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A); *accord Biden v. Texas*, 597 U.S. at 806-07. The Notice recites the statutory "case-by-case" requirement in its Background section, 90 Fed. Reg. at 13611-12, but does not apply or acknowledge it when later stating that Secretary Noem has concluded *en masse* that "the purposes" of every single grant of parole via all four CHNV processes now "have been served." *Id*. at 13619 n.70. Similarly, even though the Background section admonishes that parole determinations should "tak[e] into account each alien's unique circumstances," *id*. at 13612, the Secretary did not do so; instead, she ignored all differentiating considerations, including the amount of time remaining on each person's parole period (be it a day

_____

[9] CHNV parolees also cannot be subjected to the other basis for expedited removal, which (among other limitations) can only be applied to "an alien. . . who is arriving in the United States," 8 U.S.C. 1225(b)(1)(i), because CHNV parolees have already arrived in the United States and are now living here. *See Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020) ("Under the statutory language, if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather 'alien[s] present in the United States who [have] not been admitted.'" (quoting 8 U.S.C. § 1225(a)(1)) (last two alterations in original)).

11

or twenty-two months), whether they have any pending applications for a different immigration benefit, or any other individualized other circumstances (be it social, economic, medical, legal, or anything else).

Defendants have previously argued that the statute "only imposes requirements on *granting* parole" and "imposes no limits . . . on *denying*" or terminating parole, Doc. No. 42 at 12 (emphases in original), but the Secretary's decision to change the expiration date of all valid grants of CHNV parole to April 24, 2025 was neither a denial nor a termination *per se*, but rather an *en masse* alteration of the conditions under which all those individuals were paroled, contrary to the statute. *See* 8 U.S.C. § 1182(d)(5)(A) ("The [Secretary] may . . . in h[er] discretion parole into the United States temporarily *under such conditions as [s]he may prescribe only on a case-by-case basis . . .* any alien applying for admission to the United States" (emphasis added)). Plaintiffs are thus likely to succeed in proving that the Secretary violated the parole statute's case-by-case requirement.

**3.** Plaintiffs are also likely to succeed in proving that the Secretary's broader decision to terminate the CHNV parole processes was based on an erroneous legal interpretation of the parole statute—specifically, the interpretation in Acting Secretary Huffman's January 20 memorandum, Doc. No. 41-1, the legal errors of which are discussed at length in Plaintiffs' prior motion for preliminary injunction, Doc. No. 25 at 14-19,  In sum, the March 25 FRN acknowledged that DHS had previously concluded that the CHNV processes were independently supported by both grounds on which parole is statutorily authorized (for "urgent humanitarian reasons or significant public benefit"). *See* 90 Fed. Reg. at 13612. In explaining why the Secretary no longer believed the CHNV processes to be justified by the statutory criteria, however, the Notice said that DHS's change of heart regarding the "urgent humanitarian reasons" for CHNV parole rested on its novel interpretation of the parole statute, which tracks the reasoning of (but does not cite) the January 20

12

Huffman memorandum. *See id.* ("Regarding previous arguments or determinations that these programs were consistent with the requirement of 'urgent humanitarian reasons' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed *on a case-by-case basis consistent with the statute*, and taking into consideration each alien's specific circumstances." (emphasis added)).

As Plaintiffs have previously explained, the Huffman memorandum's interpretation of the parole statute is erroneous. *See* Pls.' Mem. in Supp. of [First] Prelim. Inj., Doc. No. 25 at 14-19. The March 25 FRN's application of that erroneous interpretation to conclude that the CHNV parole processes are not supported by urgent humanitarian reasons is thus unlawful as well, and regardless of what the Notice says about the Secretary's conclusion that those processes do not provide a significant public benefit.

**4.** In addition to the distinct ways that the March 25 FRN is not in accordance with statutory law, it is also contrary to the regulatory authority that parole should be terminated upon "written notice," which DHS claimed to be exercising. *See* 90 Fed. Reg. at 13618 n.68 (quoting 8 C.F.R. § 212.5(e)(2)(i)); *id.* at 13620 (same). The Notice asserted that "publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance," *id.* at 13620, but it cited in support only one inapplicable statute and two inapposite cases. The cited statute provides in relevant part that the "filing of a document" that is "required or authorized to be published" in the Federal Register by 44 U.S.C. § 1505 "is sufficient to give notice of the contents of the document" "except in cases where notice by publication is insufficient in law." 44 U.S.C. § 1507. Even assuming that the March 25 FRN was published pursuant to a requirement or authorization in 44 U.S.C. § 1505— which is far from obvious—the parole regulation's requirement of written notice to terminate

13

parole means that "notice by publication is insufficient in law," and so 44 U.S.C. § 1507 is inapplicable by its own terms. The two cases the Notice cited in support, meanwhile, just say the same thing as § 1507,[10] making them equally irrelevant to DHS's contention that publication in the Federal Register is "constructive notice" that "satisfies the requirement that DHS provide written notice upon the termination of parole." 90 Fed. Reg. at 13620 (citing 8 C.F.R. § 212.5(e)(2)(i)). DHS may of course change its regulation, but it cannot ignore its rules of process while they remain on the books, as it did here.[11] *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954).

DHS also said it was exercising its regulatory authority "to revoke parole-based employment authorization" under 8 C.F.R. § 274a.14(b), and it similarly disregarded the employment authorization regulation's requirements. *See* 90 Fed. Reg. at 13619 ("DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures" (citing 8 C.F.R. § 274a.14(b)). Under the employment authorization regulation, DHS cannot revoke any parolee's employment authorization without first "serv[ing] written notice of intent to revoke the employment authorization," "cit[ing] the reasons indicating that revocation is warranted," and

---

[10] *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citing 49 Stat. 502, a precursor to 44 U.S.C. § 1507)); *Friends of Sierra R.R., Inc. v. I.C.C.*, 881 F.2d 663, 667–68 (9th Cir. 1989) ("Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." (citing 44 U.S.C. § 1507 and *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. at 384-85)).

[11] The March 25 FRN also said that DHS will provide "notice to each parolee through their USCIS online account," baldly asserting that it, too, "constitute[s] 'written notice to the alien' under 8 C.F.R. § 212.5(e)(2)(i)," 90 Fed. Reg. at 13620, but there is seemingly no requirement that the CHNV parolees check those accounts or even to maintain access to them.

14

affording the noncitizen "a period of fifteen days from the date of service of the notice within which to submit countervailing evidence." 8 C.F.R. § 274a.14(b)(2). *Id.* In the March 25 FRN, DHS purported to terminate *en masse* work authorizations without serving written notice of intent to revoke, citing reasons why revocation was appropriate, or affording an opportunity to submit countervailing evidence. Importantly, the work authorization regulation says the agency decision following that process "shall be final and no appeal shall lie from the decision to revoke the authorization," *id.*, further underscoring the importance of DHS adhering to its specific procedural protections before exercising its discretion to revoke individuals' means of providing for themselves. *See Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) ("Contrary to the INS's position, we do not think it is significant that adjustment of status [the immigration benefit at issue] is a discretionary form of relief. A right to seek relief is analytically separate and distinct from a right to the relief itself. Consequently, an alien is not precluded from having a vested right in a form of relief merely because the relief itself is ultimately at the discretion of the Executive Branch.") (citing, *inter alia*, *Accardi*, 347 U.S. at 268).

## III. PRELIMINARY RELIEF IS NECESSARY TO STOP IMPENDING IRREPARABLE INJURY THAT IS CERTAIN TO OCCUR

Plaintiffs face imminent and irreparable harm if the March 25 FRN is not enjoined before April 24, 2025, when "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by [that date] will terminate." 90 Fed. Reg. at 13611. On April 24, Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe, as well as beneficiaries sponsored by Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, and Norma Lorena Dus, and thousands of CHNV beneficiaries served by HBA, will lose their lawful status; lose their work authorization and their ability to work here legally, *see* 90 Fed. Reg. at

15

13619; and be immediately at risk for removal,[12] *see id.* at 13618, which for many of these individuals will almost certainly result in family separation, a return to persecution and potentially death, and/or the inability to pursue the safety and security of alternate legal status here in the United States. Damages cannot adequately address these kinds of injuries.

    *Loss of lawful status.* If allowed to remain in effect through April 24, 2025, the March 25 FRN will prematurely cut short the grants of parole of Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, and Daniel Doe; the sponsored beneficiaries of Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, and Norma Lorena Dus; and hundreds of thousands of similarly situated individuals. *See* n.1, *supra*. For some Plaintiffs, like Alejandro Doe, Carlos Doe, Lucia Doe, and Miguel Doe, this represents a loss of over a year of lawful status and the ability to live and work legally in the United States. *Id*. What's more, because Defendants have indefinitely suspended the processing of all applications for immigration benefits filed by or on behalf of CHNV parolees, Plaintiffs and other sponsored CHNV beneficiaries will be without lawful status in the United States starting April 24, 2025. For some of these parole beneficiaries, moreover, losing their lawful status means that they will begin accruing unlawful presence, which has serious negative immigration consequences that can include being barred from the United States. *See* 8 U.S.C. § 1182(a)(9)(B).

---

[12] Although the March 25 FRN asserts that "DHS intends to prioritize for removal" only those CHNV parole beneficiaries without any pending applications for alternate legal status in the United States, 90 Fed. Reg. 13619, that assertion is unenforceable and, more importantly, fundamentally at odds with Executive Order No. 14159 direction to the Secretary and the Attorney General to "prioritize the prosecution of criminal offenses related to the . . . continued unauthorized presence of aliens in the United States," 90 Fed. Reg 8443, 8444 (Jan. 20, 2025); and with the March 25 FRN itself, which justifies cutting short *all* CHNV parole beneficiaries' grants of parole— including of those individuals with pending requests for other relief—to "effectuate their prompt removal." 90 Fed. Reg. 13619.

*Loss of work authorization.* The premature termination of CHNV parole for Plaintiffs and other sponsored CHNV beneficiaries also means the premature termination of work authorization and the ability to provide for oneself and one's family. Losing work authorization has life-altering negative consequences, from forcing Alejandro Doe and his family "to break apartment leases we have entered into, rendering us homeless," Doc. No. 24-1 ¶ 15; to Armando Doe no longer being able to send money to pay for his parents' medical appointments and living expenses, Doc. No. 24-3 ¶ 25, to Lucia Doe depleting her savings and becoming a greater financial burden on her siblings, Doc. No. 64-3 ¶14. All CHNV parole beneficiaries have been forced to confront the likelihood that they will "lose everything we have worked so hard to achieve" during their time here in the United States. Doc. No. 24-1 ¶ 15. "Because of this fear," Alejandro Doe and his family "have been sharing [] bank account passwords with one another in case anything were to happen." *Id.; see also* 71-3 ¶ 12.

*Consequences of removal.* For many CHNV parolees, including Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, and Andrea Doe, removal to their home countries will almost certainly result in a return to persecution and even death. *See, e.g.*, Doc. Nos. 24-1 ¶¶ 6-8; 24-2 ¶ 17; 24-3 ¶ 11; 24-4 ¶¶5, 18; 27-1 ¶¶ 3-4; 71-3 ¶ 2. Moreover, Plaintiffs Armando Doe, Alejandro Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, and Miguel Doe, as well as the family member beneficiaries of Plaintiffs Wilhen Pierre Victor, face abrupt separation from close family members here in the United States if any one of them is apprehended and removed without their family. *See* Doc. Nos. 24-1 ¶¶ 3, 15; 24-2 ¶¶ 3, 11; 24-3 ¶¶ 3, 23; 24-4 ¶ 2; 26-11 ¶¶ 3, 15; 26-19 ¶¶ 12-13; 64-4 ¶ 3; 64-3 ¶ 3; 71-2 ¶¶ 7, 13; *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (per curiam) (recognizing that "important [irreparable harm] factors include separation from family members" (cleaned up)).

Appx-0585

Each of these harms represents a shock and a betrayal to parole beneficiaries who followed the rules to be able to come to the United States through a lawful pathway to find opportunity, build a life here, and contribute to their families and communities. *See, e.g.*, Doc. No. 24-1 ¶ 15 ("After all my family's sacrifice and efforts to follow the law . . . having our parole cancelled, losing work authorization, and being subject to deportation feels like a betrayal. It would be devastating."). Each of these harms, independently and collectively, amounts to "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000).

## IV. THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY EQUITABLE RELIEF

The balance of equities and the public interest, which merge here, likewise support Plaintiffs' request for a preliminary equitable relief. *See Winter*, 555 U.S. at 20; *Nken v. Holder*, 556 U.S. 418, 435 (2009). In contrast to the concrete and irreparable injury facing Plaintiffs and hundreds of thousands of similarly situated individuals, Defendants have presented only "an abstract assertion about harm to executive authority over immigration matters." *Pacito v. Trump*, __ F. Supp. 3d __, No. 2:25-cv-255-JNW, 2025 WL 655075, at * 24 (W.D. Wash. Feb. 28, 2025); *see, e.g.*, Doc. No. 42 at 28. While the President has some discretion in identifying and pursuing his own immigration policy goals, "[t]he public interest is not served by maintaining executive actions that conflict with federal law." *Pacito*, 2025 WL 655075, at * 24. Moreover, the States' Amicus Brief highlights the net *positive* impact of humanitarian parole pathways such as the CHNV parole processes, noting that parole beneficiaries "particularly benefit the national, state, and local economies" by "contributing positively to our workforces and growing our economies, especially in businesses around the country facing persistent labor shortages." Amicus Curiae Br. of N.Y., et al., Doc. No. 50 at 11-12.

18

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction and stay of the Secretary's *en masse* truncation of the remaining valid periods of parole granted through the CHNV processes, and to waive Rule 65(c)'s security requirement pursuant to its discretion to do so in "suits to enforce important federal rights or public interests." *Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers*, 679 F.2d 978, 999-1000 (1st Cir. 1982) (internal quotation marks omitted), *rev'd on other grounds*, 467 U.S. 526 (1984).

19

Dated: March 27, 2025

Respectfully submitted,

*/s/ John A. Freedman*

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
 Washington, D.C. 20001-3743
 Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

*Attorneys for Plaintiffs*

Appx-0588

**CERTIFICATE OF SERVICE**

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., <br><br> *Defendants*. | C.A. No: 1:25-cv-10495-IT |

## PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

Plaintiffs, including the Proposed Class Representatives Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Norma Lorena Dus, Gabriela Doe, Daniel Doe, Miguel Doe, and Lucia Doe ("Proposed Class Representatives"), on behalf of themselves and the proposed class they seek to represent, move to certify a class pursuant to Rule 23. This motion supplements Plaintiffs' prior certification motion (Doc. No. 46) to expand the proposed class definition to add an additional subclass, as well as to appoint additional Class Representatives.

The Proposed Class Representatives respectfully request that this Court issue an order certifying a class that is defined as:

a) All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to U4U, CHNV, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

b) All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

1

c) All individuals who have received humanitarian parole through already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

Plaintiffs would exclude from the class definition any individuals or groups who choose to opt out of the class in order to seek relief in separate litigation.

The Plaintiffs also respectfully request that this Court appoint the undersigned as class counsel and the Proposed Class Representatives as class representatives.

The basis for this motion for class certification is that the proposed class meets all of the requirements for class treatment under Rule 23(a) and (b)(2), and the proposed class counsel meet all of the requirements set forth in Rule 23(a) and (g). The grounds for this motion are explained in the accompanying memorandum of law.

A Proposed Order is filed herewith.

## **<u>REQUEST FOR ORAL ARGUMENT</u>**

Plaintiffs respectfully request an oral argument Pursuant to Local Rule 7.1(d).  Plaintiffs note that the Court has scheduled argument for April 10 on this motion.  Doc. No. 63.

Dated: March 27, 2025

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Respectfully submitted,

*/s/ John A. Freedman*
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

*Attorneys for Plaintiffs*

## CERTIFICATE UNDER LOCAL RULE 7.1(a)(2)

The parties have conferred pursuant to Local Rule 7.1(a)(2).  Defendants oppose this motion.

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

/s/ John A. Freedman
John A. Freedman

4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>*Defendants*. | C.A. No: 1:25-cv-10495-IT |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND AND PROCEDURAL HISTORY ......................................... 3

    A.    Factual Background ................................................................................. 3

    B.    Procedural History .................................................................................. 6

III.   THE PROPOSED CLASS .................................................................................. 7

IV.    ARGUMENT ...................................................................................................... 8

    A.    The Proposed Class Satisfies Rule 23(a) Requirements ......................... 9

        1.    The Proposed Class Meets the Numerosity Requirement........................... 9

        2.    The Proposed Class Satisfies the Commonality Requirement................. 11

        3.    The Proposed Class Meets the Typicality Requirement .......................... 13

        4.    The Proposed Class is Adequately Represented ...................................... 15

    B.    The Proposed Class Satisfies Rule 23(b)(2) Requirements .................... 17

V.     CONCLUSION.................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)...........................................................................................................15

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985)...........................................................................................15

*Batalla Vidal v. Nielsen*,
  No. 16-CV-4756 Dkt. 342 (E.D.N.Y.. Nov. 14, 2020)........................................................18

*Bowers v. Russell*,
  Civil Action No. 22-cv-10457-PBS, 2025 WL 342077 (D. Mass. Jan. 30,
  2025) ....................................................................................................................................9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................................................................9

*Connor B. ex rel. Vigurs v. Patrick*,
  272 F.R.D. 288 (D. Mass. 2011) .......................................................................................17

*DeRosa v. Massachusetts Bay Commuter Rail Co.*,
  694 F. Supp. 2d 87 (D. Mass. 2010) .................................................................................11

*Diggs v. Mici*,
  CIVIL ACTION NO. 22-cv-40003-MRG, 2024 WL 4425654 (D. Mass. Sept.
  30, 2024) ............................................................................................................................11

*Donovan v. Philip Morris USA, Inc.*,
  268 F.R.D. 1 (D. Mass. 2010).............................................................................................9

*Emami v. Mayorkas*,
  No. 1:18-cv-1587-JD Dkt. 252 (N.D. Cal. 2024 Mar. 26, 2024)............................................18

*George v. Nat'l Water Main Cleaning Co.*,
  286 F.R.D. 168 (D. Mass. 2012)...................................................................................10, 11

*Gomez v. Trump*,
  No. 1:20-CV-01419-APM Dkt. 151 (D.D.C. Sept. 30, 2020) ..................................................18

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008).........................................................................................13

*In Re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008).................................................................................................12

ii

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005) .......................................................................... 14

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ............................................................................... 14

*John Doe #1 v. Trump*,
    Case No. 3:19-cv-1743-AI Dkt. 132 (D. Ore. Apr. 7, 2020) .............................. 18

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) ........................................................................ 12

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003) ............................................................................ 9

*Raposo v. Garelick Farms, LLC*,
    293 F.R.D. 52 (D. Mass. 2013) .......................................................................... 11

*Shanley v. Cadle*,
    277 F.R.D. 63 (D. Mass. 2011) ............................................................................ 9

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................... 11, 18

## Constitutional Provisions

U.S. Const. amend V ................................................................................................. 7

## Statutes

5 U.S.C. § 706(2)(A)-(C) ................................................................................. 2, 6, 12

8 U.S.C. § 1182(d)(5)(A) .................................................................................. 1, 3, 17

## Other Authorities

Fed. R. Civ. P.
    23 ........................................................................................................................... 8
    23(a) ....................................................................................................... 8, 9, 16, 17
    23(a)(1) ................................................................................................. 1, 9, 10, 11
    23(a)(2) ..................................................................................................... 2, 11, 13
    23(a)(3) ........................................................................................................... 2, 13
    23(a)(4) ........................................................................................................... 2, 15
    23(b) ......................................................................................................... 8, 9, 17
    23(b)(2) ..................................................................................................... *passim*
    23(g) ................................................................................................................. 16

President Trump's Executive Order 14159 ............................................................... 1

Appx-0597

March 25 Federal Register Notice "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611 .................................... *passim*

ABC News, *Trump Administration Terminates Program That United Thousands of Families Fleeing Violence in Central America*, ABC NEWS (Nov. 9, 2017, 7:32PM), https://abcnews.go.com/International/trump-administration-terminates-program-united-thousands-families-fleeing/story?id=51050866 ......................... 11

Julia Ainsley, *U.S. Has Admitted 271,000 Ukrainian Refugees Since Russian Invasion, Far Above Biden's Goal of 100,000*, NBC NEWS (Feb. 24, 2023, 11:15AM), https://www.nbcnews.com/politics/immigration/us-admits-271000-ukrainian-refugees-russia-invasion-biden-rcna72177 ................................ 10

Chellie Pingree 1st District of Maine, *Afghanistan Evacuation & Resettlement Efforts*, https://pingree.house.gov/resources/afghanistan.htm .................................. 10

Lisa Kobayashi, *The Success of Military Parole in Place*, KOBAYASHI LAW OFFICE (Nov. 30, 2018), https://www.lisakobayashi.com/the-success-of-military-parole-in-place/ .................................................................................. 11

Camilo Montoya-Galvez, *1.5 Million Apply for U.S. Migrant Sponsorship Program With 30,000 Monthly Cap*, CBS NEWS (May 22, 2023, 9:56PM), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/ .......................................................... 10

Camilo Montoya-Galvez, *U.S. to Revoke Legal Status of More Than a Half-Million Migrants, Urges Them to Self Deport*, CBS NEWS (March 23, 2025, 4:24PM), https://www.cbsnews.com/news/u-s-to-revoke-legal-status-of-over-a-half-million-migrants-chnv/ ............................................................................ 10

U.S. Citizenship and Immigration Services, Form I-131, Travel Document Applications for the Haitian Family Reunification Parole (HFRP) Program Applications Accepted, Denied, Approved, and Pending As of December 31, 2019, https://www.uscis.gov/sites/default/files/document/data/HFRP_performancedata_fy2020_qtr1.pdf ....................................................................................... 11

Appx-0598

## I.    INTRODUCTION

Pursuant to the Court's March 26, 2025 Scheduling Order (Doc. No. 58), this motion supplements Plaintiffs' prior motion for class certification (Doc. No. 46) to expand the proposed class definition to include a subclass of individuals who have received parole through humanitarian parole processes which are subject to the March 25 Federal Register Notice "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611 ("March 25 FRN") and subsequent similar actions by Defendants to rescind formally individual grants of parole on a categorical and *en masse* basis, as well as to appoint additional Class Representatives (Norma Lorena Dus, Gabriela Doe, Daniel Doe, Miguel Doe, and Lucia Doe).

As with the originally proposed class, the revised class includes the ***hundreds of thousands*** of individuals who have been or will imminently be harmed by the Defendants' actions to implement President Trump's Executive Order 14159 (titled "Protecting the American People Against Invasion") and Executive Order 14165 (titled "Securing Our Borders"), including Defendants' most recent action to rescind parole on an *en masse* basis through the March 25 FRN.  Those actions rescind, in fact or in practice,  numerous humanitarian parole processes established pursuant to 8 U.S.C. § 1182(d)(5)(A) that have been used for decades, the grants of parole under these processes to hundreds of thousands of individuals, while also ceasing adjudication of immigration benefits for parolees that would grant them more stable legal status in the United States. Members of the proposed class are all, or will soon be, harmed by the Defendant's actions, as described below, and collectively meet all requirements for class certification.

Rule 23(a)(1)'s numerosity requirement is satisfied because the proposed class includes hundreds of thousands of individuals and is so numerous as to make joinder impracticable.  There are thousands of individuals who seek to sponsor parolees: the demand to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been overwhelming,

1

reaching 1.5 million sponsorship applications for the CHNV parole processes alone within the first few months those processes were made available. There are also hundreds of thousands of individuals who have been granted parole, who seek various benefits under the immigration laws, and hundreds of thousands of individuals whose parole grants are in the process of being rescinded.

Rule 23(a)(2)'s commonality requirement is satisfied because fundamental questions of fact and law are common across all class members, where the Defendants terminated parole processes and adjudication of immigration benefits for parolees with several strokes of a pen and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C), resulting in harm to all putative class members. Among other things, each of the challenged agency actions is predicated upon the same set of fundamental legal errors and is, accordingly, contrary to law under the APA.

Rule 23(a)(3)'s typicality requirement is satisfied because each member of the proposed class would bring the same claim and seek the same relief as the rest of the proposed class that stems from restoration of the *status quo ante*: restoration of the authorized periods of parole from prior to the March 25 FRN and consideration of pending parole requests, re-parole requests, and other requests for immigration benefits for parolees.

Rule 23(a)(4)'s adequacy requirement is satisfied because the Proposed Class Representatives (Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Norma Lorena Dus, Gabriela Doe, Daniel Doe, Miguel Doe, and Lucia Doe) have claims that are the same as those of the proposed class and accordingly seek the same remedies. As such, there are no identified conflicts of interest within the proposed class, and the Proposed Class Representatives have demonstrated

2

their commitment to vigorously prosecuting the action, such as by providing detailed declarations that provide the factual bases for the present action.

Finally, Rule 23(b)(2) is satisfied because the Defendants have "acted or refused to act on grounds that apply generally to the class" through their rescission of lawful parole processes and termination of immigration benefits adjudications, which is why Plaintiffs seek uniform relief among the class members.

Accordingly, Plaintiffs respectfully request that the Court certify the proposed class.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background

For approximately seventy years, the categorical and programmatic use of humanitarian parole, pursuant to the statutory authority at 8 U.S.C. § 1182(d)(5)(A), has been a core feature of our nation's immigration policy. *See* Sec. Am. Compl., Doc. No. 68 ¶ 52. Since its first use by President Eisenhower in 1956, humanitarian parole processes have become a commonly used method by which both Republican and Democratic Administrations to achieve important foreign policy goals, manage migration flows, and provide relief to migrants fleeing humanitarian, political, and environmental crises. There have been at least 125 "categorical" parole programs, and they have been used in every single Administration—including President Trump's first Administration. *Id.* at ¶ 47. The parole processes at issue in this case – CHNV, U4U, OAW, FRP, MPIP, and CAM – have been in use for years, if not decades, to similarly allow migrants to seek safety from warfare, political unrest, and relief from other displacement in their home country and reunite or remain with family members.

Starting on January 20, 2025, President Trump and his administration took a series of actions to terminate already existing humanitarian parole processes and suspend the ability of parolees to apply for changes of immigration status and benefits. These executive orders and the

3

relevant events that followed are described in the Second Amended Complaint (*see* Doc. No. 68) and summarized below.

1.    On January 20, 2025, the President signed Executive Order 14159, titled "Protecting the American People Against Invasion," directing the Secretary of Homeland Security and others to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis"; and Executive Order 14165, titled "Securing Our Borders," directing the Secretary of Homeland Security to terminate all "categorical parole programs," expressly referencing the CHNV parole processes.

2.    Also on January 20, 2025, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), titled "Exercising Appropriate Discretion Under Parole Authority," in which he authorized pausing and terminating "categorical parole programs." Acting Secretary Huffman directed the Department of Homeland Security ("DHS") staff to implement a completely novel agency policy—one that would treat the manner in which the parole authority has historically been used as unlawful.

3.    On January 20, 2025, Acting Commissioner of Customs and Border Protection ("CBP") Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to grant parole and requiring that each instance of parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant.

4.    A few days later, then-Acting Director of U.S. Citizenship and Immigration Services ("USCIS") Jennifer Higgins issued a directive (the "January Higgins directive")

Appx-0602

prohibiting USCIS staff from making any further decisions on any request for, among other things, parole, or re-parole made through the U4U, CHNV, CAM, FRP, OAW, or other named parole processes. This directive also prohibited USCIS staff from making decisions on requests from U4U, CHNV, CAM, FRP, OAW, and other parolees for any immigration benefit, including for asylum, Temporary Protected Status ("TPS"), adjustment of status, or a visa, etc.

5.      On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, and OAW, among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

6.      On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum (the "February 14 Davidson memorandum") to various USCIS directorates and program offices.  The memorandum directed USCIS personnel not to adjudicate immigration benefit requests (including requests for asylum or temporary protected status) filed by noncitizens who are or were paroled into the United States under various programs, including U4U; CHNV; and family reunification parole for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras.

7.      On March 21, 2025, DHS made public a Federal Register Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," later published in the Federal Register on March 25, 2025 (the "March 25 FRN").  90 Fed. Reg. 13611 (Mar. 25, 2025). The March 25 FRN "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members" and further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV

5

parole programs and whose parole has not already expired by April 24, 2025 will terminate on that

date unless the Secretary makes an individual determination to the contrary." *Id.*

8.    The March 25 FRN confirms Defendants' intent to terminate humanitarian parole

processes and make it easier to deport individuals paroled through these processes as quickly as

possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive

Order 14165, DHS generally intends to remove promptly [individuals] who entered the United

States under the CHNV parole programs who do not depart the United States before their parole

termination date and do not have any lawful basis to remain in the United States." *Id.* at 13618.

The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in

its discretion initiate expedited removal proceedings where appropriate." *Id.* at 13619.

### B.    Procedural History

Plaintiffs filed their complaint on February 28, 2025, *see* Doc. No. 1, in the weeks

following the issuance of Executive Orders 14159 and 14165 on January 20, 2025, and as the

imminent danger caused by those executive orders to Plaintiffs began to materialize. Plaintiffs

filed an amended complaint to add new plaintiffs on March 17, 2025, then filed a second amended

complaint on March 27, 2025 to add new plaintiffs, factual allegations, and claims relating to the

March 25 FRN.  Doc. Nos. 22, 68.  Plaintiffs filed an emergency motion for preliminary injunction

and stay of administrative action on March 17, 2025, *see* Doc. No. 23, and then supplemented that

motion on March 27, 2025. Doc No. 70. Plaintiffs filed a Motion to Certify Class on March 21,

2025, Doc. No. 46, which is being supplemented by the present motion to account for publication

of the March 25 FRN and subsequent similar actions by Defendants to rescind formally individual

grants of parole on a categorical and *en masse* basis.

Plaintiffs assert claims under the Administrative Procedure Act ("APA"), U.S.C. §

706(2)(A)-(C), alleging that each of the challenged agency actions comprising the termination of

parole processes was contrary to law and arbitrary and capricious, and that the suspension of benefits adjudication for parolees was contrary to law, *ultra vires*, and arbitrary and capricious. *See* Doc. No. 68 at 90-99. Plaintiffs also allege that the termination of parole processes and suspension of benefits adjudication failed to comply with the issuing agency's own regulations and also deprived them of notice and opportunity to be heard, and to have their claims adjudicated under the law, in violation of the Due Process Clause of the Fifth Amendment of the Constitution. *See id.* at 100. Plaintiffs, on behalf of the putative class, seek declaratory and injunctive relief from Executive Orders 14159 and 14165, the January 20, 2025 Huffman memorandum, the January Higgins directive, the February 14, 2025 Davidson memorandum, the March 25 FRN, and all DHS actions based thereon, and an order enjoining further implementation of these agency actions and directing Defendants to restore the *status quo ante* and restore authorized periods of parole from prior to the March 25 FRN, as well as resume adjudications of parole and/or re-parole requests under CHNV, OAW, U4U, CAM, MPIP, FRP, and other parole processes as well as other requests for immigration benefits for individuals paroled through those processes. *See id.* at 100-02.

## III.    THE PROPOSED CLASS

The proposed class is defined as:

a)    All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to U4U, CHNV, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

b)    All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

7

     c)     All individuals who have received humanitarian parole through already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

*See* Doc. No. 68 at 86.

Plaintiffs would exclude from the class definition any individuals or groups who choose to opt out of the class in order to seek relief in separate litigation.

The claims of the foregoing class are all based on the same nucleus of facts described above, and their claims would be fully and finally resolved by this Court's orders. All members of the foregoing class are subject to the suspension of immigration benefits adjudication for parolees (Immigration Benefits Subclass), subject to the *en masse* rescission of parole (the Rescinded Parolee Subclass), or are sponsors with pending applications for parole beneficiaries who are affected by the termination of the parole processes (Sponsor Subclass).

All claims are asserted on behalf of the class, all relief requested is based on Defendants' common course of conduct directed at the class, and all class members seek uniform relief, including restoration of: their authorized periods of parole from prior to the March 25 FRN, adjudications for pending parole requests and re-parole requests under U4U, CHNV, OAW, FRP, MPIP, CAM, and other parole processes, as well as other requests for immigration benefits for parolees.

## IV.    ARGUMENT

In order to certify a class under Rule 23, the Plaintiffs must satisfy the requirements under Rule 23(a) and fit into one of the categories under Rule 23(b). *See* Fed. R. Civ. P. 23.

Rule 23(a) requires the proposed class to satisfy four criteria:

     (1)     the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

(3)      the claims or defenses of the representative parties are typical of the claims

or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of

the class.

Fed. R. Civ. P. 23(a); *see also Bowers v. Russell*, Civil Action No. 22-cv-10457-PBS, 2025 WL

342077, at *2 (D. Mass. Jan. 30, 2025).

"The party must also satisfy through evidentiary proof at least one of the provisions of Rule

23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Here, Plaintiffs seek certification of a

class for injunctive and declaratory relief under Rule 23(b)(2). "A class qualifies for certification

under Rule 23(b)(2) when 'the party opposing the class has acted or refused to act on grounds that

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole.'" *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1,

11 (D. Mass. 2010) (quoting Fed. R. Civ. P. 23(b)(2)). "Doubts should be resolved in favor of

certification, particularly in early stages of the litigation." *Payne v. Goodyear Tire & Rubber Co.*,

216 F.R.D. 21, 25 (D. Mass. 2003).

As demonstrated below, Plaintiffs satisfy each of the requirements for class certification

under Rule 23(a) as well as the requirements under Rule 23(b)(2).

**B.      The Proposed Class Satisfies Rule 23(a) Requirements**

**1.      The Proposed Class Meets the Numerosity Requirement**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). "There is no threshold number of class members that

automatically satisfies this requirement." *Shanley v. Cadle*, 277 F.R.D. 63, 68 (D. Mass. 2011).

However, "[c]ourts have generally found that a class size of forty or more individuals will satisfy

the numerosity requirement." *George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 173 (D. Mass. 2012).

Here, the proposed class easily meets the numerosity requirement. The Immigration Benefits Subclass alone far exceeds the forty (40) members required to meet the *prima facie* requirement of class certification under Rule 23(a)(1), as do the Rescinded Parolee[1] and Sponsor Subclasses. Based upon the numbers of parolees in the United States under CHNV, U4U, and OAW parole processes alone, the proposed class consists of *at least* hundreds of thousands of individuals. Approximately 200,000 Ukrainian parolees have entered the country under the U4U parole process[2]; approximately 532,000 CHNV parolees have entered the country under the CHNV parole processes[3]; and approximately 75,000 Afghan parolees have entered the country under the OAW parole process.[4] The demand to sponsor beneficiaries through the U4U and CHNV parole processes has also been high: USCIS received over 200,000 sponsorship applications for U4U,[5] and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available.[6] Although there are no reliable statistics on the numbers of applications for FRP and MPIP, as they are not publicly available, the FRP process for

---

[1] Camilo Montoya-Galvez, *U.S. to Revoke Legal Status of More Than a Half-Million Migrants, Urges Them to Self Deport*, CBS News (March 23, 2025, 4:24PM), https://www.cbsnews.com/news/u-s-to-revoke-legal-status-of-over-a-half-million-migrants-chnv/.

[2] Julia Ainsley, *U.S. Has Admitted 271,000 Ukrainian Refugees Since Russian Invasion, Far Above Biden's Goal of 100,000*, NBC News (Feb. 24, 2023, 11:15AM), https://www.nbcnews.com/politics/immigration/us-admits-271000-ukrainian-refugees-russia-invasion-biden-rcna72177.

[3] *See supra* note 1.

[4] Chellie Pingree 1st District of Maine, *Afghanistan Evacuation & Resettlement Efforts*, https://pingree.house.gov/resources/afghanistan.htm (last visited March 20, 2025).

[5] *See supra* note 2.

[6] Camilo Montoya-Galvez, *1.5 Million Apply for U.S. Migrant Sponsorship Program With 30,000 Monthly Cap*, CBS News (May 22, 2023, 9:56PM), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/.

Haiti alone resulted in over 12,000 invitations to eligible sponsors within two years,[7] and it appears that USCIS approved nearly 4,000 MPIP applications within two years in the late 2000s.[8] When the first Trump administration made efforts to terminate CAM parole, over 12,000 people had applied for the program.[9] *Id.* Collectively, the beneficiaries of FRP, MPIP, and CAM number in the many thousands.

While these numbers are not exact, the proposed class certainly amounts to well over "forty or more individuals." *George*, 286 F.R.D. at 173; *see also DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 98 (D. Mass. 2010) (stating a court does not need to know the exact number of a proposed class for the numerosity requirement to be satisfied). The proposed class therefore meets the numerosity requirement under Rule 23(a)(1).

### 2. The Proposed Class Satisfies the Commonality Requirement

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[T]he commonality requirement is met where the questions that go to the heart of the elements of the cause of action will each be answered either 'yes' or 'no' for the entire class and the answers will not vary by individual class member." *Raposo v. Garelick Farms, LLC*, 293 F.R.D. 52, 55 (D. Mass. 2013) (internal quotations and citation omitted). "[A] plaintiff must demonstrate that the proposed class's claims 'depend upon a common contention,' the resolution of which is 'central to the validity' of each of the class's claims." *Diggs v. Mici*, CIVIL ACTION NO. 22-cv-40003-MRG, 2024 WL 4425654, at *4 (D. Mass. Sept. 30, 2024) (citing *Wal-Mart*

---

[7] U.S. Citizenship and Immigration Services, Form I-131, Travel Document Applications for the Haitian Family Reunification Parole (HFRP) Program Applications Accepted, Denied, Approved, and Pending As of December 31, 2019, https://www.uscis.gov/sites/default/files/document/data/HFRP_performancedata_fy2020_qtr1.pdf.

[8] Lisa Kobayashi, *The Success of Military Parole in Place*, KOBAYASHI LAW OFFICE (Nov. 30, 2018), https://www.lisakobayashi.com/the-success-of-military-parole-in-place/.

[9] ABC News, *Trump Administration Terminates Program That United Thousands of Families Fleeing Violence in Central America*, ABC NEWS (Nov. 9, 2017, 7:32PM), https://abcnews.go.com/International/trump-administration-terminates-program-united-thousands-families-fleeing/story?id=51050866.

11

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The commonality requirement is a "low bar." *In Re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008). It requires only the existence of a "*single issue common* to all members of the class." *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) (italics in original).

The proposed class satisfies Rule 23(a)(2)'s commonality requirements because fundamental questions of fact and law are common to all class members. Here, all class members' claims all arise from the common contention that Defendants terminated the parole processes and adjudication of benefits for parolees in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C), causing direct harm to class members, parole beneficiaries and sponsors alike. In particular, each of the challenged agency actions is predicated upon the same set of fundamental legal errors and is, accordingly, contrary to law under the APA, which will subject them to direct harm. For example, Armando Doe is a humanitarian parole recipient from Nicaragua who received his grant of parole pursuant to the CHNV processes – Armando Doe worked for a digital media company that documented government abuses, and his family is known for its anti-government views. Armando Doe Decl., Doc. No. 24-3, ¶¶ 6-16. Many of his family members have fled Nicaragua after his father-in-law was arrested, imprisoned, and labeled as a defector. *Id.* at ¶¶ 10-11. Because of the March 25 FRN, his parole will expire on April 24, 2025. Because of the Davidson memo, his pending application for asylum has been indefinitely held up. *Id.* at ¶¶ 27-30. If Armando returns to Nicaragua, he and his wife would both be stripped of their citizenship and imprisoned. *Id.* at ¶ 30. Aleksandra Doe, a U4U beneficiary, fears that by the time her parole expires within the next few days (and cannot be renewed because of the Huffman Memorandum), her pending applications for a green card and for TPS will remain unadjudicated because of the Davidson Memorandum, making it possible that Aleksandra and her family will be deported.

12

Aleksandra Doe Decl., Doc. No. 24-17, ¶¶ 13-15. Marim Doe is an active-duty member of the U.S. Navy who applied for MPIP parole for his father, but his MPIP parole application was recently paused because of the Huffman Memorandum. Marim Doe Decl., Doc. No. 24-14, ¶¶ 2, 11, 19. Omar Doe is an OAW beneficiary who served the United States military for eighteen years in Afghanistan and now faces potential deportation with his entire family when his parole expires in September 2025; his parole cannot be renewed because of the Huffman Memorandum and any request for status adjustment will be unadjudicated because of the Davidson Memo. Omar Doe Decl., Doc. No. 6-7, ¶ 9.  Accordingly, the legal solution to each class member's harm is identical: restoration of the *status quo ante*, under which parolees are entitled to the full duration of their authorized parole (i.e., from prior to the March 25 FRN), and adjudications for pending parole requests and re-parole requests under CHNV, OAW, U4U, CAM, MPIP, FRP, and other parole processes, as well as requests for immigration benefits (including status adjustments) for parolees, all resume in the ordinary course.

Because all members of the class face a common problem (which has a common cause) and their harm would be abated through common relief, the commonality requirement under Rule 23(a)(2) is satisfied.

### 3.    The Proposed Class Meets the Typicality Requirement

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The representative plaintiff satisfies the typicality requirement when its injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those of the class are based on the same legal theory." *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008). "The typicality requirement 'is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *In re*

13

*Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004)).

Like the members of the proposed class, each Proposed Class Representative is a parole beneficiary, the sponsor of a parole beneficiary, or a petitioner for parole on behalf of another individual. As such, each Proposed Class Representative is a sponsor or has a pending application to sponsor a beneficiary for a humanitarian parole process (Kyle Varner, Wilhen Pierre Victor, Valentin Rosales Tabares, Adolfo Gonzalez, Jr., Marim Doe, Norma Lorena Dus, Gabriela Doe, and Rosa Doe), has received parole that was terminated on an *en masse* basis (Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Daniel Doe, Miguel Doe, and Lucia Doe), or has a pending re-parole request or application for additional immigration benefits which are subject to the administrative hold (Aleksandra Doe, Alejandro Doe, Ana Doe, Armando Doe, Carlos Doe, Maksym Doe, Maria Doe, Omar Doe, Svitlana Doe, and Teresa Doe). For example, the CHNV parole processes provided a safe pathway to the United States for married couple Armando and Ana Doe, who fled Nicaragua after Ana's father was captured and tortured by the Nicaraguan government. *See* Armando Doe Decl., Doc. No. 24-3; Ana Doe Decl., Doc. No. 24-2. The March 25, 2025 FRN terminates their parole, and the parole of hundreds of thousands of similarly situated individuals, as of April 24, 2025. If Armando and Ana are deported to the very danger they were forced to escape, they will likely be rendered stateless and imprisoned. Armando Doe Decl., Doc. No. 24-3, ¶ 30. Kyle Varner is a U.S. citizen and physician with deep moral and political convictions that have motivated him to sponsor seventy-nine individuals under CHNV parole processes, forty-three of whom are in the United States. Kyle Varner Decl., Doc. No. 24-10, ¶ 3. Dr. Varner's parole beneficiaries, and those of thousands of similarly situated sponsors, would lose parole on April 24, 2025 and face deportation , pursuant to the March 25 FRN. Wilhen Pierre Victor is a U.S. citizen, based in this district in Woburn, Massachusetts, who has brought five

14

family members to the United States under CHNV parole processes and has two pending applications for CHNV parole, including for a thirteen-year-old niece who lives without her parents in Haiti. Wilhen Victor Decl., Doc. No. 24-11, ¶¶ 3-6, 18. Under the March 25 FRN, those five family members who are parolees, and hundreds of thousands of similarly situated individuals sponsored under humanitarian parole programs, will lose their parole status on April 24, 2025 and be at risk of deportation, and Ms. Victor would also lose the opportunity to reunite with her niece in the United States under CHNV parole processes. Maksym Doe's U4U parole will expire next month in April 2025, and his request for re-parole (pending from last year) has been indefinitely placed on hold, as have the requests of thousands of similarly situated individuals. Doc. No. 6-5, ¶¶ 3, 17.

Accordingly, each Proposed Class Representative seeks the same relief as the rest of the proposed class: restoration of the authorized periods of parole from prior to the March 25 FRN and adjudications of pending parole requests, re-parole requests, and requests for immigration benefits for parolees.

### 4.     The Proposed Class is Adequately Represented

Rule 23(a)(4)'s adequacy requirement is met where the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

Appx-0613

First, the Proposed Class Representatives have claims that are the same as those of the proposed class, and accordingly seek the same remedies as the proposed class. Plaintiffs are not aware of any conflicts of interest within the proposed class. The undersigned counsel are also not aware of any conflicts of interest between members of the proposed class.  The Proposed Class Representatives have demonstrated their commitment to vigorously prosecuting the action, including by providing declarations that illustrate the factual bases for the present action, *see* ECF No. 24-1–24-8, 24-10–24-18, vigilantly monitoring the status of the case, and remaining in regular contact with counsel, thus representing the interests of the class.

Proposed class counsel (i.e., the undersigned counsel) also satisfy Rule 23(a) and (g). *See* Fed. R. Civ. P 23(g) (reciting the standards for appointing class counsel). Under Rule 23(g), a court that certifies a class must also appoint class counsel and consider:

i.      the work counsel has done in identifying or investigating potential claims in the action;

ii.     counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

iii.    counsel's knowledge of the applicable law; and

iv.     the resources that counsel will commit to representing the class[.]

First, the undersigned counsel has performed significant work both identifying and investigating potential claims in the action, which resulted in the submission of individualized declarations from twenty-three (23) individual plaintiffs and one organizational plaintiff that describe the factual bases for their claims.  *See* Doc. Nos. 24-1 - 24-17; 27-1; 64-3 - 64-6; 71-2; 71-3. Second, as set forth in the attached declarations of John Freedman, Karen Tumlin, and Anwen Hughes, the undersigned counsel have decades of experience prosecuting complex civil

16

litigations, claims under the Administrative Procedure Act, and federal class actions, including pursuant to Rule 23(b)(2). *See* Declaration of John A. Freedman ("Freedman Decl."), Doc No. 46-2, ¶¶ 5-9, Declaration of Karen C. Tumlin ("Tumlin Decl."), Doc No. 46-3, ¶¶ 5-6, Declaration of Anwen Hughes ("Hughes Decl."), Doc. No. 46-4, ¶ 4.  Third, the undersigned counsel include attorneys who are experienced legal advocates for immigrant and migrant rights, and who have deep knowledge of the relevant laws and regulations concerning humanitarian parole under the relevant statute of the INA, 8 U.S.C. § 1182(d)(5)(A). *See* Freedman Decl., Doc No. 46-2, ¶¶ 6-7, Tumlin Decl., Doc No. 46-3, ¶¶ 5-6, Hughes Decl., Doc No. 46-4, ¶ 4-5.  Fourth, the undersigned counsel have committed and will continue to commit significant resources to representing the proposed class and are prepared to continue zealously representing Plaintiffs and all proposed class members throughout all stages of this litigation through trial. *See* Freedman Decl., Doc No. 46-2, ¶ 10, Tumlin Decl., Doc No. 46-3, ¶¶ 4, 7, Hughes Decl., Doc No. 46-4, ¶ 6.

### C.    The Proposed Class Satisfies Rule 23(b)(2) Requirements

Because the proposed class satisfies the requirements under Rule 23(a), the Court should certify the proposed class if one or more of the requirements for maintaining a class action under Rule 23(b) are satisfied.  Here, certification is most appropriate under Rule 23(b)(2) because Defendants have, through the challenged agency actions all predicated on the same set of fundamental legal errors, "act[ed] on grounds that apply generally to the [whole] class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2). "These requirements demand cohesiveness among class members with respect to their injuries." *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011) (internal quotation and citation omitted).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"

17

*Wal-Mart*, 564 U.S. at 360 (citation omitted). Such a class is inappropriate, however, when each class member "would be entitled to a *different* injunction or declaratory judgment." *Id.*

Classes challenging particular immigration practices are frequently certified under Rule 23(b)(2). *See, e.g.*, *Gomez v. Trump*, No. 1:20-CV-01419-APM Dkt. 151 (D.D.C. Sept. 30, 2020); *John Doe #1 v. Trump*, Case No. 3:19-cv-1743-AI Dkt. 132 (D. Ore. Apr. 7, 2020); *Batalla Vidal v. Nielsen*, No. 16-CV-4756 Dkt. 342 (E.D.N.Y.. Nov. 14, 2020); *Emami v. Mayorkas*, No. 1:18-cv-1587-JD Dkt. 252 (N.D. Cal. 2024 Mar. 26, 2024).

Here, the requirements under Rule 23(b)(2) are satisfied. Plaintiffs seek injunctive and declaratory relief in response to Defendants' termination of humanitarian parole processes and adjudication of immigration benefits to parolees. Injunctive relief that addresses Defendants' conduct at issue (*i.e.,* vacating and enjoining implementation of the challenged agency actions and directing Defendants to restore the *status quo ante*) would address all of Plaintiffs' claims as well as those of members of the proposed class. Defendants terminated parole processes and adjudication of immigration benefits to parolees, thus harming the entire class. The appropriate remedy to these unlawful terminations is uniform among all class members: vacatur of the challenged agency actions, restoration of the *status quo ante* with the reinstatement of the authorized periods of parole from prior to the March 25 FRN, and adjudications for parole and/or re-parole requests under CHNV, OAW, U4U, CAM, MPIP, FRP and other parole processes as well as other requests for immigration benefits for parolees. As in *Gomez*, *John Doe #1*, *Batalla Vidal*, and *Emami*, because all class members are victims of Defendants' unlawful and arbitrary and capricious conduct and all class members would benefit from the same injunctive and declaratory relief, Rule 23(b)(2)'s requirements are met.

18

## V.    CONCLUSION

For the reasons set forth above, the Court should permit this matter to proceed as a class action under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs respectfully request that the Court accordingly certify the proposed class and appoint the Proposed Class Representatives and Plaintiffs' counsel to represent the certified class.

Dated: March 27, 2025

Respectfully submitted,

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31ˢᵗ Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

*/s/ John A. Freedman*
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

*Attorneys for Plaintiffs*

Appx-0618

**CERTIFICATE OF SERVICE**

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

*/s/ John A. Freedman*
John A. Freedman

EXHIBIT A



U.S. Department of Homeland Security
Washington, DC 20528



A#: ▓▓▓▓▓▓ ▓
Account #: ▓▓▓▓▓▓▓

03/29/2025

**Termination of Parole**

Effective March 25, 2025, the U.S. Department of Homeland Security (DHS) has exercised its discretion to terminate the categorical parole programs for aliens who are nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members.

Your parole will terminate upon the earlier of (1) your original parole expiration date or (2) April 24, 2025. You should depart the United States now, but no later than the date of the termination of your parole. Failure to timely depart may have adverse immigration consequences.

As of the termination of your parole, you may be subject to expedited removal pursuant to section 235 of the Immigration and Nationality Act (INA) or removal proceedings pursuant to section 240 of the INA, either of which may result in your removal, unless you have departed from the United States or have obtained a lawful basis to remain within the United States. If you have not obtained a lawful basis to remain in the United States and do not depart the United States by the date your parole terminates, you will begin to accrue unlawful presence in the United States unless you are otherwise protected from such accrual. Accrual of more than 180 days of unlawful presence followed by departure from the United States may result in being inadmissible if you again seek admission within a certain period of time after departure.

If you are departing the United States via land, you should report your departure once outside the United States via the CBP Home mobile app. If you are having trouble reporting your departure via land, visit https://i94.cbp.dhs.gov/home for more information about voluntarily reporting your departure.

**Notice of Intent to Revoke Parole-Based Employment Authorization**

**If you have been granted employment authorization based on parole pursuant to 8 CFR 274a.12(c)(11), and your employment authorization has not already automatically terminated as set forth in 8 CFR 274a.14(a) and is not scheduled to expire before April 24, 2025, the following applies to you:**

Consistent with 8 CFR 274a.14(b), DHS provides notice of intent to revoke your parole-based employment authorization under 8 CFR 274a.12(c)(11). DHS intends to revoke your employment authorization because the condition upon which your parole-based employment authorization was granted — being paroled into the United States under section 212(d)(5)(A) of the INA — no longer exists. See 8 CFR 274a.14(b)(1)(i). Additionally, DHS has for good cause determined that your employment authorization should be revoked with the termination of your parole. See 8 CFR 274a.14(b)(1)(i).

By operation of this notice, your unexpired parole-based employment authorization will be revoked as of April 24, 2025 unless you submit countervailing evidence that you remain paroled into the United States under section 212(d)(5)(A) of the INA through the expiration date on your Employment Authorization Document by uploading your countervailing evidence in your myUSCIS online account before April 13, 2025. See 8 CFR 274a.14(b)(2).

The timely submission of countervailing evidence does not impact the termination of your parole originally granted under the Cuba, Haiti, Nicaragua, or Venezuela parole programs described above.

Any decision to revoke your employment authorization is final and no appeal shall lie from the decision to revoke employment authorization. See 8 CFR 274a.14(b)(2). If you work without employment authorization, you are in violation of the law.

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

MICHELLE LATOUR
*Deputy Director*

PATRICK GLEN
BRIAN C. WARD
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ELISSA FUDIM
ZACHARY CARDIN
DANIEL SCHUTRUM-BOWARD
JOSEPH A. DARROW
*Trial Attorneys*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-7537
Email: joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | Civil Action No. 1:25-cv-10495 |
| Svitlana Doe, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Kristi Noem, in her official capacity as ) | |
| Secretary of Homeland Security, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
## EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION (Doc. No. 70)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

STANDARD ....................................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

    I.    The Court Lacks Jurisdiction Over Plaintiffs' Request. .................................... 4

       A.    Plaintiffs Have not Established Standing to Seek Injunctive Relief. ............................ 4

       B.    Section 1252(a)(2)(B)(ii) Precludes Jurisdiction. ......................................... 7

    II.    Plaintiffs Are Not Likely to Succeed on the Merits Because they Cannot Obtain APA Review of Their Claims. ........................................................................................... 8

    III.    Plaintiffs Are Not Likely to Succeed on the Merits of their APA Claims.................... 10

    IV. Plaintiffs Do Not Satisfy the Remaining Factors for Obtaining Injunctive Relief. ............ 17

    V.  At Minimum, Any Relief Must be Limited and Subject to Bond. ..................................... 19

CONCLUSION .................................................................................................................. 20

Appx-0623

## TABLE OF AUTHORITIES

*Aldea-Tirado v. PricewaterhouseCoopers, LLP*,
    101 F.4th 99 (1st Cir. 2024) ................................................................... 16

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
    No. 25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ..................................... 6

*Amanullah v. Nelson*,
    811 F.2d 1 (1st Cir. 1987) ............................................................... 1, 11

*Arizona v. United States*,
    567 U.S. 387 (2012) ...................................................................... 19

*Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.*,
    513 F.2d 164 (10th Cir. 1975) ............................................................. 16

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) ...................................................................... 20

*Biden v. Texas*,
    597 U.S. 785 (2022) .................................................................... 9, 10

*Camp v. U.S. Bureau of Land Mgmt.*,
    183 F.3d 1141 (9th Cir. 1999) .......................................................... 11, 15

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) ............................................................. 18

*Cheejati v. Blinken*,
    106 F.4th 388 (5th Cir. 2024) ............................................................. 8

*Clarke v. Security Indus. Ass'n*,
    479 U.S. 388 (1987) ...................................................................... 10

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) ...................................................................... 19

*DHS v. Regents*,
    591 U.S. 1 (2020) ........................................................................ 8

*Doe #1 v. Trump*,
    944 F.3d. 1222 (9th Cir. 2019) ........................................................... 19

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) .................................................................... 5, 6

Appx-0624

*FDA v. Wages & White Lion Invs., L.L.C.*,
   No. 23-1038, 2025 WL 978101 (U.S. Apr. 2, 2025) ............................................. 15

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) .............................................................................. 11

*Geda v. USCIS*,
   126 F.4th 835, 846 (3d Cir. 2025) ........................................................................ 8

*Gill v. Whitford*,
   585 U.S. 48 (2018) ........................................................................................ 4, 20

*Great Lakes Dredge & Dock Co., LLC v. Philly Shipyard, Inc.*,
   2024 WL 5109416 (E.D. Pa. Dec. 13, 2024) ....................................................... 17

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ............................................................................................. 7

*Haig v. Agee*,
   453 U.S. 280 (1981) ........................................................................................... 19

*Hassan v. Chertoff*,
   593 F.3d 785 (9th Cir. 2010) .............................................................................. 18

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................................... 10

*Henderson v. Baldwin*,
   54 F. Supp. 438 (W.D. Pa. 1942) ....................................................................... 12

*Ibragimov v. Gonzales*,
   476 F.3d 125 (2d Cir. 2007) ............................................................................... 13

*INS v. Legalization Assistance Project*,
   510 U.S. 1301 (1993) ......................................................................................... 20

*Jean v. Nelson*,
   472 U.S. 846 (1985) ............................................................................................. 9

*Kucana v. Holder*,
   558 U.S. 233 (2010) ............................................................................................. 8

*LaMarche v. Mayorkas*,
   691 F. Supp. 3d 274 (D. Mass. 2023) ........................................................ 8, 9, 10

Appx-0625

*Leng May Ma v. Barber*,
   357 U.S. 185 (1958) ............................................................................................. 13

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................................... 8

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 4

*Mass. Correction Officers Federated Union v. Baker*,
   567 F. Supp. 3d 315 (D. Mass. 2021) ................................................................. 18

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................... 3

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*,
   743 F.2d 1365 (9th Cir.1984) ............................................................................. 20

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
   434 U.S. 1345 (1977) ........................................................................................... 19

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................... 4, 18

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,
   451 U.S. 77 (1981) ................................................................................................. 5

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
   496 F. Supp. 3d 31 (D.D.C. 2020) ........................................................................ 4

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ........................................................................................... 8

*Roe v. Mayorkas*,
   No. 22-cv-10808-ADB, 2023 WL 3466327 (D. Mass. Apr. 28, 2023) ............... 8, 10

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017) ................................................................................................. 5

*Sierra Club v. Larson*,
   769 F. Supp. 420 (D. Mass. 1991) ....................................................................... 19

*Thigulla v. Jaddou*,
   94 F.4th 770 (8th Cir. 2024) ................................................................................. 8

*Thompson v. N. Am. Stainless,*
  562 U.S. 170 (2011) ............................................................................. 10

*Turner v. U.S. Att'y Gen.,*
  130 F.4th 1254 (11th Cir. 2025) ......................................................... 12

*U.S. v. Fausto,*
  484 U.S. 439 (1988) ............................................................................. 11

*United States v. Chem. Found.,*
  272 U.S. 1 (1926) ................................................................................. 21

*United States v. Maxwell,*
  254 F.3d 21 (1st Cir. 2001) ................................................................. 16

*United States v. Texas,*
  599 U.S. 670 (2023) .......................................................................... 4, 7

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................ 4, 18

*Zheng v. Napolitano,*
  2009 WL 1258908 (D. Colo. May 4, 2009) ........................................ 14

## STATUTES

5 U.S.C. § 701(a)(2) .............................................................................. 9, 10

5 U.S.C. § 705 ............................................................................................ 4

5 U.S.C. § 706(2) ....................................................................................... 3

8 U.S.C. § 1182(d)(5) ............................................................................... 19

8 U.S.C. § 1182(d)(5)(A) ................................................................. 1, passim

8 U.S.C. § 1182(d)(5)(C) ............................................................................ 4

8 U.S.C. § 1225(b) .................................................................................... 12

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ............................................................... 13

8 U.S.C. § 1226(e) .................................................................................... 11

8 U.S.C. § 1252(a)(2)(A) ........................................................................... 13

8 U.S.C. § 1252(a)(2)(B)(ii) ............................................................. 7, 10, 11

8 U.S.C. § 1252(a)(5) ........................................................................................... 11

8 U.S.C. § 1252(a)(9) ........................................................................................... 11

8 U.S.C. § 1252(e) ................................................................................................ 13

8 U.S.C. § 1432 .................................................................................................... 13

44 U.S.C. § 1505 .................................................................................................. 16

44 U.S.C. § 1507 ............................................................................................ 12, 16

## REGULATIONS

8 C.F.R. § 1.2 ................................................................................................ 12, 18

8 C.F.R § 103.2(b)(19)(ii)(B) ............................................................................... 17

8 C.F.R. § 212.0 ................................................................................................... 12

8 C.F.R. § 212.5(d) .............................................................................................. 14

8 C.F.R. § 212.5(e) ............................................................................................... 18

8 C.F.R § 212.5(e)(2)(i) ............................................................................. 3, 12, 14

8 C.F.R. § 274a.12(c)(11) ...................................................................................... 6

8 C.F.R. § 274a.14(b)(1)(i) .................................................................................. 17

8 C.F.R. § 274a.14(b)(2) ...................................................................................... 17

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 65(c) ............................................................................................ 20

## FEDERAL REGISTER

87 Fed. Reg. 63507 (Oct. 19, 2022) ....................................................................... 2

88 Fed. Reg. 1243 (Jan. 9, 2023) ........................................................................... 2

88 Fed. Reg. 1255 (Jan. 9, 2023) ........................................................................... 2

88 Fed. Reg. 1266 (Jan. 9, 2023) ........................................................................... 2

88 Fed. Reg. 1279 (Jan. 9, 2023) ........................................................................... 2

90 Fed. Reg. 13611-01 (Mar. 25, 2025) ................................................................. 2

## INTRODUCTION

Plaintiffs are beneficiaries of discretionary parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV), under which they requested and received discretionary, temporary grants of parole, as well as supporters of or organizations providing services to parole recipients. Despite the temporary, discretionary nature of parole recipients' permission to remain in the United States, and even though they retain the ability to request a discretionary grant of parole outside those programs, they now ask the Court to compel the continuation of all parole recipients' parole terms under the programs by seeking to enjoin the CHNV program's termination. The Court should decline to entertain such extraordinary relief intruding into the Executive's exercise of discretionary immigration authority.

Even assuming Plaintiffs could establish standing to seek relief from the program's termination (they cannot) and that their claims challenging the discretionary action are reviewable under the APA (they are not), Plaintiffs cannot succeed in showing the CHNV termination is likely unlawful. The Department of Homeland Security (DHS) has "remarkably broad" statutory discretion concerning the exercise of parole authority under 8 U.S.C. § 1182(d)(5)(A). *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987). That statute authorizes the Secretary of Homeland Security, "in [her] discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It further provides that parole may be terminated "when the purposes of such parole shall, *in the opinion of* the Secretary of Homeland Security, have been served." *Id.* DHS's decision to terminate the CHNV program and existing grants of parole under that program is within this statutory authority and comports with the notice requirements of the statute and regulations. Additionally, given the temporary nature of CHNV

1

parole and CHNV parolees' pre-existing inability to seek re-parole under the program, their harms are outweighed by the harms to the public if the Secretary is not permitted to discontinue a program she has determined does not serve the public interest. Finally, the requested universal relief is at minimum overbroad, as it goes far beyond addressing the alleged harms of the parolee Plaintiffs.

## BACKGROUND

The Parole Programs. Plaintiffs claim to be beneficiaries and sponsors of multiple parole programs administered by Defendants within the past several years, including the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV). Doc. No. 25 at 12. Under the CHNV parole program, nationals of Cuba, Haiti, Nicaragua and Venezuela who met eligibility requirements, including a U.S. supporter, could be considered for discretionary advance authorization to travel to certain United States ports of entry to request discretionary consideration for parole for up to a two-year term. *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022), as amended by 88 Fed. Reg. 1279 (Jan. 9, 2023); 88 Fed. Reg. 1266 (Jan. 9, 2023) (same for Cubans); 88 Fed. Reg. 1243 (Jan. 9, 2023) (same for Haitians);88 Fed. Reg. 1255 (Jan. 9, 2023) (same for Nicaraguans). The CHNV parole programs were paused in July 2024 due to fraud concerns.[1] On October 4, 2024, DHS announced that was no re-parole process under the CHNV program. 90 Fed. Reg. at 13617 & n.62.

Factual and Procedural History. In a Federal Register Notice published March 25, 2025, DHS terminated the CHNV parole programs. *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025) (FRN); Doc. No. 71-1. Grants of parole under CHNV that have not already expired by April 24, 2025, will

---

[1] Stephen Dinan, "'Parole' program put on hold amid massive fraud," Wash. Times (Aug. 2, 2024), at https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.

2

terminate on that date unless the Secretary decides to the contrary in individual cases. *Id.* at 13,611. Upon re-examination and based on DHS's experience operating them, the Secretary determined that the CHNV programs "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." *Id.* at 13612. To the extent that "urgent humanitarian reasons" supported any grants of parole under CHNV, "DHS believes that [such] reasons for granting parole [are] best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." *Id.* The FRN provided notice of the termination of parole for CHNV parolees. *Id.* at 13,620; *see* 8 C.F.R § 212.5(e)(2)(i).

Plaintiffs—14 aliens claiming to be beneficiaries of one the parole programs (Parolee Plaintiffs), 9 U.S. citizens or lawful permanent residents claiming to be supporting aliens in the parole programs (Supporter Plaintiffs), and one organization, the Haitian Bridge Alliance (HBA), claiming to provide services to CHNV parolees and supporters from Haiti—challenge, as relevant here, the CHNV FRN under the APA, 5 U.S.C. § 706(2). On March 27, 2025, Plaintiffs filed a "supplemental" motion to preliminarily enjoin Defendants from implementing the FRN, arguing that the FRN is contrary to 8 U.S.C. § 1182(d)(5)(A) and DHS regulations requiring written notice to terminate parole or parole-based work authorization. Doc. Nos. 70, 72.

## STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The factors assessing harm to the opposing party and weighing the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same standard governs a request to stay the effective date of an administrative action under 5 U.S.C. § 705. *See Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020)*.* The Court may not issue relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018).

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Plaintiffs' Request.

#### A.  Plaintiffs Have not Established Standing to Seek Injunctive Relief.

Plaintiffs cannot demonstrate a concrete and particularized "injury in fact" that is "fairly ... trace[able] to the" FRN and "likely" to be "redressed" by the preliminary injunction they seek. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

First, HBA and the Supporter Plaintiffs, as third parties who are not the subject of the challenged parole termination, cannot establish standing to enjoin the FRN. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562. Generally, a plaintiff lacks a cognizable interest in the Executive Branch's discretionary immigration enforcement decisions over others. *See United States v. Texas*, 599 U.S. 670 (2023) (finding that States, as non-regulated third parties, lacked standing to challenge immigration enforcement guidelines). Further, Congress has specifically authorized suit, and thus defined standing, for certain state officials to challenge policies concerning parole under § 1182(d)(5)(A), but has not done likewise for organizations or parole supporters. *See* 8 U.S.C. § 1182(d)(5)(C). This omission is meaningful, because "when Congress wanted to provide a right to" sue over

4

parole decisions, "it did so expressly." *See Nw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 92 & n.24 (1981).[2]

Organizational Plaintiff HBA's asserted injury based on its use of resources to assist Haitian parolees in response to the FRN does not overcome this standing hurdle. *See* Doc. No. 71-3 at ¶¶ 11–12. To show a concrete injury, it is not enough that "an organization diverts its resources in response to defendant's actions" even if it will "expend considerable time, energy, and resources." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–95 (2024) (*Alliance*). An unregulated organization must instead show that the challenged action "perceptibly impair[s]" or "interferes with" its activities by imposing an affirmative "impediment" to performing those activities. *See id.* HBA's proffered evidence does not satisfy this standard. HBA asserts that it has devoted resources to "analyz[ing] the FRN," providing information to Haitian parolees, and providing "humanitarian and legal assistance to individuals" due to the upcoming termination of their employment authorization. *See* Doc. No. 71-3 at ¶¶ 11–12. It has also updated its "educational materials" to address the FRN. *Id.* at ¶ 15. Thus, at most, HBA has voluntarily diverted its resources from conducting core activities—providing humanitarian and legal support to recent Haitian arrivals, *see id.* at ¶ 8—for one set of clients to conducting the same type of activities for the particular clients impacted by the FRN. HBA does not, and cannot, assert that the FRN actually impedes HBA's activities. And as the Supreme Court's reasoning in *Alliance* made clear, an organization cannot demonstrate standing any time

---

[2] The Supporter Plaintiffs, who assert no injury to themselves from the FRN, cannot establish standing based on asserted harms to parolees. *See* Doc. No. 72 at 13, 20–23. Courts only recognize standing to assert others' rights in special cases where the third-party plaintiff has "a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017). The Supporter Plaintiffs have not asserted any hindrance to any current CHNV parolee's ability to bring her own claim. Nor can they, as several CHNV parolees have brought their own claims here.

it shifts resources in response to a policy from one set of direct-service activities to another set of similar activities in support of its mission. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (holding that union lacked standing to challenge directive to member employees despite "choosing to divert resources towards 'respond[ing] to tremendous uncertainty created by [the challenged] actions' and away from other union priorities"). To hold otherwise would impermissibly allow organizations to create standing to challenge any policy that touches on their mission by voluntarily devoting resources toward responding to the policy. *See Alliance*, 602 U.S. at 394.

The Parolee Plaintiffs also lack standing because their alleged injuries are not redressable by an injunction or stay of the FRN. Regardless of the existence of the FRN, DHS retains its statutory authority to grant or deny parole based on any urgent humanitarian reason or significant public benefit. *See* 8 U.S.C. 1182(d)(5)(A). Even under the FRN, DHS is free to exercise that statutory discretion—the FRN is clear that DHS officers may "make[] an individual determination to the contrary" of the general guideline for terminating CHNV parole as of April 24, 2025. 90 Fed. Reg. at 13612, 13618. Likewise, DHS retains its statutory discretion to terminate Plaintiffs' parole terms absent the FRN ending the CHNV program. *See* 8 U.S.C. § 1182(d)(5)(A) (Secretary may end parole when "in" her "opinion" its purposes have been served). Redressability cannot be established where a "judicial decree rendering" guidance "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the guidance. *See United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring). Because enjoining the FRN would not eliminate the agency's underlying statutory ability to terminate parole for each CHNV parolee, 90 Fed. Reg. at 13612, redressability is lacking. *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

**B.  Section 1252(a)(2)(B)(ii) Precludes Jurisdiction.**

In 8 U.S.C. § 1252(a)(2)(B)(ii), Congress precluded review of the termination of parole.

That statute provides: "no court shall have jurisdiction to review . . . any other decision or action .

. . the authority for which is specified . . . to be in the discretion of the . . . Secretary." The exercise

of parole authority under § 1182(d)(5)(A)—which permits the Secretary of Homeland Security to,

"in [her] discretion" temporarily parole an applicant for admission into the United States and to

terminate that parole "when the purposes of such parole . . ., in the opinion of the Secretary of

Homeland Security, have been served"—is just such a "decision or action" that is subject to the

bar. *See* 8 U.S.C. § 1182(d)(5)(A). Section 1252(a)(2)(B)(ii) thus precludes jurisdiction over

Plaintiffs' challenges to the decision to terminate parole, as publicized in the CHNV FRN.

Plaintiffs argue that § 1252(a)(2)(B)(ii) does not apply as they are "challenging

overarching policy, not individual decisions." Doc. No. 72 at 14. This is wrong. *First*, the CHNV

parole programs were explicit that those "overarching policy" judgments were entirely

discretionary as well under the statute. *See, e.g.*, 88 Fed. Reg. at 1277 ("The Secretary retains the

sole discretion to terminate the Parole Process for Cubans at any point …. This process is being

implemented as a matter of the Secretary's discretion. It is not intended to and does not create any

rights …."). *Second*, Plaintiffs present no reason why the FRN's announcement of the decision to

terminate numerous CHNV parolees' existing parole terms is distinguishable from an individual

decision to terminate a particular grant of parole for purposes of § 1252(a)(2)(B)(ii). *Third*,

§ 1252(a)(2)(B)(ii) also bars review of "overarching policy" judgments concerning how the

"individual decisions" based on the reasoning in *Patel v. Garland*, 596 U.S. 328 (2022). In *Patel*,

the Supreme Court held that sister subsection 1252(a)(2)(B)(i), which bars jurisdiction to review

"any judgment regarding the granting of relief" under certain INA provisions bars review of

"judgments of whatever kind" covered by the statute, and "not just discretionary judgments or the

7

last-in-time judgment," and so this provision "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Id.* at 338–39; *see Kucana v. Holder,* 558 U.S. 233, 247 (2010) (explaining that §§ 1252(a)(2)(B)(i) and (ii) cover decisions "of a like kind"). Plaintiffs' insistence that *Patel* barred only "review of a particular discretionary decision" ignores the Court's explanation that the statutory bar applied to every decision in the chain leading to that particular decision, including, as relevant to the CHNV termination, the agency's guidance related to that ultimate discretionary judgment. Similarly, Plaintiffs' reliance on *Roe v. Mayorkas*, 2023 WL 3466327 (D. Mass. Apr. 28, 2023) and *LaMarche v. Mayorkas*, 691 F. Supp. 3d 274 (D. Mass. 2023), is misplaced. *Roe* wholly failed to address the implications of *Patel* for the scope of section 1252(a)(2)(B)(ii). *See* 2023 WL 3466327, at *7. Indeed, more recent circuit court decisions have held that § 1252(a)(2)(B)(ii) bars review of DHS policies concerning discretionary adjustment adjudications. *See Thigulla v. Jaddou*, 94 F.4th 770 (8th Cir. 2024); *Cheejati v. Blinken*, 106 F.4th 388 (5th Cir. 2024); *Geda v. USCIS*, 126 F.4th 835, 846 (3d Cir. 2025). And unlike the policy decision challenged here, *Lamarche* dealt with the alleged withholding or delay of an agency decision, 691 F. Supp. 3d 274, 277 (D. Mass. 2023) ("delay is not a discretionary decision"). Finally, unlike the CHNV parole programs, the DACA program addressed in *Regents* was not based on a statute explicitly conferring discretion as required by section 1252(a)(2)(B)(ii). *See* Doc. No. 72 at 14 (citing *DHS v. Regents*, 591 U.S. 1, 17-19 (2020)).

## II.    Plaintiffs Are Not Likely to Succeed on the Merits Because they Cannot Obtain APA Review of Their Claims.

Threshold APA requirements likewise bar Plaintiffs' claims. *First,* Plaintiffs cannot obtain APA review because they challenge agency conduct "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). The APA does not provide for review of DHS's expressly discretionary determination to end a parole process. The text of

§ 1182(d) commits decisions to grant or deny parole explicitly to the "discretion" of the Secretary of Homeland Security. 8 U.S.C. § 1182(d)(5)(A). And while the statute places restrictions on the grant of parole, including its case-by-case and humanitarian or public-interest requirements, it places absolutely no limits on the Secretary's discretion to deny or terminate parole, which she may end simply "when the purposes of such parole shall, *in [the Secretary's] opinion* . . . have been served." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). The decision to terminate the CHNV parole programs involves the "complicated balancing of a number of factors which are peculiarly within [agency] expertise," including the Executive Branch's comprehensive efforts to manage foreign affairs and border security, 90 Fed. Reg. at 13616, for which there are no judicially manageable standards permitting court superintendence. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). And as discussed, the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(B)(ii) likewise precludes APA review. *See* 5 U.S.C. § 701(a)(1).

Plaintiffs' only argument on this point is that "while individual parole decisions are discretionary, the Supreme Court has explicitly said that DHS's parole policies are subject to APA review." Doc. No. 72 at 14 (citing *Biden v. Texas*, 597 U.S. 785, 806-07 (2022)). What the Supreme Court *actually* stated was that DHS's exercise of its "discretion *to parole* applicants" was limited by the statute's requirement that parole be "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and its exercise of its discretion to *grant* parole under that framework must be reasonable and reasonably explained. *Texas*, 597 U.S. at 806 (emphasis added). The opinion does not speak to DHS's discretion *to deny* parole, *terminate* parole, or *end* a parole program, on which the statute places no restrictions. *See id.*[3]

---

[3] Plaintiffs also cite *Roe* and *LaMarche*. Doc. No. 72 at 15. *Roe* merely echoed the *Texas* analysis. *See* 2023 WL 3466327, at *9. *Lamarche* is inapplicable here, as it dealt with whether there is APA

Appx-0637

*Second*, APA review is also unavailable here because HBA and the Supporter Plaintiffs' claims do not fall within the zone of interests of § 1182(d)(5)(A). A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). Nothing in § 1182(d)(5)(A) evinces any concerns with the interests of organizations or supporters in assisting parolees or enforcing the statute's provisions. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). Indeed, the parole statute does not even mention supporters or sponsors of parole, even though it specifically provides for suit by state officers. *See* 8 U.S.C. § 1182(d)(5)(A), (C). Thus, regardless of what role HBA or Supporter Plaintiffs have played in the CHNV programs, Congress has not indicated an intent that they could challenge actions under the parole statute. To the contrary, Congress has provided that only the aliens against whom the immigration laws are being enforced may challenge application of those laws—and then only in certain circumstances and through removal proceedings, which is strong evidence that Congress intended to preclude suit by other parties. *See, e.g.,* 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *U.S. v. Fausto*, 484 U.S. 439, 448 (1988).

## III.    Plaintiffs Are Not Likely to Succeed on the Merits of their APA Claims.

Even assuming Plaintiffs' claims are reviewable, the termination of the CHNV programs accords with the statutory and regulatory authority granted to DHS.

The INA provides "sweeping" "statutory authority" to the Secretary of Homeland Security

---

review of "unreasonable delay or wholesale suspension" of parole adjudications. 691 F. Supp. 3d at 277.

in determining whether parole should be granted and when it should be terminated. *See Amanullah*, 811 F.2d at 6. Under the statute, the Secretary has authority, "in [her] discretion," to "parole" "temporarily under such conditions as [the Secretary] may prescribe," and "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled" and "his case shall continue to be dealt with in the same manner as that of any other applicant for admission[.]" 8 U.S.C. § 1182(d)(5)(A). Regulations implementing the parole authority address the mechanics of terminating parole before its expiration date, providing that "upon accomplishment of the purpose for which parole was authorized or when in the opinion of [the Secretary or her designees], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien[.]" 8 C.F.R. § 212.5(e)(2)(i). Neither the statute nor regulations define or limit what may constitute "written notice" of termination, other than to provide that a charging document qualifies as "written notice." *See id.*

The Secretary's actions concerning CHNV parole are consistent with the statute and regulations. The Secretary determined, in her opinion, that whatever purposes parole under the CHNV programs had served, it was no longer serving those purposes, and that "neither humanitarian reasons nor public benefit" warranted continuation of parole under the program. *See generally* 90 Fed. Reg. at 13,612-17; *see also* 8 U.S.C. § 1182(d)(5)(A) (leaving to the Secretary the determination of when the purposes of parole have been served); 8 C.F.R. § 212.5(e)(2)(i) (similar). The Secretary thus published notice of that determination and its rationale in the *Federal Register* and provided electronic notice of termination to each individual parolee via their USCIS online account. *See* 8 C.F.R. § 212.5(e)(2)(i) (requiring written notice where parole is terminated prior to its expiration date); *see* 44 U.S.C. § 1507; *Camp v. U.S. Bureau of Land Mgmt.*, 183 F.3d

11

1141, 1145 (9th Cir. 1999) (generally, "publication in the Federal Register is legally sufficient notice to all interested or affected parties regardless of actual knowledge"); *Henderson v. Baldwin*, 54 F. Supp. 438, 440 (W.D. Pa. 1942); Doc. No. 88-1, Ex. A (USCIS notice).

Plaintiffs' arguments that these actions are contrary to law lack merit. *First*, Plaintiffs argue (Doc. No. 72 at 15-16) that the decision to terminate existing grants of parole before their expiration was based on a legally erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b)(1). Plaintiffs incorrectly claim that 8 U.S.C. § 1225(b)(1)(A)(iii)(II)—the provision of the expedited removal statute that DHS cites in the FRN, and which is limited to those who cannot demonstrate two years of continuous physical presence—"does not permit subjecting the CHNV parolees to expedited removal." Doc. No. 72 at 15. This provision permits the government to use expedited removal for an alien who "has not been admitted or paroled." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). The use of the present perfect tense ("has not been . . . paroled") here reflects a "state that continues into the present." *See Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261–62 (11th Cir. 2025) (construing former 8 U.S.C. § 1432 and explaining that the present perfect tense can "refer to a . . . state that continues into the present"). Accordingly, an alien who was paroled in the past, but whose parole has terminated or expired, may be processed for expedited removal under § 1225(b)(1)(A)(iiii)(II).[4] This textual interpretation comports with the statutory and historical context: when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole which, in the case of all CHNV parolees, is that of an applicant for admission standing at the threshold of entry. *See* 8 U.S.C. § 1182(d)(5)(A) (at end of parole, alien "shall continue to be dealt with in the same manner as that of any other applicant for admission to

---

[4] Such an alien may also be processed for expedited removal as an alien "arriving in the United States" under § 1225(b)(1)(A)(i). *See also* 8 C.F.R. §§ 235.3(b)(1)(i), 1.2 ("An arriving alien remains an arriving alien even if paroled.")

12

the United States"); *Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 137 (2d Cir. 2007). Moreover, Plaintiffs cannot use this lawsuit to challenge the application of expedited removal, as review of expedited removal is extremely limited and systemic challenges, if proper, may only be brought in the District Court for the District of Columbia. *See* 8 U.S.C. § 1252(a)(2)(A), (e). But even assuming this justification was somehow in error, this would not warrant disturbing DHS's decision to terminate existing grants of parole, because that decision lies within DHS's discretion and is supported by DHS's separate findings that "neither humanitarian reasons nor public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served." 90 Fed. Reg. at 13,620; *see also id.* at 13,614–16 (expressing concern with expanded public benefits eligibility of certain parolees), 13,619 ("recognizing strong interest in promptly returning parolees when the basis for the underlying parole no longer exists"); *Nadal-Ginard v. Holder*, 558 F.3d 61, 69 n. 7 (1st Cir. 2009) ("We therefore need not reach the [agency's] other rationale for its decision [because if the other rationale constituted error] . . . there was no prejudice"). And DHS retains the discretion to continue to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. 90 Fed. Reg. at 13,612.

*Second*, Plaintiffs contend (Doc. No. 72 at 16-17) that the determination to end parole for all CHNV parolees via a single action is in violation of the parole statute's directive that such applications be granted only on a case-by-case basis. But the "case-by-case" requirement only governs grants of parole. The sole statutory requirement to terminate parole is that, "in the opinion of the Secretary," the purposes of parole have been served. 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5(e)(2)(i). There is no explicit case-by-case requirement for parole termination in either the statute or the regulations and, although the issue has not arisen with frequency, the

13

government is unaware of any decision imposing the requirements that govern the *granting* of a parole application on the decision to *terminate* or *revoke* parole. *See*, *e.g.*, *Zheng v. Napolitano*, 2009 WL 1258908, at *2 (D. Colo. May 4, 2009) (rejecting argument asserted in habeas petition that sought to "engraft[] the requirements pertaining to initial parole decisions onto parole revocation decisions"). The parole programs themselves are clear that parole terminations are entirely discretionary. *See, e.g.*, 88 Fed. Reg. 1272 (Cuba program) ("DHS may terminate parole in its discretion at any time"). The Secretary made that determination here regarding the CHNV programs, and nothing more is required under either the statute or the regulations.[5]

In any event, given that the Secretary has determined that the CHNV parole program should no longer exist because there is no longer an urgent humanitarian reason or significant public benefit to support the parole program, *see* 90 Fed. Reg. at 13,612-17, it makes sense to conclude that parole should be terminated for the aliens granted parole under that program. There is no reason to undertake a granular case-by-case assessment of whether parole should be terminated in each case when that decision, for any particular individual, follows from the decision to end the broader program. Moreover, the Secretary retains the authority not to terminate parole in individual cases for significant public benefit or urgent humanitarian reasons, and DHS retains its discretion to *grant* parole to individuals on a case-by-case basis, under the statutorily prescribed standard, notwithstanding the termination of the CHNV programs and the corresponding termination of parole granted pursuant to those programs. *See id.* at 13,612.

---

[5] Plaintiffs seek to avoid this conclusion by arguing inconsistently, in a brief challenging the *termination* of parole programs, that what the Secretary was doing was "neither a denial nor a termination *per se*, but rather an *en masse* alteration of the conditions" of CHNV parole. Doc. No. 72 at 17. Yet the FRN is clear on its face that the Secretary is terminating parole, which is a distinct action from setting or altering the conditions of parole. Indeed, the regulations regarding conditions of parole assume an authorized period of parole is actually in place. *See* 8 C.F.R. § 212.5(d).

14

*Third*, Plaintiffs renew their argument that termination is premised on the incorrect legal conclusion that DHS lacks the authority to implement a categorical parole program. *See* Doc. No. 72 at 17-18. This is belied by the FRN, which nowhere asserts that the CHNV programs or grants of parole are being terminated because DHS believes them to violate the parole statute. *See* 90 Fed. Reg. 13,611. DHS stated that it "believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute and taking into consideration each alien's specific circumstances." Doc. No. 72 at 18 (quoting 90 Fed. Reg. at 13612). But this observation does not state that a categorical consideration of humanitarian reasons or public benefit would be legally prohibited in creating a program to receive requests for parole for case-by-case consideration. Instead of Plaintiffs' false construction of DHS's rationale, the FRN exhaustively documents the reasons DHS believes these programs are no longer warranted and why their continuation would not serve the humanitarian or public-interest justifications of the statute. *See id.* at 13612–17. Thus, even assuming DHS had alternatively relied on this justification, such a reliance would be at most harmless error. *FDA v. Wages & White Lion Invs., L.L.C.*, No. 23-1038, 2025 WL 978101, at *24 (U.S. Apr. 2, 2025) (stating long-accepted rule that remand is unnecessary "when an agency's decision is supported by a plethora of factual findings, only one of which is unsound"). Ultimately, Plaintiffs point to nothing that *requires* DHS to exercise its discretion to continue to implement such a parole program or grant parole to anyone.

*Fourth*, Plaintiffs argue (Doc. No. 72 at 18-19) that publication in the *Federal Register* was insufficient to constitute the required regulatory notice of termination. As a document "authorized" to be published in the *Federal Register*, *see* 44 U.S.C. § 1505, publication of the notice was "sufficient to give notice of the contents of the document to a person subject to or affected by it," 44 U.S.C. § 1507; *see United States v. Maxwell*, 254 F.3d 21, 25 (1st Cir. 2001). Plaintiffs

nonetheless contend that "notice by publication is insufficient in law" merely because the regulation requires "written notice" of termination. *See* Doc. No. 72 at 19 (quoting 44 U.S.C. § 1507). But this "insufficient in law" exception, for which there is a "lack of clear precedent," *see Camp*, 183 F.3d at 1145, is not relevant here. The statute contains no notice requirements, and the relevant regulation does not specify that written notice must be accomplished by a particular means. In particular, it does not require DHS to "furnish individual notice." *Bank of Commerce v. Bd. of Governors of Fed. Res. Sys.*, 513 F.2d 164, 167 (10th Cir. 1975); *Camp*, 183 F.3d at 1145 (concluding exception applied where regulation required notice to be "sent" to certain parties).

Regardless of the applicability of 44 U.S.C. § 1507, every CHNV parolee will receive individualized notice via their USCIS online account, *see* 90 Fed. Reg. at 13,620, and this notice would independently satisfy the regulatory requirement, *cf. Aldea-Tirado v. PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103-06 (1st Cir. 2024) (finding email notice sufficient). Plaintiffs' sole argument against this method of notice is that "there is seemingly no requirement that the CHNV parolees check those accounts or even [] maintain access to them." Doc. No. 72 at 19 n.11. There is likewise no *requirement* that any parolee open mail addressed to them, but the fact they failed to do so would not support a claim of insufficient notice. So, too, here; DHS is notifying parolees through accounts they created specifically to apply for parole under the CHNV program. *See* 90 Fed. Reg. at 13,620 (noting that all parolees should have such an account); *see also* 8 C.F.R. § 103.2(b)(19)(ii)(B) (providing for electronic notice to aliens and their representatives in cases where the application is filed electronically). It is reasonable to conclude that notice of termination through that same account is sufficient under the regulation.

*Finally*, Plaintiffs assert (Doc. No. 72 at 19-20) that DHS may not revoke work authorization without individualized notice and an opportunity to contest the revocation. For good

reason, Plaintiffs do not contest that the regulations warrant revocation; with parole being terminated the "conditions upon which [employment authorization] was granted . . . no longer exist[.]" 8 C.F.R. § 274a.14(b)(1)(i). And, although the regulation does require "written notice of intent to revoke the employment authorization" citing "the reasons indicating that revocation is warranted," 8 C.F.R. § 274a.14(b)(2), the FRN and the electronic notice meet these requirements. It is "written notice" to the alien that explains that "after termination of the parole, the condition upon which the employment authorization was granted no longer exists," 90 Fed. Reg. at 13,619. Plaintiffs additionally note that aliens are "granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence," Doc. No. 72 at 20 (citing 8 C.F.R. § 274a.14(b)(2)), but nothing in the FRN eliminates this opportunity. And the individualized notice issued to CHNV parolees via their USCIS online account expressly explains this opportunity. *See* Doc. No. 88-1. Where the basis of revocation is the termination of the parole program under which the alien had become eligible for employment authorization, however, it is questionable that any evidence could be submitted that would undercut the revocation determination.

**IV. Plaintiffs Do Not Satisfy the Remaining Factors for Obtaining Injunctive Relief.**

The harms the Parolee Plaintiffs assert from termination of parole—loss of "lawful status," loss of work authorization, and potential removal—do not establish the imminent irreparable injury sufficient to obtain preliminary injunctive relief. *See* Doc. No. 72 at 21–22.[6] As an initial matter,

---

[6] Neither the Supporter Plaintiffs nor HBA assert that they will suffer irreparable harm absent an injunction, only that others will. Doc. No. 72 at 20–23. Nor can they, as HBA's claimed diversion of resources is insufficient to establish standing, *see* supra § I(A), let alone irreparable harm. And Supporter Plaintiffs' disappointment with CHNV's termination, concern about parolees, or potential incidental monetary injury from a parolee's potential loss of employment, *see* Doc. No. 71-2 at ¶¶ 8, 11, 12, likewise do not constitute irreparable harm. *See Great Lakes Dredge & Dock Co., LLC v. Philly Shipyard, Inc.*, 2024 WL 5109416, at *8 (E.D. Pa. Dec. 13, 2024); *Mass. Correction Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 327 (D. Mass. 2021).

every parolee under the CHNV program faced these same potential harms under the terms of their parole, even before the FRN. For example, Carlos Doe's parole was already set to expire in June 2025, *see* Compl. ¶ 220, and the CHNV programs did not include a re-parole component, *supra* at 2. Moreover, each grant of parole, which provides *temporary* right to remain in the United States, was always subject to termination at DHS's discretion. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e); *Hassan v. Chertoff*, 593 F.3d 785, 789 (9th Cir. 2010). Parole does not convey any permanent immigration status. *See* 8 C.F.R. § 1.2.

And the potential consequence of removal is not sufficiently imminent or concrete for any of the Plaintiffs to support a finding of irreparable harm. *Winter*, 555 U.S. at 22 (irreparable harm must be "*likely* in the absence of an injunction," rather than a mere "possibility"); *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (irreparable harm must be "of such imminence that there is a clear and present need for relief" "before the merits are decided."). The FRN states that those with pending applications for immigration benefits or petitions filed on their behalf—like many of the Parolee Plaintiffs—will not be prioritized first for removal. 90 Fed. Reg. at 13619. If Plaintiffs are placed into § 1229a removal proceedings, they will be able to assert asylum or other claims to relief in the context of those proceedings and may avoid removal as a result. If Plaintiffs are processed for expedited removal, they will be able to assert fear claims in the context of those proceedings, and may avoid removal as a result.

In any event, the harms asserted by Plaintiffs are outweighed by the harms to the government. An injunction would limit the Administration's ability to pursue its foreign policy goals and to exercise its discretionary powers with respect to immigration, and is thus not in the public interest. *Winter*, 555 U.S. at 20; *Nken*, 556 U.S. at 435. An injunction irreparably harms the

18

United States by limiting the Executive's ability to exercise its discretionary authority under 8 U.S.C. § 1182(d)(5) as provided by Congress. *See Doe #1 v. Trump*, 944 F.3d. 1222, 1228 (9th Cir. 2019) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury"); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (noting that "any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). The government would also be harmed from pursuing its foreign policy goals, as the government has also assessed that the CHNV parole programs are inconsistent with those goals. 90 Fed. Reg. at 13612; *see also Dep't of Navy v. Egan,* 484 U.S. 518, 529 (1988) ("[F]oreign policy [is] the province and responsibility of the Executive."); *Haig v. Agee,* 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Most importantly, providing Plaintiffs with their requested relief would mark a severe intrusion into the core Executive function of managing the immigration system. *See Arizona v. U.S.*, 567 U.S. 387, 394–96 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). It would impede the Government's strong interest in being able to remove aliens from the United States who lack the ability to obtain more permanent status. *See* Doc. 71-1 at 10 (90 Fed. Reg. at 13619). An injunction could compel DHS "to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system." *Id*.

## V. At Minimum, Any Relief Must be Limited and Subject to Bond.

Even if Plaintiffs were entitled to injunctive relief or a stay of administrative action—they are not—the relief they seek is overbroad. Under settled constitutional and equitable principles, the Court may not issue relief that is broader than necessary to remedy actual harm shown by

specific Plaintiffs. *Gill*, 585 U.S. at 73. Plaintiffs here lack any basis for universal relief from the FRN. Even if HBA had standing to seek injunctive relief—it does not, *supra* § I(A)—any relief could at most address Haitian nationals in the geographic areas HBA serves. And class certification is not appropriate for the reasons argued in response to Plaintiffs' supplemental motion for class certification. To the extent Plaintiffs are entitled to any relief, such relief must be limited to the individual named Plaintiffs. *Baxter v. Palmigiano*, 425 U.S. 308, 310 n. 1 (1976)); *Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir.1984). Additionally, even assuming the Court agrees with Plaintiffs that the FRN is contrary to law because it provides them with insufficient notice of the termination, then the Court should—at most—issue relief isolated to any claimed notice deficiencies consistent with the FRN's severability clause, 90 Fed. Reg. at 13621, rather than enjoining the entire FRN. For all these reasons, the Court should deny universal relief, whether in the form of a stay of agency action or an injunction.

If this Court issues any injunctive relief, it should impose a bond requirement, *see* Fed. R. Civ. P. 65(c). It should also deny Plaintiffs' overly burdensome requested weekly reporting on compliance. Plaintiffs offer no evidence to rebut the presumption that Defendants' officers will perform their duties in accordance with applicable law, which includes court orders. *See United States v. Chem. Found.*, 272 U.S. 1, 15 (1926).

## CONCLUSION

For these reasons, the Court should deny a preliminary injunction.

Dated: April 8, 2025                    Respectfully submitted,

By: /s/ *Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2025, I electronically filed this memorandum with the Clerk of the Court for the United States Court of for the District of Massachusetts by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorney*
United States Department of Justice

21

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
MICHELLE LATOUR
*Deputy Director*
PATRICK GLEN
BRIAN C. WARD
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov
ELISSA FUDIM
DANIEL SCHUTRUM-BOWARD
*Trial Attorneys*

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ )<br>Svitlana Doe, *et al.*, )<br> )<br>  Plaintiffs, )<br> )<br>v. )<br> )<br>Kristi Noem, in her official capacity as )<br>Secretary of Homeland Security, *et al.*, )<br> )<br>  Defendants. )<br>‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | Civil Action No. 1:25-cv-10495-IT |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION (Doc. No. 73)**

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ............................................................. 2

LEGAL STANDARD FOR CLASS CERTIFICATION ............................................. 6

ARGUMENT................................................................................................................. 6

    I.       Threshold Issues Preclude Consideration of Certification of Any Class. ....................... 6

    II.      The Court Should Deny Certification of the Immigration Benefits and Sponsor Classes for the Reasons Stated in Defendants' Prior Opposition. ......................................................... 10

    III.    The Rescinded Parolee Class Is Ill Defined and Overbroad. ........................................ 11

    IV.    The Rescinded Parolee Class Lacks Commonality and Typicality............................... 13

    V.      The Rescinded Parolee Class Does Not Satisfy Rule 23(b)(2)'s Requirements. ........... 16

CONCLUSION............................................................................................................. 19

Appx-0651

## TABLE OF AUTHORITIES

*Ad Hoc Comm. on Jud. Admin. v. Com. of Mass.*,
  488 F.2d 1241 (1st Cir. 1973) .................................................................. 11

*Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................15

*Amanullah v. Nelson*,
811 F.2d 1 (1st Cir. 1987) ........................................................................ 7

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591, (1997) ................................................................................. 2

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*,
  208 F.3d 1 (1st Cir. 2000) ...................................................................... 12

*Bennet v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 12

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001) ................................................................... 6

*Celebi v. Mayorkas*,
  744 F. Supp. 3d 100 (D. Mass. 2024) ............................................... 8, 10

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................... 6

*Connor B. ex rel. Vigurs v. Patrick*,
  272 F.R.D. 288 (D. Mass. 2011) ............................................................ 16

*Ctr. for Biol. Diversity v. Zinke*,
  260 F. Supp. 3d 11 (D.D.C. 2017) ........................................................ 12

*Donovan v. Philip Morris USA, Inc.*,
  268 F.R.D. 1 (D. Mass. 2010) ............................................................... 18

*Eddlemon v. Bradley Univ.*,
  65 F.4th 335 (7th Cir. 2023) .................................................................... 6

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................. 9

*Forsythe v. Sun Life Fin., Inc.*,
  417 F. Supp. 2d 100 (D. Mass. 2006) ..................................................... 6

Appx-0652

*Garcia v. E.J. Amusements of New Hampshire, Inc.*,
   98 F. Supp. 3d 277 (D. Mass. 2015) ...................................................................... 13

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) ............................................................................................... 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ................................................................................................. 6

*Hayden v. Freightcar Am., Inc.*,
   2008 WL 375762 (W.D. Pa. Jan. 11, 2008) .......................................................... 12

*In re Navy Chaplaincy*,
   306 F.R.D. 33 (D.D.C. 2014) ................................................................................ 16

*Lemon v. Int'l Union of Operating Engr's*, Local No. 139, AFL–CIO,
   216 F.3d 577 (7th Cir. 2000) ................................................................................. 16

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................... 12

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ................................................................................. 11

*Quadrelli v. Moniz*,
   No. 20-cv-10685-ADB, 2020 WL 3051778 (D. Mass. June 8, 2020) .................... 16

*Rahman v. Chertoff*,
   530 F.3d 622 (7th Cir. 2008) ................................................................................. 16

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017) .................................................................................................. 9

*United States v. Texas*,
   599 U.S. 670 ............................................................................................................ 8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..................................................................................... 6, 13, 16

*Wild Fish Conservancy v. Jewell*,
   730 F.3d 791 (9th Cir. 2013) ................................................................................. 12

**STATUTES**

5 U.S.C. § 704................................................................................................. 12

8 U.S.C. § 1182(d)(5) ....................................................................................... 9

8 U.S.C. § 1182(d)(5)(A) ......................................................................... 2, 7, 9

8 U.S.C. § 1229a .............................................................................................. 8

8.U.S.C. § 1252(a)(2)(B)(ii) ..........................................................................10

**FEDERAL RULE OF CIVIL PROCEDURE**

Fed. R. Civ. P. 23(b)(1)-(3)..............................................................................6

Fed. R. Civ. P. 23(b)(2)....................................................................................6

**FEDERAL REGISTER**

90 Fed. Reg. 13,611 ........................................................................................ 4

88 Fed. Reg. 1255 (Jan. 9, 2023) .................................................................... 7

88 Fed. Reg. 1266 (Jan. 9, 2023) .................................................................... 7

Appx-0654

## INTRODUCTION

The Court should deny Plaintiffs' supplemental motion for class certification, including their request for a new, fatally overbroad and vague class of all individuals who have received parole through various different humanitarian parole programs and who are subject to the recent termination of the parole programs for Cubans, Haitians, Nicaraguans, and Venuzelans (CHNV), or who will be subject to any other similar, future actions.

As previously instructed by the Court, Defendants here address Plaintiffs' requests for certification of (1) the claims of any Plaintiffs that are supporters or beneficiaries of parole under CHNV (CHNV Plaintiffs); and (2) the new proposed "Rescinded Parolee" class. For the reasons explained in Defendants' prior opposition, the "Immigration Benefits Subclass" and "Sponsor Subclass" cannot be certified, because the Class Representatives lack standing, the proposed classes lack commonality and typicality, and the requirements of Rule 23(b)(2) have not been satisfied. *See generally* Doc. No. 85. Nothing in Plaintiffs' supplemental class certification motion changes these arguments.

Additionally, the CHNV Plaintiffs who seek to represent the Rescinded Parolee Subclass cannot demonstrate Article III standing to challenge the CHNV termination, and Congress has precluded jurisdiction over challenges to the discretionary exercise of parole authority like the CHNV termination. Because these Plaintiffs cannot satisfy threshold jurisdictional requirements, the Court should decline to entertain their request for class certification.

But even if the Court could consider class certification of the claims challenging the CHNV termination, Plaintiffs' new broad and ill-defined proposed Rescinded Parolee class does not meet the requirements of Rule 23. Plaintiffs seek classwide relief against a Federal Register Notice that terminates the grant of discretionary parole under the CHNV parole processes. Recognizing that

1

class members cannot obtain individualized relief to compel the reinstatement or grants of parole on an individual basis because such discretionary acts are precluded from review, Plaintiffs instead attempt to obtain similar relief by enjoining or setting aside the FRN and Davidson memorandum on a classwide basis. But Rule 23 is a procedural rule that cannot be used to circumvent these substantive limitations on individual relief. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, (1997) (reiterating that Rule 23 "shall not abridge, enlarge or modify any substantive right). Indeed, these limits on individualized relief likewise defeat Plaintiffs' request for class treatment. Because DHS retains underlying discretion concerning parole and the adjudication of many immigration benefits, an injunction or declaratory judgment against the FRN would not provide relief to all members of either class and thus the requirements for certifying and maintaining an injunctive-relief class under Rule 23(b)(2) are not met.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs brought this lawsuit challenging various Executive Branch actions that relate broadly to programs governing requests for parole into the United States, or for re-parole, by certain categories of individuals under 8 U.S.C. § 1182(d)(5)(A). Second Am. Compl., Doc. No. 68 at ¶¶ 3, 158–200. The Individual Plaintiffs claim to be parole recipients or supporters of parole requests under various programs. *See* Doc. No. 68 at ¶¶ 3, 16–38. As relevant to this motion, the following Plaintiffs are parole recipients or supporters under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans (the "CHNV Plaintiffs"): Alejandro Doe, Ana Doe, Carlos Doe, Miguel Doe, Andrea Doe, Lucia Doe, Daniel Doe, Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, and Valentin Rosales Tabares.

On January 20, 2025, in accordance with several Executive Orders, Acting Homeland Security Secretary Benjamine Huffman issued a memorandum directing DHS to review over a 60-

day period its existing parole policies and instructing DHS and its subagencies, following that review, to "pause, modify or terminate" any parole policy that does not comply if: it "was not promulgated pursuant to the procedural requirements of the [APA] or any comparable scheme," no "legitimate reliance interests" are protected, and "[d]oing so is otherwise consistent with applicable statutes, regulations, and court orders." Huffman Memo, Doc. No. 41-1 at 3. On January 23, 2025, the Acting Director of U.S. Citizenship and Immigration Services (USCIS), Jennifer Higgins, sent an email requesting that USCIS officers "do not make any final decisions (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application" for enumerated parole programs, including those challenged by Plaintiffs except for MPIP, until further instructions are issued. Higgins Email, Doc. No. 41-2 at 2. In a February 14, 2025 memorandum, USCIS Acting Deputy Director Andrew Davidson explained that a preliminary internal investigation had uncovered hundreds of potential instances of fraud in the CHNV program and had exposed "serious vulnerabilities" in DHS's vetting process. Davidson Memo, Doc. No. 41-3 at 3. Accordingly, Davidson directed USCIS to "place an administrative hold on all immigration benefit requests filed by aliens who are or were paroled under U4U, CHNV, or FRP processes, pending the completion of the required screening and vetting . . . to identify any fraud, public safety, or national security concerns." *Id.*

Plaintiffs assert that these and other actions constitute a termination of parole processes and a suspension of other immigration benefits, and that they are *ultra vires*, Doc. No. 68 at ¶ 357, violate constitutional due process, *id.* at ¶ 362, and violate the Administrative Procedure Act (APA) because they allegedly are based on an erroneous interpretation of the parole statute, *id.* at ¶ 315, exceed statutory authority, *id.* at ¶ 328, and are arbitrary and capricious, *id.* at ¶¶ 324, 337–340, 345–46.

On March 18, 2025, Plaintiffs moved for a preliminary injunction and stay of administrative action seeking to enjoin implementation of the Huffman, Higgins, and Davidson guidance, which Defendants opposed. On March 21, 2025, Plaintiffs filed a motion (Doc Nos. 46 and 47) seeking to certify two classes composed of:

1. "All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to U4U, CHNV, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the 'Sponsor Subclass')[1]"; and

2. "All individuals who have received humanitarian parole through already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the 'administrative hold' set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the 'Immigration Benefits Subclass')."

Doc. No. 47 at 11.

On March 25, DHS published a federal register notice terminating the CHNV parole processes and providing notice to aliens in the United States under the CHNV parole programs, whose parole has not already expired by April 24, 2025, that their parole will terminate on April 24, 2025, unless the Secretary makes an individual determination to the contrary. Doc. No. 71-1 at 2 (90 Fed. Reg. at 13,611).

Plaintiffs expressed their intent to amend their Complaint to address the CHNV FRN, and to seek preliminary injunctive relief and class certification relating to the CHNV FRN. *See, e.g.*, Doc. No. 45. The Court subsequently set a schedule for the filing and consideration of the motions concerning the CHNV notice. The Court ordered that, for purposes of Plaintiffs' first class

---

[1] To avoid confusion, Defendants use Plaintiffs' class definitions. However, the term "sponsor" is inapplicable to the identified parole programs. Defendants will use the term "supporter" where appropriate.

4

certification motion, it would "exclude[e] consideration of claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program." Doc. No. 58.

On March 27, 2025, Plaintiffs filed their supplemental motion, explaining that it "expands the proposed class definition to include a subclass of individuals who have received parole through humanitarian parole processes which are subject to the FRN" and also adds new CHNV Plaintiffs as proposed class representatives. Doc. No. 74 at 6. Plaintiffs define their new proposed "Rescinded Parolee Subclass"[2] as individuals who received parole through the CHNV program and which parole is subject to the CHNV FRN, as well as any individual who has received parole through any other "humanitarian parole process" and will be subject to "subsequent similar actions by Defendants to rescind formally individual grants of parole on a categorical and *en masse* basis." *Id.*; *see also* Doc. No. 73.

For purposes of the current motion, Plaintiffs identify the following Plaintiffs as Proposed Representatives of the "Rescinded Parolee Subclass" ("Rescinded Parolee Plaintiffs"): Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Daniel Doe, Miguel Doe, and Lucia Doe. Doc. No. 74 at 19. Plaintiffs identify the following CHNV Plaintiffs as Proposed Representatives of the "Immigration Benefits Class" ("CHNV Immigration Benefits Plaintiffs"): Alejandro Doe, Ana Doe, Armando Doe, and Carlos Doe. *Id.* Plaintiffs identify the following CHNV Plaintiffs as Proposed Representatives of the "Sponsor Subclass" ("CHNV Supporter Plaintiffs"): Kyle Varner, Wilhen Pierre Victor, Norma Lorena Dus, Gabriela Doe, and Valentin Rosales Tabares. *Id.*

---

[2] To avoid confusion, Defendants use Plaintiffs' class definitions. However, CHNV parolees' parole has been terminated effective April 24, 2025, not "rescinded."

Appx-0659

## LEGAL STANDARD FOR CLASS CERTIFICATION

The class action is a departure from "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). To justify such departure, proposed class representatives must possess the same interest and same injury as the class members. *See id.* "[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance'" with Rule 23 and "'be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required[.]" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 350)*.* In addition to satisfying these Rule 23(a) prerequisites, a plaintiff must demonstrate that the action fits within at least one of the categories in Rule 23(b). *See* Fed. R. Civ. P. 23(b)(1)–(3). Here, Plaintiffs seek certification under Rule 23(b)(2), which requires the movant to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Courts must rigorously analyze Rule 23's requirements, *Wal-Mart Stores*, 564 U.S. at 350-51, which requires more than accepting Plaintiffs' claims as pleaded, *see Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023). Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23," otherwise certification must be denied. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

## ARGUMENT

### I.    Threshold Issues Preclude Consideration of Certification of Any Class.

Before this Court may consider whether Plaintiffs' proposed classes are capable of certification, the Court must first determine that the CHNV Plaintiffs have Article III standing.

"This constitutional threshold must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Rule 23." *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) (cleaned up); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 118 (D. Mass. 2006) (standing is a "threshold" issue that should be resolved before class certification) (collecting cases).

The CHNV Plaintiffs—regardless of what class they seek to represent—lack standing to challenge any pauses on adjudications set forth in the Huffman Memo, Higgins Email, and Davidson Memo, for the same reasons stated in Defendants' prior class certification opposition. *See* Doc. No. 85 at 11–13. Additionally, CHNV Plaintiffs have no standing to challenge the Higgins guidance pausing adjudication of requests for re-parole, because, as Plaintiffs concede (at Doc. No. 72 at 3 n.4), there was no opportunity to request re-parole under the CHNV program (although aliens can nonetheless make requests for re-parole outside the program). *See* 90 Fed. Reg. at 13617 & n.62; Doc. No. 41-4 at ¶ 8.

The Rescinded Parolee and other CHNV Plaintiffs likewise lack standing to challenge the CHNV FRN. These Plaintiffs allege a prospective injury (inability to obtain status and removal) based on the following prospective causal chain: after their parole terms end, their requests for other immigration benefits are not quickly adjudicated, they are placed in removal proceedings, and they are subsequently removed. *See* Doc. No. 74 at 19–20. But the CHNV Plaintiffs' claimed injuries are not traceable to, and cannot be redressed by, relief enjoining or declaring unlawful the CHNV FRN. Parole is discretionary and no one can claim an entitlement to it. *See* 8 U.S.C. § 1182(d)(5)(A); *Amanullah v. Nelson*, 811 F.2d 1, 14 (1st Cir. 1987). Indeed, the CHNV parole processes themselves were clear that parole terminations are entirely discretionary. *See, e.g.*, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266, 1272 (Jan. 9, 2023) ("DHS

may terminate parole in its discretion at any time"); *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255, 1260 (Jan. 9, 2023) (same). In any event, the termination of the CHNV parole program does not prevent Rescinded Parolee Plaintiffs from requesting parole outside of that program by filing a Form I-131, as is contemplated by the CHNV FRN. *See* 90 Fed. Reg. at 13612; Doc. No. 41-4 at ¶ 8. Moreover, requests for other immigration benefits—whether asylum, adjustment of status, or TPS—can take months or years to adjudicate in the ordinary course,[3] and the CHNV FRN does not set any requirements regarding those benefits adjudications. And DHS has indicated in the FRN that those former CHNV parolees with pending applications or petitions for other immigration benefits will not be prioritized for removal. 90 Fed. Reg. at 13619. If Rescinded Parolee Plaintiffs are placed into removal proceedings under 8 U.S.C. § 1229a, they can renew their requests for relief—whether for asylum, withholding of removal, TPS, or adjustment of status—in those proceedings, which have multiple levels of appellate review. In other words, to the extent any of the Rescinded Parolee Plaintiffs is harmed, that harm is not traceable to the challenged agency action terminating CHNV parole programs, but rather to pre-existing circumstances.

Indeed, these Plaintiffs' injuries are not redressable by an order setting aside, declaring unlawful, or enjoining the implementation of the CHNV FRN. *See* Doc. No. 68 at 101 (Prayer for Relief); *see* Doc. No. 89 at 13. Enjoining or declaring the FRN unlawful would not remedy the harms the Rescinded Parolee Plaintiffs assert, because it would not create any enforceable legal obligations toward them or the class members concerning their continued parole or their pending

---

[3] See, e.g., *Celebi v. Mayorkas*, 744 F. Supp. 3d 100, 104 (D. Mass. 2024) (finding three-and-a-half-year wait for adjudication of asylum application not unreasonable, and noting backlog of 900,000 asylum applications); USCIS, Historic Processing Times, Doc. No. 41-5 (noting recent average TPS application processing times of 5-6 months and average adjustment of status processing times of up to 13.4 months); OIG Report (June 2024), at https://perma.cc/PJA4-SJ3S.

applications for benefits. It would do nothing to change the fact that federal officials possess the same underlying discretion absent the FRN to terminate the Rescinded Parolee Plaintiffs' individual grants of parole. *See* Doc. No. 42 at 9 (citing *United States v. Texas*, 599 U.S. 670, 691 (Gorsuch, J., concurring)). Moreover, the FRN makes clear that the Rescinded Parolee Plaintiffs may ask DHS for a new period of parole outside of the terminated programs, as DHS also retains its statutory authority to grant parole, at its discretion, based on the alien's demonstration of urgent humanitarian reason or significant public benefit, *see* 8 U.S.C. 1182(d)(5)(A), and therefore may "make[] an individual determination to the contrary" of the general guideline for terminating CHNV parole as of April 24, 2025. 90 Fed. Reg. at 13612, 13618. Enjoining the FRN would also not compel adjudication of any other pending benefit requests within a particular time frame.

The CHNV Supporter Plaintiffs—that is, those with "pending" requests to support potential beneficiaries of the now-terminated CHNV parole programs, *see* Doc. No. 72 at 1— likewise lack standing to challenge the termination. Their claimed injury is the inability to support those individuals' parole requests, *see* Doc. No. 74 at 19–20, but that injury is not an interest that is contemplated by the statute, which does not even mention supporters of potential parolees. *See* 8 U.S.C. § 1182(d)(5)(A). This claimed injury is also not traceable to the FRN or redressable by its injunction, because DHS retains the discretion to decline to grant parole to any alien regardless of the FRN. Further, Supporter Plaintiff Varner's moral and political desires to support additional unidentified parolees cannot support an injunction of the guidance because such convictions do not suffice to establish injury in fact. *See* Doc. No. 74 at 19; *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 396 (2024) (holding that sincere moral and policy objections to federal action alone cannot support Article III standing). And the Supporter Plaintiffs "cannot rest [a] claim to relief on the [purported] legal rights of third parties" such as the individuals they have

supported for parole. *See Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017).

For these reasons, the CHNV Plaintiffs lack standing just as the other Proposed Representative Plaintiffs lack standing. *See* Doc. No. 85 at § I. But standing is not the only threshold jurisdictional impediment to adjudicating class certification. Here, as stated in Defendants' motion in opposition to the preliminary injunction, the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(B)(ii) also precludes review of Plaintiffs' challenge to the CHNV FRN and to the termination of each grant of parole. *See* Doc. No. 89 at 14–15. Because this Court lacks jurisdiction, it need not—and should not—adjudicate Plaintiffs' class certification motion.

## II.    The Court Should Deny Certification of the Immigration Benefits and Sponsor Classes for the Reasons Stated in Defendants' Prior Opposition.

Plaintiffs' Supplemental Class Certification motion repeats their prior requests and arguments for certification of their fatally vague and overbroad Immigration Benefits and Sponsor Classes. These classes should not be certified for the same reasons stated in Defendants' Opposition to that prior motion. *See* Doc. No. 85. The consideration of CHNV Plaintiffs as proposed representatives of these classes in no way defeats those arguments, but only serves to further demonstrate the material differences among the classes and why the claims cannot be determined on a class-wide basis and are not appropriate for class relief.

For example, with respect to the Immigration Benefits Subclass, an inherently individualized inquiry—or at minimum an inquiry based on the type of immigration benefit sought—is required to resolve their claims. *See* Doc. No. 85 at 18–20. And CHNV Plaintiff Armando Doe demonstrates how the *TRAC* factors and injury analysis must be analyzed differently for each individual with an application for pending immigration benefits. Armando Doe was paroled into the United States under the CHNV parole program for Nicaraguans in February 2024. Doc. No. 24-3 at ¶ 18. But for the FRN terminating his parole as of April 24, 2025, his parole

10

would have expired in February 2026. *Id.* Because of the current backlog, asylum applications often take years to adjudicate. *Celebi*, 744 F. Supp. 3d at 104. Notwithstanding, Armando waited almost a full year to apply for asylum, until January 2025. Doc. No. 24-3 at 27. Thus, even without the FRN shortening Armando's parole period, it is highly unlikely Armando's asylum application would have been adjudicated before his parole expired. And, as noted, there has never been a re-parole option under CHNV. Armando, thus, like all the individual Plaintiffs in this case, stands in a different position than someone who might be able to state a claim for unreasonable delay on their request for immigration benefits.

## III.    The Rescinded Parolee Class Is Ill Defined and Overbroad.

Under Rule 23, a class must be defined clearly. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Class definitions that include language which is subjective or vague may defeat certification. *Ad Hoc Comm. on Jud. Admin. v. Com. of Mass.*, 488 F.2d 1241, 1243, n.1 (1st Cir. 1973). "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Mullins*, 795 F.3d at 660. Having an inadequately defined or overbroad class often implicates multiple Rule 23 requirements, including typicality, commonality, and the standards for certifying an injunctive-relief class under Rule 23(b)(2).

Here, the Plaintiffs seek to certify a new class composed of:

All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and en masse basis (the "Rescinded Parolee Subclass").[4]

---

[4] While Plaintiffs frame this class, as well as the two others, as "subclasses," they are in fact separate classes as they do not fall under a single umbrella.

Doc. No. 74 at 12.

Like the prior class definitions, this definition contains the amorphous reference to "other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications." This language is not only fatally vague, it also purports to include in the class individuals who are subject to agency action that *has not yet occurred* and which is not certain to happen. Even if Plaintiffs could challenge speculative future agency action—which they cannot[5]— the Court cannot possibly determine whether such action is contrary to law based on the Plaintiffs' current claims challenging other conduct. APA challenges can succeed only where the plaintiff "identif[ies] a discrete 'agency action' that fits within the APA's definition of that term." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013). It is "entirely certain" that an "entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990); *see also Ctr. for Biol. Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017). It is impossible for the Court to certify a class based on speculative, unidentified future conduct, because there is no way to assess the justifications for an action that has not yet occurred or for which no justifications have thus been provided. There is likewise no way to assess whether there are any common legal questions relating to Plaintiffs' claims asserted against that future action that will drive resolution of each class member's claim. *See also infra* at 16. Thus, the class must be limited

---

[5] This is not permissible because the APA requires final agency action that "marks the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature." 5 U.S.C. § 704; *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted). Final agency action constitutes a "definitive statement" of the agency's position with "direct and immediate consequences." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 5 (1st Cir. 2000) (internal quotation marks and citations omitted).

Appx-0666

to those subject to the conduct challenged in the complaint, not some future conduct. *Hayden v. Freightcar Am., Inc.*, 2008 WL 375762, at *6 (W.D. Pa. Jan. 11, 2008) ("[F]uture variables bring uncertainty to the class… [such that] any reference to future possible occurrences defeats the class certification.").

## IV.    The Rescinded Parolee Class Lacks Commonality and Typicality.

The differences among the Rescinded Parolees' class members' claims to relief preclude a finding of commonality or typicality. Rule 23(a)(2) requires questions of law or fact common to the class. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered *the same injury*.'" *Wal-Mart*, 564 U.S. at 350 (citation omitted). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Instead, the "claims must depend upon a common contention" that "is capable of classwide resolution—which means that [the] determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Rule 23(a)(2) "is easy to misread, since [a]ny competently crafted class complaint literally raises common questions." *Wal-Mart Stores*, 564 U.S. at 349, 351 (citation and quotes omitted). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350.

The commonality prong tends to merge with the requirement of typicality under Rule 23(a)(3), *see id*. at 350 n.5, because "the central inquiry in assessing whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class," *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277, 288 (D. Mass. 2015).

13

The proposed Rescinded Parolee class challenges the FRN, which terminates prior grants of parole.[6] The crux of this class's injury is the same as the proposed Immigration Benefits Class— that their pending applications for additional immigration benefits will take longer to adjudicate by virtue of the Davidson memo than they would have otherwise, such that some of these individuals may be placed in removal proceedings or removed after they lose parole on April 24, but before adjudication of their additional benefits applications is complete. *See* Doc. No. 74 at 6, 17. Plaintiffs posit that common questions exist about whether challenged the agency actions are contrary to law under the APA. Doc. No. 74 at 17. But any determination on the legal justification for the challenged policies cannot drive the resolution of each class member's claim to relief, for several reasons.

*First*, the Rescinded Parolee Plaintiffs claim that the "common problem" they and Rescinded Parolee class members face is a risk of removal. Doc. No. 74 at 17-18.  As an initial matter, the fact that these class members' parole will end early does not give rise to a viable injury or claim to relief, because parole is discretionary and no one can claim an entitlement to it. *See supra* § I. The CHNV parole processes themselves were clear that parole terminations are entirely discretionary, but Rescinded Parolee Plaintiffs may nonetheless request parole outside of that program by filing a Form I-131. *See supra* § I.  But, to the extent any class member has standing relating to an injury concerning their applications for other immigration benefits (they do not, *see supra* § I), at minimum, the inquiry into legal injury is not common to the proposed class, which

---

[6] As defined, the Rescinded Parolee Class are those whose parole was or will be terminated prior to its expiration by the CHNV FRN or other similar actions taken in the future. *See* Doc. No. 73 at 1. This class cannot challenge the Davidson memo, as by definition not all of its members have pending requests for other immigration benefits. Indeed, Rescinded Parolee Plaintiffs Miguel Doe, Lucia Doe, and Daniel Doe do not allege to have any pending requests for immigration benefits. *See* Doc. No. 68 at ¶¶ 222–24, 229–36.

encompasses people who have not applied for any immigration benefits at all (who were granted parole but who have since returned to their home countries), who already have received another immigration benefit, who applied for a variety of different, unspecified immigration benefits, and who are in a variety of different situations concerning their parole status. Whether each class member is materially affected by the FRN (and whether their harms are redressable by any classwide relief) the individual alien's circumstances, including whether they already have TPS (like Daniel Doe, who has TPS until August 2025, *see* Doc. No. 68 at ¶ 234), how long it would have taken for their pending request for an immigration benefit to be adjudicated but for the pause, whether ICE places the alien in immigration proceedings, and whether the alien is able to renew his application or request in those proceedings. The variations in the attenuation of the injury among the Representative Plaintiffs and the class defeat commonality and typicality. *See Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (to show standing, the "links in the chain of causation . . . must not be too speculative or too attenuated").

Indeed, to the extent that the Rescinded Parolee Class's legal injury is based on an alleged combination of the effect of the CHNV FRN with the Davidson Memo pausing adjudications of other immigration benefits filed by parolees under the CHNV programs, this is not a common injury. As noted, not all Rescinded Parolees have pending requests for immigration benefits or eligibility for such benefits. And some, like Daniel Doe, currently have TPS or some other benefit. But even so, there are no truly common legal questions governing this claim. As explained in Defendants' opposition to Plaintiffs first motion for class certification, Plaintiffs' assertion that the pause on adjudication of certain benefits is "contrary to the statutory regime" cannot be decided on a classwide basis because those benefits are subject to different statutes. And the question of whether the Davidson Memo has unreasonably delayed adjudication is subject to the highly case-

specific analysis of the *TRAC* factors, which would require a different analysis for each class member, rendering class treatment inappropriate. *See* Doc. No. 85 at 18–20.

*Finally*, as noted in Section III, the Rescinded Parole class includes aliens whose parole through other, non-CHNV parole programs may be terminated before the expiration of the initial parole term due to the Government's unspecified, future conduct. As this future agency action does not exist, and none of the Rescinded Parolee Plaintiffs are subject to it, it is impossible for the Court to assess whether there are common questions relating to the assessment of the legality of that future action or whether the named Plaintiffs' claims are typical of all members of the class. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) (holding that typicality was not met where vague and open-ended class definition did not adequately delineate the particular procedures to which class members were subject).

**V.    The Rescinded Parolee Class Does Not Satisfy Rule 23(b)(2)'s Requirements.**

A class may be maintained under Federal Rule of Civil Procedure 23(b)(2) only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Quadrelli v. Moniz*, No. 20-cv-10685-ADB, 2020 WL 3051778, at *6 (D. Mass. June 8, 2020) (quoting *Wal-Mart*, 564 U.S. at 360 (emphasis added)); *see also In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) (holding class not maintainable under Rule 23(b)(2)). "By virtue of its requirement that the plaintiffs seek to redress a common injury ... Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive." *Lemon v. Int'l Union of Operating Engr's*, Local No. 139, AFL–CIO, 216 F.3d 577, 580 (7th Cir. 2000); *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011). The key to a

16

(b)(2) class is that "the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360. Rule 23(b)(2) is not satisfied when each class member "would be entitled to a different injunction or declaratory judgment." *Id.*

Plaintiffs claim that Rule 23(b)(2) is satisfied because "[t]he appropriate remedy [] is uniform among all class members: restoration of the *status quo ante* with the reinstatement of the authorized periods of parole from prior to the March 25 FRN, and adjudications for parole and/or re-parole requests under CHNV, OAW, U4U, CAM, MPIP, FRP[7] and other parole processes as well as other requests for immigration benefits for parolees." Doc No. 74 at 18. But, as explained, that is not correct. *See supra* §§ I, IV. This relief will not redress the injuries of all class members.

The Rescinded Parolee class includes those who filed requests for immigration benefits years ago, and those who requested benefits only recently or have not requested them at all; those who seek immigration benefits like TPS, which is a paper-based application process, and those who seek immigration benefits like asylum, which requires an interview and is subject to backlog of applicants; those who have already been placed in removal proceedings, and those who have not. These are meaningful distinctions as to whether the injunction or declaratory judgment sought in this action could possibly provide relief to each member of the class.

The crux of the Rescinded Parolee class's claimed injury—and of their claims that the agency guidance is unlawful—is that some of these individuals may be placed in expedited

---

[7] As noted above, those individuals granted parole under any program other than CHNV should not be included in this class, both because no actions similar to the CHNV FRN have been taken at this time with respect to those programs, and also because such inclusion goes beyond what was ordered by the court with respect to this additional briefing. Further, there should be no reference to re-parole as to CHNV parolees because re-parole has never been offered under the CHNV processes.

removal or § 1229a removal proceedings or removed after their parole has ended. *See supra* at 14.
But no single injunction or declaratory relief against the challenged FRN can prevent these events
for each class member. Parole is, by definition, temporary. While parolees may apply for other
immigration benefits during their period of parole, there is neither any guarantee nor any
requirement that such applications will be adjudicated before the parole period expires, even
without the FRN. This is especially true for CHNV parole, which Plaintiffs concede did not
contemplate re-parole once a parole term ends. Once a parolee's parole expires, he may generally
be placed in removal proceedings or expedited removal. This is true even if he has a pending
request for another immigration benefit, though the CHNV FRN notes that those with a pending
benefit request will not be among those prioritized for removal. 90 Fed. Reg. at 13619.

For this reason, the Rescinded Parolee class will not be affected in the same way by relief
pertaining to the challenged guidance. For most, to obtain relief that will even arguably stem their
alleged series of harms—risk of not obtaining a future immigration benefit, risk of being placed in
some form of removal proceedings, and risk of being removed—Rescinded Parolee class members
would need to file individual requests for parole through the I-131 process, or actions for
unreasonable delay in adjudication of other immigration benefits, or dispute their removal and seek
relief as available in the context of the applicable procedures. In fact, Plaintiffs acknowledge that
unidentified class members may seek individual relief. Doc No. 74 at 8 ("Plaintiffs would exclude
from the class definition any individuals or groups who choose to opt out of the class in order to
seek relief in separate litigation."). But under Rule 23(b)(2), "[c]lass members have no need to opt
out because the best result absent class members could receive is the same relief they would have
received as class members." *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 7 (D. Mass. 2010).
The fact that the "best result" an absent class member could receive—an order finding the

18

Government unreasonably delayed adjudication of his immigration benefit request and ordering

the Government to adjudicate the request by a date certain—is different from the relief sought in

this case, demonstrates why certification under Rule 23(b)(2) is improper.

## CONCLUSION

The Court should deny Plaintiffs' motion for class certification.


Dated: April 8, 2025                                Respectfully submitted,

                                            By: /s/ *Katherine J. Shinners*
                                                KATHERINE J. SHINNERS
                                                *Senior Litigation Counsel*
                                                U.S. Department of Justice, Civil Division
                                                Office of Immigration Litigation

                                                *Counsel for Defendants*

19

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2025, I electronically filed this opposition with the Clerk

of the Court for the United States Court of for the District of Massachusetts by using the CM/ECF

system. Counsel in the case are registered CM/ECF users and service will be accomplished by the

CM/ECF system.

By: */s/ Katherine J. Shinners*
      KATHERINE J. SHINNERS
      Senior Litigation Counsel
      United States Department of Justice

20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SVITLANA DOE, et al.,             )
                             )
      Plaintiffs,        )
                             )
   v.                  )
                           )  Civil Action No.
KRISTI NOEM, in her official capacity)  1:25-cv-10495-IT
as Secretary of Homeland Security,   )
et al.,                   )
                           )
      Defendants.        )
                           )
_____

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

HEARING

Thursday, April 10, 2025
3:06 p.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

```
 1                    A P P E A R A N C E S

 2
       On behalf of the Plaintiffs:
 3
            LAW OFFICE OF JUSTIN B. COX
 4          BY:   JUSTIN B. COX
            PO Box 1106
 5          Hood River, OR  97031
            (541) 716-1818
 6          justin@jcoxconsulting.org

 7
            JUSTICE ACTION CENTER
 8          BY:   LAURA FLORES-PERILLA
                  ESTHER SUNG
 9                KAREN C. TUMLIN
                  HILLARY LI
10          PO Box 27280
            Los Angeles, CA  90027
11          (323) 450-7272
            laura.flores-perilla@justiceactioncenter.org
12          esther.sung@justiceactioncenter.org
            karen.tumlin@justiceactioncenter.org
13          hillary.li@justiceactioncenter.org

14
            ARNOLD & PORTER KAYE SCHOLER LLP
15          BY:   JOHN A. FREEDMAN
            601 Massachusetts Avenue NW
16          Washington, DC  20001
            (202) 942-5000
17          john.freedman@arnoldporter.com

18
            ARNOLD & PORTER KAYE SCHOLER LLP
19          BY:   H. TIFFANY JANG
            200 Clarendon Street
20          53rd Floor
            Boston, MA  02116
21          (617) 351-8050
            tiffany.jang@arnoldporter.com
22

23

24

25
```

```
 1        HUMAN RIGHTS FIRST
          BY:  ANWEN HUGHES
 2        75 Broad Street
          31st Floor
 3        New York, NY  10004
          (212) 845-5200
 4        hughesa@humanrightsfirst.org

 5

 6   On behalf of the Defendants:

 7        UNITED STATES DEPARTMENT OF JUSTICE
          BY:  BRIAN C. WARD
 8        PO Box 868
          Washington, DC  20044
 9        (202) 616-9121
          brian.c.ward@usdoj.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2              (In open court at 3:06 p.m.)
 3              THE DEPUTY CLERK:  This is Civil Action
 4   Number 25-10495, Doe, et al. v. Noem, et al.  Would counsel
 5   please identify themselves for the record.
 6              MR. COX:  Good afternoon, Your Honor.  Justin Cox
 7   for the plaintiffs.
 8              THE COURT:  Good afternoon.
 9              And you may all be seated.
10              MS. FLORES-PERILLA:  Good afternoon, Your Honor.
11   Laura Flores-Perilla for the plaintiffs.
12              THE COURT:  Good afternoon.
13              MR. FREEDMAN:  Good afternoon, Your Honor.  John
14   Freedman for the plaintiffs.
15              THE COURT:  Good afternoon.
16              MS. TUMLIN:  Good afternoon, Your Honor.  Karen
17   Tumlin for the plaintiffs.
18              THE COURT:  Good afternoon.
19              MS. SUNG:  Good afternoon, Your Honor.  Esther Sung
20   for the plaintiffs.
21              THE COURT:  Good afternoon.
22              MS. LI:  Good afternoon.  Hillary Li for the
23   plaintiffs.
24              THE COURT:  Good afternoon.
25              MS. JANG:  Good afternoon.  Tiffany Jang for the
```

1    plaintiffs.

2            THE COURT:  Good afternoon.

3            MS. HUGHES:  Good afternoon, Your Honor.  Anwen

4    Hughes for the plaintiffs.

5            THE COURT:  Good afternoon.

6            MR. WARD:  Good afternoon, Your Honor.  Brian Ward

7    for the defendants.

8            THE COURT:  Good afternoon.

9            The pile on my desk is growing, but this is the

10   last of the hearings I've scheduled on these emergency

11   motions.  And I wanted to start out with where I am

12   anticipating going on this federal register notice, which I

13   think each side will find something to like and something to

14   dislike, and then give you an opportunity to explain to me

15   why you think I'm wrong.

16           I don't believe I can grant the request that the

17   plaintiffs are asking for to continue the CHNV program for

18   allowing applications of people who are not already here.

19   And I do believe I have the authority to stay the federal

20   register notice as to the shortening of the parole period for

21   the people who are already here.

22           So that's where I am.  And, obviously, you -- each

23   side has a lot you may disagree with or agree with in that,

24   but I thought I'd start there, and we can go from there.

25           So, plaintiffs, it's your motion.

1          MR. COX:  Thank you, Your Honor.

2          So to begin, I just wanted to clarify that our --

3     our present preliminary injunction motion regarding the

4     federal register notice is just focused on the shortening

5     piece right now.  And so we -- we understand -- understand

6     where the Court is on this.

7          And, you know, we do intend to proceed past the

8     stage of litigation, and we'd like to get the administrative

9     record as soon as possible and continue to final judgment.

10    But that -- we understand where the Court is, and I think

11    that is -- that is the relief that we're principally seeking

12    today with regards to the preliminary injunction motion.

13          THE COURT:  Then let me turn it to the defendants.

14    The -- the relief that I grant here obviously has to be

15    circumscribed by the discretion that is afforded to the

16    Secretary under the statute and the provisions about my

17    jurisdiction and standing.

18          But the nub of the problem here is that the

19    Secretary, in cutting short the parole periods afforded to

20    these individuals, has to have a reasoned decision, can't

21    just do it, in my view, simply saying, "Today I'm doing it,"

22    as they do with the Ukraine email notice.

23          And the reasons put forth in the federal register I

24    don't think follow.  I understand I don't substitute my

25    judgment, but I do think that it's based on an incorrect

1    reading of the law.

2            So what I would like to focus on to some degree --

3    and, obviously, I'll let you hit the other things you want

4    to -- but I would like to focus on the understanding of

5    expedited removal set forth in the notice, because what I

6    understand you to be saying is that you can't -- you have

7    made the decision not to allow people the length -- the

8    remaining time on their applications or even more than the

9    30 days because of a concern that staying longer would give

10    them an opportunity to have -- requests for their status,

11    et cetera, beyond what's available in expedited removal, and

12    that in order to proceed with expedited removal, you want to

13    avoid any chance that people have been here for two years.

14            So the premise is that, as soon as you terminate

15    people from their parole, they're subject to expedited

16    removal.  That's the nub here, and I want to have you address

17    that.

18            MR. WARD:  Yes, Your Honor.

19            If I could just address a threshold question before

20    we get to that about the rationale for terminating parole, I

21    just would note that, under these parole processes

22    themselves, the original federal registered notices that went

23    out a few years ago make very clear that this -- the parole

24    processes themselves can be terminated in the Secretary's

25    discretion, and grants of parole under those processes can be

1    terminated under the Secretary's discretion.

2            THE COURT:  And at this point, for the purposes of

3    this motion, I'm not disagreeing with you as to terminating

4    the program writ large.  And I'm not disagreeing with you

5    that any individual here who in -- on an individual

6    determination is determined by the Secretary that they should

7    no longer be entitled to parole, that that would be within

8    the Secretary's discretion.

9            But that's not what the Secretary has done.  What

10   the federal register notice does is categorically say all of

11   these periods of time are shorter.

12           But -- and I'll come back.  I'm sure you want to

13   spend a lot of time on jurisdiction and so forth, and I've

14   spent a fair bit of time thinking about that.  But I would

15   really like to give you the opportunity to address this nub,

16   because this is what I find compelling:  the notion that

17   people who we said, "Come, follow the rules" -- they're

18   being -- whether it's being paroled in or admitted in, it's

19   the same statutes that you're relying on -- that once the

20   parole -- once your position is that if they are here beyond

21   the period of --

22           You know, let's say someone comes on a tourist visa

23   and stays an extra period of time, a few years, a year, a

24   student visa, et cetera.  Your position seems to be that,

25   regardless of how they entered the country, expedited removal

1    is available so long as they haven't been here for two years.

2            MR. WARD:  Yes, Your Honor.

3            So the -- expedited removal has been used to

4    various extents over the years, and the current

5    administration has expanded its use for individuals up to two

6    years.

7            THE COURT:  Right.  But it has -- the statute

8    doesn't say anybody not in lawful status who has been here

9    for less than two years is subject to expedited removal.  It

10   says anybody -- essentially, anyone who didn't enter the

11   country by being admitted or paroled, a person who is not

12   paroled or admitted into the country -- that's the tense and

13   that's the verb -- and can't prove they've been here for more

14   than two years is subject to this.

15           And so I guess what you're saying here is that the

16   reason behind not allowing the time to run of their initial

17   parole is so that you can apply a provision that I think you

18   don't have a likelihood of showing that you have the correct

19   interpretation of.

20           And so what you're doing is saying, "We want to

21   shorten this time so we can get people into expedited removal

22   because we've extended our use of expedited removal.  We want

23   to shorten it, get them into expedited removal so that they

24   don't have an opportunity to challenge that removal."

25           And I'm saying I think you don't have a likelihood

1    of having that construction be correct.

2            MR. WARD:  So a couple responses to that.  So the

3    agency reads the statute as the provision that says "has been

4    admitted or paroled," based on its use of that tense, "has

5    been admitted or paroled," that that requires a present --

6    being able to show that you are presently in that status; so

7    that if you are no longer paroled, so if your parole is

8    terminated, you are no longer someone who has been paroled,

9    and so you can be subject to that and --

10            THE COURT:  And is that a different view than when,

11    you know, in the executive order and a number of places, the

12    administration says that anyone who came in in these programs

13    is here -- is inadmissible?

14            I mean, are you -- basically, what I hear you

15    saying is, on the one hand, while they're here and they're

16    paroled here, you seem to not be doing expedited removal.  At

17    the same time, you're saying but they've been here illegally

18    anyway; it's illegal.  And now you're saying that the -- as

19    soon as you can get them out of status, you can cancel their

20    parole, they then are subject to expedited removal.

21            MR. WARD:  Yes, Your Honor.  I think those are

22    distinct things because someone can be both inadmissible and

23    be paroled into the United States.  So I don't know if those

24    are --

25            THE COURT:  Have any of these people been

```
 1    determined -- and of these 500,000 people, 450,000 people,
 2    have any one of them been determined to be inadmissible?
 3              MR. WARD:  I haven't looked into that, Your Honor.
 4    I don't know the answer to that question.  But what I would
 5    say is that parole is not regarded -- the statute is clear
 6    that parole is not regarded as an admission to the
 7    United States.
 8              THE COURT:  But it's -- it's that you've neither
 9    been admitted nor rejected.  It's an -- the terms are an
10    applicant for admission.  So the people who are here, paroled
11    here, are not -- have not yet been determined to be
12    inadmissible, correct?
13              MR. WARD:  I don't know the answer to that,
14    Your Honor.
15              THE COURT:  It's a critical question, sir.
16              MR. WARD:  Well, so I think if they were -- they
17    would be determined to be inadmissible if they were placed in
18    expedited removal pleadings, and that's when that would
19    occur.
20              THE COURT:  So you're arrested, and then what
21    happens?
22              MR. WARD:  Well, it depends -- it depends on the
23    particular circumstances.  Obviously, the agency has
24    discretion to use expedited removal or not use expedited
25    removal.
```

1          I want -- I want to address the statutory

2     provision, if I could, just one more point on that, and note

3     that this statutory provision specifically says an individual

4     who has not been admitted or paroled.  It doesn't say an

5     individual who -- it doesn't say was admitted or paroled.  It

6     doesn't use a tense that refers to how someone came in.  It

7     refers to whether someone has parole or an admission.  And --

8          THE COURT:  And I guess I would disagree with that.

9     So tell me -- I'm going to pull the statute out in front of

10    me, but tell me why you think -- because I think that you're

11    reading the language that's in there; you're ignoring the

12    exact words that are in there, but let me get it in front of

13    me.

14         MR. WARD:  Yes, Your Honor.  So I believe it says

15    "has been admitted or paroled."

16         THE COURT:  Correct.

17         MR. WARD:  And so the agency views that as

18    requiring a present -- presently still having parole.

19         THE COURT:  Why?

20         MR. WARD:  We know that in some other

21    circumstances, Congress -- take, for example, the statute

22    that relates to adjustment of status, 8 USC 1255(a).  There,

23    in another provision of the INA, Congress referred to certain

24    individuals who, if they put them in categories based on

25    whether they were someone who was admitted or paroled, now

1    that's something that the agency views as addressing the

2    circumstances under which someone entered the United States.

3           They could have used that same language in this

4    provision, and they didn't.  They say someone who has been

5    admitted or paroled.  So the agency views that as requiring a

6    present -- presently being able to say your parole continues.

7           THE COURT:  And is it the position that that is the

8    same whether it's "admitted" or "paroled"?  Because it's the

9    same verb form.

10          MR. WARD:  So I don't know with respect to

11   "admitted."

12          THE COURT:  Well, so --

13          MR. WARD:  It's not a category that I'm aware of

14   them placing people in expedited removal for.

15          THE COURT:  But it would be the natural consequence

16   here.  If what you're saying is that this expedited

17   removal -- and I haven't gone back to the legislative

18   history, but my sort of understanding, just as a general

19   matter, was that what you're talking -- what -- the concern

20   there in saying people who haven't been admitted or paroled

21   is you are talking about people who are crossing the border

22   without any permission.  That's the group you're focused on.

23          And you're saying people who are crossing the

24   border without permission should be pushed out of the country

25   without recourse.  And then we say, well, but we've

1    actually -- that seems a little harsh.  If you've been here

2    two years, we're going to give you sort of a different set.

3         But the focus of that is the people who are

4    breaking the rules and coming across the border without the

5    permission of our government.  And then the people who do

6    come here with the permission, either they're admitted into

7    the country or they're paroled into the country.  In either

8    of those circumstances, that's not what this statute is

9    about.

10        MR. WARD:  Well, again, I think, based on how they

11   define other statutory provisions, "admission" and "parole"

12   are distinct in several important ways.

13        And parole, as the statute defines it, is something

14   that's not regarded as an admission; and 1182(d)(5)(A), the

15   parole statute, is clear that when parole ends, you return to

16   the status that you were in before you were granted parole,

17   and you're treated as any other applicant for admission would

18   be at that time.

19        So once parole ends, you're in a different

20   category.  I'm not aware of similar statutory provisions

21   governing an admission that do the same thing.

22        THE COURT:  Well, but this is the same -- this is

23   one statutory -- I don't see how you can say that this

24   statutory provision, you're going to read the verb one way

25   with "parole" and the other way with "admission."  I mean,

1    it's the same verb.  It's not a question -- even when

2    Congress uses the same verb in two different places.  It's

3    one place.

4         MR. WARD:  Again, I think the distinction is how

5    Congress defined and limited "parole" based on other

6    statutory provisions.

7         THE COURT:  Which would give a reason why they

8    might want to write this differently.  I hear that.  But they

9    didn't write it differently.  They wrote it the same as

10   "admission."

11        MR. WARD:  Again, Your Honor, we would disagree and

12   say that by incorporating and applying this to individuals

13   who have been paroled and by defining parole as something

14   that, when it ends, the individual returns to the status they

15   were in before they received that parole -- and, also, again,

16   pointing to other statutory provisions in the INA where

17   Congress said -- they know how to write a statute that says

18   someone who was paroled into the United States is in a

19   different category.

20        They didn't use that verb tense here, and so I

21   think that's an important distinction that we have to -- we

22   have to respect and treat Congress as making those different

23   word choices --

24        THE COURT:  Okay.

25        MR. WARD:  -- for a particular reason.

```
1              Can I --
2              THE COURT:  At the end of the day, this is a
3    question that's a purely legal question as to whether this
4    reasoning is a correct read of the law or is not a correct
5    read of the law.  But it is the reason that you are relying
6    on in saying that people shouldn't be allowed their course of
7    the parole that's still there, is to say we want to make sure
8    we get ahead of that and don't allow them to claim any
9    rights.
10             MR. WARD:  It's one of the reasons.  So the FRN
11   also notice, first of all --
12             THE COURT:  Actually, before we leave this, one
13   more question on the expedited parole, and then I'll come
14   back.
15             MR. WARD:  Yes.
16             THE COURT:  If a person is standing at the border,
17   as you said, with no rights, if you're -- if that's the way I
18   should look at it, then what difference does it make?  How
19   would they be accruing additional time regardless of whether
20   they're here, paroled here for two years or six years?
21   Right?
22             If -- at the point you say their parole is over and
23   they now have the rights of someone who is standing at the
24   border, why do you need to do this rush now and create a
25   situation where everybody is -- can be all of a sudden
```

1    rounded up?  Why not let them finish their parole?

2            It would make no change.  I'm not saying it's a

3    policy matter, but a legal matter.  By your argument, it

4    makes no change.  They're still going to be faced with

5    expedited removal because they're still standing on the

6    border, as you would say.

7            MR. WARD:  I would disagree with that, Your Honor.

8    So I think the INA generally treats physical presence in the

9    United States different than status.  And so the parole

10   statute places you back in the status and the circumstances

11   that you were prior to being granted parole, but I don't know

12   that we could read or have read the expedited removal statute

13   to apply to people regardless of how long they've been here

14   when their parole ends by treating their time in the

15   United States to go back to zero.

16           That's at least not an argument the agency has made

17   in this case, or I'm not aware of them making that

18   necessarily in other cases.

19           THE COURT:  And do you have any -- I don't remember

20   seeing them, but are there any cases that you've cited

21   regarding expedited removal that match your view of it rather

22   than the view I have here of it?

23           MR. WARD:  I don't know that there are a lot of --

24   again, expedited removal is something that has been used to

25   various extents and to various amounts of time over time.

1          And so it has only been for short amounts of time

2    in the past and only very recently that the agency or the

3    executive has extended its authority to remove, to place

4    people in expedited removal on this subprovision 3 up to two

5    years in the United States.

6          At other times, the agency has further restricted

7    how much time an individual can be in the United States, and

8    they will still apply that.  That's subject to other

9    litigation that's ongoing right now in DC.  So there are not

10   a lot of cases --

11          THE COURT:  There are no cases.

12          MR. WARD:  Huh?

13          THE COURT:  There are no cases doing this, with

14   this reading of this?

15          MR. WARD:  I'm not sure it's a factual circumstance

16   that has arisen one way or another.  That's correct,

17   Your Honor.

18          THE COURT:  Because we haven't been rounding people

19   up and arresting them and trying to do it this way.

20          I mean, this is my puzzle here, and it's -- again,

21   I'm not the one who makes the policy.  All I've got to do is

22   see if you're following the Administrative Procedure Act, and

23   that's it.  And what's -- and I think I said this at the

24   first hearing, what's so confusing to me about this is what

25   we're doing is we're taking people who are legally here, who

1   have been following the rules, and I -- I understand.  I'm

2   not saying, from where I see, that they have too good an

3   argument for saying you can -- can't stop the program.  I

4   think that's probably a political debate, as to whether you

5   stop the program or not.

6        I think they have a pretty good argument that the

7   program wasn't unlawful, but that's a different question as

8   to whether you want to do something going forward or not.

9        But here, when you're having people who are

10  following the rules -- that's what's happening.  We have

11  people who are following the rules.  And what you're saying

12  is, "You've been following the rules; and so instead of

13  following your reliance interests here and staying for the

14  amount of time that we told you you could come here for, we

15  want to put you in, essentially, a Hobson's choice.  You

16  either -- your parole gets ended and you either go back to

17  the country that you fled" -- and I have right here only

18  their side of the picture, but their side of the picture of

19  the plaintiffs is they were faced with these difficult

20  positions.

21       So either they voluntarily go back there or they

22  stay here, in an illegal status, at which point they lose all

23  opportunity to try to adjust their status properly because

24  they're here illegally then.

25       And I don't understand the reason why you -- it's a

1  tough enough question that's going to come up at the end of

2  their two years, which, at this point, is not -- you know,

3  it's less than two years for everybody.  But to say, no,

4  that's not enough for people who have been following the law;

5  but, instead, we want to change the -- we want to make them

6  illegal now.  That's what I don't understand.  We want to

7  make them either flee the country, even though they followed

8  the procedure to come here, or stay here at the risk of

9  losing everything.

10         MR. WARD:  So a couple responses on that.

11         First, I think a lot of this depends on the

12  authority to grant parole and to rescind parole, which is

13  placed by statute in the Secretary's discretion, and which

14  these processes say is in the Secretary's discretion.  Each

15  of the processes, the federal register notices announcing

16  each of these processes, said that the Secretary could -- has

17  the authority to rescind parole grants and has the authority

18  to rescind the program at any time.

19         Second, I'd note that this federal register notice

20  that is ending the CHNV processes notes that individuals who

21  have filed some other application for asylum, for TPS, for

22  adjustment of status, won't be prioritized for removal.

23         THE COURT:  What does that mean?

24         MR. WARD:  The Secretary -- huh?

25         THE COURT:  What does it mean that they're not

1    prioritized?

2          MR. WARD:  It says that the agency won't prioritize

3    those individuals as being ones that are priorities for

4    removal.

5          THE COURT:  But if they happen to be somewhere,

6    there's a -- you know, a car accident, and everybody has to

7    give their ID when they get -- see who was there as a victim

8    in the car accident or they show up at the hospital because

9    their kid's sick and their status is unlawful, what does that

10    mean that they're not prioritized?

11          MR. WARD:  I don't know what it would mean in those

12    particular circumstances, Your Honor.  I can't answer that.

13          I would note, though, also, that --

14          THE COURT:  I mean, with all due respect, I'm here

15    trying to make sure people are behaving lawfully.  And what

16    you're saying is I should take into account that maybe

17    they'll fall into unlawful status, but we're not going to

18    necessarily prosecute them too quickly.  That's not a

19    principled position that I should be following, is it?

20          MR. WARD:  Well, I think the principle behind that

21    position is that if -- the parole grants were discretionary.

22    They were based on a determination that that parole served

23    some purpose.  The Secretary has now determined that those

24    parole grants no longer serve that purpose.  If --

25          THE COURT:  But how can they decide that?  I

1    understand your complaint about categorical decisions.  But

2    here -- so a categorical decision was made to have a program,

3    but each of these individuals made a showing that they should

4    be permitted to come here.

5              You're not allowing them to make an -- you're

6    saying, well, they can also apply for this or that; but in

7    the meantime, they're going to be subject to expedited

8    removal.  So you're not permitting -- you are not -- you're

9    not -- the agency is not revoking their parole on an

10   individual basis.  They're not exercising their discretion --

11             I mean, there are two things.  One is exercising

12   their discretion to say, "We don't want this program

13   anymore."  That's -- I understand the plaintiffs don't like

14   my shrugging at that, but that's going to be a much harder

15   one.

16             But the other thing is to say we're going to

17   exercise our discretion and categorically get rid of

18   everybody who we gave permission to come here on an

19   individual basis?

20             MR. WARD:  So, again, our reading of the statute is

21   that the determination that parole is no longer serving its

22   purpose is not something that needs to be made on a

23   case-by-case basis.  And we've cited at least one case,

24   finding that you can't engraft the case by case or other

25   requirements for granting parole, on taking parole away.

1    There's not a lot of case law on this, I suspect because

2    most -- most courts that have heard a challenge to a parole

3    denial or revocation find that that's a discretionary

4    determination --

5            THE COURT:  Well --

6            MR. WARD:  -- that's not reviewable at threshold.

7            THE COURT:  Has there been a categorical revocation

8    of parole before?

9            MR. WARD:  So it depends on what you consider a

10    categorical parole program; but, yes, there are some parole

11    programs that have come into place and then gone away.

12            THE COURT:  No.  You didn't hear me.  Has there

13    been a categorical revocation of somebody's parole grant?

14            MR. WARD:  That, I would have to check, Your Honor.

15    I know that there have been categorical parole programs that

16    have been created and then taken away.

17            THE COURT:  We're not having an argument about that

18    today.

19            MR. WARD:  Yes, Your Honor.  I don't -- my point is

20    I don't know what happened in those cases.  I'm not aware of

21    the parole terms being short in the same way.  So I haven't

22    looked into this thoroughly, so I can't rule it out, but I'm

23    not aware of any examples of that.

24            But what I would say is that, as I've said earlier

25    in this week, is that these parole grants were never intended

1    to guarantee or there was no guarantee in them that

2    individuals who came under them would be able to apply for

3    some other benefit and have that benefit adjudicated before

4    the parole term was up.

5          There was always an issue and always a possibility

6    that individuals might apply for asylum, for example, and not

7    be able to have that adjudicated before their parole term was

8    up.

9          And with the CHNV parole processes in particular,

10    with these ones, there's -- I don't believe there's any

11    dispute that there was not a re-parole process under this

12    program where individuals could seek to extend.  They could

13    still seek -- seek an individual consideration for parole

14    under the I-131 process, and that's still available to these

15    individuals.

16          If they applied for another benefit and they lose

17    their parole, the agency has said that they won't be

18    prioritized for removal.  I don't have more details about

19    what in particular that looks like in practice, but they

20    could seek another grant of parole.

21          They also, as we have discussed, if they are placed

22    into removal proceedings before an immigration judge, could

23    re-raise a lot of these claims.  If they're in expedited --

24          THE COURT:  But don't -- I mean, please, if they're

25    placed in a removal proceeding before an immigration judge,

1    what does that mean when, at the same time, you're saying the

2    reason we're cutting it short is so we don't have to put them

3    in front of an immigration judge?

4        MR. WARD:  So that's with respect to individuals

5    who haven't -- so the FRN says that that's with respect to

6    individuals who haven't applied for -- some other basis to

7    remain in the United States on a permanent basis, like

8    asylum.

9        And what the agency wants to do in that

10   circumstance is that if an individual is here on a

11   discretionary grant of parole, the agency has determined that

12   that parole is no longer serving its purpose, and they

13   haven't applied for any other basis to remain in the

14   United States, they want to reserve their ability to use

15   whatever tools are at their disposal to remove those

16   individuals from the United States, and terminating parole

17   before it reaches the two-year point allows them to do that.

18       Now, the expedited removal explanation is not the

19   only explanation for rescinding the parole grants.  The

20   Secretary also set out that part of the rationale is not

21   having individuals continue to be here on parole terms when

22   the Secretary has determined that those parole terms no

23   longer serve the significant benefits that they were intended

24   for or no longer align with the executive's current foreign

25   policy and concerns about those individuals accruing other

1    nonfederal benefits during their time in the United States.

2    So even if the Court had -- is skeptical of the

3    expedited removal explanation, there are other explanations

4    in the FRN for justifying limiting the existing parole terms.

5    THE COURT:  Do you want to address the other ones?

6    MR. COX:  Your Honor, yeah, if I can address just a

7    couple of quick things that have come up.

8    So as -- we tend to agree with Your Honor that the

9    clearest grounds here is the pure legal error that was made

10    regarding expedited removal.  And, you know, as much as

11    defendants want to talk about discretion, there's simply no

12    discretion to violate the law.  There's no discretion to

13    apply it, an erroneous understanding of the law, to the

14    plaintiffs and members of the proposed class.

15    And we certainly agree that if you're going to say

16    that parole -- that someone can be put through expedited

17    removal after revoking their parole, then the same thing has

18    to apply to those who have been admitted.  Those have to be

19    read in pari materia, and it clearly would override the

20    congressional judgment, as Your Honor was saying, that

21    individuals who came here lawfully with permission are not

22    going to be put through this shortcut, you know, virtually

23    process-free removal, expedited removal process.

24    And the third thing I would mention is just the

25    incredibly breathtaking authority that the defendants'

1    interpretation would aggrandize to the executive.  It could

2    basically put parolees -- there's no limits on how long they

3    could put parolees through it, in their view -- well, the

4    two --

5            THE COURT:  I'm not sure I understand what you're

6    just saying there.

7            MR. COX:  So, basically, if all they have to do is

8    revoke the permission in order to put someone through

9    expedited removal, then the protection that Congress gave for

10   folks who came with permission is meaningless.  It's,

11   basically --

12           THE COURT:  Right.  And it's the same -- again,

13   particularly if we have the same thing for visa holders.

14           MR. COX:  Exactly.  That's right.

15           THE COURT:  And I don't see how you can read the

16   statute differently.

17           MR. COX:  I agree, Your Honor.

18           On the -- Your Honor's question about why not --

19   the question about parolees who have been here for a very

20   long time, like, more than two years, why can't you put them

21   through expedited removal after revoking the parole and treat

22   them as, you know, at the border, that actually is DHS's

23   position.  If you look at page 12, note 4, they say as much,

24   which, of course, under -- further undermines the FRN's

25   justification, if they're right.

1          THE COURT:  Well, he's saying there's two separate

2     things.  He's saying the one thing is where are you

3     geographically located?  That's your two years under this

4     statute.  And the other is, what's your status?  Is their

5     position.

6          MR. COX:  Right.  Well, they -- they have -- we --

7     we happen to have another lawsuit, and it's filed in District

8     of DC, challenging a January 23rd memo that says that

9     parolees in the interior of the United States, no matter how

10    long they have been here, if you revoke their parole, you can

11    put them through expedited removal as arriving aliens.

12          And so that -- and in reality, they can't be put

13    through expedited removal in either case, at least the

14    individuals who have been paroled into the -- into the

15    country and have resided here for some time.

16          The -- on the prioritization point, it's

17    meaningless.  The DHS used to have enforcement priorities,

18    formal enforcement priorities.  This administration did away

19    with them.  It's catch-as-catch-can.  It's completely

20    unenforceable.  It's meaningless.  It's loll paper,

21    essentially.

22          And, yes, Your Honor is correct that this is

23    completely unprecedented.  There's never been a mass

24    revocation of parole of this nature.  The record -- you know,

25    24-38 -- 24- -- excuse me -- 24-38 and 24-39 both discuss the

1    long history of categorical parole programs.  And they --
2    they mention how they -- they were wound down.
3             And in no instance, to our knowledge, in the
4    70 years and more than 125 uses, categorical uses of the
5    parole of authority, has the executive ever tried to pull the
6    rug out from under folks in this manner.
7             And, also, just to reinforce Your Honor's point,
8    there's no case law that supports the defendants' view of the
9    statute, even the *Turner* case, the -- from -- what is
10   that? -- the Eleventh Circuit, 2025 case, talks about the
11   present perfect tense.
12            And they quote it as saying it can refer to state
13   that continues into the present, but there's an ellipses
14   right in the middle of that there, and that ellipses is
15   replacing some very important words.
16            What *Turner* actually said is that the present
17   perfect tense can refer to a time in the indefinite past or
18   to a past action or a state that continues into the present.
19   And the question is which of the meanings applies in the
20   particular context?  Which makes sense from a statutory
21   construction point of view.
22            And particularly when paired with the -- with the
23   admission piece in the expedited removal statute, it simply
24   doesn't make sense to read the statute the way that the
25   government is.  And then -- so that's what I wanted to say

1    about expedited removal.  We --

2            THE COURT:  What about their argument that the

3    Secretary's views that the --

4            MR. COX:  Ah, yes.

5            THE COURT:  -- purposes of the program, in the

6    first place, are done; so, therefore, not only should you end

7    the program, but also the people who were admitted pursuant

8    to it need to leave?

9            MR. COX:  I don't believe that's what the FRN says,

10   Your Honor.  The FRN says that they are truncating, cutting

11   short, all of the grants of parole so that they can put folks

12   through expedited removal.

13           THE COURT:  Well, no, they say -- that's not it.

14   They say that it is -- that truncating the time is justified

15   by the conclusion that, quote, "Neither humanitarian reasons

16   nor public benefit warrants the continued presence of aliens

17   paroled under the CHNV program, and the purposes of such

18   programs there have been served -- therefore, have been

19   served."

20           So that's their -- they are making that argument;

21   and I guess the question is, what's your answer to that?

22           MR. COX:  Well, I think the first answer is that

23   the Secretary didn't actually address the urgent humanitarian

24   reasons.

25           THE COURT:  I can't get into those details.

31

```
 1              MR. COX:  As a procedural matter, the Secretary --
 2   not -- I'm not saying substantively.  I'm saying if -- the
 3   Secretary never explains why the urgent humanitarian reasons
 4   are no longer being served by the program, the -- other than
 5   the one sentence that we quoted in our brief that says that
 6   they think the urgent humanitarian reasons are better served
 7   by applying the statute or applying the authority consistent
 8   with the statute on a case-by-case basis.
 9              Which means either they have a different view of
10   the law, or they're saying -- which is what we think.  We
11   think they're saying -- they're pulling through the Huffman
12   interpretation of the statute; because, otherwise, it doesn't
13   make sense, because that's what they were doing before.  They
14   were applying the statute on a case-by-case basis.
15              And so either it's a circular statement that means
16   nothing --
17              THE COURT:  I'm not following you.  They're
18   saying -- I mean, if they're saying that they don't think
19   that this humanitarian need is there anymore --
20              MR. COX:  Uh-huh.
21              THE COURT:  -- I certainly don't get to substitute
22   my judgment for that.  So --
23              MR. COX:  That --
24              THE COURT:  -- if that's their finding, why is that
25   not something I have to look at and say, well, that is there,
```

1    and does that justify terminating these?

2        MR. COX:  So I -- this is our third argument in

3    our -- in our brief.  The FRN acknowledges that these

4    programs were set up under both prongs of the statute:

5    significant public benefit, urgent humanitarian reasons.

6        The entire federal register notice talks about how

7    the Secretary doesn't believe that this -- that it -- the

8    programs are any longer providing a significant public

9    benefit.  Virtually all of the federal register notices that.

10        The only thing that it says about urgent

11    humanitarian reasons is this sentence at 90 Fed. Reg 13612:

12    "Regarding previous arguments or determinations that these

13    programs were consistent with the requirement of urgent

14    humanitarian reasons for granting parole, DHS believes that

15    consideration of any urgent humanitarian reasons for granting

16    parole is best addressed on a case-by-case basis consistent

17    with the statute and taking into consideration each alien's

18    specific circumstances."

19        So that's what they were doing before.  DHS said in

20    the FRNs that this is precisely what they were doing.  They

21    were taking into consideration the urgent humanitarian

22    reasons on a case-by-case basis.

23        So they're repeating the justification for creating

24    the program as a justification for terminating the program.

25    And it's -- the only -- the only way it can make sense is if

1    they have a different understanding of what those words mean

2    now than they did then.  And they point to the statute.  They

3    say that it's best addressed on a case-by-case basis

4    consistent with the statute.

5         If that doesn't mean that they have a different

6    view of the statute now than they did before, then it's -- it

7    doesn't mean anything because that's what they said they were

8    doing before.

9         And so we think it's clear that they're pulling

10   through the same legal error that necessarily embeds the

11   wrongful erroneous interpretation of the statute as

12   precluding categorical parole programs.

13        THE COURT:  Well, they're not saying they're -- or

14   if they are, I missed it -- that categorical parole programs

15   are unlawful.

16        MR. COX:  They do say that they think the urgent

17   humanitarian reasons are best addressed in a way that's

18   consistent with the statute.

19        THE COURT:  Okay.  That doesn't mean the other way

20   is inconsistent.

21        MR. COX:  But then it's not an explanation of why

22   they made a decision.  If they're saying -- because that's

23   what they said before.  The only way it can explain anything

24   is if they have a different view of the statute now.

25        And so they -- right.  And defendants point to

13612 through 17 in their brief.  They cite six pages of the
FRN and say they exhaustively discussed the reasons for
terminating the program, but that's just significant public
benefit, and we're not asking -- you know, that --

            THE COURT:  Well, I'm focused today not on the
question of terminating the program or not.

            MR. COX:  Right.

            THE COURT:  I'm focused today on the question of --
assuming -- for today, assuming you're terminating the
program, why did the people who were here and told they could
be here for this amount of time, why not give them 60 days,
90 days, the rest of their time period?  That's my question.

            MR. COX:  Right.  Absolutely.  That's -- and if
they --

            THE COURT:  But that's not addressed by any of this
one way or another, on either side.  Whether the program
should go or shouldn't go doesn't address the question of
whether the individuals here should be returned.

            MR. COX:  100 percent agree, Your Honor.  They're
completely separate questions, what you do moving forward and
what you do with folks who are currently differently
positioned than folks who are outside of the country.

            And we just don't think that they, as a procedural
matter, explained the urgent humanitarian prong of the
statute.  Their disagreement with it or their reversal of

1    opinion, they don't have an explanation that makes sense,

2    unless there's that embedded legal interpretation that's

3    different than the past.

4            The other -- and the other -- you know, of course,

5    we only have to succeed on one of the four arguments that we

6    made in our motion.  And the case-by-case -- the failure to

7    consider the conditions of parole or to treat folks on a

8    case-by-case basis is certainly more than sufficient as well

9    to justify a preliminary injunction or a stay.

10           The government argues that the case-by-case

11   requirement doesn't apply to terminations, but that's not

12   really what this was.  This was -- unless you conceive of it

13   as a mass termination and then a mass new grant of parole for

14   30 days.  It didn't -- it just changed the amount of time

15   they had.  It wasn't a termination per se.

16           And so that's why the case-by-case requirement is

17   also being violated here, because they took everyone's

18   parole, and they just cut it down.  So that would also be

19   sufficient to -- to justify preliminary relief.

20           THE COURT:  Okay.  I have a question for the

21   government here.

22           We've been talking about the federal register

23   notice, and I put in a different pile the Higgins email.  But

24   you said that if a person has applied for these other

25   statuses while they're here lawfully, paroled here, and then

1   their parole ends on April 24th, there'll be -- they won't be

2   prioritized for removal.

3          But doesn't the Higgins email say that none of

4   those applications will be considered?

5          MR. WARD:  For -- so there is a pause on those

6   applications for certain parole processes, not for all of

7   them.

8          THE COURT:  And including the -- including --

9          MR. WARD:  The CHNV processes are included in that,

10  yes.

11         THE COURT:  So --

12         MR. WARD:  So they have been subject to a pause.

13  That pause is not supposed to be indefinite.  And the agency

14  has said that, if they have one pending, it doesn't --

15  doesn't limit it if it's been paused, that they will not be

16  prioritized for removal.

17         So presumably, at some point, they will have the

18  opportunity to have that asylum application adjudicated.

19  But, again --

20         THE COURT:  How?

21         MR. WARD:  -- as we noted, the backlog of cases

22  means that it sometimes can take three years or longer for --

23         THE COURT:  And you're not suggesting that they

24  should be leaving here without parole, without work

25  authorization during those three years, are you?

1          MR. WARD:  Well, again, the -- the parole grants

2   were never -- there was never any guarantee with the parole

3   grants that they would extend to allow that to be

4   adjudicated.  So it was always an issue.

5          THE COURT:  But --

6          MR. WARD:  But if they have -- if they have some

7   individual basis -- and I believe this is what the language

8   in the FRN about the humanitarian reason -- if they have some

9   individual basis where they can apply for the I-131 process

10   and say, "I have some ongoing humanitarian reason or --

11          THE COURT:  So --

12          MR. WARD:  -- my parole would continue to serve

13   some other significant public benefit," they can apply for

14   that and extend their parole beyond what they even could have

15   gotten in the CHNV process.

16          THE COURT:  But those applications aren't being --

17   well, those applications aren't being considered for people

18   in this program.

19          MR. WARD:  Again, there's been a pause, but I don't

20   know that that pause has affected anyone in this case,

21   because given --

22          THE COURT:  But they might be arrested.  I mean,

23   just as a practical matter, if I were not to stay -- because

24   you want me not to stay this -- if I were not to stay this,

25   then on April 25th, any of the 450,000 people who are here

1   lawfully right now under the parole authority would no longer

2   be here lawfully.  And any of them could be picked up for

3   expedited removal.

4          And once they're picked up for expedited removal,

5   this deferred priority doesn't matter because they've been

6   arrested now.  So even if you weren't going to worry about

7   going and raiding their worksite or something of that sort,

8   now they have been arrested.  They're detained, and you're

9   treating them as expedited, so all of this goes away.

10         I mean, I guess what I would -- what I'm a little

11  troubled by is if you think that that's -- or if your client

12  thinks, at the end of the day, that's the system that we're

13  under, I need to sort of think, okay, that's the system we're

14  under.  Is that okay or is that not okay?  But you're kind of

15  saying to me, "No, no, don't worry.  They'll get their asylum

16  considered over here.  It won't be so bad there.  Your

17  neighbors won't be pulled away over there."

18         But what you're really saying is that, if I don't

19  do something today, on April 24th, 450,000 people are subject

20  to an arrest.

21         MR. WARD:  So, again, the FRN says that they're not

22  prioritized for removal.  Practically, I don't believe the

23  agency has the resources or the ability to place that many

24  people in expedited removal anyway.

25         THE COURT:  But they seem to be finding as an

1  important thing, of all the important things to do -- and I

2  could be as hostile to unlawful immigration as anybody on

3  this question.

4          The idea that what you're prioritizing is not the

5  people who are coming over the border, but the people who

6  followed the rules; and so the question is are you -- you

7  know, is this simply because this was a Biden program?

8  Because if what you're trying to do is stop illegal

9  immigration, these are the people who made the decision not

10  to come here illegally, but to come here legally, and now

11  you're saying, well, so it's a priority for us.

12          And, again, your client gets to choose their

13  priorities.  But you're saying that if I don't stay this

14  shortening of the parole process, it might not be that

15  important, but it was important enough for you to stop their

16  parole process.

17          I mean, how can -- how can that be any assurance to

18  anyone?

19          MR. WARD:  Well, again, even with expedited

20  removal, if someone has not applied for -- again, it says it

21  doesn't prioritize individuals who have applied for another

22  benefit.  But let's say someone has not applied for another

23  benefit but has an asylum claim they can raise, even if --

24          THE COURT:  They get a credible fear interview.

25  They don't get in front of a judge.

1          MR. WARD:  If they satisfy a credible fear

2     interview, they get placed in removal proceedings before an

3     immigration judge.  So the credible fear interview is just a

4     screening process to determine whether they could raise an

5     asylum claim.  And then if they can, then they get a notice

6     to appear before an immigration judge, and they get to go

7     through proceedings like someone who wasn't in an expedited

8     removal.

9          Expedited removal is only for individuals who can't

10    state a credible fear or have some other claim, and that's

11    what the FRN tracks as well.  It says for individuals who

12    haven't applied for some other basis or some other status in

13    the United States, we want to reserve the ability to be able

14    to use this if we need to for people that have not applied

15    for something that would allow them some more permanent

16    status.

17         THE COURT:  So immigration law is very complicated,

18    and I don't spend a lot of my time doing it.  But let's just

19    be clear here.

20         You're applying for anything else that you've

21    applied for.  You get picked up, and you go for your

22    expedited removal proceeding.  You get a credible fear

23    interview.  That's it.  The fact that you have other

24    applications pending doesn't give you anything.  It's just a

25    question -- when you get there, with a translator who maybe

1    does or doesn't speak your language very well, whether that

2    interview results in someone thinking that you do or don't

3    have a credible fear.  That's it.

4         MR. WARD:  That -- if you don't make it past the

5    credible fear process, yes.  But you get the credible fear

6    interview, and you get the opportunity to get into

7    immigration court.

8         THE COURT:  But you keep talking to me about these

9    other applications that they've put in.  Those other

10   applications are meaningless as of April 25th unless somebody

11   decides that they are going to get through a credible fear

12   interview.  That's where we are.

13        MR. WARD:  I -- again, I would disagree with that,

14   Your Honor.

15        THE COURT:  Why?

16        MR. WARD:  If -- not for everyone in -- that they

17   are raising in this class.  So, again, they're not

18   priorities.  Not everyone is going to be placed in expedited

19   removal proceedings.  Practically, that's impossible.

20        Any individual that satisfies a credible fear

21   interview and gets before an immigration judge or is placed

22   in other proceedings or is not placed in proceedings at all

23   because they're not prioritized for removal once their parole

24   ends will have an opportunity to continue to pursue those

25   other applications either in immigration court or before they

1    get into immigration court.

2            And they all have the opportunity; if they have

3    some, again, significant public benefit or urgent

4    humanitarian reason that would justify parole, they can apply

5    for an additional term of parole to allow for that.

6            THE COURT:  So if someone has an asylum application

7    or other applications like that, or the parole application,

8    which isn't being operated, acted on, and we get past

9    April 24th and I don't stay this, are they able to assert any

10   rights under those programs if they're now here on --

11   illegally without having -- I mean, isn't the whole point,

12   for example, when people claim asylum, that they need to --

13   you know, as soon as they cross the border, they go and they

14   claim it?

15           Basically, what you're saying is we're taking

16   people who are in legal status right now and we're saying,

17   "Don't worry too much.  We won't prioritize you, and you can

18   maybe make these arguments.  Oh, but by the way, you're now

19   going to be here illegally," right?  Isn't that sort of what

20   you're saying?

21           MR. WARD:  So, again, they can apply through parole

22   if they have some other basis; but, yes, if their parole term

23   ends and they're out of status, then they --

24           THE COURT:  And they can apply for parole, which

25   you have paused -- and on April 24th, their parole -- they

1    may have -- they may have applied, but it's not being

2    adjudicated.  So that gives them nothing.

3         MR. WARD:  Not -- no.  Again, individual parole

4    applications are being adjudicated outside of this process.

5         THE COURT:  For people who have come here under

6    these programs?  Because I thought --

7         MR. WARD:  Yes.

8         THE COURT:  -- the way the Higgins email is worded

9    is anyone who is here under the program can't apply for any

10   of these.  Between Higgins and Davidson, they can't apply for

11   anything.

12        MR. WARD:  No, Your Honor.  That's not correct.

13   Give me just a moment.

14        So the Higgins email says at the bottom, "This

15   instruction does not include requests for advance parole,

16   noncategorical for I-131" --

17        THE COURT:  So -- so hold on a second.  Advance

18   parole applies to these people or not?

19        MR. WARD:  It depends on their particular

20   circumstances.  It could -- as the class is defined, it could

21   apply to some individuals.

22        THE COURT:  I thought advance parole was, for

23   example, maybe you had TPS ben- -- you have some other

24   benefits and you want to leave the country.  I thought

25   advance parole was to allow you to come back.

```
 1              MR. WARD:  I believe that's mostly what it is
 2     issued for.
 3              THE COURT:  Well, mostly; that's what it's about,
 4     right?
 5              MR. WARD:  I believe so, Your Honor.
 6              THE COURT:  So advance parole is not any help.
 7              What's the next one?
 8              MR. WARD:  Noncategorical Form I-131, humanitarian
 9     parole requests.  So that's just an individual request.
10     You're not -- there was a specific form that was set up for
11     these categorical processes.  It's the I-134.  There always
12     exists the I-131 process.
13              And that's an application not based on a particular
14     program.  You're not saying, "I'm trying to satisfy the
15     requirements of the CHNV processes."  You're just saying
16     that, "I, as an individual, can satisfy the requirements of
17     the statute, and I want to apply" --
18              THE COURT:  Does the government have the resources
19     to review those applications for these 450,000 people before
20     April 24th?
21              MR. WARD:  I don't know the answer to that,
22     Your Honor.  I don't know how many have applied.  I don't
23     know --
24              THE COURT:  Well, let's say they all go home today,
25     and they say, "I'm applying because this is what -- the
```

1    government said that my status is going to end on

2    April 24th."  Does the government have the resources to

3    review those?

4            MR. WARD:  I don't know the answer to that,

5    Your Honor.  Again, these are determinations that are often

6    made on a -- very quickly.  The agency often makes parole

7    determinations for individuals who arrive at a port of entry

8    or at the border on the spot without any advance warning.

9    And so they --

10           THE COURT:  As opposed to these people, who all

11    were first vetted before they had that individual on-the-spot

12    evaluation.

13           MR. WARD:  Yes, Your Honor.

14           THE COURT:  And --

15           MR. WARD:  But --

16           THE COURT:  -- yet you're suggesting that's less

17    good than what normally happens?

18           MR. WARD:  Well, again, this goes back to the

19    Secretary's determination that these parole processes were

20    put in place in order to do several things, including that

21    increased vetting, but also through some negotiations with

22    the country of Mexico and through an effort to ensure that

23    individuals either came through this additional process that

24    they put in place for parole applications for individuals

25    from these countries, or if they didn't, that they could be

 1    removed to Mexico.

 2            THE COURT:  Okay.  So they made a deal, and they

 3    said, "We'll make a deal with you.  Don't come to the front

 4    border."

 5            "Mexico, take people who do come to the border.

 6    Follow it in these steps.  We'll make a deal with you, and

 7    we'll give you parole.  But then once they come here, rather

 8    than going through the border, we're going to take it away

 9    again."

10            MR. WARD:  Well, that last part wasn't in part of

11    that deal, but --

12            THE COURT:  I know.  It wasn't part of the deal.

13    There was a deal, and now that deal has been undercut.

14            MR. WARD:  Well, again, so what the Secretary has

15    determined is that that process, one, did not fully serve

16    those goals, that it was designed to reduce the number of

17    individuals coming and seeking parole from these four

18    countries because these were four countries where, once

19    individuals arrive in the United States, the United States

20    had difficulty removing them to their home countries.

21            THE COURT:  No, it wasn't designed to reduce the

22    numbers coming here and seeking parole.  It was designed to

23    reduce illegal, unlawful crossing of the borders.

24            MR. WARD:  As well, Your Honor.

25            THE COURT:  As well?

1          MR. WARD:  Yes, Your Honor.  So it was designed, in

2    part, because these are countries where the United States

3    could not remove their nationals in sufficient numbers once

4    they arrived in the United States.

5          THE COURT:  But it wasn't about saying to those

6    people saying, "We don't want you seeking parole at your

7    border."  It was saying, "We don't want you coming to our

8    border."

9          MR. WARD:  I believe it was both of those things,

10    is to reduce the strain of individuals coming to the border.

11          The current Secretary has determined that the

12    reduction in the overall numbers from those countries was not

13    sufficient to justify the programs and that, also, the

14    current administration wants to pursue other options, other

15    foreign policy objectives to deal with the strain on the

16    border and individuals from these four countries.

17          So that's the determination that's been made, that

18    the processes don't serve the significant public benefits

19    that were laid out in the original federal register notices.

20          And then, again, with respect to humanitarian --

21    urgent humanitarian needs, the FRN leaves open the

22    possibility that these individuals could file individual

23    parole applications.

24          I note also that this is -- it's reflected in the

25    Higgins email.  It's also reflected in the Scott declaration.

1    This is at 41-4, paragraph 8, where we also note that these

2    individuals have an opportunity, if they think they can

3    satisfy the requirements of the statute, to seek an

4    individual parole grant under the I-131 process.

5              MR. COX:  Can I talk about that just for a minute,

6    Your Honor?

7              So there are a few reasons why the I-131 process is

8    completely insufficient.  First, I'll note it's not clear

9    what work this theoretical availability is doing for

10   defendants.  It doesn't make their actions any more lawful.

11             THE COURT:  No, it makes a Court think, "Oh, I

12   don't have to worry about this problem."

13             MR. COX:  Right.  Exactly, Your Honor.  That is --

14   I believe it's the intended purpose.  But for a few reasons,

15   it's insufficient as a practical matter.

16             So, for one, those individuals, their parole

17   applications, will, of course, not get the benefit of the

18   guidance under which their previous parole applications were

19   granted.

20             THE COURT:  That part, that's not in front of me

21   today.

22             MR. COX:  I understand.  But there's a material --

23   my point is that they are materially quite different and --

24   because that guidance is very valuable.  The Deb Rogers

25   declaration at 24-42 talks about why that guidance is so

1    valuable.

2          The second thing is that they have to pay an

3    additional filing fee of either $580 or $630, depending on

4    whether they file on paper or electronically.  They're not

5    going to get that back when their application is ignored.

6          And then the third thing is that the administration

7    has severely limited the individuals -- the officials who are

8    authorized to grant parole.  And they have also required that

9    each individual grant of parole be justified up the chain of

10   command.

11         I have a memo here if you'd like to see an example

12   of it.  It's from January 20th.  It's referred to -- the

13   subject of it is "Ending Catch and Release," and it says that

14   "Each parole granted will be reported to the acting

15   commissioner and the chief of staff of CBP and will include

16   an individualized justification of the urgent humanitarian

17   reasons or significant public benefit."

18         If you would like that, I have brought copies for

19   opposing counsel and for Your Honor, if you'd like to see it.

20   But the point is that, as a practical matter, it's not

21   available.

22         The other couple points I wanted to make is that

23   we're talking about the credible fear interview process.

24   We've litigated that.  The biggest problem is that there's no

25   judicial review of the decision as to whether or not someone

1    has a credible fear, and so they could deny 100 percent, and

2    no Article III judge can ever review those decisions.

3           The -- and I think your point about the --

4    Your Honor's point about the Higgins email is very well

5    taken.  The combined effect of defendants' actions are

6    particularly pernicious.  They -- as we mentioned at the

7    first hearing, they are manufacturing removability.

8           They're preventing people who are here lawfully

9    from enjoying the periods that they have and from having

10   their pending applications that they could give them

11   additional periods of lawful presence, they're not getting

12   adjudicated.

13          And that's an additional reason why -- why the

14   actions are unlawful, because they don't -- they never

15   explain or even acknowledge that they're coming after this

16   group of people from all directions.

17          And then the final point I wanted to make,

18   Your Honor, is that the -- the CHNV program, as Your Honor

19   may be aware, was a big talking point during Donald Trump's

20   presidential campaign.  He promised to end it on day one.

21   And his executive order -- one of the executive orders he

22   wrote directed it to be ended.

23          And the reason the FRN doesn't make a lot of sense

24   is because DHS was required to backfill the justification.

25   And so they had been -- they received instructions from the

 1    President to end this, and they had to come up with reasons

 2    to do it.  And as is often the case when you decide what you

 3    want to do and then try to decide on the reasons, it doesn't

 4    often make sense.

 5            THE COURT:  The problem for thinking about it that

 6    way is that's not the judicial review that's permitted under

 7    the APA.  I don't get to say, "Ha, there must be some

 8    ulterior motive."  I look at the document.  I look at the

 9    face of the document, and it's a reasoned decision, or it's

10    not a reasoned decision.  But I don't -- I don't think

11    there's case law that says the decision was already made;

12    therefore, the reasons that they've now given are no good.

13            MR. COX:  I -- I believe -- right.  I was -- the

14    *Department of Commerce v. New York* case, actually, from --

15    the census case from just a few years ago actually stands for

16    the proposition that, although -- it may not independently

17    make it unlawful, but the Court does not have to blind itself

18    to the reality of the situation and understand it can take

19    that information in order to understand what the agency

20    actually did do.

21            THE COURT:  So I don't -- and I guess I would say

22    this, which is I don't -- I don't think that it is my job to

23    get into the larger policy question.  I think my question

24    here is a legal question.

25            That said, to the extent -- and this is part of

1    where I started, I think, on our first hearing, to the extent

2    that I think that the characterization of things doesn't

3    match the law versus the policy, I do think that's fair game.

4        So to the extent, for example, that these 450,000

5    people are referred to as illegal aliens when they're the

6    ones who followed the rules as opposed to the ones who broke

7    the rules, I think that's a distinction I can take into

8    account; and that, to the extent that this group of people is

9    penalized for following the instructions that were given by a

10    prior administration, the question of which administration

11    gave them the instructions isn't important.

12        What's important is they followed the instructions.

13    They followed the rules that they were given, and I think

14    that's the part of this I can take into account.

15        I don't think the larger point of -- whether this

16    is a good program or a bad program, I think that's really not

17    in front of me.

18        MR. COX:  I -- no disagreement there, Your Honor.

19    We certainly agree with that.

20        In case -- I just wanted to mention, in case

21    Your Honor did have questions today about our class

22    certification motion, Mr. Freedman is prepared to address

23    that.  Ms. Flores-Perilla is prepared to discuss irreparable

24    injury and the public interest.

25        THE COURT:  I think I would like a moment on the

1    class cert, which is really to address the questions of -- I

2    do think that there's a sufficient basis to at least

3    provisionally certify a class action here.  But I don't --

4    I'm not sure that the proposed subclasses are sort of

5    tracking what the particular issues are here.

6         It does seem to me that although the individuals

7    who are here under the CHNV program have many of the same

8    issues as some of the other plaintiffs, they do have a

9    discrete set of issues because of this federal register

10   notice.  And so it does seem to me that that is one

11   appropriate subclass.

12        With regard to the supporter subclasses, I think

13   there's a little bit more of a difficulty on my part on

14   getting past the -- as I see it -- getting past the standing

15   issues and -- well, getting past the standing issues for some

16   of the supporters.  And it seems to me that that is a more

17   difficult question as to whether there's a remedy there; and

18   that seems to me, therefore, less obvious to certify as a

19   class.

20        MR. COX:  May I address the standing questions --

21        THE COURT:  Sure.

22        MR. COX:  -- briefly?  So we believe that the --

23   that sponsors have standing because the government has

24   effectively wasted their time and resources.

25        THE COURT:  Well, the problem is there's too many

1    Supreme Court cases that suggest that you need to be a little

2    bit more directly impacted to have standing.

3        MR. COX:  Well, another distinction I think that's

4    important here, Your Honor, is that the sponsors were

5    actually the applicants in this program.  The beneficiaries

6    were not the applicants.

7        THE COURT:  Okay.

8        MR. COX:  The sponsors were.

9        THE COURT:  But so now we're not taking any more

10   applications.  What's the injury to them?

11       MR. COX:  Well, certainly those who have pending

12   applications would have some injury because the government --

13   they have expended resources that the government is now going

14   to waste.  There's certainly an injury.  I understand it's

15   not the same --

16       THE COURT:  It's not an injury remedied by the

17   relief sought here.

18       MR. COX:  Well, if the relief sought is to restart

19   the programs and to adjudicate the pending applications, that

20   would certainly be -- that would certainly redress their

21   injuries.

22       The other two additional bases of standing here are

23   that several of them are sponsoring their family members, and

24   so they would certainly have standing if their family

25   member's parole is shortened.  That's Norma Dus, our

1    declarations at 71-2; Gabriela Doe, 64-6; and Wilhen Pierre

2    Victor, at 24-11.

3        Those are all US citizens, all sponsoring their

4    family members who are here, and the -- the beneficiaries are

5    all individuals whose periods of parole are shortened.  And

6    so you have family separation as a prospect.

7        And then we have our sponsors, Kyle Varner and

8    Sandra McAnany.  So they have sponsored individuals that they

9    didn't necessarily know out of their moral and religious

10    convictions.

11        And now the government is using the fact that they

12    did the meticulous calculations to figure out, "Okay.  How

13    many people can I sponsor and stay above the poverty line,"

14    which was the requirements in this process, "I" -- because

15    they feel like this is something they wanted to do for their

16    fellow humans.

17        The government's now using -- calling them serial

18    sponsors and saying that they're indicators of fraud, and

19    somehow that's a justification for ending the program.

20        We understand that the beneficiaries clearly have

21    the most grievous injuries here.

22        THE COURT:  So I think we've started this in on the

23    class question.

24        MR. COX:  Yes.  I just wanted to address the

25    standing.

1          THE COURT:  And on the overall programs, that's --

2     that, obviously, is still on the plate; but I'm, at this

3     point, most urgently concerned about the April 24th date.

4          MR. COX:  Understood.  And --

5          THE COURT:  But as to -- as to the potential

6     classes, it seems to me we have a discrete group of the

7     beneficiaries, the parolees under this program that's being

8     canceled now.  We have a discrete group of people.  I will --

9     I will acknowledge that there is a discrete group that is the

10    people who have family member beneficiaries, et cetera.

11         You then have your sort of outside supporters.  I

12    don't see right now getting to the question of class

13    certification as to that group.  Maybe they have standing to

14    make some arguments.  Maybe they don't.  But I don't really

15    see that they're a class of people who share their same -- I

16    don't see where that goes.

17         MR. COX:  Okay.  I --

18         THE COURT:  I don't know if there's something more

19    that you wanted to give me on those subclasses, potentially.

20         MR. FREEDMAN:  I -- no, Your Honor.  I agree that,

21    in terms of priorities, certainly focusing on the -- what

22    we're referring to as the "rescission subclasses," is

23    definitely our top priority.

24         We agree that family reunification, in particular,

25    we have a number of class representatives whose family

57

1    members were approved and have now been held up because of

2    this process.  That is also a priority.

3           We agree that nonfamily members do stand -- do

4    stand differently situated, and if Your Honor is not prepared

5    to look at injunctive relief for them now, we are prepared to

6    address that further down the road.

7           THE COURT:  Okay.  I had one -- one last question

8    about the pause.

9           MR. WARD:  Yes, Your Honor.

10          THE COURT:  How does the pause and the April 24th

11    date match?  I mean, on the one hand, to say it's a pause,

12    it's a short period of time, on the other hand, we say it's a

13    30-day -- with the notice, it was 30 days.  We're now down to

14    two weeks.  But how do you -- the pause isn't going to be

15    over before we get to the April 24th date, are we?

16          MR. WARD:  The -- which pause, Your Honor?

17          THE COURT:  Either of them, the adjudication of

18    anything.

19          MR. WARD:  So I don't know the answer to that.  It

20    could be.  I don't have -- I don't have information to share

21    with you about it, a particular end date.

22          THE COURT:  But if I'm thinking about how long a

23    pause is -- because you're using the word "pause."  If I

24    think about a pause to be equal or longer than the amount of

25    notice that the agency is using here to terminate the

58

1    benefits, it makes it seem sort of clear that "pause" -- it's

2    not good to talk pause as a very short period of time and to

3    talk about the 30 days' notice as adequate notice when

4    their --

5        MR. WARD:  So, again, it depends on -- how long the

6    pause is depends on the factors of the individual program and

7    the things that the agency is evaluating.  So with respect

8    to --

9        THE COURT:  Well, but they've all been paused now

10   for more than 60 days.

11       MR. WARD:  Well, so not with respect to the CHNV

12   process, for which the agency has completed -- in terms of

13   the parole pause, the pause on the adjudicating parole

14   applications, because the agency has completed the review it

15   discussed in the Huffman declaration.  The conclusion of that

16   review decided to end the program entirely.

17       THE COURT:  Sure.  We have the federal register

18   instead, so fair enough as to that.

19       On the other benefits, though, the Davidson memo,

20   those are all paused for longer than -- well, for longer than

21   60 days at this point, correct?

22       MR. WARD:  Yes, Your Honor.  But, again, that

23   doesn't apply to all the processes.  But I believe it is --

24   has been almost -- that -- that memorandum was issued on

25   February 14th, so we're approaching 60 days, I believe, or

1    perhaps just past it.

2              THE COURT:  Okay.  I promised you last time I'd

3    have something out quickly.  I am that much more urgently

4    getting something out quickly.

5              I am -- unless something changes as I read my

6    material through one last time, I am going to issue an order

7    staying the revocation of parole under the federal register

8    notice and of the -- of people's individual parole at this

9    time.  That is my current -- current order.

10             MR. COX:  May we speak just briefly about the

11   potential relief beyond the stay, Your Honor, such as

12   corrective notice to the members of the proposed class and

13   have a reporting requirement, if that would be -- in order --

14             Essentially, we think we need a canary in that coal

15   mine; because, otherwise, we just have no visibility, and

16   defendants have thus far used the lack of public visibility

17   to their advantage.  And so we just want to be able to know

18   if -- if applications, for example, are being adjudicated.

19             THE COURT:  So let's be really blunt here about how

20   these things are proceeding.  We have decisions around the

21   country because there's been urgent orders placed everywhere,

22   which has turned everything upside down.

23             I can exercise my authority as best I can.  If I

24   push the edges -- it doesn't matter whether I push the edges

25   or I'm squarely within my authority; the government will

1    appeal whatever order I put in.

2         And it seems to me that a stay of their action

3    stands on different grounds than telling them to do something

4    and that I don't see their arguments against an injunction,

5    quote, to have the same weight as an argument as to a stay,

6    that they have an administrative order that's supposed to

7    have -- is going to revoke people's parole effective on

8    April 24th.  In advance of that, I am staying the order.

9         I hear what you're saying about wanting to get word

10   out to people.  You have a lot of lawyers sitting there.  You

11   can figure out how to do a press release once the order is

12   issued.  I wouldn't jump your gun.

13        But I'm not going to order them to do that.  I am

14   trying to stay in my lane and address the problem that has

15   been created here.  And I don't want to throw out the baby

16   with the bath water because I'm awarding more than I have

17   jurisdiction to do.

18        MR. COX:  I understand, Your Honor.

19        We would hope to proceed to discovery soon, and

20   perhaps we could address it at that point if there are any

21   issues.

22        Thank you, Your Honor.

23        MR. WARD:  Just one final point, Your Honor, is to

24   renew my request that if the Court decides to grant any

25   relief, that the Court consider staying that relief.

```
1          The solicitor general is going to want to consider
2     whether or not to seek an emergency appeal.  And if the Court
3     determines for whatever reason that a stay is not
4     appropriate, if the Court could note that, then we can -- the
5     solicitor general can make whatever determination he makes,
6     and we can proceed or not; otherwise, we would need to
7     proceed with briefing or a request for stay before this
8     Court.
9          THE COURT:  The difficulty here is that I have
10    something that's happening on April 24th.  I am working as
11    quickly as I can.  You are all working as quickly as you can
12    with your efforts.
13         I hear your request for a stay.  I am certain, if
14    this goes up to the First Circuit, they're going to want to
15    be able to -- everyone wants to be able to consider things in
16    a reasoned manner.
17         The problem is that you've put a hard date on it.
18    And that April 24th date means that these issues have to be
19    addressed expeditiously.
20         I understand that there is a request for a stay.  I
21    will make a final determination as I go through, but I don't
22    see how I can safely protect the potential injury here if I
23    let the April 24th date come and go.
24         MR. WARD:  Thank you for considering the request,
25    Your Honor.
```

1          THE COURT:  And staying the order would do that.

2          MR. COX:  Your Honor, if I could just add our

3    thanks on behalf of the plaintiffs in the proposed class for

4    the Court's considerable amount of time over the last month.

5    Several members are here today, including our -- the

6    executive director of Haitian Bridge Alliance and other

7    representatives from the organization.  And we just want to

8    say thank you for your time, Your Honor.

9          THE COURT:  Well, my time would be better spent if

10   I actually got the decision out, that you can all decide what

11   to do with it.  So I will put my effort into that.

12          We are in recess.

13          (Court in recess at 4:26 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 18th day of April, 2025.

/s/ Robert W. Paschal
_____
ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter

No. 24A

# In the Supreme Court of the United States

———————

Kristi Noem, Secretary of Homeland Security, et al., Applicants

*v.*

Svitlana Doe, et al.

———————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

———————

D. John Sauer
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**TABLE OF CONTENTS**

Statement ................................................................................................ 6

    A.    Background ............................................................................ 6

    B.    Proceedings Below .............................................................. 11

Argument .............................................................................................. 13

I.    The Government Is Likely To Succeed On The Merits ................................. 13

    A.    Parole Terminations Are Not Judicially Reviewable........................... 13

        1.    The INA deprives the district court of jurisdiction ................... 13

        2.    The APA does not authorize judicial review here ..................... 16

    B.    The Parole Termination Is Lawful ....................................... 17

        1.    The parole termination does not violate the INA...................... 18

        2.    The parole termination is not arbitrary and capricious ........... 21

    C.    The Court Likely Would Grant Certiorari ........................................... 23

II.    The Equitable Factors Support A Stay ........................................................ 23

    A.    The Government Will Suffer Irreparable Harm Absent A Stay .......... 23

    B.    A Stay Would Not Impose Cognizable Harm On Respondents ........... 27

Conclusion ............................................................................................ 27

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Kristi Noem, in her official capacity as Secretary of Homeland Security; Todd M. Lyons, in his official capacity as Acting Director of Immigration and Customs Enforcement; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; Kika Scott, in her official capacity as Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and Donald J. Trump, in his official capacity as President of the United States.

Respondents (plaintiffs-appellees below) include the following individuals proceeding under pseudonyms:  Svitlana Doe; Maksym Doe; Maria Doe; Alejandro Doe; Armando Doe; Ana Doe; Carlos Doe; Omar Doe; Andrea Doe; Marim Doe; Aleksandra Doe; Teresa Doe; Rosa Doe; Miguel Doe; Lucia Doe; Daniel Doe; and Gabriela Doe. Respondents also include Sandra Mcanany; Valentin Rosales Tabares; Kyle Varner; Wilhen Pierre Victor; Adolfo Gonzalez, Jr.; Norma Lorena Dus; and Haitian Bridge Alliance.

## RELATED PROCEEDINGS

United States District Court (D. Mass.):

*Doe* v. *Noem*, No. 25-cv-10495 (Apr. 14, 2025)

United States Court of Appeals (1st Cir.):

*Doe* v. *Noem*, No. 25-1384 (May 5, 2025) (denying stay)

# In the Supreme Court of the United States

———————

No. 24A

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

SVITLANA DOE, ET AL.

———————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

———————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of Kristi Noem, Secretary of Homeland Security, et al., respectfully files this application for a stay of the April 14, 2025, order issued by the United States District Court for the District of Massachusetts (App., *infra*, 1a-41a) pending further appellate proceedings.

This application seeks to correct a recent, destabilizing trend in immigration cases. The Immigration and Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. 1101 *et seq.*), vests the Secretary of Homeland Security with broad discretion over categories of immigration determinations, and precludes judicial review of such discretionary determinations. Specifically, the INA permits the Secretary to grant parole to aliens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and it permits the Secretary to revoke that parole whenever "the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have

(1)

2

been served." 8 U.S.C. 1182(d)(5)(A).[1] The previous Administration granted parole categorically to aliens from Cuba, Haiti, Nicaragua, and Venezuela, resulting in the parole of 532,000 aliens into the United States. On March 25, 2025, Secretary Noem revoked that categorical grant of parole while reserving the discretion to make case-by-case exceptions. The district court nevertheless held that the Secretary lacked authority to revoke the categorical grant of parole without providing individualized, case-by-case consideration for each of 532,000 aliens. It then issued a *de facto* permanent injunction against the Secretary's policy. In doing so, the district court engaged in the very review Congress prohibited—needlessly upending critical immigration policies that are carefully calibrated to deter illegal entry, vitiating core Executive Branch prerogatives, and undoing democratically approved policies that featured heavily in the November election.[2] This Court should stay the district court's order.

As a general matter, an alien who arrives in the United States and cannot demonstrate his admissibility generally is either promptly removed or detained pending removal proceedings (or proceedings regarding asylum or withholding of removal). See 8 U.S.C. 1225(b)(1)(A), (B), and (2)(A). The INA provides, however, that in limited circumstances the Secretary may parole such an alien—that is, release him from detention and allow him to temporarily enter the United States. See 8 U.S.C. 1182(d)(5)(A). That parole authority is purely discretionary: the Secretary "may,

---

[1]     Notwithstanding the use of "Attorney General" throughout the INA, Congress has transferred enforcement of many provisions to the Secretary of Homeland Security. See *Nielsen* v. *Preap*, 586 U.S. 392, 397 n.2 (2019). Congress amended Section 1182(d)(5) to replace "Attorney General" with "Secretary of Homeland Security" in January 2025, but that amendment merely confirmed existing understandings. See Laken Riley Act, § 3(d)(1), 139 Stat. 4.

[2]     The pending application for a stay in *Noem* v. *National TPS Alliance*, No. 24A1059 (filed May 1, 2025), raises similar issues with respect to the Secretary's discretionary decision to terminate certain aspects of temporary protected status for certain Venezuelans.

* * * *in h[er] discretion* parole" an "alien applying for admission," and may terminate that parole "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served." *Ibid.* (emphases added). The INA clearly bars judicial review of such discretionary decisions: "Notwithstanding any other provision of law * * * no court shall have jurisdiction to review * * * any other decision or action * * * the authority for which is specified under this subchapter to be in the discretion of * * * the Secretary of Homeland Security." 8 U.S.C. 1252(a)(2)(B)(ii).

From 2022 to early 2025, then-Secretary Mayorkas granted two-year terms of parole to some 532,000 aliens from Cuba, Haiti, Nicaragua, and Venezuela in so-called CHNV special parole programs. He relied on categorical migration and country rationales—for example, that encouraging aliens from those countries to use parole to enter the United States would deter surges of illegal entry at the southwest border. See, *e.g.*, 88 Fed. Reg. 1243, 1249 (Jan. 9, 2023) (Haiti). But he was clear that parole could be summarily terminated. His notices creating those programs advised: "The Secretary retains the sole discretion to terminate the process at any point," and "DHS may terminate parole in its discretion at any time."[3]

Reviewing the results of those mass-parole programs, the new Administration concluded that they "at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status." 90 Fed. Reg. 13,611, 13,613 (Mar. 25, 2025). In March 2025, Secretary Noem thus exercised her discretion to terminate the parole of aliens who had been granted parole under the CHNV programs, but reserved the authority to grant case-by-case

---

[3]     88 Fed. Reg. 1266, 1268, 1272 (Jan. 9, 2023) (Cuba); see 88 Fed. Reg. at 1244, 1248 (Haiti); 88 Fed. Reg. 1255, 1256, 1260 (Jan. 9, 2023) (Nicaragua); 87 Fed. Reg. 63,507, 63,511, 63,516 (Oct. 19, 2022) (Venezuela).

4

exceptions.  In addition to observing that those parole programs had not accomplished their stated aims, the Secretary emphasized that the programs had "exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large," 90 Fed. Reg. at 13,615; "had a disruptive impact for [Customs and Border Protection] operations at interior air [ports of entry]," *ibid.*; and contravened the new Administration's foreign policy focus on "other measures to deter and prevent the entry of illegal aliens," *id.* at 13,616.  The Secretary further cited "significant gaps in the vetting process," including reports of massive fraud that had caused the government to suspend certain portions of the CHNV programs in July 2024.  *Ibid.*; see App., *infra*, 5a-6a.  That discretionary rescission of a discretionary benefit should have been the end of the matter:  Congress reserved those decisions exclusively to the Secretary, who weighed foreign-policy objectives and other factors and rendered her decision.

Instead, the district court certified a class of all aliens in the United States who had received parole under the CHNV parole programs, then indefinitely halted the Secretary's March 2025 termination.[4]  Though the INA expressly deprives courts of jurisdiction to review discretionary parole determinations, the district court deemed that bar inapplicable on the theory that the Secretary exceeded her statutory authority here.  See App., *infra*, 20a-21a.  And though the INA gives the Secretary broad discretion to *terminate* parole for cross-cutting reasons, the district court insisted that terminating parole must be done on a case-by-case, alien-by-alien basis—no matter that the programs that Secretary Noem terminated had *extended* parole en masse.

---

[4]    The district court characterized its order as a nationwide "stay" of the March 2025 termination, but the "stay" has no end date and prevents the government from enforcing that termination with respect to any alien in the United States.  App., *infra*, 40a.  The court's order is thus in substance and "practical effect" an appealable injunction.  *Abbott* v. *Perez*, 585 U.S. 579, 594 (2018) (citation omitted); cf. *Department of Education* v. *California*, 145 S. Ct. 966, 968 (2025) (per curiam).

Yet the First Circuit denied the government's motion to stay the district court's order. That court refused to decide whether the termination of parole was "immune to judicial review," instead summarily stating that the Secretary had not made a sufficiently strong showing on the merits or the equities to warrant relief. *Id.* at 46a.

This Court's immediate intervention is warranted. The district court has nullified one of the Administration's most consequential immigration policy decisions, revoking Secretary Noem's decision and maintaining parole for up to two years for 532,000 aliens whose continued presence in the United States the Secretary deems contrary to U.S. interests. Not only that, the court's rationale for disregarding Congress's clear jurisdictional bar—that courts can review discretionary determinations if they purportedly exceed statutory bounds—would enable wholesale evasion of the INA's judicial-review bars in every case.

Further, the district court's reasoning that parole *revocations* must be made on a case-by-case, alien-by-alien basis contradicts the plain text of the statute and creates a perverse one-way ratchet. Secretary Mayorkas granted CHNV parole categorically. Yet the court faulted only Secretary Noem's decision to *restore* the traditional case-by-case process by undoing the prior categorical grant of CHNV parole. App., *infra*, 36a-37a; see 90 Fed. Reg. at 13,612. The INA, however, prescribes the exact opposite: the Secretary may *grant* parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," but the Secretary may *terminate* parole whenever, in her "opinion," "the purposes of such parole * * * have been served"—without any similar case-by-case limitation. 8 U.S.C. 1182(d)(5)(A). In any event, agencies routinely make case-by-case determinations by applying uniform criteria to all individuals. "[E]ven if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve cer-

tain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hospital Association* v. *NLRB*, 499 U.S. 606, 612 (1991). That is what the Secretary did here.

The district court's indefinite halt of parole revocation irreparably harms the government. The court's order blocks the Executive Branch from exercising its discretionary authority over a key aspect of the Nation's immigration and foreign policy and thwarts Congress's express vesting of that decision in the Secretary, not courts. Further, the government has a strong interest in expeditiously removing aliens who lack a lawful basis to remain in the United States, but the order stymies DHS's efforts by requiring individualized parole determinations for every one of the 532,000 parolees under the CHNV programs—a colossal undertaking.

If DHS cannot terminate parole until the two-year period is up, DHS also faces the prospect of forgoing expedited removal and undergoing full-bore removal proceedings for each alien, which would "further tax[]" an "already overburdened immigration court system." 90 Fed. Reg. at 13,620; see 8 U.S.C. 1225(b)(1)(A)(iii)(II). Finally, delaying the terminations of CHNV parole programs risks "undermin[ing] the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations." 90 Fed. Reg. at 13,621. On the other side of the ledger, respondents cannot claim any cognizable irreparable harm; they accepted parole with full awareness that the benefit was temporary, discretionary, and revocable at any time. This Court should put an end to the recent, destabilizing trend in INA cases and stay the district court's order in full.

## STATEMENT

**A.    Background**

1.    Congress has provided that the Secretary of Homeland Security may, in

7

her discretion, grant and revoke parole to nearly any alien applying for admission. Specifically, with exceptions not relevant here, the Secretary may

> in h[er] discretion parole into the United States temporarily under such conditions as [s]he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. 1182(d)(5)(A); see 8 C.F.R. 212.5.

In late 2022 and early 2023, DHS created special parole programs for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela.  See 88 Fed. Reg. 1266 (Jan. 9, 2023) (Cuba); 88 Fed. Reg. 1243 (Jan. 9, 2023) (Haiti); 88 Fed. Reg. 1255 (Jan. 9, 2023) (Nicaragua); 87 Fed. Reg. 63,507 (Oct. 19, 2022) (Venezuela); see also 88 Fed. Reg. 1279 (Jan. 9, 2023) (amending Venezuela program); 88 Fed. Reg. 26,329 (Apr. 28, 2023) (amending Cuba program); 88 Fed. Reg. 26,327 (Apr. 28, 2023) (amending Haiti program).  For each program, DHS cited categorical reasons that parole of nationals from those four countries would provide a significant public benefit and address urgent humanitarian needs, based on general migration and country conditions.  See, e.g., 88 Fed. Reg. at 1272-1275; 88 Fed. Reg. at 1248-1251; 88 Fed. Reg. at 1260-1263; 87 Fed. Reg. at 63,511-63,515.  Specifically, DHS stated that each CHNV program would fulfill the same six goals:  reduce "irregular migration" of nationals from those countries; enable national-security and public-safety vetting of aliens before they arrive in the United States; reduce the strain on DHS personnel and resources from surges in southwest border and maritime encounters; minimize the burden on border communities by routing aliens to communities in the interior; disincentivize dangerous journeys through criminal smuggling networks; and address foreign-policy goals

8

by managing migration collaboratively in the Western Hemisphere. 88 Fed. Reg. at 1272 (Cuba); 88 Fed. Reg. at 1248 (Haiti); 88 Fed. Reg. at 1260 (Nicaragua); 87 Fed. Reg. at 63,511 (Venezuela).

Under those programs, DHS could consider granting advance authorization to qualifying individuals from the four listed countries to travel to certain U.S. ports of entry to request discretionary consideration for parole for up to a two-year term. See App., *infra*, 2a-3a. Approved individuals "could seek humanitarian relief or other [immigration] benefits and receive work authorization" during the two-year parole term, but "those 'who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.'" *Id.* at 3a (citation omitted). DHS later announced "that there would be no 're-parole' beyond the initial two-year period." *Ibid.* (citation omitted). Even within the two-year term, DHS expressly stated that it "may terminate parole in its discretion at any time." 88 Fed. Reg. at 1272. DHS granted parole to some 532,000 aliens in the ensuing two years. 90 Fed. Reg. at 13,612.

2. On January 20, 2025, President Trump issued an executive order declaring it to be the "the policy of the United States to take all appropriate action to secure the borders of our Nation," including by "[t]erminat[ing] all categorical parole programs that are contrary to the policies of the United States," such as "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'" Exec. Order No. 14,165, §§ 2, 7(b), 90 Fed. Reg. 8467, 8467-8468 (Jan. 30, 2025). The President also issued an executive order directing Executive Branch officials to take "all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens

9

in the United States," including by "ensuring that the parole authority under [Section 1182(d)(5)] is exercised on only a case-by-case basis." Exec. Order No. 14,159, § 16(a), 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025).

That same day, the Acting Secretary of Homeland Security ordered a review of all parole policies, including the CHNV parole programs. See App., *infra*, 4a-5a. On January 23, 2025, the Acting Director of the U.S. Citizenship and Immigration Services (USCIS) paused the acceptance and processing of new CHNV parole requests. See *id.* at 9a n.8. On February 14, the Acting Deputy Director of USCIS authorized "an immediate agency-wide administrative hold on all pending status readjustment and benefit requests filed by individuals paroled into the United States under the CHNV programs," save for case-by-case exceptions. *Id.* at 5a; see *id.* at 6a.

3.    On March 25, 2025, Secretary Noem published a notice in the Federal Register announcing that DHS was "terminating the CHNV parole programs as of March 25, 2025," and "[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." 90 Fed. Reg. at 13,611. The Secretary explained that "DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id.* at 13,618. Further, "DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice." *Ibid.* She instructed that "[p]arolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States before their parole termination date." *Id.* at 13,618-13,619.

The Secretary explained that "the CHNV programs 'do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals.'" App., *infra*, 7a (quoting 90 Fed. Reg. at 13,612). The Secretary also "explained in some detail why the original grounds for the CHNV program did not warrant continuing the program." *Id.* at 7a n.7 (citing 90 Fed. Reg. at 13,612-13,617). The Secretary added that "consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis." 90 Fed. Reg. at 13,612. "These reasons," the Secretary concluded, "independently and cumulatively, support termination of the CHNV parole programs." *Ibid.* The Secretary thus exercised "her discretion" to "terminat[e] the CHNV parole programs." *Ibid.*

The Secretary acknowledged reliance interests of parolees, potential future program beneficiaries, and potential recipients with approved advance travel authorizations who had not yet arrived in the United States. 90 Fed. Reg. at 13,617-13,619; see App., *infra*, 8a-9a. But she found that those individuals knew that parole was discretionary and that the CHNV programs could be terminated at any time, and that any costs to those individuals did not outweigh the government's "sovereign interest in determining who is paroled into the United States" and "the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." 90 Fed. Reg. at 13,618-13,619. She explained that DHS chose to terminate all parole in 30 days rather than allow parolees' two-year terms naturally to expire because the latter option would "essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States" under the expedited removal procedures in 8 U.S.C. 1225(b). 90 Fed.

11

Reg. at 13,620; see 8 U.S.C. 1225(b)(1)(A)(iii)(II) (expedited removal is unavailable if "the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility").

### B.    Proceedings Below

1.    Respondents, 23 individuals and a nonprofit organization, filed a putative class action under the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*, alleging that the termination of the CHNV parole programs (as well as other parole programs not at issue here) is contrary to law, arbitrary and capricious, and unconstitutional. Second Am. Compl. ¶¶ 308-363. As relevant here, the district court certified a class of "[a]ll individuals who have received a grant of parole" under the CHNV programs, except those outside the United States or who opt out of the class. App., *infra*, 42a; see *id.* at 28a-31a.

The district court then entered a classwide "stay" of the Secretary's March 25, 2025, notice. The court acknowledged that "Section 1252(a)(2)(B)(ii) strips district courts of jurisdiction to review" the Secretary's discretionary determinations, and that parole terminations are discretionary. App., *infra*, 20a. But the court held that the jurisdictional bar was inapplicable on the theory that a "categorical termination of the period of parole * * * violates the parole statute," and the statute supposedly does not "give the Secretary the discretion to take such unlawful action." *Id.* at 21a. The court added that the decision to terminate parole was not "committed to agency discretion by law" under the APA, 5 U.S.C. 701(a)(2), because the requirement that the Secretary determine that "the purposes of such parole . . . have been served" constitutes a "meaningful standard" by which to judge the exercise of discretion. App., *infra*, 25a-26a (citations omitted; ellipsis in original).

On the merits, the district court found that respondents were likely to succeed

on their APA claims on two grounds. App., *infra*, 31a-37a. First, the court held that one of the Secretary's justifications for terminating the parole periods—namely, so it could better secure the ability to use expedited removal under 8 U.S.C. 1225(b)(1)(A)(iii)(II)—rested on a "legal error" about whether expedited removal applies to those who were paroled in the past. See App., *infra*, 31a-35a. Second, the court held that, because parole may be granted "only on a case-by-case basis," termination of parole also must be individualized. *Id.* at 36a (citation omitted).

The district court found that respondents would be irreparably harmed if their terms of parole ended before the two-year expiration date because they would have to "leave the country on their own, or await removal proceedings." App., *infra*, 37a. The court found that preliminary relief would not hamper the government's pursuit of foreign policy goals as it "would only require the agency to give fuller consideration to the reliance interests of parolees * * * and to make any decisions terminating grants of parole in an individual, case-by-case manner." *Id.* at 38a.

The district court thus stayed the Secretary's March 25 notice "pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to" the CHNV parole programs. App., *infra*, 40a. The court also stayed "pending further court order" the sending of "individualized notices" to CHNV parolees "notifying them that their parole is being revoked without case-by-case review pursuant to the" March 25 notice. *Id.* at 41a. The court denied the government's request to stay its order based on the same reasoning above. *Id.* at 40a.

2.    The First Circuit denied a stay pending appeal. App., *infra*, 45a-47a. The court noted that "parole in the first instance is to be granted only on a case-by-case basis," but "[t]he statutory text is less clear regarding the termination of parole."

13

*Id.* at 46a.  The court stated that "the very lack of clarity cuts against a finding that the en masse termination is immune to judicial review"—yet also held:  "Whether this is so we need not now decide."  *Ibid.*  The court added without explanation that the government had not "shown that the balance of harms and the public interest weigh so heavily in [its] favor as to warrant a stay."  *Ibid.*

## ARGUMENT

This Court should stay the district court's order.  The district court lacked jurisdiction to enter that order and lacked the authority to usurp the Executive Branch's control of foreign policy and immigration.  A stay pending appellate proceedings is warranted where the applicant shows a likelihood of success on the merits, a reasonable likelihood that the Court will grant certiorari, and a likelihood of irreparable harm.  *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam).  In "close cases," "the Court will balance the equities and weigh the relative harms."  *Ibid.*  Those factors are easily satisfied here.

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.    Parole Terminations Are Not Judicially Reviewable

#### 1.    The INA deprives the district court of jurisdiction

The district court incorrectly asserted jurisdiction to review the Secretary's discretionary parole decisions by adopting an untenably narrow reading of the jurisdictional bar in 8 U.S.C. 1252(a)(2)(B)(ii).  That provision states that, with exceptions not relevant here, "no court shall have jurisdiction to review  * * *  any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified  * * *  to be in the discretion of the Attorney General or the Secretary of Homeland Security."  *Ibid.*  The exercise of parole authority under Section 1182(d)(5)(A)—which permits the Secretary to terminate parole grants "when

14

the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served," 8 U.S.C. 1182(d)(5)(A) (emphasis added)—is just such a discretionary "decision or action," 8 U.S.C. 1252(a)(2)(B)(ii).

Tellingly, neither respondents nor the district court disputed that the INA reserves parole termination decisions to the Secretary's discretion. App., *infra*, 20a. Other courts agree—and thus have held that such discretionary parole revocations are unreviewable. See, *e.g.*, *Samirah* v. *O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (authority to "grant or revoke" parole under Section 1182(d)(5)(A) is a matter of agency discretion barred from review by Section 1252(a)(2)(B)(ii)), cert. denied, 541 U.S. 1085 (2004); *Hassan* v. *Chertoff*, 593 F.3d 785, 789 (9th Cir.) (per curiam) (similar), cert. denied, 561 U.S. 1007 (2010). Section 1252(a)(2)(B)(ii) thus precludes review of respondents' challenges to the Secretary's decision to terminate parole, as memorialized in the March 25, 2025, Federal Register notice.

The district court nevertheless sidestepped Section 1252(a)(2)(B)'s plain text and asserted jurisdiction based on the premise that the parole "statute cannot be read to give the Secretary the discretion" to categorically terminate the parole period for members of the class, and instead requires her to "attend, in some way, to the reasons an individual alien received parole." App., *infra*, 21a. That is doubly wrong. First, the INA does not forbid categorical parole terminations, as explained below. See § I.B.1, *infra*. Second, even if it did, Section 1252(a)(2)(B)(ii) still precludes judicial review. Again, that provision bars judicial review when "the authority for" that action is in the Secretary's discretion. That provision thus focuses on whether particular statutory provisions grant discretion over particular decisions—not the *manner* in which the Secretary exercises that authority to make those discretionary decisions. Here, Section 1182(d)(5)(A) plainly grants the Secretary authority to revoke parole

and specifies that her parole-revocation authority may be exercised based solely on her own "opinion." 8 U.S.C. 1182(d)(5)(A). That is about as discretionary a grant of authority as the statute books contain. Even if a particular Secretary were to exercise that discretion improperly in a particular case, Congress conclusively "specified" that the "authority" to revoke parole is within the Secretary's "discretion." 8 U.S.C. 1252(a)(2)(B)(ii). No more is needed to trigger Section 1252(a)(2)(B)(ii)'s jurisdictional bar.

The district court's contrary reasoning would nullify that bar. The bar would apply only where a court first determines that the Secretary acted lawfully, not where the court thinks the Secretary violated the INA, thus rendering it meaningless. But the jurisdictional bar is supposed to *foreclose* review of actions within the Secretary's discretion—not induce courts to review the lawfulness of those actions just to decide whether review is foreclosed. The courts below ignored that fundamental point.

The district court suggested that the jurisdictional bar might not apply because respondents allegedly challenged "the legality of policies and processes governing discretionary decisions under the INA." App., *infra*, 22a (citation omitted). But there is no overarching policy or process separate and distinct from the parole terminations themselves. The Secretary acted to end the CHNV parole programs entirely, not to promulgate some set of policies or procedures to govern those programs going forward. And the "decision or action" that respondents have challenged, 8 U.S.C. 1252(a)(2)(B)(ii), is the decision to terminate parole—not some *other* decision.

The district court relied on a presumption of judicial review (App., *infra*, 21a-23a), but that presumption lacks force where there is "'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla* v. *Barr*, 589 U.S. 221, 229 (2020) (citation omitted). Here, Congress clearly and convincingly di-

rected that "no court shall have jurisdiction to review" "any" decision or action that the INA specifies to be within the Secretary's discretion.  8 U.S.C. 1252(a)(2)(B)(ii); cf. *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U.S. 261, 273-274 (2016).  And that jurisdictional bar applies "[n]otwithstanding any other provision of law (statutory or nonstatutory)."  8 U.S.C. 1252(a)(2)(B)(ii).  Where parole determinations are concerned, "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations." *Biden* v. *Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring).  All the statutory evidence points the other way, against review.

### 2.    The APA does not authorize judicial review here

Separately, respondents invoked judicial review under the APA—but the Secretary's parole termination is also unreviewable under the APA.  The APA does not authorize judicial review when "agency action is committed to agency discretion by law" or when "statutes preclude judicial review."  5 U.S.C. 701(a)(1) and (2).  Section 1252(a)(2)(B)(ii) is a statute that precludes judicial review, so the district court's error as to that provision infected its APA holding as well.  And Section 1182(d)(5)(A) commits parole termination to agency discretion by law by authorizing the Secretary to terminate an alien's parole "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served."  8 U.S.C. 1182(d)(5)(A) (emphasis added).  That language provides no judicially manageable standards for a court to apply in reviewing a parole termination.  See *Lincoln* v. *Vigil*, 508 U.S. 182, 191-194 (1993); *Webster* v. *Doe*, 486 U.S. 592, 600 (1988).

The district court instead reasoned that a decision to *"categorically* terminate grants of parole" is not within the Secretary's discretion and thus not "committed to

17

agency discretion by law." App., *infra*, 26a (emphasis added). That simply repeats the court's mistaken view that Section 1182(d)(5)(A) requires parole terminations to be made on a case-by-case basis. See § I.B.1, *infra*. The court added that Section 1182(d)(5)(A) "establishes standards for the termination of parole by requiring a determination by the Secretary that 'the purposes of such parole . . . have been served[.]'" App., *infra*, 26a (citation omitted; brackets and ellipsis in original). But the court's ellipsis elided the key phrase in the statute—"*in the opinion of the Secretary*"—language that vests the Secretary, not courts, with authority and discretion to decide whether the purposes of parole have been served. There are no judicially manageable standards for courts to review the Secretary's own "opinion." 8 U.S.C. 1182(d)(5)(A).

The district court's reliance (App., *infra*, 26a-27a) on *DHS* v. *Regents of the University of California*, 591 U.S. 1 (2020), likewise was misplaced. That case involved what the Court called a "program for conferring affirmative immigration relief," rather than an unreviewable "non-enforcement policy," as the government had argued. *Id.* at 18. Here, in contrast, the government has never argued that the CHNV parole programs are non-enforcement policies. Rather, judicial review is barred because, unlike the program in *Regents*, the INA expressly commits parole determinations to the Secretary's discretion by law. See *Webster*, 486 U.S. at 600 (no review where statute provided for terminations when relevant official "shall deem such termination necessary or advisable in the interests of the United States") (emphasis omitted).

## B.　The Parole Termination Is Lawful

Even if the Secretary's decision were reviewable, the government is likely to prevail on the merits because the district court misread the parole and expedited re-

moval statutes. Indeed, the court's reading produces an extraordinarily perverse result: though the previous Administration *granted* parole on a categorical basis to over half a million aliens, this Administration cannot *revoke* parole absent individual-by-individual determinations.

### 1.    The parole termination does not violate the INA

To start, the district court erred in concluding that the parole statute imposes a "case-by-case" requirement on parole terminations. App., *infra*, 36a. The INA explicitly requires case-by-case determinations for *granting* parole, providing that the Secretary may, with certain exceptions, "in h[er] discretion parole into the United States temporarily under such conditions as [s]he may prescribe *only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. 1182(d)(5)(A) (emphasis added). But Section 1182(d)(5)(A) contains no parallel language with respect to *terminating* parole, instead providing only that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Ibid.*

Congress's inclusion of a case-by-case limitation as to grants of parole, but not terminations, is strong evidence that parole terminations need not be so individualized. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U.S. 16, 23 (1983) (brackets and citation omitted). For good reason: many conceivable grounds for terminating parole may apply to more than one parolee or may be common to an entire group of parolees. For instance, a change in geopolitical conditions might eliminate the "urgent humanitarian reasons" that jus-

tified parole for all nationals of certain countries, 8 U.S.C. 1182(d)(5)(A); or the Secretary may determine that all aliens paroled solely because of a shortage of detention capacity should be re-detained once a new detention facility becomes available, cf. *Biden* v. *Texas*, 597 U.S. at 815-816 (Kavanaugh, J., concurring) (discussing parole in such a circumstance). Here, one independently sufficient ground for terminating the CHNV parole programs is that those programs granted parole to hundreds of thousands of aliens without any case-by-case determinations in the first place. See 90 Fed. Reg. at 13,612. Requiring the Secretary to make case-by-case determinations to terminate parole (which the statute does not require) that was granted on a categorical basis would further overburden the immigration system. See *id.* at 13,619-13,620.

The district court reasoned that Section 1182(d)(5)(A) "refers in singular, rather than plural, to grants of parole," and "thus seems to contemplate termination of parole on an individual, rather than categorical, basis." App., *infra*, 36a; see *ibid.* (emphasizing that in the clause authorizing termination, the statute refers to "such parole," "the alien," "he was paroled," and "his case") (citation and emphases omitted); see also *id.* at 46a.

That reasoning lacks merit. Most important, it proves too much. Countless INA provisions, not to mention statutes writ large, use the singular rather than the plural; that does not necessarily mean those provisions mandate case-by-case determinations, as the Dictionary Act's first provision instructs. See 1 U.S.C. 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things."). For example, in the same section as the parole authority, the INA uses the singular to provide that "[a]ny alien who * * * is likely at any time to become a public

charge is inadmissible." 8 U.S.C. 1182(a)(4)(A). Yet DHS plainly may make categorical determinations that certain classes of aliens are likely to become public charges and are thus inadmissible. Cf. *DHS* v. *New York*, 140 S. Ct. 599 (2020) (staying injunction against public-charge rule). Further, if the court's reasoning were correct, Congress's insertion of the "only on a case-by-case basis" language in 1996, see 90 Fed. Reg. at 13,612 n.4 (describing the statutory history), was entirely superfluous because the statute's use of the singular already required that result. But courts ordinarily "requir[e] a change in language to be read, if possible, to have some effect." *American National Red Cross* v. *S.G.*, 505 U.S. 247, 263 (1992).

Regardless, even if the INA imposed some sort of case-by-case requirement on parole terminations, that would not preclude the Secretary from establishing generally applicable criteria in order to guide her exercise of discretion. Even when Congress "requires individualized determinations," that requirement does not displace decisionmakers' "authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hospital Association* v. *NLRB*, 499 U.S. 606, 612 (1991); see also, *e.g.*, *Heckler* v. *Campbell*, 461 U.S. 458, 467 (1983) (agency may rely on generally applicable medical-vocational guidelines even where statute requires individualized determinations of disability); *Federal Power Commission* v. *Texaco, Inc.*, 377 U.S. 33, 44 (1964) (similar, under Natural Gas Act); *United States* v. *Storer Broadcasting Co.*, 351 U.S. 192, 205 (1956) (similar, under the Communications Act of 1934); cf. *Lopez* v. *Davis*, 531 U.S. 230, 243-244 (2001). Indeed, longstanding regulations implementing Section 1182(d)(5)(A) take that approach. See 8 C.F.R. 212.5. And this Court and others have repeatedly observed that generally applicable determinations are appropriate elsewhere in the immigration context. See, *e.g.*, *Reno* v. *Flores*, 507 U.S. 292, 313

(1993) (noting that the agency need not "forswear use of reasonable presumptions and generic rules" even where statute required "'some level of individualized determination'") (citation omitted); *Yang* v. *INS*, 79 F.3d 932, 936 (9th Cir.) (similar), cert. denied, 519 U.S. 824 (1996); *Mak* v. *INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar). Finally, the Secretary will continue to exercise her discretion to grant or deny parole to CHNV parolees on a case-by-case basis, see 90 Fed. Reg. at 13,612, underscoring that the March 25 notice does not violate even the district court's flawed understanding of Section 1182(d)(5)(A).

### 2.    The parole termination is not arbitrary and capricious

The district court also erred in concluding that the Secretary acted arbitrarily by relying on an allegedly "obvious legal error." App., *infra*, 31a (citation omitted); see *id.* at 31a-35a. One of several reasons the Secretary gave for terminating all CHNV parole in 30 days rather than allow parolees' two-year terms to naturally expire was that the latter course "would increase the likelihood that th[ose aliens] would accrue more than two years of continuous presence in the United States" and thereby preclude the use of expedited removal proceedings under Section 1225(b). *Id.* at 32a; see 90 Fed. Reg. at 13,619-13,620. The court, however, concluded that CHNV parolees "are not subject to expedited removal even if they have been here less than two years." App., *infra*, 32a. The court observed (*ibid.*) that expedited removal is available for an alien "who has not been admitted or paroled into the United States" and who cannot establish the two-year continuous-presence requirement. 8 U.S.C. 1225(b)(1)(A)(iii)(II). The court interpreted that language to mean that any alien who has ever been paroled, for any length of time, is categorically immune from expedited removal. That interpretation is incorrect.

The statute's use of the present perfect tense ("has not been * * * paroled") is

best read to reflect a "state that continues into the present." *Turner* v. *U.S. Attorney General*, 130 F.4th 1254, 1261 (11th Cir. 2025). Accordingly, an alien whose parole has terminated or expired may be processed for expedited removal if the other statutory conditions are satisfied. That reading tracks the statutory and historical context of parole, which is a temporary release into the interior of the country under which the parolee remains constructively at the border. See *Leng May Ma* v. *Barber*, 357 U.S. 185, 188-190 (1958). That reading also aligns with statutory language providing that after parole is terminated, the alien's case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. 1182(d)(5)(A). The district court's contrary reading would require a former parolee's case to be dealt with differently from any other applicant's by categorically taking expedited removal off the table. The court's reading also contradicts longstanding regulatory practice. Applicable regulations provide that after parole is terminated, "further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. 212.5(e)(2)(i). Section 235 of the Act is 8 U.S.C. 1225—the expedited removal provision.

Moreover, even if the Secretary had erred in that one rationale, that error alone would not justify halting parole terminations, because the Secretary invoked several other independently sufficient reasons. See, *e.g.*, 90 Fed. Reg. at 13,620 ("neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served"); *id.* at 13,614-13,616 (expressing concern with expanded public-benefits eligibility of certain parolees); *id.* at 13,619 (recognizing a "strong interest in promptly returning parolees when the basis for the underlying parole no longer exists"). Indeed, the Secretary stated that her various reasons "in-

23

dependently and cumulatively[] support termination of the CHNV parole programs." *Id.* at 13,612. Even the district court acknowledged that the Secretary's decision rested on many factors. App., *infra*, 7a-8a. Yet the court improperly dismissed those other reasons. Cf. *FDA* v. *Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898, 930 (2025) (remand on arbitrary-and-capricious claim is unnecessary "when an agency's decision is supported by a plethora of factual findings, only one of which is unsound").

### C.    The Court Likely Would Grant Certiorari

Whether viewed as a standalone requirement or as part of the requisite showing on the merits, a likelihood of certiorari is easily demonstrated here. See *Hollingsworth*, 558 U.S. at 190; see also *Does 1-3* v. *Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring). If the First Circuit were to affirm the district court's order, it would create a conflict with at least the Seventh and Ninth Circuits on whether parole revocation determinations are judicially reviewable under the INA. See *Samirah*, 335 F.3d at 549 (7th Cir.); *Hassan*, 593 F.3d at 789 (9th Cir.). That conflict would warrant this Court's review. In addition, certiorari independently would be warranted in light of the issue's importance. Whether to continue to permit up to 532,000 aliens to remain in this country even if they lack a lawful basis to remain is a profoundly important matter of domestic, immigration, and foreign policy—as are the separation-of-powers problems attendant to the district court's usurping the roles of both Congress (which precluded judicial review) and the Executive Branch (which sets immigration policy).

## II.    THE EQUITABLE FACTORS SUPPORT A STAY

### A.    The Government Will Suffer Irreparable Harm Absent A Stay

The injunction imposes irreparable harm on the government and public, whose

interests "merge" here, *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Whenever a district court issues a universal injunction against the Executive Branch—even when, as here, it is styled as a classwide "stay" of Executive Branch action based on a rubber-stamped nationwide class of some 532,000 aliens—the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers* v. *United States* 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. Courts irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation. Cf. *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Those concerns escalate when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Moreover, by disregarding a bar on judicial review enacted by Congress, the district court also encroached on the Legislative Branch's prerogatives as well.

The irreparable harm here is acute. The district court's order stymies the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests, and thus it inhibits the government's pursuit of its foreign policy goals. The court entirely discounted those harms on the grounds that "it [is not] in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country," and that the government supposedly "offered no substantial reason or public interest that justifies forcing [CHNV parolees] to leave (or move into undocumented status) in advance of the original date their parole was set to expire." App., *infra*, 39a. Neither ground

has merit.

As to the first, the Constitution and INA grant the Secretary and the political Branches—not the courts—the task of deciding whether it is in the public interest to allow up to 532,000 aliens who were never admitted, were paroled en masse, and have not been inspected to remain in the country.  Cf. *Nken* 556 U.S. at 435 (government and public interests "merge" in this context).

As to the second, the Secretary explained at length her assessment that the CHNV parole programs, and the specific foreign policy approach that justified the creation of those programs, are inconsistent with the Administration's current goals. See 90 Fed. Reg. at 13,612, 13,615-13,616; see also *Department of the Navy* v. *Egan,* 484 U.S. 518, 529 (1988) ("[F]oreign policy [is] the province and responsibility of the Executive."); *Haig* v. *Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").  The Secretary explained that any delay in terminating the CHNV parole programs "would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration."  90 Fed. Reg. at 13,621. She observed that "U.S. foreign policy has changed in critical respects" since the CHNV parole programs were implemented; that the government currently "is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries," and that "[i]n the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing."  *Ibid.*  By indefinitely freezing those vestiges in place, the district

court's order irreparably and unjustifiably harms the government's foreign-policy efforts.

On top of all that, the district court's order improperly encroaches on the core Executive function of managing the immigration system. See *Arizona* v. *United States*, 567 U.S. 387, 394-396 (2012); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). The order contravenes the government's—and the public's—strong interest in expeditiously removing aliens who lack a lawful basis to remain in the United States. See 90 Fed. Reg. at 13,619-13,620. The order also effectively compels DHS "to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system." *Id.* at 13,619. And, by ignoring a bar on judicial review enacted by Congress, the district court gave the Legislative Branch's prerogatives short shrift as well.

The district court attempted to minimize those harms by observing that the order does not itself "authorize the entry" of any alien or "extend the original grants of [CHNV] parole," and instead "only require[s] the agency to give fuller consideration to the reliance interests of parolees" and "to make any decisions terminating grants of parole in an individual, case-by-case manner." App., *infra*, 38a. But the Secretary extensively considered reliance interests, see 90 Fed. Reg. at 13,617-13,618, as the court elsewhere acknowledged, see App., *infra*, 8a-10a. And making individualized parole terminations would be enormously burdensome and effectively impossible given the sheer number (532,000) of CHNV parolees and the two-year parole term each was granted. See *id.* at 13,612. The order is thus tantamount to permanently enjoining *any* termination of the CHNV programs.

27

**B.     A Stay Would Not Impose Cognizable Harm On Respondents**

On the flip side, a stay of the district court's order will not impose cognizable harm on respondents or absent class members, all of whom are or should be well aware that parole is a discretionary benefit that can be revoked at any time—not least because Secretary Mayorkas repeated that admonition when establishing these very parole programs.  See, *e.g.*, 88 Fed. Reg. at 1272 ("DHS may terminate parole in its discretion at any time."); pp. 3-4 & n.3, *supra*.  Further, some class members may already have obtained immigrant or nonimmigrant status and would thus suffer no meaningful harm from the termination of their parole.  Moreover, the termination of parole is not equivalent to a final removal order; parolees who seek asylum, in particular, would have the opportunity to assert that claim if they are placed in expedited removal or removal proceedings.  See 8 U.S.C. 1225(b)(1)(A)(ii), 1229a(c)(4).

When lower courts have disregarded Congress's commands in the INA and usurped the Executive Branch's control over immigration policy, this Court has not hesitated to intervene and has repeatedly granted complete or partial stays of nationwide orders.  See, *e.g.*, *Wolf* v. *Innovation Law Lab*, 140 S. Ct. 1564 (2020); *DHS* v. *New York*, *supra*; *Barr* v. *East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019); *Trump* v. *Hawaii*, 583 U.S. 1009 (2017); *Trump* v. *IRAP*, 582 U.S. 571 (2017) (per curiam). The Court should follow the same course here.

### CONCLUSION

This Court should stay the district court's order.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

MAY 2025

No. 24A1079

# In the Supreme Court of the United States

---

KRISTI NOEM, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Applicants,*

*v.*

SVITLANA DOE, ET AL.

---

ON APPLICATION TO STAY THE ORDER ISSUED BY THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

---

## OPPOSITION TO APPLICATION TO STAY

---

ANWEN HUGHES
HUMAN RIGHTS FIRST
  *121 W 36th Street, Pmb 520*
  *New York, NY 10018*
  *(212) 845-5244*

JOHN A. FREEDMAN
LAURA S. SHORES
ARNOLD & PORTER KAYE SCHOLER LLP
  *601 Massachusetts Avenue, NW*
  *Washington, DC 20001*
  *(202) 942-5000*

JUSTIN B. COX
  *Counsel of Record*
LAW OFFICE OF JUSTIN B. COX
*JAC Cooperating Counsel*
  *P.O. Box 1106*
  *Hood River, OR 97031*
  *(541) 716-1818*
  *justin@jcoxconsulting.org*

ESTHER H. SUNG
KAREN C. TUMLIN
HILLARY LI
LAURA FLORES-PERILLA
BRANDON GALLI-GRAVES
JUSTICE ACTION CENTER
  *P.O. Box 27280*
  *Los Angeles, CA 90027*
  *(323) 450-7272*

## RULE 29.6 STATEMENT

In accordance with United States Supreme Court Rule 29.6, Respondent Haitian Bridge Alliance ("HBA") states that it is a community-based nonprofit organization incorporated in California. HBA has no parent corporation, nor has it issued any stock owned by a publicly held company.

(i)

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

STATEMENT ....................................................................................................4

    A.   The Statutory Parole Authority ........................................... 4

    B.   CHNV Parole .................................................................. 5

    C.   Defendants' Actions ........................................................ 9

    D.   Proceedings Below ....................................................... 12

ARGUMENT ...................................................................................................14

I.   THE LIKELIHOOD OF IRREPARABLE HARM REQUIRES DENYING
    THE STAY APPLICATION ..........................................................16

II.   DEFENDANTS HAVE NOT MADE A STRONG SHOWING THAT THE
    CASE IS WORTHY OF CERTIORARI OR THAT IT IS LIKELY TO
    SUCCEED ON APPEAL ..............................................................20

    A.   A grant of certiorari is unlikely and unwarranted. ............... 20

    B.   Defendants fail to show a fair prospect of obtaining reversal. ........... 23

        1.   The Secretary's cutting short of all existing grants of CHNV parole
           is subject to judicial review ........................................ 23

        2.   Defendants are unlikely to prevail on the merits of Plaintiffs' APA
           claims ................................................................... 27

        3.   The Secretary's *en masse* truncation of individualized grants of
           parole contravened the statutory case-by-case requirement. .................... 32

        4.   The Secretary's truncation of all valid grants of CHNV parole was
           arbitrary and capricious ............................................. 35

III.  THE DISTRICT COURT'S NARROW STAY ORDER WAS NOT AN
    ABUSE OF DISCRETION ............................................................38

CONCLUSION ...............................................................................................38

Appx-0770

**INTRODUCTION**

Had the district court not granted preliminary relief, the Plaintiff class of approximately half a million Cubans, Haitians, Nicaraguans, and Venezuelans lawfully in this country would have become undocumented, legally unemployable, and subject to mass expulsion on an expedited basis at midnight on April 24, 2025. After multiple hearings and rounds of briefing, the district court properly held that Plaintiffs are likely to succeed in proving that Secretary Noem's decision to trigger the first ever mass revocation of parole contravened express limits on her authority and was predicated on an erroneous legal conclusion. Given the massive irreparable harm to class members and their communities that would otherwise result, the district court exercised its statutory discretion under 5 U.S.C. § 705 to temporarily maintain the *status quo* by postponing that *en masse* revocation of parole, but it otherwise permitted the Secretary to proceed with ending the "CHNV" parole processes through which the class members arrived. Acting promptly, the First Circuit held that Defendants had not met their burden to justify staying the district court's order but invited them to request that their appeal be expedited. Instead, the Government demands this Court's permission—via the emergency docket—to execute the largest mass illegalization event in modern American history.

The Court should deny Defendants' Application, which badly mischaracterizes the scope and effect of the district court's order. Contrary to Defendants' repeated assertions, the district court's stay does not prohibit the Secretary from terminating or truncating class members' parole and employment authorizations, nor does it mandate any particular process for doing so; it just stays the Secretary's unprecedented attempt to do so via her March 25 Federal Register Notice. Likewise wholly unaffected is the Secretary's discretion

(1)

to remove class members—the Secretary has precisely the same authority and ability to do so now that she had before Plaintiffs filed suit; the stay order does not even make it more difficult. The district court's order also left undisturbed the Secretary's decision to end the CHNV parole processes, including the summary denial of some two million pending applications. In fact, the order does not prohibit or require the Secretary to do anything at all *except* to respect the district court's preliminary conclusion that her attempt to truncate parole *en masse* violated the Administrative Procedure Act because it was, among other things, based on her incorrect understanding of the law. To the extent Defendants have complaints, they are with the statutes Congress enacted and the rule of law itself, which do not justify the requested relief.

In contrast, granting the Application would cause an immense amount of needless human suffering. The class members all came to the United States with the permission of the federal government after each individually applied through a U.S. financial sponsor, passed security and other checks while still abroad, and received permission to fly to an airport here at no expense to the government to request parole. After being inspected and subjected to biometric and other additional vetting, an individual Customs and Border Protection (CBP) officer determined, on a case-by-case basis, that each individual merited a discretionary grant of parole, usually for a two-year period. Some class members have been here for nearly two years; others just arrived in January. Many class members are eligible under the INA for other, more durable forms of immigration relief, and have requested it, but the Trump Administration indefinitely suspended adjudicating their requests months ago. All of them followed the law and the rules of the U.S. government,

and they are here to reunite with family and/or to escape, even temporarily, the instability, dangers, and deprivations of their home countries. The Secretary is admittedly under no obligation to continue the CHNV parole process that brought class members here, but she nonetheless must respect required procedures and apply the law correctly before revoking their parole and upending their lives and causing mass disruption to their families, employers, and communities.

On that point—the Secretary's adherence to the law—the Application has relatively little to say. Instead, Defendants repeat *ad nauseam* the claim that the Biden Administration granted class members parole *en masse*, in violation of the statute's case-by-case requirement, and assert time and again that this somehow relieves the Secretary from accountability for her actions. Defendants have yet to present this argument to the lower courts, and so it was waived; but more importantly, not only did Secretary Noem omit any mention of this alleged justification in her Notice, she said the opposite, *conceding* that CHNV parole was case-by-case, and so the argument is precluded by the record and additionally cannot be considered under the *Chenery* doctrine. That Defendants focus on extra-record and irrelevant arguments not yet presented to the lower courts speaks volumes as to how far short they fall in carrying their heavy burden to justify the extraordinary relief they ask of this Court and the harm and chaos that granting it would unleash.

The Application should be denied.

## STATEMENT

### A.    The Statutory Parole Authority

Since its enactment in 1952, the Immigration and Nationality Act (INA) has authorized the Executive to grant noncitizens "parole"—temporary permission for them to be in the United States and, per regulation, eligible for work authorization—for humanitarian reasons and/or because it benefits the public. Parole does not by itself lead to permanent status, but once here, parolees can apply for other forms of immigration relief for which Congress has made them eligible, including asylum, Temporary Protected Status, and adjustment of status based on employment or family ties.

Over the last seventy years, the Executive has frequently issued guidance on circumstances in which parole could be justified on humanitarian and/or public benefit grounds. This guidance comes in a variety of forms but generally identifies a group of noncitizens eligible to apply (or otherwise to be considered) for parole, with each applicant then assessed on a case-by-case basis by an adjudicator exercising the delegated parole authority.[1] *See, e.g.*, Pls. App. 420-427 (describing the creation of guidance for case-by-case review of military parole in place); *see also* Pls. App. 333 (providing examples of the use of programmatic parole). One example of such guidance is contained in DHS's parole regulation, 8 C.F.R. § 212.5, as the Government mentions. *See* Gov. Br. 20.

The first example of this programmatic (or "categorical") parole guidance was issued

---

[1] Similar guidance is commonly issued regarding other authorities, including by the current Trump Administration. *See* Gov. Br. at 20-21; Hamed Aleaziz & Michael Crowley, *Inside the Extraordinary Contradictions in Trump's Immigration Policies*, N.Y. Times (May 13, 2025), https://bit.ly/3SJbxV3 (describing guidance on applying the refugee definition to the racial discrimination claims of Afrikaners).

in 1956 when the Eisenhower Administration paroled into the United States, after case-by-case review, approximately 30,000 Hungarians fleeing a Soviet crackdown. In the decades since, every single Administration—including the first Trump Administration—has used the parole authority in this "categorical" way when other authorities were unavailable, insufficiently expeditious, or otherwise inadequate to address a sufficiently important interest. Pls. App. 320-324; *cf. Biden v. Texas*, 597 U.S. 785, 806 (2022) ("Every administration, including the Trump and Biden administrations, has utilized this [parole] authority to some extent."). While there is no official accounting, there have been more than 125 categorical parole processes, usually with multiple processes operating simultaneously, and addressing a broad array of public and humanitarian concerns. Pls. App. 320-324.

Over the years, certain members of Congress have at times expressed reservations regarding the Executive paroling large numbers of noncitizens without a clear path to permanent status. Pls. App. 331-332. When Congress has acted, however, it has repeatedly extended immigration and other benefits to parolees, adopted modest limits to the parole statute, and rejected attempts to define and tightly circumscribe the humanitarian and public benefit grounds on which parole could be granted. Pls. App. 320-324, 329-334.

### B.    CHNV Parole

Facing unprecedented migration-related challenges, the Department of Homeland Security (DHS) under the Biden Administration established several "categorical" parole processes to address a variety of concerns vital to the national interest, including foreign policy, migration management, border security, and humanitarian needs. The first such program was Operation Allies Welcome (OAW), created in the wake of the U.S. military's August 2021 withdrawal from Afghanistan and its hasty evacuation of approximately

125,000 people—mostly on military cargo jets—including Afghans whose lives were at risk due to their service to the United States. After individualized medical, security, and other screenings in third countries, approximately 76,000 Afghans were approved on a case-by-case basis for two-year grants of parole and were brought to the United States.[2]

Soon after Russia's invasion of Ukraine in February 2022, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. Most of these Ukrainians—some 20,000 total—were paroled into the country.[3] In April 2022, DHS announced the Uniting for Ukraine (U4U) parole process through which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered on a case-by-case basis for parole. In addition to reducing the strain on border operations and discouraging the dangerous journey through Mexico to get there, the Ukrainian parole process further benefitted the U.S. Government by making it possible to conduct security checks on potential parolees before they traveled. *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25040, 25041 (Apr. 27, 2022). Of the seven million Ukrainians externally displaced by the ongoing war, about 200,000 of them were

---

[2] DHS, *Operation Allies Welcome: Afghan Parolee and Benefits Report* (May 8, 2023), https://bit.ly/4bFvh4L.

[3] From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by Border Patrol at the southern border dropped by more than ninety-nine percent. *See* David J. Bier, *Parole Sponsorship Is a Revolution in Immigration Policy*, CATO Institute (Sept. 18, 2023), https://bit.ly/44KJAnn.

individually approved on a case-by-case basis for humanitarian parole and are currently in the United States because of the U4U parole process.[4]

Following the success of U4U, in October 2022 DHS announced a similar process for Venezuelans after that country's displacement crisis led to a sharp uptick in asylum seekers presenting at the southern border. Pls. App. 251-261. In early 2023, DHS implemented similar processes (for similar reasons) for nationals of Cuba, Haiti, and Nicaragua.[5] Pls. App. 267-308. The CHNV parole processes were explicitly modeled on U4U and likewise required individuals seeking parole to apply through a sponsor lawfully present in the United States who committed to providing for them financially, to undergo individualized vetting, and to pay for their own travel. Unlike U4U, the CHNV processes were capped at a maximum of 30,000 total travel authorizations per month for the four countries combined, notwithstanding overwhelming demand. Pls. App. 263, 265, 279, 293, 306. After flying to an internal port of entry to request parole, individuals were inspected, underwent additional vetting (including biometric), with individual CBP officers making the ultimate decision, on a case-by-case basis, whether to grant parole.

The CHNV sponsorship model encouraged and incentivized paroling individuals when doing so would bring additional particularized benefits. CHNV sponsors around the country, including several Plaintiffs, were, for example, able to reunite with close family

---

[4] Julia Ainsley, *U.S. Has Admitted 271,000 Ukrainian Refugees Since Russian Invasion, Far Above Biden's Goal of 100,000*, NBC NEWS (Feb. 24, 2023, 11:15AM), https://bit.ly/3SJckoZ.

[5] Per CBP data, in fiscal year 2020, CBP encountered at the southwest border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined; that number increased to some 181,000 in 2021 and more than 600,000 in 2022 (comprising more than forty percent of all such encounters that year).

members. *See* Pls. App. 229-234 (Plaintiff Wilhen Pierre Victor sponsored her brother, whom she had not seen for over two decades). Sponsorship also allowed families to escape persecution and the threat of death. *See* Pls. App. 236-243 (Plaintiff Gabriela Doe sponsored her cousins, who fled persecution in Nicaragua); 176-180 (Plaintiff Andrea Doe, whose husband was a political prisoner in Nicaragua, came to the United States via the CHNV parole processes with her children to flee persecution); 204-206, 208 (Plaintiff Daniel Doe was paroled into the United States under the CHNV parole processes to flee danger and threat of gang violence in Haiti). For others, it was a way to live out their deeply held religious or moral convictions. *See* Pls. App. 212-218 (Plaintiff Sandra McAnany was motivated by her Christian beliefs to sponsor seventeen individuals); Pls. App. 220-227 (Plaintiff Kyle Varner was driven by his fierce moral convictions to sponsor dozens of individuals). The CHNV parole processes also alleviated pressure at the border.[6] Following individualized assessments, approximately 530,000 individuals—out of nearly three million applications filed—were permitted to travel through the CHNV processes.[7]

---

[6] *See* CBP, *CBP Releases December 2024 Monthly Update* (Jan. 14, 2025), https://bit.ly/43iUJt0 (reporting that encounters of CHNV nationals attempting to cross the border unlawfully were down ninety-one percent since the parole processes were created); *accord Texas v. Dep't of Homeland Sec.*, 722 F. Supp. 3d 688, 710 (S.D. Tex. 2024) (dismissing Texas's challenge to the CHNV parole processes after a two-day bench trial, holding that because the processes decreased the number of CHNV nationals in Texas—the source of the State's alleged injuries—it lacked standing). Texas moved to dismiss its appeal early this month.

[7] Due to departures and successful applications for asylum or other status adjustments, the number of individuals remaining in the United States with CHNV parole is likely significantly lower than 530,000, especially considering parole grants began in October 2022 and were for a duration not to exceed two years. However, the precise number is unclear.

Notwithstanding its successes, the CHNV parole processes became a hot-button political issue during the 2024 presidential campaign. As a candidate, President Trump promised to end the CHNV parole processes, repeatedly blaming CHNV parole for (*inter alia*) the alleged presence of pet-eating Haitians in Springfield, Ohio, including during the only presidential candidate debate held during the campaign.

### C.    Defendants' Actions

Within hours of being inaugurated, President Trump signed an executive order directing the Secretary to terminate "all categorical parole programs," specifically naming the CHNV processes. Exec. Order No. 14,615, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). DHS immediately acted upon that directive via a memorandum issued that same day by Acting Secretary Huffman and, three days later, by imposing an across-the-board indefinite suspension of all adjudications for parole (or, where available, re-parole) through the OAW, U4U, CHNV, and other "categorical" parole processes. Pls. App. 129-130, 132.

On February 14, 2025, DHS issued the Davidson Memorandum; it ordered an indefinite suspension on processing applications for any other immigration benefit— including but not limited to asylum, TPS, adjustment of status, and employment authorization—filed by any parolee in the country by virtue of CHNV, U4U, or one of several family reunification parole processes.[8] Pls. App. 134-136.

Secretary Noem published a Federal Register Notice on March 25, 2025 announcing

---

[8] As a consequence of these indefinite suspensions—which DHS did not make public until after this suit was filed, D. Ct. Dkt. 66 at 34:22-35:10—thousands of Afghan, Ukrainian, Cuban, Haitian, Nicaraguan, and Venezuelan parolees, among others, are falling out of lawful status every month, notwithstanding their efforts and eligibility to stay on the right side of the law.

10

that she had decided to terminate the CHNV parole processes. DHS, *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025). The Secretary acknowledged that DHS created the CHNV processes based on her predecessor's judgment that they would both "provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries," but explained that that did not provide sufficient public benefit to justify their continuation. 90 Fed. Reg. at 13612. Beyond prospectively terminating the CHNV processes, the Secretary announced that she was summarily denying the two million pending applications, rescinding all conditional approvals of applications and then denying those, and cancelling all travel authorizations previously issued to potential parolees. 90 Fed. Reg. at 13618. Defendants' emergency Application concerns none of those decisions.

Additionally, and most relevant here, the Secretary directed that "as one aspect of the termination of the CHNV parole programs," any grants of parole to CHNV parolees that "ha[ve] not already expired by April 24, 2025 will terminate on that date."[9] *Ibid.* The Secretary stated that she "has determined that the purposes" of those grants of parole "have been served because" they do not provide a significant public benefit. *Id.* at 13619 n.70. The Secretary cursorily referenced parolees' reliance interests, but said that they

_____

[9] The Secretary acknowledged that, in these circumstances, DHS regulations require "written notice" to individuals to terminate their parole and "written notice" and an opportunity to be heard to revoke employment authorization, but asserted that she "has determined that publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." 90 Fed. Reg. at 13620 ("Federal Register Notice as Constructive Notice").

were outweighed by the federal government's "strong interest" in deporting them through expedited removal, rather than normal removal proceedings under INA § 240. *Id.* at 13619 ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings" due to the two-year limit on expedited removal in 8 U.S.C. § 1225(b)(1)(iii)(II)).

The Secretary said that she considered two alternatives to cutting short all existing periods of parole and employment authorization of CHNV parolees: "a longer than 30-day wind-down period" and simply "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done with some parole terminations." 90 Fed. Reg. at 13619-20 (citation omitted). The Secretary gave only one reason for rejecting these alternatives: DHS's "strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible." *Id.* at 13620. "Expedited removal is available only when an alien has not been continuously present in the United States for at least . . . two years," the Secretary explained, *id.* at 13619 (citing 8 U.S.C. § 1225(b)(1)(iii)(II)), and therefore "[a]ny lengthening of the wind-down period will increase the likelihood" that CHNV parolees will "accrue more than two years of continuous presence in the United States," which "would essentially foreclose DHS's ability" to remove them via expedited removal, *id.* at 13620 (also citing 8 U.S.C. § 1225(b)(1)(iii)(II)).

Lastly, the Secretary included a severability clause, explaining: "DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs [advance travel authorizations] or existing grants of parole were

to be enjoined in whole or in part." *Id.* at 13622.

### D.    Proceedings Below

Plaintiffs[10] brought suit on February 28 and amended their complaint to address the Secretary's Notice a month later. Following multiple rounds of briefing and three hearings on Plaintiffs' requests for class certification and preliminary relief, the district court granted each in part on April 14. As to the former, the district court certified a class consisting of all individuals who received a grant of CHNV parole that was modified and cut short via the Notice, except those who already departed the United States or sued separately. Gov. App. 42a-44a.

As to Plaintiffs' motion for a stay under 5 U.S.C. § 705 and various forms of preliminary injunctive relief, the district court granted a stay under § 705 of Secretary Noem's *en masse* truncation of all valid grants of CHNV parole. Gov. App. 1a-41a. After rejecting the federal government's typical arguments regarding the reviewability of any exercise of discretion, the district court held that Plaintiffs were likely to prevail for multiple reasons. First, the Secretary's "sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error" that ending parole would maximize DHS's ability to subject parolees to expedited removal. Gov. App. 33a. As the district court explained, the parolee Plaintiffs "are not subject to expedited removal even if they have been here less than two years," because by its terms, the statute the Secretary relied upon can be applied only to someone who "has *not* been admitted or paroled into the United

---

[10] Plaintiffs include eight individual CHNV parolees; six U.S. citizen CHNV sponsors, including four who sponsored family members for parole; and the nonprofit organization Haitian Bridge Alliance. Pls. App. 445 n.1.

States." Gov. App. 32a (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added)); *see generally* Gov. App. 31a-35a. Second, the Court held that Plaintiffs were likely to succeed on their claim that the Secretary's categorical truncation of all existing grants of CHNV parole was "contrary to the statutory requirement that parole be exercised only on a case-by-case basis," Gov. App. 36a (internal quotation marks omitted), emphasizing the mismatch between the individualized purpose of each parole grant and the Secretary's decision to change a key condition of parole (its expiration date) on a blanket basis, Gov. App. 37a.[11]

The district court also held that Plaintiffs had proven that irreparable harm was certainly impending, as the Secretary's decision would cause Plaintiffs' parole "to terminate in less than two weeks, at which time they will be forced to choose between [the] two injurious options" of leaving the country, forfeiting their claims to other immigration benefits, and returning to the dangers they left behind; or staying and risking arrest and detention and undermining their "chances of receiving other forms of immigration relief." Gov. App. 37a-38a. The district court concluded that the balance of equities and public interest supported relief, finding that it is not in the public interest "to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families." Gov. App. 39a. The district court therefore granted relief,

---

[11] The district court additionally found that, although the Secretary explained why she concluded that the processes no longer provided sufficient public benefit, she gave "no rationale" and "offered no reasons" for ignoring "the humanitarian concerns previously articulated by DHS," which were an independent justification for the CHNV parole processes. Gov. App. 35a.

staying the Secretary's mass truncation of all existing grants of CHNV parole pending further review.[12] Gov. App. 40a; *see* 5 U.S.C. § 705.

A week later, the federal government moved the First Circuit for a stay of the district court's order pending appeal. Following expedited briefing, the First Circuit denied that motion on May 5, holding that the federal government had not met its burden to make at least a "strong showing that the Secretary will prevail" on appeal. Gov. App. 46a; *Nken v. Holder*, 556 U.S. 418, 434 (2009). The First Circuit directed "[a]ny party intending to seek expedited briefing of the merits of the appeal [to] file an appropriate motion as soon as practicable." Gov. App. 46a. To date, the federal government has not sought expedited briefing in the Court of Appeals.

## ARGUMENT

The government bears a "heavy burden" to justify the "extraordinary" relief of a stay. *Whalen v. Roe*, 423 U.S. 1313, 1316 (1975) (Marshall, J., in chambers). It must show, at a minimum:

> (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay. In close cases the Circuit Justice or the Court will balance the equities and weigh the relative harms to the applicant and to the respondent.

*Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). This burden is "especially heavy" where—

---

[12] The district court also stayed notices sent to class members because DHS had recently told tens of thousands of people across the country—including many people on parole, but also to non-citizens with other forms of status and even natural born U.S. citizens—that it was "time to leave the United States" because their parole had been terminated, and that they should "not attempt to remain in the United States – the federal government will find you." D. Ct. Dkt. 83-1; *see also* D. Ct. Dkt. 95.

as here—the Government seeks emergency relief after both courts below have already "denied a motion for a stay." *Edwards v. Hope Med. Grp. for Women*, 512 U.S. 1301, 1302 (1994) (Scalia, J., in chambers).

Here, a stay would result in the instant and mass termination of parole for Plaintiffs and approximately 500,000 similarly situated members of the certified class, all of whom followed the law and came into the United States legally. Many of these individuals would lose their lawful status and authorization to work legally in the United States. Moreover, Defendants' rationale is to subject these individuals to additional irreparable harm: it argues that termination is justified so that they can be removed from the United States on an expedited basis without normal deportation protections, including judicial review.

In contrast, Defendants have failed to identify any irreparable injury that would result in the absence of a stay. For this reason alone, the application for emergency stay relief should be denied.

In addition, the district court's decision is correct on the merits, and this Court is unlikely to grant certiorari because—contrary to Defendants' cursory contentions otherwise—no circuit split exists, and the district court's narrow order does not compel the Government to allow CHNV parole beneficiaries to remain in the United States; nor does it prohibit terminating class members' parole or removing them. The Government has not shown that emergency relief is warranted, especially when the court of appeals has not yet issued a decision on the merits and the Government has (thus far) declined its invitation to expedite appellate review.

## I.   THE LIKELIHOOD OF IRREPARABLE HARM REQUIRES DENYING THE STAY APPLICATION

A stay of the district court's order would immediately effectuate the *en masse* truncation of all parole grants for approximately 500,000 current CHNV parole beneficiaries in the United States, causing immediate irreparable harms not only to Plaintiffs and hundreds of thousands of similarly situated class members—all of whom followed the law and were individually approved to enter the United States on a case-by-case basis—but also causing unprecedented disruptions for these parolees' employers and communities. The Government's alleged injuries are purely abstract and do not compare to the scale and irreversible nature of the harms a stay would inflict on Plaintiffs, class members, and communities across the country from the sudden removal of approximately 500,000 people from the work force. All of this strongly weighs against this Court granting the government's stay application.

**1.** The harms inflicted by the stay the government requests would be swift and severe. Categorically terminating CHNV beneficiaries' parole would render those without another lawful status undocumented and, with the loss of work authorization, legally unemployable. *See, e.g.*, Pls. App. 163 ¶¶ 25-26; Pls. App. 141 ¶ 15. A stay would put many CHNV parole beneficiaries immediately at risk of deportation without normal due process protections, separating them from their family here in the United States. *See, e.g.*, Pls. App. 178-79 ¶¶ 12-13 (spousal family separation); Pls. App. 248-49 ¶¶ 11-13 (sibling family separation); *see also Trump v. Hawaii*, 585 U.S. 667, 750 (2018) (acknowledging "prolonged separation from family" is an irreparable harm). Moreover, class members would be subject to expedited deportation to the same despotic and unstable countries from which they fled,

where many will face serious risks of danger, persecution, and even death. *See, e.g.*, Pls. App. 169 ¶ 5; Pls. App. 172-73 ¶ 18; Pls. App. 178-79 ¶¶ 12-13. These harms, independently and collectively, are not only severe in their own right, but are also exacerbated because Plaintiffs' and other class members' pending applications for asylum and other separate immigration relief are indefinitely suspended by Defendants' Davidson Memorandum, thereby preventing them from being able to adjust to another more stable status. *See, e.g.*, Pls. App. 152-153 ¶¶ 18-19 (pending asylum application indefinitely suspended); Pls. App. 233 ¶ 17 (pending green card application indefinitely suspended).

2.    Defendants minimize the harms that CHNV parole beneficiaries would suffer if their grants of parole were prematurely terminated. Below, the Government claimed these harms were not irreparable, *e.g.* D. Ct. Dkt. 89 at 17-18; now, it goes a step further and contends such harms are not even legally "cognizable" because parole was always temporary and revocable at any time, Gov. Br. 27. These arguments in any form not only remain disingenuous, but they also miss the mark in the balancing of equities.

The premature, immediate, and *en masse* truncation of parole grants that Defendants now seek is qualitatively different from allowing individual grants of parole to expire naturally by their own terms (which is how DHS has wound down parole programs in the past), or to be revoked on a case-by-case, individualized basis, as the statute requires. And while Defendants contend that an immediate and categorical termination of all CHNV grants of parole would inflict no harm because individuals may have alternate legal status or can apply for such status through the expedited removal process, this argument is a mirage. It conveniently elides the facts, as the district court found, that Defendants,

through the Davidson Memorandum, have *indefinitely suspended* the adjudication of immigration benefits for CHNV parole beneficiaries, thereby preventing them from acquiring any alternate legal status and artificially preserving their removability; and that most forms of relief are simply not available in expedited removal. Gov. App. 5a-6a, 19a, 32a, 38a n.32.

**3.** In contrast, Defendants assert only an abstract institutional injury—the same type of generic injuries the Government asserts to this Court every time any policy is enjoined—claiming that the district court's order thwarts the Government's policy goals and contravenes its interest in expeditiously removing CHNV parole beneficiaries. Gov. Br. 24-26. But when the federal government's policy conflicts with the law, it is the policy and not the law that must give way: To be clear, Defendants' quarrel is not with the district court's order, but with the INA itself, which expressly exempts from expedited removal proceedings individuals who have been "admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Defendants' claims of "burden," Gov. Br. 7, 19, 26, arising from their inability to subject CHNV parole beneficiaries to expedited removal, are caused by what Congress has mandated in the INA, and not by the district court's order.

Moreover, even assuming that the federal executive suffers some abstract institutional injury to its broader policy goals when a federal court order prevents it from taking action unauthorized by the law, Defendants' Application is silent on how that injury would be exacerbated absent a stay. The district court's order does not require the federal government to allow "up to 532,000" CHNV parole beneficiaries to remain in the country indefinitely, and it does not "freez[e]" in place any policy goals of the prior administration

that the current administration now wishes to discard. *See* Gov. Br. 25. Quite the contrary: the federal government still has at its disposal its longstanding statutory power to remove from the United States any individual parole recipient whom it determines to be inadmissible. Nothing in the district court's order interferes with the Secretary's exercise of discretion, as authorized by 8 U.S.C. § 1182(d)(5)(A), to determine "when the purposes of such parole [of a noncitizen] shall . . . have been served," and thus to terminate that individual's grant of parole and subject them to removal proceedings. Nor does anything in the district court's order interfere with the agency's ability to initiate and pursue removal proceedings against any CHNV parole beneficiary by issuing a "charging document." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 C.F.R. § 1003.14(a) (describing how a charging document commences proceedings before an Immigration Judge)). The full array of the federal government's statutory removal powers remains available to the current administration.

In sum, Defendants' claims of irreparable injury in the absence of a stay are illusory, and they certainly do not support the grant of an emergency stay shortcutting the normal course of appellate review. Notably, Defendants have not accepted the First Circuit's invitation to seek expedition of its appeal; instead of pursuing a more expedited schedule for review below, Defendants have only sought emergency relief from this Court. *Cf. Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (denying Government's motion for stay where "the Sixth Circuit has already expedited its consideration of the case and scheduled oral argument").

A stay of the district court's order would upend the lives of Plaintiffs and the hundreds of thousands of class members and cause widespread social and economic

disruption to employers and communities across the country in one fell swoop. The Government faces no remotely comparable injuries, and thus, the relative harms tilt decisively against a stay.

## II. DEFENDANTS HAVE NOT MADE A STRONG SHOWING THAT THE CASE IS WORTHY OF CERTIORARI OR THAT IT IS LIKELY TO SUCCEED ON APPEAL

Even had Defendants satisfied the requisite showing of harm, they fail to carry their burden on the other stay factors.

### A. A grant of certiorari is unlikely and unwarranted.

Defendants treat the question of cert-worthiness almost as an afterthought, relegating its discussion to a single paragraph on page twenty-three of its brief. Such cursory treatment reveals the baselessness of Defendants' assertion that this Court would "easily" grant certiorari in this case due to a purported circuit split. Gov. Br. 23. This argument does not withstand even the slightest scrutiny. The two cases Defendants cite for the supposed split, Gov. Br. 23, do not concern a mass revocation of humanitarian parole, but rather, the revocation of *individual* grants of *advance* parole. The Seventh Circuit held in *Samirah* that the revocation of an *individual* grant of advance parole is barred under 8 U.S.C. § 1252(a)(2)(B)(ii), *see Samirah v. O'Connell*, 335 F.3d 545 (7th Cir. 2003), and the Ninth Circuit in *Hassan* did not even reach that question, finding that the agency complied with its own regulations when revoking the *individual* plaintiff's grant of advance parole, such that the revocation was "lawfully authorized" and the district court did not have jurisdiction to review the revocation as *ultra vires*, *see Hassan v. Chertoff*, 593 F.3d 785, 790 (9th Cir. 2010) (per curiam).

The district court's opinion and the Court of Appeals' decision denying the stay are

*wholly consistent with these cases*, with the former expressly agreeing with Defendants that "Congress has placed individual parole determinations, and the decision of whether to revoke such individual grants of parole, within the Secretary's discretion," and that therefore such decisions are "precluded from review by Section 1252(a)(2)(B)(ii)." Gov. App. 20a.

As the lower courts correctly noted, however, this case does not involve an *individual* termination of a grant of parole, but instead the "categorical termination of the period of parole previously awarded to the parolees." Gov. App. 21a; *see also* Gov. App. 46a ("[T]he very lack of clarity cuts against a finding that the *en masse* termination is immune to judicial review."). The district court correctly held that review of such a categorical termination of parole was not foreclosed by 8 U.S.C. § 1252(a)(2)(B)(ii), and that such review was consistent not only with this Court's decision in *Kucana v. Holder*, 558 U.S. 233 (2010), but also multiple other cases following *Kucana* to hold that 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply to "claims challenging the legality of policies and processes governing discretionary decisions under the INA." *Roe v. Mayorkas*, No. 22-cv-10808, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023) (citation omitted); *see also* Gov. App. 22a (collecting cases).

Defendants address *none* of these cases in their brief. Nor do Defendants cite any other circuit decision addressing whether 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of an *en masse* truncation of parole—because none exists. Until now, the federal government has never attempted to effect the premature and categorical extinguishing of hundreds of thousands of grants of parole. Whether the Government did so lawfully in this first and only

instance presents a legal issue that is *sui generis*.

Defendants paint a circuit split where there is none. Cases concerning the revocation of *individual* grants of parole do not conflict with a holding that courts have jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii) to review "categorical truncation of Plaintiffs' previously awarded period of parole." Gov. App. 21a. No such circuit split exists to support a grant of *certiorari*.

The Court is further unlikely to grant *certiorari* due to additional practical issues. Not only is the legal issue presented here *sui generis*, it is also of fleeting relevance: all individual grants of CHNV parole were limited to no more than two years and all will expire on their own terms in less than twenty months—many of them sooner.[13] The Government's contention that the district court's order "permit[s] up to 532,000 [noncitizens] to remain in this country even if they lack a lawful basis to remain," Gov. Br. 23, is unfounded. As the district court noted, the court's order does not "extend the original grants of parole awarded by DHS" and would only require the Government "to make any decisions terminating grants of parole in an individual, case-by-case manner," as required by the INA and the agency's implementation regulations. Gov. App. 38a. Nothing in the district court's order requires the Government to extend or otherwise permit the presence of CHNV parole beneficiaries in the country indefinitely. Nor does the order prevent the federal government from terminating the parole of any individual CHNV parole beneficiary and initiating

---

[13] *See, e.g.*, Karina Elwood, *Fearing Deportation, a Beloved Music Teacher Gives a Final Lesson*, Wash. Post, May 2, 2025, https://wapo.st/3YEPD92 (telling the story of a Venezuelan CHNV parole beneficiary who during his 2-year period of parole became a music teacher at a public Virginia elementary school, and whose parole expired on its own terms in mid-April).

removal proceedings against them. And the Government can always seek relief from the district court if its order ever does cause harm that rises above speculation.

This case does not present factors warranting *certiorari*, and a stay pending appellate proceedings is not warranted.

### B.    Defendants fail to show a fair prospect of obtaining reversal.

On each of the merits issues, Defendants have not sustained their burden of establishing a "fair prospect that a majority of the Court will vote to reverse the judgment below," for the simple reason that Defendants are wrong on all the merits issues.

### 1.    The Secretary's cutting short of all existing grants of CHNV parole is subject to judicial review.

The district court dutifully applied the controlling precedent and correctly held that 8 U.S.C. § 1252(a)(2)(B)(ii) does not deprive it of jurisdiction to consider Plaintiffs' claims, which do not challenge any decision made discretionary by the parole statute, and that there is law to apply to assess their merit. In arguing otherwise in their Application, Defendants ask the Court to insulate from all review the Secretary's legal conclusions—and her legal mistakes—regarding her own statutory authority. Defendants have not and cannot cite a single judicial opinion that has accepted anything like what it asks this Court to endorse on an emergency posture and without the benefit of even full briefing at the Court of Appeals or in this Court. This Court should decline that invitation.

### a.    The district court correctly held that 8 U.S.C. § 1252(a)(2)(B)(ii) does not strip it of jurisdiction.

The district court correctly rejected the argument that 8 U.S.C. § 1252(a)(2)(B)(ii) strips its jurisdiction to consider Plaintiffs' claims. In arguing otherwise, Defendants proffer an unbounded interpretation of what discretion is conferred by the parole statute

and what is thereby not subject to review under 8 U.S.C. § 1252(a)(2)(B)(ii). According to the Government, not only did Congress insulate from review each and every action related to the parole authority, it also immunized actions that are *not* authorized by the statute. Gov. Br. 14 (arguing first that the parole statute "does not forbid" the Secretary's "categorical parole terminations," but that, "even if it did, Section 1252(a)(2)(B)(ii) still precludes review"). But Defendants' position is contrary to the statutory text, precedent, and separation of powers principles.

"[I]n the immigration realm, properly identifying the mandatory or discretionary nature of a particular agency decision can be critical, precisely because that status has implications for whether the agency's decision can be challenged in court." *Bouarfa v. Mayorkas*, 604 U.S. 6, 10-11 (2024); *accord Kucana*, 558 U.S. at 252. By its plain text, the parole statute makes discretionary precisely two decisions: (1) whether to parole a noncitizen ("The Secretary . . . may . . . in his discretion parole into the United States . . . any alien applying for admission"[14]); and (2) "when the purposes of such parole . . . have been served." 8 U.S.C. § 1182(d)(5)(A). Notably, Plaintiffs do not challenge the Secretary's decision to parole anyone, nor her opinion about when the purposes of anyone's parole have been served. Rather, as the district court recognized, Plaintiffs instead challenge the Secretary's failure to abide by the non-discretionary legal limits on her authority.[15] Gov.

---

[14] An applicant for admission is a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)." 8 U.S.C. § 1225(a)(1).

[15] In contrast, the two cases Defendants cite, *Samirah*, 335 F.3d at 549, and *Hassan*, 593 F.3d at 790, were challenges to individual revocations of advance parole. Moreover, *Hassan*

App. 21a. Section 1252(a)(2)(B)(ii) is thus inapplicable, as the district court correctly held. 8 U.S.C. § 1182(d)(5)(A).

Even if the text were less clear and thereby left doubt or ambiguity about the precise scope of what Congress made unreviewable, two further principles weigh heavily against the Government's position. One is the strong presumption favoring judicial review of executive determinations, which this Court has "consistently applied . . . to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." *Kucana*, 558 U.S. at 251; *accord Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020); Gov. App. 46a; Gov. App. 22a-23a. The Government lacks the "clear and convincing evidence of congressional intent" necessary to overcome that presumption. *Guerrero-Lasprilla*, 589 U.S. at 229 (internal quotation marks omitted). Another "paramount factor" at issue here is that, if the Court were to accept the Government's proffered statutory interpretation, "the Executive would have a free hand to shelter its own decisions" simply by "declaring those decisions 'discretionary'" exercises of the parole authority. *Kucana*, 558 U.S. at 252. "Such an extraordinary delegation of authority cannot be extracted from the statute Congress enacted." *Id.*; *accord Biden*, 597 U.S. at 806-07 (holding that, although generally discretionary, the parole authority "is not unbounded" and is subject to APA review).

Defendants offer little to support the conclusion that both lower courts erred by

---

held that the district court lacked jurisdiction to review the *ultra vires* claim only after holding on the merits that "[t]he revocation was lawfully authorized," *id.*; and the *Samirah* plaintiff was later permitted to enforce statutory and regulatory limits on parole notwithstanding § 1252(a)(2)(B)(ii), *Samirah v. Holder*, 627 F.3d 652, 660-61 (7th Cir. 2010) (Posner, J.).

considering whether the Secretary exceeded her legal authority and whether her legal conclusions were correct. Defendants assert that the district court erred in citing precedent holding that "claims challenging the legality of policies and processes governing discretionary decisions" are not covered by § 1252(a)(2)(B)(ii), Gov. App. 22a, because, in Defendants' view, here "there is no overarching policy or process . . . ." Gov. Br. 15; *but see* Gov. Br. 5 ("The district court has nullified one of the Administration's most consequential immigration policy decisions"). But what matters is not whether Plaintiffs challenge a policy or practice; instead, the question is whether the parole statute makes discretionary the decision they challenge. *See* Gov. App. 20a-22a. There is simply no basis to conclude that truncating parole on an *en masse* basis premised on a legal conclusion is subject to the jurisdictional bar.

> **b.    The district court correctly held that the APA authorizes review.**

Defendants argue that that APA review is unavailable here under both 5 U.S.C. § 701(a)(1) and (2). Gov. Br. 16-17. Both are plainly inapplicable. Gov. App. 25a-27a. Defendants' contention that the "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is duplicative of its argument that the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii) and is wrong for the reasons discussed in the preceding section.[16]

Defendants' suggestion that review is precluded by 5 U.S.C. § 701(a)(1) because

---

[16] The government likewise repeats its faulty § 1252(a)(2)(B)(ii) argument to claim that the district court erred in relying on *DHS* v. *Regents of the University of California*, 591 U.S. 1 (2020), *see* Gov. Br. 17 (arguing that "unlike the program in *Regents*, the INA expressly commits parole determinations to the Secretary's discretion by law").

27

there is no law to apply, Gov. Br. 16-17, is weaker still. This exception is narrow, and its application is restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Gov. App. 25a (quoting *Dep't. of Com. v. New York*, 588 U.S. 752, 772 (2019)). As the district court held, that "rare circumstance" is not present here, Gov. App. 26a, as amply illustrated by the law the district court applied in assessing Plaintiffs' claims: two statutes, 8 U.S.C. §§ 1182(d)(5) and § 1225(b). *See also* Gov. App. 32a-33a.

Finally, while Defendants may be correct that "[t]here are no judicially manageable standards for courts to review the Secretary's own 'opinion,'" Gov. Br. 17, that contention has no relevance here, given that the district court's decision and Plaintiffs' request for preliminary relief are aimed at the Secretary's legal authority and her legal conclusions, not her opinions. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action . . . and set aside any such action inconsistent with the law as they interpret it." (quoting 5 U.S.C. § 706)); *see also Biden*, 597 U.S. at 806-07 ("[U]nder the APA, DHS's exercise of discretion within that statutory [parole] framework must be reasonable and reasonably explained.") (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)).

### 2. Defendants are unlikely to prevail on the merits of Plaintiffs' APA claims.

The district court correctly held that Plaintiffs are likely to succeed in proving that the Secretary's *en masse* truncation of all CHNV grants of parole is based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. §§ 1225(b)(1)(A)(i),

1225(b)(1)(A)(iii)(II); contravenes the statutory requirement that the parole authority be exercised on a case-by-case basis, 8 U.S.C. § 1182(d)(5)(A); and was insufficiently reasoned and therefore arbitrary and capricious. Gov. App. 31a-37a. Each of these grounds independently justifies the district court's stay decision, and the Government cannot demonstrate that it is likely to prevail on appeal.

> **a.    The Secretary's decision to cut short all existing periods of CHNV parole *en masse* was expressly and solely premised on an erroneous understanding of the expedited removal statute.**

Secretary Noem explained that her understanding of the expedited removal statute was *the* reason for two of her conclusions: that the reliance interests of CHNV parolees in the United States "do not outweigh the U.S. Government's strong interest in promptly removing" them via expedited proceedings, 90 Fed. Reg. at 13619; and for her rejection of the only alternatives she considered—of either a longer wind-down period or simply "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done," *id.* at 13619-20. Secretary Noem explained that because expedited removal "is available only" for use against the CHNV parolees while they have been "continuously present in the United States" for less than two years, "[a]ny lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal," meaning more of them would have to be removed via normal proceedings under § 240 of the INA, "a result DHS finds unacceptable." *Id.* at 13620.

The district court correctly held that Plaintiffs were likely to succeed in proving that the Secretary premised her decisions on a patently incorrect understanding of 8 U.S.C. §

1225(b)(1)(A)(iii)(II). Gov. App. 32a. Thereunder, and among its other limitations, DHS may subject a noncitizen to expedited removal only if that person "has *not* been admitted or *paroled* into the United States," 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphases added), "regardless of how long they have been in the United States." Gov. App 32a. In their Application, Defendants never quote or acknowledge this part of the statute; nor did the Secretary in her Notice ever explain whether (or why) she believes CHNV parolees "ha[ve] not been . . . paroled into the United States." From this omission, it can be fairly inferred that the Secretary simply overlooked this limit that Congress put on the extraordinary authority to deport noncitizens on an expedited basis without judicial review rather than through ordinary removal proceedings that are generally the "sole and exclusive procedure" for making removal determinations. 8 U.S.C. § 1229a(a)(3).

In the absence of any explanation in the Notice or evident awareness by the Secretary of this statutory limit, Defendants devote just one paragraph trying to defend the Secretary's legal conclusion regarding the expedited removal statute. Gov. Br. 21-22. Defendants' solitary argument about the text of the statute is *ipsa dixit. Ibid.* ("The statute's use of the present perfect tense ('has not been . . . paroled') is best read to reflect a 'state that continues into the present.'" (quoting *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261-62 (11th Cir. 2025) (alteration in original)).[17] Implicit in Defendants' argument is the

_____

[17] The government cites no case but *Turner* (which concerned a different statute) to support its semantical point, and it misleadingly quotes what *Turner* said on that issue. *Turner*, 130 F.4th at 1261 ("Accepting that the use of the present-perfect tense can, as a matter of pure semantics, refer to a time in the indefinite past *or* to a past action or state that continues into the present, the question becomes which of those meanings applies in this statutory context.") (citation omitted, alteration in original); *see also* Gov. App. 32a-33a.

contention that even though all members of the certified class have been paroled into the United States, DHS can subject them to expedited removal merely by ending their parole; thereafter, per Defendants' argument, that individual "has not been . . . paroled into the United States." *See, e.g.*, Pls. App. 474-482.

The district court was correct to reject Defendants' argument, which Defendants have conceded has no support in precedent.[18] Pls. App. 483. Nor does it have any basis in accepted canons of statutory construction. *See also, e.g.*, *Barrett v. United States*, 423 U.S. 212, 216 (1976) (interpreting the present perfect tense in a statute to "denot[e] an act that has been completed"). In addition to being contrary to the plain text and intent of Congress, Gov. App. 32a-33a, the government's interpretation, if accepted, would essentially strike out of the statute an explicit limit that Congress placed on the exceptional authority it gave the Executive to expeditiously remove some noncitizens without a hearing or access to judicial review. Under DHS's regulations, an individual's parole is terminated upon service of charging document. 8 C.F.R. § 212.5(e)(2)(i). Thus, according to the government, DHS

---

[18] Defendants' novel interpretation is also contradicted by DHS's own regulations, which make clear that "has not been admitted or paroled" refers to a past event that either did or did not occur, rather than a continuing status. *See, e.g.*, 8 C.F.R. § 235.3(b)(1)(ii) (expedited removal can be applied to "aliens who . . . have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry"); 8 C.F.R. § 235.3(b)(6) (requiring that a noncitizen be permitted to prove he "was . . . paroled into the United States following inspection at a port-of-entry" before being subjected to expedited removal). That the inquiry into whether a noncitizen has or "has not been admitted or paroled" refers to an event rather than a status is also consistent with this Court's observation in *Sanchez v. Mayorkas* that "[l]awful status and admission . . . are distinct concepts in immigration law," 593 U.S. 409, 415 (2021). "Parole" can be both a manner of entry and a status, but in the context of the full statutory expedited removal scheme and when paired with admission, the text focuses on manner of entry and not maintenance of a particular admission or parole status.

can obtain the authority to subject a parolee to expedited removal by the mere act of doing so. *See* Pls. App. 474-482.

The Court should reject Defendants' interpretation of the expedited removal statute that would nullify the "has not been admitted or paroled" language. *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) ("the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless. As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'") (citation omitted). Adherence to norms of statutory construction is important, particularly given how dramatically Defendants' reading would aggrandize Executive authority to subject noncitizens to expedited removal.[19] *Ibid.*

Defendants' final efforts to paper over the Secretary's mistake are even less persuasive. The Government's complaint, for example, that the district court's read of the statute "would require a former parolee's case to be dealt with differently from any other applicant [for admission]'s by categorically taking expedited removal off the table," Gov. Br. 22, is a complaint about the decision that Congress itself made. Importantly, Congress carefully prescribed which noncitizens could be exposed to expedited removal and did not simply say that such procedures could be applied to all applicants for admission. Moreover, Congress defined applicants for admission to include parolees, 8 U.S.C. § 1225(a)(1), and made parolees (but *not* other applicants for admission) ineligible for expedited removal in the next subsection, 8 U.S.C. § 1225(b)(1)(A)(iii)(II). And Defendants' assertion that "even

---

[19] As the district court observed, under Defendants' proffered interpretation, DHS could also subject to expedited removal noncitizens who had been admitted on visas—contrary to the clear intent of Congress—if it merely revokes that visa first. Pls. App. 473-474.

if the Secretary had erred in that one rationale . . . [she] invoked several other independently sufficient reasons," Gov. Br. 22, ignores that the "other" reasons they cite concerned the decision to end the CHNV parole processes generally, and not her explanation for overriding reliance interests and for rejecting the only alternatives she considered to cutting off all existing grants of parole, 90 Fed. Reg. at 13619-20.[20]

3.　**The Secretary's *en masse* truncation of individualized grants of parole contravened the statutory case-by-case requirement.**

The day before the Secretary published her Notice, the Form I-94 (Arrival-Departure Record) of each member of the certified class reflected the conditions on which that person had been individually paroled on a case-by-case basis. One important condition reflected therein is the amount of time remaining on that person's parole period, measured by an expiration date. For some class members, the expiration date was as early as March 25, 2025; for others, it was in January 2027. But on the day the Secretary published her Notice, that expiration date was changed to April 24, 2025, for all of them on a categorical basis.

As the district court correctly held, Plaintiffs are likely to succeed in proving that the Secretary's action contravened the statutory requirement that she exercise the parole authority "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A); *see also Biden*, 597 U.S. at 806 ("Importantly, the authority is not unbounded."). The Secretary acknowledged that the initial grants of parole under CHNV "were adjudicated on a case-by-case basis," 90 Fed.

---

[20] Indeed, the Secretary said that her decision to "terminat[e] the CHNV parole programs" should be treated as distinct, severable, and independent from her decision to "terminat[e] . . . existing grants of parole." 90 Fed. Reg. at 13621-22.

Reg. at 13611, but asserted on a blanket basis that "the purposes" for every single one of the approximately 500,000 individual parole grants via all four CHNV processes now "have been served," *id.* at 13619 n.70. The Secretary did not take into account any differentiating considerations, including the amount of time remaining on each person's parole period (be it a day or more than six hundred days), whether they have any pending applications for a different immigration benefit, or any other individualized circumstances (be they social, economic, medical, legal, or anything else). Gov. App. 45a ("It is also undisputed that the Secretary did indeed purport to [act] categorically.").

As below, Defendants contend that the statute only "requires case-by-case determinations for *granting* parole" and "contains no parallel language with respect to *terminating* parole." Gov. Br. 18 (emphases in original). Notably, the statute uses neither the word "grant" nor "terminate," making much of what the government argues untethered from the statutory text and thus not that helpful in ascertaining its meaning. Indeed, the Court need not even decide whether the Secretary must terminate parole on a case-by-case basis, because that is not what she did; instead, the Secretary changed, *en masse*, the conditions under which all those individuals had been paroled, contrary to the statute. *See* 8 U.S.C. § 1182(d)(5)(A) ("The [Secretary] may . . . in h[er] discretion parole into the United States temporarily *under such conditions as [s]he may prescribe only on a case-by-case basis* . . . any [noncitizen] appl[ying] for admission to the United States.") (emphasis added). Under the statute, changing the conditions of a grant of parole can only be performed on an individual basis. The Secretary's contravention of a clear limit on her legal authority is yet another independent reason to deny Defendants' Application.

Moreover, neither the plain text of the parole statute nor common sense supports Defendants' reading. As both the district court and the court of appeals observed, the statute consistently refers to both the grant *and* termination of parole on a singular and individual basis, rather than on a plural or categorical basis. Gov. App. 36a, 46a. The district court further found this to be consistent with the design of the CHNV parole processes, under which "grants of parole were to be made on a case-by-case basis." Gov. App. 36a (emphasizing the statute's language including "*such* parole of *such* alien," "*the* alien," "*he* was paroled," and "*his* case") (some emphases added).[21]

Defendants argue for the first time to this Court that this line of reasoning "proves too much," because many INA provisions and other statutes "use the singular rather than the plural" to apply to classes or groups. Gov. Br. 19-20 (citing The Dictionary Act, 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the singular include and apply to several persons, parties, or things.")). But the Dictionary Act itself makes clear that context is key. *Ibid.* And unlike in the current case, the public-charge rule Defendants cite, 8 U.S.C. § 1182(a)(4)(A), includes no language approximating the express "case-by-case" requirement delineated in the parole statute. Under the very Dictionary Act definition Defendants cite, it would be illogical to fail to take that language into account in determining the scope of parole termination requirements.

_____

[21] This reading is likewise consonant with the agency's implementing regulation, which also uses singular and individual terminology to specify that only when "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States, parole shall be terminated upon written notice to the [noncitizen]." 8 C.F.R. § 212.5(e)(2)(i).

35

As a final matter, Defendants repeatedly claim throughout their Application that because the Biden Administration did not *grant* parole on a case-by-case basis, Defendants should not be held at fault for failing to act on a case-by-case basis when it acted categorically. This argument was never made to the district court, and for good reason: in her Notice, the Secretary gave no such justification and, in fact, said the opposite. 90 Fed. Reg. at 13611 (describing how, under "these [CHNV] categorical parole programs, potentially eligible beneficiaries *were adjudicated on a case-by-case basis*") (emphasis added). Thus, in addition to being waived and directly contradicted by all record evidence, the *Chenery* doctrine precludes this Court from even considering Defendants' belated contention. *Biden*, 597 U.S. at 811 ("[T]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (internal quotation marks omitted); *Regents*, 591 U.S. at 24 ("An agency must defend its actions based on the reasons it gave when it acted.").

In short, the Government has not made even a strong showing that it will succeed on appeal as to Plaintiffs' claim that the Secretary acted in contravention of the statutory limits on the parole authority.

### 4.     The Secretary's truncation of all valid grants of CHNV parole was arbitrary and capricious.

The district court also correctly held that the truncation of individual grants of CHNV parole was arbitrary and capricious. Gov. App. 34a-35a. First, as discussed above, the district court correctly held that DHS's rejection of the clear alternative—allowing the grants to expire naturally, as the Secretary acknowledged DHS has historically done—was based exclusively on a legally erroneous reading of the expedited removal statute discussed

above. Gov. App. 31a-34a. DHS's stated reasoning therefore "lacked a rational basis," Gov.
App. 34a, in clear violation of the APA. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v.
NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the
scope of its lawful authority, but the process by which it reaches that result must be logical
and rational."); *accord Dep't of Com.*, 588 U.S. at 785; *see also Biden*, 597 U.S. at 806-07
("DHS's exercise of [the parole authority] must be reasonable and reasonably explained.").

Additionally, the district court correctly rejected Defendants' separate attempt to
justify its decisions by arguing that "neither urgent humanitarian reasons nor significant
public benefit warrants the continued presence of [individuals] paroled under the CHNV
programs and the purposes of such parole therefore have been served." Gov. App. 34a. The
Secretary made that conclusory assertion in explaining why she chose to ignore the
regulatory requirements that DHS provide written notice to parolees to revoke either their
parole or their employment authorization, and to instead rely on "constructive notice." 90
Fed. Reg. at 13620. As the district court found, the Secretary did not address any of the
urgent humanitarian concerns prompting the creation of the CHNV parole processes and
did not explain why (or even whether) she believed those concerns no longer exist, either
writ large or as to individual parolees. Gov. App. 35a.

Finally, the district court correctly held that the agency's justification for
terminating existing grants of CHNV parole within 30 days was "inadequate," "[g]iven the
significant reliance interests at stake." Gov. App. 35a. The members of the certified class
are here because they followed rules and procedures laid out by the U.S. Government to
obtain sponsorship, travel authorization, and a grant of parole once they arrived in the

country. *See* Gov. App. 2a-3a. Most of these individuals were granted two-year periods of parole, and they, their families, their employers, and their communities relied on the length of this grant to plan this chapter of their lives. *Ibid.*; *see also* Gov. App. 10a-16a (detailing the stories of the CHNV parolee Plaintiffs who came through CHNV parole). Since they have been in the United States, these parolees become integral parts of their local economies and communities. Ibid. The Notice is dismissive as to the reliance interests of employers and communities and fails to acknowledge the disruption and chaos that would ensue from the mass revocation of legal status for approximately 500,000 parolees. The Secretary would have abruptly stripped all of these individuals of lawful status and, for most, work authorization. Even those who have applied for separate immigration relief have no protection against removal, because DHS has indefinitely suspended adjudicating immigration benefit requests filed by CHNV parolees (as well as those filed by U4U and other parolees). Gov. App. 5a-6a. The significance of this harm and the reliance interests at stake cannot be overstated. Yet the Secretary gave these interests exceedingly short shrift, stating only that they were outweighed by the Government's "strong interest in promptly removing [them]." 90 Fed. Reg. at 13619.

This failure to adequately consider and address the widespread harm of premature revocation of grants of parole, particularly considering the concomitant termination of work authorization and the Government's indefinite suspension of processing of all applications for other immigration benefits, on its own makes the Government's parole terminations arbitrary and capricious. So does the Secretary's failure to consider the chaos and disruption that would ensue to these individuals' employers, families, and communities. The

district court's holding was correct.

## III.    THE DISTRICT COURT'S NARROW STAY ORDER WAS NOT AN ABUSE OF DISCRETION

The APA permits a reviewing court, "to the extent necessary to prevent irreparable injury . . . to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The district court's order did exactly this—nothing more, nothing less. The stay Defendants now request would upend the status quo, immediately throwing close to half a million individuals out of lawful status and terminating their authorization to work legally in the United States. Defendants have not borne their "heavy burden" in justifying such "extraordinary" relief that would immediately and irreparably harm thousands of parole beneficiaries, their employers, their families, and their communities. *Whalen*, 423 U.S. at 1316.

**CONCLUSION**

The Court should deny the Application.

39

Respectfully submitted.

ANWEN HUGHES
HUMAN RIGHTS FIRST
 121 W 36th Street, Pmb 520
 New York, NY 10018
 (212) 845-5244


JOHN A. FREEDMAN
LAURA S. SHORES
ARNOLD & PORTER KAYE SCHOLER LLP
 601 Massachusetts Avenue, NW
 Washington, DC 20001
 (202) 942-5000


H. TIFFANY JANG
ARNOLD & PORTER KAYE SCHOLER LLP
 200 Clarendon Street, Fl. 53
 Boston, MA 02116
 (617) 351-8053


DANIEL B. ASIMOW
ARNOLD & PORTER KAYE SCHOLER LLP
 Three Embarcadero Ctr., 10th Floor
 San Francisco, CA 94111
 (415) 471-3142


SARAH ELNAHAL
JAVIER ORTEGA ALVAREZ
ARNOLD & PORTER KAYE SCHOLER LLP
 250 West 55th Street
 New York, NY 10019
 (212) 836-8000

JUSTIN B. COX
 Counsel of Record
LAW OFFICE OF JUSTIN B. COX
JAC Cooperating Counsel
 P.O. Box 1106
 Hood River, OR 97031
 (541) 716-1818
 justin@jcoxconsulting.org


ESTHER H. SUNG
KAREN C. TUMLIN
HILLARY LI
LAURA FLORES-PERILLA
BRANDON GALLI-GRAVES
JUSTICE ACTION CENTER
 P.O. Box 27280
 Los Angeles, CA 90027
 (323) 450-7272

MAY 2025

No. 24A1079

# In the Supreme Court of the United States

————————

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

SVITLANA DOE, ET AL.

————————

**REPLY IN SUPPORT OF THE APPLICATION
TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

————————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**TABLE OF CONTENTS**

I.  The Government Is Likely To Succeed On The Merits ..................................... 3

    A.  Parole Terminations Are Not Judicially Reviewable............................. 3

        1.  The INA deprives the district court of jurisdiction ..................... 3

        2.  The APA also forecloses judicial review here .............................. 6

    B.  The Parole Termination Is Lawful .......................................................... 7

        1.  The parole termination does not violate the INA........................ 7

        2.  The parole termination is not arbitrary and capricious ........... 10

    C.  The Court Likely Would Grant Certiorari ........................................... 12

II.  The Equitable Factors Support A Stay .......................................................... 13

    A.  The Government Will Suffer Irreparable Harm Absent A Stay .......... 13

    B.  A Stay Would Not Impose Cognizable Harm On Respondents ............ 15

# In the Supreme Court of the United States

––––––––––––––

No. 24A1079

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

SVITLANA DOE, ET AL.

––––––––––––––

**REPLY IN SUPPORT OF THE APPLICATION
TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

––––––––––––––

Respondents repeatedly acknowledge (Opp. 1-3, 15-19) the significance of the parole-revocation decision that they seek to stop in its tracks. Yet they barely address the significant flaws in the district court's nationwide order, let alone the irreparable harm to the government of a year-plus delay in implementing a decision that the Secretary of Homeland Security deemed time-sensitive and critically important to the Nation's immigration policy. Respondents dismiss those harms as only "abstract" and "generic injuries." Opp. 18. But there is nothing abstract or generic about artificially extending the continued presence in this country of up to 532,000 aliens who have not demonstrated admissibility, when the Executive Branch—which is constitutionally and statutorily charged with managing the immigration system and foreign affairs—has determined that their remaining here is against the national interest. This Court often intervenes when lower courts usurp the Executive's control over immigration policy. See Appl. 27. A stay is warranted here.

Beginning with the merits, the Immigration and Nationality Act (INA), ch.

2

477, 66 Stat. 163 (8 U.S.C. 1101 *et seq.*), could not be clearer: "no court shall have jurisdiction" to review "any" decision "the authority for which" the INA specifies is "in the discretion of   *  *  *   the Secretary of Homeland Security."    8 U.S.C. 1252(a)(2)(B)(ii).  The granting and terminating of parole are precisely such discretionary authorities:  the INA specifies that the Secretary may grant parole to an alien applying for admission "in h[er] discretion" and terminate that parole when, "in [her] opinion," its purposes have been served.  8 U.S.C. 1182(d)(5)(A).

Nevertheless, the district court purported to exercise jurisdiction over respondents' challenge to Secretary Noem's termination of parole for certain aliens from Cuba, Haiti, Nicaragua, and Venezuela (CHNV), on the theory—echoed by respondents (Opp. 24)—that the review bar is inapplicable if the court finds that the Secretary exercised her parole authority in an unlawful manner.  Under that rationale, a court would exercise jurisdiction whenever it finds the challenged action to be unlawful, which defeats the whole point of a review bar.  Respondents have no answer.

In addition, respondents' entire case—both on reviewability and on the merits—hinges on their contention that the Secretary may terminate parole only on a case-by-case basis.  But the plain text of Section 1182(d)(5)(A) imposes a case-by-case limitation only on the *granting* of parole, not the *termination* of it.  8 U.S.C. 1182(d)(5)(A); see Appl. 18-21.  Respondents all but ignore the statutory text other than to observe that the statute does not use the terms "grant" or "terminate"—a *non sequitur*.  Respondents also suggest (Opp. 33) that the Secretary did not terminate respondents' parole, but modified a "condition" of it—namely, the termination date. That is textually untenable and at odds with their own references elsewhere to "mass revocation of parole."  Opp. 1.  Regardless, even when statutes call for individualized determinations, agencies may use categorical criteria, as the Secretary did here to

terminate parole. Respondents have no answer to that point either.

Instead, respondents' principal argument is that they will suffer irreparable harm if the Court stays the district court's order because parole recipients who have not acquired some other lawful immigration status must either leave the country or risk being placed in removal proceedings. Opp. 1-3, 16-20. But the prior administration granted respondents two-year terms of parole with the explicit caveat that parole was temporary, discretionary, and revocable at any time, foreclosing respondents' claims of cognizable harm. Appl. 8. Indeed, respondents underscore their own lack of irreparable harm by asserting (*e.g.*, Opp. 1, 18-19, 22) that the district court's order does not prohibit the government from terminating any class member's parole and initiating removal proceedings. That concession underscores that the district court's order does not actually protect any substantive entitlement that respondents have to remain here. That order instead serves only to throw a wrench into the government's efforts to enforce the immigration laws by confining the government to the gargantuan task of proceeding against up to 532,000 aliens individually.

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.    Parole Terminations Are Not Judicially Reviewable

#### 1.    The INA deprives the district court of jurisdiction

The INA's review bar states that, with exceptions not relevant here, "no court shall have jurisdiction to review  * * *  any other decision or action of the  * * *  Secretary of Homeland Security the authority for which is specified  * * *  to be in the discretion of the" Secretary. 8 U.S.C. 1252(a)(2)(B)(ii). The exercise of parole authority under Section 1182(d)(5)(A) plainly qualifies as discretionary and thus is unreviewable. That provision authorizes the Secretary to terminate parole grants "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Secu-*

4

*rity*, have been served."  8 U.S.C. 1182(d)(5)(A) (emphasis added).

Respondents do not dispute that the INA specifies that parole termination decisions are in the Secretary's discretion.  Instead, like the district court, respondents deem the review bar inapplicable because the Secretary "fail[ed] to abide by the non-discretionary legal limits on her authority"—namely, a supposed requirement to revoke parole only on a case-by-case basis.  Opp. 24 (citation omitted).  Setting aside that no such case-by-case limitation on parole *termination* exists, see Part B.1, *infra*, respondents' reasoning would eviscerate the bar.  Under that view, courts would always review the merits of the Secretary's exercise of discretion to determine whether the jurisdictional bar applied in the first place.  The jurisdictional bar would apply only where the court determines that the action was lawful.  See Appl. 18-21.[1]  A bar that precludes review only if a court finds the challenged action to be lawful is no bar at all.  Cf. *Garland* v. *Aleman Gonzalez*, 596 U.S. 543, 554 & n.5 (2022).  And the proposition that jurisdiction should depend on a court's view of the merits is akin to an exercise of "hypothetical jurisdiction" that this Court has long rejected.  Cf. *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).  Respondents provide no answer to those flaws in their rationale.

Respondents invoke (Opp. 25) the presumption of judicial review, but that presumption can be overcome by "specific language" in the statute and by "inferences * * * drawn from the statutory scheme as a whole," *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 349 (1984); see *Guerrero-Lasprilla* v. *Barr*, 589 U.S. 221, 229 (2020).  Here, "no court shall have jurisdiction to review" is about as specific as language gets, and the INA makes clear that review is precluded where the statute

---

[1]    Even assuming that the statutory bar does not preclude review of constitutional claims, see *Webster* v. *Doe*, 486 U.S. 592, 603 (1988), no constitutional claims are at issue here.

makes a determination discretionary, *regardless* of whether that discretion is exercised appropriately. Cf. *Kucana* v. *Holder*, 558 U.S. 233, 247-248 (2010). Respondents appear to agree that where the Secretary makes an *individual* parole-revocation decision, that decision would not be judicially reviewable. Opp. 24-25. Left unexplained is why such a decision would become reviewable if made alongside 531,999 others. Under respondents' logic, had the Secretary issued 532,000 separate notices terminating each alien's parole—with no explanation whatsoever—that would be unreviewable.[2] Yet those same determinations somehow become reviewable under respondents' view when all decisions are combined in a single Federal Register notice containing a detailed explanation of the Secretary's reasons and explicit consideration of reliance interests. Nothing in the statutory text remotely suggests that Congress enacted such a senseless scheme.

Respondents' reliance (Opp. 25) on *Kucana*, *supra*, and *Biden* v. *Texas*, 597 U.S. 785 (2022), likewise is misplaced. *Kucana* held that the INA's review bar precludes review of decisions made discretionary by the INA itself, not decisions made discretionary *by regulation*. 558 U.S. at 247. But here, the INA itself is what makes parole determinations discretionary, so *Kucana* only confirms that the judicial-review bar applies. See 8 U.S.C. 1252(a)(2)(B)(ii). *Biden* v. *Texas* stated that DHS's authority to grant parole "is not unbounded" and "must be reasonable and reasonably explained." 597 U.S. at 806-807. That the authority to *grant* parole is bounded says nothing about whether the authority to *terminate* parole is judicially reviewable. The Court had no occasion to opine on termination decisions, for which the only statutory limitation is that the Secretary have "the opinion" that the purposes of parole have

---

[2]    As it happens, the Secretary *did* send each CHNV parolee an "individual notice through the [alien's] USCIS online account." 90 Fed. Reg. at 13,620. So respondents' claims would be unreviewable even on their own misguided logic.

6

been served.  As Justice Kavanaugh explained, where parole determinations are concerned, "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations." *Id.* at 816 (Kavanaugh, J. concurring).

### 2.   The APA also forecloses judicial review here

Respondents' claims are also unreviewable under the APA.  The APA does not authorize judicial review when "statutes preclude judicial review" or when "agency action is committed to agency discretion by law."  5 U.S.C. 701(a)(1) and (2).  Both apply here:  Section 1252(a)(2)(B)(ii) is a statute that precludes judicial review, and Section 1182(d)(5)(A) commits parole termination to agency discretion by law because it authorizes the Secretary to terminate an alien's parole "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served," 8 U.S.C. 1182(d)(5)(A) (emphasis added).

Respondents say little in response.  Cf. Opp. 26-27.  They seem to agree (Opp. 27) that *individual* parole terminations are committed to agency discretion by law.  Instead, they argue that the question *whether* the Secretary may terminate parole on a categorical basis is not committed to agency discretion by law.  *Ibid.*  But the answer to that abstract legal question makes no difference to respondents' legal rights unless respondents can further demonstrate that the decision to terminate parole is substantively unlawful.  That is precisely the decision committed to the Secretary's discretion by law.  What matters is the underlying termination decision, not whether it is published in a single notice or in 532,000 separate notices.[3]

---

[3]   The district court relied heavily on *DHS* v. *Regents of the University of California*, 591 U.S. 1 (2020), but unlike the program at issue in that case, the INA here expressly commits parole determinations to the Secretary's discretion by law.

7

B.     The Parole Termination Is Lawful

Even if the Secretary's decision were reviewable, the government is likely to prevail on the merits because the statute does not require parole terminations to be made on a case-by-case basis, and the Secretary appropriately considered the availability of expedited removal.

1.     The parole termination does not violate the INA

Respondents' arguments on reviewability and the merits ultimately rest on their contention that the parole statute imposes a "case-by-case" requirement on parole terminations. Opp. 25-28, 32-35. That contention is incorrect. While the statute explicitly requires case-by-case determinations for *granting* parole, it contains no parallel requirement for the *termination* of parole. 8 U.S.C. 1182(d)(5)(A); see Appl. 18-21. Respondents never address that distinction, but that difference in statutory language should be given effect. See *Russello* v. *United States*, 464 U.S. 16, 23 (1983).

Respondents observe (Opp. 33) that "the statute uses neither the word 'grant' nor 'terminate.'" That is a *non sequitur*. The INA provides that the Secretary may "in h[er] discretion *parole* into the United States temporarily under such conditions as [s]he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission." 8 U.S.C. 1182(d)(5)(A) (emphasis added). The italicized "parole" is an active verb that everyone (including both lower courts here) understands to mean "*grant* parole." Likewise, the statute provides that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Ibid.* Again, everyone (including

---

See Appl. 17. Respondents call (Opp. 26 n.16) that distinction "faulty"—but do so in a conclusory footnote without any explanation or argument.

8

the lower courts) understands a "return" to "custody" as the "termination" of parole. And as the quotation above indicates, the Secretary's authority to order previously paroled aliens to be returned to custody lacks any "case-by-case" limitation.

Respondents next argue (Opp. 33) that the Secretary's action here does not *terminate* parole, but merely changes the "conditions" of parole (namely, the parole expiration date), and thus falls under the statutory language stating that the Secretary may parole aliens "temporarily under such conditions as [s]he may prescribe only on a case-by-case basis," 8 U.S.C. 1182(d)(5)(A). But no reasonable speaker of English would view the *elimination* of parole as a "condition[]" of parole. Even respondents elsewhere refer to "mass revocation of parole" (Opp 1). Anyway, the Secretary's authority to impose "conditions" on parole is in a separate clause from her authority to determine that the purposes of parole have been served and the alien should be returned to custody. That distinction illustrates that, whatever the general term "conditions" might encompass, it cannot include the specific decision to return an alien to custody, which is what the Secretary decided here. Cf. *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specific governs the general).

Like the district court, respondents rely (Opp. 34) on the statute's use of the singular rather than the plural to refer, *e.g.*, to "such parole of such alien." But the mere fact that a statute is phrased in the singular does not preclude the application of categorical rules, as the Dictionary Act confirms. See Appl. 19-20. Respondents observe (Opp. 34) that "context is key"—but here, the context cuts the government's way. As longstanding regulations confirm, the Secretary may employ categorical criteria in making parole determinations. See 8 C.F.R. 212.5. Nor do respondents address the problem that their incorrect reading of the statute would render Congress's insertion of the "case-by-case basis" language in 1996 entirely superfluous, given that

the statute has always been phrased in the singular. And courts ordinarily should "requir[e] a change in language to be read, if possible, to have some effect." *American Nat'l Red Cross* v. *S.G.*, 505 U.S. 247, 263 (1992).

Even if the statute imposed a case-by-case requirement on parole terminations, the Secretary's termination here would satisfy any such requirement. Even when Congress "requires individualized determinations," agencies may apply categorical criteria in making such determinations. *American Hosp. Ass'n* v. *NLRB*, 499 U.S. 606, 612 (1991); see Appl. 20-21 (listing examples, including in the immigration context). The Secretary's application of categorical criteria here comfortably fits within those historical examples. Again, respondents have no response.

Indeed, it would be strange to fault Secretary Noem for *terminating* parole by applying categorical factors when Secretary Mayorkas *granted* parole by applying categorical factors. Appl. 5, 18-19. Respondents observe (Opp. 35) that Secretary Noem recognized that "potentially eligible beneficiaries were adjudicated on a case-by-case basis," 90 Fed. Reg. at 13,611. That misses the point. To receive parole, a CHNV parolee had to satisfy *both* Secretary Mayorkas's categorical criteria (such as countrywide considerations, see Appl. 7-8) *and* individualized criteria (such as public-safety vetting). A failure to satisfy *either* would have resulted in a denial of parole. Secretary Noem's determination that the categorical criteria no longer justify parole, and instead counsel in favor of termination, necessarily applies to *all* CHNV parolees.

Such situations may be common. For example, a lack of detention capacity may induce the Executive to parole a certain subset of aliens who, based on a case-by-case review, are deemed least likely to flee or endanger the community. Cf. *Biden* v. *Texas*, 597 U.S. at 815-816 (Kavanaugh, J., concurring). But once a new detention facility becomes available, the purposes of parole necessarily would have been served

for *all* such aliens who were paroled solely because of the lack of detention capacity. See Appl. 18-19. That example illustrates why Congress reasonably decided to require parole to be granted on a case-by-case basis, but to permit parole to be terminated on a categorical basis. It would be pointless and illogical to require the Secretary to additionally (and redundantly) make case-by-case determinations before terminating those individuals' respective terms of paroles.

In all events, given that the Secretary will continue to exercise her discretion to grant or deny parole to CHNV parolees on a case-by-case basis, see 90 Fed. Reg. at 13,612, her rejection of the categorical criteria under which parole was initially granted does not violate even respondents' incorrect understanding of the statute.

## 2. The parole termination is not arbitrary and capricious

Like the district court, respondents erroneously contend (Opp. 28-32) that the Secretary acted arbitrarily in terminating the two-year parole terms because she relied on a legally incorrect premise that, if parolees did not accumulate two years of continuous presence, they could be placed in expedited removal proceedings under Section 1225(b). Respondents observe that Section 1225(b) provides that "DHS may subject a noncitizen to expedited removal only if that person 'has *not* been admitted or *paroled* into the United States,'" and they interpret that language to mean that anyone who has ever been paroled in the past is categorically immune from being placed in expedited removal proceedings.[4] Opp. 29 (citation omitted). That interpretation is incorrect.

As a purely grammatical or linguistic matter, of course, the present perfect

---

[4]    Respondents contend (Opp. 29) that "[i]n their Application, Defendants never quote or acknowledge this part of the statute." That contention is incorrect: the government quoted that precise statutory language (Appl. 21) and explained why it does not preclude expedited removal. See Appl. 21-22.

11

tense could refer either to a single past event or to a continuing status—as respondents themselves seem to acknowledge, see Opp. 29 n.17. Context is the deciding factor. The context here indicates a continuing status, not a past event. If, as respondents contend, "has not been * * * paroled" means "has not ever been granted parole on a past occasion," an alien whose parole is terminated would *not* be "dealt with in the *same* manner as that of *any other* applicant for admission," as the INA requires, 8 U.S.C. 1182(d)(5)(A) (emphases added). Any "other" applicant—*i.e.*, one who was never paroled—who lacks two years of continuous presence would be subject to expedited removal. To treat aliens whose parole has been terminated in the same manner as other applicants, all such aliens must be subject to expedited removal. Respondents' only reply is the question-begging assertion that the government is making "a complaint about the decision that Congress itself made," Opp. 31, or "would essentially strike out of the statute an explicit limit that Congress placed," Opp. 30.

Respondents observe (Opp. 30 n.18) that "parole" is "paired with admission" in Section 1225(b)(1)(A)(iii)(II), and contend (Opp. 31 n.19) that under the government's interpretation, "DHS could also subject to expedited removal noncitizens who had been admitted on visas * * * if it merely revokes that visa first." That is incorrect. The INA elsewhere provides that "[a]ny alien * * * *in and admitted* to the United States" shall be "removed" if he is found to be deportable, 8 U.S.C. 1227(a) (emphasis added). That provision omits the "without further hearing or review" language contained in the expedited-removal statute, 8 U.S.C. 1225(b)(1)(A)(i). Given the general rule that ordinary (non-expedited) removal proceedings "shall be the sole and exclusive procedure for determining whether" an alien who "has been * * * admitted" may be "removed," 8 U.S.C. 1229a(a)(3), it follows that an alien who is "in and admitted" may not be placed in expedited removal proceedings.

12

But the INA lacks any similar provision regarding "any alien in or paroled"; nor does the INA specify that ordinary removal proceedings are the sole and exclusive procedure for determining whether an alien who "has been paroled" may be removed. Respondents also are incorrect to contend (Opp. 30 n.18) that the government's interpretation is "contradicted by DHS's own regulations." Those regulations instead expressly provide that after parole is terminated, "further inspection or hearing shall be conducted *under section 235* [*i.e.*, the expedited-removal provision] or 240 of the Act," 8 C.F.R. 212.5(e)(2)(i) (emphasis added).

### C.    The Court Likely Would Grant Certiorari

If the court of appeals were to affirm the district court's order, this Court likely would grant certiorari. Such a decision would create a circuit conflict with the Seventh and Ninth Circuits on an issue of profound national importance. Appl. 23; see *Samirah* v. *O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003), cert. denied, 541 U.S. 1085 (2004); *Hassan* v. *Chertoff*, 593 F.3d 785, 789 (9th Cir.) (per curiam), cert. denied, 561 U.S. 1007 (2010). Respondents dispute (Opp. 20-22) the circuit conflict on the ground that *Samirah* and *Hassan* involved individual parolees. But the Seventh and Ninth Circuits interpreted the judicial-review bar directly contrary to the reasoning here.

*Samirah*, for instance, expressly rejected the argument that parole revocation must be judicially reviewable because it supposedly has the effect of "short-circuit[ing] the rights of an alien who has long lived in the United States," 335 F.3d at 548 (citation omitted)—analogous to respondents' argument that the Secretary's termination must be judicially reviewable because it terminates parole *en masse*. And *Hassan* "disagree[d]" with the alien's argument that "the district court had jurisdiction to review the [parole] revocation" on the theory that "the government lacked any discretion to revoke his advanced parole because no statute or regulation expressly

13

authorizes revocation," 593 F.3d at 789—analogous to respondents' argument that the Secretary's termination is reviewable because she lacks discretion to terminate parole on a categorical basis. Nothing in those decisions suggests that the outcomes would have been different had the cases involved many parolees instead of just one.

Respondents assert (Opp. 22-23) that this case is too insignificant to warrant certiorari, even as they portray the case as of surpassing importance when alleging irreparable harm (*e.g.*, Opp. 1-3, 15-19). They cannot have it both ways. The district court's sweeping order here is obviously important: the order thwarts the Executive Branch's constitutional and statutory responsibility for immigration and foreign affairs on an issue affecting over a half-million aliens, while also ignoring Congress's direction to preclude judicial review. Respondents contend (Opp. 22) that the order does not "prevent the federal government from terminating the parole of any individual CHNV parole beneficiary," but that is disinguous: there is no feasible way to conduct the sort of case-by-case analysis that the district court appeared to demand in any reasonable timeframe. Respondents do not argue otherwise. The order thus prevents the removal of up to 532,000 CHNV parolees for up to a year and a half, notwithstanding the Secretary's determination that the purposes of their parole have been served. That is textbook judicial interference in Executive Branch affairs that warrants this Court's review. See *Haig* v. *Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

## II.    THE EQUITABLE FACTORS SUPPORT A STAY

### A.    The Government Will Suffer Irreparable Harm Absent A Stay

The district court's order imposes irreparable harm on the government and public, whose interests "merge" here, *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). The

14

Constitution and INA grant the Secretary and the political Branches—not the courts—the task of deciding whether it is in the public interest to allow up to 532,000 aliens who were never admitted or inspected to remain in the country. And the Secretary discharged that responsibility at length, explaining why the CHNV parole programs, and the specific foreign policy approach that justified the creation of those programs, are antithetical to the Administration's foreign policy and immigration objectives. See 90 Fed. Reg. at 13,612, 13,615-13,616.

Respondents call those harms are "abstract" and "generic," but ignore the concrete, specific harms that result from forcing the Executive Branch to tolerate the presence of up to 532,000 aliens whom the Secretary has determined should not remain in the country. As the Secretary explained, any delay in terminating the CHNV parole programs "would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration." 90 Fed. Reg. at 13,621. Beyond that, the Executive Branch suffers harm when district courts intrude on core Executive functions, such as managing the immigration system. See *Arizona* v. *United States*, 567 U.S. 387, 394-396 (2012); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers).

Respondents alternatively try to portray the district court's order as narrow, contending that it "does not prohibit the Secretary from terminating or truncating class members' parole," Opp. 1, or "prevent the federal government from terminating the parole of any individual CHNV parole beneficiary," Opp. 22; see Opp. 18-19. But there is no practical way for the government to proceed individually against up to 532,000 aliens in any reasonable timeframe—least of all because the effect of such delays might well require "a greater proportion of this population" to be placed in

ordinary rather than expedited removal proceedings, "further straining the already over-burdened immigration court system." 90 Fed. Reg. at 13,619. Put simply, the district court's order is inimical to the government's and the public's strong interest in expeditiously removing aliens who lack a lawful basis to remain in the United States. See *id.* at 13,619-13,620.[5]

### B. A Stay Would Not Impose Cognizable Harm On Respondents

On the flip side, a stay of the district court's order will not cognizably harm respondents or absent class members. As Secretary Mayorkas repeated when establishing these very parole programs, parole is a discretionary benefit that can be terminated at any time. See, *e.g.*, 88 Fed. Reg. 1266, 1272 (Jan. 9, 2023) ("DHS may terminate parole in its discretion at any time."); Appl. 3-4 & n.3.

Respondents contend that a stay of the district court's order "would put many CHNV parole beneficiaries immediately at risk of deportation without normal due process protections." Opp. 16. That is incorrect. As the government has explained, CHNV parolees who lack two years of continuous presence and cannot establish admissibility likely would be placed in expedited removal proceedings, which comport with the Constitution, including the Due Process Clause. See *DHS* v. *Thuraissigiam*, 591 U.S. 103, 138-140 (2020). Respondents assert that they may be removed to countries where they "will face serious risks of danger, persecution, and even death." Opp. 17. But any alien placed in expedited removal proceedings could raise claims under the Convention Against Torture or statutory withholding of removal. See 8 C.F.R. 208.30(b) and (e)(2)-(3); cf. *Johnson* v. *Guzman Chavez*, 594 U.S. 523, 530 (2021).

---

[5]     Respondents fault the government (*e.g.*, Opp. 1, 14-15, 19) for seeking a stay in this Court instead of expedited briefing in the First Circuit. The government does not oppose expedited briefing, but can still seek immediate relief from this Court when, as here, its harms are immediate and continuing. Cf. Sup. Ct. R. 23.3.

More fundamentally, respondents' repeated assertion (*e.g.*, Opp. 1, 18-19, 22) that the order does not prevent the government from terminating the parole of any individual respondent and initiating removal proceedings against him only underscores that the district court's order does not actually protect any *substantive* entitlement that respondents may have.  Instead, the order simply serves to stymie the government's efforts to enforce the immigration laws against respondents.  That is not a cognizable harm at all, much less one that outweighs the government's strong foreign policy interests in implementing the discretionary judgments that Congress entrusted to the Secretary of Homeland Security.

\* \* \* \* \*

This Court should stay the district court's order.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

MAY 2025

## CERTIFICATE OF SERVICE

I, Katherine J. Shinners, Senior Litigation Counsel, hereby certify that on June 11, 2025, I filed the the foregoing appendix through the ECF system, which will provide electronic service to the registered participants as identified on the Notice of Electronic Filing (NEF).

*s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel