No. 25-1384

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

SVITLANA DOE, *et al*.,

*Plaintiffs-Appellees*,

v.

KRISTI NOEM, Secretary of Homeland Security, *et al*.,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-10495-IT (Hon. Indira Talwani)

———————————————

## BRIEF OF PLAINTIFFS-APPELLEES

———————————————

John A. Freedman
Laura Shores
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com

H. Tiffany Jang
ARNOLD & PORTER
  KAYE SCHOLER LLP
200 Clarendon Street, Fl. 53
Boston, MA 02116
(617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow

Justin B. Cox
LAW OFFICE OF JUSTIN B. COX
*JAC Cooperating Counsel*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Esther H. Sung
Karen C. Tumlin
Hillary Li
Laura Flores-Perilla
Brandon Galli-Graves
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org

ARNOLD & PORTER
  KAYE SCHOLER LLP
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
(415) 471-3142
daniel.asimow@arnoldporter.com

hillary.li@justiceactioncenter.org
laura.flores-
perilla@justiceactioncenter.org
brandon.galli-graves@justiceaction-
center.org

*Counsel for Plaintiffs-Appellees*

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellee Haitian Bridge Alliance ("HBA") is a community-based nonprofit organization incorporated in California. HBA has no parent corporation, nor has it issued any stock owned by a publicly held company.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT..................................................................i

TABLE OF CONTENTS............................................................................... ii

INTRODUCTION ............................................................................................1

STATEMENT OF THE ISSUES.........................................................................3

STATEMENT OF THE CASE............................................................................4

      A.   Statutory Background .................................................................4

      B.   CHNV Parole Processes ...........................................................5

      C.   Defendants' Actions ..................................................................9

      D.   Procedural History..................................................................12

SUMMARY OF THE ARGUMENT ................................................................17

ARGUMENT ..................................................................................................22

I.     The District Court Correctly Held 8 U.S.C. § 1252(a)(2)(B)(ii)
     Inapplicable. ...........................................................................................22

II.    The District Court Correctly Held that the APA Authorizes Review..............29

III.   The District Court Correctly Held that Plaintiffs are Likely to Succeed
     in Proving that the Mass Truncation of Parole was Arbitrary,
     Capricious, an Abuse of Discretion, and Otherwise Not In Accordance
     with Law.................................................................................................32

      A.   The district court correctly held that Secretary Noem's *en masse*
          truncation of individualized grants of CHNV parole contravened
          statutory limits. .......................................................................33

      B.   The district court correctly held that Secretary Noem's *en masse*
          truncation of CHNV parole was arbitrary and capricious because it
          was based on legal error and unreasoned decisionmaking.......................41

IV.   Without the District Court's Stay, Plaintiffs and Class Members Are
     Suffering Irreparable Harm. ....................................................................47

V.    The Balance of Equities and Public Interest Support Affirming. ....................50

CONCLUSION ...............................................................................................54

CERTIFICATE OF COMPLIANCE ................................................................56

CERTIFICATE OF SERVICE .........................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke.*
  280 F. Supp. 3d 373 (W.D.N.Y. 2017).................................................24

*Aracely R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018).....................................23, 24, 31

*Barrett v. United States*,
  423 U.S. 212 (1976)...........................................................................43

*Biden v. Texas*,
  597 U.S. 785 (2022)....................................................................25, 40

*Bollat Vasquez v. Wolf*,
  460 F. Supp. 3d 99 (D. Mass. 2020).................................................45

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024)........................................................................26, 27

*Cal. v. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025).............................................................30

*Castaneira v. Noem*,
  138 F.4th 540 (D.C. Cir. 2025).........................................................32

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)...........................................................................41

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018)..................................................24

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)..............................................................29, 41, 46

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988)...........................................................................52

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020)...........................................................23, 29, 30, 40

*Doe 1 v. Mayorkas*,
   530 F. Supp. 3d 893 (N.D. Cal. 2021) ..................................................24

*Doe v. Noem*,
   No. 25-1384, 2025 WL 1505688 (1st Cir. May 5, 2025).... 15, 23, 33, 34, 35, 36

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ............................................................................46

*Guerrero-Lasprilla v. Barr*,
   589 U.S. 221 (2020) ........................................................................22, 23

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................................52

*Haoud v. Ashcroft*,
   350 F.3d 201 (1st Cir. 2003) ..............................................................30

*Hassan v. Chertoff*,
   593 F.3d 785 (9th Cir. 2010) ..............................................................28

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................31

*INS v. Yueh-Shaio Yang*,
   519 U.S. 26 (1996) ..............................................................................30

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of*
   *Am. v. Brock*, 783 F.2d 237 (D.C. Cir. 1986) ....................................30

*Judulang v. Holder*,
   565 U.S. 42 (2011) ..............................................................................41

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ............................................................................52

*Kucana v. Holde*r,
   558 U.S. 233 (2010) ..........................................................22, 23, 27, 28, 45

*Lamarche v. Mayorkas*,
   691 F. Supp. 3d 274 (D. Mass. 2023) ................................................24

*Latino Political Action Comm., Inc. v. City of Boston*,
716 F.2d 68 (1st Cir. 1983) ................................................................. 51

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................. 18, 31

*Mach Mining, LLC v. E.E.O.C.*,
575 U.S. 480 (2015) ................................................................. 28

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991) ................................................................. 32

*Merrill v. Milligan*,
142 S. Ct. 879 (mem.) (2022) ................................................................. 51

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ................................................................. 36

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ................................................................. 44

*New Jersey v. Trump*,
131 F. 4th 27 (1st Cir. 2025) ................................................................. 53

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................. 48

*R.F.M. v. Nielsen*,
365 F. Supp. 3d 350 (S.D.N.Y. 2019) ................................................................. 24

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ................................................................. 30

*Roe v. Mayorkas*,
No. 22-cv-10808-ADB, 2023 WL 3466327 (D. Mass. May 12,
2023) ................................................................. 23, 24, 32

*Salazar v. King*,
822 F.3d 61 (2d Cir. 2016) ................................................................. 30

*Samirah v. Holder*,
627 F.3d 652 (7th Cir. 2010) ................................................................. 28

*Samirah v. O'Connell*,
  335 F.3d 545 (7th Cir. 2003) ...............................................................27

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021)...........................................................................44

*Sea–Land Serv., Inc. v. Dep't of Transp.*,
  137 F.3d 640 (D.C. Cir. 1998).............................................................31

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)..............................................................................42

*Soltane v. U.S. Dep't of Justice*,
  381 F.3d 143 (3d Cir. 2004) ..........................................................23, 27

*Somerville Pub. Schs. v. McMahon*,
  139 F.4th 63 (1st Cir. 2025)................................................................53

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
  788 F.3d 25 (1st Cir. 2015).............................................................16, 47

*Succar v. Ashcroft*,
  394 F.3d 8 (1st Cir. 2005)..............................................................23, 28

*Texas v. DHS*,
  722 F. Supp. 3d 688 (S.D. Tex. 2024).................................................26

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023)............................................................................33

*Turner v. U.S. Att'y Gen.*,
  130 F.4th 1254 (11th Cir. 2025) .........................................................43

*Zadvydas v. Davis*,
  533 U.S. 678 (2001)............................................................................31

**Statutes**

5 U.S.C.
  § 701(a)(2) ..................................................................... 3, 18, 29-32
  § 705................................................................................2, 3, 10, 12, 14
  § 706...................................................................................3, 18, 31

8 U.S.C.

§ 1182(d)(5) ........................................................................*passim*

§ 1184(f)....................................................................................34

§ 1225(a)(1) .............................................................................44

§ 1225(b)(1)(A)(i)....................................................................45

§ 1225(b)(1)(A)(iii)(II) ...........................................12, 13, 42, 45

§ 1252(a)(2)(B)(ii) ................................... 3, 17, 18, 22-29

Pub. L. No. 119-1 § 3(d)(2) (2025) (codified at 8 U.S.C. §
1182(d)(5)(C))......................................................................26

**Regulations**

8 C.F.R.

§ 212.5.......................................................................................34

§ 212.5(e)(2)(i)..........................................................................28

§ 235.3(b)(1)(ii) .......................................................................44

§ 235.3(b)(6) ............................................................................44

Securing Our Border, Exec. Order No. 14,615, 90 Fed. Reg. 8467
(Jan. 20, 2025)..........................................................................9

DHS, *Implementation of the Uniting for Ukraine Parole Process*, 87
Fed. Reg. 25040-01 (Apr. 27, 2022)................................. 5-6

DHS, *Termination of Parole Processes for Cubans, Haitians,
Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25,
2025) ...................................................................................*passim*

**Other Authorities**

*CBP Releases December 2024 Monthly Update* (Jan. 14, 2025),
bit.ly/43iUJt0 ...........................................................................8

DHS, *DHS Issues Notices of Termination for the CHNV Parole
Program, Encourages Parolees to Self-Deport Immediately* (June
12, 2025), www.dhs.gov/news/2025/06/12/dhs-issues-notices-
termination-chnv-parole-program-encourages-parolees-self-deport.................16

## INTRODUCTION

Plaintiffs represent a certified class of nearly half a million people from four countries—Cuba, Haiti, Nicaragua, and Venezuela (together, "CHNV")—that in recent years have experienced displacement crises caused by a variety of country-specific events and circumstances. Over the last two years, Customs and Border Protection ("CBP") officers at ports of entry (airports) across the country determined, on a case-by-case basis, that the specific circumstances presented by each member of the class—all of whom had been inspected and had cleared rounds of vetting—justified a discretionary grant of the statutory parole authority. The day before Secretary Noem's March 25, 2025 decision, and as reflected on each class member's Form I-94 (record of entry/exit), some class members' parole was about to expire; others had only recently arrived and had nearly two years left. On March 25, 2025, however, every class member's electronic I-94 was changed to reflect a new expiration date—April 24, 2025—based on Secretary Noem's concern that if she let them stay for the full two years, they would become ineligible for fast-track, expedited removal. Class members were not given notice that their parole (and any associated employment authorization) was cut short, as Secretary Noem had determined that only constructive notice, via Federal Register publication, was legally required.

Following rounds of briefing and argument, the district court issued a well-reasoned opinion explaining that Secretary Noem had misunderstood the law in

1

multiple ways and that, in an exercise of judicial discretion, it granted the statutorily-authorized remedy of staying that one aspect of the March 25, 2025 Federal Register Notice ("FRN") while the case proceeds to final judgment. 5 U.S.C. § 705. The district court identified the correct law, applied it faithfully to the facts as found, dutifully detailed its conclusions, and granted narrow relief—far narrower than Plaintiffs requested—to preserve the status quo. On appeal, and as explained below, Defendants can identify no error in the district court's legal conclusions nor any abuse of its discretion, and this Court should affirm.

Unfortunately, the district court's order will not go back into effect even upon this Court's mandate affirming, given the Supreme Court's decision to grant Defendants' emergency stay application. And indeed, Defendants argue throughout their brief that this Court should, in essence, defer to the fact that their application was granted as resolving the legal questions presented. But even assuming this Court should seek to infer meaning from a grant of relief via the emergency docket, whatever meaning one *could* infer from the stay here is undermined by Defendants' unwillingness to repeat to this Court key representations made in procuring that emergency stay, as noted below. Far better, Plaintiffs respectfully submit, not to assign meaning to the one-paragraph order in which the Supreme Court could have, but did not, provide reasoning; but rather to apply binding precedent as this Court would in the ordinary course, under which the district court should be affirmed.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in holding that 8 U.S.C. § 1252(a)(2)(B)(ii)'s bar on review of a "decision or action of the … Secretary of Homeland Security[,] the authority for which is specified under this subchapter [II of Chapter 12 of Title 8] to be in [her] discretion," does not apply to Secretary Noem's *en masse* decision to make all existing, unexpired grants of parole obtained individually through the CHNV parole processes expire on April 24, 2025.

II.    Whether the district court erred in holding that the exception to judicial review under the Administrative Procedure Act ("APA") for action that is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is inapplicable to Secretary Noem's decision.

III.    Whether the district court erred in holding that Plaintiffs are likely to succeed in proving that Secretary Noem's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

IV.    Whether the district court abused its discretion in concluding that the balance of the equities favored staying Secretary Noem's decision under 5 U.S.C. § 705 while the case proceeds to final judgment.

3

## STATEMENT OF THE CASE

### A.    Statutory Background

"Parole" is a statutorily authorized form of temporary permission for a noncitizen to be in the United States that can be granted for humanitarian reasons and/or because it significantly benefits the public. 8 U.S.C. § 1182(d)(5); *see generally* Appx-0169-70. Parole does not lead directly to permanent status but is a common transitional one while individuals apply for more durable forms of immigration relief. Under longstanding regulations, parolees can obtain employment authorization to support themselves and their families.

Since it was first codified more than seventy years ago in the Immigration and Nationality Act ("INA"), successive administrations of both parties have frequently used parole in a "programmatic" or "categorical" way when other legal pathways have been unavailable or inadequate to address a sufficiently important issue of national concern. Appx-0774-75. To do so, the Executive generally defines a group of noncitizens, "typically by nationality plus additional [enumerated] factors" or circumstances, whose entry could be justified by humanitarian or public interest reasons, with each applicant then assessed under that guidance on a case-by-case basis. Appx-0179-81. Since the first such use by President Eisenhower in 1956, there have been at least 125 similar parole processes, usually with multiple operating at the same time, and during every single Administration, including the first Trump

Administration. Appx-0461, Appx-0775. These parole processes have provided the public significant benefits by furthering a variety of important foreign policy interests, including humanitarian, human rights, migration management, anti-trafficking, and regional security goals. *See generally* Appx-0178-270.

Over the years, some members of Congress have at times expressed reservations regarding the Executive paroling large numbers of noncitizens without a definite path to permanent status. *See* Appx-0182-84. When Congress has *acted*, however, it has repeatedly extended immigration and other benefits to those same parolees, adopted modest limits to the parole statute, and rejected attempts to define and tightly circumscribe the humanitarian and public benefit grounds on which parole could be granted. *See* Appx-0169-70, 0182-86, Appx-0290.

## B.    CHNV Parole Processes

This case concerns several parole processes the Biden Administration created in response to unprecedented migration and border management challenges resulting from the current global displacement crisis, which has led some fraction of the approximately 120 million forcibly displaced people to come to our southern border to request humanitarian protection (as is their right under U.S. law). The first such process was Uniting for Ukraine ("U4U"), created in April 2022 after thousands of Ukrainians began coming to our southern border fleeing Russia's invasion; the surge strained CBP resources processing the arrivals, who were typically paroled anyway.

5

Under U4U, Ukrainians with a U.S.-based sponsor committed to providing for them financially could request consideration for parole from abroad. *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25040-01, 25041 (Apr. 27, 2022). The U4U process addressed the humanitarian needs of the displaced Ukrainians while permitting the United States to conduct security checks in advance and better facilitate arrivals, through the (novel) sponsorship requirement; it also led to a 99 percent year-over-year decrease in CBP border encounters of Ukrainians. Appx-0774. To date, more than 250,000 Ukrainians have been paroled through U4U.

In October 2022, DHS instituted a similar parole process for Venezuelans, Appx-0103, which it expanded the following January at the same time it created parallel processes for Cubans, Haitians, and Nicaraguans ("CHNV"). Appx-0115-60. Due to events particular to each country, CBP encounters of CHNV nationals had gone from approximately 18,000 in 2020 to more than 600,000 in 2022, comprising more than forty percent of all migrants CBP encountered at the border that year. Appx-0777; *see also* A047. As with the Ukrainians discussed above, this surge strained CBP operations, and many such CHNV nationals coming to the southern border were allowed into the country (often on parole) while their humanitarian claims were processed by our immigration system. Appx-0103-113. In response to those realities, the CHNV parole processes were created; they were explicitly modeled on U4U and similarly required individuals seeking parole to have

U.S-based financial sponsors and to pay for and arrange their own travel. Unlike U4U, however, the CHNV parole processes had a monthly cap of no more than 30,000 people from the four countries combined. Appx-0115-18. Due to overwhelming demand—approximately three million sponsorship applications were filed by individuals motivated by a range of familial, moral, and religious factors, *see generally* Appx-0078-85, Appx-87-94—and to ensure the processes sufficiently dissuaded irregular migration by providing a viable alternative, DHS instituted a lottery to randomly select applications to fill half the monthly slots, with the other half processed by order of filing date.[1] Appx-0114-18.

After selecting an application, U.S. Citizenship and Immigration Services ("USCIS") would individually vet the sponsor and potential beneficiary and would "confirm," on a case-by-case basis, that the application met the criteria to be considered for parole; 78 percent adjudicated were "confirmed." A051. If the application was conditionally approved, the noncitizen would receive authorization to fly to an internal port of entry (an airport) to request parole. Appx-0111. There, potential parolees were referred to secondary inspection for the collection of

---

[1] Lotteries had been used in past parole processes for similar reasons. Appx-0190-91, A0237 (discussing a lottery for a Cuban parole process that operated throughout the mid-1990s). One unforeseen consequence of using a lottery for the CHNV processes, however, was that it strongly incentivized would-be sponsors to file duplicative applications, *see* Appx-0310, which forms the principal basis for what Defendants misleadingly characterize as "reports of massive fraud." Defs.' Br. 4.

biometrics (e.g., fingerprints), an interview, and additional vetting. Following this, an individual CBP officer would decide on a case-by-case basis whether to grant parole (generally for two years) based on the agency guidance applied to the facts and circumstances presented by the individual CHNV national, which necessarily varied.[2] Ultimately, approximately 520,000 people were granted parole through the CHNV processes. A046. The thousands of CHNV nationals who were denied parole at ports of entry left voluntarily or were removed. *See* A049 (discussing "disruptive impact" this had on ports of entry); D. Ct. Dkt. 128-6.

As with U4U, the CHNV parole processes drove down border crossings; as of January of this year, CBP encounters of CHVN nationals attempting to cross unlawfully were down ninety-one percent since the processes were created. *CBP Releases December 2024 Monthly Update* (Jan. 14, 2025), bit.ly/43iUJt0. Meanwhile, once here, most CHNV parolees applied for another form of immigration status, including adjustment of status, asylum, and Temporary Protected Status ("TPS")[3]—a stated purpose of the parole processes. A046; Appx-0104; Appx-0122; Appx-0136; Appx-0150.

---

[2] A significant number of CHNV parolees came to reunite with family, *see, e.g.*, Appx-0096-101; and most were escaping political instability, widespread violence, persecution, and/or humanitarian deprivation of some kind, *see, e.g.*, Appx-0040-77, 0292-302, 0336-60.

[3] As of March 2025, more than two-thirds of CHNV parolees had filed for another form of relief, with more than 200,000 applications pending. D. Ct. Dkt. 128-2.

Notwithstanding its successes, the CHNV parole processes became a hot-button political issue during the 2024 presidential campaign. As a candidate, President Trump frequently denigrated CHNV parolees as "illegals" (despite their lawful status) and repeatedly blamed CHNV parole for (*inter alia*) the alleged presence of pet-eating Haitians in Springfield, Ohio and Venezuelan gangs overtaking apartment buildings in Aurora, Colorado.

## C.    Defendants' Actions

Within hours of being inaugurated, President Trump signed an executive order directing the Secretary to terminate "all categorical parole programs," specifically naming the CHNV processes. Exec. Order No. 14,615, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). DHS immediately acted upon that directive via a memorandum issued that same day, Appx-0303, and, three days later, by imposing an across-the-board indefinite suspension of all adjudications for parole (or, where available, re-parole) through the U4U, CHNV, and other "categorical" parole processes. Appx-0307. Then, on February 14, DHS indefinitely suspended processing applications for any other immigration benefit—including but not limited to asylum, TPS, adjustment of status, and employment authorization—filed by any parolee in the country by virtue of CHNV, U4U, or one of seven family reunification parole processes. Appx-0309-11. Plaintiffs filed suit on February 28 and promptly moved

for class certification and preliminary relief as to these agency actions,[4] but they are

not directly at issue in this appeal.

Secretary Noem published the FRN on March 25, 2025, announcing that she

had decided to terminate the CHNV parole processes. A045 (*Termination of Parole*

*Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg.

13611-01 (Mar. 25, 2025)). The Secretary acknowledged that DHS created the

CHNV processes based on her predecessor's judgment that they would both

"provide a significant public benefit for the United States and address the urgent

humanitarian reasons underlying the high levels of migration from those countries,"

but explained that they did not provide sufficient public benefit to justify their

continuation. A046. Beyond prospectively terminating the CHNV processes, the

Secretary announced that she was summarily denying the two million pending

applications, rescinding all conditional approvals of applications and then denying

those, and cancelling all travel authorizations previously issued to potential parolees.

A052. This appeal does not concern any of these decisions.

Additionally, Secretary Noem directed that "as one aspect of the termination

---

[4] The district court granted in part Plaintiffs' motions on May 28, 2025, granting a stay under 5 U.S.C. § 705 that effectively requires Defendants to restart processing of requests for re-parole or other immigration benefits filed by parolees in the United States and of requests for initial parole under the Military Parole-in-Place process. As of this filing, Defendants have neither appealed that decision nor restarted processing. *See* D. Ct. Dkt. 120, 124, 132.

of the CHNV parole programs," any grants of parole to CHNV parolees that "ha[ve] not already expired by April 24, 2025 will terminate on that date."[5] A052. The Secretary stated that she "has determined that the purposes" of those grants of parole "have been served because" they do not provide a significant public benefit. A053 n.70. The Secretary cursorily referenced parolees' reliance interests but said they were outweighed by the federal government's "strong interest" in deporting them through expedited removal, rather than normal removal proceedings under INA § 240. A053 ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings" due to the two-year limit on expedited removal in 8 U.S.C. § 1225(b)(1)(A)(iii)(II)).

Secretary Noem said that she considered two alternatives to cutting short all existing periods of parole and employment authorization: "a longer than 30-day wind-down period" and simply "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in the past done with some parole terminations." A053-54 (citation omitted). The Secretary gave only one

---

[5] Secretary Noem acknowledged that DHS regulations require "written notice" to individuals to terminate their parole and "written notice" and an opportunity to be heard to revoke employment authorization, but asserted that she "has determined that publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." A054.

reason for rejecting these alternatives: DHS's "strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible." A054. The Secretary wrote: "Expedited removal is available only when an alien has not been continuously present in the United States for at least … two years," A053 (citing 8 U.S.C. § 1225(b)(1)(A)(iii)(II)), and therefore "[a]ny lengthening of the wind-down period will increase the likelihood" that CHNV parolees will "accrue more than two years of continuous presence in the United States," which "would essentially foreclose DHS's ability" to remove them via expedited removal, A054 (same citation)).

### D.    Procedural History

Plaintiffs expeditiously amended their complaint and moved for class certification and class-wide preliminary relief regarding Secretary Noem's mass truncation of grants of CHNV parole. Appx-0442-545. Following rounds of briefing and argument, the district court granted in part Plaintiffs' motions on April 14. A001-44. The court certified a class of "[a]ll individuals who ha[d] received a grant of parole that [was] subject to the [FRN]," excluding those who voluntarily left the United States or sued separately. A042-44. As to Plaintiffs' motion for a stay under 5 U.S.C. § 705 and various forms of preliminary injunctive relief, the district court granted only a stay of that portion of the FRN cutting short all unexpired grants of parole as of April 24. A040.

After rejecting the government's contention that Secretary Noem's decisions are wholly unreviewable, A017-27, the district court held that Plaintiffs were likely to prevail for multiple reasons. First, the Secretary's "sole basis for rejecting the alternative of allowing parole to expire naturally was based on a legal error" that ending parole would maximize DHS's ability to subject parolees to expedited removal. A031-34. As the district court explained, the parolee Plaintiffs "are not subject to expedited removal even if they have been here less than two years," because by its terms, the expedited removal statute the Secretary relied upon can be applied only to someone who "has *not* been admitted or paroled into the United States." A032 (quoting 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added)); *see generally* A031-35. Second, the Court held that Plaintiffs were likely to succeed on their claim that the Secretary's categorical truncation of all existing grants of CHNV parole was "contrary to the statutory requirement that parole be exercised only on a case-by-case basis," A036 (citation omitted), emphasizing the mismatch between the individualized purpose of each parole grant and the Secretary's decision to change a key condition of parole (its expiration date) on a blanket basis, A037. The district court additionally found that, although the Secretary explained why she concluded that the processes no longer provided sufficient public benefit, she gave "no rationale" and "offered no reasons" for ignoring "the humanitarian concerns

13

previously articulated by DHS," which were an independent justification for the CHNV parole processes and the individual grants. A035.

The district court also held that Plaintiffs had proven that irreparable harm was certainly impending, as the Secretary's decision would cause Plaintiffs' parole "to terminate in less than two weeks, at which time they will be forced to choose between [the] two injurious options" of leaving the country, forfeiting their claims to other immigration benefits, and returning to the dangers they left behind; or staying and risking arrest and detention and undermining their "chances of receiving other forms of immigration relief." A037-38. The district court concluded that the balance of equities and public interest supported relief, finding it not in the public interest "to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families." A039. The district court stayed the Secretary's mass truncation of all existing grants of CHNV parole pending further review.[6] A040; 5 U.S.C. § 705. The district court's stay order does not prohibit the Secretary from terminating or truncating individual

---

[6] The district court also stayed notices sent to class members, A041, as DHS had recently told tens of thousands of people across the country—including many people on parole, but also to non-citizens with other forms of status and even natural born U.S. citizens—that it was "time to leave the United States" because their parole had been terminated, and that they should "not attempt to remain in the United States— the federal government will find you." D. Ct. Dkt. 83-1; *see also* D. Ct. Dkt. 95.

class members' parole; nor require using any particular process to do so. Likewise unaffected is the Secretary's authority and discretion to remove class members—the Secretary has precisely the same legal authority and ability to do so now that she had before Plaintiffs filed suit. The district court's order also left undisturbed the Secretary's decision to end the CHNV parole processes, including the summary denial of some two million pending applications.

Defendants thereafter sought emergency relief from this Court requesting a stay of the district court's order pending appeal. This Court denied that motion on May 5, holding that the government had not met its burden to make at least a "strong showing that the Secretary will prevail" on appeal. *Doe v. Noem*, No. 25-1384, 2025 WL 1505688, at *1. This Court noted that even if "less clear" than with granting parole, "common sense" and a reasoned interpretation of various textual markers suggest that "parole given only on a case-by-case basis is to be terminated only on such a basis." As such, a categorical, blanket termination would run afoul of what is statutorily permissible. It likewise stated that any "lack of clarity cuts against a finding that the en masse termination is immune to judicial review."

Thereafter, Defendants applied to the Supreme Court for an emergency stay of the district court's order, which it characterized as a "*de facto* permanent

injunction" entered on behalf of a "rubber-stamped nationwide class"[7] that blocks DHS from terminating the Biden Administration's unlawful "categorical grant of parole" to CHNV nationals "en masse." Appx-0742, 0744, 0764. Defendants asserted that the district court's order "stymies" efforts to remove CHNV parolees by "effectively compel[ling]" DHS to use regular removal proceedings, rather than expedited removal, and is "tantamount to permanently enjoining *any* termination of the CHNV programs." Appx-0766.

On May 30, the Supreme Court issued an unsigned and unreasoned one-paragraph order staying the district court's order through at least the petition for certiorari stage. On June 12, DHS announced that it would seek to email CHNV parolees ("illegal aliens") to notify them that "both their parole is terminated, and their parole-based employment authorization is revoked—effective immediately."[8]

---

[7] Defendants' opening brief does not argue the district court erred in granting class certification and thus waived any argument regarding it. *Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788 F.3d 25, 29-30 (1st Cir. 2015).

[8] DHS, *DHS Issues Notices of Termination for the CHNV Parole Program, Encourages Parolees to Self-Deport Immediately* (June 12, 2025), www.dhs.gov/news/2025/06/12/dhs-issues-notices-termination-chnv-parole-program-encourages-parolees-self-deport.

## SUMMARY OF THE ARGUMENT

1.  The district court correctly rejected Defendants' argument that 8 U.S.C. § 1252(a)(2)(B)(ii)'s jurisdictional bar on review of a "decision or action" by the Secretary of Homeland Security, "the authority for which is specified under" an applicable statute "to be in [her] discretion," applies to Plaintiffs' claims that Secretary Noem exceeded her statutory authority and acted contrary to statutory limits and requirements. The parole statute (8 U.S.C. § 1182(d)(5)) does make discretionary the Secretary's decision to parole someone (or not), but Plaintiffs challenge no such decision (and Defendants do not argue otherwise); to the contrary, that decision had already been made, on a case-by-case basis, as to each and every member of the class. Nor do Plaintiffs challenge the only other decision the parole statute specifies is discretionary—whether the "purposes" of someone's parole "have been served"—because Secretary Noem admittedly made no such determination as to the class members. What is more, and as a long line of cases have held, nothing in § 1252(a)(2)(B)(ii) strips jurisdiction to review whether Secretary Noem's categorical exercise of the parole authority complied with the substantive and procedural limits and requirements that Congress imposed thereon; nor does it preclude review of her compliance with her agency's regulations. Tellingly, the government can cite no case agreeing with their expansive interpretation of § 1252(a)(2)(B)(ii)'s application to 8 U.S.C. § 1182(d)(5), whereby

17

the former creates a jurisdictionally impenetrable penumbra of impunity around all exercises of the latter, no matter how flagrantly they exceed governmental authority, violate express legal limits and requirements, and trample on rights of hundreds of thousands of law-abiding people living and working throughout the United States.

2.     The district court also correctly held that Secretary Noem's action is not immune from judicial review under 5 U.S.C. § 701(a)(2). Reflecting the strong presumption that agency action is reviewable, that provision provides that the APA's judicial review provisions "appl[y], according to the provisions thereof, except to the extent that … agency action is committed to agency discretion by law." In addition to correctly rejecting Defendants' recycled argument that everything about the parole statute is discretionary, the district court rightly held that there is law to apply by which to measure Secretary Noem's compliance therewith: in particular, statutes. Even now, Defendants cannot explain how there is no law to apply to the two claims at issue in this appeal, which turn on the proper interpretation of statutes—the heartland of APA review. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

3.     The district court also correctly held that Plaintiffs are likely to succeed in proving that Secretary Noem's mass truncation of each class member's authorized period of parole and employment should be held unlawful and set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2). Defendants do not contest the district court's factual findings and can identify no legal error in either independent basis of the district court's holding.

All textual indicators, requirements, and limits of the parole statute make clear that the district court was correct in holding that it requires the Secretary to "attend, in some way, to the reasons an individual alien received parole." A021. Defendants' arguments to the contrary rely on grossly mischaracterizing the district court's reasoned opinion, Secretary Noem's own explanation, and the CHNV parole processes through which class members arrived. Most brazenly, Defendants repeatedly suggest in carefully chosen words that all of the original grants of parole—made over a two-year period by individual CBP officers, one-by-one, after inspecting each parolee, all of whom were required to submit their biometrics and reasons for parole and to pass multiple rounds of vetting—somehow violated the statute's case-by-case requirement, and that somehow this relieves Secretary Noem of liability for violating the statute in the inverse. Defs.' Br. 5, 32-33. That argument would fail on its merits even were Defendants willing to actually articulate it to this Court, *see infra* 39 n.22, but it cannot be considered regardless: not only did Defendants waive the argument by not making it to the district court, Secretary Noem said nothing of the sort in explaining her actions (and her lawyers cannot add to her explanation *post hoc*), and in fact she said the opposite, that the CHNV parole processes *were* case-by-case. A045. Regardless, this is all distraction anyway;

19

Defendants have no theory why their newfound "but what about what the Biden Administration did" argument, even if it could be and were accepted fully, would forgive Secretary Noem's own unlawful actions.

Defendants' arguments regarding the independent basis for the district court's holding are weaker still. On their position that Secretary Noem correctly interpreted the expedited removal statute (she did not, as the district court rightly concluded), Defendants use just one page; and they place it amidst various suggestions that her error does not matter anyway because it was but one of "several reasons" for her action. Here again, Defendants are not allowed to rewrite Secretary Noem's explanation. As the district court found, the only reason Secretary Noem gave for overriding the class members' reliance interests and cutting short all of their periods of parole (be it by a day or by nearly two years) was her "strong interest" in subjecting as many of them as possible to expedited removal, which would be undermined if "DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole," because (as she erroneously explained) the class members are only eligible for expedited parole during the two year window after they arrive. A053. Secretary Noem gave the identical (and likewise solitary) explanation for rejecting the only two alternatives that she considered, explaining that she rejected "a longer than 30-day wind-down period" and "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as

DHS has in the past done" because "[a]ny lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal." A053-54. There is no "other" reason here on which to justify Secretary Noem's decision. Indeed, and as the district court correctly held, not only did Secretary Noem fail to determine that the humanitarian purpose of each class member's grant of parole "had been served," in violation of the parole statute's requirements, but the failure even to consider that issue is an independent basis for Plaintiffs' arbitrary and capricious claim. A034-035.

4.    Finally, the district court applied the law correctly and did not abuse its discretion when it concluded that Secretary Noem's action inflicted irreparable injury on the class members (among others) and that the public interest and balance of the equities tip sharply in favor of preliminary relief. Defendants' complaints about the effects on DHS of the district court's order rely on mischaracterization. The district court's order does not prevent DHS from terminating anyone's parole, does not require any particular process to do so, and likewise creates no barrier whatsoever to DHS removing anyone. Defendants' assertion that because parole is temporary and class members were told that it could be revoked, they "cannot claim an interest in [the] privilege" of parole, Defs.' Br. 23, is a non sequitur; it has nothing to do with whether Plaintiffs' factually undisputed injuries can be remedied by money damages (they cannot, and thus are irreparable), and Defendants do not

explain why the discretionary nature of parole has anything to do with the relevant equitable inquiry. Defendants ignore, moreover, that regardless of what they were told, class members were (and are) entitled to anticipate that any theoretical revocation of their parole would comply with the law—and they should not have expected what Secretary Noem did to them instead.

## ARGUMENT

### I.    The District Court Correctly Held 8 U.S.C. § 1252(a)(2)(B)(ii) Inapplicable.

The district court did not err in concluding that the jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply to the Secretary's categorical truncation of parole.

The  district court's conclusion that the Secretary's action is reviewable is consistent with the strong presumption favoring judicial review of executive action, which courts have "consistently applied … to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). The "presumption favoring judicial review of administrative action … can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review," *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), and even "when a statutory provision 'is reasonably susceptible to divergent interpretation, [courts are required to] adopt the reading that accords with traditional understandings and basic principles: that

22

executive determinations generally are subject to judicial review.'" *Id.* (citing *Kucana*, 558 U.S. at 251). *See also Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 147 (3d Cir. 2004) (Alito, J.) ("[W]e do not think … that the use of marginally ambiguous statutory language … is adequate to 'specif[y]' that a particular action is within the Attorney General's discretion for the purposes of § 1252(a)(2)(B)(ii)"). As this Court's motion panel noted, "the very lack of clarity cuts against a finding that the en masse termination is immune to judicial review." 2025 WL 1505688, at *1 (citing *Guerrero-Lasprilla*, 589 U.S. at 229).

Consistent with this presumption, courts routinely distinguish between cases challenging the exercise of an agency's discretion in adjudicating an individual's eligibility for immigration status (where jurisdictional bars may be applicable) and cases challenging policies or procedures adopted to govern adjudications generally. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (holding jurisdiction stripping provisions inapplicable to decision ending Deferred Action for Childhood Arrivals ("DACA") program); *Succar v. Ashcroft*, 394 F.3d 8, 19-20 (1st Cir. 2005) (holding § 1252(a)(2)(B)(i) inapplicable to challenge to parole regulations); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *8-9 (D. Mass. May 12, 2023) (collecting cases holding challenges to "changes in policy"—including parole policies—are not barred by § 1252(a)(2)(B)(ii)); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018) ("While § 1252(a)(2)(B)(ii) undoubtedly bars judicial

23

review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA."). The district court's conclusion that Secretary Noem's en masse truncation of parole is subject to judicial review is consistent with the long line of cases finding that challenges to parole policies and practices are reviewable. *See, e.g.*, *Lamarche v. Mayorkas*, 691 F. Supp. 3d 274, 277 (D. Mass. 2023); *Roe*, 2023 WL 3466327, at *9; *Aracely R.*, 319 F. Supp. 3d at 135; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 327-28 (D.D.C. 2018); *Abdi v. Duke*. 280 F. Supp. 3d 373, 384 (W.D.N.Y. 2017); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019); *Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893, 904 (N.D. Cal. 2021).

Defendants urge this Court to adopt an impermissibly broad interpretation of the relevant statutes, untethered to their text, to immunize *all* aspects of *any* exercise of the parole statute—even if grounded in errors in law. Defendants' position is contrary to statutory text, precedent, and separation of powers principles. The parole statute, 8 U.S.C. § 1182(d)(5)(A), simply does not evince the clear and convincing intent needed to insulate every agency exercise of it.

As Defendants note, § 1252(a)(2)(B)(ii) only deprives courts of jurisdiction to hear claims based on a "decision or action of the … Secretary of Homeland Security the authority for which is specified … to be in the discretion of the … Secretary of Homeland Security[.]" Defs.' Br. 25 (citation omitted). The relevant

language of the parole statute makes discretionary at most two decisions: (1) whether to parole a noncitizen ("The Secretary … may … in his discretion parole into the United States … any alien applying for admission"), and (2) determining "when the purposes" of that individual noncitizen's parole "have been served." 8 U.S.C. § 1182(d)(5)(A).

Plaintiffs do not challenge either of these decisions. Rather, as the district court correctly held, A021, Plaintiffs challenge Secretary Noem's failure to abide by non-discretionary limits on her parole authority, including those in the statutory text itself—which "is not unbounded," *Biden v. Texas*, 597 U.S. 785, 806 (2022)—and Congress's mandate through the APA that "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained," *id.* at 806-07 (discussing the parole statute specifically). The parole statute does not specify that adherence to these requirements is discretionary, and thus § 1252(a)(2)(B)(ii) is inapplicable.

Nor does the parole statute indicate a more general congressional intent to shield from judicial review any manner of its exercise. To the contrary, Congress has amended the parole statute several times since 1952, and each time has reinforced that, while discretionary, the parole authority has limits.[9] Even since

---

[9] Appx-0169-70 (showing amendments that, *inter alia*, made explicit the case-by-case requirement, applied a heightened standard to parole refugees, and prohibited

President Trump's inauguration, the Laken Riley Act was enacted, adding a new subsection to the parole statute decreeing that state officers have standing for injunctive relief if they "alleg[e] a violation of the limitation under subparagraph (A) that parole solely be granted on a case-by-case basis and solely for urgent humanitarian reasons or a significant public benefit, that harms [a] State or its residents," to include "financial harm in excess of $100."[10] Pub. L. No. 119-1 § 3(d)(2) (2025) (codified at 8 U.S.C. § 1182(d)(5)(C)). This provision underscores that Congress does *not* intend all exercises of parole to be immune from review.

Defendants' counterargument is just to repeat in slightly different frames their same basic contention: that all exercises of parole authority—from individual determinations to general policy decisions, and even those in violation of the statute itself—are discretionary by statute and thus immune from judicial review. Defs.' Br. 27-29. But Defendants ignore that, as the Supreme Court recently cautioned, "in the immigration realm, properly identifying the mandatory or discretionary nature of a particular agency decision can be critical, precisely because that status has

---

paroling noncitizens to perform certain work aboard a vessel or aircraft during a labor dispute unless necessary to national security).

[10] *Compare with Texas v. DHS*, 722 F. Supp. 3d 688, 710 (S.D. Tex. 2024) (Tipton, J.) (dismissing Texas's challenge to the CHNV processes after a two-day bench trial, holding that because they decreased the number of CHNV nationals in Texas—the source of the State's alleged injuries—the State lacked standing notwithstanding expenditures on CHNV parolees, such as through issuing driver's licenses).

implications for whether the agency's decision can be challenged in court." *Bouarfa v. Mayorkas*, 604 U.S. 6, 10-11 (2024). *See also Soltane*, 381 F. 3d at 146 (Alito, J.) ("The key to § 125[2](a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute"). Neither of the two decisions made discretionary by 8 U.S.C. § 1182(d)(5) are challenged here. For that reason, Defendants' contention, for example, that the parole statute's reference to the Secretary's "opinion" is "as discretionary a grant of authority as the statute books contain," Defs.' Br. 27, is immaterial; under the statute, only one decision is committed to the Secretary's "opinion"—"when the purposes" of an individual's parole "have been served"—and it is not relevant to Plaintiffs' claims.

More generally, it is simply not the case that by making discrete decisions discretionary, Congress intended to create some kind of penumbra shielding from review any other decision the Secretary makes regarding parole. *See Kucana*, 558 U.S. at 252 ("A statute affecting federal jurisdiction 'must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes.'" (citation omitted)); *accord Bouarfa*, 604 U.S. at 10-11. Had Congress wanted to immunize all parole-related decisions from judicial review, it "could easily have said so," *Kucana*, 558 U.S. at 248, but it has chosen otherwise.

The two cases Defendants cite illustrate the limits of the jurisdictional bar as applied to the parole statute. Defs.' Br. 26. Both *Samirah v. O'Connell*, 335 F.3d

545 (7th Cir. 2003), and *Hassan v. Chertoff*, 593 F.3d 785, 790 (9th Cir. 2010) (per curiam), concern individual revocations of advance parole[11] under 8 C.F.R. § 212.5(e)(2)(i) based on the requisite official's opinion (apparently based on subsequently obtained information about the noncitizen in question) that parole of that individual was no longer justified by the statutory criteria. As discussed above, Plaintiffs do not challenge any opinion of Secretary Noem as to individual parole recipients, and thus those cases' application of 8 U.S.C. § 1252(a)(2)(B)(ii) likewise has no relevance here.[12] Yet these are Defendants' *best* cases in support of their breathtaking claim that Congress shielded from judicial review even flagrantly unlawful exercises of the parole authority. "Such an extraordinary delegation of authority cannot be extracted from the statute Congress enacted." *Kucana*, 558 U.S. at 252. *See also Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 489 (2015) ("Congress knows … that legal lapses and violations occur, and especially so when they have no consequence").

---

[11] "Advance parole is … issued to an alien residing in the United States who has an unexpected need to travel abroad and whose conditions of stay do not otherwise allow for readmission to the United States." *Succar*, 394 F.3d at 15 n.7.

[12] The Seventh Circuit held as much in a subsequent appeal in *Samirah*, distinguishing between "our previous decision" holding that the "the grant of advance parole [is] discretionary and its revocation likewise," from a subsequent successful challenge to DHS's failure to comply with its parole regulation, and ordering the government to return the plaintiff to the United States. *Samirah v. Holder*, 627 F.3d 652, 663 (7th Cir. 2010) (Posner, J.).

The district court correctly held § 1252(a)(2)(B)(ii) inapplicable.

## II.    The District Court Correctly Held that the APA Authorizes Review.

The district court also correctly rejected Defendants' contention that its actions are committed to unreviewable agency discretion, which overlaps to a significant degree with their arguments regarding § 1252(a)(2)(B)(ii).

In arguing that the district court erred, Defs.' Br. 29-32, Defendants fail to acknowledge that the APA embodies a "basic presumption of judicial review" that may be rebutted here only by clear and convincing evidence that the "'agency action is committed to agency discretion by law.'" *Regents*, 591 U.S. at 16-17 (quoting 5 U.S.C. § 701(a)(2)). To "honor the presumption of judicial review," courts "read the § 701(a)(2) exception … 'quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (citation omitted). The exception's application is limited to "rare 'administrative decision[s] traditionally left to agency discretion'" where there is no law to apply. *Regents*, 591 U.S. at 17 (citation omitted).

The requisite law to apply can be provided by any of the broad range of materials typically considered in APA actions, including statutes,[13] regulations,[14] formal or informal agency guidance,[15] or a settled course of agency action.[16] Here, because the challenged action is DHS reversing its agency's own actions, those prior actions creating the CHNV processes also supply standards against which to measure the reversal.[17] Here, the district court applied various forms of law to evaluate Plaintiffs' claims: the parole statute, the expedited removal statute, DHS regulations, and the APA. A026-27. In short, there is no shortage of law to apply here. *See Cal. v. Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) (regulatory and statutory limits "cabin the Department's discretion," providing law to apply).

---

[13] "Indeed, it seems almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 783 F.2d 237, 245 (D.C. Cir. 1986).

[14] *Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003) ("[R]egulation[s] provide[ ] more than enough 'law' by which a court could review . . . .").

[15] *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) ("Agency regulations and guidance can provide a court with law to apply . . . .")

[16] *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 31-32 (1996) (so holding even though agency discretion was "unfettered at the outset").

[17] *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("Once an agency has declared that a given course is the most effective way of implementing the statutory scheme, the courts are entitled to closely examine agency action that departs from this stated policy."); *see also Regents*, 591 U.S. at 17-19 (rejecting argument that § 701(a)(2) precludes review of attempt to end DACA and then applying traditional arbitrary and capricious review).

Defendants dispute none of this; instead, they assert that there are "no judicially manageable standards" to evaluate the Secretary's "opinion" that the purposes of someone's parole have been served. Defs.' Br. 30-31. Defendants ignore that Plaintiffs challenge not the Secretary's opinion, but her adherence to the substantive limits and procedural requirements of statutes Congress enacted and that the agency imposed upon itself, via regulation. Those matters of law are not left to agency discretion. *Loper Bright Enters.*, 603 U.S. at 392 ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action … and set aside any such action inconsistent with the law as they interpret it." (quoting 5 U.S.C. § 706)).[18]

In sum, and as the district court correctly held, courts can meaningfully review whether the Secretary acted consistent with or outside the limits of her authority. A026-27. "[T]he extent of that authority is not a matter of discretion," *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001), as courts have held in considering procedural and substantive challenges to parole and other immigration-related decisions made discretionary by statute, *see, e.g.*, *Aracely R.*, 319 F. Supp. 3d at 136 n.14 (rejecting

---

[18] *Accord Sea–Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based … on an erroneous view of the law'"); *see also Heckler v. Chaney*, 470 U.S. 821, 829-30 (1985) (reasoning that some discretionary decisions must be reviewable because 5 U.S.C. § 706 requires courts to set aside agency action that is an "abuse of discretion").

31

§ 701(a)(2) argument where parole policy allegedly violated the Constitution and regulations); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327 at *7-9 (similar); *cf. Castaneira v. Noem*, 138 F.4th 540, 549-50 (D.C. Cir. 2025) (collecting cases holding that a statute "may shield from judicial review an agency's ultimate determination without precluding courts from reviewing the 'practice[s] or procedure[s] employed in making' such individual determinations." (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991)). Section 701(a)(2) is inapplicable.

## III. The District Court Correctly Held that Plaintiffs are Likely to Succeed in Proving that the Mass Truncation of Parole was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not In Accordance with Law.

The district court correctly held, for multiple independent reasons, that Plaintiffs are likely to succeed in proving that Secretary Noem's categorical decision to cut short all unexpired grants of CHNV parole was both contrary to law and arbitrary and capricious. Defendants must demonstrate that the district court erred on both claims to merit reversal. They cannot do so. Defendants' arguments are contrary to the plain statutory text, contort Secretary Noem's own explanation for her actions, and rely on *post hoc* justifications—clear indicators that their position lacks merit. When assessed against the actual language of the relevant statutes and the actual reasoning Secretary Noem provided, the district court was plainly correct.

**A.    The district court correctly held that Secretary Noem's *en masse* truncation of individualized grants of CHNV parole contravened statutory limits.**

The entirety of Defendants' affirmative argument here is that, although the parole statute limits the Secretary to granting parole to a noncitizen "under such conditions as [s]he may prescribe only on a case-by-case basis," 8 U.S.C. § 1182(d)(5)(A), the statute does not have parallel "case-by-case" language "with respect to *terminating* parole," Defs.' Br. 32-33. Defendants assert that this is omission is "strong evidence" that Congress authorized Secretary Noem's categorical action cutting short the parole—granted one-by-one based on individual applications and adjudications—of some half a million people from four different countries, and that the district court erred in holding otherwise. *Id*. at 33. Defendants are wrong for several independent reasons.

First, Defendants fail to account for the statutory text as a whole. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("[T]his Court has a 'duty to construe statutes, not isolated provisions.'" (citation omitted)). As both the district court and this Court's motions panel observed, A036; 2025 WL 1505688, at *1, the parole statute consistently uses the *singular* form when discussing all aspects of the parole authority, including: to refer to how someone may be paroled (the Secretary "may … parole into the United States temporarily under such conditions as [s]he may prescribe *only on a case-by-case basis* … any *alien*"); the legal

33

significance of parole ("*such* parole of *such alien* shall not be regarded as an admission of *the alien*"); how and when that person's parole is over ("when the purposes of *such* parole shall … have been served"); and what happens once that person no longer has parole ("*the alien* shall forthwith return or be returned to the custody from which *he* was paroled and thereafter *his case* shall continue to be dealt with in the same manner as that of any other applicant for admission"). 8 U.S.C. § 1182(d)(5)(A) (emphases added). The other limits of the parole statute—its heightened standard for paroling refugees[19] and its limitations on paroling someone to perform certain services during a labor dispute[20]—are also phrased exclusively in the singular. DHS's parole regulation likewise exclusively uses the singular. 8 C.F.R. § 212.5. As this Court's motion panel said, the textual indicators "all consistently suggest[] a case-by-case determination rather than a categorial determination" is necessary to end someone's parole. 2025 WL 1505688, at *1.

---

[19] 8 U.S.C. § 1182(d)(5)(B) ("The Secretary of Homeland Security may not parole into the United States *an alien* who is *a refugee* unless [she] determines that compelling reasons in the public interest with respect to *that particular alien* require that *the alien* be paroled into the United States rather than be admitted as *a refugee* under section 1157 of this title.") (emphases added).

[20] *See* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided" in 8 U.S.C. § 1184(f)); *id.* § 1184(f)(2) ("*An alien* described in paragraph (1) … may not be paroled … unless the Attorney General determines that *the parole* of *such alien* is necessary to protect the national security of the United States") (emphases added).

Defendants contend that this text-based reasoning of the district court and the motions' panel "lacks merit" for two reasons. Defs.' Br. 34-36. First—in an argument never made to the district court—Defendants reason that many statutes, including immigration statutes, use the singular form (which is true), and that the use of the singular form in a statute does not generally preclude the Secretary from deciding issues of general applicability, such as through rulemaking (which is true to a point). But Defendants' conclusion from these premises—that the district court and motions' panel erred when they relied in part on the parole statute's consistent use of the singular form to ascertain its meaning—simply does not follow. Critically, Defendants' premise regarding the Secretary's rulemaking authority is wholly irrelevant here, because *that isn't what Secretary Noem did*, neither procedurally nor substantively. Instead, she cut short all grants of parole given to identifiable people (the class members). A045; 2025 WL 1505688, at *1 ("Secretary [Noem] did indeed purport to categorically terminate plaintiffs' parole."). To make it worse, while DHS' regulations require "written notice" of termination, Secretary Noem asserted (erroneously) that she satisfied those requirements via "constructive notice," through publication in the Federal Register. A054 (noting the regulations' applicability while claiming erroneously that "constructive notice" was sufficient). Defendants' analogies to the public charge regulations and regulations adopted by other agencies, Defs.' Br. 34-36, simply do not apply to the categorical action under review here.

*See* 2025 WL 1505688, at *1 ("It is also undisputed that the Secretary did indeed purport to categorically terminate plaintiffs' parole.").

Defendants identify only one other basis for error, claiming that the district court's interpretation of the statute means that "Congress's insertion of the 'only on a case-by-case basis' language" via the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") "was entirely superfluous because the statute's use of the singular already required that result." Defs.' Br. 35 (citing, *inter alia*, Appx-0170). Defendants reasoning is wrong for several reasons. For one, when Congress amended the parole statute through IIRIRA, it did not just insert the "case-by-case" language Defendants quote; instead, it changed surrounding language, too, as shown below (with additions underlined and ~~deletions struck out~~):

> *The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe ~~for emergent reasons or for reasons deemed strictly in the public interest~~ only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission ....*

Appx-0170. Add in *all* of IIRIRA's parole-related provisions,[21] and Defendants clearly err in assigning particularized congressional intent based on a few words while ignoring the balance of Congress's action. *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) ("We focus on the plain meaning of the whole statute, not of isolated sentences or phrases." (alteration and citation omitted)).

---

[21] Appx-0183-84 (discussing IIRIRA's other parole-related provisions).

Additionally, as a matter of historical fact, the federal government understood well before IIRIRA that the parole authority required case-by-case adjudication, as Plaintiffs demonstrated through uncontested record evidence. *See, e.g.*, Appx-0247 (transcript of April 1995 press briefing regarding new parole process for certain Cubans) ("We are operating under the provisions of humanitarian parole. Humanitarian parole is granted by the Attorney General on a case-by-case basis," and "[b]ecause it's done on a case-by-case basis," the government could not say the number of Cubans who would be paroled); Appx-0259 (May 1995 statement of Attorney General Reno) (same substance); Appx-0181, Appx-0184-85; Appx-0206. Moreover, Defendants' repeated emphasis on what the parole statute requires to "grant" or to "terminate" parole ignores that the statute uses neither of those words; if anything, Secretary Noem's decision to change the expiration date of every class member's period of parole is best described in statutory terms as "prescrib[ing]" revised "conditions" of each person's parole (i.e., changing the duration of each grant), but not on a case-by-case basis. Appx-0580.

Most fundamentally, Defendants unfairly malign the district court's holding, which was not based just on the parole statute's use of the singular tense, nor any other single consideration, but rather the entire statutory text and context. *Cf.* Defs.' Br. 34 (citing the Dictionary Act's admonition to consider context). Upon her examination of the statutory text, the district court reasoned that:

- *First*, the statute requires that parole be granted on a case-by-case basis for public benefit and/or humanitarian purposes, A036 ("Even under the categorical programs, grants of parole were to be made on a case-by-case basis"), and parole through the CHNV processes were based on both statutory grounds, A034-35; A046. Defendants do not contest this.

- *Second*, each class member was granted a period of parole (expiring on a specified day) by an individual CBP officer based upon their personal information and circumstances following multiple case-by-case reviews and rounds of vetting and being inspected and interviewed at a U.S. port of entry, A002-03, A034 & n.30; A045. Defendants do not contest this.

- *Third*, terminating someone's parole requires the Secretary "to determine whether the purposes of a grant of parole 'have been served.'" A021. Defendants do not contest this.

- *Lastly*, Secretary Noem did not and could not have determined that the *humanitarian* purposes of each class members' parole "had been served"—and *that* is one way we know her action was not in accordance with the statute. A035-37 (explaining that Secretary Noem "offered no reasons for categorically revoking parole despite the humanitarian concerns previously articulated by DHS," failed to consider or address "the humanitarian concerns facing each parolee whose parole is being truncated," and that notwithstanding her "significant discretion to terminate a

grant of parole under the statute," the statute says "such termination must attend to the reasons an individual alien received parole"). Defendants nowhere contest this in their opening brief, either.

Instead, this is where Defendants abandon recognized principles of statutory construction: they claim that regardless of how unlawfully Secretary Noem acted, that does not matter because the Biden Administration did it first.[22] Beyond asking this Court to adopt the unrecognized *primum fecit illud* cannon of statutory construction, this cynical contention cannot be considered for several reasons: it was not made to the district court (and so was waived); the record is conclusively to the contrary, including because Secretary Noem said literally the opposite in the FRN,[23]

---

[22] The Solicitor General argued similarly to the Supreme Court, but Defendants appear materially less committed to the argument now that their stay application has been granted. *Compare* Appx-0758 *with* Defs.' Br. 32 (identical assertions about the "perverse result" produced by the district court's reasoning, but with the latter making the indicated changes (underlined and c̶r̶o̶s̶s̶e̶d̶ ̶o̶u̶t̶) from the former: "though the previous Administration effectively *granted* parole on a categorical basis to over half a million aliens̶,̶—̶by using common reasons to determine the prerequisites for parole were met—this Administration cannot *r̶e̶v̶o̶k̶e̶ terminate* parole absent individual̶-̶b̶y̶-̶i̶n̶d̶i̶v̶i̶d̶u̶a̶l̶ determinations."); *and compare* Appx-0759 *with* Defs.' Br. 33 (same convention: "Here, one independently sufficient ground for terminating the CHNV parole programs is that those programs g̶r̶a̶n̶t̶e̶d̶ ̶p̶a̶r̶o̶l̶e̶ made parole available to hundreds of thousands of aliens w̶i̶t̶h̶o̶u̶t̶ ̶a̶n̶y̶ ̶c̶a̶s̶e̶-̶b̶y̶-̶c̶a̶s̶e̶ d̶e̶t̶e̶r̶m̶i̶n̶a̶t̶i̶o̶n̶s̶ based on programmatic, non-individualized findings in the first place.").

[23] USCIS said the same a month earlier, Appx-0310, and Defendants' counsel likewise conceded that class members were individually evaluated and paroled, Appx-0310.

A045 ("Under these [CHNV] categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis …."); and Secretary Noem's decision can be justified, if at all, solely on the grounds she gave—and this was not one. *Biden*, 597 U.S. at 811; *Regents*, 591 U.S. at 24.

Defendants' remaining arguments make even less sense. Defendants argue that "[r]equiring the Secretary to make case-by-case determinations to terminate parole … would further overburden the immigration system," Defs.' Br. 34, but even assuming current burdens on the immigration system are relevant to the meaning of the parole statute (and they of course aren't), they point in the opposite direction, since the least burdensome way of proceeding would be to simply let the parole grants expire naturally, "as DHS has in the past done with some parole terminations." A053-54. Defendants' final argument, that Secretary Noem's action "does not violate even the district court's flawed understanding of" the parole statue because "the Secretary will continue to exercise her discretion to grant or deny parole to CHNV parolees on a case-by-case basis," Defs.' Br. 36 (citing A046), seemingly references the FRN's statement that Secretary Noem "retains discretion" to extend the parole of "any alien paroled under CHNV" on a "case-by-case basis," A046, which is tantamount to saying that Secretary Noem will try to correctly apply the parole statute to the CHNV parolees *from now on*—cold comfort indeed.

Defendants identify no error in the district court's holding that Plaintiffs are likely to prove Secretary Noem's action was not in accordance with law.

**B.    The district court correctly held that Secretary Noem's *en masse* truncation of CHNV parole was arbitrary and capricious because it was based on legal error and unreasoned decisionmaking.**

The district court did not err in holding that DHS's *en masse* termination of existing grants of CHNV parole was arbitrary and capricious due to Secretary Noem's legal error and failure to engage in reasoned decisionmaking. When executive agencies exercise their considerable authority, the APA requires that they do so on an informed basis, ground their justifications on neutral and rational principles, and "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. As "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011), review of whether an agency's action reflects reasoned decision-making "is to be searching and careful," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The district court did just this and correctly held Plaintiffs are likely to succeed on their arbitrary and capricious claim for two separate reasons.

1. The district court correctly concluded that Secretary Noem's explanation for why she overrode class members' reliance interests, cut short all of their periods of parole, and rejected the only alternatives she considered—a longer wind down

period or allowing their parole to "remain in effect until the natural expiration of the parole," A053—was based on an "obvious legal error." A031; *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law"). The sole reason Secretary Noem gave for this set of decisions was to "preserv[e] the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population" by ensuring that as few class members as possible "accrue more than two years of continuous presence." A053-54.

Secretary Noem based her decision on a misunderstanding of the expedited removal statute. Noncitizens in the United States after being inspected and paroled—as all class members were—are, by the plain text of the expedited removal statute, categorically ineligible for expedited removal no matter how long they have been here. A032. Under the expedited removal provision at issue, the Secretary can subject certain noncitizens to expedited removal if they are inadmissible for their failure to have valid entry documents, but only if they have "*not* been admitted *or paroled* into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphases added).

Defendants argue that the statute's use of "has not been … paroled" should be read to allow DHS to subject individuals whose parole has ended to expedited removal if they have been here less than two years. Defs.' Br. 37-38. Defendants provide no case law endorsing their interpretation, which directly contradicts the

statutory text. They cite only a single case in support, *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261-62 (11th Cir. 2025), which, as the district court noted, "merely explained" in the context of a different statutory scheme "that 'the use of the present-perfect tense can, as a matter of pure semantics, refer to a time in the indefinite past <u>or</u> to a past action or state that continues into the present," A032-33 (quoting *Turner*, 130 F.4th at 1261). In this case, the text, context, and purpose of 8 U.S.C. § 1225(b)(1)(A)(iii)(II) are clear: to carve out those who came in with permission—be via parole or through an admission, such as with a visa—from those who can be subjected to expedited removal. A033; *accord Barrett v. United States*, 423 U.S. 212, 216 (1976) (interpreting the present perfect tense in a statute to "denot[e] an act that has been completed").

Defendants' reading would render meaningless express congressional limits on the Executive's authority to subject noncitizens to swift, summary deportation (without judicial review) if Defendants could simply subject a previously "paroled" person to expedited removal by terminating their parole. Defendants' position appears to be that Congress nonsensically extended protection from expedited removal to "paroled" noncitizens, but only until the point that DHS decides to subject them to expedited removal. Defendants' assertion runs contrary to the text

and all norms of statutory interpretation.[24] *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) ("[T]he Court rejects an interpretation of the statute that would render an entire subparagraph meaningless. As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'") (citation omitted).

Defendants further try to defend the Secretary's legal error by claiming the district court's interpretation "would require a former parolee's case to be dealt with differently from any other applicant [for admission]'s by categorically taking expedited removal off the table." Defs.' Br. 38. Defendants ignore that Congress made that decision, by instructing that "an alien present in the United States who has not been admitted"—which includes but is not limited to someone paroled into the country whose parole then expires—"shall be deemed … an applicant for

---

[24] DHS's own regulations also contradict Defendants' novel interpretation, making clear that "has not been admitted or paroled" refers to a past event, rather than a continuing status. *See, e.g.*, 8 C.F.R. § 235.3(b)(1)(ii) (expedited removal can be applied to "aliens who … have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry"); *id.* § 235.3(b)(6) (requiring each noncitizen be permitted to prove he "was … paroled into the United States following inspection at a port-of-entry" before being subjected to expedited removal). That the inquiry into whether a noncitizen has or "has not been admitted or paroled" refers to an event rather than a status is also consistent with the Supreme Court's observation in *Sanchez v. Mayorkas* that "[l]awful status and admission … are distinct concepts in immigration law." 593 U.S. 409, 415 (2021). "Parole" can be both a manner of entry and a status, but in the full context here, the text focuses on manner of entry and not maintenance of a particular admission or parole status.

44

admission," 8 U.S.C. § 1225(a)(1), and then, in the very next subsection, limiting expedited removal *without regard* to whether someone is an applicant for admission, but by their manner of entry, *id.* § 1225(b)(1)(A)(iii)(II) ("an alien … who has not been admitted or paroled"). Had Congress wanted the Secretary to treat all applicants for admission the same, it "could easily have said so," *Kucana*, 558 U.S. at 248, and Defendants cannot defend their contention that Congress did so impliedly.[25]

Finally, Secretary Noem's explanation for her actions is inconsistent with what DHS claims to be its expedited removal authority more generally. Specifically, DHS claims that it also has the authority to subject paroled individuals to expedited removal as "arriving aliens" under 8 U.S.C. § 1225(b)(1)(A)(i)—the other prong under which noncitizens can be subjected to expedited removal—and no matter how long they have been in the country. Appx-0640 n.4. This position is grammatically nonsensical; the class members presented at a port of entry, were inspected and paroled into the country, and are now living here. There are no longer in the process of "arriving." *See Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020). This position is also, as the district court found, contrary to Secretary Noem's stated rationale, which justified cutting short all class members' parole lest they become ineligible for expedited removal. A033. But regardless of whether or not Secretary

---

[25] Under Defendants' proffered interpretation, DHS could also subject to expedited removal noncitizens admitted on visas—likewise contrary to the clear intent of Congress—if it merely revokes that visa first. Appx-0682-83.

Noem is *correct* about the scope of expedited removal, it is arbitrary and capricious for her to claim simultaneously that (a) she must uproot the lives of hundreds of thousands of class members because otherwise they may accrue sufficient continuous presence to become ineligible for expedited removal *and* that (b) she can subject class members to expedited removal in perpetuity as "arriving aliens." *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("Unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (cleaned up); *see also Dep't of Com.*, 588 U.S. at 783-85 (vacating agency action where "the evidence tells a story that does not match the explanation the Secretary gave" because courts "cannot ignore th[is] disconnect").

2. Defendants also assert that this legal error does not justify staying the truncation of class members' parole "because the Secretary invoked several other independently sufficient reasons." Defs.' Br. 39. But Defendants badly mischaracterize what Secretary Noem said; she did not *give* any other reasons for dismissing the class members' reliance interests or for rejecting the only alternatives she considered. A053-54. Instead, all the "other" reasons Secretary Noem gave concerned her decision to terminate the CHNV parole processes prospectively, and have nothing to do with her separate decision that is at issue here. *Id.*; *see also, e.g.*, A046 ("These reasons, independently and cumulatively, support *termination of the*

46

*CHNV parole programs*.") (cited at Defs.' Br. 39) (emphasis added). Secretary Noem was even explicit that her decision to "terminat[e] the CHNV parole programs" should be treated as distinct, severable, and independent from her decision to "terminat[e] … existing grants of parole." A055-56.

And contrary to Defendants' bald assertion that the district court "improperly, and summarily, dismissed these other reasons," Defs.' Br. 39, the district court *did* analyze the "other" reasons Secretary Noem gave.[26] *See* A034-36. As discussed above, the district court found that Secretary Noem failed to address the humanitarian basis for the CHNV parole processes generally *and* failed to consider the humanitarian bases for the individual grants of parole. *See id.* Notably, Defendants do not argue the district court erred in reaching these conclusions, thereby waiving any claim of error. *Sparkle Hill, Inc.*, 788 F.3d at 29-30.

In sum, the district court correctly held that Plaintiffs are likely to prevail on their claim that Secretary Noem acted arbitrarily and capriciously.

## IV.    Without the District Court's Stay, Plaintiffs and Class Members Are Suffering Irreparable Harm.

The district court did not abuse its discretion in finding that Secretary Noem's action truncating parole inflicts irreparable harm on the class members. Indeed, the

---

[26] Defendants assert the district court erred in considering Plaintiffs' likelihood of success "without the benefit of an administrative record," Defs.' Br. 39 & n.3, but Defendants omit that they *agreed* to proceeding without the administrative record here. Appx-0332.

harms are severe and consequential, individually and collectively. First, categorically and prematurely truncating class members parole and work authorization has rendered those without another lawful status undocumented and legally unemployable, which has ripple effects through their and their families' lives. *See, e.g.*, Appx-0066 (for Armando Doe, losing work authorization means losing the ability to provide for his family, including his wife in the United States and his parents back in Nicaragua); Appx-0044 (for Alejandro Doe, losing work authorization means being "forced to break apartment leases" and being "render[ed] … homeless" after making "great personal and financial sacrifice[s]" to come to the United States); A019 n.19 ("Denial of work authorization over the course of this litigation would cause harm to Plaintiffs that could not be remedied through damages").

Moreover, Secretary Noem's action puts many class members immediately at risk of deportation to countries where they face grave risks of violence, persecution, and even death. *See, e.g.*, Appx-0075 (Carlos Doe fled persecution, political instability, and death threats after participating in political protests in Nicaragua and is "still a wanted man for [his] anti-government political views"); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("removal is a serious burden for many [noncitizens]"). Many class members also face the imminent risk of being abruptly separated from their family here in the United States. *See, e.g.*, Appx-0295-96 (Andrea and Rafael Doe face spousal family separation if Andrea's parole is terminated and she

is removed, because Rafael has been stripped of his Nicaraguan citizenship and can-not return to Nicaragua with her); Appx-0553, 0555 (Lucia Doe faces sibling family separation from her U.S. citizen sponsor sister after CHNV made it possible for all of the family's siblings to be "incredibl[y]" and "joyful[ly]" reunited in 2024 after six years apart). Defendants only answer is to observe that parole is "a discretionary benefit that can be terminated at any time," Defs.' Br. 44-45, which has nothing to do whether the injuries inflicted by Secretary Noem are irreparable—that is, whether they can be remedied with money damages.

Defendants also deflect from the harms inflicted on Plaintiffs and the class by pointing to post-hoc measures that theoretically might be available to mitigate some of their harm. Defs.' Br. 45 (asserting that some class members "may already have obtained immigrant or nonimmigrant status" and that, regardless, they might "have the opportunity to assert [asylum claims] if they are placed in expedited removal or removal proceedings"). These assertions are disingenuous. First, as the district court correctly noted, concomitant with their termination of parole grants, Defendants "imposed an indefinite suspension of immigration benefits adjudications, rendering Plaintiffs' chances of having any benefits adjudicated outside of removal proceed-ings a virtual nullity." A005-6, 019. This suspension was stayed approximately a month ago, yet Defendants have yet to restart the processing of class members' im-migration benefit requests. *Supra* 10 n.4.

Second, the notion that CHNV parole beneficiaries could assert claims for asylum or other forms of protection from removal in expedited removal or regular removal proceedings is likewise a red herring. First, the only reason Secretary Noem gave for prematurely ending class members' parole was to subject them to *expedited* removal proceedings, not regular removal proceedings. *See* A053-54. Second, as the district court noted, expedited removal does not afford individuals the ability to "renew most immigration benefits requests," A019, let alone "raise asylum" or other protection claims, as Defendants assert.[27] Defs.' Br. 45-46.

The district court did not err in holding that Plaintiffs and hundreds of thousands of class members would suffer irreparable harm in the absence of a preliminary and temporary stay of Secretary Noem's mass truncation of parole.

## V. The Balance of Equities and Public Interest Support Affirming.

The balance of equities and public interest weigh in favor of affirming the district court. Although Defendants claim that the Supreme Court's May 30 Order

---

[27] Individuals in expedited removal can only apply for relief from removal by first getting *out* of expedited removal; the only way noncitizens can do that is to persuade an Executive branch employee that they have a sufficiently high likelihood of being persecuted or tortured if returned to their home country (if successful, the noncitizen is diverted into full removal proceedings). Noncitizens have no right to counsel (even at their expense) and there is no judicial review of the Executive's conclusion that noncitizens failed to carry their burden of proof. Even if successfully diverted to regular removal proceedings, many "collateral" forms of relief (like adjustment of status) require the immigration judge to agree to delay removal proceedings long enough for the noncitizen to obtain that relief from USCIS.

purportedly "determined that the equity balance weighs in the Government's favor," they cite only Justice Jackson's dissent for this proposition, which obviously has no precedential value. *See* Defs.' Br. 39. The Order itself is silent on the balance of equities as to Defendants' application for an emergency stay, and Defendants identify no error of law in the district court's decision. Moreover, a "stay order is not a ruling on the merits." *See*, *e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879 (mem.) (2022) (Kavanaugh, J., concurring); *Latino Political Action Comm., Inc. v. City of Boston*, 716 F.2d 68, 69 (1st Cir. 1983) ("Our decision on a motion for a stay pending appeal is necessarily something short of a final decision on the merits. Such matters often, as here, arise in contexts of great urgency with only a brief period available for review and analysis.").

Defendants claim that the concrete and irreparable harms inflicted on the Plaintiffs and class members are outweighed by abstract injuries to the government, miscasting the district court's measured decision as an "unwarranted judicial interference in the conduct of foreign policy," Defs.' Br. 41; an "encroach[ment] on the core Executive function of managing the immigration system," Defs.' Br. 43; and a "permanent[] enjoining [of] any termination of CHNV parole," Defs.' Br. 44. These contentions are untethered from the district court's order, which only stays one aspect of Secretary Noem's decision to end the CHNV parole processes, and only while this case proceeds to final judgment. A040. Defendants can identify no

basis for concluding that the balance of equities tips in favor of reversing this narrowly drawn order.

1.     First, Defendants' claims that the district court's order unduly interferes with the executive's conduct of foreign policy, Defs.' Br. 42-43, are an empty talisman. As the district court noted in its order, the relief ordered "would not authorize the entry of any individual currently outside the United States," nor "extend the original grants of parole awarded by DHS." A038. Tellingly, other than repeatedly invoking the phrase "foreign policy," Defendants do not substantiate (anywhere) and cannot identify how an order staying Secretary Noem's attempt to cut short the parole of all the class members actually interferes with the federal government's conduct of foreign policy—because it does not. The cases Defendants cite are clearly distinguishable. *Compare* A038 (noting the stay has a purely *domestic* impact that concerns only people already *inside* the United States), *with* Defs.' Br. 41-42; *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) (concerning the Alien Tort Statute and whether *foreign* nationals could bring causes of action against *foreign* corporations acting in a *foreign* country); *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988) (regarding national security concerns surrounding revocation of an individual's security clearance to work on a nuclear submarine, a "crucial component of our Nation's defense system"); *Haig v. Agee*, 453 U.S. 280 (1981) (concerning the Secretary of State's authority to revoke a passport on the

ground that the holder's activities in *foreign* countries are causing or likely to cause serious damage to the *national security* or *foreign policy* of the United States).

2.     Defendants claim great harm based on the mere fact that the district court's order contravenes the will of President Trump. Defs.' Br. 41. Defendants ignore that the public's primary interest is in government officials obeying the law that the people's representatives have enacted. *See Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) ("There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (alteration and citation omitted)); *accord New Jersey v. Trump*, 131 F. 4th 27, 41 (1st Cir. 2025).

3.     Finally, Defendants claim that the district court's order "would effectively force DHS to delay removal proceedings for this population for a long period of time." Defs.' Br. 43. But nothing in the district court's order forces Defendants to do anything at all; nor does it prohibit Defendants from doing anything. Instead, the district court merely paused that part of Secretary Noem's action that cut short all class members' parole while this case proceeds to final judgment. The district court's order does not prohibit DHS from revoking any class member's parole nor from removing any class member. Secretary Noem has exactly the same legal authority on those and other matters that she had before Plaintiffs filed suit.

Defendants still can identify "no substantial reason or public interest" to justify the categorical, premature, and *en masse* truncation of parole for "hundreds of thousands of individuals … lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families." A039. The balance of equities tips decisively in Plaintiffs' favor.

## CONCLUSION

This Court should affirm.

Dated: June 25, 2025

John A. Freedman
Laura Shores
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com

H. Tiffany Jang
ARNOLD & PORTER
  KAYE SCHOLER LLP
200 Clarendon Street, Fl. 53
Boston, MA 02116
(617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow
ARNOLD & PORTER
  KAYE SCHOLER LLP

Respectfully submitted,

*/s/ Justin B. Cox*
Justin B. Cox
LAW OFFICE OF JUSTIN B. COX
*JAC Cooperating Counsel*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Esther H. Sung
Karen C. Tumlin
Hillary Li
Laura Flores-Perilla
Brandon Galli-Graves
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
(415) 471-3142
daniel.asimow@arnoldporter.com

brandon.galli-
graves@justiceactioncenter.org

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A) that the foregoing opposition contains 12,986 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: June 25, 2025                     Respectfully submitted,

                                         */s/ Justin B. Cox*
                                         Justin B. Cox


**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2025, I electronically filed the foregoing document using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


                                         Respectfully submitted,

                                         */s/ Justin B. Cox*
                                         Justin B. Cox