No. 25-1384

# United States Court of Appeals
# For the First Circuit

SVITLANA DOE, et al.,

*Plaintiffs-Appellees*,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Massachusetts
1:25-cv-10495, Judge Indira Talwani

**AMICUS CURIAE BRIEF OF THE AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS ("AFL-CIO") AND AFFILIATED UNIONS SEIU, UFCW, UAW, UNITE HERE, IUPAT, IUE-CWA, AND BAC IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Matthew Ginsburg
  *General Counsel*
Andrew Lyubarsky
  *Counsel of Record*
AFL-CIO
815 Black Lives Matter Plaza, NW
Washington, DC 20006
alyubarsky@aflcio.org
(202) 637-5115

David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
dzimmer@zimmercitronclarke.com
(617) 676-9421

*Counsel for Amici Curiae*

Steven K. Ury
Service Employees International Union
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(213) 440-4547
steven.ury@seiu.org

*Counsel for Amicus Curiae SEIU*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state that no *amici curiae* has a parent corporation and that no publicly-held corporation owns 10% or more in stock in any *amici curiae*. Each *amicus curiae* is a not-for-profit labor organization.

/s/ Andrew Lyubarsky

July 1, 2025                      Andrew Lyubarsky

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE*.................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................4

ARGUMENT ...............................................................................................8

I.   The Abrupt Rescission of CHNV Parole and Parolees' Work
     Authorization Has Generated Chaos in American Workplaces,
     Impacted Production and Harmed American Workers..................8

     A. DHS's Actions Have Had Profoundly Disruptive Effects on
        U.S. Workplaces…………………………………………………9

     B. DHS's Failure to Provide Employers, Unions, and Workers
        Meaningful Guidance Has Led to Widespread Confusion and
        Arbitrary Results......................................................................17

II.  The Disruption the Blanket Rescission of CHNV Parole Would
     Cause to U.S. Workers and Employers Weighs Against a Stay in
     Two Ways .......................................................................................23

     A.   The Blanket Rescission of CHNV Was Arbitrary and
          Capricious Because It Failed to Consider the Economic
          Disruption Caused by DHS's Actions. ..................................24

     B.   The Balance of Hardships and the Public Interest Militate
          Strongly Against a Stay of the District Court's Order.........33

CONCLUSION .........................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Doe v. Noem*,
   No. 1:25-cv-10495 (IT), 2025 WL 1514420, (D. Mass. May 28, 2025) . 30

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................. 25

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................. 25

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) ................................................................. 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................... 23, 24, 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................ 8, 35

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ................................................................... 5

*Vaca v. Sipes*,
   386 U.S. 17 (1967) ..................................................................... 5

**Statutes**

8 U.S.C. § 1158(d)(2) ................................................................. 32

8 U.S.C. § 1324a(a)(2) ............................................................... 18

8 U.S.C. § 1324a(b)(1)(A) .......................................................... 18

8 U.S.C. § 1324b(a)(6) ............................................................... 20

**Regulations**

8 C.F.R. § 274a.2(b)(1)(v)(A)(4) .................................................... 18

8 C.F.R. § 274a.2(b)(3)..................................................................18

8 C.F.R. § 274a.12(c)(8) ................................................................ 30

8 C.F.R. § 274a.12(c)(11) .............................................................. 19

8 C.F.R. § 274a.14(a) .................................................................... 31

8 C.F.R. § 274a.14(a)(1)(ii) ........................................................... 32

8 C.F.R. § 274a.14(b)(1)(i). ........................................................... 32

8 C.F.R. § 274a.14(b)(2) ............................................................... 20

**Administrative Materials**

DHS, "Implementation of a Parole Process for Haitians," 88 Fed. Reg.
    1243, 1244 (Jan. 9, 2023)  ....................................................29

DHS, "Implementation of a Parole Process for Venezuelans," 87 Fed.
    Reg. 63507, 63508 (Oct. 19, 2022)........................................29

DHS, "Termination of Parole Processes for Cubans, Haitians,
    Nicaraguans, and Venezuelans," 90 Fed. Reg. 13611 (Mar. 25, 2025)
    ................................................................................6, 25, 26, 31

Termination of the Central American Minors Parole Program,
    82 Fed. Reg. 38926 (Aug. 16, 2017)......................................25

**Miscellaneous**

DHS, E-Verify, "EAD Revocation Guidance for E-Verify Employers,"
    (June 23, 2025), https://www.e-verify.gov/ead-revocation-guidance-for-
    e-verify-employers ...............................................................22

Greenspoon Marder LLP, "Confusion Surrounds DHS' Handling of CHNV Parole and EAD Revocations," (June 17, 2025), https://www.gmlaw.com/news/confusion-surrounds-dhs-handling-of-chnv-parole-and-ead-revocations ........................................................... 21

Holland & Hart LLP, "CHNV Update: Revocations and USCIS Guidance Trigger Urgent Employer Action," (June 24, 2025), https://www.hollandhart.com/chnv-update-revocations-and-uscis-guidance-trigger-urgent-employer-action ............................................ 20

Seyfarth Shaw LLP, "CHNV Fallout: USCIS Issues Compliance Guidance for Employers," (June 23, 2025), https://www.bigimmigrationlawblog.com/2025/06/chnv-fallout-uscis-issues-compliance-guidance-for-employers ........................................... 21

Steve Eder, Danielle Ivory & Marcela Valdes, *The Hidden Truth Linking the Broken Border to Your Online Shopping Cart*, N.Y. Times (Nov. 17, 2024), https://www.nytimes.com/2024/11/17/us/immigration-undocumented-migrants-jobs.html ....................................................... 16

Transp. Sec. Admin., Press Release, "TSA Expects Over 18.5 Million People to Travel by Air Over Busy Fourth of July Holiday," (June 24, 2025), https://www.tsa.gov/news/press/releases/2025/06/24/tsa-expects-over-185-million-people-travel-air-over-busy-fourth-july ...... 14

USCIS, "The Cuban Family Reunification Parole Program," https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program (last accessed June 28, 2025) ... 19

USCIS, "The Haitian Family Reunification Parole Program," https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-aliens-outside-the-united-states/the-haitian-family-reunification-parole-hfrp-program (last accessed June 28, 2025) ..................................................................................... 19

## INTEREST OF *AMICI CURIAE*[1]

The **American Federation of Labor & Congress of Industrial Organizations ("AFL-CIO")** is a federation of 63 national and international labor organizations with a total membership of over 15 million working men and women who are employed in every sector of this country. All seven other *amici* are labor organizations affiliated with the AFL-CIO.

The **Service Employees International Union ("SEIU")** is a labor organization of approximately two million members who work in the healthcare industry, state and local government, and in property service industries, such as janitors, security officers, airport workers, retail, distribution, laundry, and fast food workers, and adjunct professors, throughout the United States, Canada, and Puerto Rico. SEIU estimates that hundreds of its members are CHNV parolees.

---

[1] *Amici* certify that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici* made a monetary contribution to its preparation or submission. All parties to this appeal have consented to the filing of this brief.

The **United Food and Commercial Workers International Union ("UFCW")** is a labor union that represents over 1.2 million people across the United States, Canada and Puerto Rico. In the United States and Puerto Rico, UFCW represents over 900,000 workers. Many UFCW members work in the meatpacking and food processing industries in the United States, and a significant number of CHNV parolees are among their ranks.

The **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")** is one of the largest and most diverse unions in North America, with members in virtually every sector of the economy. UAW has more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico. UAW represents a significant number of CHNV parolees in the manufacturing sector who have been impacted by the abrupt termination of the program.

**UNITE HERE** is an international labor union that primarily represents workers in the hotels, casino gaming and food service industries, and has approximately 270,000 members in the United States. Service jobs in the hospitality industry attract new immigrants

as they arrive and seek work opportunities in United States, and as a result, UNITE HERE's membership includes many immigrants who are temporarily authorized to work in the United States, including through CHNV parole.

The **International Union of Painters and Allied Trades ("IUPAT")** proudly represents 140,000 workers in the finishing trades across the United States and Canada. IUPAT members work in dozens of trades, primarily industrial painters, commercial and decorative painters, drywall finishers, glaziers and glass workers, sign and display workers, trade show workers, floor covering installers, and many more successful careers in the construction industry and beyond. The ranks of IUPAT's membership include many CHNV parolees.

The **International Union of Electrical Workers-Communications Workers of America ("IUE-CWA")** is the Industrial Division of the Communications Workers of America ("CWA"). The Union represents 40,000 workers across the country in a wide range of manufacturing industries. IUE-CWA represents employees in at least two factories in the Midwest where a significant number of members are CHNV parolees. The Administration's efforts to

abruptly terminate CHNV parole has been highly disruptive to the workforce in these locations and to IUE-CWA members' lives.

The **International Union of Bricklayers and Allied Craftworkers ("BAC")** represents 70,000 workers in the masonry trades across the United States and Canada. These skilled craftworkers include bricklayers, stone and marble masons, cement masons, plasterers, tilesetters, terrazzo and mosaic workers, and pointers/cleaners/caulkers. BAC's membership includes many CHNV parolees. The signatory contractors who employ BAC members rely on the skills that these individuals bring to their jobsites to help build their communities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* are labor unions representing workers across a wide spectrum of industries, including the automotive, manufacturing, airport service contracting, construction, meatpacking, and hospitality sectors. Our members are American citizens and non-citizens. The National Labor Relations Act ("NLRA") mandates that unions comply with a duty of fair representation and provide equitable, zealous, and non-discriminatory advocacy for all of their members, regardless of

their immigration status. *See Vaca v. Sipes*, 386 U.S. 171, 177–78 (1967); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891–92 (1984) (NLRA provides rights to all employees regardless of immigration status).

*Amici*'s members hold a variety of immigration statuses that provide work authorization, ranging from lawful permanent residents to non-immigrant visa holders. And thousands of them are parolees from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV parolees") whose right to work was tied to their parole status. These parolees entered the country lawfully by invitation of a U.S. sponsor, were lawfully present in this country, were lawfully authorized to work at the facilities where *amici* represent workers, and lawfully went through the I-9 verification process provided for in the Immigration Reform and Control Act ("IRCA") and its implementing regulations. They are also among the workers to whom unions owe this duty of fair representation.

Each CHNV parolee was permitted to enter the country and remain here for a period of two years. During their time in this country, they have worked shoulder-to-shoulder with their U.S.-citizen co-workers in industries critical to our Nation's economic security.

On March 25, 2025, all this changed. Rather than wait for each parolee's two-year term to end, the U.S. Department of Homeland Security ("DHS") issued a notice abruptly terminating the CHNV program, rescinding all existing grants of CHNV parole with a 30-day wind-down period, and initiating processes to revoke work authorization from hundreds of thousands of CHNV parolees. DHS, "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13611 (Mar. 25, 2025) (hereinafter, the "Federal Register Notice" or "FRN").

*Amici* received a short reprieve from the repercussions of this decision because of the district court's swift action in this case. On April 14, Judge Talwani stayed significant portions of the FRN under the Administrative Procedure Act ("APA"), holding that DHS's proposed mass revocations of parole and work authorization is both arbitrary and capricious and also rests on a legally-flawed reading of the expedited removal statute. A031–37. This staved off—temporarily, at least—what *amici* believe to be the largest single-day revocation of work authorization in our Nation's history, one that DHS sought to initiate

6

with effectively no notice to employers or the U.S. workers who would be impacted.

On May 30, however, the Supreme Court stayed the district court's order—for now, allowing the revocations to proceed while litigation continues before this Court. As a consequence—despite a dearth of guidance from DHS—employers have discharged scores of CHNV parolees across a variety of sectors. U.S. workers (and the unions who represent them) have been left to pick up the pieces, particularly in industries that have already been suffering from labor shortages.

But the Supreme Court's stay order is just that—a stay. It is a non-precedential ruling that does not bind this Court to resolve this case on its merits in any particular way. Because the district court's order is stayed pending this Court's decision on the Government's appeal and the disposition of any petition for writ of certiorari that may be filed, it emphasizes the need for this Court to act with dispatch to mitigate the workplace disruptions that *amici* detail in this submission.

These disruptions impact two questions before this Court. First, regardless of the merits of the CHNV program in its conception, DHS's failure to consider the dramatic impact of summarily rescinding

hundreds of thousands of work permits with virtually no notice to American workers, employers, and unions renders the agency's actions arbitrary and capricious. Thus, Plaintiffs are likely to succeed on the merits of their claims under the APA. Second, the immense strain the FRN has placed on unions and employers alike means that the balance of the equities and the public interest—two key factors that the district court properly considered in its stay order, *Nken v. Holder*, 556 U.S. 418, 435–36 (2009)—tilt sharply against the government.

*Amici* thus urge the Court to affirm the district court's order.

## ARGUMENT

### I.   The Abrupt Rescission of CHNV Parole and Parolees' Work Authorization Has Generated Chaos in American Workplaces, Impacted Production and Harmed American Workers.

*Amici* are uniquely positioned to assess the impact of DHS's FRN on the workplace. Between March 25, when the FRN was issued without notice-and-comment from affected stakeholders, and April 14, when the mass rescission of CHNV parole was stayed by the district court, *amici* endured three weeks of confusion among the workers they represent and the employers with whom they bargain. Following a month-and-a-half-long reprieve when the district court's order was in

8

effect, this state of chaos has reemerged. *Amici*'s CHNV parolee

members—even those who were eligible for or had applied for another

immigration benefit— have experienced abrupt job loss and potential

destitution, or fear that such a fate is imminent. And *amici*'s other

members are preparing for punishing work conditions including

excessive mandatory overtime on the one hand, and, on the other, the

potential for layoffs if employers are no longer able to meet consumer

demand as a result of a sudden reduction in staffing.

### A. DHS's Actions Have Had Profoundly Disruptive Effects on U.S. Workplaces

In the aftermath of the FRN's revival, employers have begun to

discharge CHNV parolee workers whose work authorization they

understand to have been revoked. This has led to impacts across all

sectors of our Nation's economy.

We begin with manufacturing, where labor shortages are

rampant. For instance, **IUE-CWA** represents approximately 6,000

employees at a home appliance manufacturer in the Midwest. Even

before DHS's decision to abruptly terminate CHNV parole, IUE-CWA

reports that this facility had approximately 150 unfilled positions, and

had eliminated a shift due to lack of labor. As a result, despite the

additional boost provided by CHNV parolee workers, the employer announced that it was imposing mandatory overtime on all remaining workers, requiring them to work 9 hours per day, until further notice, in order to meet its production needs.

This employer has already discharged 52 employees that had previously been work-authorized via CHNV parole and has indicated that additional terminations may be forthcoming. In the meantime, the Union's other workers see their working conditions further degraded by the need to meet the company's production needs with an ever-decreasing pool of workers.[2]

**UAW** is similarly impacted. The union represents workers at three tier-one automotive parts facilities that supply auto assembly

---

[2] IUE-CWA reports a similar situation at another facility in the energy manufacturing sector where it represents approximately 1,000 employees, where the Employer has asserted that approximately 40 are CHNV parolees. In this facility, too, IUE-CWA reports that there are roughly 100 open positions and bargaining unit members have had to work, collectively, 192,000 hours of mandatory overtime in the past year. While the employer has not discharged any employees at this facility yet, it has stated that it will discharge workers it identifies as CHNV parolees shortly unless they provide an alternate basis for work authorization.

plants employing thousands of manufacturing workers throughout the
Midwest. These employers advised that approximately 270 of these
members were likely CHNV parolees—constituting between 15 and 20%
of the overall workforce in each facility. In other words, three facilities
that are integral to our Nation's automotive supply chain stand poised
to lose *nearly 20% of their workers* precipitously.

CHNV parolees at these facilities perform skilled, physically-
demanding work in an area of the country that is experiencing a labor
shortage. Turnover among U.S. workers in this region is high, and
CHNV parolees provided the employer with a stable, reliable workforce.
UAW observes that these facilities, despite making their best efforts to
hire other U.S. workers, are falling short, and anticipates that they will
attempt to approach the Union to negotiate an arrangement where
remaining workers would have to work twelve-hour shifts (rather than
the current eight-hour shifts), to maintain production. UAW is thus
concerned that its U.S. members will have to perform more intense
work for longer hours, generating an increased health and safety risk,
and disrupting their work/life balance. Furthermore, as a result of
overwork, quality of the product manufactured in this facility would

likely suffer, potentially endangering existing and future contracts with auto manufacturers.

In pure numbers, however, it is likely that **UFCW**'s meatpacking and food processing workers will suffer the greatest exposure as a result of DHS's abrupt parole-and-work-authorization termination decision. UFCW estimates that there are nearly *25,000* parolees working at the plants where it represents workers.[3] The sudden removal of even a fraction of these workers from the workforce would cause severe disruptions to production in these industries.

These discharges have already begun to occur. UFCW reports over 500 terminations across ten bargaining units in three states in the Midwest, with 175 of these occurring in one facility alone. These discharges—which UFCW fears are just the beginning of a much broader workforce impact—will lead to a serious deterioration in the

_____

[3] UFCW is unable to determine the exact number of individuals from Cuba, Haiti, Nicaragua, and Venezuela who are employed because they are CHNV parolees, and the number who may have received parole on some other basis, such as after being inspected by an immigration officer at a land port of entry during an appointment made using the CBP ONE application. At any rate, UFCW is confident that thousands of its parolee members are CHNV parolees.

terms and conditions of employment for other UFCW members working in these plants. For example, in one facility where approximately 130 CHNV parolees were discharged, the company added an entire day to workers' regular work schedules for the entire month of June, compelling them to work six days a week. But in UFCW's experience, mass discharges can lead to layoffs of U.S. workers as readily as overwork. Some employers, when short on manpower, opt to slow down production to account for lower man-hours and schedule workers for less than 40 hours a week, resulting in decreased pay. Workers continue to face pressure to meet production goals, yet must do so with shorter work hours. Additionally, operating with a reduced workforce also means greater safety concerns for workers in an already dangerous industry. Again, only affirmance of the district court's stay order would avoid generating an unstable situation in this industry.

The harms experienced by *amici* were not limited to manufacturing and food processing. In addition to its members who work in healthcare and janitorial services—hundreds of whom have already been informed that they must submit new work authorization

documents or face termination[4]—**SEIU** represents a wide array of

employees employed by service contractors at our Nation's airports.

These essential personnel monitor airports for potential threats, keep

passengers safe, and ensure the timely operation of flights, during a

time when air travel is under significant stress from the peak summer

travel season.[5]

Following publication of the FRN, airport service contractors

advised SEIU that approximately 300-500 of its workers in airports in

the New York/New Jersey metropolitan area, 60-100 workers in

airports in the Boston metropolitan area, and 50-100 workers in West

Coast airports were likely CHNV parolees.[6] All of these workers are at

---

[4] SEIU reports that a *single* janitorial contractor, signatory to several multi-employer master collective bargaining agreements with SEIU locals, recently informed the Union that approximately 350 employees were CHNV parolees who would have to reverify their employment authorization or face discharge.

[5] Transp. Sec. Admin., Press Release, "TSA Expects Over 18.5 Million People to Travel by Air Over Busy Fourth of July Holiday," (June 24, 2025), https://www.tsa.gov/news/press/releases/2025/06/24/tsa-expects-over-185-million-people-travel-air-over-busy-fourth-july.

[6] In New York/New Jersey, this number represented between 3 and 5 percent of SEIU-represented airport service workers.

current risk of termination. SEIU believes that, now that the district court's order has been placed on pause, essential airport operations are likely to be disrupted, with other work-authorized employees straining to deal with a substantially increased workload.

**UNITE HERE** faces a similar situation. In several Texas and Florida hotels whose employees are represented by UNITE HERE, CHNV parolees make up a substantial part of "back-of-the-house" workers. Such positions are less desirable and employers routinely have difficulty hiring and retaining workers in those positions. It is common for back-of-the-house departments in hotels to be understaffed and for the workers to work mandatory overtime or excessive workloads. Regrettably, when faced with labor shortages, it is UNITE HERE's experience that hotel industry employers often turn to temporary labor agencies to supply workers so that the hotel can continue serving its guests. Such labor agencies, in addition to undermining the wages and working conditions for U.S. workers employed by the hotels by paying substandard wages and benefits, often violate immigration law by

hiring undocumented workers.[7] One Florida hotel, which is in the process of terminating approximately 20 employees who it believes to be CHNV parolees, has recently contacted UNITE HERE with a request to use a temporary labor agency to fill the ensuing staffing shortage for the first time. UNITE HERE has thus been harmed by a loss of members, subcontracting of work outside the bargaining unit, and harsher working conditions for existing members.

Finally, **IUPAT**'s experience provides a window into the effects of the FRN on the construction sector. IUPAT estimates that several hundred CHNV parolees work for signatory contractors on important infrastructure projects, particularly in the Southeast US and Gulf Coast region, where they perform skilled work as commercial and industrial painters, drywall finishers, and glaziers. These contractors secured work based on their ability to timely complete projects; yet the sudden loss of significant numbers of workers would lead to project delays. Even if a project may continue, it places additional strain upon the

---

[7] Steve Eder, Danielle Ivory & Marcela Valdes, *The Hidden Truth Linking the Broken Border to Your Online Shopping Cart*, N.Y. Times (Nov. 17, 2024), https://www.nytimes.com/2024/11/17/us/immigration-undocumented-migrants-jobs.html .

remaining workforce, manifesting in longer hours and working conditions that may be less safe. IUPAT understands that the situation faced by other building trades unions is similar.

### B. DHS's Failure to Provide Employers, Unions, and Workers Meaningful Guidance Has Led to Widespread Confusion and Arbitrary Results

As *amici* have just detailed, the FRN's impacts in the workplace are severe. And as we will shortly demonstrate *infra* at 24–33, the FRN is arbitrary and capricious because DHS wholly failed to consider these impacts—or, as it was required to do by law, the reliance interests of unions, employers, and the American workforce. *Amici* pause here briefly to add that, now that DHS has temporarily been permitted to implement the challenged portions of the FRN, its cavalier approach to workplace impacts has been laid bare. Indeed, DHS has provided employers incomplete and contradictory information about their compliance obligations—seemingly offering large classes of employers with no way to comply without at the same time violating IRCA's anti-discrimination provisions. *Amici*—who, as mentioned *supra*, owe a legal duty of fair representation to *all* their members—have been left

scrambling to provide accurate advice to CHNV parolees in their bargaining units.

It is unlawful for an employer to "continue to employ [any] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). However—unless they are enrolled in the voluntary e-Verify program, which covers only a minority of American businesses—employers verify whether an individual is work-authorized solely by examining certain documents and determining whether they "reasonably appear on [their] face to be genuine." *Id.* § 1324a(b)(1)(A). An Employment Authorization Document ("EAD") with a future expiration date is one such document. 8 C.F.R. § 274a.2(b)(1)(v)(A)(4). While an employer *must* retain copies of I-9 forms attesting that it has examined such documentation, it "may, but is not required to" retain copies of the underlying document. *See* 8 C.F.R. § 274a.2(b)(3) (noting also that employer "should not" do so only for "individuals of certain national origins or citizenship statuses"). Thus, many employers who are in full compliance with IRCA simply do not retain copies of the specific document used to demonstrate work

authorization. These employers have no way of identifying which of their employees are in any kind of parole status.

But even those employers who do retain copies of the underlying document used to demonstrate work authorization cannot meaningfully comply with DHS's directive, for two reasons. First, *all* parolees—regardless of whether they entered under the CHNV program or any number of other programs, many of which have not been rescinded—are authorized to work under 8 C.F.R. § 274a.12(c)(11), and their EADs are marked with an identical "C11" code. There is thus no way for an employer to distinguish between a CHNV parolee and a parolee entering under a different parole program.[8] Nor could an employer lawfully "investigate" whether a particular Cuban, Haitian, Nicaraguan, or Venezuelan employee with a C11-coded EAD entered

---

[8] Several parole programs that have *not* been terminated apply to the same nationalities represented in the CHNV program. *See* USCIS, "The Cuban Family Reunification Parole Program," https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program (last accessed June 28, 2025); USCIS, "The Haitian Family Reunification Parole Program," https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-aliens-outside-the-united-states/the-haitian-family-reunification-parole-hfrp-program (last accessed June 28, 2025).

under the CHNV program— IRCA expressly *prohibits* employers from requesting "more or different documents than are required" or "refusing to honor documents tendered on that on their face reasonably appear to be genuine" and declares this to be an "unfair immigration-related employment practice" when done on the basis of national origin. 8 U.S.C. § 1324b(a)(6).

Second, the termination of parole status does not *automatically* terminate work authorization. Instead, EAD revocation requires an individualized "notice of intent to revoke," in which each noncitizen is provided fifteen days to provide countervailing evidence. 8 C.F.R. § 274a.14(b)(2). An employer has no manner of knowing whether any given employee received such a notice, whether they submitted countervailing evidence, or whether their authorization was, in fact, revoked.

Unsurprisingly, publicly-available compliance advice is all over the map. Some attorneys advise employers to "meet with each employee [and] ask whether they have received revocation notices from the

government,"[9] or note that "it is an open question whether an employer must question their employees on their work authorization status to determine if they are definitively part of the CHNV program."[10] Others state that "this approach is viewed by many as extreme,"[11] while yet others advise employers: "Do not ask employees if they entered through CHNV or another program. Employers are not required, and are, frankly, prohibited from making these inquiries."[12]

---

[9] Holland & Hart LLP, "CHNV Update: Revocations and USCIS Guidance Trigger Urgent Employer Action," (June 24, 2025), https://www.hollandhart.com/chnv-update-revocations-and-uscis-guidance-trigger-urgent-employer-action.

[10] Littler Mendelson, P.C., "Update on E-Verify Issuing Notices of Termination for the CHNV Parole Program," (June 26, 2025), https://www.littler.com/news-analysis/asap/update-e-verify-issuing-notices-termination-chnv-parole-program.

[11] Seyfarth Shaw LLP, "CHNV Fallout: USCIS Issues Compliance Guidance for Employers," (June 23, 2025), https://www.bigimmigrationlawblog.com/2025/06/chnv-fallout-uscis-issues-compliance-guidance-for-employers.

[12] Greenspoon Marder LLP, "Confusion Surrounds DHS' Handling of CHNV Parole and EAD Revocations," (June 17, 2025), https://www.gmlaw.com/news/confusion-surrounds-dhs-handling-of-chnv-parole-and-ead-revocations.

The situation is also fraught with confusion for the minority of employers who do voluntarily participate in the federal eVerify program. Initially, DHS announced that it would issue "Case Alerts" informing employers of individual EAD revocations. On June 20, however, the agency abruptly changed course, stating that employers now had an affirmative obligation to "regularly" generate a "Status Change Report" that would identify employees with revoked EADs and require reverifications to occur "within a reasonable period of time," defining neither the term "regularly" nor "reasonable period of time."[13] As immigration counsel have noted, because these reports omit employee names, employers must "reconcile these numbers with internal HR records, a time-consuming and error-prone process" that "will require substantial manual effort."[14]

The vague guidance for e-Verify employers—and utter lack of guidance for non-e-Verify employers—has led to an untenable situation

---

[13] DHS, E-Verify, "EAD Revocation Guidance for E-Verify Employers," (June 23, 2025), https://www.e-verify.gov/ead-revocation-guidance-for-e-verify-employers. state

[14] *See* supra n.11 (Seyfarth Shaw guidance).

for unions. Some employers have asserted that they are required to discharge all employees of certain nationalities hired under the C11 category, or erroneously discharged workers from the CHNV countries who are, in fact, work-authorized under other categories. Other employers have taken no action at all. The fact that DHS's mass work-authorization revocations have led to a situation where employers must arguably violate IRCA in order to avoid continuing to employ individuals who have had their work authorization revoked *sub silentio* demonstrates that the arbitrary and capricious real-world effect of a government action that "entirely failed to consider" its impact on the workforce—indisputably "an important aspect of the problem" before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

## II. The Disruption the Blanket Rescission of CHNV Parole Would Cause to U.S. Workers and Employers Weighs Against a Stay in Two Ways

If DHS wanted to end the CHNV parole program, it had a straightforward way to do so consistent with employers' and employees' expectations and IRCA's employment-verification requirements: It could have simply declined to renew any grant of parole after the two-

23

year term ended. This would have accomplished DHS's desired goal of ending parole while allowing employers and employees time to prepare as the CHNV parolees gradually left the workforce unless they were able to establish an independent basis for work authorization. Instead of terminating the program in that logical, non-disruptive way, DHS eliminated the CHNV parole program in its entirety and overnight. The disruption that decision causes, as highlighted above, weighs strongly against a stay for two reasons: (1) it supports the district court's decision that the FRN was arbitrary and capricious; and (2) it undermines the government's arguments on both the public interest and balance of hardships under *Nken*.

> **A.    The Blanket Rescission of CHNV Was Arbitrary and Capricious Because It Failed to Consider the Economic Disruption Caused by DHS's Actions.**

It is hornbook law that an agency action is arbitrary and capricious under the APA when it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The district court—and plaintiffs—have ably explained that the wholesale rescission of parole with a 30-day wind-down period is arbitrary and capricious because (1) it failed to rebut any of the humanitarian reasons

that justified the CHNV program in the first place; and (2) rested on the legal fallacy that parolees could be subject to expedited removal despite their legal entry into the country. A031–35.

While *amici* agree with this analysis, we emphasize another portion of the FRN that clearly failed to consider an important aspect of the problem—the reliance of unions, employers, and the American workforce on CHNV parolees' work authorization. As the Supreme Court has explained, when a "prior policy has engendered serious reliance interests that must be taken into account . . . [i]t would be arbitrary and capricious to ignore such matters." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Instead, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) (when "serious reliance interests [are] at stake, [an agency's] conclusory statements do not suffice to explain its decision").

The FRN purports to have considered the regulatory alternative of "permitting CHNV participants' parole to remain in effect until the natural expiration of the parole," acknowledging that this was DHS's

practice in the past. 90 Fed. Reg. at 13619–20 (citing 82 Fed. Reg. 38926 (Aug. 16, 2017) (wind-down of parole program for Central American minors during first Trump Administration which allowed existing parolees to maintain status until its natural expiration)). It also claims to have considered "the alternative of a longer than 30-day wind-down period." *Id.* But the FRN gives no rational explanation for not following a similar path here. The sole reason given for rejecting these alternatives is the alleged difficulty of subjecting CHNV parolees to expedited removal (which, as the district court correctly concluded, is based on the legally erroneous premise that CHNV parolees can be subject to expedited removal in the first place). A032.

As far as employment issues are concerned, the FRN limits discussion of such reliance interests to one paragraph. It states, in full:

> Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effect of such expiration. By providing 30 days' notice, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, DHS finds the U.S. government's interest in terminating these

26

grants of parole outweigh any reliance interest of third
parties.

90 Fed. Reg. at 13619.

This conclusory statement is manifestly insufficient to constitute
the "reasoned analysis for [a] change" in agency position required by
law. *State Farm*, 463 U.S. at 42. The FRN does not indicate that DHS,
or any other federal agency, has conducted any labor market study or
survey to determine where CHNV parolees are employed or whether
particular industries or geographies may suffer a disproportionate
impact from a sudden loss of significant parts of their workforce. It
refers to no data or statistics relating to the effects that providing 30
days' notice would have on any sector of the workforce. Nor does it
compare this to any other notice period (e.g. 6 months). It simply
declares (apparently based on *no facts at all*) that even if an employer
reasonably expected to continue to lawfully employ large numbers of
CHNV parolees pursuant to their current employment authorization
through *January 2027*, it would be minimally prejudiced by being
required to terminate them all in *April 2025*.

This is obviously wrong: There is a massive difference between
believing that an employee must be terminated in twenty months and

being told that an employee must be terminated in thirty days. Thus, as explained at length in Section I.A, *supra*, the mass revocation of CHNV-related work authorization on a 30-day timeline imposes significant harms on unions, employers, and American workers alike. As UAW and IUE-CWA explain, summarily terminating skilled workers at core manufacturing facilities gravely harms U.S. workers who have already been forced to work mandatory overtime due to labor shortages, and potentially endangers contracts between suppliers and assembly plants. As UFCW shows, it causes massive disruptions to the meatpacking and food-processing industries. As SEIU demonstrates, such an action is likely to interrupt the orderly functioning of our Nation's airport infrastructure. As IUPAT contends, it causes construction contractors to have difficulty in timely completing key infrastructure projects. And as noted by UNITE HERE, it incentivizes employers to meet their labor needs via temporary labor agencies, which undermines both American workers' labor standards and, perversely, encourages the employment of undocumented workers with no work authorization at all.

DHS's explanation that employer, union, and worker reliance interests were diminished because they "would have experienced the

effect of such expiration" at the end of two years is demonstrably false. As an initial matter, as described above, it is far different for employers to know that a significant subset of employees would gradually lose work authorization during a period stretching until January 2027 than for employers to discover that those employees would *all* lose work authorization *in thirty days*. Moreover, employers had every reason to think that, were the CHNV program allowed to naturally fade away, a meaningful number of CHNV parolees would have been able to maintain their work authorization through an alternate path. A stated goal of CHNV parole was to provide beneficiaries with a reasonable, orderly process by which they may be evaluated for and apply for other relief: "the two-year period [would] enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so." DHS, "Implementation of a Parole Process for Venezuelans," 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022); *see also* DHS, "Implementation of a Parole Process for Haitians," 88 Fed. Reg. 1243, 1244 (Jan. 9, 2023)

(same).[15] Therefore, many CHNV beneficiaries would likely have obtained a right to continuing employment authorization beyond the initial two-year parole period by, for instance, timely filing a meritorious asylum application or being the beneficiary of another family- or work-based petition. *See, e.g.,* 8 C.F.R. § 274a.12(c)(8) (permitting asylum applicants to apply for work permits 150 days after filing their applications if they have not yet been adjudicated). Thus, though employers and unions had no *guarantee* of continuing work authorization beyond the initial two-year grant of parole, they had a reasonable expectation that a number of CHNV parolees would obtain

---

[15] On February 14, DHS attempted to short-circuit this process by placing an "administrative hold on all benefits requests filed by aliens who are or were paroled into the United States "under the CHNV program, alleging a need for "additional vetting" to address purported "fraud, public safety, [and] national security concerns." *Doe v. Noem*, No. 1:25-cv-10495 (IT), 2025 WL 1514420, at *6 (D. Mass. May 28, 2025). This "administrative hold" would have, in practice, impeded CHNV parolees fully entitled to work authorization on other grounds, such as those with pending asylum or adjustment-of-status applications, from being approved for such benefits, thus fully shutting them out of the workforce. On May 28, the district court stayed this administrative hold, rendering it without effect, *id.* at *24, and DHS has since resumed processing benefits applications for CHNV parolees. As of the date of this brief, DHS has not appealed this order.

an independent lawful basis for work authorization prior to the
expiration of their parole.[16]

But *even if* DHS had reasonably justified its decision to
precipitously end CHNV parolees' parole status—which, as described
above, it has not—it has provided absolutely no rationale for also acting
to revoke parolees' employment authorization. *Even if* DHS needed to
end the CHNV program quickly in order to subject its beneficiaries to
expedited removal—which, as the district court explained, it does not,
because parolees are not eligible for expedited removal at all—nothing
about this rationale justifies stripping parolees of their work
authorization.[17] As the FRN itself acknowledges, parolees' work
authorization terminates automatically *only* if the initially-granted
parole expires, removal proceedings are instituted, or voluntary

---

[16] Indeed, though the FRN does not provide statistics on this matter, it
acknowledges that some number of CHNV parolees have, in fact,
applied for other statuses and states that it does not intend to prioritize
them for removal. 90 Fed. Reg. at 13619.

[17] The fact of maintaining work authorization would not prevent DHS
from instituting removal proceedings, expedited or otherwise, against
any CHNV parolee.

departure is granted. 8 C.F.R. § 274a.14(a). But none of these three
conditions are at issue here. Instead, DHS has stated that it intends to
exercise its *discretion* to revoke work authorization en masse, under a
provision that provides it the ability to do so "when it appears that any
condition upon which it was granted . . . no longer exists." *Id.*
§ 274a.14(b)(1)(i). This provision is not mandatory, and had it
considered the interests of employers, unions, and the American labor
market, DHS could have continued to provide CHNV parolees with
work authorization unless and until it determined to take
individualized enforcement action.[18] DHS's wholesale failure to consider
this possibility is not a minor issue. Union members who are CHNV
parolees reasonably relied on the government's assurances that they
would have two years to apply for any immigration benefit for which
they qualified. Securing counsel and preparing any immigration
application takes time and effort, and for asylum, the most common
benefit for which CHNV parolees would qualify, the INA requires a six-

_____

[18] As noted above, the institution of removal proceedings would
terminate work authorization by operation of law. *See* 8 C.F.R.
§ 274a.14(a)(1)(ii).

month waiting period between the time the application is filed and when the applicant may receive an EAD. *See* 8 U.S.C. § 1158(d)(2). Even if a parolee is able to prepare and file an asylum application on the same day that their parole is revoked—thus establishing a legal basis for their continuing presence in the United States—they will experience a gap in employment authorization of at least six months, a period which is tremendously disruptive to employers, unions, and other workers. DHS failed to consider that it might limit parole without revoking work authorization to minimize such disruptions.

Thus, for this and the reasons articulated by plaintiffs and the district court, DHS's failure to consider employment- and labor market-related harms of its precipitous termination of the CHNV parolees' status and work authorization renders its determination arbitrary and capricious under the APA. This provides additional grounds for the Court to affirm the district court's stay order.

## B.    The Balance of Hardships and the Public Interest Militate Strongly Against a Stay of the District Court's Order

The district court's prompt action avoided imminent grave harm to hundreds of thousands of CHNV parolees, who risked losing their

immigration status and work authorization on legally specious grounds: to *amici* unions, who collectively represent over 15 million American workers, and who risked losing thousands of members and were forced to scramble to provide unexpected legal and community support; to employers, who were forced to reduce production and lose profits; and to other workers, who were forced to work mandatory overtime and saw declines in their terms and conditions of employment. The stay of the district court's order is now threatening to bring these harms to fruition; a reversal of the order would make these harms virtually certain.

It is contrary to the public interest for manufacturing, meatpacking, and food processing facilities, which already suffer from a significant labor shortage, to be further hampered by sudden terminations of hundreds of skilled workers, forcing American workers into mandatory overtime at the expense of their health and safety. It contravenes the public interest for hundreds of essential airport workers, many of whom are engaged in security-related functions, to be summarily dismissed at the height of the summer travel season. It contravenes the public interest to have important infrastructure

projects remain unfinished because contractors have been forced to lay off significant parts of their workforce. And it contravenes the public interest for employers facing labor shortages in difficult-to-fill positions to turn to low-road subcontractors known for exploiting undocumented workers, thus undermining the working standards of those who are authorized to work.

The district court thus balanced the factors correctly. Reversing the district court's order and allowing the FRN to go into effect in full would "substantially injure the other parties interested in the proceeding," *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), and contravene the public interest, two factors that indicate that a stay should be denied, *Nken*, 556 U.S. at 435.

## CONCLUSION

The Court should affirm the district court's order.

Dated: July 1, 2025 

Respectfully submitted,

<u>/s/ Andrew Lyubarsky</u>
Matthew Ginsburg
   *General Counsel*
Andrew Lyubarsky
   *Counsel of Record*
AFL-CIO
815 Black Lives Matter Plaza,
NW

David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
dzimmer@zimmercitronclarke.com
(617) 676-9421

Washington, DC 20006
alyubarsky@aflcio.org
(202) 637-5115

*Counsel for Amici Curiae*

Steven K. Ury
Service Employees International Union
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 730-7168

*Counsel for Amicus Curiae SEIU*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing *Amicus Curiae* Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,499 words, as counted by counsel's word processing system.

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word using size 14 Century Schoolbook font.

Dated: July 1, 2025

/s/ Andrew Lyubarsky

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2025, I electronically filed the foregoing *Amicus Curiae* Brief using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: July 1, 2025

/s/ <u>Andrew Lyubarsky</u>