No. 25-1384

# In the United States Court of Appeals for the First Circuit

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; HAITIAN BRIDGE ALLIANCE; ANDREA DOE; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; MIGUEL DOE; LUCIA DOE; DANIEL DOE; GABRIELA DOE; NORMA LORENA DUS,

Plaintiffs-Appellees

*v.*

KRISTI NOEM, IN THEIR OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; PETE R. FLORES, IN THEIR OFFICIAL CAPACITY AS ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; KIKA SCOTT, IN THEIR OFFICIAL CAPACITY AS THE SENIOR OFFICIAL PERFORMING THE DUTIES OF THE DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DONALD J. TRUMP, IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; TODD LYONS, IN THEIR OFFICIAL CAPACITY AS THE ACTING DIRECTOR OF IMMIGRATION AND CUSTOMS ENFORCEMENT

Defendants-Appellants

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-10495-IT, Hon. Indira Talwani

**BRIEF OF THE CATO INSTITUTE AND PROFESSOR ILYA SOMIN AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Yetter Coleman LLP
  Grant B. Martinez
  gmartinez@yettercoleman.com
  First Circuit Bar No. 1218213
  David J. Gutierrez
  dgutierrez@yettercoleman.com
  First Circuit Bar No. 1218334
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

**Attorneys for Amici Curiae The Cato Institute and Prof. Ilya Somin**

## Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* disclose that The Cato Institute is a non-profit corporation, incorporated in Kansas. It has no parent companies, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Grant B. Martinez*
Grant B. Martinez
*Counsel for Amici Curiae The Cato Institute and Professor Ilya Somin*

# Table of Contents

Page

Disclosure Statement ............................................................... iii

Table of Authorities ................................................................. v

Interest of *Amici Curiae* ........................................................ 1

Summary of the Argument ....................................................... 3

Argument .................................................................................. 5

    I.    Broad, categorical parole programs have deep historical roots. ........... 5

    II.    The CHNV Parole Program satisfied the statutory requirement that Parole be granted on a "case-by-case basis." ............................... 6

    III.    Parole under the CHNV Program is justified by both "urgent humanitarian reasons" and a "significant public benefit." .............. 10

        A.    Urgent Humanitarian Reasons. ............................................... 10

        B.    Significant Public Benefit. ...................................................... 13

    IV.    Permitting termination in this case could threaten the status of over 100,000 people lawfully present under the Uniting for Ukraine Program. ............................................................. 16

Conclusion .............................................................................. 18

Certificate of Compliance ....................................................... 19

Certificate of Service .............................................................. 20

# Table of Authorities

**Page(s)**

## Cases

*Am. Hosp. Ass'n v. NLRB,*
499 U.S. 606 (1991)................................................................. 7

*Biden v. Texas,*
142 S. Ct. 2528 (2022) ........................................................... 5

*Texas v. U.S. Dep't of Homeland Sec.,*
722 F. Supp. 3d 688 (S.D. Tex. 2024) .................................. 8, 9, 14, 15

*Vazquez Romero* v. *Garland,*
999 F.3d 656 (9th Cir. 2021) .................................................. 8

## Statutes

8 U.S.C. § 1182(d)(5)(A) ........................................................... 4, 7, 10, 13

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
§ 602, 110 Stat. 3009–546 ...................................................... 7

## Other Authorities

8 C.F.R. § 212.5 ......................................................................... 7

Adam Cox & Cristina Rodriguez, The President And
Immigration Law 67 (2020) .................................................... 6

Alex Nowrasteh, *Biden's Border Immigration Policy Is Still Reducing
Border Crossings and Illegal Immigration,* Cato Inst. (Mar. 29,
2023), https://bit.ly/43Yxfsm ...............................................15

American Immigration Council, The Biden Administration's
Humanitarian Parole Program for Cubans, Haitians,
Nicaraguans, and Venezuelans: An Overview (Oct. 31, 2023),
https://bit.ly/432urfR .............................................................. 9

Bernd Debusmann, Jr., *US Immigration: "They'd Rather Die than Return to Nicaragua"*, BBC (Dec. 12, 2022), https://bbc.in/3NtNjLy ................................................................ 11, 12

*Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023) ........................................ 3

Carl J. Bon Tempo, AMERICANS AT THE GATE: THE UNITED STATES AND REFUGEES DURING THE COLD WAR (2008) ................................. 5

Carl J. Bon Tempo, *The Ukrainian Parole Policy in Historical Perspective*, NISKANEN CTR. (Sept. 22, 2022), https://bit.ly/437ykgo ........................................................................ 5

CATHOLIC IMMIGRATION NETWORK, INC., FREQUENTLY ASKED QUESTIONS ABOUT FORM I-134 AND I-134A (Mar. 29, 2023), https://bit.ly/437ykgo ........................................................................ 9

Daniel Allott & Jordan Allott, *Inside the Great Cuban Exodus*, WASH. EXAMINER (June 23, 2023), https://bit.ly/3pZsUGN ..................... 11

Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, MANHATTAN INST. (May 25, 2023), https://bit.ly/3r1XwaG ......... 15

David Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, CATO INST. (July 17, 2023), https://bit.ly/3rFsAx4 ........................................................................ 6

Ilya Somin, *Biden Expands Uniting for Ukraine Private Refugee Sponsorship Model to Include up to 30,000 Migrants Per Month from Cuba, Nicaragua, Venezuela, and Haiti*, REASON (Jan. 5, 2023), https://bit.ly/3XsVhsQ ................................................................ 16, 17

Ilya Somin, *Courts Should Uphold Valuable Immigration Policy*, THE HILL (Sept. 2, 2023), https://bit.ly/4drpyk6 ................................... 10

Ilya Somin, *Federal District Court Rules Red States Lack Standing to Challenge Legality of Immigration Parole Program for Migrants from Four Latin American Countries*, REASON (Mar. 8, 2024), https://bit.ly/4j9XJ0K ........................................................................ 16

Ilya Somin, *We Sponsored Refugees Under a New Biden Program: The Results Were Astonishing*, WASH. POST (Jan. 3, 2023)..........................17

Jennifer Joas, *What to Know About the 'Uniting for Ukraine' Program in US*, NBC CT (Feb. 24, 2025), https://bit.ly/4mj1LH1 ....................17

Jorge Duany, *Cuban Migration: A Postrevolution Exodus Ebbs and Flows*, MIGRATION POL'Y INST. (July 6, 2017), https://bit.ly/3CP1s1c..........................11

Mauricio Maldonado, *Rubio Warns of Growing Iranian Influence in Venezuela, Drone Threats in Hemisphere*, CBS NEWS (Jan. 16, 2025), https://bit.ly/3FcNiLW ...................................................... 12

President Donald Trump, State of the Union Address (Feb. 4, 2020), http://bit.ly/3Fa9Ih2..........................................................12

*Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators*, HUMAN RIGHTS WATCH (July 11, 2022), https://bit.ly/3pr2Qnt......................11

Rosevale Supreme, *This is the Worst Crisis I've Seen in Haiti*, NEWSWEEK (Nov. 1, 2022), https://bit.ly/3pgZvHI ............................13

*Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025) ........................... 8

U.S. CUSTOMS & BORDER PROT., CBP RELEASES MARCH 2023 MONTHLY OPERATIONAL UPDATE (Apr. 17, 2023), https://bit.ly/3CMC5gj ................................................. 14, 15

U.S. CUSTOMS & BORDER PROT., NATIONWIDE ENCOUNTERS (July 18, 2023), https://bit.ly/3KfaSqA ...............................................15

U.S. Dep't of Justice, 2000 STATISTICAL YEARBOOK OF THE IMMIGRATION AND NATURALIZATION SERVICE 122 (2002) ................................ 6

Vanda Felbab-Brown, *Haiti in 2023: Political Abyss and Vicious Gangs*, BROOKINGS INST. (Feb. 3, 2023), https://bit.ly/3PxtUfA ................................13

Vanessa Buschschlüter, *Venezuela Crisis: 7.1m Leave Country Since 2015*, BBC (Oct. 17, 2022), https://bit.ly/3Np3MAF ...................... 12

## Interest of *Amici Curiae*[1]

The Cato Institute, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books, studies, and the annual *Cato Supreme Court Review*, and conducts conferences and forums. This case interests Cato because the Institute has long had a focus on both immigration policy and separation of powers.

Ilya Somin is Professor of Law at the Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy, as well as separation of powers. His amicus briefs and other writings have been cited by the Supreme Court, federal circuit and district courts, multiple state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights, including *Free to Move: Foot Voting, Migration, and Political Freedom* (Oxford University Press, rev. ed. 2022); *Democracy and*

---

[1] No party's counsel authored this brief in whole or part; no party, counsel for a party, or any person other than *amici curiae* or their counsel made a monetary contribution toward the preparation and submission of this brief.

- 1 -

*Political Ignorance: Why Smaller Government is Smarter* (Stanford University Press, 2nd. ed. 2016); and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* (University of Chicago Press, 2015).

## SUMMARY OF THE ARGUMENT

In early 2023, the Department of Homeland Security established a program under which citizens of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") were eligible to request two years of humanitarian parole into the United States if someone lawfully present in the United States was willing to sponsor them and commit to providing financial and other support. *See Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023). The policy was based on the highly successful Uniting for Ukraine parole program and a more limited parole program for Venezuelan nationals, both of which began in 2022, with the important difference that the number of CHNV parolees was capped at a total of 30,000 per month. *Id.*

Parole under the CHNV program was granted for two-year terms. In 2025, the new Administration attempted to cut short all of those two-year terms for over 500,000 parolees—giving them only thirty more days of lawful status and associated work authorization. The Government seeks reversal of the district court's preliminary injunction against the premature termination of the CHNV parole programs. A central element of the Government's position is the claim that the CHNV program was illegal. Amici will demonstrate that claim is badly mistaken.

In Part I of this brief, amici show that broad, categorical parole programs have deep historical roots. Since the Eisenhower Administration, and even in President Trump's first administration, the Government has implemented over 125 such categorical programs, involving thousands or even millions of parolees in a single year.

Part II explains why the CHNV parole programs are consistent with the statutory requirement that parole be considered on a "case-by-case basis." 8 U.S.C. § 1182(d)(5)(A).

In Part III, amici demonstrate that migrants from the CHNV countries indeed have "urgent humanitarian reasons" to seek refuge in the United States. They are fleeing a combination of rampant violence, brutal oppression by authoritarian socialist regimes, and severe economic crises. We further show that paroling CHNV migrants also creates a "significant public benefit." That benefit is reducing pressure and disorder on America's southern border. The CHNV program massively reduced cross-border illegal migration by citizens of the nations it covers.

Finally, Part IV shows that, if the Court accepts the Government's position on the legality of the CHNV program, it would also potentially imperil over 100,000 people who received parole under the Uniting for Ukraine program. The latter relies on the same legal authority as the former.

## ARGUMENT

### I.   Broad, categorical parole programs have deep historical roots.

The Government's claim that Secretary Noem's decision would "*restore* the traditional case-by-case process by undoing prior categorical determinations" of grants of parole does not accurately reflect the history of parole in this country, which has traditionally involved extensive use of categories. Gov't Br. 5 (emphasis added).

Broad, categorical parole programs like CHNV have deep historical roots. As the Supreme Court noted in *Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022), "[e]very administration, including the Trump and Biden administrations, has utilized [parole] authority to some extent" and they have done so without imposing numerical limits confining parole to small numbers. *Cf. id.* at 2548 (Kavanaugh, J., concurring) ("[E]very President since the late 1990s has employed the parole option[.]").

During the Cold War, parole was repeatedly used to admit many thousands of refugees fleeing oppressive communist regimes in Cuba, Hungary, and Indochina. *See* Carl J. Bon Tempo, *The Ukrainian Parole Policy in Historical Perspective*, NISKANEN CTR. (Sept. 22, 2022);[2] Carl J. Bon Tempo, AMERICANS AT THE GATE: THE UNITED STATES AND REFUGEES DURING THE COLD WAR (2008).

---

[2]    https://bit.ly/437ykgo.

Since Congress added the parole authority in 1952, there have been over 125 categorical uses of the parole power; these were all systematic orders that authorized the entry of defined classes of noncitizens. *See* David Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, CATO INST. (July 17, 2023)[3] (providing a detailed overview); *see also* Appellees' Br. 4-5. Many of these programs have involved thousands of migrants at a time. *Id.* Indeed, during a six-month period in 2000, millions of travelers from 29 countries were paroled into the United States. *Id.* (citing U.S. Dep't of Justice, 2000 STATISTICAL YEARBOOK OF THE IMMIGRATION AND NATURALIZATION SERVICE 122-123 (2002)).

For decades, the Government has recognized that categorical programs could satisfy requirements to evaluate potential parolees on a case-by-case basis. *Id.*

## II.     The CHNV Parole Program satisfied the statutory requirement that Parole be granted on a "case-by-case basis."

In 1996, Congress amended the parole statute and made two changes. It excised the more permissive standard allowing parole "for emergent reasons or for reasons deemed strictly in the public interest" and substituted language permitting parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." ADAM COX & CRISTINA RODRIGUEZ, THE PRESIDENT AND

---

[3]    https://bit.ly/3rFsAx4.

IMMIGRATION LAW 67 (2020); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 602, 110 Stat. 3009–546.

The Government suggests that the original grants of parole under the program to CHNV nationals were improper because they involved the use of systematic categories. It asserts, without evidence, that the CHNV parole programs could be terminated because they "made parole available to hundreds of thousands of aliens based on programmatic, non-individualized findings in the first place." Gov't Br. 33; *see also id.* at 4-6. But in the next breath it recognizes that "[e]ven when Congress 'requires individualized determinations,' that requirement does not displace decisionmakers' 'authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.'" *Id.* at 35 (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991)). It even recognizes the longstanding use of general categories in the context of this specific statute. *Id.* at 35-36 (citing 8 C.F.R. § 212.5).

In any event, the "case-by-case basis" standard is satisfied so long as the executive establishes plausible criteria for meeting the requirement that the grant of parole is justified by "urgent humanitarian reasons" or a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). An individual—or group—of non-citizens need only meet one of these two requirements to be eligible for parole. The statute

imposes few, if any, constraints on the Secretary's discretion in determining what kinds of rules and presumptions should be used in assessing migrants' eligibility for parole. It "gives the government broad parole discretion, without mentioning any threshold standard that the government must meet or the timing of when a decision as to admissibility must be made." *Vazquez Romero* v. *Garland*, 999 F.3d 656, 664 (9th Cir. 2021).

Importantly, the CHNV program did in fact involve case-by-case determinations. As the Secretary herself stated in her announcement terminating the CHNV parole programs, "Under these [CHNV] categorical parole programs, *potentially eligible beneficiaries were adjudicated on a case-by-case basis*." *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611-01 (Mar. 25, 2025) (emphasis added). The Secretary's prior statement about the case-by-case adjudication of parolee applications is correct. Merely being a citizen of one of the four covered nations did not automatically qualify a migrant for parole. Citizenship in one of those countries was a necessary, but not sufficient condition. As the Southern District of Texas explained, a Customs and Border Protection officer implementing the CHNV program "considers the request for parole at the port of entry on an individualized, case-by-case basis." *Texas v. U.S. Dep't of Homeland Sec.*, 722 F. Supp. 3d 688, 698 (S.D. Tex. 2024). "CBP has, when

making this determination, denied parole for aliens . . . pursuant to the CHNV processes." *Id.*

There were specific requirements that factored into the case-by-case determination of parole eligibility, in addition to citizenship in one of the four affected countries. Each parolee was required to have a U.S. sponsor able to provide financial support and assistance with accessing housing and employment. *See id.* at 693; *see also* Appellees' Br. 7. This helped ensure that the parolees would quickly settle in the interior of the country and avoid contributing to congestion at the border. USCIS Form I-134A, which sponsors had to submit to be approved, required a presentation of evidence that sponsors were able to provide necessary financial support and assistance with searching for jobs and housing.[4] U.S. Citizenship and Immigration Services would also individually vet sponsors and potential beneficiaries on a case-by-case basis to confirm if applications met the criteria considered for parole. *See* Appellees' Br. 7. In addition, parolees had to undergo robust security vetting.[5]

---

[4]   The present Administration has taken down the website that previously had this information. It remains available at CATHOLIC IMMIGRATION NETWORK, INC., FREQUENTLY ASKED QUESTIONS ABOUT FORM I-134 AND I-134A (Mar. 29, 2023), http://bit.ly/4duV9RW .

[5]   The present Administration has taken down the website that previously had this information. It remains available at AMERICAN IMMIGRATION COUNCIL, THE BIDEN ADMINISTRATION'S HUMANITARIAN PAROLE PROGRAM FOR CUBANS, HAITIANS, NICARAGUANS, AND VENEZUELANS: AN OVERVIEW (Oct. 31, 2023), https://bit.ly/432urfR.

Ultimately, any case-by-case decision-making process must be guided by reasonable rules and presumptions, if it is not to be completely random and arbitrary. And it is entirely reasonable to presume that migrants from nations afflicted by horrifically oppressive governments, widespread violence, and economic crises, have urgent humanitarian needs. *Cf.* Ilya Somin, *Courts Should Uphold Valuable Immigration Policy*, THE HILL (Sept. 2, 2023) (describing humanitarian benefits of CHNV in detail).[6]

### III. Parole under the CHNV Program is justified by both "urgent humanitarian reasons" and a "significant public benefit."

#### A. Urgent Humanitarian Reasons.

Under the law, parole can be justified either because there are "urgent humanitarian reasons" for granting it or because a "significant public benefit" results. 8 U.S.C. § 1182(d)(5)(A). Each ground is independently sufficient.

The "urgent humanitarian reasons" for granting parole to migrants from the CHNV countries are undeniable. People from these countries are threatened by a combination of severe repression, rampant violence, and economic crisis.

Three of the four nations included in the program—Cuba, Nicaragua, and Venezuela—are ruled by oppressive socialist dictators whose policies have created

---

[6]    https://bit.ly/4drpyk6.

horrific conditions. Cuba inflicts severe poverty and oppression on its people, including the recent brutal suppression of protests in July 2021. *Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators*, HUMAN RIGHTS WATCH (July 11, 2022).[7] It is no accident that, before the current Venezuela crisis, the biggest refugee flow in the history of the Western Hemisphere was that of people fleeing Cuban communism, beginning with Fidel Castro's seizure of power in 1959. Jorge Duany, *Cuban Migration: A Postrevolution Exodus Ebbs and Flows,* MIGRATION POL'Y INST. (July 6, 2017).[8] The communist regime remains brutally oppressive, and many of its victims continue to seek freedom in the United States. *Cf.* Daniel Allott & Jordan Allott, *Inside the Great Cuban Exodus*, WASH. EXAMINER (June 23, 2023) (describing recent Cuban exodus and heightened repression causing it).[9]

Nicaragua, under the increasingly authoritarian rule of President Daniel Ortega, is a similar story. Ortega's repression has deepened already severe poverty and created what the BBC describes as an "atmosphere of terror." Bernd Debusmann, Jr., *US Immigration: "They'd Rather Die than Return to Nicaragua"*,

---

[7]    https://bit.ly/3pr2Qnt.

[8]    https://bit.ly/3CP1s1c.

[9]    https://bit.ly/3pZsUGN.

BBC (Dec. 12, 2022).[10] That is why many Nicaraguans have sought refuge in the United States. As one Nicaraguan human rights activist puts it, conditions are so bad that "[t]hey'd rather die than return to Nicaragua." *Id.*

Venezuela is no better. President Trump has recognized that Venezuela's dictator, Nicolas Maduro, is "a tyrant who brutalizes his people." President Donald Trump, State of the Union Address (Feb. 4, 2020).[11] According to Secretary of State Rubio, Venezuela is "governed by a narco-trafficking organization that has empowered itself as a nation-state." Mauricio Maldonado, *Rubio Warns of Growing Iranian Influence in Venezuela, Drone Threats in Hemisphere*, CBS News (Jan. 16, 2025).[12] Venezuelan socialism has resulted in widespread oppression, poverty, and hyperinflation, leading to the biggest refugee crisis in the history of the Western hemisphere, with over 7 million people fleeing. Vanessa Buschschlüter, *Venezuela Crisis: 7.1m Leave Country Since 2015*, BBC (Oct. 17, 2022).[13]

Haiti, the one nation with a non-socialist government included in the program, has long been one of the poorest and most dysfunctional states in the world. Over

---

[10]  https://bbc.in/3NtNjLy.

[11]  http://bit.ly/3Fa9Ih2.

[12]  https://bit.ly/3FcNiLW.

[13]  https://bit.ly/3Np3MAF.

the last few years, conditions have gotten even worse, with intensifying violence and shortages of basic necessities. *See, e.g.*, Rosevale Supreme*, This is the Worst Crisis I've Seen in Haiti*, NEWSWEEK (Nov. 1, 2022) (documenting widespread violence and suffering);[14] Vanda Felbab-Brown*, Haiti in 2023: Political Abyss and Vicious Gangs*, BROOKINGS INST. (Feb. 3, 2023) (same).[15] It is impossible to deny that Haitians, too, have "urgent humanitarian reasons" to seek refuge in the United States.

It is obvious that migrants from Cuba, Venezuela, Nicaragua, and Haiti are threatened by repressive governments, rampant violence, and economic crisis. There are thus multiple urgent humanitarian reasons for the CHNV programs to provide qualifying migrants parole into the United States.

### B. Significant Public Benefit.

In addition to humanitarian reasons, the INA also allows the Secretary of Homeland Security to grant parole when there is a "significant public benefit" to doing so. 8 U.S.C. § 1182(d)(5)(A). In this case, the significant public benefit is alleviating the surge in migrants at the southern border.

---

[14]    https://bit.ly/3pgZvHI.

[15]    https://bit.ly/3PxtUfA.

Many of the migrants seeking entry at the border come from the four nations covered by the program. Prior to the CHNV program, there was a historical surge and increase in immigration at the southern border that strained DHS's operational capacity. *Texas*, 722 F. Supp. 3d at 696.

Parole enabled migrants from Cuba, Haiti, Nicaragua, and Venezuela to enter with advance authorization by plane, and thereby bypass the border entirely, thus relieving pressure at the border and alleviating the border crisis. *See id.* at 699 (explaining that the CHNV program at one point "would require CHNV nationals to enter the United States via an interior port of entry—as opposed to traveling through Mexico to reach the Southwest border—the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect."); *id.* at 694 (observing that parolees under the CHNV programs "may fly to an interior port of entry where a U.S. Citizenship and Immigration Services . . . agent will determine whether to grant parole").

The U.S. Customs and Border Protection agency reports that between the announcement of the parole program on January 5 and March 31, 2023, average daily encounters outside ports of entry with migrants from the four countries covered declined by 72%. U.S. CUSTOMS & BORDER PROT., CBP RELEASES MARCH 2023

MONTHLY OPERATIONAL UPDATE (Apr. 17, 2023).[16] No other policy change that occurred in that period accounts for this decline.

The number of encounters with CHNV migrants increased somewhat in April and May 2023 (about 30,000 in each month) but then fell again to 13,927 in June.[17] At no point was it anywhere near as high as the figures in the months before the introduction of CHNV (85,590 in December 2022). *Id.* Indeed, a report by the conservative Manhattan Institute found that "[t]he CHNV parole program . . . has reduced combined illegal immigration by more than 98,000 immigrants per month." Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, MANHATTAN INST. (May 25, 2023).[18]

In sum, the CHNV program "resulted in a decrease of CHNV nationals entering the United States." *Texas*, 722 F. Supp. 3d at 703. So, the CHNV program has had positive effects in alleviating pressure at the border and produced significant public benefit.

---

[16]  https://bit.ly/3CMC5gj. *Cf.* Alex Nowrasteh, *Biden's Border Immigration Policy Is Still Reducing Border Crossings and Illegal Immigration,* CATO INST. (Mar. 29, 2023), available at https://bit.ly/43Yxfsm (reaching similar conclusions).

[17]  Data calculated from U.S. CUSTOMS & BORDER PROT., NATIONWIDE ENCOUNTERS (July 18, 2023), https://bit.ly/3KfaSqA. While the figures include encounters at all borders, CHNV migrant encounters actually occur almost entirely at the southern border, as opposed to the northern one.

[18]  https://bit.ly/3r1XwaG.

IV.    **Permitting termination in this case could threaten the status of over 100,000 people lawfully present under the Uniting for Ukraine Program.**

While the Government has, to date, attempted to terminate only the CHNV program and to precipitously end parole for all current beneficiaries of that program, approving that termination here would imperil other individuals paroled into the country under similar programs supported by the same legal authority. That is true of Ukrainians fleeing Russian aggression, Afghan nationals—many of whom supported U.S. forces in Afghanistan at great peril to themselves and their families—and others, all of whom came to the United States lawfully through parole and remain here in that status.

It is notable that the Government targeted and terminated the CHNV private sponsorship parole program for the four Latin American countries, but not the Uniting for Ukraine program—even though the latter is the model for the former and rests on the exact same statutory authority. *See* Ilya Somin, *Federal District Court Rules Red States Lack Standing to Challenge Legality of Immigration Parole Program for Migrants from Four Latin American Countries*, REASON (Mar. 8, 2024)[19]; Ilya Somin, *Biden Expands Uniting for Ukraine Private Refugee Sponsorship Model to Include up to 30,000 Migrants Per Month from Cuba, Nicaragua, Venezuela, and Haiti*, REASON

---

[19]    https://bit.ly/4j9XJ0K.

(Jan. 5, 2023) (describing connection between the Uniting for Ukraine parole program and the CHNV program).[20]

Whatever the Government's motives for distinguishing between Uniting for Ukraine and CHNV, if it prevails, Uniting for Ukraine and the migrants granted parole under that program are likely to be imperiled. The enormously successful Uniting for Ukraine program has, with the help of American private sponsors, given refuge to over 117,000 Ukrainians fleeing the brutal Russian invasion of their country. Jennifer Joas, *What to Know About the 'Uniting for Ukraine' Program in US*, NBC CT (Feb. 24, 2025).[21] It has helped save these people from horrific violence and oppression and enabled them to contribute to the U.S. economy by granting them two-year residency and work permits on the same terms as those now extended to CHNV parolees. *See* Ilya Somin, *We Sponsored Refugees Under a New Biden Program: The Results Were Astonishing*, WASH. POST (Jan. 3, 2023) (providing an overview of the Uniting for Ukraine program and its benefits).

Like CHNV, Uniting for Ukraine is not limited to small numbers of migrants, and it does not have significantly more extensive case-by-case assessment than the former program. Thus, the Court should be aware that any judgment in favor of the

---

[20] https://bit.ly/3XsVhsQ.

[21] https://bit.ly/4mj1LH1.

Government in the present case, based on the notion that CHNV is illegal, is also

likely to become a precedent endangering Uniting for Ukraine and the refugees with

lawful status under that program.

### Conclusion

The Court should affirm the district court's preliminary injunction.


Dated: July 2, 2025

Respectfully submitted,

/s/ *Grant B. Martinez*

Grant B. Martinez
gmartinez@yettercoleman.com
First Circuit Bar No. 1218213
David J. Gutierrez
dgutierrez@yettercoleman.com
First Circuit Bar No. 1218334
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000


*Counsel for Amici Curiae*
*The Cato Institute and Prof. Ilya Somin*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5), 32(a)(7)(B), and 32(g)(1) because this document contains 3,376 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date:    July 2, 2025                    /s/ *Grant B. Martinez*
                                         Grant B. Martinez
                                         *Counsel for Amici Curiae The Cato Institute and Professor Ilya Somin*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit via the court's electronic filing system, on the 2nd day of July, 2025. I certify that all participants in this case are registered CM/ECF filers and that an electronic copy of this document was served on all via the court's electronic filing system on the same date.

/s/ *Grant B. Martinez*

Grant B. Martinez
*Counsel for Amici Curiae The Cato*
*Institute and Professor Ilya Somin*