# 25-1384

# United States Court of Appeals for the First Circuit

SVITLANA DOE,

*Plaintiffs-Appellees,*

v.

KRISTI NOEM, in their official capacity as Secretary of Homeland Security,

*Defendants-Appellants.*

(*Caption continues inside front cover.*)

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF FOR THE STATES OF NEW YORK, ILLINOIS, MASSACHUSETTS, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, MAINE, MARYLAND, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, WISCONSIN, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS AND FOR AFFIRMANCE**

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
115 South LaSalle Street
Chicago, Illinois  60603

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
TASHA J. BAHAL
  *Deputy State Solicitor*
ELIZABETH D. MATOS
  *Chief, Civil Rights Division*
DAVID UREÑA
  *Assistant Attorney General,*
  *Civil Rights Division*
One Ashburton Place
Boston, Massachusetts  02108

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
  *of Counsel*
28 Liberty Street
New York, New York  10005
(212) 416-6184

(*Additional counsel listed on signature pages.*)     Dated: July 2, 2025

*(Caption continues from front cover.)*

MARIA DOE, ALEJANDRO DOE, ARMANDO DOE, ANA DOE, CARLOS DOE, OMAR DOE, SANDRA MCANANY, KYLE VARNER, WILHEN PIERRE VICTOR, HAITIAN BRIDGE ALLIANCE, ANDREA DOE, VALENTIN ROSALES TABARES, MARIM DOE, ADOLFO GONZALEZ, JR., ALEKSANDRA DOE, TERESA DOE, ROSA DOE, MIGUEL DOE, LUCIA DOE, DANIEL DOE, GABRIELA DOE, NORMA LORENA DUS

*Plaintiffs-Appellees,*

v.

PETE R. FLORES, in their official capacity as Acting Commissioner of U.S. Customs and Border Protection, ANGELICA ALFONSO-ROYALS, in their official capacity as the Senior Official performing the duties of the Director of U.S. Citizenship and Immigration Services, DONALD J. TRUMP, in their official capacity as President of the United States, TODD LYONS, in their official capacity as the Acting Director of Immigration and Customs Enforcement,

*Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................ii

INTERESTS OF AMICI STATES.............................................................. 1

BACKGROUND ....................................................................................... 3

ARGUMENT ........................................................................................... 13

    PRESERVING CHNV PAROLE BENEFITS THE PUBLIC AND
    SERVES URGENT HUMANITARIAN CONCERNS ........................................ 13

        A.    Immigrants Are Key Contributors to the
               Economies and Communities of Amici States........................ 14

        B.    Terminating CHNV Parole Separates Families,
               Damages Communities, and Endangers Immigrants............ 22

CONCLUSION ....................................................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Doe v. Noem*,
No. 25-1384, 2025 WL 1505688 (1st Cir. May 5, 2025) ..................... 12

*Moore v. City of East Cleveland*,
431 U.S. 494 (1977) ................................................................................ 24

*Noem v. Doe*,
145 S. Ct. 1524 (2025) .......................................................................... 12

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................. 13

**Federal Statutes**

8 U.S.C. § 1182(d)(5)(A) ......................................................................... 1, 3

**Federal Regulations**

Implementation of the Uniting for Ukraine Parole Process,
87 Fed. Reg. 25040 (Apr. 27, 2022) ..................................................... 5-6

Implementation of a Parole Process for Venezuelans,
87 Fed. Reg. 63507 (Oct. 19, 2022) ............................................... 6-7, 28

Implementation of a Parole Process for Haitians,
88 Fed. Reg. 1243 (Jan. 9, 2023) .................................................. 7-9, 26

Implementation of a Parole Process for Nicaraguans,
88 Fed. Reg. 1255 (Jan. 9, 2023) ..................................................... 7, 27

Implementation of a Parole Process for Cubans,
88 Fed. Reg. 1266 (Jan. 9, 2023) ................................................ 7, 9, 28

Implementation of Changes to the Parole Process for
Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023) ................................... 7

Exec. Order No. 14165, 90 Fed. Reg. 8467, 8467 (Jan. 30, 2025) .......... 10

ii

**Federal Regulations**                                    **Page(s)**

Termination of Parole Processes for Cubans, Haitians,
    Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611
    (Mar. 25, 2025) ................................................................ 11

**Miscellaneous Authorities**

Abha Bhattarai, *Worker Shortages Are Fueling America's
    Biggest Labor Crise*s, Wash. Post (Sept. 16, 2022),
    https://www.washingtonpost.com/business/2022/09/16/worke
    r-shortage-strikes-economy/ ............................................. 19

Allison Abrams, *Damage of Separating Families*, Psych. Today
    (June 22, 2018),
    https://www.psychologytoday.com/us/blog/nurturing-self-
    compassion/201806/damage-separating-families ............................ 24

Am. Immigr. Council, *Immigrants in California* (n.d.),
    https://map.americanimmigrationcouncil.org/locations/califor
    nia/ ............................................................................ 16

Am. Immigr. Council, *Immigrants in Illinois* (n.d.),
    https://map.americanimmigrationcouncil.org/locations/illinoi
    s/ ........................................................................... 15-16

Am. Immigr. Council, *Immigrants in Massachusetts* (n.d.),
    https://map.americanimmigrationcouncil.org/locations/massa
    chusetts/ .................................................................. 16-17

Am. Immigr. Council, *Immigrants in New York* (n.d.),
    https://map.americanimmigrationcouncil.org/locations/new-
    york/ ....................................................................... 15-16

Am. Immigr. Council, *Immigrants in the United States* (n.d.),
    https://map.americanimmigrationcouncil.org/locations/nation
    al/ ............................................................................ 15

## Miscellaneous Authorities          Page(s)

Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021), https://www.americanimmigrationcouncil.org/fact-sheet/us-citizen-children-impacted-immigration-enforcement/ .................23-24

Anatoly Kurmanaev & Ethan Singer, *Election Results Presented by Venezuela's Opposition Suggest Maduro Lost Decisively*, N.Y. Times (July 31, 2024), https://www.nytimes.com/2024/07/31/world/americas/venezuela-maduro-election-results.html ......................................29

Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* (Oct. 15, 2020), https://www.congress.gov/crs-product/R46570 ...........4

Andorra Bruno, Cong. Rsch. Serv., R47654, *Immigration Options for Immigration Parolees* (Aug. 17, 2023), https://www.congress.gov/crs-product/R47654 ....................................6

Béatrice Vallières, *'You Leave with Nothing': Haitians Face Impossible Choice After Supreme Court Decision*, Documented (June 5, 2025), https://documentedny.com/2025/06/05/haitians-chnv-face-impossible-choice-after-supreme-court-decision/ ..............................29

Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (Sept. 18, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html................................................................27

Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (Dec. 13, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Nicaragua.html .......................................................27

**Miscellaneous Authorities**                                    **Page(s)**

Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (May 12, 2025), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html ....................................................................... 28

Bureau of Lab. Stat., Econ. News Release, *Labor Force Characteristics of Foreign-Born Workers Summary* (May 20, 2025), https://www.bls.gov/news.release/forbrn.nr0.htm .................. 14

Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1 (July 2019), https://www.ncfr.org/sites/default/files/2019-07/Immigrant_Families_Policy_Brief_July_23_2019.pdf ................. 23

Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-they-are-the-new-american-workforce/ ......... 16

Darrell M. West, *The Costs and Benefits of Immigration*, 126 Pol. Sci. Q. 427 (2011), https://www.jstor.org/stable/23056953 ......... 14

David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023), https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders ..................... 4-5

Emry Dinman, *Spokane Refugee Communities Search for Path Forward After Supreme Court Decision Allows Parole Status to be Stripped*, Spokesman-Rev. (May 30, 2025), https://www.spokesman.com/stories/2025/may/30/spokane-refugee-communities-search-for-path-forwar/ ................................... 26

**Miscellaneous Authorities**                                     **Page(s)**

Erick Díaz Veliz, *The End of Humanitarian Parole and TPS Is Shaping Michigan Communities*, Mich. Advance (June 6, 2025), https://michiganadvance.com/2025/06/06/the-end-of-humanitarian-parole-and-tps-is-shaping-michigan-communities/ ..................................................................... 21

FWD.us, *CHNV Has Been a Huge Economic Success* (May 16, 2025), https://www.fwd.us/news/chnv-has-been-a-huge-economic-success-the-trump-administration-should-abandon-its-effort-to-fast-track-the-revocation-of-humanitarian-parole-for-more-than-500000-people/ ....................... 17

Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*, Reuters (Feb. 17, 2023), https://www.reuters.com/markets/us/feds-barkin-labor-shortages-may-persist-2023-02-17/ ...................................... 19

Jacqueline Charles, *'Returning to Haiti Is Suicide': Migrants Face Harrowing Choice After Supreme Court Ruling*, Mia. Herald (June 1, 2025), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article307554541.html .......................... 29

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html ...................... 22

Jesús Jank Curbelo, *Legal Status Revoked, Jobs Gone From One Day to the Next: "I Don't Know How I'm Going to Survive"*, El País (Apr. 10, 2025), https://english.elpais.com/usa/2025-04-10/legal-status-revoked-jobs-gone-from-one-day-to-the-next-i-dont-know-how-im-going-to-survive.html .......................................... 21

**Miscellaneous Authorities**                                        **Page(s)**

Joint Econ. Comm., U.S. Cong., *Immigrants Are Vital to the
U.S. Economy* (Apr. 26, 2021),
https://www.jec.senate.gov/public/_cache/files/6750b0f0-c851-
4fee-9619-295582fd44e8/immigrants-are-vital-to-the-us-
economy-final.pdf ............................................................... 14

Katie Johnston, *Migrants Want to Work. And Employers Want
to Hire Them.*, Bos. Globe (Jan. 15, 2024),
https://www.bostonglobe.com/2024/01/15/business/migrants-
work-employers/ ................................................................. 17

Katie Johnston, *'Our Future Workforce': How 41 Haitian
Migrants Solved a Marlborough Nonprofit's Staffing
Shortage*, Bos. Globe (Oct. 1, 2024),
https://www.bostonglobe.com/2024/10/01/business/migrants-
jobs-labor-shortage-massachusetts/ ................................... 18

Katie Johnston, *With Migrants' Legal Status Revoked,
Marshfield Employer Faces Loss of 100-Plus Workers*, Bos.
Globe (June 17, 2025),
https://www.bostonglobe.com/2025/06/17/metro/trump-
revokes-legal-status-haitian-workers-massachusetts/ ....................... 21

Lydia DePillis, *Immigration Rebound Eases Shortage of
Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023),
https://www.nytimes.com/2023/02/06/business/economy/immi
gration-labor.html ............................................................... 17

Lydia DePillis, *Trump's Immigration Plans Could Bring an
Economic Toll*, N.Y. Times (Nov. 13, 2024),
https://www.nytimes.com/2024/11/13/business/economy/trum
p-immigration-inflation-prices.html ................................... 19

**Miscellaneous Authorities**                                        **Page(s)**

Lynsie Ranker et al., *Keeping Medicare Solvent: How
    Immigrants Subsidize Medicare's Trust Fund for All U.S.
    Seniors*, New Am. Econ. (Apr. 2021),
    https://www.americanimmigrationcouncil.org/wp-
    content/uploads/sites/2/2021/05/NAE_Medicare_Report.pdf ............ 20

Mass. Senior Care Ass'n, *Supreme Court Allows Federal
    Government to Proceed with Changes to CHNV
    Humanitarian Parole Program* (June 17, 2025),
    https://maseniorcare.org/about/newsroom/supreme-court-
    allows-federal-government-proceed-changes-chnv-
    humanitarian-parole ............................................................ 18

Mem. from Benjamine C. Huffman, Acting Sec'y, DHS, to Caleb
    Vitello, Acting Dir., ICE et al., Guidance Regarding How to
    Exercise Enforcement Discretion (Jan. 23, 2025),
    https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-
    and-parole-guidance.pdf ..................................................... 11

N.Y.C. Mayor's Office of Immigr. Affs., *State of Our Immigrant
    City* (2021),
    https://www.nyc.gov/assets/immigrants/downloads/pdf/MOIA
    -Annual-Report-for-2020.pdf ............................................... 15

Nat'l Found. for Am. Pol'y, *2.7 Million People Could Lose TPS,
    DACA and Humanitarian Parole* (Oct. 2024),
    https://nfap.com/wp-content/uploads/2024/10/TPS-And-
    Humanitarian-Parole-Numbers.NFAP-Policy-Brief.2024.pdf ............ 6

New Am. Econ., *New Americans in Chicago* (n.d.),
    https://www.newamericaneconomy.org/wp-
    content/uploads/2018/11/G4G_Chicago.pdf .............................. 15

Nik Theodore, Great Cities Inst., *Insecure Communities: Latino
    Perceptions of Police Involvement in Immigration
    Enforcement* (2013),
    https://www.policylink.org/sites/default/files/INSECURE_CO
    MMUNITIES_REPORT_FINAL.PDF ...................................... 22

**Miscellaneous Authorities**                                        **Page(s)**

Nora Gámez Torres et al., *'Death Sentence': CHNV Ruling
    Upends Lives of South Floridians from Troubled Nations*,
    Mia. Herald (May 30, 2025),
    https://www.miamiherald.com/news/local/immigration/article
    307528636.html ................................................................... 29

Phyllis Hanlon, *Residential Schools: Still Riding the Pandemic
    Wave*, New England Psych. (Jan. 10, 2023),
    https://www.nepsy.com/articles/leading-stories/residential-
    schools-still-riding-the-pandemic-wave/ ............................................. 18

R. Gabriela Barajas-Gonzalez et al., *Applying a Community
    Violence Framework to Understand the Impact of
    Immigration Enforcement Threat on Latino Children*, 31
    Soc'y for Rsch. in Child Dev. 1 (2018),
    https://srcd.onlinelibrary.wiley.com/doi/epdf/10.1002/sop2.1 ............ 24

Ricky Sayer, *Haitian Community in Charleroi Facing
    Uncertain Future as U.S. Aims to Revoke Legal Status of
    Migrants*, CBS News (Mar. 24, 2025),
    https://www.cbsnews.com/pittsburgh/news/charleroi-haitian-
    community-revoking-legal-status-chnv/ ............................................. 21

Safia Samee Ali, *Farmers Push for Immigration Reform to
    Counter Labor Shortages and Rising Food Prices*, NBC News
    (Sept. 5, 2022), https://www.nbcnews.com/news/us-
    news/farmers-pushing-immigration-reform-counter-labor-
    shortages-escalating-rcna45741 ........................................................ 19

Sam González Kelly, *Supreme Court Ruling Sparks Fear
    Among Houston Immigrants as Trump Halts Parole
    Program*, Hou. Chron. (June 3, 2025),
    https://www.houstonchronicle.com/news/houston-
    texas/immigration/article/supreme-court-houston-chnv-
    immigrants-20357289.php................................................................ 26

**Miscellaneous Authorities**                                        **Page(s)**

Stephanie Ferguson, U.S. Chamber of Com., *Understanding
    America's Labor Shortage* (July 24, 2024),
    https://www.uschamber.com/workforce/understanding-
    americas-labor-shortage ................................................................ 19

Tim Balk & Miriam Jordan, *Trump Administration Moves to
    End Program for Migrants from 4 Caribbean and Latin
    American Nations*, N.Y. Times (Mar. 21, 2025),
    https://www.nytimes.com/2025/03/21/us/politics/the-trump-
    administration-moved-to-end-a-program-for-migrants-from-
    4-caribbean-and-latin-american-nations.html .................................. 20

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and
    the Economy*, Ctr. for Am. Progress (Jan. 26, 2017),
    https://www.americanprogress.org/article/the-effects-of-
    sanctuary-policies-on-crime-and-the-economy/ ............................... 22

U.S. Citizenship & Immigr. Servs., *CBP Releases December
    2024 Monthly Update* (Jan. 14, 2025),
    https://www.cbp.gov/newsroom/national-media-release/cbp-
    releases-december-2024-monthly-update ......................................... 8

U.S. Citizenship & Immigr. Servs., *Humanitarian or
    Significant Public Benefit Parole for Aliens Outside the
    United States* (last updated Jan. 24, 2025),
    https://www.uscis.gov/humanitarian/humanitarian_parole ............... 6

U.S. Citizenship & Immigr. Servs., *Update on Form I-134A*
    (Jan. 28, 2025),
    https://www.uscis.gov/newsroom/alerts/update-on-form-i-
    134a ................................................................................................ 10

U.S. Cong. Budget Off., *The Impact of Unauthorized
    Immigrants on the Budgets of State and Local Governments*
    (Dec. 2007),
    https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/87xx/d
    oc8711/12-6-immigration.pdf ........................................................ 20

**Miscellaneous Authorities**                                        **Page(s)**

U.S. Dept. of Homeland Sec., *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), https://www.dhs.gov/archive/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and ................................................. 7

U.S. Dept. of Homeland Sec., *Operation Allies Welcome* (n.d.), https://www.dhs.gov/sites/default/files/publications/21_1110-opa-dhs-resettlement-of-at-risk-afghans.pdf ...................................... 5

U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration and Refugee Policy* (Mar. 1, 1981), https://babel.hathitrust.org/cgi/pt?id=txu.059173024374848&view=1up&seq=9 .................................................... 25

VisaVerge, *What the End of CHNV Parole Means for Migrants* (Apr. 8, 2025), https://www.visaverge.com/news/what-the-end-of-chnv-parole-means-for-migrants/ ........................................... 26

Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* (Mar. 2018), https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchildrensfears.pdf .............................................. 24

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019), https://www.reuters.com/article/us-usa-immigration-ban/us-denied-tens-of-thousands-more-visas-in-2018-due-to-travel-ban-data-idUSKCN1QF2KF/ ........................................... 24

**Miscellaneous Authorities**             **Page(s)**

Zhen Wang, *'We've Got Their Backs': New London Neighbors
     Stand with Tyson Foods Workers Facing Deportation*,
     Appleton Post-Crescent (Apr. 10, 2025),
     https://www.postcrescent.com/story/money/companies/2025/0
     4/10/tyson-foods-to-terminate-immigrant-chnv-program-
     workers-in-new-london/83018723007/...............................................20

Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy
     and the Case for Family Unity*, 5 J. Migration & Hum. Sec.
     417 (2017), https://cmsny.org/publications/jmhs-case-for-
     family-unity/.......................................................................................23

## INTERESTS OF AMICI STATES

In 2022 and 2023, the U.S. Department of Homeland Security (DHS) established parole processes, or "pathways," for certain immigrants from Cuba, Haiti, Nicaragua, and Venezuela fleeing dangerous conditions in their home countries ("CHNV parole"). In implementing the CHNV parole pathways, DHS exercised its statutory authority to grant immigration parole for a two-year period to noncitizens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Upon taking office, President Trump directed the termination of these and other humanitarian parole pathways. And shortly thereafter, DHS categorically terminated the immigration parole of more than 500,000 CHNV parole recipients, immediately upending the lives of these lawfully present immigrants and threatening to tear communities and families apart.

The district court entered a preliminary injunction against DHS's termination of CHNV parole. The court explained that the plaintiff class of CHNV parole recipients was likely to succeed in showing that DHS improperly revoked their parole status en masse based on flawed legal reasoning. The court further held that terminating plaintiffs' parole

would cause them immediate and irreparable harm and that the public interest would not be served by leaving over 500,000 immigrants without legal status, unable to work, and without means to provide for themselves and their families. This Court should affirm.

Amici States of New York, Illinois, Massachusetts, California, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia ("Amici States") submit this brief to emphasize that the district court correctly concluded that terminating the parole status of hundreds of thousands of immigrants severely harms the public interest. Many thousands of immigrants from Cuba, Haiti, Nicaragua, and Venezuela live in Amici States, and immigrants from these and other countries are essential to the fabric of our communities and are vital members of the workforce. Immigrants pay substantial sums in state and local taxes and wield significant spending power. And CHNV parole recipients in particular hold key jobs in state and local workforces, including in industries facing labor shortages. Ending CHNV parole deprives Amici States of immigrants' substantial economic and social contributions, increases costs, and threatens public safety.

DHS's en masse termination of parole also separates families, prevents family reunification, and endangers parole recipients by placing them at immediate risk of removal to countries with exceptionally danger-ous living conditions. In many cases, parole recipients are family members or friends of individuals already living in Amici States' communities. These negative effects have already been felt in communities within our respective jurisdictions and, unless the preliminary injunction is affirmed, will continue to reverberate across the Nation.

## BACKGROUND

The Immigration and Nationality Act gives the Attorney General discretion to grant parole to noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" until the purposes of such parole have been served. 8 U.S.C. § 1182(d)(5)(A). "Parole is one of several authorities that allow foreign nationals to live and work in the United States without being formally admitted to the country and without having a set pathway

to a permanent immigration status."[1] In this respect, parole shares characteristics of other immigration programs, such as Temporary Protected Status (TPS) and Deferred Action for Childhood Arrivals (DACA).[2]

The federal government's exercise of its parole authority has "deep historical precedent."[3] Over the years, this authority has been used to provide safe harbor to immigrants in danger and to reunify separated families. Past parole programs have benefitted various groups, including individuals fleeing Vietnam, Cambodia, and Laos in the late 1970s; Cuban nationals; and family of U.S. military servicemembers.[4] From 1998 to 2003 (the most recent six-year period for which DHS published such data), the United States admitted between 235,000 and 300,000 parolees annually.[5] More recently, the United States has made parole available to certain Central American minor children of parents residing in the United

---

[1] Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* 1 (Oct. 15, 2020). (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on July 2, 2025.)

[2] *Id.* at 3.

[3] David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023).

[4] *Id.*

[5] *Id.* (figure 1).

States, and vulnerable Afghans who had supported U.S. military operations in Afghanistan.[6]

In 2022, DHS announced Uniting for Ukraine, a parole pathway for Ukrainian citizens and their immediate family members displaced by the Russian invasion.[7] This program would become a model for the CHNV pathways at issue in this appeal. Uniting for Ukraine allowed parolees to stay in the United States for a two-year period, provided that a U.S.-based sponsor agreed to provide them with financial support.[8] To participate, the sponsor submitted an application to U.S. Citizenship and Immigration Services (USCIS), which assessed the sponsor's ability to provide financial support. The prospective parolee then provided biographic and biometric data, which USCIS ran against national security and law enforcement databases.[9] Next, the prospective parolee received advance authorization to travel to a U.S. port of entry, where a customs officer inspected the individual and made a "case-by-case processing

_____

[6] *Id.*; *see* DHS, *Operation Allies Welcome* (n.d.).

[7] Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040, 25040 (Apr. 27, 2022).

[8] *Id.* at 25042-43.

[9] *Id.*

determination" as to whether parole should be granted.[10] Individuals granted parole could apply for work authorization.[11]

Uniting for Ukraine successfully established a safe and orderly process for prospective immigrants that obviated the need to journey to the southwest border,[12] and more than 200,000 Ukrainians received parole through this pathway.[13] As for all humanitarian parole programs, parole ends when the parole period expires, or when the parolee leaves the United States without first securing appropriate documentation.[14] However, parolees "may be eligible individually for one or more immigration mechanisms that offer a way to remain lawfully in the United States on a temporary or permanent basis."[15]

---

[10] *Id.*

[11] *Id.* at 25043.

[12] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022) (reproduced at Appendix (Appx.) 103-113).

[13] Nat'l Found. for Am. Pol'y, *2.7 Million People Could Lose TPS, DACA and Humanitarian Parole* 2 (Oct. 2024).

[14] *See* U.S. Citizenship & Immigr. Servs. (USCIS), *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States* (last updated Jan. 24, 2025) ("What Is Parole?").

[15] Andorra Bruno, Cong. Rsch. Serv., R47654, *Immigration Options for Immigration Parolees* 6 (Aug. 17, 2023).

In October 2022, following the success of Uniting for Ukraine, DHS implemented a similar parole pathway for Venezuelans,[16] which drastically "decreased the number of Venezuelan nationals making the dangerous journey to" the southwest border.[17] In January 2023, DHS announced that the parole pathway for Venezuelans would continue and that it would establish similar parole pathways for Cubans, Haitians, and Nicaraguans modeled on the successful processes for Ukrainians and Venezuelans.[18]

The CHNV parole pathways allowed certain nationals of these countries, along with their spouses and qualifying children, to request to

---

[16] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63507.

[17] Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1268 (Jan. 9, 2023) (reproduced at Appx. 120-133).

[18] DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023); *see* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023) (reproduced at Appx. 135-147); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) (reproduced at Appx. 149-160); Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1266; Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023) (reproduced at Appx. 115-118); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63507.

come to the United States for a period of up to two years, during which time they could apply for work authorization.[19] The process for obtaining parole was substantially similar to Uniting for Ukraine: a prospective parolee was required to have a U.S.-based sponsor commit to provide them with financial support, clear a rigorous vetting process, and demonstrate their eligibility for parole on a case-by-case basis. Individuals removed from the United States within the past five years, found to have crossed into the United States without authorization after the announcement of the parole pathways, or subject to an admissibility bar based on a prior removal order were not eligible to participate.[20]

Through the CHNV parole pathways, DHS could grant advance travel authorization to up to 30,000 noncitizens each month to seek parole.[21] In all, more than 530,000 individuals were granted parole.[22] At the same time, the CHNV parole pathways drastically reduced the

---

[19] *See, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1243-44, 1253.

[20] *Id.* at 1252.

[21] *Id.* at 1253.

[22] USCIS, *CBP Releases December 2024 Monthly Update* (Jan. 14, 2025).

number of noncitizens entering the United States without authorization.[23] Previously, when immigrants from these countries were detained for entering the United States without authorization, DHS faced significant challenges returning them to their home countries. But with the parole pathways in place, Mexico agreed to accept Cubans, Haitians, Nicaraguans, and Venezuelans who entered the United States without authorization, substantially increasing the likelihood that individuals from those countries who entered the United States without authorization would be removed.[24] The CHNV parole pathways thus incentivized immigrants to use a safe and orderly process to enter the United States.

Notwithstanding the success of the parole pathways, President Trump directed their termination upon taking office. On January 20, 2025, the President issued an executive order directing the DHS Secretary to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans,

---

[23] *See, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1243-44.

[24] *See, e.g.*, *id.* at 1243-44, 1253; Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1271-72.

and Venezuelans.'"[25] The same day, the Acting DHS Secretary issued a memorandum declaring that programs which allow categories of individuals to apply for immigration parole are contrary to law, even though the Executive Branch had advanced the opposite position during presidential administrations of both parties "over the past several decades." (Appendix (Appx.) 304-305.) The memorandum directed the agency to phase out any parole programs that were not "strictly in accord" with its view of the law. (Appx. 305.) DHS officials subsequently stopped processing new parole applications[26] and prohibited staff from considering requests from CHNV parole recipients for other forms of immigration status, such as asylum, TPS, and adjustment of status (*see* Appx. 311).[27] Meanwhile, DHS

---

[25] Exec. Order No. 14165, 90 Fed. Reg. 8467, 8467 (Jan. 30, 2025).

[26] *See* USCIS, *Update on Form I-134A* (Jan. 28, 2025) ("Due to the Jan. 20, 2025 Executive Order, Securing Our Borders, USCIS is pausing acceptance of Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, until we review all categorical parole processes as required by that order.").

[27] The district court has issued a preliminary injunction against DHS's hold on these adjudications. (Mem. & Order Granting Partial Relief on Pls.' Mot. for Prelim. Inj. & Stay of Admin. Action at 49 (May 28, 2025), ECF No. 107.)

expanded the use of expedited removal procedures, including against parole recipients.[28]

Shortly after plaintiffs brought this suit, DHS issued a Federal Register notice on March 25, 2025, terminating the parole status and work authorization for all CHNV parole recipients as of April 24, 2025, and stating the agency's intent to promptly initiate removal proceedings against any individuals who remained.[29] Plaintiffs moved for a preliminary injunction against this agency action, which the district court granted. After explaining that plaintiffs were likely to succeed on the merits of their claims (Addendum (A.) 31-37), the court held that the equitable factors also supported preliminary relief. The court found that, absent preliminary relief, plaintiffs would suffer irreparable harm by having to choose between (i) voluntarily departing the United States to face dangerous conditions in their native countries, or (ii) remaining in the United States to await removal while unable to work or seek

---

[28] *See* <u>Mem. from Benjamine C. Huffman, Acting Sec'y, DHS, to Caleb Vitello, Acting Dir., ICE et al., Guidance Regarding How to Exercise Enforcement Discretion 1-2 (Jan. 23, 2025).</u>

[29] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13611, 13618-19 (Mar. 25, 2025) (reproduced at Addendum (Add.) 45-56).

adjustment of status. (A. 18-19, 37-38.) And it would not be in the public interest "to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present in the country, such that these individuals cannot legally work in their communities or provide for themselves and their families." (A. 39.)

Defendants appealed the district court's order, and this Court denied defendants' motion for a stay pending appeal, concluding that defendants had not made a strong showing that they were likely to succeed on the merits or that the equities and public interest weighed in their favor. *Doe v. Noem*, No. 25-1384, 2025 WL 1505688, at *1 (1st Cir. May 5, 2025). The Supreme Court subsequently granted a stay without opinion. *Noem v. Doe*, 145 S. Ct. 1524 (2025) (mem.). Justice Jackson, joined by Justice Sotomayor, dissented, reasoning that the balance of equities and public interest alone warranted denying a stay, because suddenly revoking the parole of more than 500,000 individuals would cause immediate "social and economic chaos." *Id.* at 1527 (Jackson, J., dissenting).

# ARGUMENT

## PRESERVING CHNV PAROLE BENEFITS THE PUBLIC AND SERVES URGENT HUMANITARIAN CONCERNS

Plaintiffs are likely to succeed on the merits of their claims because DHS's termination of CHNV parole was arbitrary, capricious, and contrary to law. In addition, the Court must consider the public interest and the balance of equities in assessing the propriety of a preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Amici States write to emphasize that immediately terminating CHNV parole severely harms the public interest and is inequitable. Experience and data confirm that parole recipients, like other immigrants, deliver significant public benefits. And terminating CHNV parole would inflict severe harms on Amici States' communities.

A.    **Immigrants Are Key Contributors to the Economies and Communities of Amici States.**

In the experience of Amici States, the benefits of immigration are profound. Not only do immigrants benefit from the opportunities associated with living in the United States, but the States and the Nation as a whole benefit from immigrants' contributions to our economies and communities.[30] Immigrants enrich the Nation's economic, social, and cultural life; offer pathbreaking contributions in science, technology, and other fields; and ultimately make our diverse communities more desirable places to live.[31]

Immigrants contribute to the economy in many ways, including by paying taxes, starting businesses, contributing to state and local labor forces, and consuming goods and services. Approximately 19% of the American civilian workforce is foreign born.[32] Nationally, immigrants

---

[30] *See* Joint Econ. Comm., U.S. Cong., *Immigrants Are Vital to the U.S. Economy* 1-7 (Apr. 26, 2021).

[31] Darrell M. West, *The Costs and Benefits of Immigration*, 126 Pol. Sci. Q. 427, 437-41 (2011).

[32] Bureau of Lab. Stat., U.S. Dep't of Lab., Econ. News Release, *Labor Force Characteristics of Foreign-Born Workers Summary* (May 20, 2025).

pay over $651 billion in taxes, and immigrant-owned companies employ millions of workers.[33]

Immigrants' economic contributions to Amici States are staggering. In New York alone, immigrant households paid $31.3 billion in state and local taxes in 2023 and wielded $160.5 billion in spending power.[34] And in 2019, immigrants contributed $244 billion to New York City's gross domestic product (GDP), or about 23% of the city's total GDP.[35] Likewise, in Illinois, immigrant households paid $10.6 billion in state and local taxes in 2023 and wielded $68.5 billion in spending power.[36] In Chicago specifically, immigrant households paid $1.6 billion in state and local taxes in 2016 and wielded $10.9 billion in spending power—thus holding 22.4% of all spending power in Chicago.[37] Immigrant households in California paid $61.8 billion in state and local taxes in 2023 and exercised

---

[33] Am. Immigr. Council, *Immigrants in the United States* (n.d.).

[34] Am. Immigr. Council, *Immigrants in New York* (n.d.).

[35] N.Y.C. Mayor's Office of Immigr. Affs., *State of Our Immigrant City* 32 (2021).

[36] Am. Immigr. Council, *Immigrants in Illinois* (n.d.).

[37] New Am. Econ., *New Americans in Chicago* 1 (n.d.).

$404.4 billion in spending power.[38] And in Massachusetts, immigrant households paid $6.6 billion in state and local taxes in 2023 and wielded $51.8 billion in spending power.[39]

Immigrants often take on important and difficult-to-fill jobs, especially in burgeoning sectors such as at-home healthcare.[40] For example, in New York, immigrants made up 27.8% of the labor force in 2023 and held 75.1% of home health aide jobs and 67.7% of housekeeping jobs.[41] In Illinois, for that same year, immigrants made up 18.5% of the labor force and held 56.6% of taxi driver jobs and 50.1% of housekeeping jobs.[42] In California, immigrants made up 32.7% of the labor force in 2023, and held 46.1% of health aide jobs, 85.1% of sewing machine operator jobs, and 62.2% of agricultural jobs.[43] In Massachusetts, immigrants made up 21.9% of Massachusetts's labor force and accounted for 38.6% of health

---

[38] Am. Immigr. Council, *Immigrants in California* (n.d.).

[39] Am. Immigr. Council, *Immigrants in Massachusetts* (n.d.).

[40] Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018).

[41] Am. Immigr. Council, *Immigrants in New York, supra*.

[42] Am. Immigr. Council, *Immigrants in Illinois, supra*.

[43] Am. Immigr. Council, *Immigrants in California, supra*.

aides in the State.[44] Immigrants account for similarly substantial portions of the labor forces of other States and localities.

The parole pathways at issue here similarly benefit the economy. Individuals who are ultimately granted parole may seek employment authorization. As a result, parole recipients—together with other immigrants who have work authorization—have helped to ease worker shortages in critical industries.[45] CHNV parole recipients in particular "went to work in industries with persistent workforce challenges."[46] For instance, as of September 2024, there were approximately 240,000 CHNV parole recipients active in the labor force, including "40,000 in manufacturing; 30,000 in construction; 30,000 in leisure and hospitality; and 30,000 recipients in health service."[47] Massachusetts provides a striking example of how CHNV parole recipients are working to fill critical work vacancies: 800 to 1,000 CHNV parole recipients work as

---

[44] Am. Immigr. Council, *Immigrants in Massachusetts*, *supra*.

[45] Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023); Katie Johnston, *Migrants Want to Work. And Employers Want to Hire Them.*, Bos. Globe (Jan. 15, 2024).

[46] FWD.us, *CHNV Has Been a Huge Economic Success* (May 16, 2025).

[47] *Id.*

caregivers in nursing facilities that already struggle with over 4,000 caregiver vacancies.[48] Staffing shortages also plague residential special education schools in Massachusetts,[49] and Haitian immigrants have played a vital role in helping to fill these vacancies.[50]

Terminating CHNV parole harms Amici States and undermines the broader public interest. Revoking CHNV parole and work authorization grants prevents parole recipients from making valuable contributions to our economies, participating in our workforces, and attending our schools. This is especially detrimental to sectors facing persistent labor shortages, and particularly so for individuals and families who rely on human

---

[48] Mass. Senior Care Ass'n, *Supreme Court Allows Federal Government to Proceed with Changes to CHNV Humanitarian Parole Program* (June 17, 2025).

[49] Phyllis Hanlon, *Residential Schools: Still Riding the Pandemic Wave*, New England Psych. (Jan. 10, 2023).

[50] *See* Katie Johnston, *'Our Future Workforce': How 41 Haitian Migrants Solved a Marlborough Nonprofit's Staffing Shortage*, Bos. Globe (Oct. 1, 2024) (describing how Haitian immigrants have filled job vacancies to provide care for and teach skills to people with developmental and intellectual disabilities).

services providers.[51] For example, community colleges and universities in Massachusetts report that CHNV parole recipients represent significant portions of their student populations and many of these students are in specialized training programs for job positions that are hard to fill. Revocation of these students' parole may mean the students cannot graduate or work in the United States in the fields in which they are trained. Moreover, community colleges and universities face fiscal consequences if students are unable to complete their studies.

Amici States face other hardships from the revocation of CHNV parole, too. Expelling parole recipients will lead to higher prices for goods and services by slowing economic growth, eliminating jobs, and reducing the supply capacity of U.S. businesses.[52] And as more CHNV parole recipients lose their legal immigration status and work authorization,

---

[51] *See, e.g.*, Stephanie Ferguson, U.S. Chamber of Com., *Understanding America's Labor Shortage* (July 24, 2024) (listing low immigration rate as factor contributing to labor shortage); Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*, Reuters (Feb. 17, 2023) (same); Abha Bhattarai, *Worker Shortages Are Fueling America's Biggest Labor Crises*, Wash. Post (Sept. 16, 2022) (same); *see also* Safia Samee Ali, *Farmers Push for Immigration Reform to Counter Labor Shortages and Rising Food Prices*, NBC News (Sept. 5, 2022).

[52] *See* Lydia DePillis, *Trump's Immigration Plans Could Bring an Economic Toll*, N.Y. Times (Nov. 13, 2024).

Amici States' costs to provide care to uninsured residents will increase, including emergency health services and funding for public health programs that serve underinsured patients.[53] The public will also be harmed by losing parole recipients' substantial contributions to Medicare.[54]

Since the March 25 termination of CHNV parole, these harms have already materialized. Large employers, including Amazon and Honda, had hired many CHNV parole recipients after struggling with worker shortages, and will likely lose those workers if the revocation of parole is not preliminarily enjoined.[55] At the local level, about 100 Haitian immigrants working at a single Wisconsin food-processing facility were expected to lose their legal status and work authorization, affecting not only the facility's continued operations but also the broader local economy.[56] In

---

[53] *Cf.* U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007).

[54] *See* Lynsie Ranker et al., *Keeping Medicare Solvent: How Immigrants Subsidize Medicare's Trust Fund for All U.S. Seniors* 2, New Am. Econ. (Apr. 2021).

[55] *See* Tim Balk & Miriam Jordan, *Trump Administration Moves to End Program for Migrants from 4 Caribbean and Latin American Nations*, N.Y. Times (Mar. 21, 2025).

[56] *See* Zhen Wang, *'We've Got Their Backs': New London Neighbors Stand with Tyson Foods Workers Facing Deportation*, Appleton Post-Crescent (Apr. 10, 2025).

Massachusetts, a developmental disabilities nonprofit, Road to Responsi-bility, fears the consequences of the loss of work authorization for more than 100 of its 800-person workforce.[57] These employees "provide critical support for people who need help with nearly every aspect of their daily lives," and losing them "would take a heavy toll on the nonprofit."[58] As the nonprofit's chief executive explained, the immigrant hires are "good, hard-working people who have been paying taxes, following the rules, and filling positions that . . . we have not been able to fill otherwise."[59] Similar stories can be found nationwide.[60]

Finally, terminating CHNV parole will threaten public safety. Many parole recipients who remain without legal status may be less

---

[57] Katie Johnston, *With Migrants' Legal Status Revoked, Marshfield Employer Faces Loss of 100-Plus Workers*, Bos. Globe (June 17, 2025).

[58] *Id.*

[59] *Id.*

[60] *See, e.g.*, Ricky Sayer, *Haitian Community in Charleroi Facing Uncertain Future as U.S. Aims to Revoke Legal Status of Migrants*, CBS News (Mar. 24, 2025) (Pennsylvania community would lose 800 to 1,000 workers); Jesús Jank Curbelo, *Legal Status Revoked, Jobs Gone From One Day to the Next: "I Don't Know How I'm Going to Survive"*, El País (Apr. 10, 2025) (parole recipient fired from Texas meat processing facility); Erick Díaz Veliz, *The End of Humanitarian Parole and TPS Is Shaping Michigan Communities*, Mich. Advance (June 6, 2025) (discussing challenges to Michigan's agricultural economy).

likely to report crime due to fear of removal, or of having a family or community member removed.[61] When law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[62]

## B.    Terminating CHNV Parole Separates Families, Damages Communities, and Endangers Immigrants.

There is a strong public interest in fostering the reunification of community members with family in danger abroad and preventing the many harms that would result from separating families that have been reunited through CHNV parole. Ending CHNV parole would significantly hinder reunification and upend the lives of children granted parole as the immediate family members of parole recipients. And it would harm community life and place parole recipients in danger.

---

[61] *See, e.g.*, Nik Theodore, Great Cities Inst., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 14 (2013); James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017).

[62] *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017) (sanctuary counties have lower crime rates than comparable nonsanctuary counties).

The parole pathways targeted here have been successful in achieving family reunification. (*See, e.g.*, Appx. 81, 293-296.) By contrast, prolonged or permanent family separations have a devastating impact on the welfare of our communities. Multiple studies illustrate that family reunification benefits the economic, social, and psychological well-being of the affected individuals,[63] while family separation results in myriad harms. Separating family members from each other can result in negative mental and behavioral health outcomes, such as severe stress and symptoms of post-traumatic stress disorder.[64] Separation can be particularly traumatizing to children, resulting in a greater risk of developing mental health disorders such as depression, anxiety, and toxic stress.[65] Trauma can also have negative physical effects on children, such as loss of appetite, stomachaches, headaches, and increased risk of chronic

---

[63] Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 423 (2017).

[64] *See* Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1, 2-3 (July 2019).

[65] Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021).

health conditions.[66] A child's concern about a parent's immigration status can also impair socioemotional and cognitive development.[67] Similarly, spousal separation can cause fear, anxiety, and depression.[68]

The harms to individual residents and their families will, in turn, have a negative effect on Amici States. Intact families provide crucial social support, which strengthens not only the family unit but also the neighborhood, community, and civic society at large. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."). The Select Commission on Immigration and Refugee Policy, a congressionally appointed commission tasked with

---

[66] *Id.*; Allison Abrams, *Damage of Separating Families*, Psych. Today (June 22, 2018); Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-4 (Mar. 2018).

[67] R. Gabriela Barajas-Gonzalez et al., *Applying a Community Violence Framework to Understand the Impact of Immigration Enforcement Threat on Latino Children*, 31 Soc'y for Rsch. in Child Dev. 1, 9-11 (2018).

[68] *See, e.g.*, Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019) (stating that the separation of a U.S. citizen from his noncitizen wife caused them both to "break down psychologically").

studying immigration policy, expounded upon the necessity of family reunification in 1981:

> The reunification of families serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well-being of the nation. Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.[69]

By contrast, denying families the ability to reunite contradicts the foundations of our immigration system and will irreparably harm our families, neighborhoods, and communities. Removing a family's wage-earners from the labor force—either through removal to a foreign country or termination of parole status—also leads to economic hardship for families in Amici States' communities. (*See* A. 39.)

DHS's termination of CHNV parole has instilled fear and anxiety in parole recipients, leading them to draw away from their communities. For example, parole recipients have stopped attending religious services and other community events for fear of deportation, and they hesitate to

---

[69] U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration and Refugee Policy* 112 (Mar. 1, 1981).

interact with state and local government officials.[70] Many efforts to integrate parole recipients into communities have been stopped in their tracks.[71]

Terminating CHNV parole also exposes immigrants to grave personal danger by forcing them to return to the dangerous conditions from which they fled. For instance, "Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country."[72] Collectively, these crises have led to the collapse of Haiti's economy and the spread of gangs that carry out hundreds of killings, assaults, and kidnappings, and have left "Haitians struggling to find basic products including food, water, and medicines."[73] Haiti is currently

---

[70] *See* Emry Dinman, *Spokane Refugee Communities Search for Path Forward After Supreme Court Decision Allows Parole Status to be Stripped*, Spokesman-Rev. (May 30, 2025); Sam González Kelly, *Supreme Court Ruling Sparks Fear Among Houston Immigrants as Trump Halts Parole Program*, Hou. Chron. (June 3, 2025).

[71] *See* VisaVerge, *What the End of CHNV Parole Means for Migrants* (Apr. 8, 2025).

[72] Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1246.

[73] *Id.* at 1246-47.

subject to a level 4 "[d]o not travel" advisory "due to kidnapping, crime, civil unrest, and limited health care" and has been under a state of emergency since March 2024.[74]

Many Nicaraguan nationals, for their part, fled "political, economic, and humanitarian crises," including the government's "regime of terror and . . . suppression of all freedoms."[75] "Nicaragua is one of the poorest countries in Latin America," with almost 30% of families living in poverty,[76] and is currently subject to a level 3 travel advisory due to arbitrary law enforcement, wrongful detention, crime, and limited health-care.[77]

Cuban nationals also face multiple challenges, including Cuba's "worst economic crisis in decades," marked by "[m]ass shortages of dairy

---

[74] Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (Sept. 18, 2024) (click "[READ MORE]").

[75] Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. at 1258 (quotation marks omitted).

[76] *Id.*

[77] Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (Dec. 13, 2024).

and other basic goods," and "[d]eepening poverty."[78] The Cuban government has resorted to "repressive tactics to manage public discontent," including restricting "freedoms of expression, association, peaceful assembly, and other human rights."[79]

And in Venezuela, the combination of "[a] complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country."[80] Venezuela is currently subject to a level 4 "[d]o not travel" advisory due to terrorism, kidnapping, arbitrary law enforcement, wrongful detention, civil unrest, crime, and poor health infrastructure.[81] Fallout from last year's elections in the country has heightened the volatility, triggering violent demonstrations, and prompting "several Latin American

---

[78] Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1269-70.

[79] *Id.* at 1270.

[80] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63509.

[81] Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (May 12, 2025).

countries to suspend or downgrade diplomatic relations with Venezuela, plunging the polarized country into a new period of flux."[82]

The balance of equities and public interest weigh heavily in favor of protecting CHNV parole recipients and preventing their return to these dangerous, violent, and repressive conditions.[83]

---

[82] Anatoly Kurmanaev & Ethan Singer, *Election Results Presented by Venezuela's Opposition Suggest Maduro Lost Decisively*, N.Y. Times (July 31, 2024).

[83] *See, e.g.*, Nora Gámez Torres et al., *'Death Sentence': CHNV Ruling Upends Lives of South Floridians from Troubled Nations*, Mia. Herald (May 30, 2025); Jacqueline Charles, *'Returning to Haiti Is Suicide': Migrants Face Harrowing Choice After Supreme Court Ruling*, Mia. Herald (June 1, 2025); Béatrice Vallières, *'You Leave with Nothing': Haitians Face Impossible Choice After Supreme Court Decision*, Documented (June 5, 2025).

## CONCLUSION

The preliminary injunction order should be affirmed.

Dated:   New York, New York
         July 2, 2025

                                    Respectfully submitted,


KWAME RAOUL                         LETITIA JAMES
  *Attorney General*                  *Attorney General*
  *State of Illinois*                 *State of New York*
JANE ELINOR NOTZ                    BARBARA D. UNDERWOOD
  *Solicitor General*                 *Solicitor General*
ALEX HEMMER                        JUDITH N. VALE
  *Deputy Solicitor General*          *Deputy Solicitor General*
115 South LaSalle Street
Chicago, IL 60603                  By:   */s/ Stephen J. Yanni*
                                        STEPHEN J. YANNI
                                        Assistant Solicitor General

                                        28 Liberty Street
                                        New York, NY 10005
                                        (212) 416-6184

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
TASHA J. BAHAL
  *Deputy State Solicitor*
ELIZABETH D. MATOS
  *Chief, Civil Rights Division*
DAVID UREÑA
  *Assistant Attorney General,*
  *Civil Rights Division*
One Ashburton Place
Boston, MA 02108

*(Counsel listing continues on next page.)*

30

ROB BONTA
 *Attorney General*
 *State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, CT 0610

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 North French Street
Wilmington, DE 19801

ANNE E. LOPEZ
 *Attorney General*
 *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

*(Counsel listing continues on next page.)*

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
 *Attorney General*
 *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
 *Attorney General*
 *State of New Jersey*
25 Market Street
Trenton, NJ 08625

DAN RAYFIELD
 *Attorney General*
 *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
 *Attorney General*
 *State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
 *Attorney General*
 *State of Wisconsin*
17 West Main Street
Madison, WI 53703

## Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains ___5,409___ words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using
Century Schoolbook_____ in
14 point_____, **or**

☐ this document has been prepared in a monospaced typeface using
_____ with
_____.

(s) Stephen J. Yanni_____

Attorney for  New York et al._____

Dated:  July 2, 2025_____