# United States Court of Appeals
## For the First Circuit

No. 25-1384

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE;
CARLOS DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE
 VICTOR; HAITIAN BRIDGE ALLIANCE; ANDREA DOE; VALENTIN ROSALES
TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA
 DOE; ROSA DOE; MIGUEL DOE; LUCIA DOE; DANIEL DOE; GABRIELA DOE;
            NORMA LORENA DUS; and ANA DOE,

                    Plaintiffs, Appellees,

                            v.

    KRISTI NOEM, in her official capacity as the Secretary of
Homeland Security; RODNEY S. SCOTT, in his official capacity as
the Commissioner of U.S. Customs and Border Protection;* JOSEPH
  B. EDLOW, in his official capacity as the Director of U.S.
 Citizenship and Immigration Services;** DONALD J. TRUMP, in his
  official capacity as the President of the United States; and
 TODD M. LYONS, in his official capacity as the Acting Director
            of Immigration and Customs Enforcement,

                    Defendants, Appellants.

                  ───────────────────

           APPEAL FROM THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS

           [Hon. Indira Talwani, U.S. District Judge]

                  ───────────────────

───────────────

     * Pursuant to Fed. R. App. P. 43(c)(2), Commissioner of U.S.
Customs and Border Protection Rodney S. Scott has been substituted
for former Acting Commissioner of U.S. Customs and Border
Protection Pete R. Flores as appellant.

     ** Pursuant to Fed. R. App. P. 43(c)(2), Director of U.S.
Citizenship and Immigration Services Joseph B. Edlow has been
substituted for former Senior Official Performing the Duties of
the Director of U.S. Citizenship and Immigration Services Angelica
Alfonso-Royals as appellant.

Before

Gelpí, Kayatta, and Montecalvo,
<u>Circuit Judges</u>.

———————————

<u>Drew C. Ensign</u>, Deputy Assistant Attorney General, with whom <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Yaakov M. Roth</u>, Principal Deputy Assistant Attorney General, <u>Brian C. Ward</u>, Acting Assistant Director, <u>Patrick Glen</u>, Senior Litigation Counsel, <u>Katherine J. Shinners</u>, Senior Litigation Counsel, and <u>Elissa Fudim</u>, Trial Attorney, were on brief, for appellants.

<u>Justin B. Cox</u>, with whom <u>Law Office of Justin B. Cox</u>, <u>John A. Freedman</u>, <u>Laura Shores</u>, <u>H. Tiffany Jang</u>, <u>Daniel B. Asimow</u>, <u>Arnold & Porter Kaye Scholer LLP</u>, <u>Esther H. Sung</u>, <u>Karen C. Tumlin</u>, <u>Hillary Li</u>, <u>Laura Flores-Perilla</u>, <u>Brandon Galli-Graves</u>, and <u>Justice Action Center</u> were on brief, for appellees.

<u>Matt A. Crapo</u> and <u>Christopher J. Hajec</u> on brief for Immigration Reform Law Institute as amicus curiae supporting appellants.

<u>Kwame Raoul</u>, Attorney General of Illinois, <u>Jane Elinor Notz</u>, Solicitor General, <u>Alex Hemmer</u>, Deputy Solicitor General, <u>Andrea Joy Campbell</u>, Attorney General of Massachusetts, <u>Tasha J. Bahal</u>, Deputy State Solicitor, <u>Elizabeth D. Matos</u>, Chief, Civil Rights Division, <u>David Ureña</u>, Assistant Attorney General, Civil Rights Division, <u>Letitia James</u>, Attorney General of New York, <u>Barbara D. Underwood</u>, Solicitor General, <u>Judith N. Vale</u>, Deputy Solicitor General, <u>Stephen J. Yanni</u>, Assistant Solicitor General of Counsel, on brief for the States of New York, Illinois, Massachusetts, California, Connecticut, Delaware, Hawai'i, Maine, Maryland, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia as amici curiae supporting appellees.

<u>Adam Cederbaum</u>, <u>Samuel B. Dinning</u>, and <u>Thomas J. Broom</u> on brief for cities, counties, and local government leaders as amici curiae supporting appellees.

<u>Matthew Ginsburg</u> and <u>Andrew Lyubarsky</u>, American Federation of Labor and Congress of Industrial Organizations, and <u>David Zimmer</u>, Zimmer, Citron & Clarke LLP, on brief for the American Federation of Labor and Congress of Industrial Organizations, Service Employees International Union, United Food and Commercial Workers, United Auto Workers, UNITE HERE, International Union of Painters

and Allied Trades, International Union of Electrical Workers-Communications Workers of America, and the International Union of Bricklayers and Allied Craftworkers as amici curiae supporting appellees, and Steven K. Ury on brief for the Service Employees International Union as amicus curiae supporting appellees.

Ana Muñoz, Zalkind Duncan & Bernstein LLP, and Aaron Simcha Jon Zelinsky, Zuckerman Spaeder LLP, on brief for faith-based organizations as amici curiae supporting appellees.

Grant B. Martinez and David J. Gutierrez, Yetter Coleman LLP, on brief for The Cato Institute and Professor Ilya Somin as amici curiae supporting appellees.

---

September 12, 2025

---

GELPÍ, **Circuit Judge**.    This appeal centers on the Executive Branch's authority to categorically terminate parole grants under the Immigration and Nationality Act ("INA").  Parole "permit[s] a non-citizen to enter the United States temporarily while investigation of eligibility for admission takes place." Succar v. Ashcroft, 394 F.3d 8, 15 (1st Cir. 2005).  Besides allowing legal access to the United States with the ability to work, and in some cases receive federal benefits, a grant of parole does not per se confer additional rights upon a non-citizen.  See Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 139 (2020) (explaining that even non-citizens who have been paroled for years "are 'treated' for due process purposes 'as if stopped at the border.'" (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 215 (1953))).

The INA empowers the Secretary of the Department of Homeland Security ("DHS") to grant parole of non-citizens into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[1]  8 U.S.C. § 1182(d)(5)(A). And many presidential administrations have invoked this authority

---

[1] See Thuraissigiam, 591 U.S. at 139 ("The power to admit or exclude aliens is a sovereign prerogative, the Constitution gives the political department of the government plenary authority to decide which aliens to admit, and a concomitant of that power is the power to set the procedures" to determine "whether an alien should be admitted." (citation modified)).

to grant parole to non-citizens.[2]  Most relevant to the instant appeal, DHS, under the Administration of President Joseph R. Biden, launched parole programs under which nationals of Cuba, Haiti, Nicaragua, and Venezuela (collectively, "CHNV parole programs") who met certain categorical criteria could seek discretionary individual grants of parole into the United States for up to two years.  Between October 2022 and January 2025, about 532,000 individuals received grants of parole under the CHNV parole programs.

But when President Donald J. Trump took office on January 20, 2025, he signed "Securing Our Borders," Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025), directing the Secretary of DHS ("the Secretary") to terminate all categorical parole programs that are contrary to the policies of the United States.  Two months later, DHS published "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" ("Termination Notice"), announcing that it was "terminating" the

---

[2] The Executive Branch has utilized the INA since its inception to grant parole to immigrants from multiple countries. In fact, many administrations have not only granted immigration relief through a parole program, but also have implemented programs akin to the one at issue here.  In 1956, for instance, the Eisenhower Administration paroled more than 30,000 Hungarian refugees into the United States following an uprising in Hungary. U.S. Citizenship & Immigr. Servs., Refugee Timeline, https://www.uscis.gov/about-us/our-history/stories-from-the-archives/refugee-timeline [https://perma.cc/G4MD-A4GX].  Then, in 1962, the Kennedy Administration granted parole to 15,000 Chinese immigrants.  See id.

CHNV parole programs.  90 Fed. Reg. 13611, 13611 (Mar. 25, 2025). Among other actions announced in the Termination Notice, DHS revoked all existing grants of parole in a month's time, rather than letting each expire at the end of the individual two-year period.  Id. at 13611.

Plaintiffs-Appellees ("Plaintiffs" or "CHNV parolees"), all of whom were affected by the revocation of grants of parole under the CHNV parole programs, filed suit and sought a stay of DHS's action in the United States District Court for the District of Massachusetts.  The district court granted the preliminary request, certifying a class of individuals paroled under the CHNV programs and staying the Termination Notice insofar as it revoked their previously granted parole.  Doe v. Noem, 778 F. Supp. 3d 311, 319, 336 (D. Mass. 2025).  Defendants-Appellants ("the Government") appealed.[3]  For the reasons explained below, we vacate the stay of the termination notice.

## I. BACKGROUND

We begin by briefly orienting the reader with the relevant statutory regime.  After doing so, we move to the travel

---

[3] Defendants-Appellants are the Secretary of Homeland Security, Kristi Noem; the Commissioner of U.S. Customs and Border Protection, Rodney S. Scott; the Director of U.S. Citizenship and Immigration Services, Joseph B. Edlow; the President of the United States, Donald J. Trump; and the Acting Director of Immigration and Customs Enforcement, Todd M. Lyons.  All are being sued in their official capacities.

of this appeal, explaining first the underlying facts and then the
procedural history of this dispute.

### A. Parole Authority in the INA

Section 212(d)(5)(A) of the INA, 8 U.S.C.
§ 1182(d)(5)(A), grants the Secretary discretion to parole
non-citizens into the United States. That statutory provision
states:

> The Secretary of Homeland Security may . . . in his
> discretion parole into the United States temporarily
> under such conditions as he may prescribe only on a
> case-by-case basis for urgent humanitarian reasons or
> significant public benefit[4] any alien applying for
> admission to the United States, but such parole of such
> alien shall not be regarded as an admission of the alien
> and when the purposes of such parole shall, in the
> opinion of the Secretary of Homeland Security, have been
> served the alien shall forthwith return or be returned
> to the custody from which he was paroled and thereafter
> his case shall continue to be dealt with in the same
> manner as that of any other applicant for admission to
> the United States.

8 U.S.C. § 1182(d)(5)(A). Thus, parole allows the Secretary, in
her discretion, to allow non-citizens to be physically present in
the United States without being legally "admitted" to the United
States. See id.; Succar, 394 F.3d at 15-16. Its purpose "is to
permit a non-citizen to enter the United States temporarily while

---

[4]    In the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996 ("IIRIRA"), Congress amended 8 U.S.C.
§ 1182(d)(5)(A) "by striking 'for emergent reasons or for reasons
deemed strictly in the public interest'" from an earlier version
of the statute and "inserting 'only on a case-by-case basis for
urgent humanitarian reasons or significant public benefit.'" Pub.
L. No. 104-208, div. C, § 602, 110 Stat. 3009, 3009-689 (1996).

investigation of eligibility for admission takes place." Succar, 394 F.3d at 15.    Since the late 1990s, every presidential administration has exercised the parole authority, "including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden." Biden v. Texas, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring).

## B. Facts[5]

### 1. CHNV Parole Programs

On October 19, 2022, DHS under the Biden Administration announced a new parole process to address an increasingly high number of encounters with Venezuelan nationals at the southern border.    Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022).    This new process allowed Venezuelan nationals to obtain advance authorization to "travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years." Id. at 63508.    Modeled after the Venezuelan parole program, DHS launched similar programs for nationals of Cuba, Haiti, and Nicaragua in January 2023.    See Implementation of Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of Parole Process for Haitians, 88

---

[5] In recounting the facts, "we draw the[m] from the district court's opinion" "[t]o the extent that they align with the record." Doe v. R.I. Interscholastic League, 137 F.4th 34, 36 (1st Cir. 2025).

Fed. Reg. 1243 (Jan. 9, 2023); Implementation of Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023).

In doing so, DHS justified establishing the CHNV parole programs on two general bases: significant public benefit and urgent humanitarian reasons. More specifically, DHS said that the CHNV parole programs would serve a significant public benefit by (1) enhancing border security, (2) improving the vetting of prospective parolees, (3) relieving the effect of increased migration on the DHS's workforce and resources, (4) reducing the strain on border communities and domestic resources, (5) incentivizing aspiring parolees to enter the United States safely and lawfully, and (6) fulfilling the Biden Administration's foreign policy goal to collaboratively manage migration. Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63515; Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1272; Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1248; Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. at 1260. As for the urgent humanitarian reasons, DHS stated the CHNV parole programs would address the needs of nationals from Cuba, Haiti, Nicaragua, and Venezuela who sought to leave the political instability, social unrest, or dire economic conditions in those countries. Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63515; Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1275; Implementation

of a Parole Process for Haitians, 88 Fed. Reg. at 1251-52;
Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg.
at 1262-63.

Yet being a national of one of the CHNV countries did
not guarantee parole. The programs required each applicant to
meet certain requirements: have a supporter based in the United
States, pass national security and public safety vetting,
demonstrate that a grant of parole was warranted, and comply with
various other requirements. Once paroled, CHNV recipients could
seek other immigration benefits and work authorization in the
United States during the two-year parole period. Implementation
of a Parole Process for Venezuelans, 87 Fed. Reg. at 63508;
Implementation of a Parole Process for Cubans, 88 Fed. Reg. at
1268; Implementation of a Parole Process for Haitians, 88 Fed.
Reg. at 1244; Implementation of a Parole Process for Nicaraguans,
88 Fed. Reg. at 1256.

In October 2024, DHS -- still under the Biden
Administration -- announced that it would not renew or extend the
parole periods beyond the initial two-year period. See Termination
of Parole, 90 Fed. Reg. at 13614 n.24. So, CHNV parolees who did
not receive other immigration authorization would have to leave
the United States upon expiration of their parole period, or else
the Government would place them in removal proceedings.
Implementation of a Parole Process for Venezuelans, 87 Fed. Reg.

at 63508; Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1268; Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1244; Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. at 1256.

**2. Executive Orders and Agency Memorandum**

Shortly after taking office on January 20, 2025, President Trump signed two executive orders relevant to this appeal. Executive Order No. 14165, titled "Securing Our Borders," directed the Secretary to "[t]erminate all categorical parole programs that are contrary to the policies of the United States . . .[,] including the [CHNV parole programs]." 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). And, Executive Order No. 14159, titled "Protecting the American People Against Invasion," instructed the Secretary to "take all appropriate action, consistent with law, to . . . ensur[e] that the parole authority under section 212(d)(5) of the INA (8 U.S.C. § 1182(d)(5)) [would be] exercised on only a case-by-case basis in accordance with the plain language of the statute." 90 Fed. Reg. 8443, 8445-46 (Jan. 20, 2025).

At the same time, then-Acting Secretary of Homeland Security, Benjamin Huffman, published a memorandum about DHS's exercise of the parole authority under 8 U.S.C. § 1182(d)(5)(A). The memorandum provided that 8 U.S.C. § 1182(d)(5)(A) applies in "narrow circumstances and only on a case-by-case basis" and "does

not authorize categorical parole programs." Given this
interpretation of the statute, the memorandum declared that "many
current DHS policies and practices governing parole [we]re
inconsistent with [8 U.S.C. § 1182(d)(5)(A)]." To address that
apparent inconsistency, the memorandum ordered Immigration and
Customs Enforcement, U.S. Citizenship and Immigration Services,
and Customs and Border Protection to review all parole-related
policies and procedures, identify those that were not "strictly in
accord" with 8 U.S.C. § 1182(d)(5)(A), and develop a plan to phase
them out. Pending this review, DHS would have the "discretion to
pause, modify, or terminate any parole program" identified,
subject to certain conditions that are not relevant to the instant
appeal.

### 3. Termination Notice in the Federal Register

On March 25, 2025, DHS published in the Federal Register
the Termination Notice stating that, effective immediately, DHS
was "terminating the categorical parole programs for inadmissible
aliens from Cuba, Haiti, Nicaragua, and Venezuela and their
immediate family members." Termination of Parole Processes,
90 Fed. Reg. at 13611. The Termination Notice further specified
that "[t]he temporary parole period of aliens in the United States
under the CHNV parole programs and whose parole ha[d] not already
expired by April 24, 2025[,] w[ould] terminate on that date unless
the Secretary ma[de] an individual determination to the contrary."

Id.  Accordingly, the Termination Notice explained that the CHNV parolees would have to "depart the United States before their parole termination date."  Id. at 13618-19.

The Termination Notice provided several reasons that "independently and cumulatively" supported DHS's decision to terminate the CHNV parole programs.  Id. at 13612.  It explained that the termination was "appropriate and necessary" because the CHNV parole programs "d[id] not serve a significant public benefit, [we]re not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, [we]re not serving their intended purposes, and [we]re inconsistent with the Administration's foreign policy goals."  Id.  The Termination Notice also stated that DHS "believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis[,] . . . taking into consideration each alien's specific circumstances."  Id.

Moreover, the Termination Notice examined the potential reliance interests of supporters and beneficiaries.  Id. at 13617-20.  At the outset, the Termination Notice explained that "the temporary and discretionary nature of the programs indicate[d] that reliance on the continued existence of the CHNV parole programs would be unwarranted."  Id. at 13617.  The Termination Notice explained that the Federal Register notices issued during the Biden Administration establishing the CHNV

parole programs expressly stated that the Secretary and DHS may terminate parole at any time.  Id.

The Termination Notice also noted that, on October 4, 2024, the Biden Administration announced that "there was no re-parole process under [the CHNV programs]." Id.  The Termination Notice then discussed the potential reliance interests of (1) prospective supporters based in the United States and prospective beneficiaries, (2) prospective beneficiaries with approved advanced travel authorization and their supporters, and (3) current CHNV parolees.  Id. at 13617-20.  As to each group, DHS concluded that the Government's interests outweighed the reliance interests of prospective and current supporters and beneficiaries of the CHNV parole programs.  Id.

With respect to current CHNV parolees specifically, DHS considered two alternatives to early termination of parole: (1) permitting existing CHNV parole grants to remain in effect until they naturally expire or (2) implementing a termination "wind-down" period of more than thirty days.  Id. at 13619-20.  But DHS rejected those alternatives because it interpreted a different provision of the INA, 8 U.S.C. § 1235(b)(1)(iii)(II), to prohibit the use of expedited removal proceedings for ex-parolees who had been continuously present in the U.S. for more than two years.  Id.  DHS explained that permitting existing program participants to remain until their terms of parole naturally

expired would jeopardize its goal of "expeditiously remov[ing] those CHNV parolees with no lawful basis to remain in the United States" using expedited removal proceedings.  Id. at 13620.  It reasoned that permitting ex-parolees to remain in the country for more than two years would "further tax[]" the "already overburdened immigration court system" by requiring the use of regular section 240 removal proceedings, "a result DHS finds unacceptable."  Id.  Thus, it adopted the early termination approach so that it could retain its "ability to initiate expedited removal proceedings to the maximum extent possible."  Id.

### C. Procedural History

About a month after President Trump directed the Secretary to terminate the CHNV parole programs, Plaintiffs sued the Government in the United States District Court for the District of Massachusetts.  Then, on March 25, 2025, DHS published the Termination Notice, and two days later, Plaintiffs moved for (1) a preliminary injunction and (2) a stay of DHS's truncation of grants of parole under the CHNV parole programs.

On April 14, 2025, the district court issued a Memorandum and Order granting in part Plaintiffs' motion.[6]  See

---

[6] Before determining whether to grant preliminary relief, the district court addressed issues of standing, jurisdiction, and class certification.  First, the district court found that Plaintiffs have standing to challenge the early termination of their parole grants.  Second, the district court rejected the Government's challenge to the district court's jurisdiction,

generally Doe, 778 F. Supp. 3d at 319.  Specifically, the district
court stayed DHS's action "insofar as it revoke[d], without
case-by-case review, the previously granted parole and work
authorization issued to" CHNV parolees.  Id.  It also stayed
individual notices of parole revocation pursuant to the
Termination Notice sent to CHNV parolees through their USCIS online
accounts.  Id. at 342.

In determining whether to grant preliminary relief, the
district court evaluated four factors: "(1) whether the stay
applicant has made a strong showing that he is likely to succeed
on the merits; (2) whether the applicant will be irreparably
injured absent a stay; (3) whether issuance of the stay will
substantially injure the other parties interested in the
proceeding; and (4) where the public interest lies."  See id. at
336 (quoting Nken v. Holder, 556 U.S. 418, 425-26 (2009)).

As to the first factor, the district court decided that
at least three reasons indicated that Plaintiffs were likely to
succeed on their claim that the DHS's categorical termination of
existing CHNV parole grants was arbitrary and capricious, in

---

determining that 8 U.S.C. § 1252(a)(2)(B)(ii) does not preclude
judicial review of Plaintiffs' claims and that DHS's termination
of the CHNV parole programs is not "committed to agency discretion
by law" under the APA, 5 U.S.C. § 701(a)(2).  Third, the district
court certified a class of "[a]ll individuals who have received a
grant of parole that is subject to the [Termination Notice]," with
certain exceptions.

violation of the Administrative Procedure Act ("APA"). Id. 336-340. The first reason was that DHS "lacked a rational basis" for disallowing CHNV parolees' grants of parole to expire naturally because the stated reason was based on legal error. Id. In the Termination Notice, DHS justified terminating CHNV parole grants within thirty days because any longer parole period would "foreclose" DHS's ability to deport CHNV parolees using expedited removal. Id. at 336. But the district court noted that "persons who were authorized to enter the United States [are not subject] to expedited removal, regardless of how long they have been in the United States." Id. at 337. The second reason was that the text of the parole authority, 8 U.S.C. § 1182(d)(5)(A), supported Plaintiffs' position that parole termination must occur on an individual, case-by-case basis, rather than on the categorical basis employed by the Trump Administration's DHS. Id. at 339. And the third reason was that Plaintiffs made a strong showing of likelihood of success because the Termination Notice did not sufficiently address the humanitarian concerns behind the initial grants of parole. Id. at 338.

In addressing the second factor for granting a stay, the district court determined that Plaintiffs were likely to suffer irreparable injury absent a stay. Id. at 340. For in the absence of a stay, the district court reasoned, Plaintiffs would be forced to "continue following the law and leave the country on their own,

or await removal proceedings." Id. Thus, either outcome, according to the district court, would inflict irreparably harmful consequences on Plaintiffs. Id.

Finally, as to the third and fourth factors, which it analyzed together, the district court held that the "balance of equities and public interest weigh[ed]" in Plaintiffs' favor. Id. at 341. The district court reasoned that Plaintiffs sought relief only for current CHNV parolees, and the Government did not provide a "substantial reason or public interest that justifies forcing individuals who were granted parole" to leave prematurely. Id. The district court further stated that it was not "in the public interest to summarily declare that hundreds of thousands of individuals are no longer considered lawfully present . . . such that these individuals cannot legally work in their communities or provide for themselves and their families." Id.

The Government appealed the district court's order. A few days later, the Government moved to stay the district court's order pending appeal, which this Court denied on May 5, 2025. Doe v. Noem, No. 25-1384, 2025 WL 1505688 (1st Cir. May 5, 2025). The Government then applied to the Supreme Court for a stay of the district court's order pending appeal. The Supreme Court granted the application, thus staying the district court's order while the merits of it are reviewed, first by our court, and then -- if

- 18 -

certiorari is granted -- by the Supreme Court.  Noem v. Doe, 145
S. Ct. 1524 (2025).

## II. DISCUSSION

"We ordinarily review the grant or denial of a motion
for preliminary injunctive relief for abuse of discretion."
Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151,
158 (1st Cir. 2004); see also id. at 157 (noting that this standard
extends to orders that are "injunctive in nature").  Even under
this "deferential" standard, however, "[a] material error of law
constitutes an abuse of discretion."  González-Fuentes v. Molina,
607 F.3d 864, 875 (1st Cir. 2010).  We therefore review questions
of law, like the statutory interpretation issues presented here,
de novo.  Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics
& Election Pracs., 144 F.4th 9, 19 (1st Cir. 2025).

At the outset, we must emphasize that no constitutional
claims are involved in this appeal.  Rather, this appeal only
involves the Government's challenge to the district court's (1)
statutory interpretation of the INA, (2) conclusion that the
Termination Notice violated the APA because it was arbitrary and
capricious (either because the Secretary's decision rested on
legal error or because it insufficiently addressed the change in
policy and reliance interests), and (3) application of the stay
factors.

In contesting the district court's ruling, the Government advances two main arguments. First, the Government posits that the district court erred in determining it could review the Secretary's discretionary decision to categorically terminate the grants of parole under the CHNV parole programs. Second, the Government claims that Plaintiffs did not demonstrate a strong likelihood of success on their APA claims because the Secretary's decision was not arbitrary and capricious.

### A. The Jurisdictional Hurdle

In cases where an appellant challenges our jurisdiction, we first consider the jurisdictional issue. The Government argues that both 8 U.S.C. § 1252(a)(2)(B)(ii) and the APA preclude review of the Secretary's discretionary decision to categorically terminate parole. Section 1252(a)(2)(B)(ii) provides that "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of . . . the Secretary of Homeland Security." Similarly, the APA authorizes judicial review of agency action "except to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

We need not decide these reviewability issues at present. For we have previously said that "[w]here a 'case poses a question of statutory, not Article III, jurisdiction' and where

'a decision on the merits will favor the party challenging the court's jurisdiction,' we may assume that we have jurisdiction to reach the merits of an appeal." Johansen v. Liberty Mut. Grp., 118 F.4th 142, 148 (1st Cir. 2024) (quoting Caribe Chem Distribs., Corp. v. S. Agric. Insecticides, Inc., 96 F.4th 25, 28 (1st Cir. 2024)).  Because we are deciding this appeal in the Government's favor, we bypass the jurisdictional question and move to the merits.  See Cowels v. FBI, 936 F.3d 62, 67 (1st Cir. 2019) ("Where a question of statutory jurisdiction is complex, . . . we can assume jurisdiction for purposes of deciding the appeal.").

### B.  Stay Factors

"A stay is not a matter of right, even if irreparable injury might otherwise result." Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)).  The "burden of showing that the circumstances justify an exercise of . . . discretion" rests with the party requesting a stay -- here, the plaintiffs.  Id. at 433-34.  In determining whether to grant or deny a stay, the court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. at 434 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see also id. ("There is substantial overlap between [stay

factors] and the factors governing preliminary injunctions . . . because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."). "The first two factors . . . are the most critical." Id. Here, because we hold that Plaintiffs failed to make a strong showing of likelihood of success on the merits, we focus our review on that issue.[7]

The Government contends that Plaintiffs did not demonstrate a strong likelihood of success on their APA claims because the decision to terminate grants of parole under the CHNV parole programs en masse is within the Secretary's authority and otherwise not arbitrary and capricious. We address each argument seriatim.

## 1. Authority to Terminate Parole

We begin with the Government's assertion that the parole statute permits en masse termination of parole. The district court held that the statutory text "contemplate[s] termination of parole on an individual, rather than categorical, basis." Doe, 778 F.

---

[7] In its brief, the Government suggests at times that the district court's order was a preliminary injunction and not a stay. But even if we were to treat the relief granted as a preliminary injunction, our decision here would not change because "we consider basically the same factors when reviewing a preliminary injunction on the merits as we do in considering a stay motion." Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 38 (1st Cir. 2022) (comparing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) with Nken, 556 U.S. at 434).

Supp. 3d at 339.  We read the statute differently and thus, we conclude that Plaintiffs have not demonstrated a strong likelihood of success in showing that under the statute, the Secretary must terminate these grants of parole under the CHNV program on an individual basis.

As customary, our interpretation of any statute begins with its text.  Asociación De Detallistas De Gasolina De P.R., Inc. v. Puerto Rico, 138 F.4th 686, 695 (1st Cir. 2025).  "A statute is ambiguous only if it admits of more than one reasonable interpretation."  United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008) (quoting Gen. Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006)).  If the statutory text is ambiguous or unclear, we may look to legislative history to ascertain congressional intent.  Lapine v. Town of Wellesley, 304 F.3d 90, 97 (1st Cir. 2002).  With those principles in mind, we turn to § 212(d)(5)(A) of the INA.

As we said earlier, § 212(d)(5)(A) of the INA empowers the Secretary with the discretion to "parole into the United States temporarily under such conditions as [s]he may prescribe."  8 U.S.C. § 1182(d)(5)(A).  But the Secretary's parole authority, of course, is not limitless.  The statute specifies that the Secretary's decision to grant parole must be carried out "only on

a case-by-case basis" and "for urgent humanitarian reasons or significant public benefit."  Id.

On the other hand, the clause describing the Secretary's authority to terminate any grants of parole does not contain the same limiting language.  Indeed, Congress allows the Secretary to terminate parole "when the purposes of such parole shall, in [her] opinion . . . have been served."  Id.  When Congress uses limiting language -- as it does in the antecedent clause -- "we must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others."  Gallardo ex rel. Vassallo v. Marstiller, 596 U.S. 420, 431 (2022).  Giving every word effect, the statutory text thus reflects a deliberate choice on the part of Congress to require the Secretary to implement a case-by-case approach to granting parole, but not to end such grants.  The statutory text, therefore, favors an interpretation that the "case-by-case" requirement only limits the Secretary's discretion to grant parole.  Id.

Moreover, one cannot necessarily presume that termination of parole must proceed case-by-case merely because the granting of parole proceeds case-by-case.  Granting parole, as here, requires a two-pronged judgment on the part of the executive branch: (1) that there exists a policy that will be furthered by the granting of parole meeting certain conditions and (2) that the particular applicant satisfies those conditions.  Once the

executive branch determines, however, that achieving the policy aim is no longer possible or desired, then it takes no individualized determination in any way to ascertain those persons for whom it can no longer be said that parole furthers the country's interest.

The district court, on the other hand, emphasized that "Section 1182(d)(5)(A) refers in singular, rather than plural, to grants of parole." Doe, 778 F. Supp. 3d at 339. Working from that premise, the district court determined that the antecedent singular referent also extends to terminations, for the text continues using the singular when referring to the conditions upon which the Secretary may terminate parole. As a result, the district court concluded, the termination of parole requires an individualized, rather than a categorical, analysis. Id. Not so.

That the provision's text is written in the singular form does not resolve the question. First, the Dictionary Act instructs courts that in statutes, "words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. And we do so "unless the context [of the statute] indicates otherwise." Id. The context of the statute here, however, does not indicate that the Secretary must engage in individualized terminations of parole. Second, Congress's decision to add the "case-by-case" language only to the clause "granting" parole suggests that it intended to narrow only DHS's

ability to categorically grant parole, not to restrain a categorical termination of the same. And a court cannot rewrite the statute to say otherwise. See Biden, 597 U.S. at 803 ("The statutory grant of discretion here contains no such caveat, and we will not rewrite it to include one.").

The legislative history of the "case-by-case" language also weighs in favor of the Government's interpretation. As we noted above, IIRIRA replaced "for emergent reasons or for reasons deemed strictly in the public interest" with "only on a case-by-case basis." Pub. L. No. 104-208, div. C, § 602, 110 Stat. 3009, 3009-689 (1996). The parole authority was one of the "special provisions and exceptions" Congress sought to restrict through IIRIRA. H.R. Rep. 104-469, pt. 1, at 111 (1996). The accompanying House Report explained that "in recent years, parole ha[d] been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." Id. at 140. That practice, the House Report deemed, "contravene[d] the intent of" parole, which Congress "intended to be used on a case-by-case basis." Id. Congress added the "case-by-case" requirement with the explicit intent of limiting the Secretary's discretion to grant parole. Id. Opponents of the bill noted as much, considering the amendment to impose "sweeping new restrictions on the" Secretary's parole authority. Id. at 538. The legislative history thus makes clear

that Congress was specifically concerned with limiting grants of parole rather than limiting the ability to effect its termination.

Because the text and legislative history favor the Government's position, we conclude that the Plaintiffs have not demonstrated a strong likelihood of success in establishing that the statute requires the Secretary to end grants of parole under the CHNV program on a case-by-case basis. As a result, by otherwise interpreting the applicable statutory provision, the district court legally erred in issuing injunctive relief. See Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986) ("We may reverse a district court's order granting a preliminary injunction only for an abuse of discretion or a clear error of law.").

## 2. Sufficient Explanation of the Termination

Having determined that the statute does not require individualized termination of parole, we now consider whether under the APA the Secretary's decision to terminate parole early for existing CHNV program recipients was arbitrary and capricious. The district court concluded that the Secretary's decision was arbitrary and capricious because "it was based on a legal error and failed to explain why humanitarian concerns no longer justified the original periods of parole" under the CHNV programs. Doe, 778 F. Supp. 3d at 339. In this section, we address the alleged legal error -- DHS's interpretation of the law governing expedited

removal -- and the other reasons why the district court found the termination to be arbitrary and capricious.

**a. Alleged Legal Error**

The APA instructs a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision cannot be discerned."  Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)).  Agency action that is premised on a "legal error" runs afoul of this standard.  See Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024) (quoting United States v. Sawyer, 521 F.3d 792, 794 (7th Cir. 2008)); Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943) ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.").

The district court determined that Plaintiffs were likely to prevail on their argument that the Secretary's decision to terminate parole for existing parole recipients could not stand because it was based on an "obvious legal error."  Doe, 778 F.

Supp. 3d at 336-37.  The Secretary's explanation for termination rested on the premise that the INA, 8 U.S.C. § 1225(b)(1)(A)(iii)(II), prohibited the use of expedited removal proceedings for prior parole recipients who had been continuously present in the country for at least two years.  DHS explained that it sought to terminate parole early for existing parolees -- rather than permit their parole to naturally expire -- to minimize the number of people who would have otherwise been ineligible by statute for expedited removal proceedings by virtue of their two-year continuous presence in the United States.  Termination of Parole Processes, 90 Fed. Reg. at 13619-20.  But the district court agreed with Plaintiffs that, to the contrary, "[t]he statute does not subject persons who were authorized to enter the United States to expedited removal, regardless of how long they have been in the United States."  Doe, 778 F. Supp. 3d at 337.  Thus, it reasoned, the premise of DHS's proffered rationale for terminating parole for existing recipients was faulty in this respect.  The Government challenges the district court's interpretation of this provision of the INA.

We address this issue mindful of Plaintiffs' burden, in the context of a stay, to demonstrate a strong likelihood of success.  We cannot agree that Plaintiffs have made such a strong showing here.

The INA permits only those "who ha[ve] not been admitted or paroled into the United States" to be subject to expedited removal proceedings.  8 U.S.C. § 1225(b)(1)(A)(iii)(II).  The parties reasonably disagree on the meaning of "ha[ve] been . . . paroled" in this context.  Plaintiffs and the district court reasonably read the language to mean those who have been granted parole at some point in the past, whether or not that parole has since been terminated.  Doe, 778 F. Supp. at 337.  Viewed this way, no prior recipient of parole can be subject to expedited removal proceedings.  The Government, on the other hand, reasonably reads "ha[ve] been . . . paroled" to refer to those with the current status of being paroled.  Under that reading, the statute clarifies that those people who are currently paroled may not be subject to expedited removal proceedings.  Id.  However, it does not impose a categorical ban on the use of expedited removal proceedings for those whose past parole has since been terminated.

Both readings are plausible because, as Plaintiffs point out, "parole" can refer to both a manner of entry and a status.  See Sanchez v. Mayorkas, 593 U.S. 409, 415 (2021) ("Lawful status and admission . . . are distinct concepts in immigration law.").  Similarly, the present perfect tense (e.g., "ha[ve] been . . . paroled") can be used both to "denot[e] an act that has been completed," Barrett v. United States, 423 U.S. 212, 216 (1976), and to denote an event that continues to be true into the present,

_Hewitt_ v. _United States_, 145 S. Ct. 2165, 2172 (2025).  And
although both sides offer regulations in support of their proffered
interpretations, the fact that different regulations appear to
support both interpretations does not shed light on which
interpretation Congress intended.  Compare 8 C.F.R. §
212.5(e)(2)(i) (instructing that further proceedings may occur
after the termination of parole under Section 235 of the INA, which
includes expedited removal proceedings), with id. § 235.3(b)(6)
(giving a person an opportunity to establish that they were
"admitted or paroled into the United States following inspection
at a port-of-entry" before being subject to expedited removal).

But since the Government's interpretation of the statute
is persuasive enough, we cannot discern a "clear legal error," as
the district court put it, in DHS's reasoning proffered in the
Termination Notice.  We therefore are unable to conclude that
Plaintiffs made the required strong showing that the agency's
action was "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law" on this basis alone.  5
U.S.C. § 706(2)(A).  Plaintiffs accordingly did not make a "strong
showing that [they are] likely to succeed on the merits" in this
respect.  Nken, 556 U.S. at 434.

**b.  Additional Reasons**

As additional, independently sufficient reasons
supporting the stay, the district court concluded that the

termination was arbitrary and capricious. The district court so concluded in part because the Termination Notice "did not attend to any of the humanitarian reasons underlying the creation of the CHNV programs" and because "the significant reliance interests at stake -- which the [Termination Notice] recognized as aliens departing their native countries, incurring expenses traveling to the United States, obtaining housing and means of transport, and building connections in their communities -- [required DHS] to give a justification for terminating existing grants of parole within 30 days instead of on the original termination dates." Doe, 778 F. Supp. 3d at 338. We disagree. As explained forthwith, we conclude that Plaintiffs have not made a strong showing that they are likely to succeed in demonstrating that the Secretary's action was arbitrary and capricious because she provided a reasoned explanation for terminating grants of parole under the CHNV programs.

The APA mandates "an executive agency's exercise of discretion be reasonable and reasonably explained." Biden, 597 U.S. at 815 (Kavanaugh, J., concurring). The change-in-position doctrine -- which applies when the agency is changing its existing policy -- is relevant in assessing DHS's action. "Under that doctrine, agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious

reliance interests." FDA v. Wages & White Lion Invs., LLC, 145 S. Ct. 898, 917 (2025) (citation modified). To satisfy the requirement that it provide reasoned explanation for its action, "the agency must show that there are good reasons for the new policy." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

The Supreme Court has clarified that the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." Id. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Id. "This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." Id.

Of course, the agency must consider the impact the policy change will have on any "serious reliance interests." Wages & White Lion Invs., 145 S. Ct. at 917. To do so, it must consider "whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020). On the other hand, "[r]eview under the arbitrary and capricious standard is narrow and this [c]ourt may not substitute its judgment for that of the agency, even if it

disagrees with the agency's conclusions." River St. Donuts, LLC v. Napolitano, 558 F.3d 111, 114 (1st Cir. 2009).

Here, the parties disagree with the scope of the reasons that we should review from the Termination Notice.  The Plaintiffs contend, for instance, that we should examine only the reason given in the section of the Termination Notice that addressed the "Effect on Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests."  The reason listed there was DHS's interest in preserving the ability to pursue expedited removal, which -- as addressed above -- Plaintiffs contended was a legal error.  In contrast, the Government argues that we should also include all of the reasons in the Termination Notice more generally, concerning, for example, the cancellation of the CHNV parole programs moving forward and the denial of all pending CHNV parole applications.  Those reasons include the Secretary's assessments that: neither urgent humanitarian reasons nor significant public benefit warranted continuing the CHNV programs; that the CHNV parole programs had not improved border security; that parolees were competing for limited resources, including public benefits; and that parolees were exacerbating immigration system backlogs.  Termination of Parole Processes, 90 Fed. Reg. at 13612-18.  The Secretary also stated that parolees' reliance interests are minimized where, as here, the grants were discretionary, limited to two years, and DHS repeatedly warned

that they could be revoked at any time. Id. at 13617-20. We agree with the Government that reviewing all of the reasons stated in the Termination Notice in conjunction better accords with our deferential standard of review.

Unlike the Supreme Court decision in Regents, where the Secretary did not address the reliance interests of Deferred Action for Childhood Arrivals beneficiaries in terminating the policy, see 591 U.S. at 15, 30-33, here the Secretary considered and addressed the reliance interests of CHNV parolees and their supporters. See Termination of Parole Processes, 90 Fed. Reg. at 13618-19 (considering and discussing "the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period"). The Plaintiffs, of course, disagree with the Secretary's reasoning and the weight that she gave to their significant reliance interests. But while we have no doubt that many parolees have conducted their lives based on a hope that the parole would run for a full two years -- and perhaps serve as a bridge to further immigration opportunities -- the Secretary nonetheless considered the impact of the premature termination on the reliance interests of the parolees and their supporters in the United States. And so, we cannot say that the Secretary's explanation was so deficient that Plaintiffs have made a strong showing that they are likely to succeed on the deferential arbitrary and capricious standard.

Finally, we note that the Secretary explained that humanitarian considerations are "best addressed on a case-by-case basis" because that approach would be more "consistent with the statute" and would take "into consideration each [person]'s specific circumstances." Termination of Parole Processes, 90 Fed. Reg. at 13612. Although this statement is somewhat conclusory, when read in combination with the other reasons given throughout the Termination Notice, it does not seem so deficient as to enable the Plaintiffs to make a strong showing of likelihood of success on the merits. Our conclusion is bolstered by the brevity of DHS's original explanation of the humanitarian reasons undergirding the establishment of the CHNV program. See Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63515; Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1275; Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1251-52; Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. at 1262-63 (providing a short paragraph summarily describing general "humanitarian conditions" in each country). It is difficult to fault a conclusory explanation for a change in policy when the basis for the policy's establishment was similarly conclusory.

In sum, we hold that the Plaintiffs have not made a strong showing that they are likely to succeed in showing that the Secretary's decision to terminate the CHNV parole programs

exceeded her discretion as authorized by the INA.  We also conclude that Plaintiffs have not made a strong showing that they are likely to succeed in demonstrating that the Secretary's termination was so insufficiently reasoned as to clear the hurdle presented by the "arbitrary and capricious" standard.

We recognize the risks of irreparable harm persuasively laid out in the district court's order: that parolees who lawfully arrived in this country were suddenly forced to choose between leaving in less than a month -- a choice that potentially includes being separated from their families, communities, and lawful employment and returning to dangers in their home countries (as well as potentially abandoning their APA claims) or staying after the loss of their legal status, which means the risk of removal proceedings and detention, the loss of any work authorization, and potential effects on their eligibility for other forms of immigration relief in the future.  Doe, 778 F. Supp. 3d at 329, 340.  But absent a strong showing of likelihood of success on the merits, the risk of such irreparable harms cannot, by itself, support a stay.  See Nken, 556 U.S. at 434 (noting that the first two stay factors are the "most critical" and require more than a possibility).  Given this conclusion on the "most critical" factors, we need not consider the final two Nken factors.  See 556 U.S. at 435; see also Ohio v. EPA, 603 U.S. 279, 292 (2024) ("Because each side has strong arguments about the harms they face

and equities involved, our resolution of these stay requests ultimately turns on the merits and the question who is likely to prevail at the end of this litigation.").

### III. CONCLUSION

For the foregoing reasons, we **vacate** the district court's order and **remand** for further proceedings consistent with this opinion.[8]

It is so ordered.

---

[8] We note that Plaintiffs' second amended complaint includes a constitutional due process cause of action as well as other claims not before us. Our holding today is limited to only those arguments raised in this appeal.